Danny Newman, WSBA 61824
  (Lead Attorney)
  Email: danny.newman@tonkon.com
TONKON TORP LLP
1300 SW Fifth Ave., Suite 2400
Portland, OR 97201
Main: 503.221.1440
Facsimile: 503.274.8779
  *Attorneys for Debtors and*
  *Debtors-in-Possession*

- and -

Michael J. Gearin, WSBA 20982
  Email: michael.gearin@klgates.com
K&L Gates LLP
925 Fourth Ave., Suite 2900
Seattle, WA 98104-1158
  *Attorneys for Official Committee of*
  *Unsecured Creditors of Refreshing*
  *USA, LLC, Water Station Management*
  *LLC, and Creative Technologies, LLC*

HONORABLE FREDERICK P. CORBIT

# UNITED STATES BANKRUPTCY COURT

# EASTERN DISTRICT OF WASHINGTON

REFRESHING USA, LLC,

Debtors[1],

**DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025)**

---

[1] Debtors and debtors-in-possession in these Chapter 11 cases ("*Bankruptcy Case(s)*"), along with the last four digits of their respective Employer Identification Numbers, are as follows: Refreshing USA, LLC (85-3358945) ("*Refreshing*"), Case No. 24-01863-11; Water Station Management LLC (81-1202716) ("*Water Station*"), Case No. 24-01864-11; and Creative Technologies, LLC (46-2581888) ("*Creative*" and, together with Refreshing and Water Station, "*Debtors*"), Case No. 24-01866-11. Debtors' mailing address is: 2732 Grand Ave., Ste. 122, Everett, WA 98201.

ARTICLE 1.   INTRODUCTION ..................................................................1

ARTICLE 2.   GENERAL SUMMARY OF THE PLAN .................................4

ARTICLE 3.   EVENTS LEADING TO CHAPTER 11 CASES .....................5

ARTICLE 4.   SIGNIFICANT POST-PETITION EVENTS .........................7

A.   Joint Administration and Transfer of Venue .................................8
B.   Appointment of Committee .............................................................8
C.   Engagement of Professionals ..........................................................8
D.   Contributed Properties ....................................................................8
E.   Filing of Schedules ..........................................................................9
F.   Claims Bar Dates .............................................................................9
G.   Marketing and Sale of Personal Property Assets ..........................9
H.   Mergers .............................................................................................9
I.   First Fed Settlement .......................................................................10

ARTICLE 5.   TREATMENT OF CLASSIFIED CLAIMS .........................10

A.   General ............................................................................................10
B.   Unclassified Claims .......................................................................10
C.   Classified Claims ...........................................................................10

ARTICLE 6.   MEANS FOR IMPLEMENTATION OF THE PLAN.................15

A.   Restructuring Transactions ..........................................................15
B.   Sources of Consideration for Plan Distributions .........................16
C.   Liquidation Trust, Liquidation Trustee, and Liquidation Trust
     Supervisory Board .........................................................................19
D.   Cancellation of Securities and Agreements .................................20
E.   Company Action .............................................................................20
F.   Effectuating Documents; Further Transactions ...........................21
G.   Section 1146 Exemption ................................................................21
H.   Preservation of Retained Causes of Action .................................22
I.   Closing the Chapter 11 Cases .......................................................22
J.   U.S. Securities and Exchange Commission ..................................23

ARTICLE 7.   SUBSTANTIVE CONSOLIDATION ................................23

ARTICLE 8.   TYLER SADEK AND RYAN WEAR ...............................24

A.   Tyler Sadek .....................................................................................24

i

B.      Ryan Wear ........................................................................................24

ARTICLE 9.      LIQUIDATION TRUST ................................................24

A.      Liquidation Trust Criteria ..............................................................25
B.      Purpose of the Liquidation Trust ...................................................25
C.      Liquidation Trust Assets ................................................................25
D.      Beneficiaries of the Liquidation Trust ..........................................27
E.      Distribution of the Liquidation Trust Assets .................................27
F.      Transfer of Assets to the Liquidation Trust ..................................27
G.      Interests in the Liquidation Trust Assets .......................................28
H.      Appointment of the Liquidation Trustee ........................................28
I.      Rights and Powers of Debtors and the Liquidation Trustee...........28
J.      Distribution and Withholding ........................................................29
K.      Insurance ........................................................................................29
L.      Other Rights and Remedies ...........................................................29
M.      Priority Claims Reserve .................................................................30
N.      Disputed Claims Reserve ...............................................................31
O.      Attribution of Income ....................................................................31
P.      Current Basis ..................................................................................31
Q.      Tax Identification Numbers ............................................................31
R.      Wind-Down .....................................................................................32
S.      Termination of the Liquidation Trust and Liquidation Trustee .....32
T.      Transfer of Beneficial Interests .....................................................33

ARTICLE 10.    ASSETS AND LIABILITIES......................................33

ARTICLE 11.    EXECUTORY CONTRACTS AND UNEXPIRED
                LEASES .......................................................................34

ARTICLE 12.    CONFIRMATION AND VOTING PROCEDURES...................35

A.      Confirmation Procedures ...............................................................35
B.      Procedure for Objections ...............................................................35
C.      Requirements for Confirmation .....................................................35
D.      Classification of Claims and Interests ...........................................36
E.      Impaired Claims/Voting .................................................................36
F.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the
        Bankruptcy Code ............................................................................38
G.      Feasibility ......................................................................................39
H.      Best Interests Test and Liquidation Analysis ................................40

ARTICLE 13.    EFFECT OF CONFIRMATION ..................................41

A.      Binding Effect..................................................................................41

24-01863-FPC11      Doc 1051      Filed 07/01/25      Entered 07/01/25 17:03:07      Pg 3 of 61

B.    Injunction ...................................................................................41
C.    RESERVED.................................................................................42
D.    Modification, Revocation, or Withdrawal of Plan .......................................42
E.    Retention of Jurisdiction..............................................................42
F.    United States Trustee Fees ..............................................................44

ARTICLE 14.    GENERAL TAX CONSEQUENCES ON CREDITORS ............45

ARTICLE 15.    CERTAIN RISK FACTORS TO BE CONSIDERED
               PRIOR TO VOTING ........................................................45

A.    The Plan May Not be Accepted...................................................46
B.    The Plan May Not be Confirmed ..............................................46
C.    Distributions to Holders of Allowed Claims Under the Plan May be
      Inconsistent With Projections.................................................46
D.    Objections to Classification of Claims .........................................47
E.    Failure to Consummate the Plan ..............................................47
F.    Certain Tax Considerations ....................................................48

ARTICLE 16.    MISCELLANEOUS ..................................................55

iii

# ARTICLE 1.
## INTRODUCTION

Debtors and the Committee jointly propose the Debtors' and Committee's Joint First Amended Chapter 11 Plan of Liquidation attached to this Disclosure Statement as **Exhibit 1** ("*Plan*"). Debtors and the Committee are seeking acceptance of the Plan by Debtors' creditors that are entitled to vote on the Plan. A ballot has been enclosed with this Disclosure Statement for use in voting on the Plan. Debtors and the Committee believe confirmation of the Plan is in the best interest of Debtors' creditors and asks those parties entitled to vote to vote in favor of the Plan.

TO BE COUNTED FOR VOTING PURPOSES, BALLOTS FOR THE ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY DEBTORS NO LATER THAN 4:00 P.M. PACIFIC TIME ON _____, 2025 AT THE FOLLOWING ADDRESS:

> Tonkon Torp LLP
> Attn: Spencer Fisher/Refreshing
> 1300 SW 5th Avenue, Suite 2400
> Portland, Oregon 97201

The purpose of this Disclosure Statement is to provide you with adequate information to enable you to make an informed judgment concerning whether to vote for or against the Plan. Please review this Disclosure Statement and the Plan in their entirety and, if appropriate, consult with legal counsel before voting on the Plan.

Capitalized terms used but not defined in this Disclosure Statement have the meanings assigned to such terms in the Plan or the Bankruptcy Code.

This Disclosure Statement has been approved by Order of the Bankruptcy Court as containing adequate information to permit parties-in-interest to make an informed judgment as to whether to vote to accept or reject the Plan. The Bankruptcy Court's approval of this Disclosure Statement, however, does not constitute a recommendation by the Bankruptcy Court either for or against the Plan.

The description of the Plan contained in this Disclosure Statement is intended as a summary only and is qualified in its entirety by reference to the Plan itself. This Disclosure Statement does not attempt to summarize or discuss every aspect of the Plan. If any inconsistency exists between the Plan and this Disclosure Statement, the terms of the Plan are controlling. This Disclosure Statement may not be relied on for any purpose other than to determine how to vote on the Plan.

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 1

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan to commence on **_____, 2025 at _:__ _.m. Pacific time**. That hearing will be held at the U.S. Bankruptcy Court for the Eastern District of Washington, 904 West Riverside Avenue, Spokane, Washington 99201, before the Honorable Frederick P. Corbit. The hearing on confirmation may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the hearing on any adjournment thereof.

This Disclosure Statement has been prepared by Debtors and the Committee in good faith based upon information available to Debtors and the Committee. The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein, and the delivery of this Disclosure Statement shall not imply there has been no change in the facts set forth herein since the date of this Disclosure Statement and the date the material relied on in preparation of this Disclosure Statement was compiled.

<u>ADDITIONAL DISCLAIMERS</u>

EACH HOLDER OF A CLAIM AGAINST DEBTORS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THE TERMS HEREOF AND SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE.

THE PLAN AND DISCLOSURE STATEMENT HAVE BEEN PREPARED IN ACCORDANCE WITH SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 3016 AND 3017, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST, OR INTERESTS IN, DEBTORS SHOULD EVALUATE THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. NEITHER THE PLAN NOR THE DISCLOSURE STATEMENT SHALL BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, DEBTORS. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

THE DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND FINANCIAL

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 2

INFORMATION. ALTHOUGH DEBTORS BELIEVE THE STATEMENTS AND DESCRIPTIONS CONTAINED IN THE DISCLOSURE STATEMENT ARE TRUE AND ACCURATE, THEY ARE QUALIFIED TO THE EXTENT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DOCUMENT OR APPLICABLE STATUTORY PROVISION. THE TERMS OF THE DOCUMENTS RELATED TO THE PLAN OR DISCLOSURE STATEMENT AND APPLICABLE STATUTES GOVERN IN THE EVENT OF ANY DISCREPANCY WITH THE PLAN OR DISCLOSURE STATEMENT. CREDITORS AND OTHER INTERESTED PARTIES SHOULD READ BOTH THE PLAN AND THE DISCLOSURE STATEMENT, THE DOCUMENTS RELATED TO THE PLAN AND DISCLOSURE STATEMENT, AND THE APPLICABLE STATUTES THEMSELVES FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE FACTUAL STATEMENTS AND REPRESENTATIONS CONTAINED IN THE DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED, AND DEBTORS DISCLAIM ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS. DELIVERY OF THE PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

ALL FORWARD-LOOKING STATEMENTS INVOLVE MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS BEYOND DEBTORS' CONTROL. DEBTORS DO NOT INTEND TO UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED THEREIN WILL NOT BE REALIZED.

ANY PROJECTED RECOVERIES TO CREDITORS SET FORTH IN THIS DISCLOSURE STATEMENT ARE BASED UPON THE ANALYSES PERFORMED BY DEBTORS AND THEIR ADVISORS. ALTHOUGH DEBTORS AND THEIR ADVISORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN, DEBTORS AND THEIR ADVISORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THIS INFORMATION.

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 3

THE DISCLOSURE STATEMENT IS TO BE USED SOLELY IN CONNECTION WITH EVALUATING THE PLAN. NOTHING STATED IN THE PLAN OR DISCLOSURE STATEMENT SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING DEBTORS OR ANY OTHER PARTY.

## ARTICLE 2.
## GENERAL SUMMARY OF THE PLAN

All descriptions of the Plan in this Disclosure Statement are qualified in their entirety by reference to the Plan. Below is a general summary of the Plan, a copy of which is attached hereto as **Exhibit 1**.

Debtors are no longer operating entities and are in the process of liquidating their Assets. To the extent the proceeds of such sales are distributed before the Effective Date of the Plan, they will be distributed in accordance with Orders entered by the Bankruptcy Court, or pursuant to the Plan or Confirmation Order.

Some of the proceeds of such sales and some of Debtors' Assets will not have been distributed or liquidated prior to the Effective Date of the Plan. Accordingly, the Plan provides for the creation of a Liquidation Trust and the appointment of a Liquidation Trustee (see Articles 7 and 11 of the Plan) to liquidate Debtors' remaining Assets, administer Claims, make Distributions to Creditors, and wind up Debtors' affairs. The Liquidation Trustee is subject to the supervision and oversight of the three-member Liquidation Trust Supervisory Board.

The Plan is a substantively consolidated Plan for all Debtors, and serves as a motion to substantively consolidate Debtors, with the Confirmation Order ordering such consolidation. Moreover, the Plan substantively consolidates or merges certain non-Debtor affiliates (listed in Article 8 of the Plan). Further, such merger and substantive consolidation represents a settlement of Debtors' and non-Debtor affiliates' claims against their affiliate Ideal Property Investments LLC, including their substantive consolidation claims. The Plan retains each Debtor's right to assert fraudulent conveyance actions against recipients of such transfers from each Debtor.

Administrative Claims and Priority Tax Claims are addressed in Article 4 of the Plan. Administrative Claims and Priority Tax Claims are not classified and do not vote on the Plan.

The Plan has nine separate Classes, each addressed in Article 5 of the Plan.

Classes 1 through 5 consist of the Secured Claims of Secured Creditors. Each Secured Creditor should carefully review its particular treatment under the Plan.

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 4

Class 6 consists of all Other Priority Claims. The Plan provides that each Holder of an Allowed Other Priority Claim will receive, at the option of Debtors, either (a) the full unpaid amount of such Allowed Other Priority Claim in Cash on the Effective Date; or (b) equal annual installment payments in Cash, of a total value equal to the Allowed amount of such Other Priority Claim, over a period ending not later than five years after the Petition Date. Class 6 is entitled to vote on the Plan.

