Michael J. Gearin, WSBA # 20982
John T. Bender, WSBA # 49658
Michael W. Meredith, WSBA #45264
Madisyn M. Uekawa, WSBA #56953
Clara M. Virden, WSBA #60308
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, WA  98104-1158
(206) 623-7580

Honorable Frederick P. Corbit
Chapter 11

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WASHINGTON

In re:

REFRESHING USA, LLC,

Debtors.[1]

Bankr. Case No. 24-01863-11

**MEMORANDUM IN SUPPORT OF PONZI SCHEME FINDINGS UNDER CHAPTER 11 PLANS OF LIQUIDATION**

---

[1] Debtors in these Chapter 11 cases: Refreshing USA, LLC (85-3358945) ("Refreshing"), Case No. 24-01863-11; Water Station Management LLC (81012-2716) ("WSM"), Case No. 24-01864-11; and Creative Technologies, LLC (46-2581888) ("Creative" and, together with Refreshing and Water Station Management, "Opco Debtors"), Case No. 24-01866-11. Ideal Property Investments, LLC ("Ideal") is a related Debtor ("Ideal," together with Opco Debtors and Debtors' related affiliates defined in the Becky Yang O'Malley Report, ¶ 2, Appendix C, are referred to herein as "Debtors" or "WST Enterprise").

MEMORANDUM IN SUPPORT OF PONZI SCHEME FINDINGS
UNDER CHAPTER 11 PLANS OF LIQUIDATION - 1

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

24-01863-FPC11    Doc 1158    Filed 08/01/25    Entered 08/01/25 20:49:55    Pg 1 of 28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................ 1

BACKGROUND ................................................................ 3

    A.    Debtors Perpetrated a $400 million Ponzi Scheme that Left a Trail of Financial Carnage in its Wake ............................................. 3

    B.    As Early as 2018, Debtors Depended on Fundraising from Investors to Pay Earlier Investors and Creditors ................................. 4

    C.    The Vast Majority of Machines Sold by the WST Enterprise Do Not Exist or were Sold More Than Once ....................................... 6

    D.    Forensic Analysis of Debtors' Prepetition Activities Demonstrates Debtors Carried Out a Ponzi Scheme .................................. 9

JURISDICTION ................................................................ 10

AUTHORITY AND ARGUMENT ................................................ 10

    A.    Debtors Indisputably Paid Earlier Investors with Funds from Later Investors, Not Legitimate Business Proceeds .......................... 12

    B.    Debtors Extensively Commingled New Investor Funds to Meet Obligations to Earlier Creditors in Furtherance of the Ponzi Scheme .................................................................. 15

    C.    Debtors Cultivated the Illusion of a Legitimate Profit-Making Business while Diverting Funds to Earlier Investors and Creditors ....... 19

        1.    *Illusion of a profit-making enterprise* ........................... 19

        2.    *Diversion to pay earlier investors and creditors* ................. 21

CONCLUSION .................................................................. 23

MEMORANDUM IN SUPPORT OF PONZI SCHEME FINDINGS
UNDER CHAPTER 11 PLANS OF LIQUIDATION- i

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

# TABLE OF AUTHORITIES

**CASES**

Page

*In re EPD Inv. Co., LLC*,
114 F.4th 1148 (9th Cir. 2024)...............................................................*passim*

*In re Harris*,
590 F.3d 730 (9th Cir. 2009).........................................................................10

*Kapila v. Phillips Buick-Pontiac GMC Truck, Inc. (In re ATM Fin. Servs., LLC)*, 2011 Bankr. LEXIS 2394 (Bankr. M.D. Fla. June 24, 2011) ................................................................................................................20

*Miller v. Wulf*,
84 F. Supp. 3d 1266 (D. Utah), *aff'd*, 632 F. App'x 937 (10th Cir. 2015) ................................................................................................................16

*In re Ramirez Rodriguez*,
209 B.R. 424 (Bankr. S.D. Tex. 1997) ..............................................15, 21, 22

*Schultze v. Chandler*,
765 F.3d 945 (9th Cir. 2014) ........................................................................10

*In re Taubman*,
160 B.R. 964 (Bankr. S.D. Ohio 1993) ........................................................15

*United States v. Benson*,
79 F. App'x 813 (6th Cir. 2003).....................................................................20

*Winkler v. McCloskey*,
83 F.4th 720 (9th Cir. 2023) ...........................................................................1

**STATUTES**

28 U.S.C. § 157(a)..........................................................................................10

28 U.S.C. §§ 157(b)(2)(A) .............................................................................10

MEMORANDUM IN SUPPORT OF PONZI SCHEME FINDINGS
UNDER CHAPTER 11 PLANS OF LIQUIDATION- ii

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

28 U.S.C. § 157(b)(2)(L) ................................................................10

28 U.S.C. § 1334(b) ....................................................................10

**OTHER AUTHORITIES**

26 CFR § 1.165-8 .........................................................................23

https://www.irs.gov/newsroom/help-for-victims-of-ponzi-investment-
schemes (accessed July 2025) ....................................................23

MEMORANDUM IN SUPPORT OF PONZI SCHEME FINDINGS
UNDER CHAPTER 11 PLANS OF LIQUIDATION- iii

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

24-01863-FPC11     Doc 1158     Filed 08/01/25     Entered 08/01/25 20:49:55     Pg 4 of 28

# MEMORANDUM IN SUPPORT OF PONZI SCHEME FINDINGS UNDER CHAPTER 11 PLANS OF LIQUIDATION

## INTRODUCTION

The Official Committee of Unsecured Creditors ("UCC" or "Committee") respectfully requests that this Court make findings that Debtors and their principals and affiliates (*see* O'Malley Decl., Ex. Q, ¶ 2, Appendix C) operated a Ponzi scheme beginning no later than March 1, 2018, through September 1, 2024 ("Ponzi Finding"). *See* Dkt. 1117 (Opco Plan); Dkt. 718 (Ideal Plan).