Class 7 consists of all General Unsecured Claims. The Plan provides that each Holder of an Allowed General Unsecured Claim will receive its pro rata share of the GUC Recovery. To the extent a Holder of an Allowed General Unsecured Claim elects to contribute its non-estate claims to the Liquidating Trust and otherwise opt in to treatment as described in the opt-in provisions of the Plan (Article 6.B), such electing creditor shall receive an enhanced dividend on its claim in the amount of 10% of the dividend amount that such creditor would have received if no unsecured creditors had elected to opt-in. Electing creditors will also be entitled to the benefit of the First Fed release under the terms of the First Fed Settlement. The Liquidation Trust is described below in this Disclosure Statement and in Articles 7 and 11 of the Plan. General Unsecured Claims are entitled to vote on the Plan. **At the time of filing this Disclosure Statement, Debtors cannot estimate with any certainty the range of recovery to Holders of Allowed General Unsecured Claims. Prior to the Voting Deadline, Debtors will file a Plan Supplement that will, among other things, contain a general summary of Assets and liabilities (including an update on Asset sales), and, if possible, an estimated range of recovery to Holders of Allowed General Unsecured Claims.**

Class 8 consists of Subordinated Claims. The Plan provides that Subordinated Claims will not receive anything on account of their Claims. Holders of Subordinated Claims are conclusively deemed to have rejected the Plan and Class 8 is not entitled to vote on the Plan.

Class 9 consists of all Interests. The Plan cancels all Interests as of the Effective Date. Holders of Interests are conclusively deemed to have rejected the Plan and Class 9 is not entitled to vote on the Plan.

**ARTICLE 3.**
**EVENTS LEADING TO CHAPTER 11 CASES**

Debtors ceased operations shortly after the Petition Date due to the lack of cash flow to fund ongoing operations. Prior to ceasing operations, Debtors owned and operated water machine and vending machine assets throughout the United States. Creative Technologies, LLC ("*Creative*") manufactured (partially) and sold water purification machines; Water Station Management LLC ("*Water Station*") sourced,

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 5

placed, and serviced water machines purchased by investors (who make up the Committee's members); and Refreshing USA, LLC ("*Refreshing*") and its subsidiaries owned and operated vending machines across the United States. Refreshing was the central financial clearinghouse for Debtors and their subsidiaries.

Prior to the Petition Date, Debtors had several models of Water Machines on the market, including (a) the WST 700, which Debtors described as "a state-of-the-art water dispensing system that purifies drinking water to a very high standard and percolates it through layers of natural minerals to produce a soft, silky water in one-, three-, and five-gallon increments;" (b) the WST 600, which Debtors described as "The only single-serve vending machine that creates virtual spring water through a natural mineralization process, and it's bottle-less!  The WST 600 delivers alkaline mineral water in a single-serve portion allowing the consumer to fill their favorite reusable cup or sports bottle;" and (c) the WST 200, described as a "modern and attractive water cooler[, that] is a closed system keeping environmental contaminants out.  Cold or hot water is safely dispensed directly to your cup or bottle."  For the most part, Debtors did, or do not, own these Water Machines.  Rather, the Water Machines were sold by Water Station as part of a packaged services agreement with Water Station (each a "*Services Agreement*") that included, among other things, the purchaser/investor in the Water Machine itself supplying the capital (e.g., $15,000) ostensibly to fund a purchase from Creative, who would then manufacture the Water Machine, and Water Station would handle all logistical aspects of the Water Machine, including finding a location to install it, negotiating revenue share agreements with the landlord, installation of the Water Machine, and servicing and repairing the Water Machine, in exchange for a service fee with the purchaser/investor, with the purchaser/investor getting the remaining income (revenue, less landlord revenue share, less Water Station management fee, less rent).

Although the number of units in existence is far fewer than previously understood, there are a few thousand Water Machines located across the country at locations that Debtors serviced and located at numerous warehouses across the United States that are not, or never were, in service.  At some point, the business faltered; Debtors fell behind in making payments to machine purchasers and landlords; litigation ensued and injunctive relief was issued; and such lawsuits and missed payments caused breaches of the leases with Landlords, who called defaults and demanded pickup of the Water Machines.  The situation snowballed, causing further disruption and cashflow issues, and then the receivership (described below) began, which exacerbated those issues further.  Additionally, many Water Machines that Debtors represented as sold either did not exist or were never placed in service, and many were double or triple-sold to various investors.  This situation led to allegations that the entire operation, at least for the last several years, was mostly a fraud and allegedly operated as a Ponzi scheme.  See Article 6, Section B.

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 6

(Source of Consideration for Plan Distribution) below for further discussion of the prepetition Ponzi or "Ponzi-like" activities of Debtors.

Many Water Station investors/purchasers have filed proofs of claim in Debtors' Chapter 11 Cases. Some of these claims are only for the purchase price of the Water Machines, while others are for the purchase price plus unpaid income earned from the Water Machines. Debtors believe purchasers asserting claims on unpaid income from Water Machines should anticipate an objection beyond the true value of their losses, and that their vote to accept or reject Debtors' Plan will only count the value of the investors' "money in," and not projected or anticipated lost revenue.

In May of 2024, upon the motion of First Fed Bank, the Superior Court of King County, Washington ("*Washington Court*") appointed Turning Point Strategic Advisors ("*Receiver*") as a general receiver over Creative. On August 23, 2024, the Washington Court entered an Order also making Receiver the receiver over Water Station, Refreshing, and all of Debtors' subsidiaries ("*Subsidiaries*"). Receiver ran into an intractable problem: there were at least two federal lawsuits, and several state lawsuits, alleging that Debtors' previous manager, Ryan Wear, engaged in a massive fraud and Ponzi scheme, and alleging that Debtors' real property assets may have been obtained using funds involved in fraud. As a result, title insurance companies were unwilling to insure the receivership sales of real property. Receiver had lengthy, detailed discussions and meetings with multiple title insurance companies across the country which ultimately, after weeks of review, declined to provide coverage. Representatives of those companies informed Receiver that they would be willing to provide coverage if Debtors were placed in bankruptcy, and if Debtors' assets were sold under Bankruptcy Court supervision.

On August 27, 2024 ("*Petition Date*"), Chapter 11 Involuntary Petitions were filed against each Debtor in the Bankruptcy Court for the Southern District of Texas ("*Texas Court*"). The Subsidiaries did not have involuntary petitions filed against them and, to the extent they have not been merged into Debtors, remain subject to the Washington Court receivership.

## ARTICLE 4.
## SIGNIFICANT POST-PETITION EVENTS

**THE FOLLOWING IS NOT INTENDED AS A DETAILED OR COMPLETE SUMMARY OF ALL SIGNIFICANT POST-PETITION EVENTS. PLEASE SEE THE BANKRUPTCY CASE DOCKET FOR A COMPLETE LISTING OF ALL FILINGS IN THE CASE.**

## A. JOINT ADMINISTRATION AND TRANSFER OF VENUE

On October 27, 2024, the Texas Court entered Orders Directing Joint Administration of the Chapter 11 Cases. On November 12, 2024, the United States Trustee for the Southern District of Texas appointed certain creditors to an Official Committee of Unsecured Creditors of Debtors. On November 14, 2024, on motion to transfer venue filed by Debtors, the Texas Court transferred the Chapter 11 Cases to the United States Bankruptcy Court for the Eastern District of Washington ("*Court*" or "*Bankruptcy Court*").

## B. APPOINTMENT OF COMMITTEE

On November 15, 2024, the United States Trustee for the Eastern District of Washington informed Debtors and counsel for Debtors' affiliate Ideal Property Investments LLC that it would combine the official Committee of Unsecured Creditors appointed in Debtors' cases pursuant to 11 U.S.C. § 1102(a) and 11 U.S.C. § 1102(b)(1) with the Official Committee of Unsecured Creditors appointed in the Ideal Property Investments LLC ("*Ideal*") bankruptcy case pending in this Court (Case No. 24-1421-FPC11) ("*Committee*").

The Committee was appointed to generally represent the interests of General Unsecured Creditors and to participate in Debtors' Chapter 11 Cases with respect to, among other things, the sale of Debtors' Assets and the formulation of a plan of liquidation. The Committee engaged (i) K&L Gates as attorneys for the Committee and (ii) B Riley Financial, Inc. as financial advisors.

## C. ENGAGEMENT OF PROFESSIONALS

Pursuant to a series of Court orders, Debtors engaged (i) Tonkon Torp LLP as attorneys for Debtors, (ii) Brian Weiss of Force Ten Partners LLC as Chief Restructuring Officer ("*CRO*") for Debtors, (iii) Hilco Real Estate, LLC as real estate consultants for Debtors, (iv) Tagged Brands as auctioneer for Debtors, and (v) Hilco Corporate Finance, LLC as investment banker for Debtors.

## D. CONTRIBUTED PROPERTIES

On or around October 17, 2024, Debtors' CRO negotiated an agreement with Ryan Wear along with the Pacific Parties whereby Wear would contribute 10 pieces of real property from several different single-purpose entities owned or controlled by Mr. Wear, as well as Mr. Wear's interests in two other single-purpose real estate entities (whose real property could not be transferred to Debtors at that time for various reasons) to avoid Debtors from pursuing fraudulent transfer claims against these entities and to, upon the sale of the real property, help fund the Chapter 11 Cases. Those properties have all been titled in the name of Debtors and are being marketed for sale by Hilco Real Estate, LLC for Debtors.

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 8

## E.    FILING OF SCHEDULES

On November 22. 2024, Debtors filed Schedules of Assets and Liabilities and Statements of Financial Affairs for each Debtor (as amended or supplemented from time to time, the "*Schedules*").

## F.    CLAIMS BAR DATES

On December 5, 2025, the Court entered an order establishing February 1, 2025, as the deadline to file a Proof of Claim for all creditors other than governmental units, and February 15, 2025, as the deadline to file a Proof of Claim for governmental units.  After December 5, 2025, as a result of Debtors' filing supplemental Schedules which identified additional creditors, various additional Proof of Claim deadlines have been established for such additional creditors only.

## G.    MARKETING AND SALE OF PERSONAL PROPERTY ASSETS

From and after the Petition Date, Debtors' primary objective has been to identify, market, and sell Debtors' Assets for the benefit of Creditors, primarily utilizing various Court-approved sale procedures for the various categories of Assets (e.g., real estate, vending machines, and water machines).  In addition, Debtors have been working to identify, market, and sell water machines for the benefit of their owners.

*At the time of filing this Disclosure Statement, it is impossible for Debtors to estimate with any accuracy the total amount of sale proceeds that will be generated from the Sale of Assets for the benefit of creditors.*

As of the date of filing this Disclosure Statement, Debtors have entered into numerous contracts for the sale of Assets (collectively, "*APAs*") which have closed or are expected to close prior to the Effective Date.

In the Plan Supplement, Debtors will provide an update on the status of their marketing and sale of Assets.

Any Assets not sold prior to the Effective Date will be sold or otherwise liquidated by the Trustee of the Liquidation Trust for the benefit of creditors and interested parties.

## H.    MERGERS

Pursuant to a series of Court orders, Debtors have completed mergers of numerous subsidiaries of Refreshing ("*Merged Subsidiaries*") into Refreshing, thereby bringing the Assets of the Merged Subsidiaries into the Estates for Debtors to sell for the benefit of Debtors' creditors.  See Article 6, Section A. below

## I. FIRST FED SETTLEMENT

On _____, 2025, Debtors, Ideal Property Investments LLC, a debtor and debtor-in-possession ("*Ideal*"), First Fed (together with its officers, directors, employees, attorneys, agents and parent company, First Northwest Bancorp, the "*First Fed Parties*"), and the Committee entered into a settlement (the "*First Fed Settlement*") as further described in Article 6.A of the Plan. The First Fed Settlement is discussed in length in Article 6.A of the Plan.

**ARTICLE 5.**
**TREATMENT OF CLASSIFIED CLAIMS**

### A. GENERAL

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, a Plan of Reorganization must designate classes of Claims and classes of Interests. The classification of Claims and Interests is made for the purpose of voting on the Plan and making distributions thereunder, and for ease of administration of the Plan.

### B. UNCLASSIFIED CLAIMS

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims) and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article 5 of the Plan. Article 4 of the Plan addresses Administrative Claims and Priority Tax Claims, which do not vote on the Plan.

### C. CLASSIFIED CLAIMS

Except for the unclassified Claims addressed above, all Claims against and Interests in Debtors are classified in the Classes set forth in Article 5 of the Plan. A Claim or Interest is classified in a particular Class only to the extent such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving Distributions under the Plan only to the extent such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. For the avoidance of doubt, a Claim which was listed in an amount of "Unknown" in the Schedules and Statements, and for which the Creditor did not File a Proof of Claim, shall be treated as a Disallowed Claim and shall receive no Distribution.

Set forth below are the nine Classes set forth in the Plan, and their treatment under the Plan.

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 10

1.  Class 1 – First Fed Bank Secured Claim

    (a)  Classification. Class 1 consists of the Secured Claim of First Fed Bank ("*First Fed*").[2]

    (b)  Treatment. Subject to the terms of the First Fed Settlement (described in Article 6 of the Plan), the lien of First Fed will continue to attach to its Collateral and the proceeds from such Collateral after the Effective Date, subject to all Avoidance Actions, Causes of Action, defenses and objections to Claims, which are hereby reserved under the Plan. Interest shall accrue on the Class 1 Claim at the prepetition non-default rate of interest to the extent First Fed is over secured. If Collateral securing the Class 1 Claim is sold during the pendency of an adversary proceeding or contested matter against First Fed before the Class 1 Claim is adjudicated, settled, Allowed, or Disallowed, the Liquidation Trustee shall reserve sufficient proceeds from the sale of such Collateral (to the extent sufficient proceeds are generated) to satisfy the asserted Class 1 Claim, to be held in reserve pending resolution of such adversary proceeding or contested matter. Debtors retain the right to satisfy the Class 1 Allowed Claim in any manner provided for under § 1129(b)(2) of the Bankruptcy Code including by means of surrender of the collateral supporting such claim; in the event of such surrender, First Fed may abandon its Secured Claim.

    (c)  Voting. Class 1 is Impaired under the Plan and, subject to the terms of the First Fed Settlement, is entitled to vote to accept or reject the Plan.