A Ponzi scheme "consists of funneling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment." *Winkler v. McCloskey*, 83 F.4th 720, 722 n.1 (9th Cir. 2023) (string cite omitted). This is exactly what the Debtors did here.

From at least March 2018 through September 2024, Debtors perpetrated a scheme to defraud thousands of victims by raising nearly $400 million in outside capital under false pretenses, failing to deploy investor funds as promised, and misappropriating and converting funds for unauthorized purposes including the enrichment of insiders.

To execute the scheme, Debtors falsely held the WST Enterprise out to the public as the manufacturer, assembler, seller, servicer, and owner of a highly profitable, nationwide vending machine business. *See* Declaration of Brian Weiss In Support of Memorandum In Support of Ponzi Scheme Findings Under Chapter 11 Plans of Liquidation ("Weiss Decl."), ¶ 16–19; Declaration of Becky Yang O'Malley In Support of Memorandum In Support of Ponzi Scheme Findings Under Chapter 11 Plans of Liquidation ("O'Malley Decl."), Ex. Q ("O'Malley Report"), Section IV,

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Section VI.A. To induce investment, Debtors claimed to manufacture, sell, and operate a network of profitable "WaterStation" and traditional vending machines at retail locations throughout the United States. Weiss Decl., ¶ 20. Debtors induced prospective customers/investors and other creditors to invest their capital based upon, among other things, promises to use the funds to purchase revenue-generating vending machines and to deliver a steady-stream of returns predicated on a "proprietary" franchise system.

As time has revealed, however, Debtors perpetrated a prolific fraud that stretches from 'Mainstreet' to 'Wall Street.' In fact, the revenues generated from legitimate operations paled in comparison to what was necessary to meet Debtors' obligations; and the enterprise did not use investor capital for the purpose it promised by a wide margin. Indeed, the Committee's investigation into Debtors' prepetition activities conclusively demonstrates, among other things:

- ❖ The "WST Enterprise," consisting of Debtors in these consolidated cases and their related affiliates, operated as a single economic unit;
- ❖ The WST Enterprise inextricably commingled their financial affairs;
- ❖ The WST Enterprise had insufficient operating income to meet their liabilities on a current basis no later than March 1, 2018;
- ❖ The WST Enterprise routinely used funds raised from machine purchasers, bond issues, and lenders to make payments owed to earlier investors and creditors;
- ❖ The WST Enterprise operated as a Ponzi scheme commencing no later than March 1, 2018.

As with any Ponzi scheme, the WST Enterprise left a trail of financial wreckage in its wake. The victims of this colossal tragedy consist of nurses, military veterans,

MEMORANDUM IN SUPPORT OF PONZI SCHEME FINDINGS
UNDER CHAPTER 11 PLANS OF LIQUIDATION- 2

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

24-01863-FPC11    Doc 1158    Filed 08/01/25    Entered 08/01/25 20:49:55    Pg 6 of 28

retirees, doctors, dentists, entrepreneurs, pension plan recipients, and many other everyday Americans who in many cases have lost all or part of their savings through no fault of their own. On their behalf, the Committee respectfully submits this request that the Court enter orders at the Confirmation Hearing finding that Debtors operated a Ponzi scheme commencing no later than 2018 through 2024 when they became debtors in these bankruptcy cases.

## BACKGROUND

A.  Debtors Perpetrated a $400 million Ponzi Scheme that Left a Trail of Financial Carnage in its Wake

From at least 2018 to 2024, Debtors perpetrated a scheme to defraud investors and other creditors. Weiss Decl., ¶ 21. To execute the scheme, Debtors solicited nearly $400 million in capital injections under false pretenses from a combination of investors and other creditors. Weiss Decl., ¶ 21.

As the Court is aware, Debtors[2] held the WST Enterprise out to the public as a successful manufacturer and operator of specialized water vending machines and, later, traditional vending equipment. Weiss Decl., ¶ 20. Debtors claimed to design and manufacture "WaterStation" vending machines that it offered to sell for $8,500 in combination with a "proprietary" franchise system. Weiss Decl., Section C.

_____

[2] Although Ryan Wear formed the debtor entities and affiliates separately, they all operated as a single enterprise. Weiss Decl., ¶ 13; O'Malley Decl., Ex. Q, ¶ 112. Creative was held out to the public as being in the business of manufacturing, assembling, and selling water vending machines. Weiss Decl., ¶ 16. WSM was held out to the public as a business that specialized in servicing and managing the water vending machines sold by Creative. Weiss Decl., ¶ 17. Ideal was a holding company for real estate acquired and serviced with OpCo resources, primarily investor and creditor funds. Weiss Decl., ¶ 18. Refreshing was held out to customers and the public as in the business of placing and servicing traditional vending machines. Weiss Decl., ¶ 19. As the majority owner, Wear controlled the business operations activities of the Debtors and their affiliates, and operated them as a single, consolidated enterprise, as evidenced by extensive commingling through thousands of intercompany transfers to pay each other's obligations and other abuse of corporate formalities. *See* O'Malley Decl., Ex. Q, ¶ 11.