2.  Class 2 – Water for Commerce Fund Management, LLC ("*C2FO*") Secured Claim

    (a)  Classification. Class 2 consists of the Secured Claim of C2FO.

    (b)  Treatment. The lien of C2FO will continue to attach to its Collateral and the proceeds from such Collateral after the Effective Date, subject to all Avoidance Actions, Causes of Action, defenses and objections to Claims, which are reserved under the Plan. In full and final satisfaction of the Class 2 Claim, C2FO will receive, from each sale of its Collateral, 87.5% of the "net proceeds" from such sale. The remaining 12.5% of net proceeds will be retained by the Liquidation Trustee for distribution under the Liquidation Trust. The phrase "net proceeds" means gross sale proceeds less allowed direct costs of liquidation incurred by the liquidator (e.g., TagEx Brands or Hilco Corporate Finance, LLC) and less any Allowed Administrative Claims properly allocated as a surcharge

---

[2] Debtors may modify the Plan to reflect the final Settlement Agreement terms with First Fed.

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 11

against the Collateral.  To the extent any portion of the Class 2 Claim is Allowed but determined not to be a Secured Claim, such portion shall be classified and afforded the treatment of a Class 7 General Unsecured Claim to the extent so Allowed. Debtors retain the right to satisfy the Class 1 Allowed Claim in any manner provided for under § 1129(b)(2) of the Bankruptcy Code including by means of surrender of the collateral supporting such claim.

(c)     <u>Voting</u>.  Class 2 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

3.     <u>Class 3 – Acquisition Secured Claims</u>

(a)     <u>Classification</u>.  Class 3 consists of all Acquisition Secured Claims.

(b)     <u>Treatment</u>.  The liens of the Holders of Allowed Class 3 Claims will continue to attach to their respective Collateral and proceeds from such Collateral after the Effective Date, subject to all Avoidance Actions, Causes of Action, defenses and objections to Claims, which are reserved under the Plan. Beginning on the Confirmation Date, to the extent such claim is oversecured, interest shall accrue on the Class 3 Claims at the prepetition non-default rate of interest. To the extent any portion of the Class 3 Claim is Allowed but determined not to be a Secured Claim, such portion shall be classified and afforded the treatment of a Class 7 General Unsecured Claim to the extent so Allowed. Debtors retain the right to satisfy the Class 1 Allowed Claim in any manner provided for under § 1129(b)(2) of the Bankruptcy Code including by means of surrender of the collateral supporting such claim.

(c)     <u>Voting</u>.  Class 3 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

4.     <u>Class 4 – Secured Claim of 3|5|2 Capital ABS Master Fund LP</u>

(a)     <u>Classification</u>.  Class 4 consists of the Secured Claim of 3|5|2 Capital ABS Master Fund LP ("*352*").

(b)     <u>Treatment</u>.  To the extent it has one, the lien of 352 will continue to attach to its Collateral and the proceeds from such Collateral after the Effective Date, subject to all Avoidance Actions, Causes of Action, defenses and objections to Claims, which have been reserved under the Plan.  Interest shall accrue on the Class 4 Claim at the prepetition non-default rate of interest to the extent the Class 4 Claim is secured.  If Collateral securing the Class 4 Claim is sold during the pendency of an adversary proceeding or contested matter to determine validity and amount of 352's Secured Claim and before the validity and amount of 352's Secured Claim is fully and finally adjudicated or settled, the Liquidation

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 12

Trustee shall reserve the proceeds from the sale of such Collateral, to be held in reserve pending resolution of such adversary proceeding or contested matter. To the extent any portion of 352's Claim is Allowed but determined not to be a Secured Claim, such portion shall be classified and afforded the treatment of a Class 7 General Unsecured Claim to the extent so Allowed. Debtors retain the right to satisfy the Class 1 Allowed Claim in any manner provided for under § 1129(b)(2) of the Bankruptcy Code including by means of surrender of the collateral supporting such claim.

(c)    <u>Voting</u>.  Class 4 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.  For purposes of voting only, 352 will vote a portion of its Claim as a Secured Claim in Class 4 and the remaining portion of its Claim as a Class 7 General Unsecured Claim, as set forth in a stipulation between Debtors and 352 to be filed prior to the Voting Deadline.

5.    <u>Class 5 – Other Secured Claims</u>

(a)    <u>Classification</u>.  Class 5 consists of all Other Secured Claims.

(b)    <u>Treatment</u>.  The lien of each Holder of a Class 5 Claim will continue to attach to such Holder's Collateral and the proceeds from such Collateral after the Effective Date, subject to all Avoidance Actions, Causes of Action, defenses and objections to Claims, which are reserved under the Plan.  To the extent such claim is oversecured, Interest shall accrue on each Class 5 Claim at the prepetition non-default rate of interest.  If Collateral securing a Class 5 Claim is sold during the pendency of an adversary proceeding or contested matter against the Holder of a Class 5 Claim before the Class 5 Claim is adjudicated, settled, Allowed, or Disallowed, the Liquidation Trustee shall reserve sufficient proceeds from the sale of such Collateral (to the extent sufficient proceeds are generated) to satisfy the asserted Class 5 Claim, and to be held in reserve pending resolution of such adversary proceeding or contested matter.  To the extent any portion of a Class 5 Claim is Allowed but determined not to be a Secured Claim, such portion shall be classified and afforded the treatment of a Class 7 General Unsecured Claim to the extent so Allowed.

(c)    <u>Voting</u>.  Class 5 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

6.    <u>Class 6 – Other Priority Claims</u>

(a)    <u>Classification</u>.  Class 6 consists of all Other Priority Claims.

(b)    <u>Treatment</u>.  Each Holder of an Allowed Other Priority Claim shall receive, at the option of Debtors, either (i) the full unpaid amount of such Allowed Other Priority Claim in Cash on the Effective Date; or (ii) equal annual

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 13

installment payments in Cash of a total value equal to the Allowed amount of such Priority Tax Claim, over a period ending not later than five years after the Petition Date.

(c)     Voting.  Class 6 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

7.     Class 7 – General Unsecured Claims

(a)     Classification.  Class 7 consists of all General Unsecured Claims.

(b)     Treatment.  Each Holder of an Allowed General Unsecured Claim shall receive its pro rata share of the GUC Recovery. To the extent a Holder of an Allowed General Unsecured Claim elects to contribute its non-estate claims to the Liquidating Trust and otherwise opt in to treatment as described in the opt-in provisions of the Plan (Article 6.B), such electing creditor shall receive an enhanced dividend on its claim in the amount of 10% of the dividend amount that such creditor would have received if no unsecured creditors had elected to opt-in. Electing creditors will also be entitled to the benefit of the First Fed release under the terms of the First Fed Settlement.

(c)     Voting.  Class 7 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

8.     Class 8 – Subordinated Claims

(a)     Classification.  Class 8 consists of all Subordinated Claims.

(b)     Treatment.  On the Effective Date, all Subordinated Claims shall be cancelled, released, and discharged as of the Effective Date, and shall be of no further force or effect.  Therefore, Holders of Subordinated Claims shall not receive any Distribution on account of such Subordinated Claims.

(c)     Voting.  Class 8 is Impaired under the Plan.  Holders of Subordinated Claims are conclusively deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code and, therefore, Class 8 is not entitled to vote to accept or reject the Plan.

9.     Class 9 – Interests

(a)     Classification.  Class 9 consists of all Interests.

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 14

     (b)  <u>Treatment</u>.  On the Effective Date, all Interests in Debtors shall be cancelled, and the Holders of all Interests in Debtors shall receive no Distribution under the Plan.

     (c)  <u>Voting</u>.  Class 9 is Impaired under the Plan.  Holders of Interests in Debtors are conclusively deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code and, therefore, Class 9 is not entitled to vote to accept or reject the Plan.

**ARTICLE 6.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

**A.    RESTRUCTURING TRANSACTIONS**

Prior to the Effective Date, pursuant to multiple merger transactions (collectively, the "*Prior Mergers*"), the following wholly-owned subsidiaries of Refreshing merged with and into Refreshing, with Refreshing surviving each merger and the separate existence of each merging subsidiary ceasing upon the effective date of the respective merger:  Refreshing Arizona, LLC, an Arizona limited liability company ("*Refreshing AZ*"); Refreshing California L.L.C., a California limited liability company ("*Refreshing CA*"); Refreshing Florida LLC, a Florida limited liability ("*Refreshing FL*"); Refreshing Georgia LLC, a Georgia limited liability company ("*Refreshing GA*"); Refreshing Great Lakes, LLC, an Illinois limited liability company ("*Refreshing IL*"); Refreshing Las Vegas, LLC, a Nevada limited liability company ("*Refreshing LV*"); and Refreshing Texas LLC, a Texas limited liability company ("*Refreshing TX*" and, together with Refreshing AZ, Refreshing CA, Refreshing FL, Refreshing GA, Refreshing IL, and Refreshing LV, the "*Merged RUSA Subsidiaries*").  Because the Merged RUSA Subsidiaries were not in bankruptcy, yet held assets of the overall enterprise, it was necessary to effectuate the mergers to bring the subsidiaries' assets into the Estates.  As a result of the Prior Mergers, real property and other assets previously owned by the Merged RUSA Subsidiaries were transferred to Refreshing by operation of law and became assets of the Bankruptcy Estate.  Refreshing or another Debtor may continue to enter into one or more additional merger transactions with subsidiaries or other Affiliates, or substantive consolidation of subsidiaries or other Affiliates, to transfer real property or other assets into Debtors' Estates and increase the Assets, or otherwise benefit the Estates.

On the Effective Date, or as soon as reasonably practicable thereafter, the Liquidation Trustee shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect the transactions described herein, including, as applicable, one or more intercompany or Affiliate mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs,

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 15

intercompany sales, purchases, or other corporate transactions (collectively, and together with the Prior Mergers, the "*Restructuring Transactions*"). The actions to implement the Restructuring Transactions may include (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms consistent with the terms of the Plan and that satisfy the pertinent requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, reinstatement, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable law; and (iv) all other actions the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan. For the avoidance of doubt, the Liquidation Trust and Liquidation Trustee shall be bound by any release approved by a Final Order entered in the Chapter 11 Cases prior to the Effective Date, and, in the event of such approval, shall be deemed to have released any and all Causes of Action against the First Fed Released Parties.

**B.    SOURCES OF CONSIDERATION FOR PLAN DISTRIBUTIONS**

Plan Distributions will be made from available Cash generated primarily from the sale of Assets (including surcharges to secured creditors under Section 506(c) of the Bankruptcy Code), the First Fed Settlement, any recoveries from Retained Causes of Action, and any amounts received by Debtors from their claims filed in the Ideal Property Investments, LLC bankruptcy case.  Distributions and other payments to be funded under the Plan on the Effective Date will be funded from Cash on hand as of the Effective Date.  Assets not sold prior to the Effective Date will be transferred to the Liquidation Trust for liquidation by the Liquidation Trustee.  After the Effective Date, the Liquidation Trustee shall make Plan Distributions from the Liquidation Trust and Liquidation Trust Assets in accordance with the Plan and Liquidation Trust Agreement.  A copy of the Liquidation Trust Agreement is attached to the Plan.  In the Plan Supplement, Debtor will provide a general summary of the status of Asset sales.

Specifically as it relates to Causes of Action, Debtors have several promising avenues for recovery.  Three examples follow, including one that has already generated millions of dollars of benefits for the Estates, without limiting the fact that there are many more Causes of Action that might bear fruit.

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 16

First, Debtors have filed an adversary proceeding, Case No. 2:25-ap-80017-FOP, against Riverside Capital NY LLC for the recovery of a nearly $7 million fraudulent conveyance by Water Station after Riverside swept that amount from a Water Station account at Bank of America despite the fact that Water Station had no relationship to Riverside. Instead, Riverside was a creditor of Creative and other affiliates. The transfer to Riverside was therefore both a constructive and intentional fraudulent transfer under Section 548 of the Bankruptcy Code, and entirely voidable. Once returned, that money will inure to the benefit of Debtors' unsecured creditors.

Second, Debtors, Ideal, and the Committee previously asserted or threatened various claims against First Fed of significant value, including claims for (i) constructive fraudulent transfer to avoid certain deeds of trust and payments, (ii) actual fraudulent transfer to avoid deeds of trust, among others. Debtors, First Fed, Ideal and the Committee participated in a settlement conference ultimately leading to the First Fed Settlement, which is discussed in detail in Article 6 of the Plan. The First Fed Settlement Agreement will free up millions of dollars in equity from real estate in Debtors' cases (and in Ideal's case) that will flow to unsecured creditors and provide significant cash to benefit Creditors.

Third, the Committee has been investigating whether Debtors qualify as a Ponzi scheme, or a Ponzi-like scheme, under federal law. The Committee has uncovered many examples of "Ponzi-like" transactions through Debtors' books and records, bank statements, and other documents. The Committee and Debtors ("Plan Proponents") will seek findings in the Confirmation Order ("Ponzi Findings") that (i) prior to the Petition Date, Debtors and certain Affiliates of Debtors operated a Ponzi scheme and raised not less than $250 million from investors in the United States and abroad; and (ii) the Ponzi scheme involved the payment of purported returns to existing investors from funds contributed by new investors. The Plan Proponents shall not seek Ponzi Findings that would be binding on any other court or governmental or regulatory authority. In the event the Confirmation Order does not include Ponzi Findings, the Liquidation Trust may seek Ponzi Findings after the Effective Date. For the avoidance of doubt, nothing set forth herein or in the Plan shall in any way prohibit the Liquidation Trust from investigating or pursuing Causes of Action related to prepetition Ponzi schemes or Ponzi-like conduct of Debtors and/or their Affiliates from and after the Effective Date. If successful, the Retained Causes of Action will include fraudulent conveyances with an irrebuttable presumption of intentional fraud, which could unlock tens of millions of dollars of recoveries from Ponzi "winners" for the benefit of Debtors' unsecured creditors. *See In re EPD Inv. Co., LLC*, 114 F.4th 1148, 1152 & 1157 (9th Cir. 2024); *see, e.g., In re Equip. Acquisition Res., Inc.*, 2012 WL 4755028, at *6 (Bankr. N.D. Ill. Sept. 28, 2012) ("[Debtor's] leasing and financing transactions were a "Ponzi-like" scheme and, as such, establish [debtor's] actual fraudulent intent.").