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

To induce new and continued investments, Debtors marketed the business opportunity as a "totally passive" and "recession resistant" investment—one through which investors could earn "18% to 20% ROI" within "12 months of startup operations." O'Malley Decl., Ex. Q, ¶ 35. Debtors promised to install and service customer machines at retail locations throughout the country in exchange for a percentage of the profits. Weiss Decl., ¶ 23. Debtors told customers that their investment would qualify for tax deductions and that they could finance their investment through favorable loans approved by the U.S. Small Business Administration. O'Malley Decl., Ex. Q, ¶ 37. Debtors also touted a "guaranteed buyback" of machines to limit the risk of the investment. O'Malley Decl., Ex. Q, ¶ 37. Investors that consummated the transaction were supplied with serial numbers and addresses where their machines were ostensibly located. O'Malley Decl., Ex. Q, ¶ 39.

These representations were false. Contrary to Debtors' representations, Debtors' legitimate business operations and assets were far from profitable and could never sustain the scheme's mounting obligations. Weiss Decl., ¶ 13. To the contrary, Debtors depended almost exclusively on fundraising and constant commingling of funds to meet their growing obligations to investors and other creditors. *Id*.

B. As Early as 2018, Debtors Depended on Fundraising from Investors to Pay Earlier Investors and Creditors

Despite Debtors' claims about the success of the WST Enterprise, Debtors never generated sufficient operating revenue to support their mounting obligations to machine owners and other creditors. Weiss Decl., ¶ 45. Debtors began experiencing cash liquidity issues starting no later than March 2018, which is when the enterprise began funneling cash from new investors and other sources to make monthly payments to investors. O'Malley Decl., Ex. Q, ¶ 100.

MEMORANDUM IN SUPPORT OF PONZI SCHEME FINDINGS UNDER CHAPTER 11 PLANS OF LIQUIDATION- 4

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

24-01863-FPC11    Doc 1158    Filed 08/01/25    Entered 08/01/25 20:49:55    Pg 8 of 28

Between 2018 and 2022, Debtors raised over $225 million from machine purchaser who were led to believe they were acquiring water vending machines. O'Malley Decl., Ex. Q, ¶ 76. Rather than use these funds to manufacture and install revenue-generating machines, however, the vast majority of machine purchaser capital—*over 70%*—was commingled with various Debtor–affiliated accounts to pay insiders, machine owners and other preexisting debts. O'Malley Decl., Ex. Q., ¶ 97.

In 2022, when the flow of funds from purported machine owners slowed, Debtors issued bonds to generate tens of millions in new funding. O'Malley Decl., Ex. Q, ¶¶ 11, 77, 114. This bond indenture generated over $97 million of new funds disbursed directly to Debtors. O'Malley Decl., Ex. Q, ¶¶ 11, 77, 114. While the terms of the bond initially required that the funds be used exclusively to acquire water stations, approximately 80% of these funds were actually used to pay insiders, machine owners, and other preexisting expenses. *See id.*[3]

Debtors also raised capital through commercial loans and various forms of distressed financing throughout the relevant time period. Weiss Decl., Section E. Between 2020 and 2024, Debtors borrowed over $58.7 million (excluding bond proceeds) to pay their debts. Weiss Decl., ¶ 38.

All told, between 2018 and 2024, Debtors raised approximately $380 million from these sources. As is the case for all Ponzi schemes, all of this fundraising helped create the illusion of a profit-making enterprise. In reality, however, in 2018 and after, the WST Enterprise depended nearly exclusively on raising funds from outside sources to remain in business:

---

[3] 352 Capital GP LLC has filed lawsuits against Ryan Wear in New York State Court (Case No. 653486/2025) and federal court (S.D.N.Y., Case No. 1:24-cv-05102-VEC), asserting that the bond funds were withdrawn and used fraudulently.

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

O'Malley Report Table 19 – Comparison of Revenues from Operations to Investor Payments and Operating Expenses

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Jan - Sept 2024 | Total |
|---|---|---|---|---|---|---|---|---|
| Revenues from Operations | $ 264,740 | $ 802,511 | $ 2,145,440 | $ 14,772,619 | $ 29,139,095 | $ 29,313,799 | $ 5,807,899 | $ 82,246,103 |
| Less: Payments to Investors | $ (2,973,356) | $ (7,649,816) | $ (15,816,727) | $ (31,505,878) | $ (44,431,555) | $ (17,587,192) | $ (454,076) | $ (120,418,600) |
| Subtotal | $ (2,708,616) | $ (6,847,306) | $ (13,671,287) | $ (16,733,259) | $ (15,292,460) | $ 11,726,608 | $ 5,353,823 | $ (38,172,497) |
| Less: Operating Expenses | $ (9,654,623) | $ (15,772,902) | $ (26,694,721) | $ (46,279,035) | $ (31,082,374) | $ (28,995,597) | $ (15,028,740) | $ (173,507,992) |
| Total Shortfall | $ (12,363,239) | $ (22,620,208) | $ (40,366,008) | $ (63,012,294) | $ (46,374,834) | $ (17,268,989) | $ (9,674,916) | $ (211,680,489) |

*See* also O'Malley Decl., Ex. Q, ¶ 98. As further illustrated in the table below, approximately *90 cents of every dollar* in revenue generated between 2018 and 2024 was generated from a source other than legitimate vending operations:

| Category | Amount | % of Total |
|---|---|---|
| Intercompany Transfers | $   276,677,484 | 36.9% |
| Investor Funds | 225,343,685 | 30.0% |
| Bank Loans & Bond Deposits | 156,489,623 | 20.9% |
| Cash Deposits from Operations | 82,246,103 | 11.0% |
| Deposits from Insiders | 9,225,097 | 1.2% |
| **TOTAL** | $   **749,981,992** | **100.0%** |

O'Malley Decl., Ex. Q, ¶ 82 (Table 11 - Total Cash Deposits into the Main Operating Bank Accounts by Category).