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 17

A Ponzi scheme is a form of fraud. *In re EPD Inv. Co., LLC*, 114 F.4th 1148, 1156 (9th Cir. 2024) ("A Ponzi scheme is a financial fraud that induces investment by promising high returns, usually in a short time period, where in fact no legitimate profit-making business opportunity exists."); *see also In re Fox Ortega Enters., Inc.*, 631 B.R. 425, 441 (Bankr. N.D. Cal. 2021) ("While there is not one universal definition of a 'Ponzi Scheme,' it is a type of fraud[.]").

The "hallmark" of a Ponzi scheme is "[d]istributing funds to earlier investors from the receipt of monies from later investors." *Hayes v. Palm Seedlings Partners–A (In re Agricultural Research and Technology Group, Inc.)*, 916 F.2d 528, 536 (9th Cir. 1990). "The fraud consists of [1] funneling proceeds received from new investors to previous investors [2] in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profitmaking business opportunity exists and inducing further investment." *In re United Energy Corp.*, 944 F.2d 589, 590 n.1 (9th Cir. 1991); *see In re Fox Ortega Enterprises, Inc.*, 631 B.R. at 441–42 ("While there is not one universal definition of a 'Ponzi Scheme,' . . . [they] have two important characteristics which distinguish them from other types of fraud: (1) the promise of profit that is disconnected from any legitimate business activity . . . , and (2) use of new investor funds, instead of legitimate profit, to provide a return to earlier investors.").

"[A] Ponzi scheme is [by definition] destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership." *In re EPD Inv. Co., LLC*, 114 F.4th at 1156. Common indicia of a Ponzi scheme include the absence of significant legitimate business operations,[3] commingling of money between related business entities,[4] later investors and other creditors receiving lower returns than earlier investors and other creditors,[5] encouraging investors to roll over funds

---

[3] *Scholes v. Lehman*, 56 F.3d 750, 757 (7th Cir. 1995); *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 590 n.1 (9th Cir. 1991) (describing the Ponzi scheme's purported "profit-making business opportunity" as "an illusion").

[4] *Wing v. Williams*, 2011 U.S. Dist. LEXIS 25607, at *10 (D. Utah Mar. 11, 2011).

[5] *In re Taubman*, 160 B.R. 964, 973 (Bankr. S.D. Ohio 1993).

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 18

rather than cash out,[6] unrealistic promises of returns on investments,[7] and failing to invest funds in promised investments.[8]

In this case, the evidence developed thus far reflects that Debtors and their various affiliates (collectively, "*WST Entities*") operated in a manner that meets the key Ponzi criteria, among others (i) they paid earlier investors and/or creditors with funds from later investors and/or creditors, rather than legitimate business proceeds; (ii) they commingled money between related business entities; (iii) they cultivated the illusion of a legitimate profit-making business by doing so; (iv) they made unrealistic promises of returns on investments; and (v) they failed to invest funds received in promised investments. Accordingly, Debtors intend to ask the Court to find that Debtors and their affiliates operated as a Ponzi scheme.[9]

## C. LIQUIDATION TRUST, LIQUIDATION TRUSTEE, AND LIQUIDATION TRUST SUPERVISORY BOARD

On or prior to the Effective Date, Debtors, on their own behalf and on behalf of Holders of Beneficiaries, will execute the Liquidation Trust Agreement and take all other steps necessary to establish the Liquidation Trust pursuant to the Liquidation Trust Agreement as further described in the Plan. On the Effective Date (or, with respect to the Remaining Professional Fee Escrow Amounts, on the Escrow Amounts Transfer Date) or as soon thereafter as is practicable, and in

---

[6] *In re Taubman*, 160 B.R. at 973.

[7] *O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197, 1199 (11th Cir. 2003) (noting fact that 100% return was promised to those investors who were able to find two additional investors); *United States v. Benson*, 79 Fed. App'x 813, 817 (6th Cir. 2003) (noting that perpetrator promised 138% and 181% return with no risk); *Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 624-25 (Bankr. E.D. Ohio 2006); *In re Taubman*, 160 B.R. at 978 (Bankr. S.D. Ohio 1993); *Kapila v. Phillips Buick-Pontiac GMC Truck, Inc. (In re ATM Fin. Servs., LLC)*, 2011 Bankr. LEXIS 2394, at *15 (Bankr. M.D. Fla. June 24, 2011) ("The debtor and the Netschi Companies conned people into making a purchase they believed would generate a future income steam based on the perpetrators' misrepresentations about the amount of withdrawal fees each ATM could earn. The ATM purchases were therefore no different from investors hoping to make above market returns based on phony investments, and the monies they transferred to the debtor and the Netschi Companies were functionally equivalent to investments.").

[8] *Santa Barbara Capital Mgmt. v. Neilson* (*In re Slatkin*), 525 F.3d 805, 813–14 (9th Cir. 2008); *Emerson v. Maples* (*In re Mark Benskin & Co.*), 161 B.R. 644, 650 (Bankr. W.D. Tenn. 1993).

[9] While this focuses on aiding and abetting fraud, the Committee also plans to satisfy this element by demonstrating Water Station's breaches of fiduciary duty as well as other violation.

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 19

accordance with and pursuant to the terms of the Plan, Debtors will transfer to the Liquidation Trust all of their rights, titles, and interests in all of the Liquidation Trust Assets.

The Liquidation Trustee shall serve as the trustee of the Liquidation Trust, subject to the supervision and oversight of the Liquidation Trust Supervisory Board. The Liquidation Trust Supervisory Board shall consist of three members, as identified in the Plan Supplement. One member of the Liquidation Trust Supervisory Board shall be designated by the Committee and one member shall be designated by 3|5|2 Capital ABS Master Fund LP ("*352*"). Any rights, powers, or obligations given to the Liquidation Trustee pursuant to the Plan or the Liquidation Trust Agreement shall be subject to any consultation, approval, or other rights provided to the Liquidation Trust Supervisory Board in the Liquidation Trust Agreement.

## D.    CANCELLATION OF SECURITIES AND AGREEMENTS

On the Effective Date, except as otherwise specifically provided for in the Plan, (i) the obligations of Debtors under any certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any ownership interest in Debtors giving rise to any Claim or Interest shall be cancelled solely as to Debtors and the Liquidation Trustee shall not have any continuing obligations thereunder; and (ii) the obligations of Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, operating agreements, articles of organization, or certificates or articles of formation or similar documents governing any such ownership interest in Debtors shall be released. Notwithstanding the foregoing, no Executory Contract or Unexpired Lease (i) that has been, or will be, assumed pursuant to Section 365 of the Bankruptcy Code or (ii) relating to a Claim paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date.

## E.    COMPANY ACTION

Upon the Effective Date, all actions contemplated by the Plan which were taken on or before the Effective Date, and all actions reasonably necessary or appropriate to effectuate the Plan or to consummate the transactions contemplated by the Plan which are taken during the period beginning on the Effective Date and ending 60 days after dissolution of the Liquidation Trust, shall be deemed authorized and approved, including, without limitation, the Restructuring Transactions. All matters provided for in the Plan or deemed necessary or desirable by Debtors before, on, or after the Effective Date involving the organizational structure of Debtors, and any company action required by Debtors or the Liquidation Trustee to implement the Plan, shall be deemed to have occurred and shall be in effect on the Effective Date without any requirement of further action by the security holders,

directors, managers, members, or officers of Debtors or the Liquidation Trustee. On and after the Effective Date, the Liquidation Trustee shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of Debtors. To the fullest extent permitted by the Bankruptcy Code, the authorizations and approvals contemplated by the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

## F. EFFECTUATING DOCUMENTS; FURTHER TRANSACTIONS

On and after the Effective Date, the Liquidation Trustee is authorized to, and may, issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Restructuring Transactions in the name of and on behalf of Debtors from and after the Effective Date, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

## G. SECTION 1146 EXEMPTION

To the fullest extent permitted by Section 1146(a) of the Bankruptcy Code, any transfers of property under or in connection with the confirmed Plan or pursuant to the (i) issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in Debtors or the Liquidation Trust; (ii) restructuring transactions; (iii) creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iv) making, assignment, or recording of any lease or sublease; or (v) making, delivering, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with the confirmed Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the confirmed Plan, shall not be subject to any document recording tax, stamp tax, transfer tax, conveyance fee, intangibles or similar tax, sales tax, use tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 21

comply with the requirements of Section 1146 of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## H. PRESERVATION OF RETAINED CAUSES OF ACTION

Debtors preserve and, as of the Effective Date, assign to the Liquidation Trust the Retained Causes of Action. The Liquidation Trustee may, subject to supervision by the Liquidation Trust Supervisory Board, commence, prosecute, or settle such Retained Causes of Action. No Entity may rely on the absence of a specific reference in this Plan or the Plan Supplement to any Cause of Action against it as any indication that Debtors or the Liquidation Trustee, as applicable, will not pursue any and all available Retained Causes of Action against it. Except with respect to any Causes of Action released pursuant to any settlement approved by a Final Order entered in the Chapter 11 Cases prior to the Effective Date, Debtors or the Liquidation Trustee, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article 14. The Liquidation Trustee expressly reserves all Retained Causes of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Retained Causes of Action as a consequence of Confirmation or Consummation of the Plan.

The Liquidation Trust shall retain such Retained Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with Section 1123(b)(3) of the Bankruptcy Code, any Retained Causes of Action a Debtor may hold against any Entity shall vest in the Liquidation Trust. The Liquidation Trustee may, subject to the supervision of the Liquidation Trust Supervisory Board, exclusively enforce any and all such Retained Causes of Action. Subject to the supervision of the Liquidation Trust Supervisory Board and the terms of the Liquidation Trust Agreement, the Liquidation Trustee shall have the exclusive right, authority, and discretion to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Retained Cause of Action without the consent or approval of any third party or further notice to, or action, order, or approval of the Bankruptcy Court.

## I. CLOSING THE CHAPTER 11 CASES

After the Effective Date, the Liquidation Trustee may file a motion to close the Chapter 11 Case of each Debtor for all purposes. For the avoidance of doubt, the closing of such cases shall not have any effect, in any manner, on the Retained

Causes of Action the Liquidation Trustee may assert in accordance with the Plan and Liquidation Trust Agreement.

## J.     U.S. SECURITIES AND EXCHANGE COMMISSION

Notwithstanding any language to the contrary contained in the Plan and/or Confirmation Order, no provision of the Plan or Confirmation Order shall (i) preclude the SEC or any other Governmental Unit from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair, or delay the SEC or any other Governmental Unit from commencing or continuing any claims, causes of action, proceedings, or investigations against any non-Debtor Person or Entity in any forum.

**ARTICLE 7.**
**SUBSTANTIVE CONSOLIDATION**

The Plan serves as a motion by Debtors and the Committee seeking entry of an order substantively consolidating the Estates of each Debtor and, to the extent applicable, their specified subsidiaries or affiliates, into a single consolidated estate for all purposes associated with confirmation and consummation of the Plan, while retaining each Debtor's right to assert fraudulent conveyance actions against recipients of such transfers from each Debtor or affiliates.

See Article 8 of the Plan for a discussion of the effects of substantive consolidation and its impact on creditors. As more fully set forth in Article 8 of the Plan, Debtors believe substantive consolidation is in the best interest of Debtors' creditors. In short, Debtors believe it would be extremely difficult to untangle Debtors' Assets and liabilities in any meaningful sense, and any attempt to accurately separate the Assets and liabilities of each Debtor would be time consuming, costly, and further deplete the Estates' already limited resources. Debtors believe the benefits of substantive consolidation significantly outweigh the costs and delay of attempting to separate the Assets and liabilities of each Debtor and, thus, the Estates of all Debtors should be deemed substantively consolidated.

Debtors intend that their substantive consolidation not impact potential fraudulent conveyance claims that any individual Debtor may have against any third party, or the security interests of any secured party, and will ask the Court to craft the consolidation in a manner that preserves those Causes of Action and security interests and does not create additional defenses or impairment of security interests.

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 23

# ARTICLE 8.
## TYLER SADEK AND RYAN WEAR

## A. TYLER SADEK

Tyler Sadek had received, as collateral for a purported loan, an assignment from Ryan Wear as to all of Mr. Wear's interests in Debtors and a variety of other membership interests and real and personal properties. In June 2024, Mr. Sadek completed a foreclosure as to the pledged interests and properties in a state court proceeding in Indiana. Mr. Sadek was previously involved in management of Debtors' businesses and a variety of their affairs. There are allegations by interested parties that Mr. Sadek participated in the fraud and downfall of Debtors.

Debtors [intend to/have filed] an adversary complaint against Mr. Sadek seeking, among other things, invalidation of certain transfers; turnover of real and personal property, including control of at least two operating businesses; and equitable subordination of Mr. Sadek's Claims. Under the Plan, Mr. Sadek's Claims (other than on account of any equity interest he holds in Debtors, which are canceled) is subordinated under the Plan and he will not receive any Distribution on account of such Claims.

## B. RYAN WEAR

Based on the Receiver's investigation to date, Receiver asserts that Mr. Wear conducted a large-scale fraud on investors, through Water Station, starting around 2020. It is alleged that Mr. Wear convinced over 150 over-the-counter investors to pay approximately $10,000 per water machine, promising 20% annual returns on their investments. Many investors reported receiving some returns after their initial investment, often leading to additional investments/purchases. Over time, these investors paid over $100 million to purchase water machines. Mr. Wear also worked to develop a bond program with 352 Fund that issued $100 million in bonds to Water Station for the purchase of water machines.

To the extent he asserts any Claims against Debtors beyond his equity interests, which are canceled, Mr. Wear's Claims will be subordinated under the Plan and he will not receive any Distribution on account of such Claims.