C. The Vast Majority of Machines Sold by the WST Enterprise Do Not Exist or were Sold More Than Once

Prior to bankruptcy, the Pacific Parties engaged an investigator to survey the hundreds of locations where machines purchased by investors were represented to be located. The results of the investigation showed that fewer than 10% of the locations surveyed actually housed machines. Declaration of John Bender In Support of Memorandum In Support of Ponzi Scheme Findings Under Chapter 11 Plans of

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Liquidation ("Bender Decl."), Exs. 12–15.

Now in bankruptcy, Debtors under the direction of independent management, have carried out their own investigation into the estates' assets and pre-petition activities of the Debtors. The Debtors' investigation in this respect has included an evaluation and accounting of Debtors' real assets. To do so, Debtors engaged TAGeX Brands, a specialist in providing restaurant and food service liquidation services, to survey, secure, inventory and liquidate the vending assets and water machine equipment belonging to the estates. Declaration of Neal Sherman In Support of Memorandum In Support of Ponzi Scheme Findings Under Chapter 11 Plans of Liquidation ("Sherman Decl."), ¶ 3.

Given the extensive fundraising Debtors carried out premised on the notion that investor funds would be used to acquire and install tens of thousands of individual vending units across the United States, TAGeX's findings are stunning. Sherman Decl., ¶¶ 4–25. TAGeX, after conducting months of field surveys to locate and inventory the estate assets, reports the following:

❖ Debtors' warehouses are in a state of disrepair and disorder, with estimated repair costs of hundreds of thousands of dollars;

❖ Debtors' warehouses contain "little-to-no records" of what inventory was ever stored at these locations;

❖ The limited operational assets that exist, primarily consisting of traditional and water vending machines as well as motor vehicles, were found in varying states of disrepair; and

❖ The water machines and other vending assets were poorly made and in such poor condition that most if not all were virtually unmarketable.

Sherman Decl., ¶¶ 4–25.

MEMORANDUM IN SUPPORT OF PONZI SCHEME FINDINGS
UNDER CHAPTER 11 PLANS OF LIQUIDATION- 7

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

The images below illustrate the conditions of some of the warehouses:

 

Sherman Decl., ¶ 8, Ex. D.

In parallel to TAGeX's work, Debtors have independently investigated the number of water station vending machines that truly exist, as well as over 21,000 serial numbers submitted by water station owners in these proceedings, which Debtors have analyzed and compared with the internal records still in Debtors' possession to determine the rate of duplicative serial numbers as well as the rate of multiple- or competing ownership or use as collateral. Weiss Decl., ¶ 13.

All told, Debtors have found *at best 10%* of the 21,000+ vending units previously sold by Debtors may have actually exist in the field as of the petition date. Weiss Decl., ¶ 13. These findings are consistent with site visits of hundreds of locations where machine owner machines were supposedly located. In addition, Debtors identified 10,125 serial numbers that were assigned to more than one claimant at least once, meaning Debtors routinely sold the same serial numbers to multiple purchasers. Weiss Decl., ¶ 13.

MEMORANDUM IN SUPPORT OF PONZI SCHEME FINDINGS
UNDER CHAPTER 11 PLANS OF LIQUIDATION- 8

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

**D.**     Forensic Analysis of Debtors' Prepetition Activities Demonstrates Debtors Carried Out a Ponzi Scheme

From the outset, in addition to grasping the nature of the estates' true assets, a main purpose of the Committee's forensic assessment has been to determine whether Debtors, in fact, carried out a Ponzi scheme. This examination has demonstrated the following:

- ❖ Debtors began functioning as a Ponzi scheme by no later than March 2018, which is when the enterprise began funneling new investors funds to earlier investors (O'Malley Decl., Ex. Q, ¶ 138);

- ❖ Throughout the 2018 to 2024 time period, Debtors' revenues from legitimate operations were just $82 million or 11.0% of total bank deposits. In other words, Debtors legitimate revenues were *never* sufficient to satisfy their obligations to investors and other creditors, let alone turn a profit (O'Malley Decl., Ex. Q, ¶¶ 11, 82);

- ❖ At the same time, the WST Enterprise raised approximately $380 million through a combination of machine sales, bond financing, and direct lending (O'Malley Decl., Ex. Q, Section IX.A);

- ❖ The WST Enterprise's activities were extensively commingled between the Debtors, which were separate in name only as evidenced by, among other things, *thousands* of undocumented intercompany transfers that collectively moved hundreds of millions of dollars between Debtors and their various affiliates (O'Malley Decl., Ex. Q, Section IX.D); and

- ❖ Debtors used the vast majority of these funds for unauthorized purposes such as transfers to insiders, acquisitions of real property and other businesses, as well as payments to earlier investors and creditors. (O'Malley Decl., Ex. Q, Section IX.A, IX.G).