# ARTICLE 9.
## LIQUIDATION TRUST

As set forth above, the Plan provides for the creation of a Liquidation Trust and the appointment of a Liquidation Trustee and Liquidation Trust Supervisory Board (see Articles 7 and 11 of the Plan) to liquidate Debtors' remaining Assets, administer Claims, make Distributions to Creditors, and wind up Debtors' affairs. The Liquidation Trust is discussed in detail in Article 11 of the Plan and is

summarized below. Debtors believe establishing the Liquidation Trust pursuant to the Plan is in the best interests of Debtors' Estates and their stakeholders. The Liquidation Trust provides a mechanism by which potential recoveries for Beneficiaries can be preserved for investigation and prosecution by the Liquidation Trustee without the burdensome administrative cost of continuing the Chapter 11 Cases. Allowing the Liquidation Trustee to liquidate the remaining Assets and pursue the Retained Causes of Action provides the best chance for Beneficiaries to receive the maximum recovery on their Allowed Claims.

## A. LIQUIDATION TRUST CRITERIA

On the Effective Date, the Liquidation Trust will be established and become effective for the benefit of Beneficiaries. All relevant parties will take the actions necessary to cause title to the Liquidation Trust Assets to be transferred to the Liquidation Trust. The powers, authority, responsibilities, and duties of the Liquidation Trust and the Liquidation Trustee are set forth in, and will be governed by, the Liquidation Trust Agreement, the Plan, and the Confirmation Order.

## B. PURPOSE OF THE LIQUIDATION TRUST

The Liquidation Trust will be established for the primary purpose of liquidating the Liquidation Trust Assets; pursuing the Retained Causes of Action; reconciling and objecting to asserted Claims; and making distributions to Beneficiaries in accordance with Treas. Reg. § 301.7701-4(d), Revenue Procedure 94–45, 1994.28, I.R.B. 124, and the Plan, Confirmation Order, and Liquidation Trust Agreement, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust.

Further, to continue the Chapter 11 Cases or convert these cases to Chapter 7 would result in greater administrative and professional fees and expenses that would decrease recoveries Beneficiaries may receive from prosecution of the Causes of Action.

The Liquidation Trust is intended to qualify as a liquidating trust pursuant to Treasury Regulation Section 301.7701-4(d). If the Liquidation Trust does not qualify as a liquidating trust for U.S. federal income tax purposes, it is intended that the Liquidation Trust be treated as a partnership for U.S. federal income tax purposes.

## C. LIQUIDATION TRUST ASSETS

The Liquidation Trust Assets include (i) Retained Causes of Action; (ii) all other remaining Assets of the Estates, including, without limitation, all Cash, escrow accounts, real estate, interests in real estate, amounts owing from Ideal Property

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 25

Investments, LLC or other affiliates, the Remaining Professional Fee Escrow Amounts, if any, and all other personal property; and (iii) the proceeds of each of the foregoing.

1.    Retained Causes of Action

Retained Causes of Action are being preserved and contributed by Debtors to the Liquidation Trust so these Retained Causes of Action may be investigated and prosecuted, if possible, by the Liquidation Trustee, with any recoveries resulting therefrom to be distributed to Beneficiaries of the Liquidation Trust.

At the time of filing this Disclosure Statement, Debtors have identified multiple potential Causes of Action. However, Debtors cannot reasonably estimate the likely recoveries from such Causes of Action. The Liquidation Trustee, together with oversight from the Liquidation Trust Supervisory Board, will determine which, if any, Causes of Action to pursue after the Effective Date.

For the avoidance of doubt, if it is not completed by the confirmation hearing, Debtors expect that one of the first actions of the Liquidation Trustee will be to complete the investigation and determine whether Debtors were operated as a Ponzi or Ponzi-like scheme and, if so, over what period. Debtors further expect, but cannot predict with certainty, that the Court will determine that Debtors did operate a Ponzi scheme. If Debtors or the Liquidation Trustee establish such a Ponzi scheme to the Court, the Causes of Action will include avoidance actions under Section 548 of the Bankruptcy Code with the "irrebuttable" presumption of actual intent to defraud against all payment recipients from Debtors during the Ponzi period. *See In re EPD Inv. Co., LLC*, 114 F.4th 1148, 1157-59 (9th Cir. 2024) (a Ponzi scheme contains "two essential elements: (1) the funneling of money from new investors to pay old investors, and (2) no legitimate profit-making business opportunity exists for investors").

2.    Remaining Assets of the Estates

Additionally, Debtors will transfer all other remaining Assets, including Cash, in their possession as of the Effective Date (or, with respect to the Remaining Professional Fee Escrow Amounts, on the Escrow Amounts Transfer Date) or as soon thereafter as practicable to the Liquidation Trust, including all contractual rights and obligations under the APAs and any sale contracts executed prior to the Effective Date.

The Liquidation Trustee will also review whether any insurance policies held by Debtors provide a source of recovery to Beneficiaries of the

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 26

Liquidation Trust, including whether any such insurance policies cover any Causes of Action.

For the avoidance of doubt, the Liquidation Trust Assets shall not include (a) Cash, if any, held in the Professional Fee Escrow Account for the benefit of Professional Fee Claims, but shall include the Remaining Professional Fee Escrow Amounts (if any); or (b) any Causes of Action expressly released or exculpated pursuant to the Plan.

*As of the filing of this Disclosure Statement, Debtors cannot estimate with any certainty the amount of Cash or the value of the other Assets that will remain as of the Effective Date and be transferred to the Liquidation Trust.*

## D. BENEFICIARIES OF THE LIQUIDATION TRUST

Beneficiaries of the Liquidation Trust are the Holders of Liquidation Trust Interests, whether individually or as an agent on behalf of one or more other Entities. To the extent Holders of Allowed Claims are entitled to Distributions from the Liquidation Trust in accordance with the terms of the Plan, such Holders are each a Beneficiary.

## E. DISTRIBUTION OF THE LIQUIDATION TRUST ASSETS

The Liquidation Trust Assets, including any recovery from prosecution of the Retained Causes of Action, if any, will be distributed in accordance with the Plan, Confirmation Order, Bankruptcy Code, and the Liquidation Trust Agreement.

## F. TRANSFER OF ASSETS TO THE LIQUIDATION TRUST

Debtors and the Liquidation Trustee will establish the Liquidation Trust on behalf of Beneficiaries pursuant to the Liquidation Trust Agreement, with Beneficiaries to be treated as the grantors and deemed owners of the Liquidation Trust Assets. Debtors will irrevocably transfer, assign, and deliver to the Liquidation Trust, on behalf of Beneficiaries, all of their rights, title, and interests in the Liquidation Trust Assets, notwithstanding any prohibition on assignment under non-bankruptcy law. The Liquidation Trust will accept and hold the Liquidation Trust Assets in the Liquidation Trust for the benefit of Beneficiaries subject to the Plan and Liquidation Trust Agreement.

On the Effective Date (or, with respect to the Remaining Professional Fee Escrow Amounts, on the Escrow Amounts Transfer Date), all Liquidation Trust Assets will vest, and be deemed to vest, in the Liquidation Trust in accordance with Section 1141 of the Bankruptcy Code; provided that the Liquidation Trust, with the consent of the Liquidation Trustee, may abandon or otherwise not accept any Liquidation Trust Assets that the Liquidation Trustee believes, in good faith, have

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 27

no value to the Liquidation Trust. Any Assets the Liquidation Trust so abandons or otherwise does not accept shall not vest in the Liquidation Trust. As of the Effective Date (or, with respect to the Remaining Professional Fee Escrow Amounts, on the Escrow Amounts Transfer Date), all Liquidation Trust Assets vested in the Liquidation Trust shall be free and clear of all liens, Claims, and Interests except as otherwise specifically provided in the Plan or Confirmation Order. Upon transfer by Debtors of the Liquidation Trust Assets to the Liquidation Trust or abandonment of Liquidation Trust Assets by the Liquidation Trust, Debtors will have no reversionary or further interest in, or with respect to, any Liquidation Trust Assets or the Liquidation Trust. Notwithstanding anything herein to the contrary, the Liquidation Trust and the Liquidation Trustee shall be deemed to be fully bound by the terms of the Plan and Confirmation Order.

Upon the occurrence of the Effective Date, Debtors' books and records shall be transferred to the Liquidation Trust, which shall continue to preserve all financial books and records, emails, and other financial documents relating to Debtors' business that are currently in Debtors' possession.

For the avoidance of doubt, and notwithstanding anything herein to the contrary, Debtors shall not transfer, or be deemed to have transferred, to the Liquidation Trust any Claims or Causes of Action that are specifically exculpated pursuant to the Plan or Confirmation Order, or released pursuant to a settlement approved by the Bankruptcy Court prior to the Effective Date.

**G. INTERESTS IN THE LIQUIDATION TRUST ASSETS**

Each Beneficiary shall have a beneficial interest in the Liquidation Trust Assets.

**H. APPOINTMENT OF THE LIQUIDATION TRUSTEE**

The initial Liquidation Trustee will be identified in the Plan Supplement. The Liquidation Trustee shall serve as the trustee of the Liquidation Trust subject to supervision and oversight of the Liquidation Trust Supervisory Board. Any rights, powers, or obligations given to the Liquidation Trustee pursuant to the Plan or Liquidation Trust Agreement shall be subject to any consultation, approval, or other rights provided to the Liquidation Trust Supervisory Board in the Plan or the Liquidation Trust Agreement.

**I. RIGHTS AND POWERS OF DEBTORS AND THE LIQUIDATION TRUSTEE**

    1.    <u>Powers of Debtors and the Liquidation Trustee</u>

       All Distributions under the Plan shall be made on the Effective Date by Debtors or thereafter by the Liquidation Trustee or its designees. After the

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 28

Effective Date, the Liquidation Trustee shall have the right to object to, allow, or otherwise resolve any Claim, and shall have such other rights, duties, and obligations as set forth in the Plan and Liquidation Trust Agreement.

Debtors and the Liquidation Trustee, as applicable, shall not be required to give any bond, surety, or other security for the performance of their respective duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event the Bankruptcy Court requires Debtors or the Liquidation Trustee, as applicable, to post a bond or surety, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Liquidation Trust.

2. <u>Expenses Incurred on or After the Effective Date</u>

Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Liquidation Trustee on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Liquidation Trustee shall be paid in Cash from the Liquidation Trust Assets without further notice to, or action, order, or approval of, the Bankruptcy Court.

## J.   DISTRIBUTION AND WITHHOLDING

Notwithstanding anything in the Plan to the contrary, the Liquidation Trustee will make, or cause to be made, all Distributions under the Plan other than (i) those Distributions made by Debtors on the Effective Date, and (ii) Distributions from the Professional Fee Escrow Account in accordance with the Plan.

The Liquidation Trustee may withhold from amounts distributable to any Entity any and all amounts determined, in the Liquidation Trustee's sole discretion, to be withheld by the Plan or applicable law, regulation, rule, ruling, directive, or other governmental requirement.

## K.   INSURANCE

The Liquidation Trustee may maintain customary insurance coverage for the protection of the Liquidation Trust Assets, Liquidation Trustee, and Professionals retained by the Liquidation Trustee on and after the Effective Date. The cost of such insurance shall be deemed a trust administrative expense.

## L.   OTHER RIGHTS AND REMEDIES

In addition to the Liquidation Trustee's rights and duties with respect to the Liquidation Trust, on and after the Effective Date, the Liquidation Trustee will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court.

On the Effective Date, the Liquidation Trustee shall (i) take possession of all books, records, and files of Debtors and their Estates in all forms, including electronic and hard copy, other than Debtors' Professionals' work product and other documents; and (ii) provide for the retention and storage of such books, records, and files until such time as the Liquidation Trustee determines, in accordance with the Liquidation Trust Agreement, that retention of same is no longer necessary or required. Any and all rights to conduct investigations with respect to Causes of Action or Claims not released by Debtors, and to assert such Causes of Action, shall vest with the Liquidation Trust and shall continue until dissolution of the Liquidation Trust, and the Liquidation Trust shall be deemed a successor-in-interest to Debtors with all requisite standing and authority to pursue such rights, including Causes of Action, as if neither the Confirmation Date nor the Effective Date had occurred. Filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Liquidation Trustee.

Notwithstanding the foregoing or any other provision in the Plan, in the event the Liquidation Trust receives any monies from the United States or any other Governmental Unit, obtained as forfeited assets (or otherwise) by the Governmental Unit for the benefit of the investor victims of Debtors' prepetition Ponzi scheme, no such monies shall constitute Estate Assets or Liquidation Trust Assets, and such monies shall be distributed only to such investor victims, subject to the Plan and the Liquidation Trust Agreement; provided that the Liquidation Trustee and its agents will be reimbursed from such monies for reasonable costs and expenses incurred by said parties related to the Liquidation Trust's collection, administration, and distribution of such monies to the applicable investors.

## M.    PRIORITY CLAIMS RESERVE

On the Effective Date, the Liquidation Trustee shall, to the extent feasible, establish the Priority Claims Reserve by depositing Cash from the Liquidation Trust Assets in the amount of all anticipated Allowed Priority Tax Claims and Allowed Other Priority Claims. The Priority Claims Reserve shall be used to pay Allowed Priority Tax Claims and Allowed Other Priority Claims. If all or any portion of a Priority Tax Claim or Other Priority Claim shall become a Disallowed Claim, or is reclassified as a General Unsecured Claim, then the amount on deposit in the Priority Claims Reserve attributable to such Disallowed Claim or reclassified Claim, including the interest accrued on said amount while on deposit in the Priority Claims Reserve, shall remain in the Priority Claims Reserve to the extent the Liquidation Trustee determines necessary to ensure that the Cash remaining in the Priority Claims Reserve is sufficient to ensure that Allowed Priority Tax Claims and Allowed Other Priority Claims will be paid in accordance with the Plan.

## N. DISPUTED CLAIMS RESERVE

The Liquidation Trustee may maintain, in accordance with the Liquidation Trustee's powers and responsibilities under the Plan and Liquidation Trust Agreement, a Disputed Claims Reserve. The Liquidation Trustee may, in its reasonable discretion, distribute such amounts (net of any expenses, including any taxes relating thereto) as provided herein and in the Liquidation Trust Agreement, as Disputed Claims are resolved pursuant to the Plan, and such amounts may be distributed on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date.