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Pursuant to 28 U.S.C. § 157(a) and the standing order of reference in this district, this Court has "original but not exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or related to cases under title 11." *See* 28 U.S.C. § 1334(b); *In re Harris*, 590 F.3d 730, 736-737 (9th Cir. 2009). Claims that arise in a Title 11 proceeding "are deemed to be 'core' proceedings, while claims that are related to Title 11 are 'noncore' proceedings." *Schultze v. Chandler*, 765 F.3d 945, 948 (9th Cir. 2014), as amended (Aug. 1, 2014) (citing *Maitland v. Mitchell (In re Harris Pine 22 Mills)*, 44 F.3d 1431, 1435 (9th Cir. 1995)). Section 157(b)(2) sets forth a non-exhaustive list of core proceedings, including "matters concerning the administration of the estate," "confirmations of plans," and "other proceedings affecting the liquidation of the assets of the estate." 28 U.S.C. §§ 157(b)(2)(A); (b)(2)(L); (b)(2)(O).

Here, the relief requested by the Committee is a core proceeding arising under 28 U.S.C. § 157(b)(2)(L). The Committee is seeking entry of the Ponzi Finding in connection with approval of Plans, which is explicitly a core proceeding under 28 U.S.C. § 157(b)(2)(L). The Ponzi scheme findings in connection with confirmation of the Plans also relate to the administration of Debtors' estates and their assets. *See* 28 U.S.C. § 157(b)(2)(A); (b)(2)(O).

## AUTHORITY AND ARGUMENT

"This Circuit's definition of a Ponzi scheme recognizes two essential elements: (1) the funneling of money from new investors to pay old investors, and (2) no legitimate profit-making business opportunity exists for investors." *In re EPD Inv. Co., LLC*, 114 F.4th 1148, 1159 (9th Cir. 2024) (citation omitted). The Ninth Circuit has "characterized these schemes as 'borrow[ing] from Peter to pay Paul' because the

MEMORANDUM IN SUPPORT OF PONZI SCHEME FINDINGS UNDER CHAPTER 11 PLANS OF LIQUIDATION- 10

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

24-01863-FPC11   Doc 1158   Filed 08/01/25   Entered 08/01/25 20:49:55   Pg 14 of 28

fraud consists of funneling money from new investors to pay old investors while cultivating the illusion of a legitimate profit-making business." *Id*. at 1156 (citation omitted).

"[A] Ponzi scheme is [by definition] destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership." *Id.* (citing David R. Hague, *Expanding the Ponzi Scheme Presumption*, 64 DePaul L. Rev. 867 (2015)).[4] This is exactly what occurred here.

The hallmarks of a Ponzi scheme are all present in this case. Through Debtors, the WST Enterprise operated in a manner that -- beyond reasonable doubt -- meets the Ninth Circuit's definition of a Ponzi scheme. Specifically:

(a) Between March 2018 and September 2024, Debtors paid earlier investors with capital from later investors rather than revenues from legitimate business operations;

(b) Debtors extensively commingled funds between entities to funnel money from new investors to earlier investors and creditors; and

(c) Debtors cultivated the illusion of a legitimate profit-making business while diverting funds to pay earlier investors and creditors.

---

[4] In *In re EPD Inc.*, in rejecting the notion that lenders are not included in the class of victims to a Ponzi scheme, the Ninth Circuit endorsed the following jury instruction articulating this Circuit's definition of a Ponzi scheme: "In a Ponzi scheme, payments are made to investors or lenders from later investments or loans rather than from profits of the underlying business venture. The fraud consists of transferring proceeds received from the new investors to previous investors, thereby giving other investors the impression that a legitimate profit-making business opportunity exists, where in fact no such opportunity exists. Distributing funds to earlier investors from the receipt of monies from later investors or lenders is the hallmark of Ponzi schemes." 114 F.4th at 1162.

MEMORANDUM IN SUPPORT OF PONZI SCHEME FINDINGS
UNDER CHAPTER 11 PLANS OF LIQUIDATION- 11

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

### A. Debtors Indisputably Paid Earlier Investors with Funds from Later Investors, Not Legitimate Business Proceeds

Both elements of the Ninth Circuit's definition of a Ponzi are clearly met. The evidence is overwhelming that Debtors "'borrow[ed] from Peter to pay Paul'" by "funneling money from new investors to pay old investors while cultivating the illusion of a legitimate profit-making business." *In re EPD Inv. Co., LLC*, 114 F.4th at 1156 (citation omitted). This is the "hallmark" of a Ponzi scheme. *Id.* at 1162. Because Debtors never generated sufficient revenues to cover its payment obligations, they had to rely almost exclusively on new fundraising to pay investors and creditors.

As noted, Debtors began funneling cash from new investors to pay earlier investors in March 2018. O'Malley Decl., Ex. Q, ¶ 100. Debtors depended on funds from machine purchasers to remain operational during the initial years and then turned to bonds and distressed financing to remain afloat for as long as it did:

#### O'Malley Report Table 19

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Jan - Sept 2024 | Total |
|---|---|---|---|---|---|---|---|---|
| Revenues from Operations | $ 264,740 | $ 802,511 | $ 2,145,440 | $ 14,772,619 | $ 29,139,095 | $ 29,313,799 | $ 5,807,899 | $ 82,246,103 |
| Less: Payments to Investors | $ (2,973,356) | $ (7,649,816) | $ (15,816,727) | $ (31,505,878) | $ (44,431,555) | $ (17,587,192) | $ (454,076) | $ (120,418,600) |
| Subtotal | $ (2,708,616) | $ (6,847,306) | $ (13,671,287) | $ (16,733,259) | $ (15,292,460) | $ 11,726,608 | $ 5,353,823 | $ (38,172,497) |
| Less: Operating Expenses | $ (9,654,623) | $ (15,772,902) | $ (26,694,721) | $ (46,279,035) | $ (31,082,374) | $ (28,995,597) | $ (15,028,740) | $ (173,507,992) |
| Total Shortfall | $ (12,363,239) | $ (22,620,208) | $ (40,366,008) | $ (63,012,294) | $ (46,374,834) | $ (17,268,989) | $ (9,674,916) | $ (211,680,489) |

*See also* O'Malley Decl., Ex. Q, ¶ 98.