## O. ATTRIBUTION OF INCOME

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Liquidation Trustee of a private letter ruling if the Liquidation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustee), allocations of taxable income of the Liquidation Trust (other than taxable income allocable to the Liquidation Trust's Claims reserves) among Holders of Claims will be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidation Trust had distributed all of its assets (valued at their tax book value) to the holders of beneficial interests in the Liquidation Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidation Trust. Similarly, taxable loss of the Liquidation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidation distribution of the remaining Liquidation Trust Assets. The tax book value of the Liquidation Trust Assets for purposes of this paragraph shall equal their fair market value on the date the Liquidation Trust Assets are transferred to the Liquidation Trust, adjusted in accordance with tax accounting principles prescribed by the IRS, the Internal Revenue Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

## P. CURRENT BASIS

All income of the Liquidation Trust will be subject to tax on a current basis.

## Q. TAX IDENTIFICATION NUMBERS

The Liquidation Trustee may require any Beneficiary to furnish to the Liquidation Trustee its Employer or Taxpayer Identification Number as assigned by the IRS or certify to the Liquidation Trustee's satisfaction that Distributions to the

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 31

Beneficiary are exempt from backup withholding. The Liquidation Trustee may condition any Distribution to any Beneficiary upon receipt of such identification number. If, after reasonable inquiry, any Beneficiary fails to provide such identification number to the Liquidation Trustee, the Liquidation Trustee shall deem such Beneficiary's Claim as Disallowed and no Distribution shall be made on account of such Beneficiary's Claim.

**R.    WIND-DOWN**

In addition to the Liquidation Trustee's rights and duties with respect to the Liquidation Trust, on and after the Effective Date, the Liquidation Trustee will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court that pertain to the Liquidation Trust. The Liquidation Trustee shall retain the power and authority to take any action necessary to wind down and dissolve Debtors' Estates or take any other action of Debtors required or permitted under the Bankruptcy Code.

As soon as practicable after the Effective Date, the Liquidation Trustee shall (i) cause Debtors to comply with, and abide by, the terms of any outstanding APAs; (ii) complete and file all final or otherwise required federal, state, and local tax returns for Debtors and, pursuant to Section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of each Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws; and (iii) take such other actions as may be necessary or desirable to carry out the purposes of the Plan. From and after the Effective Date, Debtors (a) for all purposes shall be deemed to have withdrawn their business operations from any state in which they were previously conducting, or are registered or licensed to conduct, their business operations; and (b) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. In addition, Debtors shall be deemed to have cancelled all Interests pursuant to the Plan. For the avoidance of doubt, (x) the dissolution of Debtors shall not have any effect, in any manner, on the Retained Causes of Action the Liquidation Trustee may assert in accordance with the Plan and Liquidation Trust Agreement; and (y) notwithstanding each Debtor's dissolution, Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

**S.    TERMINATION OF THE LIQUIDATION TRUST AND LIQUIDATION TRUSTEE**

Notwithstanding any provision of the Plan to the contrary, the Liquidation Trust shall be dissolved upon the earlier of the Distribution of all Liquidation Trust Assets to Beneficiaries required to be made by the Liquidation Trust under the Plan

or the fifth anniversary of creation of the Liquidation Trust; provided, however, notwithstanding the foregoing, that the Liquidation Trust shall be dissolved no later than five years from the Effective Date unless the Bankruptcy Court, upon a motion filed within six months of the fifth anniversary of the Effective Date or the end of any extension period approved by the Bankruptcy Court (the filing of which shall automatically extend the term of the Liquidation Trust pending entry of an order by the Bankruptcy Court granting or denying the motion), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets; provided, however, that adequate funding exists for such extension period as determined by the Bankruptcy Court; and provided, further, that each request for an extension shall be approved by the Bankruptcy Court within six months prior to conclusion of the extended term. After (i) final Distribution of the balance of the Liquidation Trust Assets or proceeds of the Liquidation Trust pursuant to the Plan; (ii) the filing by or on behalf of the Liquidation Trust of a certification of dissolution with the Bankruptcy Court in accordance with the Plan; and (iii) any other action deemed appropriate by the Liquidation Trustee, the Liquidation Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

The duties, responsibilities, and powers of the Liquidation Trustee will terminate in accordance with the terms of the Liquidation Trust Agreement.

## T.    TRANSFER OF BENEFICIAL INTERESTS

Notwithstanding anything to the contrary in the Plan, beneficial interests in the Liquidation Trust shall not be transferrable except upon the death of the interest holder or by operation of law.

**ARTICLE 10.**
**ASSETS AND LIABILITIES**

At the time of filing this Disclosure Statement, Debtors cannot with any accuracy estimate the total amount of Assets or liabilities.

As set forth in more detail above, Debtors are in the process of selling their tangible Assets, which consist primarily of real estate contributed to the Estates, directly or indirectly, by Mr. Wear's vending machines and related contracts; a carve-out from proceeds of sales of water machines and related contracts; various other personal property; millions in cash payments from First Fed; and the proceeds from the Ideal bankruptcy case that, as of this date, are all slated to pour over into the Liquidation Trust once secured administrative claims of the Ideal

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE
STATEMENT (JULY 1, 2025) – Page 33

estate are satisfied. Importantly, the amount of real estate proceeds available to unsecured creditors is now estimated to be several million dollars as a result of the First Fed Settlement that includes cash payments from First Fed to Debtors and First Fed walking away from claims that it has security interests in more than a dozen pieces of real property.

Other non-tangible Assets that may serve as a source for Distributions include, without limitation, surcharges to secured creditors under 506(c) of the Bankruptcy Code, potential recoveries from Causes of Action, and any recovery Debtors may receive with respect to their filed proofs of claim in the Ideal Property Investments, LLC bankruptcy case.

Except for those subject to the First Fed Settlement, nearly all of Debtors' Assets are encumbered and subject to Claims of Secured Creditors (see Classes 1 through 5 of the Plan), except Causes of Action under Section 5 of the Bankruptcy Code. Debtors are in the process of analyzing filed Claims, including Secured Claims. Debtors anticipate that they, or the Liquidation Trustee, will challenge the amount or validity of numerous Secured Claims.

Given the uncertainty as to the amount of sale proceeds that will be generated from the sale or liquidation of Assets, the uncertainty as to the total amount of liabilities, and the uncertainty as to the amount or validity of various asserted Secured Claims, at this time Debtors cannot with any accuracy estimate the amount of equity in Debtors' Assets that may be available for Distribution to Unsecured Creditors.

The Assets of the Liquidation Trust that will likely provide the most benefit to Holders of General Unsecured Claims is the Section 5 Causes of Action, including, but not limited to, actions related to any eventual Ponzi scheme finding.

Prior to the Voting Deadline, Debtors will file a Plan Supplement that will, among other things, contain an update on Asset sales, a general summary of Assets and liabilities, an update with respect to negotiations with various Secured Creditors, and, to the extent possible, an estimated range of recovery to Holders of Allowed General Unsecured Claims.

## ARTICLE 11.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The treatment of Executory Contracts and Unexpired Leases is set forth in Article 9 of the Plan. In short, on the Effective Date, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected, pursuant to Sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease (a) is the subject of a motion to assume such Executory Contracts or Unexpired Leases

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 34

pending on the Confirmation Date; or (b) is a contract, release, or other agreement or document entered into in connection with the Plan.  Please see Article 9 of the Plan for a more detailed discussion of Executory Contracts and Unexpired Leases.

## ARTICLE 12.
## CONFIRMATION AND VOTING PROCEDURES

### A.    CONFIRMATION PROCEDURES

The Order approving this Disclosure Statement will, among other things, conditionally approve the Plan for solicitation purposes only and authorize Debtors to solicit votes to accept or reject the Plan.  The Confirmation Hearing will be scheduled for [_____] to consider (i) final approval of the Disclosure Statement as providing adequate information pursuant to Section 1125 of the Bankruptcy Code, and (ii) confirmation of the Plan pursuant to Section 1129 of the Bankruptcy Code.  The Confirmation Hearing may be adjourned from time to time by Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

### B.    PROCEDURE FOR OBJECTIONS

Any objection to interim approval of the Disclosure Statement as providing adequate information pursuant to Section 1125 of the Bankruptcy Code or final approval of the Disclosure Statement and confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on [_____] (collectively, the "*Objection Recipients*"); in each case by no later than [_____] in connection with approval of the Disclosure Statement and confirmation of the Plan.  Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

### C.    REQUIREMENTS FOR CONFIRMATION

The Bankruptcy Court will confirm the Plan only if it meets all of the applicable requirements of Section 1129 of the Bankruptcy Code.  Among other requirements, the Plan (i) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (ii) must be feasible.  The Bankruptcy Court must also find that the Plan (x) has classified Claims and Interests in a permissible manner, (y) complies with the technical requirements of Chapter 11 of the Bankruptcy Code, and (z) has been proposed in good faith.

## D.    CLASSIFICATION OF CLAIMS AND INTERESTS

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with Section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those Claims which, pursuant to Section 1123(a)(1) of the Bankruptcy Code, need not be, and have not been, classified).  Debtors are also required, under Section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular Class unless the claim or interest holder agrees to a less favorable treatment of its claim or interest.  Debtors believe the Plan complies with such standard.  If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent the Claim or Interest falls within the description of that Class, and is classified in other Classes to the extent any portion of the Claim or Interest falls within the description of such other Classes.  A Claim is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

Debtors believe the Plan has classified all Claims and Interests in compliance with the provisions of Section 1122 of the Bankruptcy Code and applicable case law.  It is possible that a Holder of a Claim or Interest may challenge Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  If such a situation develops, Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation.  Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

## E.    IMPAIRED CLAIMS/VOTING

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in Section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan.  Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are altered under such plan.  In addition, if the holders of claims or interests in an

impaired Class do not receive or retain any property under a plan on account of such claims or interests, such impaired Class is deemed to have rejected such plan under Section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, Holders of Claims in Classes 1, 2, 3, 4, 5, 6, and 7 are Impaired and are entitled to vote on the Plan.

Under the Plan, Holders of Claims or Interests in Classes 8 and 9 are Impaired but will not receive or retain any property under the Plan on account of such Claims or Interests and, therefore, are not entitled to vote on the Plan and are deemed to reject the Plan.

Accordingly, a ballot for acceptance or rejection of the Plan is being provided only to Holders of Claims in Classes 1 through 7.

**TO BE COUNTED FOR VOTING PURPOSES, BALLOTS FOR THE ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY DEBTORS NO LATER THAN 4:00 P.M. PACIFIC TIME ON _____, 2025 AT THE FOLLOWING ADDRESS**:

> Tonkon Torp LLP
> Attn: Spencer Fisher/Refreshing
> 1300 SW 5th Avenue, Suite 2400
> Portland, Oregon 97201

If you believe you are a Holder of a Claim entitled to vote on the Plan and you did not receive a ballot, please contact Spencer Fisher at spencer.fisher@tonkon.com.

Holders of each Claim scheduled by Debtors or with respect to which a Proof of Claim has been filed will receive ballots and are permitted to vote based on the amount of the Proof of Claim, except as discussed below. If no Proof of Claim has been filed, then the vote will be based on the amount set forth by Debtors in their Schedules (unless scheduled as disputed, contingent, or unliquidated, in which case the amount for voting purposes will be zero). The Bankruptcy Code provides that such votes will be counted unless the Claim has been disputed, disallowed, disqualified, or suspended prior to computation of votes on the Plan. A Claim to which an objection has been filed is not allowed to vote unless and until the Bankruptcy Court rules on the objection except that, to the extent the objection does not dispute certain amounts of a Claim, the Claimant shall be entitled to vote in the amount of the undisputed amount of the Claim as of the voting record date, which is the date of the Order approving this Disclosure Statement. Holders of Disputed Claims who have settled their dispute with Debtors are entitled to vote the settled amount of their Claim. The Bankruptcy Code provides that the Bankruptcy Court may, if timely requested to do so by the holder of such Claim,

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 37

estimate or temporarily allow a disputed Claim for the purpose of voting on the Plan.

If a Claim is filed as entirely unliquidated, or in the amount of $0.00, or the amount was left blank, the holder of such Claim shall not be entitled to vote on account of such Claim. If a Claim is filed as partially liquidated and partially unliquidated, such Claim will be Allowed for voting purposes only in the liquidated amount.

When a ballot is signed and returned without further instruction regarding acceptance or rejection of the Plan, the signed ballot shall be counted as a vote accepting the Plan. When a ballot is returned indicating acceptance or rejection of the Plan but is unsigned, the unsigned ballot will not be included in any calculation to determine whether parties entitled to vote on the Plan have voted to accept or reject the Plan. When a ballot is returned without indicating the amount of the Claim or an amount different from a timely filed Proof of Claim, then the amount shall be as set forth on Debtors' Schedules, or any Proof of Claim timely filed with respect to such Claim, or Order of the Bankruptcy Court.

## F.   CONFIRMATION PURSUANT TO SECTIONS 1129(a)(10) AND 1129(b) OF THE BANKRUPTCY CODE

If any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, determined without including any acceptance of the plan by any insider holding a claim in that class, and the plan meets the "cramdown" requirements set forth in Section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (i) "does not discriminate unfairly" and (ii) is "fair and equitable" with respect to each non-accepting impaired class of claims or interests. Debtors shall seek Confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to any Class of Claims or Interests that votes or is deemed to reject the Plan, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code.

Debtors believe the requirements of Section 1129(b) of the Bankruptcy Code are satisfied. The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists; courts typically examine the facts and circumstances of each particular case to determine whether unfair discrimination exists. At a minimum, however, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without sufficient justifications for doing so. Debtors believe that, under the Plan, all Impaired Classes of Claims or Interests are

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 38

treated in a manner consistent with the treatment of other Classes of Claims or Interests similarly situated, if any, except where there is sufficient justification for different treatment. Accordingly, Debtors believe the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders as follows:

Secured Creditors. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value at least equal to the amount of its allowed secured claim as of the Effective Date; (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

Unsecured Creditors. Either (i) each impaired unsecured creditor receives or retains under the Plan property of a value, as of the Effective Date, equal to the amount of its allowed claim; or (ii) the holders of claims and interests junior to the claims of the dissenting Class will not receive any property under the Plan on account of such junior claim or interest.

Equity Interests. Either (i) each holder of an equity interest will receive or retain under the Plan property of a value equal to the greater of the Allowed amount of any fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of such interest; or (ii) the holder of any interest junior to such non-accepting Class will not receive or retain any property under the plan on account of such junior interest.

Debtors believe the Distributions provided for under the Plan satisfy the absolute priority rule where required.