Moreover, the timeline below further demonstrates how new fundraising became *essential* for Debtors to meet its mounting obligations to earlier investors and creditors:

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

O'Malley Report Chart 5 – Timeline of Sources of Cash Infusion



O'Malley Decl., Ex. Q, ¶ 99.

Because the WST Enterprise did not have sufficient cash flow to cover its mounting payment obligations, Debtors had to rely on new investor funds in order to service payments to investors and creditors. O'Malley Decl., Ex. Q, ¶ 79. Forensic analysis of the bank statements for the relevant period show a consistent pattern of funds flowing between entities, and on the same day or a few days after, to pay existing investors and creditors or other monthly expenses:

MEMORANDUM IN SUPPORT OF PONZI SCHEME FINDINGS
UNDER CHAPTER 11 PLANS OF LIQUIDATION- 13

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

## O'Malley Report Chat 7 – March 23, 2018 Transfer



## O'Malley Report Chat 13 – February 16, 2021 Transfers



K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

## O'Malley Report Chat 14 – March 25, 2022 Transfers



B. Debtors Extensively Commingled New Investor Funds to Meet Obligations to Earlier Creditors in Furtherance of the Ponzi Scheme

It is axiomatic that commingling funds through extensive intercompany transfers is a common feature of Ponzi schemes. *See, e.g., In re EPD*, 114 F.4th at 1162 (substantial evidence, including that the debtor "commingled the funds he received from investors," supported Ponzi finding); *In re Ramirez Rodriguez*, 209 B.R. 424, 429 (Bankr. S.D. Tex. 1997) (commingled investor funds were used to pay earlier

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

investors, operating expenses, and debtor's personal expenses); *In re Taubman*, 160 B.R. 964, 978-79 (Bankr. S.D. Ohio 1993) (debtor who commingled investor funds was engaged in a Ponzi scheme); *Miller v. Wulf*, 84 F. Supp. 3d 1266, 1274 (D. Utah), *aff'd*, 632 F. App'x 937 (10th Cir. 2015) ("When a company commingles funds and operates at a loss while continuing to pay the old investors, the money to pay the old investors necessarily comes from new investments.").

Here, the WST Enterprise engaged in *thousands* of intercompany transfers using Debtors' accounts from one entity to the next entity *to funnel new investor funds to earlier investors and creditors*. O'Malley Decl., Ex. Q, ¶ 107. Indeed, Debtors' bank statements reflect *over 4,600* such transfers which, in the aggregate, moved over $500 million in cash through bank accounts for almost 40 different related entities:

| Year | Transfers In | Number of Transactions - Transfers In | Transfers Out | Number of Transactions -Transfers Out |
|---|---|---|---|---|
| 2018 | $    5,134,160 | 74 | $    7,818,068 | 204 |
| 2019 | 8,605,896 | 82 | 9,740,164 | 170 |
| 2020 | 18,316,259 | 134 | 21,385,702 | 282 |
| 2021 | 26,507,518 | 125 | 35,304,838 | 358 |
| 2022 | 110,860,735 | 784 | 119,772,227 | 1,626 |
| 2023 | 98,086,282 | 925 | 99,958,862 | 1,523 |
| 2024 (9 mos.) | 9,166,633 | 440 | 12,009,986 | 464 |
| **Total** | **$ 276,677,484** | **2,564** | **$    305,989,845** | **4,627** |

O'Malley Decl., Ex. Q, ¶ 107 (Table 21), *see also* Appendix B.

Whereas intercompany accounts should be regularly reconciled and net to zero at the end of each year, Debtors failed to accurately record how these funds were being used and lumped all intercompany transactions into one general ledger account which was never reconciled. O'Malley Decl., Ex. Q, ¶ 108–111. This large volume of

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

intercompany transfers and inadequate tracking in the Debtors' books and records, as noted, is "highly indicative of and consistent with a Ponzi scheme." *Id.* ¶ 111.

The WST Enterprise's extensive commingling of affairs and assets between Debtors was, of course, not limited to just transfers to pay investors and other debts. As noted in the O'Malley Report, Debtors' pervasive commingling included using one entity's cash to acquire assets for another. *Id.* ¶ 112. Indeed, Debtors diverted tens of millions of dollars to acquire various real property and operational assets in the name of other entities including Ideal:

- $25.3 million in cash from Creative and WSM's bank accounts were used to acquire real estate properties on behalf of Ideal between October 2018 and October 2023 as well as cash payments on loans for the benefit of Ideal;

- $32.1 million in cash from Creative and WSM's bank accounts to acquire vending companies upon behalf of a non-Debtor affiliate;

- $4 million (approximately) in cash from Creative's bank accounts were used to acquire vending assets on behalf of Refreshing Texas;

- $1.1 million in cash disbursements from WSM's bank accounts to acquire shares of stock in an entity called KGBH Enterprises;

- Cash disbursements from Creative's bank accounts to service the acquisition loan for $3422 W. Clarendon Ave LLC.

O'Malley Decl., Ex. Q, ¶ 112.