## G.    FEASIBILITY

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of debtors or any successor to debtors (unless such liquidation or reorganization is proposed in the plan). For purposes of this test, Debtors have analyzed the ability of Debtors and the Liquidation Trust to meet their obligations under the Plan. Based on Debtors' analysis, Debtors and the Liquidation Trust will have sufficient assets to accomplish their tasks under the Plan. This is especially true given (i) the First Fed settlement and (ii) the expected Ponzi finding at

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 39

confirmation. Either the First Fed Settlement or the Ponzi finding would, on their own, comfortably satisfy feasibility. Together, the Liquidation Trust stands to produce a significant benefit and recovery for creditors. Therefore, Debtors believe the transactions to be effectuated pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

## H.    BEST INTERESTS TEST AND LIQUIDATION ANALYSIS

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the Bankruptcy Court to determine that such plan is in the best interests of all holders of claims or interests impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in Section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would recover if Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if a debtor were liquidated under Chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its Chapter 11 case were converted to a case under Chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of distributions from the proceeds of a liquidation of a debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a Chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of holders of claims or interests in such impaired class.

Here, Debtors believe the Plan satisfies the best interests test as the recoveries expected to be available to Holders of Allowed Claims under the Plan will be greater than the recoveries expected in a liquidation under Chapter 7 of the Bankruptcy Code. As described at length above and in the Plan, the First Fed settlement and the anticipated Ponzi findings at confirmation will produce an immediate, substantial, tangible benefit and potential distribution (should the Liquidation Trust decide to provide one) beyond anything that would be accomplished in a Chapter 7 liquidation. Those facts alone are sufficient to satisfy the best interests test.

Moreover, by the Effective Date, Debtors anticipate that most of Debtors' tangible Assets will have already been sold and Debtors will have limited tangible Assets remaining in their Estates to liquidate. While a liquidation under Chapter 7 of the Bankruptcy Code would have the same goal, Debtors believe the Plan provides the best source of recovery for several reasons. First, Debtors believe that liquidation under Chapter 7 of the Bankruptcy Code would not provide for a timely distribution. Second, Debtors believe distributions would likely be smaller because a Chapter 7 trustee and his/her professionals would have to expend significant time and resources familiarizing themselves with Debtors, the Assets, and the Retained Causes of Action prior to completing any sales of Assets or pursuing any Causes of Action, while Debtors, the Committee, and their professionals have already spent considerable time and effort on that and are the people most familiar with Debtors' affairs, and it is anticipated that some combination thereof will remain involved in the Liquidation Trust to effectively administer its assets. At this time, there are no alternative feasible plans available to Debtors. Debtors are no longer a going concern enterprise and as of the Effective Date will have relatively few Assets remaining to administer. Therefore, Debtors believe the Plan provides the greatest possible value to all stakeholders under the circumstances and has the greatest chance to be confirmed and consummated.

## ARTICLE 13.
## EFFECT OF CONFIRMATION

### A.    BINDING EFFECT

The treatment of, and consideration received by, holders of Allowed Claims and Interests pursuant to the Plan will be in full satisfaction of their respective Claims against, or Interests in, Debtors. The Confirmation Order shall bind Debtors and any Creditor, and discharge Debtors from any liability that arose before the Effective Date as provided in Sections 524 and 1141 of the Bankruptcy Code, and any debt and liability of a kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (i) a Proof of Claim based on such Creditor's debt or liability is Filed or deemed Filed under Section 501 of the Bankruptcy Code; (ii) a Claim based on such debt or liability is Allowed; or (iii) the Holder of the Claim based on such debt or liability has accepted the Plan.

### B.    INJUNCTION

The effect of confirmation shall be as set forth in Section 1141 of the Bankruptcy Code. Except as otherwise provided in the Plan or Confirmation Order, confirmation of the Plan shall act as a permanent injunction applicable to Entities against (i) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 41

against the Committee or its Related Parties, the Liquidation Trust or its Related Parties, or, other than the Non-Released Debtor Parties, the Related Parties of Debtors (collectively, the "*Protected Parties*"), that was or could have been commenced against the Protected Parties before entry of the Confirmation Order; (ii) the enforcement against the Protected Parties, or Debtors' Assets, of a judgment obtained before the Petition Date; and (iii) any act to obtain possession of, exercise control over, or create, perfect, or enforce a lien upon all or any part of the Assets of Debtors. For the avoidance of doubt, the foregoing injunction does not discharge Debtors.

**C.      RESERVED**

**D.      MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN**

Subject to Section 1127 of the Bankruptcy Code, Debtors reserve the right to alter, amend, modify, or withdraw the Plan before its substantial consummation so long as the treatment of holders of Claims and Interest Holders under the Plan is not adversely affected.

**E.      RETENTION OF JURISDICTION**

Notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court retains jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, to the fullest extent permitted by law, including jurisdiction to:

     1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including resolution of any request for payment of any Administrative Claim and resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

     2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals (including Professional Fee Claims) authorized pursuant to the Bankruptcy Code or the Plan;

     3.      resolve any matters related to (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to Section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed (or assumed and assigned); (c) the Liquidation Trustee amending,

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 42

modifying, or supplementing, after the Effective Date, pursuant to Article 14 of the Plan, the Executory Contracts and Unexpired Leases to be assumed, rejected, or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.　　ensure that Distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.　　adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving Debtors that may be pending on the Effective Date;

6.　　adjudicate, decide, or resolve any and all matters related to Section 1141 of the Bankruptcy Code;

7.　　enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Plan Supplement;

8.　　enter and enforce any order for the sale of property pursuant to Sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.　　resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.　　issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.　　resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article 14 of the Plan, and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.　　resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of Distributions and recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article 12.H of the Plan;

13.　　enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 43

14. determine any other matters that may arise in connection with, or that relate to, the Plan, Disclosure Statement, Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan;

15. enter an order or Final Decree concluding or closing any of the Chapter 11 Cases;

16. adjudicate any and all disputes arising from or relating to Distributions under the Plan;

17. consider any modifications of the Plan to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18. determine requests for payment of Claims entitled to priority pursuant to Section 507 of the Bankruptcy Code;

19. hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20. hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Restructuring Transactions, whether they occur before, on, or after the Effective Date;

21. hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

22. hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, injunctions, and releases granted in connection with and under the Plan, including under Article 14 of the Plan;

23. hear and determine all Causes of Action;

24. enforce all orders previously entered by the Bankruptcy Court; and

25. hear any other matter not inconsistent with the Bankruptcy Code.

## F.   UNITED STATES TRUSTEE FEES

Fees payable by Debtors under 28 U.S.C. § 1930, or to the Clerk of the Bankruptcy Court, will be paid in full in Cash on the Effective Date. All quarterly fees due to the United States Trustee pursuant to 28 U.S.C. § 1930(a), including fees due for

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 44

any partial quarter, accruing after the Effective Date shall be paid by the Liquidation Trustee as and when they become due and will be based on the Plan Agent's total disbursements, including ordinary course of business disbursements as well as disbursements made to Claimants under the Plan. Such fee obligations will not terminate until this Case is converted or dismissed, or until this Case is no longer pending upon entry of a Final Order closing this Case, whichever first occurs, and all United States Trustee fees, including any such fees accrued in any partial quarter, shall be paid as a condition precedent prior to entry of an order closing the Bankruptcy Cases. All United States Trustee fees, including any such fees accrued in any partial quarter, shall also be paid as a condition precedent prior to entry of a Final Decree.

## ARTICLE 14.
## GENERAL TAX CONSEQUENCES ON CREDITORS

The effect of the Plan on specific creditors will depend on specific financial information relative to such Creditor, which is unknown to Debtors. As a result, the tax implications to specific Creditors cannot be completely described herein. For a general tax discussion on certain creditors, please see Article 15 below.

NOTWITHSTANDING ANY TAX DISCUSSION IN THIS DISCLOSURE STATEMENT, INCLUDING THE DISCUSSION IN Article 15 BELOW, EACH HOLDER IS URGED TO CONSULT SUCH HOLDER'S OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN TO SUCH HOLDER UNDER FEDERAL AND APPLICABLE STATE, LOCAL, AND FOREIGN TAX LAWS. DEBTORS AND DEBTORS' COUNSEL EXPRESS NO OPINION AS TO THE TAX CONSEQUENCES OF THE PLAN OR THE EFFECT THEREOF ON ANY CLAIMANT.

## ARTICLE 15.
## CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHICH ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND DOCUMENTS DELIVERED TOGETHER HEREWITH, OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 45

## A.    THE PLAN MAY NOT BE ACCEPTED

Debtors can make no assurances that the requisite acceptances of the Plan will be received.  In the event the Plan is not accepted by Creditors and the Plan is not otherwise confirmed pursuant to Section 1129(b) of the Bankruptcy Code, the Chapter 11 Cases may be converted to Chapter 7 of the Bankruptcy Code.

## B.    THE PLAN MAY NOT BE CONFIRMED

Even if Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan.  Even if the Bankruptcy Court determines that the Plan and Disclosure Statement, and the balloting procedures and results, were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation have not been met.  Moreover, there can be no assurance that modifications to the Plan and Disclosure Statement will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes.  If the Plan is not confirmed, the Plan will need to be revised and it is unclear whether a Chapter 11 reorganization or liquidation of Debtors' Assets could be implemented and what distribution the Holders of Allowed Claims would receive.  If an alternative cannot be agreed to, it is possible Debtors would have to liquidate their remaining assets in Chapter 7, in which case it is likely the Holders of Allowed Claims would receive less favorable treatment than they would receive under the Plan.  There can be no assurance that the terms of any such alternative would be similar to or as favorable to Debtors' creditors as those proposed in the Plan.

## C.    DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS UNDER THE PLAN MAY BE INCONSISTENT WITH PROJECTIONS.

At this time, Debtors cannot estimate with any certainty the Distributions that will be available to Creditors.  Projected distributions, to the extent they are or can be provided, will be based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution.  There can be no assurance that any projected Distributions will be accurate.  Any estimated amounts will be based on certain assumptions with respect to a variety of factors, and those assumptions may prove to be inaccurate.  Both the actual amount of Allowed Claims in a particular Class, and the funds available for Distribution to such Class, may differ from any estimates provided by Debtors.  If the total amount of Allowed Claims in a Class is higher than Debtors' estimates, or the funds available for Distribution to such Class are lower than Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 46

## D.  OBJECTIONS TO CLASSIFICATION OF CLAIMS

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  Debtors believe all Claims and Interests have been appropriately classified in the Plan.  To the extent the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, Debtors would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation, and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent modification of classification in the Plan requires resolicitation, Debtors will, in accordance with the Bankruptcy Code, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class to which such Holder is ultimately deemed to be a member. Debtors believe that under the Bankruptcy Code, they would be required to re-solicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest.  Debtors believe the Plan complies with the requirement of equal treatment.  To the extent the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.  Issues or disputes relating to classification and/or treatment could result in a delay in confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

## E.  FAILURE TO CONSUMMATE THE PLAN

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date (see Article 15 of the Plan).  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance the Plan will be consummated.

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 47

## F.    CERTAIN TAX CONSIDERATIONS

A summary description of certain U.S. federal income tax consequences of the Plan and Disclosure Statement is provided below.  The description of tax consequences below is for informational purposes only and due to lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various U.S. federal income tax consequences of the Plan and Disclosure Statement as discussed herein.  Only the potential material U.S. federal income tax consequences to Debtors and to hypothetical Holders of Claims entitled to vote to accept or reject the Plan and Disclosure Statement are described below.  This summary is based on the Internal Revenue Code of 1986, as amended ("*Internal Revenue Code*"), Treasury Regulations promulgated and proposed thereunder ("*Treasury Regulations*"), judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect.  No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan and Disclosure Statement, and no tax opinion is being given in the Plan and Disclosure Statement.  No rulings or determinations of the IRS or any other tax authorities have been obtained or sought with respect to any tax consequences of the Plan and Disclosure Statement, and the discussion below is not binding upon the IRS or such other authorities.  No representations are being made regarding the particular tax consequences of confirmation and consummation of the Plan and Disclosure Statement.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of the U.S. federal income tax consequences below is based on the Tax Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions, and administrative rulings and pronouncements of the IRS and other applicable authorities, all as in effect on the date hereof.  Legislative, judicial, or administrative changes or interpretations enacted or promulgated in the future could alter or modify the analyses and conclusions set forth below.  It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to Holders of Claims.  Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences discussed below.

THIS DISCUSSION DOES NOT ADDRESS FOREIGN, STATE, OR LOCAL TAX CONSEQUENCES OF THE PLAN AND DISCLOSURE STATEMENT, NOR DOES IT PURPORT TO ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND DISCLOSURE STATEMENT TO SPECIAL CLASSES OF TAXPAYERS (SUCH AS FOREIGN ENTITIES, NONRESIDENT ALIEN INDIVIDUALS, CERTAIN EXPATRIATES, OR

FORMER LONG-TERM RESIDENTS OF THE UNITED STATES, GOVERNMENTAL AUTHORITIES OR AGENCIES, PASS-THROUGH ENTITIES SUCH AS PARTNERSHIPS AND HOLDERS THROUGH SUCH PASS-THROUGH ENTITIES, S CORPORATIONS, RETIREMENT PLANS, INDIVIDUAL OR TAX- DEFERRED ACCOUNTS, MUTUAL FUNDS, INSURANCE COMPANIES, BANKS OR OTHER FINANCIAL INSTITUTIONS, SMALL BUSINESS INVESTMENT COMPANIES, REGULATED INVESTMENT COMPANIES, CERTAIN SECURITIES TRADERS, BROKER-DEALERS, REAL ESTATE INVESTMENT TRUSTS, AND TAX-EXEMPT ORGANIZATIONS).  FURTHERMORE, ESTATE AND GIFT TAX ISSUES ARE NOT ADDRESSED HEREIN AND TAX CONSEQUENCES RELATING TO THE ALTERNATIVE MINIMUM TAX AND MEDICARE TAX ARE NOT DISCUSSED HEREIN.