Debtors' rampant commingling of assets between all Debtor-entities and related companies only continued with the influx of tens of millions in bond funds in 2022. *Id.* ¶ 117. Indeed, well over half of all funds generated through the bond indenture were transferred out to other Debtors:

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

O'Malley Table 23 – Uses of Bond Funds

| Description | Amount | % of Total |
|---|---:|---:|
| Intercompany Transfers Out | $ 58,432,374 | 59.8% |
| Investor Payments | 12,292,733 | 12.6% |
| Operating Expenses | 12,096,132 | 12.4% |
| Bond Obligation | 7,624,519 | 7.8% |
| Loan Payments | 7,064,028 | 7.2% |
| Acquisition | 200,000 | 0.2% |
| Payments to Insider | 50,000 | 0.1% |
| **Total** | **$ 97,759,786** | **100%** |

*Id.* ¶ 117.

The following chart illustrates Debtors' execution of over 153 intercompany transfers using bond funds on a single day in August 2022 that included payments to both investors and loans, none of which were used to acquire water machines:

O'Malley Chart 14 – Example of Use of Bond Funds



K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

O'Malley Decl., Ex. Q, ¶ 121.

C.   Debtors Cultivated the Illusion of a Legitimate Profit-Making Business while Diverting Funds to Earlier Investors and Creditors

As articulated above, Debtors' extensive commingling to funnel money "from new investors [and creditors] to pay old investors [and creditors]," when combined with the enterprises' misrepresentations to investors about the profitability of its business, cultivated a compelling "illusion" of a "legitimate profit-making business opportunity." *In re EPD*, 114 F.4th at 1159. This illusion was compelling enough to induce hundreds of millions in new investments. As noted, however, nothing could have been further from the truth as Debtors operated a quintessential Ponzi given that the WST Enterprise was never profitable, as Debtors' cash deposits from "legitimate" operations were no more than 11.0% of total cash flow between 2018 and 2024, which is now hardly surprising given that *no more than 10% of the machines it claimed to have installed and operated actually existed in the field*.

1.   *Illusion of a profit-making enterprise*

The WST Enterprise, like so many Ponzi schemes before it, induced hundreds of millions of dollars in investments based on false claims about the profitability of its underlying business.[5] Debtors raised over $320 million from machine purchasers and a bond indenture, all premised on the notion that the WST Enterprise operated a profitable vending business and that the funds would be used to acquire and operate

---

[5] Indeed, as noted, to induce investments Debtors falsely touted WST's proprietary and "patent-pending" design, claiming its models "combine[d] the five most advanced and significant water treatment Technology in existence." Weiss Decl., ¶ 26. Debtors falsely marketed the business opportunity as a "totally passive" and "recession and pandemic resistant" investment—one through which investors could expect to achieve "18% to 20% ROI on overall average revenues on or before 12 months of startup operations," and that the WST Enterprise would install and service customer machines at retail locations throughout the country in exchange for a percentage of the profits. Weiss Decl., ¶ 23-24, Exs. 25-26; O'Malley Decl., Ex. Q, ¶ 35.

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

profitable vending machines. Weiss Decl., ¶ 13, 21; O'Malley Decl., Ex. Q, ¶ 33.[6] This, in tandem with Debtors' extensive commingling of funds (which, as noted, is an all-to common feature of Ponzi schemes), cultivated an illusion of a profit-making enterprise when, in truth and in fact, there was none. *See, e.g., In re EPD*, 114 F.4th at 1162 ("A Ponzi scheme is a financial fraud that induces investment - often by promising high, risk-free returns …."); *United States v. Benson*, 79 F. App'x 813, 817 (6th Cir. 2003) (Ponzi perpetrator promised 138% and 181% ROI with no risk); *Kapila v. Phillips Buick-Pontiac GMC Truck, Inc. (In re ATM Fin. Servs., LLC)*, 2011 Bankr. LEXIS 2394, at *15 (Bankr. M.D. Fla. June 24, 2011) (Ponzi perpetrator "conned people into making a purchase they believed would generate a future income stream based on the perpetrator's misrepresentations….").

We now know in painful detail, however, that it was all a sham. Between 2018 and 2024, Debtors were never profitable. *See* O'Malley Decl., Ex A, ¶ 100 ("The WST entities were never sufficient capitalized or profitable from the start, contrary to marketing materials provided to Investors."). As reflected in the table below, Debtors revenues from legitimate operations *represented a mere 11% of total cash deposits* during the relevant time period:

| Category | Amount | % of Total |
|---|---|---|
| Intercompany Transfers | $   276,677,484 | 36.9% |
| Investor Funds | 225,343,685 | 30.0% |
| Bank Loans & Bond Deposits | 156,489,623 | 20.9% |
| Cash Deposits from Operations | 82,246,103 | 11.0% |
| Deposits from Insiders | 9,225,097 | 1.2% |
| **TOTAL** | **$   749,981,992** | **100.0%** |

---

[6] Just 11% of Debtors' total deposits between 2018 to 2024 represented funds generated from legitimate operations such as vending revenue and real estate sales. O'Malley Decl., Ex. Q, ¶ 82.

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

O'Malley Decl., Ex. Q, ¶ 82 (Table 11 – Total Cash Deposits by Category).

The truth is that the actual vending operations were miniscule compared to what Debtors had represented. Indeed, we now know that *fewer than 10% of the 21,000+ vending units previously sold by Debtors actually existed in the field* and that Debtors routinely recycled the same duplicate serial numbers to sell and collateralize different investor transactions. Weiss Decl., ¶ 13.

### 2. *Diversion to pay earlier investors and creditors*

So where did all of the money go? The Committee's forensic analysis conclusively answers the question. As outlined above, *we now know that the vast majority of capital raised from third parties was diverted to uses other than the acquisition or operation of vending and water machines*. O'Malley Decl., Ex. Q, Section IX.A. *See, e.g., In re Ramirez Rodriguez*, 209 B.R. at 429 (Ponzi commingled investor funds to pay earlier investors, operating expenses, and personal expenses).