(a)    Consequences to Debtors

Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of any cancellation of indebtedness ("*COD*") income recognized during the taxable year.  COD income generally equals the excess of the adjusted issue price of the indebtedness discharged over the sum of the (i) amount of cash, (ii) issue price of any new debt, and (iii) fair market value of any other property (including stock) transferred by Debtors in satisfaction of such discharged indebtedness.  COD income also includes any interest that has been previously accrued and deducted but remains unpaid at the time the indebtedness is discharged.

Section 108(a)(1)(A) of the Tax Code provides an exception to this rule, however, where a taxpayer is in bankruptcy and where the discharge is granted or is effected pursuant to an approved plan of reorganization by the Bankruptcy Court.  In such a case, instead of recognizing income, the taxpayer is required, under Section 108(b) of the Tax Code, to reduce certain of its tax attributes by the amount of COD income.  The attributes of the taxpayer are to be reduced in the following order: current year Net Operating Losses ("*NOLs*") and NOL carryovers, general business and minimum tax credit carryforwards, capital loss carryforwards, the basis of the taxpayer's assets, and finally, foreign tax credit carryforwards.  The reduction in the foregoing tax attributes generally occurs after calculation of a debtor's tax for the year in which the debt is discharged. Section 108(b)(5) of the Tax Code permits a taxpayer to elect to first apply the reduction to the basis of the taxpayer's depreciable assets, with any remaining balance applied to the taxpayer's other tax attributes in the order stated above.  In addition to the foregoing, Section 108(e)(2) of the Tax Code provides a further exception to the realization of COD income upon the discharge of debt in that a taxpayer will not recognize COD income to the extent the taxpayer's satisfaction of the debt would have given rise to a deduction for federal income tax purposes.

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 49

Debtors may realize COD income as a result of the Plan and Disclosure Statement. The ultimate amount of any COD income realized by Debtors is uncertain because, among other things, it will depend on the fair market value of all Assets transferred to Holders of Claims issued on the Effective Date.

In general, if a debtor sells property to a third party it will recognize taxable income equal to the difference between the amount realized on the sale and its tax basis in such assets sold. In addition, if a debtor conveys appreciated (or depreciated) property (i.e., property having an adjusted tax basis less (or greater) than its fair market value) to a creditor in cancellation of debt, the debtor must recognize taxable gain or loss (which may be ordinary income or loss, capital gain or loss, or a combination of each) equal to the excess or shortfall, respectively, of such fair market value over debtor's adjusted tax basis in such property.

(b) Tax Consequences in Relation to the Liquidation Trust

On the Effective Date, Debtors and the Liquidation Trustee shall execute the Liquidation Trust Agreement and take all steps necessary to establish the Liquidation Trust in accordance with the Plan and Disclosure Statement, which shall be for the benefit of Beneficiaries. Additionally, on the Effective Date (or, with respect to the Remaining Professional Fee Escrow Amounts, on the Escrow Amounts Transfer Date) Debtors shall transfer and/or assign, and shall be deemed to transfer and/or assign, to the Liquidation Trust all of their rights, title, and interests in and to all of the Liquidation Trust Assets, and in accordance with Bankruptcy Code Section 1141, the Liquidation Trust Assets shall automatically vest in the Liquidation Trust free and clear of all Claims and liens, subject only to the (i) beneficial interests in the Liquidation Trust; and (ii) expenses of the Liquidation Trust as provided for in the Liquidation Trust Agreement and herein. The tax consequences of the Plan in relation to the Liquidation Trust and Beneficiaries thereof are subject to uncertainties due to the complexity of the Plan and the lack of interpretive authority regarding certain changes in the tax law.

The Liquidation Trust shall be governed by the Liquidation Trust Agreement and administered by the Liquidation Trustee. The powers, rights, responsibilities, and compensation of the Liquidation Trustee shall be specified in the Liquidation Trust Agreement. The Liquidation Trustee shall hold and distribute the Liquidation Trust Assets in accordance with the Plan and Disclosure Statement and the Liquidation Trust Agreement. Other rights and duties of the Liquidation Trustee and Beneficiaries shall be as set forth in the Liquidation Trust Agreement.

After the Effective Date (or, with respect to the Remaining Professional Fee Escrow Amounts, on the Escrow Amounts Transfer Date),

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 50

Debtors shall have no interest in the Liquidation Trust Assets. To the extent any Liquidation Trust Assets cannot be transferred to the Liquidation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by Bankruptcy Code Section 1123 or any other provision of the Bankruptcy Code, such Liquidation Trust Assets shall be deemed to have been retained by Debtors and the Liquidation Trust shall be deemed to have been designated as a representative of Debtors pursuant to Bankruptcy Code Section 1123(b)(3)(B) to enforce and pursue such Liquidation Trust Assets on behalf of Debtors for the benefit of Beneficiaries. Notwithstanding the foregoing, all net proceeds of such Liquidation Trust Assets shall be transferred to the Liquidation Trust, to be distributed in accordance with the Plan and Disclosure Statement.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Liquidation Trust is intended to be treated as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation Section 301.7701-4(d), and the Liquidation Trustee will take this position on the Liquidation Trust's tax return accordingly. Beneficiaries shall be treated as grantors of the Liquidation Trust and deemed owners of the Liquidation Trust Assets. For U.S. federal income tax purposes, the transfer of assets to the Liquidation Trust will be deemed to occur as a (i) first-step transfer of Liquidation Trust Assets to Holders of Allowed Claims, and (ii) second-step transfer by such Holders to the Liquidation Trust. As a result, the transfer of Liquidation Trust Assets to the Liquidation Trust should be a taxable transaction, and Debtors should recognize gain or loss equal to the difference between the tax basis and fair market value of such assets. In addition, as detailed above, if the total fair value of the Liquidation Trust Assets is less than the total of the Allowed Claims (that have been deducted for federal income tax purposes) Debtors will recognize COD income equal to such difference.

As soon as possible after transfer of the Liquidation Trust Assets to the Liquidation Trust, the Liquidation Trustee shall make a good faith valuation of the Liquidation Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each Debtor, the Liquidation Trustee, and the Holders of Claims receiving beneficial interests in the Liquidation Trust shall take consistent positions with respect to valuation of the Liquidation Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes. The Liquidation Trust shall in no event be dissolved later than five years from the creation of such Liquidation Trust unless the Bankruptcy Court, upon motion (the filing of which shall automatically extend the term of the Liquidation Trust pending entry of an order by the Bankruptcy Court granting or denying the motion) within the six-month period prior to the fifth anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five years with a private letter ruling

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 51

from the IRS or an opinion of counsel satisfactory to the Liquidation Trustee that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets.

If the Liquidation Trust were not to qualify as a "liquidating trust," as described above, the Liquidation Trustee will take the position that it is a partnership for U.S. federal income tax purposes. In either case, each Beneficiary will include its distributive share of income, as reported to it by the Liquidation Trustee, and may not receive sufficient cash to satisfy its tax liability. The IRS may take the position that the Liquidation Trust should be taxed as a corporation for U.S. federal income tax purposes. If the IRS were to prevail in that position, the Liquidation Trust would be subject to U.S. federal income tax, which would reduce the return to a Beneficiary. Each Beneficiary is urged to consult with its own tax advisor.

As detailed above, transfer of the Liquidation Trust Assets to the Liquidation Trust could give rise to taxable income or loss equal to the difference between the tax basis and fair value of the Liquidation Trust Assets.

With respect to any COD income recognized due to transfer of the Liquidation Trust Assets to the Liquidation Trust, Section 108(a)(1)(A) of the Tax Code should apply and thus any COD income should be excluded. However, any NOLs (or other tax attributes) remaining after the use of said NOLs to offset taxable income generated by the asset transfers will be reduced by the amount of such COD income excluded above.

(c)     Consequences to Holders of Class 7 General Unsecured Claims

Pursuant to the Plan and Disclosure Statement, each Holder of a Class 7 Allowed General Unsecured Claim against Debtors will receive in satisfaction of its Claim a pro rata share of the GUC Recovery. The U.S. federal income tax treatment to Holders of Allowed General Unsecured Claims may depend in part on the tax basis a Holder has in its Claim, and, in some circumstances, what gave rise to, or the nature of, the Holder's Claim.

As set forth above, for federal income tax purposes, the Class 7 General Unsecured Claims will be satisfied by the deemed transfer to them of the Liquidation Trust Assets, followed by a deemed contribution of said assets to the Liquidation Trust in exchange for their pro rata share of the GUC Recovery. It is intended that the Liquidation Trust be treated as a liquidating trust for federal income tax purposes and, if it does not so qualify, as a partnership for federal income tax purposes.

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 52

Because of the nature of the Liquidation Trust Assets, the deemed transfer by Debtors of the Liquidation Trust Assets could cause a Holder to recognize gain or loss due to said transfer. The Liquidation Trust Assets that will be deemed transferred to Holders of Class 7 General Unsecured Claims consist of various assets, including the Causes of Action (and proceeds thereof). To the extent the (i) fair market value of the pro rata beneficial interest in the Liquidation Trust Assets a Holder of a Class 7 General Unsecured Claim receives, exceeds (or is less than) (ii) the Holder's tax basis in such Claim, the Holder should recognize gain (or loss) on such deemed transfer equal to such excess. The Holder's tax basis in a Claim will generally be equal to the Holder's cost therefor (subject to the below discussion regarding original issue discount ("*OID*")).

Such gain (or loss) could be capital or ordinary in nature depending on the status of the Holder, the genesis and nature of the Claim being satisfied, the Holder's holding period of the Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the Holder's hands, any gain or loss realized will generally be characterized as a capital gain or loss, and will constitute long-term capital gain or loss if the Holder has held such Claim for more than one year.

A Creditor who receives Cash in satisfaction of its Claims may recognize ordinary income or loss to the extent any portion of such consideration is characterized as accrued interest or OID. A Creditor who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent any consideration received is characterized for U.S. federal income tax purposes as interest, regardless of whether such Creditor realizes an overall gain or loss as a result of surrendering its Claim. A Creditor who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent such accrued but unpaid interest is not satisfied, regardless of whether such Creditor realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim. Pursuant to the Plan, distributions with respect to a Claim will be allocated first to the principal portion of such Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Claim, if any. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes.

Under the "market discount" provisions of the Internal Revenue Code, some or all of any gain realized by a Holder of a Claim which exchanges the Claim for an amount may be treated as ordinary income (instead of capital gain) to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 53

acquired with "market discount" if it is acquired other than on original issue and if its Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest;" or (b) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity). Any gain recognized by a Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

Under the Plan, a portion of the payment received by Holders of Allowed Claims may be attributable to accrued interest or OID on such Claims. Such amount should be taxable to that Holder as interest income if such accrued interest or OID has not been previously included in the Holder's gross income for U.S. federal income tax purposes. Conversely, Holders of Claims may be able to recognize a deductible loss to the extent any accrued interest or OID on the Claims was previously included in the Holder's gross income but was not paid in full by Debtors. If the payment does not fully satisfy all principal, interest, or OID on Allowed Claims, the extent to which payment will be attributable to accrued interest or OID is unclear. Whether the applicable Holder of such Claims will recognize a loss or any other tax treatment will depend upon facts and circumstances specific to the nature of the Holder and its Claims. Creditors should consult their own tax advisors.

(d)     Information Reporting and Withholding

In connection with the Plan and Disclosure Statement, Debtors and the Liquidation Trustee will comply with all applicable withholding and information reporting requirements imposed by U.S. federal, state, local, and foreign taxing authorities, and all Distributions under the Plan will be subject to those withholding and information reporting requirements. Holders of Claims may be required to provide certain tax information as a condition to receiving Distributions pursuant to the Plan. In the case of any non-U.S. Holders, if applicable, the Liquidation Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate or is otherwise excluded from withholding). As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders. Accordingly, such Holders should consult their tax advisors with respect to the U.S. federal income

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 54

tax consequences of the Plan, including owning an Interest in the Liquidation Trust.

In general, information reporting requirements may apply to Distributions pursuant to the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding with respect to Distributions made pursuant to the Plan unless a U.S. Holder provides the applicable withholding agent with a taxpayer identification number, certified under penalties of perjury, as well as certain other information, or otherwise establishes an exemption from backup withholding. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a credit against a U.S. Holder's U.S. federal income tax liability, if any, and may entitle a U.S. Holder to a refund, provided that the required information is timely furnished to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders of Claims or Interests are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holder's tax returns.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND DISCLOSURE STATEMENT ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE PLAN AND DISCLOSURE STATEMENT.

## ARTICLE 16.
## MISCELLANEOUS

In addition to the provisions discussed above, the Plan contains a number of administrative and miscellaneous provisions that are not restated or summarized in this Disclosure Statement. Please read this Disclosure Statement and the Plan carefully. After reviewing all the information and making an informed decision, please vote by using the enclosed ballot.

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE STATEMENT (JULY 1, 2025) – Page 55

To the extent practicable, Debtors will continue to make available all non-privileged source data turned over by Debtors' former management and obtained by Debtors through subpoenas or otherwise over the course of Debtors' investigation to any interested party in this matter upon request and execution of a confidentiality agreement approved by Debtors and the Committee.

Debtors and the Committee urge you to vote in support of the Plan.

DATED:  July 1, 2025.

REFRESHING USA, LLC
CREATIVE TECHNOLOGIES, LLC
WATER STATION MANAGEMENT LLC

By _____
    Brian Weiss, Chief Restructuring Officer

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF REFRESHING USA, LLC,
WATER STATION MANAGEMENT LLC, AND
CREATIVE TECHNOLOGIES, LLC

By _____
    Michael J. Gearin, WSBA 20982
    Attorneys for Official Committee of
    Unsecured Creditors of Refreshing USA, LLC,
    Water Station Management LLC, and Creative
    Technologies, LLC

Presented by:

TONKON TORP LLP

By */s/ Danny Newman*_____
    Danny Newman, WSBA 61824
    Attorneys for Debtors and
    Debtors-in-Possession

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE
STATEMENT (JULY 1, 2025) – Page 56

K&L Gates LLP

By _____
      Michael J. Gearin, WSBA 20982
      Attorneys for Official Committee
      of Unsecured Creditors of
      Refreshing USA, LLC,
      Water Station Management LLC,
      and Creative Technologies, LLC

044904\00001\18341916v8

DEBTORS' AND COMMITTEE'S JOINT FIRST AMENDED DISCLOSURE
STATEMENT (JULY 1, 2025) – Page 57