In the case of the more than $225 million raised from machine owners, Debtors diverted at least over 70%[7] to intercompany transfers, payments to insiders, real estate acquisitions, and investor payments:

| Uses | % of Total |
|---|---|
| Intercompany Transfers | 40.7% |
| Operating Expenses | 23.1% |
| Machine Owner Payments | 16% |
| Loan Payments | 8.7% |

---

[7] Notably, the category "operating expenses" includes costs for payroll, overhead, broker payments, and other day-to-day expenses. In other words, it does not represent the dollar-for-dollar amount of capital raised that was actually devoted to acquiring and installing machines, as Debtors promised these funds would utilized.

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

| Acquisitions of Real Estate and Businesses | 8.3% |
|---|---|
| Payments to Insiders | 3.2% |

Weiss Decl., ¶ 32; O'Malley Decl., Ex. Q, ¶ 97 (Cash Disbursements by Category).

In the case of the $97 million which the WST Enterprise raised through the 2022 bond indenture, Debtors likewise diverted bond funds to cover payments to insiders, investor payments, loan payments, and other expenses:

| Use of Bond Proceeds | % of Total |
|---|---|
| Intercompany Transfers | 59.8% |
| Machine Owner Payments | 12.6% |
| Operating Expenses | 12.4% |
| Bond Payments | 7.8% |
| Loan Payments | 7.2% |
| Acquisitions | 0.2% |
| Payment to Insiders | 0.1% |

O'Malley Decl., Ex. Q, ¶ 118 (Table 23 – Uses of Bond Funds).

Jeremy Briggs, Debtors' former controller, indeed has affirmed the fact that Debtors routinely diverted investor funds to "commercial lease payments, payroll payments, commission payments to retailers, vendor payments, and payments to franchisees." Bender Decl., Ex. 16 (Briggs Declaration), ¶ 35.

Debtors' documented use of investor funds to pay earlier debts is the quintessential "hallmark" of a Ponzi scheme. *See In re EPD*, 114 F.4th at 1162 ("As we have long held, [d]istributing funds to earlier investors from the receipt of monies

MEMORANDUM IN SUPPORT OF PONZI SCHEME FINDINGS
UNDER CHAPTER 11 PLANS OF LIQUIDATION- 22

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

24-01863-FPC11    Doc 1158    Filed 08/01/25    Entered 08/01/25 20:49:55    Pg 26 of 28

from later investors is the hallmark of Ponzi schemes." (citation and quotation marks omitted)).[8]

<u>CONCLUSION</u>

A Ponzi finding in connection with confirmation of the subject Chapter 11 plans is highly important to the administration of Debtors' estates and assets. The Court's findings will lay the groundwork for future recoveries on behalf of victims of this Ponzi and may support direct tax relief for victims under the Internal Revenue Code.[9]

What is at stake in this important finding, of course, is not simply about money. It is also about vindicating the truth and rendering justice to the many victims of this widespread and devasting fraud.

\* \* \*

For the foregoing reasons, the Committee requests that the Court make the following findings:

1. The "WST Enterprise," consisting of Debtors in these consolidated cases and their related affiliates (*see* O'Malley Decl., Ex. Q, ¶ 2, Appendix C), operated as a single economic unit;

---

[8] The Ninth Circuit in *In re EPD* reaffirmed the Ninth Circuit's definition of a Ponzi scheme as consisting of two objective criteria, (1) funneling money to old investors and creditors from new investors and (2) the lack of a legitimate profit-making opportunity for investors. The Court also contrasted the Ninth Circuit's definition with that of other jurisdictions that have identified very similar (and largely overlapping) factors in the bankruptcy context, all of which are present here, such as "the debtor conducted little or legitimate business operations as represented to investors," "the purported business operation of the debtor produced little or no profits or earnings," "the source of payments from investors was from cash infused by new investors," "the unrealistic promises of low risk and high returns," "commingling of investor money," "misuse of investor funds," "payment of excessively large fees to the perpetrator," and "the use of false financial statements." 114 F.4th at 1159.

[9] *See, e.g.,* 26 CFR § 1.165-8 (Theft Losses); *see also* Help for Victims of Ponzi Investment, Internal Revenue Service, accessible at https://www.irs.gov/newsroom/help-for-victims-of-ponzi-investment-schemes (accessed July 2025).

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

2.     The WST Enterprise inextricably commingled their financial affairs;

3.     The WST Enterprise has insufficient operating income to meet their liabilities on a current basis no later than March 1, 2018;

4.     The WST Enterprise routinely used funds raised from machine purchasers, bond issues, and lenders to make payments owed to earlier investors and creditors;

5.     The WST Enterprise operated as Ponzi scheme no later than March 1, 2018.

Respectfully submitted: August 1, 2025

*Official Committee of Unsecured Creditors*

*/s/ Michael J. Gearin*
Michael J. Gearin, WSBA #20982
Michael W. Meredith, WSBA #45264
Madisyn M. Uekawa, WSBA #56953
Clara M. Virden, WSBA #60308

*/s/ John T. Bender*
John T. Bender, WSBA #49658
 Special Trial Counsel

K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
Telephone: (206) 623-7580
Email: michael.gearin@klgates.com
     john.bender@klgates.com
     michael.meredith@klgates.com
     madisyn.uekawa@klgates.com
     clara.virden@klgates.com

K&L GATES, LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022