# EXHIBIT 26







*Planet Friendly. Human Healthy*

PLACEMENT AGENT

**CIM SECURITIES LLC**

2022, REG D 506(c)

ACCREDITED INVESTORS ONLY

# Who is WaterStation Technology

**1994**



**2013**



**growth**



Traditional Vending
30,000+ machines
300+ employees
150+ vehicles

WaterStation Technology
10,000+ machines
160+ Investors

Goal: 500,000 Machines
over the next 5 years.
New Offerings.
New Advertising Revenue.

WaterStation
TECHNOLOGY®



*Why Water*

Now ***and always*** WATER is Essential
US Water Infrastructure

Growing Concern for Healthy WATER
J.D. Powers Water Satisfaction Study

Rising Costs of Recycling
China Refuses to Accept our Trash

Fast Growing Grocery Category
Shift Away From Soda

Taps into limitless WATER supply

Large Market Share growth opportunity

WaterStation
TECHNOLOGY®

# What is A WaterStation

## Water Vending Machine

ALKALINE Water. Micro Filtration.

Advantages over Reverse Osmosis

Multiple Forms of Payment (WST 700)

Contactless Payment (WST 600, DrinkUp)

Reports Sales Data Remotely

Monitors Water Quality On Site

Future Advertising Capable Extra Revenue Stream

1, 3, 5 Gallon Quantity Options (WST 700)

Single Serve Programmable Options (WST 600, DrinkUp)

WST 700

DrinkUp



# 100% Passive Opportunity



Managed By…

**WaterStation** TECHNOLOGY®

**Business Owner Purchases Equipment**

100% depreciable!

**Vending Partners**
Filters Changes
On-Going Maintenance

**Manufacturing**
Installation
Location Procurement

**Advertising Partners***
Digital Media
Billboard Ads

**User Experience**
Loyalty Rewards App*
Consumer Marketing

* Future Launch

# Monthly Distribution





100% Management
Of Equipment

100% Management
Of Advertising*

Fixed 1% Monthly
Distribution
(calculated on total purchase price)



30% Revenue Share
on Ad Sales





*Future Launch

# The Investment



Investment Option

## 50 Bulk Water Machines
### (WST 700)

- $9,000 / Machine
- $450,000 Total Investment
- Financing Available

Investment Option

## 50 DrinkUp Machines
### (Point of Sale Single Serve)

- $10,000 / Machine
- $500,000 Total Investment
- Financing Available

*We have lending sources that have proven success with our model. Ask me for a referral!

# Return on Investment Considerations

- Fixed Water Revenue

  1% Fixed Monthly Distribution!

  No time. No effort. No skill set required!

- Ad Revenue Share

  30% Advertising Revenue shared with Business Owner

- Tax Benefit

  Cost of Equipment is **100%** Depreciable

- Equipment Buy Back

  WaterStation will purchase equipment back! Returns the principal investment back to the business owner!

*\* Discuss all tax implications with CPA for most efficient use of benefits for your investment portfolio*





# WST 600 SERIES (DrinkUp)

## NET PROFIT ESTIMATE
### *fixed revenue model - DrinkUp*

| | | |
|---|---|---|
| Assumed Total Contract Amount (50 units) | $ | 500,000 |
| | | |
| **MONEY IN @ 5 years** | | |
| Buy Back | $ | 500,000 |
| Estimated H2O earnings | $ | 300,000 |
| **APPROX TOTAL IN AT 5 YEARS** | $ | **800,000** |
| | | |
| **MONEY OUT @ 5 years** | | |
| Purchase Price if paid in full cash | $ | 500,000 |
| **APPROX TOTAL OUT AT 5 YEARS** | $ | **500,000** |
| | | |
| **ESTIMATED PROFIT AT 5 YEARS** | $ | **300,000** |

*Depreciation Tax Savings over 5 years (assuming 30% tax bracket)\**
*\*consult with tax advisor on buy back capital gain and other effects on your personal tax situation*

# WST 700 SERIES

## NET PROFIT ESTIMATE
### *fixed revenue model - WST 700*

| | | |
|---|---|---|
| Assumed Total Contract Amount (50 units) | $ | 450,000 |
| | | |
| **MONEY IN @ 5 years** | | |
| Buy Back | $ | 450,000 |
| Estimated H2O earnings | $ | 270,000 |
| **APPROX TOTAL IN AT 5 YEARS** | $ | **720,000** |
| | | |
| **MONEY OUT @ 5 years** | | |
| Purchase Price if paid in full cash | $ | 450,000 |
| **APPROX TOTAL OUT AT 5 YEARS** | $ | **450,000** |
| | | |
| **ESTIMATED PROFIT AT 5 YEARS** | $ | **270,000** |

*Depreciation Tax Savings over 5 years (assuming 30% tax bracket)\**
*\*consult with tax advisor on buy back capital gain and other effects on your personal tax situation*



The ideal investors

Supplement Current Income while Continuing Career

Interested in LARGE Tax Deduction

Wanting to Diversify Current Investment Portfolio

Looking for Low-Risk, Fixed Revenue with Scalability

Facing a tax liability from the sale of a business or liquidating property

Concern for a Recession and Pandemic Resistant Industry

WaterStation
TECHNOLOGY®

# INVESTOR CONSIDERATIONS

The terms and conditions set forth herein are subject to change, customary legal review, and the conduct of due diligence. This Executive Summary ("Summary") does not constitute an offer and does not constitute an agreement or obligation on the part of any person to purchase or sell any the securities of the Company.

CIM Securities, LLC, is a Registered Broker/Dealer, Member FINRA/SiPC. This document is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender at CIM Securities at 619-749-2460 immediately by telephone or by return e-mail and delete this message, along with any attachments, from your computer. Thank you, your cooperation is appreciated.

## NOTICES

The information contained in this Summary has been provided wholly and completely by **Smart Soda Holdings, Inc.** (the "Company", "we" or "us") Any estimates, forecasts or other forward-looking statements contained in this Summary have been prepared by the Management Team of the Company in good faith and on a basis, it believes is reasonable. Such estimates, forecasts and other forward-looking statements involve significant elements of subjective judgment and analysis, and no representation can be made as to their attainability. No representation or warranty (express or implied) is made or is to be relied upon as a promise or representation as to the future performance of the Company.

## CAUTIONARY NOTE REGARDING FORWARD LOOKING STATEMENTS

This Summary also contains certain forward-looking statements within the meaning of Section 27A of the Act. All statements that address expectations or projections about the future, including statements about product development, market position, expected expenditures and financial results are forward-looking statements. These forward-looking statements are based on current expectations, estimates and projections for our industry, management' sbeliefs and assumptions made by management. Words such as "anticipates", "expects," "intends," "plans," "believes,"seeks," "estimates," "should,"could," "may," and variations of such words and similar expressions are intended to identify such forward-looking statements. These statements are not guarantees of future performance and are subject to certain risks, uncertainties, rapid changes, and assumptions that are difficult to predict. Accordingly, actual results or performance of The Company may differ significantly, positively or negatively, from forward-looking statements made herein. Unanticipated events and circumstances are likely to occur. Factors that might cause such differences include, but are not limited to, those discussed under the heading "Risk Factors" provided in the Private Placement Memorandum and/or Subscription Agreement which investors should carefully consider before investing. These factors include, but are not limited to, risks that our products and services may not receive the level of market acceptance anticipated; anticipated funding may prove to be unavailable; potential competition in our market may result in lower than anticipated revenues or higher than anticipated costs, and general economic conditions, such as the rate of employment, inflation, interest rates and the condition of the capital markets may change in a way that is not favorable to us. This list of factors is not exclusive. We undertake no obligation to update any forward-looking statements.

AN INVESTMENT IN THE SECURITIES IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK. SEE "RISK FACTORS" FOR A DISCUSSION OF CERTAIN FACTORS THAT SHOULD BE CONSIDERED IN CONNECTION WITH ANY PURCHASE OF THE SECURITIES. THERE IS NO PUBLIC MARKET FOR ANY OF THE COMPANY' S SECURITIES AND NO SUCH MARKET IS EXPECTED TO DEVELOP FOLLOWING THE PLACEMENT OF THE SECURITIES SIGNIFICANT RESTRICTIONS ON TRANSFER WILL APPLY. YOU SHOULD BE PREPARED TO BEAR THE ECONOMIC RISK OF YOUR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME AND BE ABLE TO WITHSTAND A TOTAL LOSS OF YOUR INVESTMENT. THIS SUMMARY DOES NOT CONSTITUTE AN OFFER TO SELL OR SOLICITATION OF AN OFFER TO BUY, ANY SECURITIES TO ANY PERSON IN ANY JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS UNLAWFUL.

By accepting delivery of this Summary, you agree to return promptly to the Company this Summary and any of the other documents or information furnished to you pursuant to this Summary if you elect not to invest in the Securities or if the investment is withdrawn.

AN INVESTMENT IN OUR OFFERING IS HIGHLY SPECULATIVE, AN INVESTOR COULD EXPERIENCE AN ENTIRE LOSS OF PRINCIPAL, AND THAT THE INVESTMENT IS ILLIQUID FOR AN INDEFINITE PERIOD OF TIME. SEE A LEGEND

You should make your own decision whether this placement meets your investment objectives and risk tolerance level. No Federal or State securities commission has approved, disapproved, endorsed or recommended this placement. No independent person has confirmed the accuracy or truthfulness of this disclosure, nor whether it is complete. Any representation to the contrary is illegal. No state administrator has reviewed the disclosures included herein. The Company is relying on an exemption from registration or qualification under applicable Federal and State Securities Laws.

This Slide Deck PowerPoint Presentation ("Presentation") contains only preliminary information regarding our Company and should be read in conjunction with the entire Private Placement Offering Memorandum ("Memorandum"and/or Subscription Agreement. The Company and our officers and representatives may from time to time make, "forward-looking statements" within the meaning of the Safe Harbor provisions of the U.S. Private Securities Litigation Reform Act of 1995. Forward-looking statements can be identified by words such as: "anticipate", "intend", "plan", "goal", "seek","believe", "project", "estimate", "expect", "strategy", "future","likely","may", "should" ,"will"and similar references to future periods.

Examples of forward-looking statements include, among others, statements we make regarding: guidance relating to revenues, gross margins, operating income, net income and net income per share; expected operating results, such as revenue growth and earnings; anticipated levels of capital expenditures for the fiscal year; current or future volatility in the credit markets and future market conditions; our belief that we have sufficient liquidity to fund our business operations as planned; expectations of the effect on our financial condition of claims, litigation, contingent liabilities and governmental and regulatory investigations and proceedings; strategy for growth, product development, market position, financial results and reserves; strategy for risk management. Forward-looking statements are neither historical facts nor assurances of future performance. Instead, they are based only on our current beliefs, expectations and assumptions regarding the future of our business, future plans and strategies, projections, anticipated events and trends, the economy and other future conditions. Because forward-looking statements relate to the future, they are subject to inherent uncertainties, risks and changes in circumstances that are difficult to predict and many of which are outside of our control.

Our actual results and financial condition may differ materially from those indicated in the forward-looking statements. Therefore, you should not rely on any of these forward-looking statements. Important factors that could cause our actual results and financial condition to differ materially from those indicated in the forward-looking statements include, among others, the following: economic and financial conditions, continued volatility in the capital or credit markets; the adequacy of our cash flow and earnings and other conditions; developments and changes in laws and regulations. Investors are strongly encouraged to review all Risk Factors and the entire Private Placement Memorandum ("Memorandum") and/or Subscription Agreement(s) before investing.

Any forward-looking statement made by us in this document is based only on information currently available to us and speaks only as of the date on which it is made. We undertake no obligation to publicly update any forward-looking statement, whether written or oral, that may be made from time to time, whether as a result of new information, future developments or otherwise.

This Presentation is intended for general solicitation under the exemption for Regulation D 506(c) but does not constitute an offer to sell or a solicitation of an offer to buy any securities. The information contained herein has been prepared by Management of the Company to assist interested parties in making their evaluation of the Company and does not purport to contain all of the information that a party may desire. In all cases, interested parties should conduct and rely on their own investigation and analysis of the Company and the data set forth herein.

An offer to buy these securities can only be made by obtaining the Company's confidential Memorandum and/or Subscription Agreement(s) interested parties should only rely on the information contained in such Offering Materials. Confidential and Proprietary Information. All information contained herein is the confidential and proprietary information of the Company and as such, cannot be, disclosed, reproduced or distributed without the prior written consent of the CEO of the Company or its Placement Agent CIM Securities, LLC.

WaterStation
TECHNOLOGY®

# RISK FACTORS

This presentation contains forward looking statements. Actual results could differ materially from those proposed or projected in the forward-looking statements as a result of certain risk factors set forth below. The Memberships being offered hereby involve a high degree of risk. Prospective investors should consider the following risk factors inherent in and affecting the business of the Company and an investment in the Memberships. Any of the following risks and possible more could adversely affect our business, financial condition, and results of operations.

- General Water Vending Machine Risks - The Issuer and Investor will be subject to the risks that generally relate to investing in water stations.
- Governmental Regulation of Water - Commercial water vending machines are regulated by each state and are periodically tested to confirm compliance with their standards.
- Risks Associated with a Changing Economic Environment - As a result of the COVID-19 virus pandemic and the lockdowns and restrictions on movement and contact among people that have resulted, the general economy has suffered a significant decline. Inflation is increasing and could require increases in prices and otherwise could dampen the market for water.
- Competition - The Issuer faces significant competition from companies placing water stations and selling water across the country, and from regional competitors as well.
- Ryan Wear is an Indispensable Person – Ryan is the manager of both CTL and WSM and their success is highly dependent on his active participation in their management.
- WSM Services Water Stations for Third Parties – WSM's duties to non-Offering investors may conflict with those to Investors.
- Ongoing Offering – The Offering is subject to modification from time to time due to material events. Current Investors will not be entitled to modification of their Investment Contracts.
- Digital Operations Risk – Water stations rely heavily on software, the internet, the cloud, and other technology to digitally track sales and produce machine-level reports.
- Long-Term Nature of Investment – An investment in the Securities is long term and illiquid. Investors must be willing and able to bear the economic risk for an indefinite period of time. Investors will not be able to liquidate in the event of an emergency.
- No Guarantee of Profitability - There can be no assurance that cash flows from the water stations, once placed and operating, will be sufficient to pay the Water Sale Fee on any water station even if the Issuer believes in each water station's economic viability.
- Government Regulation of Securities Offerings - WST and Ryan Wear are currently the subjects of an investigation by the Washington State Department of Financial Institutions ("DFI"). DFI is seeking information regarding past offerings and sales of franchises and business opportunities. The investigation is in the early stages. The Issuer will attempt to comply with all applicable securities regulations.
- Compliance with Securities Laws - The offer and sale of the Securities will not be registered under the Securities Act or the laws of any applicable state pursuant to an exemption from the registration requirements of the Securities Act, and the securities laws of certain states. The Securities have not been, and will not be, registered under the Securities Act.
- Possible Non-Compliance with Securities Laws – If the sale of the Securities were to fail to qualify for the exemptions being relied on, Investors may seek rescission of their purchased Securities and the Issuer and non-rescinding Investors could face significant financial impacts as a result.
- Absence of Registration Under Applicable Securities Laws - This Offering is being made under certain federal and state securities laws exemptions. No Sales to Unacceptable Investors - The Securities may not be offered, sold, assigned, transferred or delivered, directly or indirectly, to any "Unacceptable Investor."
- Compliance with Anti-Money Laundering Requirements – The Issuer may be subject to anti-money laundering statutes and may therefore request Investors provide documentation verifying their identity and source of funds used to purchase the Securities.
- Ownership of the Water Stations – The Investor will own the water stations and will therefore assume all of the risks of ownership, including loss or damage, and disposal at termination of the Service Agreement if WSM does not repurchase them. Investor will be required to insure the water stations and to pay applicable sales taxes.
- Sources of Payment of Water Sales Fees – The Water Sales Fees will be paid from general revenues. WSM has similar arrangements with third parties which fees are also paid from general revenues.
- Early Repurchase of the Water Stations – WSM will have the right, but not the obligation, to repurchase any water station (i) after the third anniversary of an Investor's purchase of water stations, (ii) if the Investor decides to sell its water vending business or assets or any or all of its water stations, and (iii) if the parties cannot agree to the resolution of a significant dispute.

WaterStation
TECHNOLOGY.

# RISK FACTORS – (continued)

- Purchase of Water Stations Upon Termination of Service Agreement – WSM will have the right, but not the obligation, to repurchase any water station at any time after the third anniversary of an Investor's purchase of them. WSM expects to repurchase them upon termination of the Service Agreement but may choose not to do so. A decision not to repurchase may negatively impact an Investor's ability to recoup his or her investment. Investors will face certain restrictions on their use of their machines if WSM does not repurchase them.
- WSM Management of the Water Stations – WSM will have full authority to make all day-to-day decisions and to take any action not specifically reserved to the Investor concerning placement, use and management of the water stations.
- WSM Cash Management – WSM will provide cash management services. It will not be required to maintain separate bank accounts for each Investor or otherwise segregate revenues received from different Investors or third-party investors. Errors in miscalculations and shortfalls in aggregate revenues may lead to misapplications of cash.
- Investor Failure to Timely Notify Issuer of Desire to Renew Service Agreement – Investors will have the option to renew their Service Agreements upon notice given to WSM no less than 60 days prior to the termination date. Failure to give such notice on a timely basis may result in termination of the agreement.
- Restrictions on Transfer of the Investment Contracts – Investors will not be free to sell or transfer Securities without the written consent of the Issuer, which may be withheld in its sole discretion. There is no market for the Securities and they will therefore not be a source of liquidity.
- Investors Have no Right to Vote or be Involved in Management of Issuer – Investors will have no right to exercise any control over Issuer's affairs and not have any vote, control or other influence over its management.
- WSM Has Limited Fiduciary Duties – Investors will be required to waive, release and discharge WSM from any fiduciary duties it may have under applicable law, to the extent the law permits. That will limit any recourse Investors may have against WSM.
- Noncompetition Restrictions on Investor upon Termination – During the term of the Service Agreement and for three years after its termination, an Investor is prohibited from engaging in certain activities related to the vending machine business within a specified geographical area. Issuer will retain all rights to any leases and other agreements entered into with Location Owners. Investors are prohibited from competing with or interfering or impairing WSM's rights in any lease.
- No Assurance of a Return on Investment – The Securities being offered are speculative and involve a high degree of risk. Issuer gives no assurances that cash flows from all the water stations WSM services and owns will be sufficient to pay the Water Sale Fees due an Investor. Issuer has not entered into any advertising agreements as of the date of the PPM.
- Federal Income Tax Risk – An investment in the Securities carries federal income tax risks. All Investors are advised to consult competent tax counsel. Issuer is subject to certain actions by the IRS, such as audit.



# Look Who is Talking About Us

- [https://www.vendingtimes.com/articles/refreshing-a-how-a-national-cs-operation-retains-the-entrepreneurial-spirit/](https://www.vendingtimes.com/articles/refreshing-a-how-a-national-cs-operation-retains-the-entrepreneurial-spirit/)

- [https://franchisedictionarymagazine.com/waterstation-technology-making-a-move-to-find-success-and-stability/](https://franchisedictionarymagazine.com/waterstation-technology-making-a-move-to-find-success-and-stability/)

- [https://franchisedictionarymagazine.com/waterstation-technology-a-healthy-environmentally-conscious-alternative/](https://franchisedictionarymagazine.com/waterstation-technology-a-healthy-environmentally-conscious-alternative/)

- [https://franchisedictionarymagazine.com/waterstation-technology-an-environmentally-sustainable-investment-for-the-future/](https://franchisedictionarymagazine.com/waterstation-technology-an-environmentally-sustainable-investment-for-the-future/)

- WaterStation Technology: Drinking Solutions for a Cleaner Future

- US Water Infrastructure

- J.D. Powers Water Satisfaction Study

- China Refuses to Accept our Trash

- Shift Away From Soda





# WaterStation
## TECHNOLOGY®

*Planet Friendly. Human Healthy*



**Franchise Dictionary Magazine's Game Changer Award**

Fills a niche in the market
Raises the bar on service
Creates Opportunity
Turns heads with a Unique Product
Helps the Community



REV20220706

# EXHIBIT 27



Learn why over 170 investors
## trust in WaterStations



Ryan Mau, Founder / CEO of WaterStation Technology

MORE INFORMATION

Currently in the **top 100**

THE MOST GROWING OPPORTUNITIES OF THE
FOLLOWING 2018

BizBuySell

IFPG

FRANSERVE

TOP SELLING
FRANCHISE

americasBestFranchises

---

## OUR PROGRAM
and how to join

We provide investors a Business Alliance Owner (BAO) profit-sharing business model by delivering a **completely passive investment opportunity.** The program allows investors the ability to purchase and own our eco-friendly alkaline water vending machines (picture below.) Our model gives investors we use the word partners) the opportunity to then partner with WaterStation Technology to manage the overall operation of the business. A complete hands-off, passive investment opportunity is the result. We do offer ways to be active as well if you choose to.

WaterStation Technology will install the Partners machines at one of the ten thousand retail locations we have available. These include the contracts we have with large grocery, convenience stores, and gas station chains.

The minimum purchase price is 50 machines equaling $425,000. Financing options are available. The responsibilities in the model are included in the price, and there are no hidden fees or additional costs. The benefits of the program are listed below.

MORE INFORMATION



## How Partners Benefit:

**12% on investment**

We have been running this program since 2017. Throughout this time, we have adjusted compensation from projections and feedback. Partners now receive 12% of their investment price annually.

**Possible Tax-Deductions**

Section 179 of the IRC allows businesses to take an immediate deduction for business expenses related to depreciable assets such as equipment. Section 179 is limited to a maximum deduction of $1,050,000.

If you are selling other businesses, income properties, etc, you can possibly capitalize on current tax laws and defer payment on capital gains taxes by investing those funds in WaterStation Technology Equipment.

**Please consult your own company for either. Please consult with your CPA.

**Buyback Rates**

We do have guaranteed buyback rates tied strategy in our agreement if the owner wishes to sell back the machines to our company. This helps mitigate risk as well as improves ROI.

**30% of Advertising**

LCD screens on the machines have allowed us to leverage large, medium, and small businesses wanting to advertise. Partners will receive 30% of available advertising. *Starting the first quarter of 2022.

---

## More Information
ABOUT US     THE MACHINES

### About WaterStation Technology

WaterStation Technology is a nationally branded eco-friendly water vending company based in Kanets, Washington. Founded in 2013 by the experience of management. We manufacture, deploy, and operate water purification machines that produce alkaline water. Our machines offer the highest quality abilities of water through our state-of-the-art patent-pending 7-step filter. The most recognizable location for a walk vending machine like ours is your local grocery or convenience store.

Our mission is to provide individuals, towns, cities, and our whole nation with healthier and less expensive drinking water delivered through more responsible purification systems that do not damage the environment.

### The Machines and the Market

The WST 700 is the only vending machine that turns local tap water into healthy alkaline, ionized water. Since we are local water, we never have to refund or transport bottled water. This also allows us to offer alkaline water at a fraction of the cost of its bottled counterpart. One of the main focuses was making this product accessible to the masses. So we made sure it accepts almost every form of payment imaginable, so we never drain a customer. For perspective, the local sales of bottled water in the U.S. reached $14.1 billion in 2020. Jug/tank water accounted for $2.3 billion.

This average fill-up time in three minutes since people typically fill two containers per visit. In this time, our customers are face to face with the LCD screens we have on the machines. We are now allowing advertising on this screen for both businesses just like ours and other brands to get in front of thousands of people every day. Local and nation-wide people reach their 1.4 gallon water containers. Initiatives and business as plans published.

---

## Partner Division



Kevin Mooney       Nick Hauk

Kevin has been with WST over the past four years and is the leading industry for over twenty-eight years. Kevin can answer any financial questions, funding options, and agreement questions you may have.

Nick has been with WST since early 2020, participating in investor development. He is our active transition coordinator and has oversees the agreements for many illiteracies in the program.

SET UP A CALL WITH US

---

We currently have **170+ partners**
in the program.

Here's what some of them have to say:

"

I have been working with WaterStation Technology for over five years and have found them to be a company of integrity and full of people proud to be in my opinion. WaterStation Technology is one of those rare gems in the wide world of investment opportunities. They give back to their investors and help make it a day-one passive income with a strong and steady ROI that's backed by Bill and is a 100% tax deduction. It is just about the perfect investment opportunity."

Jordan G.

"

It was great thing is that I've been able to earn some along again. Ninety-eight percent of the time, I'm doing something other than WaterStation. It takes about 15 minutes a week, corporate takes care of everything, and they send me a check every month. It's the most passive they..."

Brian H.

"

If you are looking for a 100% passive investment that is recession-proof and COVID-19 proof, there is no better choice than WaterStation Technology. My clients love this opportunity because it gives them another alternative to investing to grow their money from the comfort of home. You need to talk to current investors to see why this is a must-buy!"

Jack J.

---

## Want more information on our program?

Our Investor Relations team would answer any question you ask on this page.

CONTACT FORM

© Copyright 2022 - All Rights Reserved. WaterStation Technology | Honorville.
Contact | 2723 Grand Avenue, Suite 123 Everett, WA 98201 | 425-961-3021

# EXHIBIT 28



# FRANCHISE AGREEMENT

| SUMMARY PAGE | |
|---|---|
| 1.   **Franchisee** | **Apex Water Innovations, LLC** |
| 2.   **Effective Date** | **April 5th, 2019** |
| 3.   **Initial Franchise Fee** | $ 280,500 |
| 4.   **Opening Deadline** | **NA** |
| 5.   **Principal Executive** | **Christopher M. Carter** |
| 6.   **Franchisee's Address** | 7134 Eastridge Dr., Apex, NC 27539 |

WaterStation FDD 2018 Franchise Agreement

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 20 of 332

# FRANCHISE AGREEMENT

This Agreement is made between WST Franchise Systems LLC, a Washington limited liability company ("<u>WST</u>"), and Franchisee on the Effective Date.

## Background Statement:

A.      WST and its affiliate Creative Technologies, LLC, have created and own a system (the "<u>System</u>") for developing and operating a vending machine business to dispense purified, mineralized water under the trade name "WaterStation".

B.      The System includes (1) methods, procedures and standards for developing and operating a WaterStation business, (2) particular products and services, (3) the Marks, (4) training programs, (5) business knowledge, (6) marketing plans and concepts, and (7) other mandatory or optional elements as determined by WST from time to time.

C.      The parties desire that WST license the Marks and the System to Franchisee for Franchisee to develop and operate a WaterStation business on the terms and conditions of this Agreement.

## ARTICLE 1. DEFINITIONS

"**Action**" means any action, suit, proceeding, claim, demand, governmental investigation, governmental inquiry, judgment or appeal thereof, whether formal or informal.

"**Approved Vendor**" means a supplier, vendor, or distributor of Inputs which has been approved by WST.

"**Business**" means the WaterStation business owned by Franchisee and operated under this Agreement.

"**Competitor**" means any business which sells, installs, services, or manages vending machines that sell water.

"**Confidential Information**" means all non-public information of or about the System, WST, and any WaterStation business, including all methods for developing and operating the Business, and all non-public plans, data, financial information, processes, vendor pricing, supply systems, marketing systems, formulas, techniques, designs, layouts, operating procedures, customer data, information and know-how.

"**Gross Sales**" means the total dollar amount of all sales generated through the Business for a given period, including, but not limited to, payment for any services or products sold by Franchisee, whether for cash or credit. Gross Sales does not include (i) bona fide refunds to customers, (ii) sales taxes collected by Franchisee, (iii) sales of used equipment not in the ordinary course of business, or (iv) sales of prepaid cards or similar products (but the redemption of any such card or product will be included in Gross Sales).

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 21 of 332

"**Input**" means any goods, services, supplies, fixtures, equipment, inventory, computer hardware and software, real estate, or comparable items related to establishing or operating the Business.

"**Location**" means a location where a Machine is placed.

"**Losses**" includes (but is not limited to) all losses; damages; fines; charges; expenses; lost profits; reasonable attorneys' fees; travel expenses, expert witness fees; court costs; settlement amounts; judgments; loss of WST's reputation and goodwill; costs of or resulting from delays, financing, advertising material and media time/space and the costs of changing, substituting or replacing the same; and any and all expenses of recall, refunds, compensation, public notices and other such amounts incurred in connection with the matters described.

"**Machine**" means a WaterStation machine.

"**Manual**" means WST's confidential Operating Manual(s), including any supplements, additions, or revisions from time to time, which may be in any form or media.

"**Marketing Fund**" means the fund established (or which may be established) by WST into which Marketing Fund Contributions are deposited.

"**Marks**" means the trade name and logo contained on the Summary Page, and all other trade names, trademarks, service marks and logos specified by WST from to time for use in a WaterStation business.

"**Owner**" means each person or entity which directly or indirectly owns or controls any equity of Franchisee. If Franchisee is an individual person, then "Owner" means Franchisee.

"**Required Vendor**" means a supplier, vendor, or distributor of Inputs which WST requires franchisees to use.

"**System Standards**" means, as of any given time, the then-current mandatory procedures, requirements, and/or standards of the System as determined by WST, which may include without limitation, any procedures, requirements and/or standards for appearance, business metrics, cleanliness, customer service, design, equipment, inventory, marketing and public relations, operating hours, presentation of Marks, product and service offerings, quality of products and services (including any guaranty and warranty programs), reporting, safety, technology (such as computers, computer peripheral equipment, smartphones, point-of-sale systems, back-office systems, information management systems, security systems, video monitors, other software, backup and archiving systems, communications systems (including email, audio, and video systems), payment acceptance systems, and internet access, as well as upgrades, supplements, and modifications thereto), uniforms, and vehicles.

"**Transfer**" means for Franchisee (or any Owner) to voluntarily or involuntarily transfer, sell, or dispose of, in any single or series of transactions, (i) substantially all of the assets of the

Business, (ii) this Agreement, (iii) direct or indirect ownership interest of more than 25% of the Business, or (iv) control of the Business.

## ARTICLE 2.  GRANT OF LICENSE

**2.1    Grant.** WST grants to Franchisee the right to operate a WaterStation business headquartered at the address specified on the Summary Page. Franchisee shall develop, open and operate a WaterStation business for the entire term of this Agreement. The parties acknowledge that Franchisee must operate the Business to meet WST's minimum System Standards, but that the means of satisfying the System Standards are left to the control and discretion of Franchisee.

**2.2    No Protected Territory.** Franchisee acknowledges that it does not receive a protected or exclusive territory. Without limiting the generality of the foregoing, WST retains the right to (i) solicit and serve (and to authorize third parties to solicit and service) customers located anywhere, through any channel of commerce (ii) establish and license others to establish and operate WaterStation businesses located anywhere; and (iii) sell and service vending machines other brand names other than WaterStation, with machines the same as, similar to, or dissimilar to WaterStation machines.

**2.3    Sales and Service Area; Future Exclusive Areas.** As of the date of this Agreement, Franchisee may solicit, sell to, and provide service to customer located anywhere in the United States (but not outside of the United States). WST retains the right to designate territories in which it grants a party the exclusive right to solicit, sell to, and/or provide service to customers located in the territory. If WST grants such exclusive rights and gives Franchisee notice thereof, then Franchisee shall not thereafter solicit or sell WaterStation machines in such territory.

**2.4    Franchisee Control.** Franchisee represents that Attachment 1 (i) identifies each owner, officer and director of Franchisee, and (ii) describes the nature and extent of each owner's interest in Franchisee. If any information on Attachment 1 changes (which is not a Transfer), Franchisee shall notify WST within 10 days.

**2.5    Principal Executive.** Franchisee agrees that the person designated as the "Principal Executive" on the Summary Page is the executive primarily responsible for the Business and has decision-making authority on behalf of Franchisee. The Principal Executive must have at least 10% ownership interest in Franchisee. The Principal Executive must participate in the direct operation of the Business and must devote substantial time and attention to the Business. If the Principal Executive dies, becomes incapacitated, transfers his/her interest in Franchisee, or otherwise ceases to be the executive primarily responsible for the Business, Franchisee shall promptly designate a new Principal Executive, subject to Water Station Franchising's reasonable approval.

**2.5    Guaranty.** If Franchisee is an entity, then Franchisee shall have each Owner sign a personal guaranty of Franchisee's obligations to WST, in the form of Attachment 2.

**2.6    No Conflict.** Franchisee represents to WST that Franchisee and each of its Owners (i) are not violating any agreement (including any confidentiality or non-competition covenant) by entering into or performing under this Agreement, (ii) are not a direct or indirect owner of any

Competitor, and (iii) are not listed or "blocked" in connection with, and are not in violation under, any anti-terrorism law, regulation, or executive order.

## ARTICLE 3. TERM

**3.1    Term.** This Agreement commences on the Effective Date and continues for 5 years.

**3.2    Successor Agreement.** When the term of this Agreement expires, Franchisee may enter into a successor agreement for up to 3 additional periods of 5 years each, subject to the following conditions prior to each renewal:

(i)      Franchisee notifies WST of the election to renew between 90 and 180 days prior to the end of the term;

(ii)     Franchisee (and its affiliates) are in compliance with this Agreement and all other agreements with WST (or any of its affiliates) at the time of election and at the time of renewal;

(iii)    Franchisee has made or agrees to make (within a period of time acceptable to WST) changes to the Business as WST requires to conform to the then-current System Standards;

(iv)    Franchisee executes WST's then-current standard form of franchise agreement, which may be materially different than this form (including, without limitation, higher and/or different fees), except that Franchisee will not pay another initial franchise fee and will not receive more renewal or successor terms than described in this Section; and

(v)     Franchisee and each Owner executes a general release (on WST's then-standard form) of any and all claims against WST, its affiliates, and their respective owners, officers, directors, agents and employees.

## ARTICLE 4. FEES

**4.1    Initial Franchise Fee.** Upon signing this Agreement, Franchisee shall pay an initial franchise fee in the amount stated on the Summary Page. This initial franchise fee is not refundable, except as provided in <u>Section 6.4</u>.

**4.2    Royalty Fee.** In Franchisee's first year of operation, Franchisee shall pay WST a monthly royalty fee (the "<u>Royalty Fee</u>") equal to 8% of Gross Sales; provided, however, that if Franchisee is a party to a Management Agreement with WaterStation Management, LLC, then the Royal Fee shall be 5% of Gross Sales. The Royalty Fee for any given month is due on the 5th day of the following month.

**4.3    Marketing Fund Contribution.** If WST has formed a Marketing Fund, Franchisee shall pay WST a contribution to the Marketing Fund (the "<u>Marketing Fund Contribution</u>") equal to 1% of Franchisee's Gross Sales (or such lesser amount as WST determines), at the same time as the Royalty Fee.

6

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 24 of 332

**4.4     Replacement / Additional Training Fee.** If Franchisee sends an employee to WST's training program after opening, WST may charge its then-current training fee. As of the date of this Agreement, the training fee is $500 per person.

**4.5     Third Party Vendors.** If WST requires Franchisee to use a designated third-party vendor, WST has the right (but not the obligation) to collect payment on behalf of the vendor and remit the payment to the vendor. If WST does so, it may impose a reasonable markup or charge for administering the payment program.

**4.6     Non-Compliance Fee.** WST may charge Franchisee $250 for any instance of non-compliance with the System Standards or this Agreement (other than Franchisee's non-payment of a fee owed to WST) which Franchisee fails to cure after 30 days' notice from WST. Thereafter, WST may charge Franchisee $250 per week until Franchisee ceases such non-compliance. This fee is a reasonable estimate of WST's internal cost of personnel time attributable to addressing the non-compliance, and is not a penalty or estimate of all damages arising from Franchisee's breach. The non-compliance fee is in addition to all of WST's other rights and remedies.

**4.7     Reimbursement.** WST may (but is never obligated to) pay on Franchisee's behalf any amount that Franchisee owes to a supplier or other third party. If WST does so or intends to do so, Franchisee shall pay such amount plus a 10% administrative charge to WST within 15 days after invoice by WST accompanied by reasonable documentation.

**4.8     Payment Terms.**

(a)     <u>Method of Payment</u>. Franchisee shall pay the Royalty Fee, Marketing Fund Contribution, and any other amounts owed to WST by pre-authorized bank draft or in such other manner as WST may require.

(b)     <u>Calculation of Fees</u>. Franchisee shall report monthly Gross Sales to WST by the 5th day of the following month. If Franchisee fails to report monthly Gross Sales, then WST may withdraw estimated Royalty Fees and Marketing Fund Contributions equal to 125% of the last Gross Sales reported to WST, and the parties will true-up the actual fees after Franchisee reports Gross Sales. Franchisee acknowledges that WST has the right to remotely access Franchisee's point-of-sale system and to calculate Gross Sales.

(c)     <u>Late Fees and Interest</u>. If Franchisee does not make a payment on time, Franchisee shall pay a $100 "late fee" plus interest on the unpaid amount at a rate equal to 18% per year (or, if such payment exceeds the maximum allowed by law, then interest at the highest rate allowed by law).

(d)     <u>Insufficient Funds</u>. WST may charge $50 for any payment returned for insufficient funds (or, if such amount exceeds the maximum allowed by law, then the fee allowed by law).

(e)     <u>Costs of Collection</u>. Franchisee shall repay any costs incurred by WST (including reasonable attorney fees) in attempting to collect payments owed by Franchisee.

<div align="center">7</div>

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 25 of 332

(f)     Application. WST may apply any payment received from Franchisee to any obligation and in any order as WST may determine, regardless of any designation by Franchisee.

(g)     Obligations Independent; No Set-Off. The obligations of Franchisee to pay to WST any fees or amounts described in this Agreement are not dependent on WST's performance and are independent covenants by Franchisee. Franchisee shall make all such payments without offset or deduction.

## ARTICLE 5. ASSISTANCE

**5.1     Manual.** WST shall make its Manual available to Franchisee.

**5.2     Assistance in Hiring Employees.** WST shall provide its suggested staffing levels to Franchisee. WST shall provide suggested guidelines for hiring employees. All hiring decisions and conditions of employment are Franchisee's sole responsibility.

**5.3     Assistance in Training Employees.** WST shall, to the extent it deems appropriate, provide programs for Franchisee to conduct training of new employees.

**5.4     Pre-Opening Assistance.**

(a)     Pre-Opening Specifications and Vendors. To the extent not included in the Manual, WST shall provide Franchisee with (i) applicable System Standards and other specifications as WST deems appropriate (which may include specifications regarding inventory, supplies, materials, and other matters), and (ii) WST's lists of Approved Vendors and/or Required Vendors.

**(b)**     Business Plan Review. If requested by Franchisee, WST shall review and advise on Franchisee's pre-opening business plan and financial projections. **Franchisee acknowledges that WST accepts no responsibility for the performance of the Business.**

(c)     Pre-Opening Training. WST shall make available its standard pre-opening training to the Principal Executive and up to three other employees, at WST's headquarters. WST shall not charge any fee for this training. Franchisee is responsible for its own travel, lodging, meal, and other out-of-pocket expenses.

(d)     Market Introduction Plan. WST shall advise Franchisee regarding the planning and execution of Franchisee's market introduction plan.

(e)     On-Site Opening Assistance. If requested by Franchisee, WST shall have a representative support Franchisee's business opening with at least one or two days of onsite opening training and assistance, at WST's expense.

**5.5     Post-Opening Assistance.**

(a)     Advice, Consulting, and Support. If Franchisee requests, WST will provide advice to Franchisee (by telephone or electronic communication) regarding improving and developing Franchisee's business, and resolving operating problems Franchisee encounters, to the extent

8

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 26 of 332

WST deems reasonable. If WST provides in-person support in response to Franchisee's request, WST may charge its then-current fee plus any out-of-pocket expenses (such as travel, lodging, and meals for employees providing onsite support).

(b)    Pricing. Upon request, WST will provide recommended prices for products and services offered by franchisees of the System.

(c)    Procedures. WST will provide Franchisee with WST's recommended administrative, bookkeeping, accounting, and inventory control procedures. WST may make any such procedures part of required (and not merely recommended) System Standards.

(d)    Marketing. WST shall manage the Marketing Fund.

(e)    Internet. WST shall maintain a website for WaterStation.

## ARTICLE 6.  DEVELOPMENT AND OPENING

**6.1    Headquarters.** If Franchisee desires to relocate its headquarters from the address on the Summary Page, it shall give prior notice to WST.

**6.2    New Franchisee Training.** Franchisee's Principal Executive must complete WST's training program for new franchisees. If the Principal Executive (i) fails to complete the initial training program to WST's satisfaction, or (ii) WST concludes, no more than 10 days after the Principal Executive completes the initial training program, that the Principal Executive does not have the ability to satisfactorily operate the Business, then WST may terminate this Agreement. In such event, WST shall refund the initial franchise fee to Franchisee (less any out-of-pocket costs incurred by WST), subject to Franchisee's prior execution of a general release of liability of WST and its affiliates, in a form prescribed by WST.

**6.3    Conditions To Opening.** Franchisee shall notify WST at least 30 days before Franchisee intends to open the Business. Before opening, Franchisee must satisfy all of the following conditions: (1) Franchisee is in compliance with this Agreement, (2) Franchisee has obtained all applicable governmental permits and authorizations, (3) the Business conforms to all applicable System Standards, (4) Franchisee has hired sufficient employees, (5) Franchisee's officers and employees have completed all of WST's required pre-opening training; and (6) WST has given its written approval to open, which will not be unreasonably withheld.

**6.4    Opening Date.** Franchisee shall open the Business on or before the date stated on the Summary Page.

## ARTICLE 7. OPERATIONS

**7.1    Compliance With Manual and System Standards**. Franchisee shall at all times and at its own expense comply with all System Standards and with all other mandatory obligations contained in the Manual.

**7.2     Compliance With Law.** Franchisee and the Business shall comply with all laws and regulations. Franchisee and the Business shall obtain and keep in force all governmental permits and licenses necessary for the Business.

**7.3     Obtaining Locations.** Franchisee shall obtain suitable Locations for its Machines. Franchisee shall obtain WST's prior approval for any Location. Franchisee shall follow any procedures of WST for submitting information and obtaining approval of a potential Location. If a potential Location is not approved by WST, it is deemed rejected.

**7.4     Products and Services.** Franchisee shall offer all products and services, and only those products and services, from time to time prescribed by WST in the Manual or otherwise in writing. Notwithstanding any provision of this Agreement or the Manual to the contrary, Franchisee retains the sole discretion to determine the prices it charges for products and services.

**7.5     Personnel.**

(a)     <u>Service</u>. Franchisee shall cause its personnel to render competent and courteous service to all customers and members of the public.

(b)     <u>Appearance</u>. Franchisee shall cause its personnel to comply with any dress attire, uniform, personal appearance and hygiene standards set forth in the Manual.

(c)     <u>Qualifications</u>. WST may set minimum qualifications for categories of employees employed by Franchisee.

(d)     <u>Sole Responsibility</u>. Franchisee is solely responsible for the terms and conditions of employment of all of its personnel, including recruiting, hiring, training, scheduling, supervising, compensation, and termination. Franchisee is solely responsible for all actions of its personnel. Franchisee and WST are not joint employers, and no employee of Franchisee will be an agent or employee of WST.

**7.6     Post-Opening Training.** WST may at any time require that the Principal Executive and/or any other employees complete training programs, in any format and in any location determined by WST. WST may charge a reasonable fee for any training programs. WST may require Franchisee to provide training programs to its employees. If a training program is held at a location which requires travel by the Principal Executive or any other employee, then Franchisee shall pay all travel, living and other expenses.

**7.7     Guaranties and Warranties.** Franchisee shall implement any guaranties, warranties, or similar commitments regarding products and/or services that WST may require.

**7.8     Customer Complaints.** Franchisee shall use its best efforts to promptly resolve any customer complaints. WST may take any action it deems appropriate to resolve a complaint regarding the Business (from a customer, a location, or any other party), and WST may require Franchisee to reimburse WST for any expenses.

**7.9     Customer Evaluation and System Compliance Programs.** Franchisee shall participate at its own expense in programs required from time to time by WST for obtaining customer

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 28 of 332

evaluations and/or reviewing Franchisee's compliance with the System, which may include (but are not limited to) a customer feedback system, customer survey programs, and mystery shopping. WST shall share with Franchisee the results of these programs, as they pertain to the Business. Franchisee must meet or exceed any minimum score requirements set by WST for such programs.

**7.10    Payment Systems.** Franchisee shall accept payment from customers in any form or manner designated by WST (which may include, for example, cash, specific credit and/or debit cards, gift cards, electronic fund transfer systems, and mobile payment systems). Franchisee shall purchase or lease all equipment and enter into all business relationships necessary to accept payments as required by WST. Franchisee must at all times comply with payment card industry data security standards (PCI-DSS).

**7.11    Resale of WaterStation Machines.** Franchisee shall not sell WaterStation Machines to any person or entity other than another WaterStation franchisee without the prior approval of WST.

**7.12    Maintenance and Repair.** Franchisee shall operate, inspect, service, repair, and maintain its Machines in accordance with all applicable System Standards.

**7.13    Vehicles.** If Franchisee purchases or leases one or more vehicles for the Business, Franchisee shall ensure that all vehicles comply with all applicable System Standards, including without limitation required equipment and exterior décor. Franchisee shall keep all vehicles in good repair, clean, and free of dents and other damage, and shall ensure that the vehicles presents a first-class image appropriate to WST's System. Franchisee shall use the vehicle solely for the Business.

**7.14    Meetings.** The Principal Executive shall use reasonable efforts to attend all in-person meetings and remote meetings (such as telephone conference calls) that WST requires, including any national or regional brand conventions. Franchisee shall not permit the Principal Executive to fail to attend more than three consecutive required meetings.

**7.15    Insurance.**

(a)    Franchisee shall obtain and maintain insurance policies in the types and amounts as specified by WST in the Manual. If not specified in the Manual, Franchisee shall maintain at least the following insurance coverage:

(i)    Commercial General Liability insurance, including products liability coverage, and broad form commercial liability coverage, written on an "occurrence" policy form in an amount of not less than $1,000,000 single limit per occurrence and $2,000,000 aggregate limit;

(ii)    Business Automobile Liability insurance including owned, leased, non-owned and hired automobiles coverage in an amount of not less than $1,000,000; and

(iii)    Workers Compensation coverage as required by state law.

24-01863-FPC11      Doc 1161-2      Filed 08/01/25      Entered 08/01/25 21:58:04      Pg 29 of 332

(b)     Franchisee's policies must list WST and its affiliates as an additional insured and the policies must stipulate that WST shall receive a 30 day prior written notice of cancellation. Franchisee shall provide Certificates of Insurance evidencing the required coverage to WST prior to opening and upon annual renewal of the insurance coverage, as well as at any time upon request of WST.

**7.16     Suppliers and Landlord.** Franchisee shall pay all vendors and suppliers in a timely manner. If Franchisee leases its headquarters, Franchisee shall comply with its lease.

**7.17     Public Relations.** Franchisee shall not make any public statements (including giving interviews or issuing press releases) regarding WaterStation, the Business, or any particular incident or occurrence related to the Business, without WST's prior written approval.

**7.18     Association With Causes.** Franchisee shall not in the name of the Business (i) donate money, products, or services to any charitable, political, religious, or other organization, or (ii) act in support of any such organization, without WST's prior written approval.

**7.19     No Other Businesses.** If Franchisee is an entity, Franchisee shall not own or operate any other business except WaterStation businesses.

**7.20     No Third Party Management.** Franchisee shall not engage a third-party management company to manage or operate the Business (other than an affiliate of WST) without the prior written approval of WST, which will not be unreasonably withheld.

**7.21     No Co-Branding.** Franchisee shall not "co-brand" or associate any other business activity with the WaterStation Business in a manner which is likely to cause the public to perceive it to be related to the WaterStation Business.

**7.22     No Subcontracting.** Franchisee shall not subcontract or delegate to a third party any services to be performed by Franchisee for a customer (other than engaging individuals as independent contractors in the ordinary course of business).

**7.23     Identification.** Franchisee must identify itself as the independent owner of the Business in the manner prescribed by WST.

**7.24     Business Practices.** Franchisee, in all interactions with customers, employees, vendors, governmental authorities, and other third parties, shall be honest and fair. Franchisee shall comply with any code of ethics or statement of values from WST. Franchisee shall not take any action which may injure the goodwill associated with the Marks.

## ARTICLE 8.  WATERSTATION MACHINES AND SUPPLY CHAIN

**8.1     Generally.** Franchisee shall acquire all Inputs required by WST from time to time in accordance with System Standards. WST may require Franchisee to purchase or lease any Inputs from WST, WST's designee, Required Vendors, Approved Vendors, and/or under WST's specifications. WST may change any such requirement or change the status of any vendor. To make such requirement or change effective, WST shall issue the appropriate System Standards.

12

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 30 of 332

**8.2     WaterStation Machines.** Without limiting the generality of <u>Section 8.1</u>, Franchisee shall purchase all WaterStation machines, filters, parts, and other inventory solely from WST or its affiliate, or other party designated by WST.

**8.3     Warranty and Service.**

(a)     As of the date of this Agreement, WST or its affiliate warrants parts and materials for 12 months on WaterStation machines sold to Franchisee:

(b)     WST and its affiliates reserve the right to modify its warranty policy.

**8.4     Alternate Vendor Approval.** If WST requires Franchisee to purchase a particular Input (other than WaterStation machines, filters, parts, and inventory) only from an Approved Vendor or Required Vendor, and Franchisee desires to purchase the Input from another vendor, then Franchisee must submit a written request for approval and any information, specifications and/or samples requested by WST. WST may condition its approval on such criteria as WST deems appropriate, which may include evaluations of the vendor's capacity, quality, financial stability, reputation, and reliability; inspections; product testing, and performance reviews. WST will provide Franchisee with written notification of the approval or disapproval of any propose new vendor within 30 days after receipt of Franchisee's request.

**8.5     Alternate Input Approval.** If WST requires Franchisee to purchase a particular Input, and Franchisee desires to purchase an alternate to the Input, then Franchisee must submit a written request for approval and any information, specifications and/or samples requested by WST. WST will provide Franchisee with written notification of the approval or disapproval of any proposed alternate Input within 30 days after receipt of Franchisee's request.

**8.6     Shortages and Unavailability.** WST shall not have liability to Franchisee for unavailability of, or delay in shipment or receipt of, any products or supplies from any vendor (including WST or its affiliates) resulting from shortages, order backlogs, production difficulties, delays, unavailability of transportation, fire, strikes, work stoppages, or other causes beyond the control of WST.

**8.7     Product Recalls.** If WST or any vendor, supplier, or manufacturer of an item used or sold in Franchisee's Business issues a recall of such item or otherwise notifies Franchisee that such item is defective or dangerous, Franchisee shall immediately cease using or selling such item, and Franchisee shall at its own expense comply with all instructions from WST or the vendor, supplier, or manufacturer of such item with respect the recall, repair, or other remedy of such item.

## ARTICLE 9. MARKETING

**9.1     Implementation.** Franchisee shall not use any marketing materials or campaigns (including point-of-sale materials, advertising, social media marketing, and sponsorships) that have not been approved by WST. Franchisee shall implement any marketing plans or campaigns determined by WST.

<div align="center">13</div>

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 31 of 332

**9.2     Use By WST.** WST may use any marketing materials or campaigns developed by or on behalf of Franchisee, and Franchisee hereby grants an unlimited, royalty-free license to WST for such purpose.

**9.3     Marketing Fund.** WST may establish a Marketing Fund to promote the System on a local, regional, national, and/or international level. If WST has established a Marketing Fund:

(a)     <u>Separate Account</u>. WST shall hold the Marketing Fund Contributions from all franchisees in one or more bank accounts separate from WST's other accounts.

(b)     <u>Use</u>. WST shall use the Marketing Fund only for marketing, advertising, and public relations materials, programs and campaigns (including at local, regional, national, and/or international level), and related overhead. The foregoing includes such activities and expenses as WST reasonably determines, and may include, without limitation: development and placement of advertising and promotions; sponsorships; contests and sweepstakes; development of décor, trade dress, Marks, and/or branding; development and maintenance of brand websites; social media; internet activities; e-commerce programs; search engine optimization; market research; public relations, media or agency costs; trade shows and other events; printing and mailing; and administrative and overhead expenses related to the Marketing Fund (including the compensation of WST's employees working on marketing and for accounting, bookkeeping, reporting, legal and other expenses related to the Marketing Fund).

(c)     <u>Discretion</u>. Franchisee agrees that expenditures from the Marketing Fund need not be proportionate to contributions made by Franchisee or provide a direct or any benefit to Franchisee. The Marketing Fund will be spent at WST's sole discretion, and WST has no fiduciary duty with regard to the Marketing Fund.

(d)     <u>Surplus or Deficit</u>. WST may accumulate funds in the Marketing Fund and carry the balance over to subsequent years. If the Marketing Fund operates at a deficit or requires additional funds at any time, WST may loan such funds to the National Marketing Fund on reasonable terms.

(e)     <u>Financial Statement</u>. WST will prepare an unaudited annual financial statement of the Marketing Fund within 120 days of the close of WST's fiscal year and will provide the financial statement to Franchisee upon request.

**9.4     Market Introduction Plan.** Franchisee must develop a market introduction plan and obtain WST's approval of the marketing plan prior to opening the Business.

**9.5     Internet Marketing.** WST has the exclusive right to conduct and manage all marketing and commerce on the internet or other electronic medium, including all websites and "social media" marketing. Franchisee shall not conduct such marketing or commerce, nor establish any website or social media presence independently, except as WST may specify, and only with WST's consent. WST retains the right to approve any linking to or other use of WST's website. Franchisee must comply with any internet, online commerce and/or social media policy that WST may prescribe.

## ARTICLE 10.      RECORDS AND REPORTS

**10.1**   **Systems.** Franchisee shall use such customer data management, sales data management, administrative, bookkeeping, accounting, and inventory control procedures and systems as WST may specify in the Manual or otherwise in writing.

**10.2**   **Reports.**

(a)   <u>Financial Reports</u>. Franchisee shall provide such periodic financial reports as WST may require in the Manual or otherwise in writing, including:

      (i)   a quarterly profit and loss statement and balance sheet for the Business within 30 days after the end of each fiscal quarter of WST's fiscal year, and

      (ii)   an annual financial statement (including profit and loss statement, cash flow statement, and balance sheet) for the Business within 90 days after the end of WST's fiscal year.

(b)   <u>Legal Actions and Investigations</u>. Franchisee shall promptly notify WST of any Action or threatened Action by any customer, governmental authority, or other third party against Franchisee or the Business, or otherwise involving the Franchisee or the Business. Franchisee shall provide such documents and information related to any such Action as WST may request.

(c)   <u>Government Inspections</u>. Franchisee shall give WST copies of all inspection reports, warnings, certificates, and ratings issued by any governmental entity with respect to the Business, within three days of Franchisee's receipt thereof.

(d)   <u>Other Information</u>. Franchisee shall submit to WST such other financial statements, reports, records, copies of contracts, documents related to litigation, tax returns, copies of governmental permits, and other documents and information related to the Business as specified in the Manual or that WST may reasonably request.

**10.3**   **Initial Investment Report.** Within 120 days after opening for business, Franchisee shall submit to WST a report detailing Franchisee's investment costs to develop and open the Business, with costs allocated to the categories described in Item 7 of WST's Franchise Disclosure Document and with such other information as WST may request.

**10.4**   **Business Records.** Franchisee shall keep accurate books and records reflecting all expenditures and receipts of the Business, with supporting documents (including, but not limited to, payroll records, payroll tax returns, register receipts, production reports, sales invoices, bank statements, deposit receipts, cancelled checks and paid invoices) for at least three years. Franchisee shall keep such other business records as WST may specify in the Manual or otherwise in writing.

**10.5**   **Records Audit.** WST may examine and audit all books and records related to the Business, and supporting documentation, at any reasonable time. WST may conduct the audit at franchisee headquarters and/or require Franchisee to deliver copies of books, records and

supporting documentation to a location designated by WST. Franchisee shall also reimburse WST for all costs and expenses of the examination or audit if (i) WST conducted the audit because Franchisee failed to submit required reports or was otherwise not in compliance with the System, or (ii) the audit reveals that Franchisee understated Gross Sales by 3% or more for any month.

**10.6 Remote Access Systems.** Franchisee shall give WST unlimited access to Franchisee's software systems related to the operation of the Business, by any means designated by WST.

## ARTICLE 11. FRANCHISOR RIGHTS

**11.1 Manual; Modification.** The Manual, and any part of the Manual, may be in any form or media determined by WST. WST may supplement, revise, or modify the Manual, and WST may change, add or delete System Standards at any time in its discretion. WST may inform Franchisee thereof by any method that WST deems appropriate (which need not qualify as "notice" under <u>Section 18.9</u>). In the event of any dispute as to the contents of the Manual, WST's master copy will control.

**11.2 Business Evaluation.** WST may accompany Franchisee or its personnel on any services performed for a customer to conduct an evaluation. If Franchisee's headquarters are open to the public or used for meeting customers or potential customers, WST may enter the premises of the Business from time to time during normal business hours and conduct an evaluation. Franchisee shall cooperate with WST's evaluators. The evaluation may include, but is not limited to, observing operations, conducting a physical inventory, evaluating physical conditions, monitoring sales activity, speaking with employees and customers, and removing samples of products, supplies and materials. WST may videotape and/or take photographs of the evaluation. Without limiting WST's other rights under this Agreement, Franchisee will, as soon as reasonably practical, correct any deficiencies noted during an evaluation. If WST conducts an evaluation because of a governmental report, customer complaint or other customer feedback, or a default or non-compliance with any System Standard by Franchisee (including following up a previous failed evaluation), then WST may charge all out-of-pocket expenses plus its then-current evaluation fee to Franchisee.

**11.3 WST's Right To Cure.** If Franchisee breaches or defaults under any provision of this Agreement, WST may (but has no obligation to) take any action to cure the default on behalf of Franchisee, without any liability to Franchisee. Franchisee shall reimburse WST for its costs and expenses (including the allocation of any internal costs) for such action, plus 10% as an administrative fee.

**11.4 Right to Discontinue Supplies Upon Default.** While Franchisee is in default or breach of this Agreement, WST may (i) require that Franchisee pay cash on delivery for products or services supplied by WST, (ii) stop selling or providing any products and services to Franchisee, and/or (iii) request any third party vendors to not sell or provide products or services to Franchisee. No such action by WST shall be a breach or constructive termination of this Agreement, change in competitive circumstances or similarly characterized, and Franchise e shall not be relieved of any obligations under this Agreement because of any such action. Such rights of WST are in addition to any other right or remedy available to WST.

**11.5    Business Data.** All customer data and other non-public data generated by the Business is Confidential Information and is exclusively owned by WST. WST hereby licenses such data back to Franchisee without charge solely for Franchisee's use in connection with the Business for the term of this Agreement.

**11.6    Innovations.** Franchisee shall disclose to WST all ideas, plans, improvements, concepts, methods and techniques relating to the Business (collectively, "<u>Innovations</u>") conceived or developed by Franchisee, its employees, agents or contractors. WST will automatically own all Innovations, and will have the right to use and incorporate any Innovations into the System, without any compensation to Franchisee.

**11.7    Communication Systems.** If WST provides email accounts and/or other communication systems to Franchisee, then Franchisee acknowledges that it has no expectation of privacy in the assigned email accounts and other communications systems, and authorizes WST to access such communications.

**11.8    Delegation.** WST may delegate any duty or obligation of WST under this Agreement to a third party.

**11.9    System Variations.** WST may vary or waive any System Standard for any one or more WaterStation franchises due to the peculiarities of the particular site or circumstances, density of population, business potential, population of trade area, existing business practices, or any other condition relevant to the performance of a franchise or group of franchises. Franchisee is not entitled to the same variation or waiver.

**11.10    Temporary Public Safety Closure.** If WST discovers or becomes aware of any aspect of the Business which, in WST's opinion, constitutes an imminent danger to the health or safety of any person, then immediately upon WST's order, Franchisee must temporarily cease operations of the Business and remedy the dangerous condition. WST shall have no liability to Franchisee or any other person for action or failure to act with respect to a dangerous condition.

## ARTICLE 12.        MARKS

**12.1    Authorized Marks.** Franchisee shall use no trademarks, service marks or logos in connection with the Business other than the Marks. Franchisee shall use all Marks specified by WST, and only in the manner as WST may require. Franchisee has no rights in the Marks other than the right to use them in the operation of the Business in compliance with this Agreement. All use of the Marks by Franchisee and any goodwill associated with the Marks, including any goodwill arising due to Franchisee's operation of the Business, will inure to the exclusive benefit of WST.

**12.2    Change of Marks.** WST may add, modify, or discontinue any Marks to be used under the System. Within a reasonable time after WST makes any such change, Franchisee must comply with the change, at Franchisee's expense.

**12.3     Infringement.**

(a)     <u>Defense of Franchisee</u>. If Franchisee has used the Marks in accordance with this Agreement, then (i) WST shall defend Franchisee (at WST's expense) against any Action by a third party alleging infringement by Franchisee's use of a Mark, and (ii) WST will indemnify Franchisee for expenses and damages if the Action is resolved unfavorably to Franchisee.

(b)     <u>Infringement By Third Party</u>. Franchisee shall promptly notify WST if Franchisee becomes aware of any possible infringement of a Mark by a third party. WST may, in its sole discretion, commence or join any claim against the infringing party.

(c)     <u>Control</u>. WST shall have the exclusive right to control any prosecution or defense of any Action related to possible infringement of or by the Marks.

## ARTICLE 13.     COVENANTS

**13.1     Confidential Information.** With respect to all Confidential Information, Franchisee shall (a) adhere to all procedures prescribed by WST for maintaining confidentiality, (b) disclose such information to its employees only to the extent necessary for the operation of the Business; (c) not use any such information in any other business or in any manner not specifically authorized in writing by WST, (d) exercise the highest degree of diligence and effort to maintain the confidentiality of all such information during and after the term of this Agreement, (e) not copy or otherwise reproduce any Confidential Information, and (f) promptly report any unauthorized disclosure or use of Confidential Information. Franchisee acknowledges that all Confidential Information is owned by WST (except for Confidential Information which WST licenses from another person or entity). This Section will survive the termination or expiration of this Agreement indefinitely.

**13.2     Covenants Not to Compete.**

(a)     <u>Restriction – In Term</u>. During the term of this Agreement, neither Franchisee, any Owner, nor any spouse of an Owner (the "<u>Restricted Parties</u>") shall directly or indirectly have any ownership interest in, or be engaged or employed by, any Competitor.

(b)     <u>Restriction – Post Term</u>. For two years after this Agreement expires or is terminated for any reason (or, if applicable, for two years after a Transfer), no Restricted Party shall directly or indirectly have any ownership interest in, or be engaged or employed by, any Competitor in the United States.

(c)     <u>Interpretation</u>. The parties agree that each of the foregoing covenants is independent of any other covenant or provision of this Agreement. If all or any portion of the covenants in this Section is held to be unenforceable or unreasonable by any court, then the parties intend that the court modify such restriction to the minimum extent reasonably necessary to protect the legitimate business interests of WST. Franchisee agrees that the existence of any claim it may have against WST shall not constitute a defense to the enforcement by WST of the covenants of this Section. If a Restricted Party fails to comply with the obligations under this Section during the restrictive period, then the restrictive period will be extended for each day of noncompliance.

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 36 of 332

**13.3** **Employee Recruitment.** During the term of this Agreement and for one year after termination, transfer, or expiration of this Agreement, Franchisee shall not knowingly employ or seek to employ or engage as an independent contractor any person then employed by WST or by any other WaterStation franchisee.

**13.4** **General Manager and Key Employees.** If requested by WST, Franchisee will cause its general manager and other key employees to sign WST's then-current form of confidentiality and non-compete agreement.

## ARTICLE 14.    DEFAULT AND TERMINATION

**14.1** **Termination by Franchisee.** Franchisee may terminate this Agreement only if WST violates a material provision of this Agreement and fails to cure or to make substantial progress toward curing the violation within 30 days after receiving written notice from Franchisee detailing the alleged default. Termination by Franchisee is effective 10 days after WST receives written notice of termination.

**14.2** **Termination by WST.**

(a)    <u>Subject to 10-Day Cure Period</u>. WST may terminate this Agreement if Franchisee does not make any payment to WST when due, or if Franchisee does not have sufficient funds in its account when WST attempts an electronic funds withdrawal, and Franchisee fails to cure such non-payment within 10 days after WST gives notice to Franchisee of such breach.

(b)    <u>Subject to 30-Day Cure Period</u>. If Franchisee breaches this Agreement in any manner not described in subsection (a) or (c), and fails to cure such breach to WST's satisfaction within 30 days after WST gives notice to Franchisee of such breach, then WST may terminate this Agreement.

(c)    <u>Without Cure Period</u>. WST may terminate this Agreement by giving notice to Franchisee, without opportunity to cure, if any of the following occur:

(i)    Franchisee misrepresented or omitted material facts when applying to be a franchisee, or breaches any representation in this Agreement;

(ii)    Franchisee intentionally submits any false report or intentionally provides any other false information to WST;

(iii)    a receiver or trustee for the Business or all or substantially all of Franchisee's property is appointed by any court, or Franchisee makes a general assignment for the benefit of Franchisee's creditors or Franchisee makes a written statement to the effect that Franchisee is unable to pay its debts as they become due, or a levy or execution is made against the Business, or an attachment or lien remains on the Business for 30 days unless the attachment or lien is being duly contested in good faith by Franchisee, or a petition in bankruptcy is filed by Franchisee, or such a petition is filed against or consented to by Franchisee and the petition is not dismissed within 45 days, or Franchisee is adjudicated as bankrupt;

WaterStation FDD 2018                                                                 Franchise Agreement

(iv)     Franchisee fails to open for business by the date specified on the Summary Page;

(v)     Franchisee or any Owner commits a material violation of <u>Section 7.2</u> (compliance with laws) or <u>Section 13.1</u> (confidentiality), violates <u>Section 13.2</u> (non-compete) or <u>Article 15</u> (transfer), or commits any other violation of this Agreement which by its nature cannot be cured;

(vi)     Franchisee abandons or ceases operation of the Business for more than five consecutive days;

(vii)     Franchisee or any Owner slanders or libels WST or any of its employees, directors, or officers;

(viii)     Franchise refuses to cooperate with or permit any audit or inspection by WST or its agents or contractors, or otherwise fails to comply with <u>Section 10.5</u> or <u>Section 11.2</u>.

(ix)     the Business is operated in a manner which, in WST's reasonable judgment, constitutes a significant danger to the health or safety of any person, and Franchisee fails to cure such danger within 48 hours after becoming aware of the danger (due to notice from WST or otherwise);

(x)     Franchisee has received two or more notices of default and Franchisee commits another breach of this Agreement, all in the same 12-month period;

(xi)     WST (or any affiliate) terminates any other agreement with Franchisee (or any affiliate) due to the breach of such other agreement by Franchisee (or its affiliate); or

(xii)     Franchisee or any Owner is charged with, pleads guilty to, or is convicted of a felony, or is accused by any governmental authority or third party of any act that in WST's opinion is reasonably likely to materially and unfavorably affect WST's brand.

**14.3    Effect of Termination.** Upon termination or expiration of this Agreement, all obligations that by their terms or by reasonable implication survive termination, including those pertaining to non-competition, confidentiality, indemnity, and dispute resolution, will remain in effect, and Franchisee must immediately:

(i)     pay all amounts owed to WST based on the operation of the Business through the effective date of termination or expiration;

(ii)     return to WST all copies of the Manual, Confidential Information and any and all other materials provided by WST to Franchisee or created by a third party for Franchisee relating to the operation of the Business, and all items containing any Marks, copyrights, and other proprietary items;

(iii) notify the telephone, internet, email, electronic network, directory, and listing entities of the termination or expiration of Franchisee's right to use any numbers, addresses, domain names, locators, directories and listings associated with any of the Marks, and authorize their transfer to WST or any new franchisee as may be directed by WST, and Franchisee hereby irrevocably appoints WST, with full power of substitution, as its true and lawful attorney-in-fact, which appointment is coupled with an interest; to execute such directions and authorizations as may be necessary or appropriate to accomplish the foregoing; and

(iv) cease doing business under any of the Marks.

**14.4    Remove Identification.** Within five days after termination or expiration, Franchisee shall at its own expense "de-identify" all of its operations so that it no longer contains the Marks, signage, or any trade dress of a WaterStation business, to the reasonable satisfaction of WST. Franchisee shall comply with any reasonable instructions and procedures of WST for de-identification.

**14.5    Other Claims.** Termination of this Agreement by WST will not affect or discharge any claims, rights, causes of action or remedies (including claims for WST's lost future income after termination), which WST may have against Franchisee, whether arising before or after termination.

**14.6    Purchase Option.** When this Agreement expires or is terminated, WST will have the right (but not the obligation) to purchase any or all of the assets related to the Business (including any or all WaterStation machines) at fair market value. To exercise this option, WST must notify Franchisee no later than 30 days after this Agreement expires or is terminated. If the parties cannot agree on fair market value within 30 days after the exercise notice, the fair market value will be determined by an independent appraiser reasonably acceptable to both parties. The parties will equally share the cost of the appraisal. WST's purchase will be of assets only (free and clear of all liens), and will not include any liabilities of Franchisee. If WST exercises the purchase option, WST may deduct from the purchase price: (a) all amounts due from Franchisee; (b) Franchisee's portion of the cost of any appraisal conducted hereunder; and (c) amounts paid or to be paid by WST to cure defaults under Franchisee's lease and/or amounts owed by Franchisee to third parties. If any of the assets are subject to a lien, WST may pay a portion of the purchase price directly to the lienholder to pay off such lien. WST may withhold 25% of the purchase price for 90 days to ensure that all of Franchisee's taxes and other liabilities are paid. WST may assign this purchase option to another party.

## ARTICLE 15.    TRANSFERS

**15.1    By WST.** WST may transfer or assign this Agreement, or any of its rights or obligations under this Agreement, to any person or entity, and WST may undergo a change in ownership and/or control, without the consent of Franchisee.

**15.2    By Franchisee.** Franchisee acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee and that WST entered into this Agreement in reliance on Franchisee's business skill, financial capacity, personal character, experience, and business

ability. Accordingly, Franchisee shall not conduct or undergo a Transfer without providing WST at least 30 days prior notice of the proposed Transfer, and without obtaining WST's. In granting any such consent, WST may impose conditions, including, without limitation, the following:

    (i)    WST receives a transfer fee equal to $5,000, payable Franchisee notifies WST of Franchisee's intent to sell the Business (WST will refund 50% of this fee if Franchisee does not sell the Business);

    (ii)    the proposed assignee and its owners have completed WST's franchise application processes, meet WST's then-applicable standards for new franchisees, and have been approved by WST as franchisees;

    (iii)    the proposed assignee is not a Competitor;

    (iv)    the proposed assignee executes WST's then-current form of franchise agreement, which form may contain materially different provisions;

    (v)    Franchisee has paid all monetary obligations to WST in full, and Franchisee is not otherwise in default or breach of this Agreement;

    (vi)    the proposed assignee and its owners and employees undergo such training as WST may require;

    (vii)    Franchisee, its Owners, and the transferee and its owners execute a general release of WST in a form satisfactory to WST; and

    (viii)    the Business fully complies with all of WST's most recent System Standards.

**15.3    Transfer for Convenience of Ownership.** If Franchisee is an individual, Franchisee may Transfer this Agreement to a corporation or limited liability company formed for the convenience of ownership after at least 15 days' notice to WST, if, prior to the Transfer: (1) the transferee provides the information required by Section 2.3; (2) Franchisee provides copies of the entity's charter documents, by-laws (or operating agreement) and similar documents, if requested by WST, (3) Franchisee owns all voting securities of the corporation or limited liability company, and (4) Franchisee provides a guaranty in accordance with Section 2.5.

**15.4    Transfer upon Death or Incapacity.** Upon the death or incapacity of Franchisee (or, if Franchisee is an entity, the person with the largest ownership interest in Franchisee), the executor, administrator, or personal representative of that person must Transfer the Business to a third party approved by WST within nine months after death or incapacity. Such transfer must comply with Section 15.2.

**15.5    WST's Right of First Refusal.** Before Franchisee (or any Owner) engages in a Transfer (except under Section 15.3 or Section 15.4), WST will have a right of first refusal, as set forth in this Section. Franchisee (or its owners) shall provide to WST a copy of the terms and conditions of any Transfer. For a period of 30 days from the date of WST's receipt of such copy, WST will have the right, exercisable by notice to Franchisee, to purchase the assets subject of the proposed

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 40 of 332

Transfer for the same price and on the same terms and conditions (except that WST may substitute cash for any other form of payment). If WST does not exercise its right of first refusal, Franchisee may proceed with the Transfer, subject to the other terms and conditions of this Article.

**15.6     No Sublicense.** Franchisee has no right to sublicense the Marks or any of Franchisee's rights under this Agreement.

**15.7     No Lien on Agreement.** Franchisee shall not grant a security interest in this Agreement to any person or entity. If Franchisee grants an "all assets" security interest to any lender or other secured party, Franchisee shall cause the secured party to expressly exempt this Agreement from the security interest.

## ARTICLE 16.      INDEMNITY

**16.1     Indemnity.** Franchisee shall indemnify and defend (with counsel reasonably acceptable to WST) WST, its parent entities, subsidiaries and affiliates, and their respective owners, directors, officers, employees, agents, successors and assignees (collectively, "Indemnitees") against all Losses in any Action by or against WST and/or any Indemnitee directly or indirectly related to, or alleged to arise out of, the operation of the Business. Notwithstanding the foregoing, Franchisee shall not be obligated to indemnify an Indemnitee from claims arising as a result of any Indemnitee's misconduct or negligence. This indemnity will continue in effect after this Agreement ends.

**16.2     Assumption by WST.** WST may elect to assume the defense and/or settlement of any Action subject to this indemnification, at Franchisee's expense. Such an undertaking shall not diminish Franchisee's obligation to indemnify the Indemnitees.

## ARTICLE 17.      DISPUTE RESOLUTION

**17.1     Arbitration.**

(a)     Disputes Subject to Arbitration. Except as expressly provided in subsection (c), any controversy or claim arising out of or relating to this Agreement (including its formation), shall be resolved by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, including the Optional Rules for Emergency Measures of Protection. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction.

(b)     Location. The place of arbitration shall be the city and state where WST's headquarters are located.

(c)     Injunctive Relief. Either party may apply to the arbitrator seeking injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved. Either party also may, without waiving any remedy or right to arbitrate under this Agreement, seek from any court having jurisdiction any interim or provisional injunctive relief.

(d)     <u>Confidentiality</u>. All documents, information, and results pertaining to any arbitration or lawsuit will be confidential, except as required by law or as required for WST to comply with laws and regulations applicable to the sale of franchises.

(e)     <u>Performance During Arbitration or Litigation</u>. Unless this Agreement has been terminated, WST and Franchisee will comply with this Agreement and perform their respective obligations under this Agreement during the arbitration or litigation process.

**17.2     Damages.** In any controversy or claim arising out of or relating to this Agreement, each party waives any right to punitive or other monetary damages not measured by the prevailing party's actual damages, except damages authorized by federal statute. In the event of termination of this Agreement prior the expiration of the term, WST's actual damages will include its lost future income from Royalty Fees and other amounts that Franchisee would have owed to WST but for the termination.

**17.3     Waiver of Class Actions.** The parties agree that any claims will be arbitrated, litigated, or otherwise resolved on an individual basis, and waive any right to act on a class-wide basis.

**17.4     Time Limitation.** Any arbitration or other legal action arising from or related to this Agreement must be instituted within two years from the date such party discovers the conduct or event that forms the basis of the arbitration or other legal action. The foregoing time limit does not apply to claims (i) by one party related to non-payment under this Agreement by the other party, (ii) for indemnity under <u>Article 16</u>, or (iii) related to unauthorized use of Confidential Information or the Marks.

**17.5     Venue Other Than Arbitration.** For any legal proceeding not required to be submitted to arbitration, the parties agree that any such legal proceeding will be brought in the United States District Court where WST's headquarters is then located. If there is no federal jurisdiction over the dispute, the parties agree that any such legal proceeding will be brought in the court of record of the state and county where WST's headquarters is then located. Each party consents to the jurisdiction of such courts and waives any objection that it, he or she may have to the laying of venue of any proceeding in any of these courts.

**17.6     Legal Costs.** In any legal proceeding (including arbitration) related to this Agreement or any guaranty, the non-prevailing party shall pay the prevailing party's attorney fees, costs and other expenses of the legal proceeding. "Prevailing party" means the party, if any, which prevailed upon the central litigated issues and obtained substantial relief.

## ARTICLE 18.          MISCELLANEOUS

**18.1     Relationship of the Parties.** The parties are independent contractors, and neither is the agent, partner, joint venture, or employee of the other. WST is not a fiduciary of Franchisee and does not control Franchisee or its Business. WST has no liability for Franchisee's obligations to any third party whatsoever.

**18.2     No Third Party Beneficiaries.** This Agreement does not confer any rights or remedies upon any person or entity other than Franchisee, WST, and WST's affiliates.

**18.3    Entire Agreement.** This Agreement constitutes the entire agreement of the parties and supersedes all prior negotiations and representations. Nothing in this Agreement or in any related agreement is intended to disclaim the representations made by WST in its franchise disclosure document.

**18.4    Modification.** No modification or amendment of this Agreement will be effective unless it is in writing and signed by both parties. This provision does not limit WST's rights to modify the Manual or System Standards.

**18.5    Consent; Waiver.** No consent under this Agreement, and no waiver of satisfaction of a condition or nonperformance of an obligation under this Agreement will be effective unless it is in writing and signed by the party granting the consent or waiver. No waiver by a party of any right will affect the party's rights as to any subsequent exercise of that right or any other right. No delay, forbearance or omission by a party to exercise any right will constitute a waiver of such right.

**18.6    Cumulative Remedies.** Rights and remedies under this Agreement are cumulative. No enforcement of a right or remedy precludes the enforcement of any other right or remedy.

**18.7    Severability.** The parties intend that (i) if any provision of this Agreement is held by an arbitrator or court to be unenforceable, then that provision be modified to the minimum extent necessary to make it enforceable, unless that modification is not permitted by law, in which case that provision will be disregarded, and (ii) if an unenforceable provision is modified or disregarded, then the rest of this Agreement will remain in effect as written.

**18.8    Governing Law.** The laws of the state of Washington (without giving effect to its principles of conflicts of law) govern all adversarial proceedings between the parties. The parties do not intend that the Washington Franchise Investment Protection Act or any other law or regulation of the state of Washington for the protection of franchisees or business opportunity purchasers apply unless Franchisee is located in the state of Washington.

**18.9    Notices.** Any notice will be effective under this Agreement only if made in writing and delivered as set forth in this Section to: (A) if to Franchisee, addressed to Franchisee at the notice address set forth in the Summary Page; and (B) if to WST, addressed to 2732 Grand Avenue Suite 122, Everett, WA 98201. Any party may designate a new address for notices by giving notice of the new address pursuant to this Section. Notices will be effective upon receipt (or first rejection) and must be: (1) delivered personally; (2) sent by registered or certified U.S. mail with return receipt requested; or (3) sent via overnight courier. Notwithstanding the foregoing, WST may amend the Manual, give binding notice of changes to System Standards, and deliver notices of default by electronic mail or other electronic communication.

**18.10   Joint and Several Liability.** If two or more people sign this Agreement as "Franchisee", each will have joint and several liability.

**18.11   No Offer and Acceptance.** Delivery of a draft of this Agreement to Franchisee by WST does not constitute an offer. This Agreement shall not be effective unless and until it is executed by both Franchisee and WST.

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 43 of 332

# ARTICLE 19.    CERTIFICATION OF FRANCHISOR'S COMPLIANCE

By signing this Agreement, Franchisee acknowledges the following:

(1)    Franchisee understands all the information in WST's Disclosure Document.

(2)    Franchisee understands the success or failure of the Business will depend in large part upon Franchisee's skills, abilities and efforts and those of the persons Franchisee employs, as well as many factors beyond Franchisee's control such as weather, competition, interest rates, the economy, inflation, labor and supply costs, lease terms and the marketplace.

(3)    That no person acting on WST's behalf made any statement or promise regarding the costs involved in operating a WaterStation franchise that is not in the Disclosure Document or that is contrary to, or different from, the information in the Disclosure Document.

(4)    That no person acting on WST's behalf made any claim or representation to Franchisee, orally, visually, or in writing, that contradicted the information in this Disclosure Document.

(5)    That no person acting on WST's behalf made any statement or promise regarding the actual, average or projected profits or earnings, the likelihood of success, the amount of money Franchisee may earn, or the total amount of revenue a WaterStation franchise will generate, that is not in the Disclosure Document or that is contrary to, or different from, the information in the Disclosure Document.

(6)    That no person acting on WST's behalf made any statement or promise or agreement, other than those matters addressed in this Agreement, concerning advertising, marketing, media support, market penetration, training, support service, or assistance that is contrary to, or different from, the information contained in the Disclosure Document.

(7)    Franchisee understands that this Agreement contains the entire agreement between WST and Franchisee concerning the WaterStation franchise, which means that any oral or written statements not set out in this Agreement will not be binding.

*[Signatures on next page]*

Agreed to by:

FRANCHISOR:

WST FRANCHISE SYSTEMS LLC

By:_____
Name:_____
Title:_____
Date: _____

FRANCHISEE:

[*if an individual:*]

_____
Name: _____
Date: _____

[*if an entity:*]

Apex Water Innovations, LLC

By: _____
Name: Christopher M. Carter
Title: Managing Member
Date: 16 April 2019

(*Check if applicable*) At the same time as the parties execute this Agreement, they are also executing a Rider to Franchise Agreement pursuant to:

_____Illinois
_____Indiana
_____Maryland
_____Minnesota
_____New York
_____North Dakota
_____Rhode Island
_____Washington
_____Other

**Attachment 1 to Franchise Agreement**

**OWNERSHIP INFORMATION**

1.  **Form of Ownership.** Franchisee is a (check one):

| | |
|---|---|
| _____ | *Sole Proprietorship* |
| _____ | *Partnership* |
| _X_____ | *Limited Liability Company* |
| _____ | *Corporation* |

State of incorporation / organization / residence: _North Carolina_____

2.  **Owners.** If Franchisee is a partnership, limited liability company or corporation:

| Name | Shares or Percentage of Ownership |
|---|---|
| Christopher M. Carter | 100 |
| | |
| | |
| | |
| | |

3.  **Officers.** If Franchisee is a limited liability company or corporation:

| Name | Title |
|---|---|
| Christopher M. Carter | Managing Member |
| | |
| | |
| | |
| | |

28

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 46 of 332

<u>**Attachment 2 to Franchise Agreement**</u>

## GUARANTY AND NON-COMPETE AGREEMENT

This Guaranty and Non-Compete Agreement (this "<u>Guaranty</u>") is executed by the undersigned person(s) (each, a "<u>Guarantor</u>") in favor of WST Franchise Systems LLC, a Washington limited liability company ("<u>WST</u>").

**Background Statement: Apex Water Innovations, LLC** ("<u>Franchisee</u>") desires to enter into a Franchise Agreement with WST for the franchise of a WaterStation business (the "<u>Franchise Agreement</u>"; capitalized terms used but not defined in this Guaranty have the meanings given in the Franchise Agreement). Guarantor owns an equity interest in Franchisee. Guarantor is executing this Guaranty in order to induce WST to enter into the Franchise Agreement.

Guarantor agrees as follows:

1.    **Guaranty.** Guarantor hereby unconditionally guarantees to WST and its successors and assigns that Franchisee shall pay and perform every undertaking, agreement and covenant set forth in the Franchise Agreement and further guarantees every other liability and obligation of Franchisee to WST, whether or not contained in the Franchise Agreement. Guarantor shall render any payment or performance required under the Franchise Agreement or any other agreement between Franchisee and WST upon demand from WST. Guarantor waives (a) acceptance and notice of acceptance by WST of this Guaranty; (b) notice of demand for payment of any indebtedness or nonperformance of any obligations of Franchisee; (c) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed; (d) any right Guarantor may have to require that an action be brought against Franchisee or any other person or entity as a condition of liability hereunder; (e) all rights to payments and claims for reimbursement or subrogation which any of the undersigned may have against Franchisee arising as a result of the execution of and performance under this Guaranty by the undersigned; (f) any law which requires that WST make demand upon, assert claims against or collect from Franchisee or any other person or entity (including any other guarantor), foreclose any security interest, sell collateral, exhaust any remedies or take any other action against Franchisee or any other person or entity (including any other guarantor) prior to making any demand upon, collecting from or taking any action against the undersigned with respect to this Guaranty; and (g) any and all other notices and legal or equitable defenses to which Guarantor may be entitled.

2.    **Confidential Information.** With respect to all Confidential Information Guarantor shall (a) adhere to all security procedures prescribed by WST for maintaining confidentiality, (b) disclose such information to its employees only to the extent necessary for the operation of the Business; (c) not use any such information in any other business or in any manner not specifically authorized or approved in writing by WST, (d) exercise the highest degree of diligence and make every effort to maintain the confidentiality of all such information during and after the term of the Franchise Agreement, (e) not copy or otherwise reproduce any Confidential Information, and (f) promptly report any unauthorized disclosure or use of Confidential Information. Guarantor acknowledges that all Confidential Information is owned by

WST or its affiliates (except for Confidential Information which WST licenses from another person or entity). Guarantor acknowledges that all customer data generated or obtained by Guarantor is Confidential Information belonging to WST. This Section will survive the termination or expiration of the Franchise Agreement indefinitely.

3.    **Covenants Not to Compete.**

(a)    <u>Restriction - In Term</u>. During the term of the Franchise Agreement, Guarantor shall not directly or indirectly have any ownership interest in, or be engaged or employed by, any Competitor.

(b)    <u>Restriction – Post Term</u>. For two years after the Franchise Agreement expires or is terminated for any reason (or, if applicable, for two years after a Transfer by Guarantor), Guarantor shall not directly or indirectly have any ownership interest in, or be engaged or employed by, any Competitor operating in the United States.

(c)    <u>Interpretation</u>. Guarantor agrees that each of the foregoing covenants is independent of any other covenant or provision of this Guaranty or the Franchise Agreement. If all or any portion of the covenants in this Section is held to be unenforceable or unreasonable by any court, then the parties intend that the court modify such restriction to the minimum extent reasonably necessary to protect the legitimate business interests of WST. Guarantor agrees that the existence of any claim it or Franchisee may have against WST shall not constitute a defense to the enforcement by WST of the covenants of this Section. If Guarantor fails to comply with the obligations under this Section during the restrictive period, then the restrictive period will be extended for each day of noncompliance.

4.    **Employee Recruitment.** During the term of the Franchise Agreement and for one year after termination, transfer, or expiration of the Franchise Agreement, Guarantor shall not knowingly employ or seek to employ or engage as an independent contractor any person then employed by WST or by any other franchisee of WST.

5.    **Modification.** Guarantor agrees that Guarantor's liability hereunder shall not be diminished, relieved or otherwise affected by (a) any amendment of the Franchise Agreement, (b) any extension of time, credit or other indulgence which WST may from time to time grant to Franchisee or to any other person or entity, or (c) the acceptance of any partial payment or performance or the compromise or release of any claims.

6.    **Governing Law; Dispute Resolution.** This Guaranty shall be governed by and construed in accordance with the laws of the state of Washington. The provisions of Article 17 (Dispute Resolution) of the Franchise Agreement apply to and are incorporated into this Guaranty as if fully set forth herein. If multiple Guarantors sign this Guaranty, each will have joint and several liability.

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 48 of 332

Agreed to by:

_____

Name: _____
Address: _____

_____

Date: _____

_____

Name: Apex Water Innovations, LLC
Address: _7134 Eastridge Drive_____

_____

Date: _16 April 2019_____

_____

Name: _____
Address: _____

_____

Date: _____

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 49 of 332

<center>**EXHIBIT C**</center>

<center>**MANAGEMENT AGREEMENT**</center>

This Management Agreement (this "<u>Agreement</u>") is made as of _____ between WaterStation Management LLC, a Washington limited liability company ("<u>Manager</u>") and <u>Apex Water Innovations, LLC</u> , a <u>North Carolina limited liability company</u> ("<u>Franchisee</u>").

**Background Statement:** Franchisee and WST Franchise Systems LLC, a Washington limited liability company("<u>WST</u>") are parties to a Franchise Agreement dated _____ pursuant which Franchisee agreed to purchase WaterStation vending machines (the "<u>Machines</u>") and operate a WaterStation franchise. Franchisee and Manager desire that Manager manage Franchisee's WaterStation franchise on the terms and conditions set forth herein.

**1.** **Engagement.** Franchisee hereby engages Manager to provide the following services to Franchisee (the "<u>Services</u>"):

> (i) identify and obtain locations for the Machines, on such terms as Manager deems appropriate;

> (ii) deliver, setup, and install Machines;

> (iii) operate, inspect, service, repair, and maintain the Machines;

> (iv) collect funds from the Machines;

> (v) provide monthly reports to Franchisee, summarizing sales, revenues, and other business metrics;

> (vi) manage the relationship with the lessor of space each Machine, including remitting any payments to the lessor;

> (vii) remit funds owed to WST under the Franchise Agreement;

> (viii) relocate a Machine if Manager deems appropriate; and

> (ix) remove the Machine from a location when Manager deems appropriate or when the location is no longer available.

**2.** **Term.** This Agreement shall run concurrently with the term of the Franchise Agreement.

**3.** **Financial Management.** Manager shall document all water vending sales and collect all cash payments contained in the Machines. Manager shall forward the accrued sum to Franchisee on or before the tenth day of each month for the previous month's sales, less any fees owed to Manager or WST.

<center>1</center>

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 50 of 332

**4.    Maintenance and Service Fee.** Manager shall be due a maintenance and service fee (the "M&S Fee") equal to 20% of all gross sales from or related to the Machines (including products and advertising). Manager shall deduct the M&S Fee from funds collected from the Machines.

**5.    Risk of Loss and Insurance.** Franchisee is responsible for maintaining insurance on the Machines and bears all risk of loss.

**6.    Good Faith and Commercially Reasonable Efforts.** In providing the Services, Manager shall act in good faith and use commercially reasonable efforts. Franchisee acknowledges that Manager makes no guaranties or representations regarding the profitability of any location or Machine.

**7.    Expenses.** Manager is solely responsible for all expenses of providing the Services.

**8.    Termination By Franchisee.** Franchisee may terminate this Agreement at any time after 30 days' notice. If Franchisee relocates the Machines after termination, Franchisee will bear all costs thereof. Such termination shall not cause the termination of the Franchise Agreement or release Franchisee from any obligations thereunder.

**9.    Termination By Manager.** Manager may terminate this Agreement (i) upon 90 days' prior notice to Franchisee, or (ii) if the Franchise Agreement is terminated or any circumstance arises that would permit WST to terminate the Franchise Agreement.

**10.    Delegation.** Franchisee acknowledges the Manager may delegate the performance of one or more of the Services to third parties.

**11.    Miscellaneous.** This Agreement shall be governed by and construed in accordance with the laws of the state of Washington. The provisions of Article 17 (Dispute Resolution) and Article 18 (Miscellaneous) of the Franchise Agreement apply to and are incorporated into this Agreement as if fully set forth herein, and as if "Manager" was substituted for "WST".

*[Signatures on next page]*

Agreed to by:

MANAGER:

WATERSTATION MANAGEMENT LLC

By:_____
Name:_____
Title:_____
Date: _____

FRANCHISEE:

[*if an individual:*]

_____
Name: _____
Date: _____

[*if an entity:*]

Apex Water Innovations, LLC

By: _____
Name: Christopher M. Carter

Title: Managing Member
Date: 16 April 2019

3

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 52 of 332

## RECEIPT

This disclosure document summarizes certain provisions of the franchise agreement and other information in plain language. Read this disclosure document and all agreements carefully.

If WST Franchise Systems LLC offers you a franchise, it must provide this disclosure document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale. New York requires that you be given this disclosure document at the earlier of the first personal meeting or 10 business days before the execution of any franchise or other agreement, or payment of any consideration that relates to the franchise relationship.

If WST Franchise Systems LLC does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and any applicable state agency (which are listed in Exhibit A).

The name, principal business address, and telephone number of each franchise seller offering the franchise is:

| Name | Principal Business Address | Telephone Number |
|------|----------------------------|------------------|
| Ryan Wear | 2732 Grand Avenue Suite 122, Everett, WA 98201 | (877) 475-7717 |
| Bryce Froberg | 2732 Grand Avenue Suite 122, Everett, WA 98201 | (877) 475-7717 |
| | | |

Issuance Date: April 4, 2017

I received a disclosure document dated April 4, 2017, that included the following Exhibits:

- A. State Administrators and Agents for Service of Process
- B. Franchise Agreement (with Guaranty and Non-Compete Agreement)
- C. Management Agreement
- D. Form of General Release
- E. Financial Statements
- F. Operating Manual Table of Contents
- G. Current and Former Franchisees
- H. State Addenda to Disclosure Document
- I. State Addenda to Franchise Agreement

Signature: _____

Print Name: __Christopher M. Carter__

Date Received: __16 April 2019__

**Return this copy to us.**

**WST Franchise Systems LLC**
**2732 Grand Avenue Suite 122, Everett, WA 98201**

# EXHIBIT D

# FORM OF GENERAL RELEASE

[*This is our current standard form of General Release. This document is not signed when you purchase a franchise. In circumstances, such as a renewal of your franchise or as a condition of our approval of a sale of your franchise, we may require you to sign a general release.*]

This General Release ("Release") is executed by the undersigned ("Releasor") in favor of WST Franchise Systems LLC, a Washington limited liability company ("WST").

**Background Statement**: [*describe circumstances of Release*]

Releasor agrees as follows:

1. **Release.** Releasor (on behalf of itself and its parents, subsidiaries and affiliates and their respective past and present officers, directors, shareholders, managers, members, partners, agents, and employees (collectively, the "Releasing Parties")) hereby releases WST, its affiliates, and their respective directors, officers, shareholders, employees, and agents (collectively, the "Released Parties") from any and all claims, causes of action, suits, debts, agreements, promises, demands, liabilities, contractual rights and/or obligations, of whatever nature, known or unknown, which any Releasing Party now has or ever had against any Released Party based upon and/or arising out of events that occurred through the date hereof, including without limitation, anything arising out of the Franchise Agreement (collectively, "Claims").

2. **Covenant Not to Sue.** Releasor (on behalf of all Releasing Parties) covenants not to initiate, prosecute, encourage, assist, or (except as required by law) participate in any civil, criminal, or administrative proceeding or investigation in any court, agency, or other forum, either affirmatively or by way of cross-claim, defense, or counterclaim, against any Released Party with respect to any Claim.

3. **Representations and Acknowledgments.** Releasor represents and warrants that: (i) Releasor is the sole owner of all Claims, and that no Releasing Party has assigned or transferred, or purported to assign or transfer, to any person or entity, any Claim; (ii) Releasor has full power and authority to sign this Release; and (iii) this Release has been voluntarily and knowingly signed after Releasor has had the opportunity to consult with counsel of Releasor's choice. Releasor acknowledges that the release in Section 1 is a complete defense to any Claim.

4. **Miscellaneous.** If any of the provisions of this Release are held invalid for any reason, the remainder of this Release will not be affected and will remain in full force and effect. In the event of any dispute concerning this Release, the dispute resolution, governing law, and venue provisions of the Franchise Agreement shall apply. Releasor agrees to take any actions and sign any documents that WST reasonably requests to effectuate the purposes of this Release. This Release contains the entire agreement of the parties concerning the subject matter hereof.

Agreed to by:

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 54 of 332



Name: Apex Water Innovations, LLC

Date: 16 APR 2019

# EXHIBIT 29

**<span style="color:red">DO NOT COPY OR CIRCULATE</span>**

---

**<span style="color:red">CONFIDENTIAL</span>**

# PRIVATE PLACEMENT MEMORANDUM

Memorandum No. _____          Issued To: _____

## CREATIVE TECHNOLOGIES, LLC
**A Washington Limited Liability Company**
**and**
## WATER STATION MANAGEMENT LLC
**A Washington Limited Liability Company**



## CTL-WSM INVESTMENT CONTRACTS

**MINIMUM PRICE PER PURCHASE:  $450,000.00**

**UNIT PRICE:  $9,000.00**

## A CONTINUING OFFERING

## <span style="color:red">ACCREDITED INVESTORS ONLY</span>

**January 1, 2022**

**2732 Grand Avenue, Ste 122**
**Everett, WA 98201**

**THE SECURITIES OFFERED IN THIS PRIVATE PLACEMENT MEMORANDUM ("MEMORANDUM" OR "PPP") HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR REGISTERED UNDER ANY STATE'S SECURITIES LAWS. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, APPLICABLE STATE SECURITIES LAWS, OR PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. NEITHER THE SECURITIES AND EXCHANGE COMMISSION ("SEC") NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**AN INVESTMENT IN THESE SECURITIES MAY INVOLVE SUBSTANTIAL RISK OF LOSS. YOU SHOULD REVIEW THE ENTIRE CONTENTS OF THIS MEMORANDUM, INCLUDING THE RISKS SET FORTH BEGINNING ON PAGE 6 BEFORE MAKING YOUR INVESTMENT DECISION.**

<u>**IMPORTANT NOTICES TO INVESTORS**</u>

CREATIVE TECHNOLOGIES, LLC, D/B/A WATERSTATION TECHNOLOGY, AND WATER STATION MANAGEMENT LLC (HEREINAFTER REFERRED TO TOGETHER AS THE "ISSUER" OR IN THE FIRST PERSON AS "WE," "OUR," OR "US") IS OFFERING TO ISSUE INVESTMENT CONTRACTS (THE "INVESTMENT CONTRACTS" OR "SECURITIES") ON A CONTINUING BASIS TO PROSPECTIVE INVESTORS ("YOU" OR, INDIVIDUALLY OR COLLECTIVELY, AS THE CONTEXT REQUIRES, "INVESTORS"). THE OFFERING IS BEING MADE TO SELECT "ACCREDITED INVESTORS" (AS DEFINED IN RULE 501(A) OF REGULATION D PROMULGATED BY THE SEC). THE SECURITIES WILL BE SOLD ONLY PURSUANT TO AN EXECUTED SUBSCRIPTION AGREEMENT SUBSTANTIALLY IN THE FORM ATTACHED AS <u>EXHIBIT A</u> TO THIS MEMORANDUM, AN EXECUTED PURCHASE ORDER AGREEMENT BY AND BETWEEN THE INVESTOR AND CREATIVE TECHNOLOGIES, LLC, D/B/A WATERSTATION TECHNOLOGY, SUBSTANTIALLY IN THE FORM ATTACHED AS <u>EXHIBIT B</u> TO THIS MEMORANDUM, AND AN EXECUTED SERVICE AND MANAGEMENT AGREEMENT BY AND BETWEEN THE INVESTOR AND WATER STATION MANAGEMENT LLC SUBSTANTIALLY IN THE FORM ATTACHED AS <u>EXHIBIT C</u> TO THIS MEMORANDUM. ALL INVESTORS ARE REQUIRED TO COMPLETE THE INVESTOR SUITABILITY STATEMENT SUBSTANTIALLY IN THE FORM ATTACHED AS <u>EXHIBIT D</u> TO THIS MEMORANDUM.

THIS IS AN OFFERING OF UNREGISTERED SECURITIES. THE SECURITIES OFFERED BY THIS MEMORANDUM MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THEY HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE, THE ISSUER HAS GIVEN ITS CONSENT, AND ALL FEDERAL AND STATE SECURITIES LAWS HAVE BEEN COMPLIED WITH. YOU SHOULD UNDERSTAND THAT YOU MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF YOUR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

THE ISSUER WILL NOT BE REGISTERED AS AN INVESTMENT COMPANY UNDER THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT").

THE INFORMATION IN THIS MEMORANDUM IS PROVIDED TO YOU SOLELY TO ENABLE YOU TO EVALUATE THE TERMS OF AN INVESTMENT IN THE ISSUER, AND ON THE UNDERSTANDING THAT YOU WILL NOT USE THIS MEMORANDUM FOR ANY OTHER PURPOSE OR COPY OR REPRODUCE THIS MEMORANDUM OR DISTRIBUTE THIS MEMORANDUM TO ANYONE OTHER THAN YOUR LEGAL, TAX, ACCOUNTING AND INVESTMENT ADVISORS. IF YOU ACCEPT A COPY OF THIS MEMORANDUM, YOU AGREE TO RETURN THIS MEMORANDUM AND ALL RELATED DOCUMENTS TO THE ISSUER IF YOU DO NOT INVEST IN THE ISSUER OR IF YOUR SUBSCRIPTION OFFER IS REJECTED BY THE ISSUER. IF YOU RECEIVED AN ELECTRONIC COPY, YOU ARE REQUIRED TO DELETE IT FROM YOUR SYSTEM, THOUGH YOU ARE NOT REQUIRED TO DELETE IT FROM YOUR SYSTEM-BACKUP MEDIA (E.G., EMAIL AND FILE BACKUP), SO LONG AS SUCH BACKUP MEDIA ARE MAINTAINED IN CONFIDENCE AND ARE NOT READILY ACCESSIBLE TO OTHERS AND WILL BE OVERWRITTEN IN THE ORDINARY COURSE OF REUSE OF THE SYSTEM-BACKUP MEDIA.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, ANY SECURITY OFFERED HEREBY BY ANY PERSON IN ANY JURISDICTION IN WHICH IT IS UNLAWFUL TO MAKE SUCH AN OFFER, SOLICITATION OR SALE. THIS MEMORANDUM IS PERSONAL TO EACH INVESTOR AND DOES NOT CONSTITUTE AN OFFER TO ANY OTHER PERSON OR TO THE PUBLIC GENERALLY TO SUBSCRIBE FOR OR OTHERWISE ACQUIRE THE SECURITIES DISCUSSED HEREIN.

NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE MADE HEREUNDER SHALL UNDER ANY CIRCUMSTANCES IMPLY THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF ISSUER OR THAT THE INFORMATION SET FORTH IN THIS MEMORANDUM IS CORRECT AS OF ANY DATE SUBSEQUENT TO THE DATE HEREOF. THE INFORMATION CONTAINED IN THS PPM IS GIVEN AS OF THE DATE STATED ON THE FRONT PAGE HEREOF AND THE ISSUER DISCLAMS ANY DUTY TO UPDATE ANY INFORMATION CONTAINED HEREIN.

YOU SHOULD RELY ONLY ON THE INFORMATION CONTAINED IN THIS MEMORANDUM. WE HAVE NOT AUTHORIZED ANY PERSON TO PROVIDE YOU WITH ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS ABOUT THE ISSUER THAT ARE DIFFERENT OR INCONSISTENT WITH THAT CONTAINED IN THIS PPM. IF ANYONE PROVIDES YOU WITH DIFFERENT OR INCONSISTENT INFORMATION, YOU SHOULD NOT RELY ON IT.

ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERENCED IN THIS MEMORANDUM IS NOT INTENDED TO BE USED, AND CANNOT BE USED, BY PROSPECTIVE INVESTORS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE OR ANY APPLICABLE STATE CODES; SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE ISSUER OF THE TRANSACTIONS OR MATTERS ADDRESSED IN THIS MEMORANDUM; AND PROSPECTIVE INVESTORS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR. CONSULT WITH YOUR LEGAL, TAX, ACCOUNTING AND INVESTMENT ADVISORS BEFORE INVESTING. YOU SHOULD NOT VIEW THE CONTENTS OF THIS MEMORANDUM AS LEGAL, TAX, ACCOUNTING OR INVESTMENT

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts

ADVICE. YOU SHOULD CONSULT YOUR OWN COUNSEL, ACCOUNTANT OR FINANCIAL ADVISOR AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING AN INVESTMENT IN THE ISSUER.

THE ISSUER HAS PREPARED THIS MEMORANDUM AND IS SOLELY RESPONSIBLE FOR ITS CONTENTS. THIS MEMORANDUM DOES NOT PURPORT TO BE ALL INCLUSIVE OR TO CONTAIN ALL THE INFORMATION THAT YOU MAY DESIRE IN INVESTIGATING THE ISSUER AND THE TERMS OF THIS OFFERING. SEE "RISK FACTORS" BELOW FOR A DISCUSSION OF CERTAIN FACTORS THAT SHOULD BE CONSIDERED IN CONNECTION WITH AN INVESTMENT IN THE ISSUER. YOU ARE RESPONSIBLE FOR MAKING YOUR OWN EXAMINATION AND INVESTIGATION OF THE ISSUER AND YOUR OWN ASSESSMENT OF THE MERITS AND RISKS OF INVESTING IN THE ISSUER.

WE RESERVE THE RIGHT IN OUR SOLE DISCRETION, AND FOR ANY REASON WHATSOEVER: (I) TO MODIFY, AMEND AND/OR WITHDRAW THE TERMS OF THE OFFERING, THE NUMBER OF SECURITIES OFFERED, OR THE PRICE PER SECURITY; (II) TO ACCEPT OR REJECT IN WHOLE OR IN PART ANY PROSPECTIVE INVESTMENT IN THE SECURITIES; OR (III) TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE AMOUNT OF THE SECURITIES SUCH INVESTOR HAS SUBSCRIBED TO PURCHASE. WE SHALL HAVE NO LIABILITY WHATSOEVER TO ANY OFFEREE AND/OR INVESTOR IN THE EVENT THAT ANY OF THE FOREGOING SHALL OCCUR.

THE ISSUER HAS AGREED TO MAKE AVAILABLE TO EACH PROSPECTIVE INVESTOR AND TO HIS, HER, OR ITS REPRESENTATIVE(S), OR BOTH, THE OPPORTUNITY, PRIOR TO THE CONSUMMATION OF A SALE OF SECURITIES TO SUCH PROSPECTIVE INVESTOR, TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM THE PRINCIPALS OF THE ISSUER CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING AND TO OBTAIN ANY ADDITIONAL INFORMATION, TO THE EXTENT THEY POSSESS SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE, NECESSARY TO VERIFY THE ACCURACY AND COMPLETENESS OF THE INFORMATION SET FORTH HEREIN.

**NASAA UNIFORM LEGEND**: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

**FOR FLORIDA RESIDENTS**: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT IN RELIANCE UPON EXEMPTIVE PROVISIONS CONTAINED THEREIN. SECTION 517.061(11)(a)(5) OF THE FLORIDA SECURITIES AND INVESTOR

iii

PROTECTION ACT (THE "FLORIDA ACT") PROVIDES WHEN SALES ARE MADE TO FIVE OR MORE PURCHASERS IN THIS STATE THAT ANY SALE OF SECURITIES IN FLORIDA WHICH ARE EXEMPTED FROM REGISTRATION UNDER SECTION 517.061(11) OF THE FLORIDA ACT IS VOIDABLE BY THE PURCHASER IN SUCH SALE EITHER WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE ISSUER, AN AGENT OF THE ISSUER, OR AN ESCROW AGENT OR WITHIN THREE (3) DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.

**FOR FOREIGN INVESTORS**: IF YOU LIVE OUTSIDE THE UNITED STATES, IT IS YOUR RESPONSIBILITY TO FULLY OBSERVE THE LAWS OF ANY RELEVANT TERRITORY OR JURISDICTION OUTSIDE THE UNITED STATES IN CONNECTION WITH ANY PURCHASE, INCLUDING OBTAINING REQUIRED GOVERNMENTAL OR OTHER CONSENTS OR OBSERVING ANY OTHER REQUIRED LEGAL OR OTHER FORMALITIES.

**FORWARD-LOOKING STATEMENTS**

CERTAIN STATEMENTS CONTAINED IN THIS PPM, INCLUDING, WITHOUT LIMITATION, STATEMENTS CONTAINING THE WORDS "BELIEVES," "ANTICIPATES," "COULD," "CONTINUE," "ESTIMATE," "MAY," "PLANS," "INTENDS," "EXPECTS," "PREDICT," "PROJECT," "SHOULD," AND "WILL," AND WORDS OF SIMILAR IMPORT CONSTITUTE "FORWARD-LOOKING STATEMENTS." FORWARD-LOOKING STATEMENTS INCLUDE THOSE RELATED TO INVESTOR RETURNS, INVESTMENT AND OBJECTIVES, AND RETURNS TO INVESTORS.

THESE FORWARD-LOOKING STATEMENTS, WHEREVER THEY OCCUR IN THIS MEMORANDUM, ARE ESTIMATES REFLECTING THE BEST JUDGMENT OF THE MANAGEMENT OF THE ISSUER. FORWARD-LOOKING STATEMENTS INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES, AND OTHER FACTORS THAT MAY CAUSE THE ACTUAL RESULTS, PERFORMANCE, OR ACHIEVEMENTS OF THE ISSUER TO BE MATERIALLY DIFFERENT FROM ANY FUTURE RESULTS, PERFORMANCE, OR ACHIEVEMENTS EXPRESSED OR IMPLIED BY SUCH FORWARD-LOOKING STATEMENTS. GIVEN SUCH UNCERTAINTIES, YOU ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON SUCH FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS SHOULD, THEREFORE, BE CONSIDERED IN LIGHT OF VARIOUS IMPORTANT FACTORS, INCLUDING THOSE SET FORTH UNDER "RISK FACTORS" AND ELSEWHERE IN THIS MEMORANDUM. THE ISSUER MAY UPDATE SUCH FACTORS OR ANNOUNCE REVISIONS TO ANY OF THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN TO REFLECT FUTURE EVENTS OR DEVELOPMENTS BUT DISCLAIMS ANY OBLIGATION TO DO SO.

## Important Considerations

A purchase of Securities offered pursuant to this PPM is limited to "Accredited Investors" as that term is defined in Rule 501(a) of Regulation D.

**IF YOU ARE NOT AN "ACCREDITED INVESTOR" AS DEFINED BY THE SECURITIES AND EXCHANGE COMMISSION, PLEASE IMMEDIATELY RETURN THIS PPM**.

iv

This Confidential Private Placement Memorandum is being provided to select qualified prospective investors (the "Investor" or "Investors") on a confidential basis solely in connection with the consideration of the purchase of investment contracts (the "Securities") issued jointly by Creative Technologies, LLC, d/b/a WaterStation Technology, and Water Station Management LLC.

All of the information in this PPM is nonpublic, confidential and proprietary in nature, and the disclosure of any information in this PPM could cause harm to the Issuer, their Affiliates, and other parties. The information contained herein is disclosed for the sole purpose of evaluating the Securities offered to Investors. The information contained in this PPM may not be provided to persons who are not directly concerned with an Investor's decision to invest in the Securities.

The Securities offered hereby are speculative and involve certain risks. See "Risk Factors." There is no public market for the Securities, nor will one develop following this Offering.

The Securities are suitable only for sophisticated investors for whom an investment in the Issuer does not constitute a complete investment program and who fully understand, are willing to assume, and have the financial resources necessary to withstand the risks involved in the investment program in which the Issuer will engage. Accordingly, distribution of this PPM, and offers and sales of the Securities referred to herein, are limited to persons who meet certain suitability requirements. Each Investor will be required to make certain representations to the Issuer, including representations as to investment intent, degree of sophistication, access to information concerning the Issuer, and ability to bear the economic risk of the investment.

This PPM may contain projections which are predictions of future events that may or may not occur. Although all such projections, if any, are based on assumptions that the Issuer believes are reasonable there can be no assurance that they will in fact prove to be correct. Consequently, they must not be relied upon to indicate, or guarantee, any actual results that may be realized.

The duties and obligations of the Issuer are set forth in and will be governed by a Purchase Order Agreement by and between the Investor and Creative Technologies, LLC, a Washington limited liability company, d/b/a WaterStation Technology ("CTL"), and a Service and Management Agreement by and between the Investor and Water Station Management LLC, a Washington limited liability company ("WSM"). The obligations of the Investors are set forth in and will be governed by the Purchase Order Agreement and the Service and Maintenance Agreement (together, the "Investment Contract" or "Security") as well. The Investor will also be required to deliver an executed investor suitability statement (the "Investor Suitability Statement") confirming his, her or its status as an accredited investor pursuant to Rule 501(a) of Regulation D under the Securities Act of 1933. All of the statements and information contained herein are qualified in their entirety by reference to the Investment Contract. This PPM may summarize some of the terms of the Investment Contract and other documents referred to herein and therein. However, the discussions set forth in this PPM do not purport to be complete. Forms of the Investment

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts

Contract are provided to prospective Investors with this PPM and each prospective Investor and its advisors should read these materials, including any and all revisions thereto, prior to making a decision to invest in the Securities.

The delivery of this PPM does not imply that the information contained herein is correct as of any time subsequent to the date of its issue. Unless specified otherwise, all statements made herein are made as of January 1, 2022.

In considering the performance information contained herein, Investors should bear in mind that there can be no assurance that the Issuer will achieve the projected results. Actual future conditions may require actions that differ from those contemplated at this time and Investors are cautioned not to place undue reliance on any projections contained in this PPM.

All capitalized terms not otherwise defined will have the meanings given them in the "Definition of Terms" section.

**DIRECT INQUIRIES TO:**

Inquiries about this Offering should be directed to any of the persons listed below as follows:

Ryan Wear:
      Telephone: 425-320-1281 (office)
      Mobile:    425-244-0350
      Email at rwear@waterstationtechnology.com.

Kevin Nooney:
      Telephone: 425-320-1281 (office)
      Mobile:    425-922-2889
      Email at kevin.nooney@waterstationtechnology.com.

Jeremy Briggs:
      Telephone: 425-320-1281 (office)
      Email at jeremy.briggs@refreshingusa.com.

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts

## TABLE OF CONTENTS

IMPORTANT NOTICES TO INVESTORS..................................................................... i

IMPORTANT CONSIDERATIONS ......................................................................... iv

DIRECT INQUIRIES TO ..................................................................................... vi

DEFINITION OF TERMS ....................................................................................1

SUMMARY OF THE OFFERING ........................................................................2

RISK FACTORS ...................................................................................................6

THE SECURITIES................................................................................................15

USE OF PROCEEDS............................................................................................18

BUSINESS ...........................................................................................................19

MANAGEMENT ..................................................................................................22

SELECT FINANCIAL INFORMATION .............................................................22

LEGAL AND JUDICIAL PROCEEDINGS.........................................................24

PLAN OF DISTRIBUTION.................................................................................24

EXHIBITS

EXHIBIT A   -   Form of Subscription Agreement
EXHIBIT B   -   Form of Purchase Order Agreement
EXHIBIT C   -   Form of Service and Maintenance Agreement
EXHIBIT D   -   Form of Investor Suitability Questionnaire

SCHEDULES

SCHEDULE I-A   -   Financials of Creative Technologies, LLC – FY 2020
SCHEDULE I-B   -   Financials of Creative Technologies, LLC – YTD September 2021
SCHEDULE II-A   -   Financials of Water Station Management LLC – FY 2020
SCHEDULE II-B   -   Financials of Water Station Management LLC – YTD September 2021

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts

## DEFINITION OF TERMS

The following terms have the meanings ascribed to them below when used elsewhere in this PPM with the initial letter capitalized:

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person. "Control" for purposes of this definition means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, through voting securities, contract rights, or otherwise.

"CTL" means Creative Technologies, LLC, a Washington limited liability company, d/b/a WaterStation Technology, which manufactures water station vending machines.

"CTL-WSM Investment Contract" or "Investment Contract" means, with respect to the purchase, operation, maintenance and servicing, management and administration of specified water stations, the executed Purchase Order Agreement by and between an Investor, as purchaser, and CTL, d/b/a WaterStation Technology, as seller, considered together with the executed Service and Management Agreement by and between the Investor, as owner, and WSM, as contractor.

"Investor" means either, or both, a prospective or actual purchaser of an Investment Contract pursuant to this Offering.

"Investor Suitability Statement" or "Suitability Statement" means the suitability statements substantially in the form of Exhibit D hereto made by an Investor in conjunction with the Investor's consummation of the transactions contemplated by an Investment Contract.

"IRS" means the United States Internal Revenue Service.

"Issuer" means, together, CTL and WSM.

"Offering" means the offering of the CTL-WSM Investment Contracts pursuant to this PPM and related documents.

"Person" means an individual, a partnership (general, limited, or limited liability), a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a governmental, quasi-governmental, judicial, or regulatory entity, or any department, agency, or political subdivision thereof.

"SEC" means the United States Securities and Exchange Commission.

1

"Security" means an Investment Contract.

"Service Agreement" means a Service and Maintenance Agreement between WSM, as contractor, and an Investor, as owner of the water stations, substantially in the form of <u>Exhibit C</u> hereto.

"Servicing Expenses" means the expenses incurred from the placement, installation, operation, servicing and maintenance, management, and administration of the water stations subject to the Investment Contracts. Those expenses include, but are not necessarily limited to, location placement expenses and leases, water, electricity and other utilities costs, servicing, maintenance and repair costs, which may include fees paid to third-party contractors to perform such services, credit card, banking and other payment and cash management fees, legal and accounting fees and costs, and administration, management and employee expenses.

"WSM" means Water Station Management LLC, a Washington limited liability company which is in the business of placing, installing, operating, servicing and maintaining, managing and administering water vending machines.

"Water Sale Fee" means the monthly fee paid to an Investor under an Investment Contract for the sale of water from a water station subject to that Investment Contract.

## SUMMARY OF THE OFFERING

The following summary is qualified, in its entirety, by information appearing elsewhere in this PPM, the Subscription Agreement and the Investment Contract (collectively, the "Investment Documents"). You should read the Investment Documents in their entirety and, in particular, focus on the risks described in the section of this PPM titled "Risk Factors." In the event of a conflict between this summary and any of the other Investment Documents, the provisions of the other Investment Documents will control. Capitalized terms used in this summary but not defined have the meanings assigned to them in the section of this PPM labeled "Definition of Terms" above.

**The Issuer:**    CTL and WSM are referred to collectively as the "Issuer" in this PPM. CTL is a Washington limited liability company doing business as WaterStation Technology that manufactures and sells water station vending machines ("water stations"). Its sole members are Dr. Richard Wear and his son, Ryan Wear. WSM is a Washington limited liability company which identifies and leases installation sites, installs, operates, services, maintains, manages and administers water stations, whether directly or through third-party contractors. In addition, it may own and operate water stations itself. WSM is wholly owned by Ryan Wear.

.

2

| | |
|---|---|
| **Ownership of** | |
| **The Issuer:** | Following an investment in any Investment Contract, Investors will not have any ownership interest in either CTL or WSM and will have no management or voting rights in either. Dr. Richard Wear and Ryan Wear are now and will, following any purchase of one or more Investment Contracts by an Investor, be the sole owners of CTL and Ryan Wear is now and will, following any purchase of one or more Investment Contracts by an Investor, be the sole owner of WSM. No equity is being offered to Investors pursuant to this PPM. |
| **Management:** | CTL and WSM are both managed by Ryan Wear. He has been in the business of managing vending machines for 27 years. After growing his initial business to approximately 5,000 machines he sold it to Canteen Vending, the largest vending machine company in the world. In 2013 he and his father started CTL and he founded WSM in 2016 and has been managing both companies from their beginnings. |
| **The Securities:** | Each Security will consist of (i) a Purchase Order Agreement between CTL, d/b/a WaterStation Technology, and the Investor, pursuant to which the Investor will purchase from CTL a minimum of fifty (50) water stations, and (ii) a Service and Maintenance Agreement between WSM and the Investor, pursuant to which WSM will identify the sites on which to place the water stations purchased under the Purchase Order Agreement, negotiate for and lease the sites, install the water stations and service, maintain, manage and administer the water stations and the revenues derived from their operation. Each Investor will be responsible for the payment of applicable sales taxes on the purchased water stations. |
| **Eligible Investors:** | The Securities are being offered solely to "accredited investors," as that term is defined by Rule 501(a) of Regulation D of the Securities Act of 1933, and who satisfy eligibility requirements set from time to time by the Issuer. In the sole discretion of the Issuer, the Issuer may establish a structure to secure investments in the Issuer from foreign Investors. |
| **The Offering** | The Investment Contracts are the only securities being offered by the Issuer under this PPM. The Issuer will issue the Securities in multiples of $9,000 with a minimum purchase requirement of $450,000. The Issuer reserves the right to accept a lesser amount from any individual Investor. There is no fixed ceiling on the amount the Issuer will accept from an Investor but the Issuer may, at its discretion, set a ceiling for a particular Investor based on the Issuer's Investor Suitability Standards and the Investor's Suitability Statement. |

3

24-01863-FPC11   Doc 1161-2   Filed 08/01/25   Entered 08/01/25 21:58:04   Pg 67 of 332

**Offering Period:** The Offering is a continuing offering. Interested Investors may purchase an Investment Contract at any time following the receipt of this PPM and the execution and delivery of a Subscription Agreement, a Purchase Order Agreement, a Service Agreement, the Investor Suitability Statement, such other documentation the Issuer may require, and a check or wire transfer of the investment amount.

**Offering Size:** This Offering is a continuing offering and is not limited by dollar amount, the number of water stations or Securities sold, or the time in which the offering and sale of any Security may occur. Issuer may discontinue the Offering at any time for any reason.

**Investor Returns:** Investors will receive revenue from two sources under an Investment Contract. First, they will receive the Water Sale Fee each month from the sale of water from each water station, which constitutes a fixed rate of return per annum, to be paid monthly. In addition, Investors will receive a thirty percent (30.0%) share of the advertising net revenue attributable to each water station, payable quarterly.

*An investment in the Securities is inherently speculative and no specific return on an Investor's purchase or even return of Investor's investment can be promised or guaranteed.*

**Service Agreement:** Pursuant to the Service Agreement, WSM will, with respect to the water stations subject to such Service Agreement: (i) locate placement sites and negotiate and enter into leases with the location owners; (ii) negotiate, execute and perform service agreements for credit card and other electronic sales payments with credit card companies; (iii) negotiate, execute and perform advertising agreements to provide advertising on the LCD or other screens of the water stations; (iv) transport the water stations to their installation sites; (v) install the water stations, (vi) service, maintain and repair the water stations; (vii) manage the operation of the water stations; (viii) relocate a water station in the event of cancellation of its current lease or upon termination of the current lease during the term of the Service Agreement; (ix) maintain all licensing and registration that is reasonable or necessary for the use and operation of each water station; (x) hire such technicians, repair and maintenance personnel and others as employees, independent contractors, third-party contractors, materialmen, suppliers and vendors as WSM deems reasonable or necessary; (xi) maintain all books and

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts

records; and (xii) collect payments from the location lessors for the use of the water stations.

**Term of Investment Contract:**

Each Service Agreement will have a term of ten (10) years with an option to renew for a subsequent term by giving sixty (60) days prior written notice of the Investor's intent to exercise the option. Either party may terminate the Service Agreement for cause, provided the defaulting party fails to cure and prior written notice is given as set forth in the Service Agreement.

**Repurchase of Water Stations:**

WSM will have the right under the Investment Contract, but not an obligation, to purchase some or all of the water stations subject to that Investment Contract at any time after the third anniversary of the Investor's purchase or the occurrence of certain events and subject to terms, including price, specified therein.

***Any repurchase of water stations subject to an Investment Contract may adversely affect the Investor's return on investment.***

**Financial Statements**

Each Investor will receive monthly statements reporting gross sales from each water station that is subject to that Investor's Security. Each Investor will receive quarterly statements reporting the gross revenue, advertising costs and net advertising revenue distributed to it.

The Issuer will also prepare quarterly and annual financial statements in accordance with Generally Accepted Accounting Principles ("GAAP") or such other methodology as determined to be appropriate by the Issuer in consultation with its accountants. CTL's annual financial statements will be audited financials beginning with 2021. WSM's annual financial statements will be certified by its manager or chief financial officer until such time as its revenues are equal to or greater than $25,000,000, after which they will be audited. CTL's and WSM's quarterly financial statements will be certified by the manager or chief financial officer. These financial statements shall be made available to Investors upon request.

**Subscription:**

Investors may complete and return the Subscription Agreement, Investment Contract and Investor Suitability Statement to the Issuer at any time during the Offering Period, together with funds sufficient to purchase the water stations subscribed for. Those funds will be deposited temporarily into the Issuer's holding account (the "Subscription Account"). Purchase of any Security will only become effective as of the date upon which the Issuer

5

accepts the Investor's subscription and transfers the Investor's funds from the Subscription Account to its operating account. The Investor's deposited funds earn no interest while held in the Subscription Account.

The Offering is a continuing offering and is not limited by dollar amount, the number of Securities sold, or the time in which the offering and sale of any Security may occur. Issuer may discontinue the Offering at any time for any reason.

## RISK FACTORS

There are risks associated with investing in the Issuer, the majority of which are not within the Issuer's control. These risks include, among others, trends in the economy, particularly the market for vending machine water, income tax laws, and government regulations. Prior to investing in the Issuer, Investors should perform their own analysis of the investment opportunities and objectives presented and discuss investing in the Issuer with their own advisors.

### Risks Relating to an Investment in the Issuer – General

### General Water Vending Machine Risks

The Issuer and Investor will be subject to the risks that generally relate to investing in water stations. The performance and value of the investment once originated depends upon many factors beyond the Issuer's control, including general economic risk. The ultimate performance and value of an Investor's investment are subject to the varying degrees of risk generally incident to the ownership and operation of the water stations in which the Investor invests.

The ultimate performance and value of the Investor's water stations will depend, in large part, upon WSM's ability to operate any given machine so that it produces sufficient cash flows to pay its operating expenses and the Water Sales Fee, and to acquire and retain advertisers and collect payments from them on advertising placed on each water station. Revenues and cash flows may be adversely affected by: changes in national or local economic conditions; changes in the circumstances and condition of the business where the machine is placed, including, but not limited to, competition from other businesses offering the same or similar products and services; changes in the location of such other businesses in the local market; changes in governmental rules and fiscal policies, civil unrest, acts of God, including earthquakes, hurricanes, and other natural disasters, pandemics, acts of war, or terrorism, which may decrease the availability of or increase the cost of insurance or result in uninsured losses; changes in governmental rules and fiscal policies which may result in adverse tax consequences or changes in tax rates; unforeseen increases in operating expenses generally; decreases in consumer confidence in water sold from public water stations; government taking by eminent domain; various uninsured or uninsurable risks; the bankruptcy or liquidation of the lessor of a water station site; adverse changes in zoning laws; the

6

impact of present or future environmental legislation and compliance with environmental laws; the impact of lawsuits which could cause the Issuer to incur significant legal expenses and divert management's time and attention from the day-to-day operations of the Issuer; and other factors that are beyond the Issuer's control and the control of the property owners.

Any of the foregoing factors as well as others could adversely impact the cash flows and values of an Investor's water stations and their returns.

**Governmental Regulation of Water**

Commercial water vending machines are regulated by each state and are periodically tested to confirm compliance with their standards. A finding of noncompliance can result in fines and could result in the shutting down of the offending water station or stations.

**Risks Associated with a Changing Economic Environment**

As a result of the COVID-19 virus pandemic and the lockdowns and restrictions on movement and contact among people that have resulted, the general economy has suffered a significant decline. Although it is recovering, evidence of increased price inflation has recently been reported in the national news which may indicate further issues with the economy. If the costs associated with the operation and maintenance increase it may be necessary to increase prices, if the market can bear it, or not, if the market does not. In either case, the result may be a reduction in sales or net sales revenue. So far CTL and WSM have continued to do well in this environment but it is possible that they too may see a decline in business. If the sale of water by public water stations becomes seriously constrained, WSM's ability to pay the Water Sale Fee may be significantly adversely affected. Advertisers too may find it necessary to reduce their advertising expenses, which could affect the advertising revenue the Issuer and Investor receive for each water station.

**Competition**

The Issuer faces significant competition from companies placing water stations and selling water across the country, and from regional competitors as well. The Issuer's primary national competitor is Primo Water Corporation, which is a national vendor of commercial water.

**Digital Operations Risk**

WSM and the water stations rely heavily on software, the internet, the cloud, and other technology to digitally track sales and produce machine-level reports. The software in the machines allows it to track and manage their sales and performance with confidence and accuracy. However, there are risks associated with technology. Defects in software products and errors or delays in processing of electronic transactions could result in:

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts

- transaction or processing errors;
- diversion of technical and other resources from other efforts;
- loss of credibility with current or potential customers;
- harm to reputation;
- exposure to liability claims; or
- susceptibility to hacking by outside parties.

In addition, CTL and WSM rely on technologies supplied by third parties that may also contain undetected errors, viruses, or defects that could have a material adverse effect on the performance of the water stations and therefore the Issuer's financial condition and results.

**No Guarantee of Profitability**

There can be no assurance that cash flows from the water stations, once placed and operating by WSM, will be sufficient to pay the Water Sale Fee on any water station even if the Issuer believes in each water station's economic viability. Poor performance by a few of the water stations subject to an Investment Contract could significantly affect WSM' ability to pay the Water Sale Fee and therefore the total return to the applicable Investor.

**Government Regulation of Securities Offerings**

The issuance of securities is highly regulated at both state and federal levels. Some of these regulations are discussed in greater detail below under "Compliance with Anti-Money Laundering Requirements." The Issuer may be subject to governmental regulations in addition to those discussed in this PPM, and new regulations or regulatory agencies may develop that affect the Issuer's operations and ability to generate revenue. The Issuer will attempt to comply with all applicable securities regulations.

WSM and Ryan Wear are currently the subjects of an investigation by the Washington State Department of Financial Institutions ("DFI"). DFI is seeking information regarding past offerings and sales of franchises and business opportunities. The investigation is in the early stages. DFI has issued a cease and desist order that prohibits WSM from issuing securities unless they are registered or exempt from registration under the securities laws of Washington. The securities in this offering are being offered by CTL, d/b/a WaterStation Technology, as seller of the water stations, together with WSM, as servicer. WSM will maintain and administer the water stations pursuant to the Service Agreement that is signed at the beginning of the investment. Because the Securities are being issued only to accredited investors pursuant to Rule 506(b) of Regulation D, CTL and WSM believe this offering is exempt from registration and is therefore permitted under the cease and desist order. If DFI determines that CTL or WSM has violated Washington state securities laws, rules or regulations, DFI may impose fines and penalties or take other actions that could detrimentally affect your investment. Also, the investigation may trigger investigations by

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts

the responsible agencies of other states regarding WSM and CTL, and their offering and sale of franchises and business opportunities in those states.

## Compliance with Securities Laws

The offer and sale of the Securities will not be registered under the Securities Act or the laws of any applicable state pursuant to an exemption from the registration requirements of the Securities Act, and the securities laws of certain states. Each Investor must furnish certain information to WSM and represent, among other customary private placement representations, that it is acquiring its Securities for investment purposes and not with a view towards resale or distribution. The acquisition of Securities by each Investor also must be lawful under applicable state securities laws.

The Securities have not been, and will not be, registered under the Securities Act. Accordingly, the United States securities laws impose certain restrictions upon the ability of an Investor to sell, assign or otherwise transfer the Securities. The Securities may not be offered, sold, assigned, transferred, or delivered, directly or indirectly, unless (i) they are registered under the Securities Act and any applicable state securities laws, or (ii) an exemption from registration under the Securities Act and any applicable state securities laws is available. Moreover, there will be no liquid, public market for the Securities, and none is expected to develop.

## Absence of Registration Under Applicable Securities Laws

This Offering is being made under certain federal and state securities laws exemptions. As such, the Securities have not been registered under the Securities Act or applicable state securities laws. Therefore, no regulatory authority has reviewed the terms of this Offering, including the nature and amounts of the compensation, the disclosure of risks and tax consequences, and the fairness of the terms of this Offering. Further, Investors do not have all of the protection afforded in registered or qualified offerings, and they must judge the adequacy of disclosure and the fairness of the terms of this Offering without the benefit of prior review by any regulatory authority.

Furthermore, the Issuer may fail to comply with the requirements of the exemptions from registration on which it is relying. If so, the Investors could rescind their purchase of Securities under applicable state and federal securities laws. If enough Investors successfully sought rescission, the Issuer would face severe financial demands, which would adversely affect the Issuer.

## No Sales to Unacceptable Investors

The Securities may not be offered, sold, assigned, transferred or delivered, directly or indirectly, to any "Unacceptable Investor." An Unacceptable Investor means any person who is known to be a:

<div align="center">9</div>

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 73 of 332

(a)     person or entity who is a "designated national," "specially designated national," "specially designated terrorist," "specially designated global terrorist," "foreign terrorist organization," or "blocked person" within the definitions set forth in the Foreign Assets Control Regulations of the United States Treasury Department, 31 C.F.R., Subtitle B, Chapter V, as amended;

(b)     person acting on behalf of, or an entity owned or controlled by, any government against whom the United States maintains economic sanctions or embargoes under the Regulations of the United States Treasury Department, 31 C.F.R., Subtitle B, Chapter V, as amended-- including, but not limited to--the "Government of Sudan," the "Government of Iran," the "Government of Cuba," the "Government of Syria," and the "Government of Burma"; or

(c)     person or entity subject to additional restrictions imposed by the following statutes or Regulations and Executive Orders issued thereunder: the Trading with the Enemy Act, the Iraq Sanctions Act. Pub. L. 101-5 13, Title V, §§ *586* to 586J, 104 Stat. 2047, the National Emergencies Act, 50 U.S.C. §§ 1601 et seq., the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104 132, 110 Stat. 1214 1319, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., the United Nations Participation Act. 22 U.S.C. § 287c, the International Security and Development Cooperation Act, 22 U.S.C. § 2349aa-9, the Nuclear Proliferation Prevention Act of 1994, Pub. L. 103 236, 108 Stat. 507, the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. §§* 1901 et seq., the Iran and Libya Sanctions Act of 1996, Pub. L. 104 172, 110 Stat. 1541, the Cuban Democracy Act. 22 U.S.C. §§ 6001 et seq., the Cuban Liberty and Democratic Solidarity Act. 22 U.S.C. §§ 6021-91, and the Foreign Operations, Export Financing and Related Programs Appropriations Act, 1997, Pub. L. 104 208, 110 Stat. 3009 172, or any other law of similar import as to any non-U.S. country, as each such Act or law has been or may be amended, adjusted, modified, or reviewed from time to time.

**Compliance with Anti-Money Laundering Requirements**

The Issuer may be subject to certain provisions of the USA PATRIOT Act of 2001 ("the Patriot Act"), including, but not limited to, Title III thereof, the International Money Laundering and Abatement and Anti-Terrorist Financing Act of 2001 ("Title III"), certain regulatory and legal requirements imposed or enforced by the Office of Foreign Assets Control ("OFAC") and other similar laws of the United States. In response to increased regulatory concerns with respect to the sources of the Issuer's capital used in investments and other activities, Issuer may request that Investors provide additional documentation verifying, among other things, such Investor's identity and source of funds to be used to purchase Securities. Issuer may decline to accept a subscription from an Investor if this information is not provided or on the basis of the information that is provided. Requests for documentation and additional information may be made at any time during which an Investor holds a Security. WSM may be required to report this information or report the

10

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts

failure to comply with such requests for information, to appropriate governmental authorities, in certain circumstances without informing an Investor that such information has been reported. Issuer will take such steps as it determines necessary to comply with applicable law, regulations, orders, directives, or special measures, including, but not limited to, those imposed or enforced by OFAC, the Patriot Act, and Title III. Governmental authorities continue to consider additional measures to implement anti-money laundering laws and the Issuer may be required to take additional steps in the future.

## Other General Risks of an Investment in the Issuer

### Federal Income Tax Risks

As with any investment that generates income or loss or distributes cash, an investment in the Issuer has federal income tax risks. All Investors are encouraged to review this PPM with competent tax counsel. This discussion does not constitute tax advice and is not intended to substitute for tax planning.

Investors should understand the role of the Issuer and the IRS concerning the tax issues involved in any investment in the Issuer. The IRS may do any of the following:

- Review the federal income taxation rules involving the Issuer and any investment in it, and issue revised interpretations of established concepts.

- Scrutinize the proper application of tax laws to the Issuer, including a comprehensive audit of the Issuer at any time. The Issuer does not expect to fall under the reporting requirements for tax shelters, as the Issuer does not have the avoidance or evasion of federal income tax as a significant purpose. If the Issuer borrows significant sums and incurs significant losses, however, the Issuer may be required to notify the IRS of its status as a tax shelter. The effect of such action is generally unknown, but could result in increased IRS scrutiny of the Issuer's taxes.

The Issuer does not intend to apply to the IRS for any ruling concerning the operation of the Issuer.

## Risks Specific to the Investment Contracts

### Ownership of the Water Stations

Under the terms of each Investment Contract, the applicable Investor will purchase and own the water stations that are subject to that Investment Contract. The Investor therefore assumes all of the risks of ownership, including loss or damage, as well as disposal of the water stations upon the

11

termination of the applicable Service Agreement if WSM chooses not to repurchase them. The Investor is required, at its own cost, to carry insurance on the water stations that are subject to the Investor's Service Agreement. Each Investor will be responsible for the payment of applicable sales taxes on the purchased water stations. Applicable sales taxes are determined by the state in which each water station is placed.

**Early Repurchase of the Water Stations by WSM**

Under the terms of each Investment Contract, WSM shall have the right, but not the obligation, after three (3) years following the execution of the applicable Service Agreement, to purchase any or all of the water stations that are subject to that Service Agreement. WSM's exercise of that option may have a serious impact on the Investor's ability to recognize its investment objectives with respect to that Security. WSM will also have the right, but not the obligation, to repurchase some or all of the water stations in the event (i) the Investor decides to close or sell its water vending business, assets and/or any or all of its water stations, or (ii) the parties cannot agree on the resolution of a significant dispute. Issuer's exercise of the right to repurchase the water machines as described in the preceding sentence is not conditioned on the passage of any period of time.

**Purchase of Water Stations Upon Termination of Service Agreement**

Issuer will have right, but not the obligation, to purchase any or all of the water stations subject to an Investment Contract at any time after the third anniversary of the Investor's purchase of those water stations. Issuer expects to exercise its right to repurchase upon the termination of the Investment Contract. Notwithstanding its expectations, however, Issuer may decide upon termination of the Investment Contract not to exercise its right to repurchase the water stations. Issuer's decision not to repurchase the water stations upon termination of the Investment Contract may affect the Investor's return and may even affect its ability to recoup its investment. In addition, under the terms of the Service Agreement, upon termination of the Service Agreement and if Issuer does not repurchase the water stations, the Investor may be restricted in its ability to employ the water stations in the territory in which it is then located and may be subject to other restrictions on their use or further deployment. The restrictions on the Investor's ability to utilize the water stations following termination of the Service Agreement may affect the Investor's return and may even affect its ability to recoup its investment.

**WSM Management of the Water Stations**

The Investor will have only limited rights with respect to the management of its water stations. Under the terms of each Service Agreement, the applicable Investor will grant WSM full authority to make all day-to-day decisions and to take all actions not specifically reserved by the applicable Investor under that Service Agreement with respect to the placement, use and management of the water stations subject to that Service Agreement.

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts

The Investor and WSM will be required to mutually agree to any decision concerning the Investor's water stations that concerns (i) entering into any agreement concerning the renewal of a lease or otherwise concerning the placement of water stations, if such agreement extends beyond the current term of the applicable Service Agreement, (ii) termination of an existing lease or any other agreement concerning the placement and use of a water station prior to the term of such agreement, (iii) the decommissioning of any water station, or (iv) entering into a new lease for the placement and use of any water station if certain terms of the new lease are less advantageous than those of the existing lease.

WSM makes no representation, guarantee or warranty to secure any specific lease, location, number of leases or locations, nor to generate any specific amount of revenue from such leases or locations, and it disclaims any liability for any failure on its part to do so. If (a) WSM is not successful in obtaining (i) specific, desirable leases on the locations for each water station, or (ii) the necessary number of leases to place all of an Investor's water stations, or (b) the water stations, whether individually or in the aggregate, fail to generate sufficient sales and advertising revenue, the Investor may fail to achieve his, her or its investment goals with respect to the Investment Contract.

**WSM Cash Management**

Under the terms of each Service Agreement, WSM will provide cash management services with respect to the revenues received from each water station that is subject to that Service Agreement. WSM will not be required to maintain separate bank accounts for each Investor or each Service Agreement and will not otherwise be required to segregate revenues from similar payments received under contracts for the benefit of other investors. Errors in calculations and shortfalls in revenues received from individual water stations can lead to the misapplication, whether intentional or unintentional, of cash between Investment Contracts and Investors, as well as between the Issuer and Investors.

**Investor Failure to Timely Notify Issuer of Desire to Terminate the Service Agreement**

An Investor will have the option to renew the Service Agreement at the end of the initial term by giving Issuer sixty (60) days prior written notice of the Investor's intent to exercise the option. The Investor's failure to provide required notice sixty (60) days prior to the termination date will result in the termination of the Service Agreement.

**Restrictions on Transfer of the Investment Contracts**

Investors will not be free to sell or transfer Securities without written consent from the Issuer which may be withheld in its sole discretion. There is no market for the Securities, public or private, and there is no likelihood that one will ever develop. The Securities will therefore not be a source of

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts

liquidity and Investors must be prepared to hold their Securities to the date on which their Service Agreement next terminates.

**TO COMPLY WITH APPLICABLE TAX AND SECURITIES LAWS, THE ISSUER, IN ITS SOLE DISCRETION, MAY REFUSE TO CONSENT TO A SALE, TRANSFER OR ASSIGNMENT OF SECURITIES.**

### Investors Have No Right to Vote or to be Involved in Management of Issuer

Investors will have no right to exercise any control over the Issuer's affairs and will not have any vote, control or other influence over the Issuer, its investment policies, any of its operations, or its management. Ryan Wear will exercise complete management control over CTL and WSM. Because the Investors will have no rights with respect to the Issuer's management and affairs, they must rely entirely on WSM's management experience and competence to successfully provide the revenues provided for under the Securities.

### WSM Has Limited Fiduciary Duties

CTL, as seller under each Purchase Order Agreement will owe no fiduciary duty to the Investors. WSM, as contractor under each Service and Maintenance Agreement, is acting as agent for the related Investor and, to the extent permitted under applicable law, the Investor will be required to waive, release and discharge WSM from any fiduciary duty it may have at law or by statute. Investors will therefore have limited recourse against WSM if WSM fails to perform its duties and obligations under the Service Agreement.

### Noncompetition Restrictions on Investor Upon Termination

During the term of the Service Agreement and for three years thereafter, the Investor will be prohibited, within a specified geographical area, whether directly or indirectly, on its own behalf or that of another, from engaging in any service and/or support the development, manufacture, marketing and/or sale of any product that competes with or is intended to compete with any service or product offered, sold or otherwise provide by WSM, including the specific services provided for under the Service Agreement.

In addition, upon the termination of the Service Agreement, the Investor will be prohibited, directly and indirectly, whether on the Investor's behalf or otherwise, from placing, managing, operating, maintaining, using, and/or deriving any profit from any vending machine (including the water stations subject to the Service Agreement) at any Location or with any Location Owner, as those terms are defined in the Service Agreement. The Investor is further required to agree that, for the purposes of the foregoing sentence, WSM owns all rights in and to any lease or related agreements entered into with Location Owners and with respect to the operation of the water stations subject to the Service Agreement, and that the Investor may not compete with or interfere or impair the

14

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 78 of 332

rights of WSM in such leases or related agreements. An Investor will therefore be limited in the potential locations and location owners which it may use to continue to employ the water machines of which it retains ownership following termination of the Service Agreement.

**Ryan Wear is an Indispensable Person**

Ryan Wear is the sole owner of WSM and the majority owner of CTL. Ryan is the manager of both companies and the success of both is highly dependent on his continuing active participation in the management thereof. His loss could have a material adverse impact on Issuer's performance.

## THE SECURITIES

The Issuer will issue the Securities in multiples of $9,000 with a minimum purchase requirement of $450,000.

The Securities are investment contracts which consist of two agreements: a Purchase Order Agreement between CTL, d/b/a WaterStation Technology, as seller, and the Investor, as purchaser, and a Service and Maintenance Agreement between WSM, as contractor, and the Investor, as owner of the water stations.

Under the terms of each Investment Contract, an Investor purchases water stations and becomes the owner thereof upon consummation of the Purchaser Order Agreement. The Service Agreement then provides for the placement, installation, servicing and maintenance, management and administration of the water stations by WSM on behalf of the Investor.

The Investor recognizes a return on the Investment Contract in two ways. First, the Investor receives a monthly payment, with respect to each water station subject to the Investment Contract from the sales of water from that water station. Second, the Investor receives a quarterly payment of thirty percent (30.0%) of the net advertising revenue received by WSM and attributable to each of those water stations in the prior quarter.

The Securities will have a term to maturity of ten (10) years unless the Investor exercises its option to renew the Service Agreement at the end of its term. The Issuer will have the right, but not the obligation, to purchase any or all of the water stations from an Investor at any time after the third anniversary of the Investor's purchase of the water stations.

The Offering is a continuing offer and is not limited by any number of Investment Contracts sold, the dollar proceeds received, or the number of Investors who are offered or who purchase Investment Contracts.

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts

**Eligible Investors**

The Securities are being offered solely to "accredited investors," as that term is defined by Rule 501(a) of Regulation D of the Securities Act of 1933, and who satisfy eligibility requirements set from time to time by the Issuer. In its sole discretion, the Issuer may establish a structure to secure investments in the Issuer from foreign Investors.

An Investor that purchases Securities will not become a Member of the Issuer or otherwise receive any of the rights, privileges, duties or obligations of a Member. By executing and delivering the Purchase Order Agreement, the Service Agreement, the Investor Suitability Statement, and delivery of payment for water stations, an Investor unconditionally and irrevocably agrees to purchase the Investment Contract in the amount shown thereon.

**Minimum Investment**

Each Investor will be required to purchase a minimum of $450,000 of water stations, which equates to fifty (50) water stations. Purchase of the water stations under an Investment Contract will occur immediately upon acceptance by the Issuer of an Investor's Investment Documents. There is no fixed ceiling on the amount the Issuer will accept from each Investor but WSM may, at its discretion, set a ceiling for a particular Investor based on the Issuer's Investor Suitability Standards.

**Return to Investors**

Investors will, with respect to each water station subject to their Investment Contracts, receive the monthly Water Sale Fee, which is calculated as a percentage per month of the investment amount. In addition, Investors will, with respect to each water station subject to their Investment Contracts, receive a payment each quarter of thirty percent (30.0%) of the net advertising revenue received by WSM and attributable to each of that Investor's water stations. The Investor's return on the purchase of an Investment Contract will depend solely on the sales of water from each water station the Investor purchases, and on the net advertising revenue attributable to each of those water stations.

The water stations that are purchased by an Investor pursuant to an Investment Contract will be the sole source of that Investor's income from that Investment Contract. Investors will not have recourse to any other sources of revenue WSM may receive from any other of its business activities.

**NO ASSURANCE CAN BE GIVEN THAT ANY OF THESE OBJECTIVES WILL BE ATTAINED**

**AN INVESTMENT IN THE ISSUER IS INHERENTLY SPECULATIVE AND NO SPECIFIC RETURN ON INVESTOR CAPITAL OR EVEN RETURN *OF* INVESTOR CAPITAL OR PRINCIPAL CAN BE PROMISED OR GUARANTEED.**

16

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 80 of 332

**PREDICTIONS OF ANNUALIZED RETURNS ARE HIGHLY SPECULATIVE**

### Strategy to Achieve Issuer Investment Objectives

The strategy of the Issuer will be to manufacture, sell, place, install, operate, service, manage and administer the water stations sold to Investors under the Investment Contracts. Each Investor entering into an Investor Contract with the Issuer will acquire ownership title to the water machines subject to that Investment Contract. WSM will identify potential locations at which each water station may be placed and will negotiate and, if successful, enter into appropriate leases with the location owners. WSM will also negotiate and enter into agreements with credit card companies concerning water station purchases made by credit card or other electronic methods.

Once installed, the water stations will generate revenues in two ways: first, through the sale of water and second, through advertising placed on the water stations. Investors will receive a fixed monthly fee for each water station with respect to the sale of water. They will also receive thirty percent (30.0%) of the net revenue generated from advertising attributable to their water stations.

**ISSUER CAN MAKE NO GUARANTEE CONCERNING THE SITING OF ANY WATER STATION, THE FINAL TERMS AND CONDITIONS WITH RESPECT TO THE LEASE OF ANY SITE ON WHICH IT IS FINALLY PLACED, OR THE ACTUAL FINANCIAL RESULTS OBTAINED AT THE LOCATION AT WHICH IT IS PLACED**

### No Redemption of Securities; Issuer's Right to Repurchase

Investors will have no right to redemption of an Investment Contract and Issuer will have no obligation to repurchase any water station subject an Investment Contract. Issuer will have the right, at its sole discretion, to repurchase any or all of the water stations under an Investment Contract beginning on the third anniversary of the Investor's purchase of the Investment Contract. Each Investment Contract will have a term of ten (10) years and the Investor will have an option to renew for an additional term, provided it gives Issuer sixty (60) days prior written notice of its intent to do so. It is Issuer's expectation that, upon termination, it will repurchase the water stations from the Investor. Notwithstanding the foregoing sentence, however, Issuer has no obligation to exercise its purchase option upon the termination of the Service Agreement. The repurchase price will be established as a term of the Service Agreement. Notwithstanding the prior two sentences, Issuer will have no obligation to repurchase any water station at any time.

**ISSUER'S EXERCISE OF ITS RIGHT TO REPURCHASE ANY OR ALL OF AN INVESTOR'S WATER STATIONS MAY HAVE MATERIAL ADVERSE EFFECTS ON THE RETURN INVESTOR MAY BE EXPECTING**

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 81 of 332

**ISSUER'S FAILURE TO EXERCISE ITS RIGHT TO REPURCHASE ANY OR ALL OF AN INVESTOR'S WATER STATIONS UPON THE TERMINATION OF THE SERVICE AGREEMENT MAY MATERIALLY ADVERSELY AFFECT THE RETURN INVESTOR MAY BE EXPECTING**

**Subscription**

Investors may complete and return the executed Subscription Agreement, Investment Contract and Investor Suitability Statement to the Issuer at an y time during the Offering, together with funds sufficient to purchase the Securities subscribed for. Those funds will be deposited temporarily into the Issuer's holding account (the "Subscription Account"). Purchase of any Security will only become effective as of the date upon which the Issuer accepts the Investor's subscription and transfers the Investor's funds from the Subscription Account to its purchase account (the "Purchase Account"). The Investor's deposited funds earn no interest while held in the Subscription Account. There is no escrow of proceeds. Once subscriptions are accepted, the funds will be immediately available to the Issuer.

## USE OF PROCEEDS

Any proceeds received from the Offering will be used to finance the manufacture of the water stations to be sold pursuant to each Investment Contract, pay any broker fees incurred with respect to such Investment Contract, and to provide a return to the owners of CTL.

|  | Offering Price | Selling Commissions | Proceeds to Company |
|---|---|---|---|
|  |  |  |  |
| **Per Machine** | $9,000 | $*** | $9,000 |
| **Minimum Investment** | $450,000 | $*** | $450,000 |

*** The Issuer does not intend to engage placement agents or to otherwise incur broker-dealer fees except in those jurisdictions in which it believes it is necessary to do so in order to comply with the applicable broker-dealer or sales registration laws, rules and regulations of individual states. Investors in any jurisdiction in which Issuer engages a placement agent to offer and sell the Securities will be provided supplemental disclosure concerning the fees paid to broker-dealers for offering and selling of the Securities in that jurisdiction.

18

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 82 of 332

# THE BUSINESS

## Creative Technologies, LLC

Creative Technologies, LLC ("CTL") is a Washington limited liability company managed by its members. It does business under the trade name "WaterStation Technology" and "WaterStation Technology, LLC." CTL was founded in 2013 by Dr. Richard Wear and Ryan Wear. CTL manufactures water vending machines or "water stations" which are sold to a CTL Affiliate or to third party investors and placed around the country. Its manufacturing facilities are located in Everett, Washington. It also contracts with third parties to manufacture water stations. The third-party facilities are currently located in Illinois. Richard and Ryan Wear are the sole owners of CTL.

CTL manufactures four (4) different models of water stations. Depending on the model, they may be placed in front of a sponsoring retail store, in a hotel room, school, community center, airports, businesses and government facilities. CTL is capable of manufacturing 120–140 units per week and is adding to its capacity to increase that output to 300 units per week. It currently projects a demand for 200 units per week into 2025 or sooner.

The water stations CTL manufactures are electronically sophisticated in that, not only do they accept credit cards and debit cards in payment for their p roduct, but each machine reports its daily operating results regularly during each day to WSM via wireless transmission. It is also able to report issues with its operation, permitting WSM to act more rapidly to correct them than if it had to wait until the issue was reported by the lessor of the p roperty on which the water station is located. This ability to rapidly respond to problems results in less downtime and therefore less lost revenue and greater consumer confidence in the product.

CTL has one credit facility in place, the proceeds of which are used for working capital purposes.

In 2020 CTL had $57.4 million in sales and over $12.7 million net income. As of September 21, 2021 it had assets of approximately $83.2 million, year-to-date sales of $38.9 million, and year-to-date net income of $8.1 million.

## Water Station Management LLC

Water Station Management LLC ("WSM") is a Washington limited liability company managed by Ryan Wear who founded it in 2016. He is the sole owner. WSM identifies and leases sites for CTL manufactured water stations and installs, services and operates, maintains, manages and administers them. It may purchase and own the water stations itself or enter into arrangements

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts

with third parties pursuant to which the third parties purchase them from CTL and WSM enters into servicing and maintenance agreements with the purchasers substantially in the form of Exhibit C hereto.

WSM currently has over 7,000 water stations under management in more than 25 states around the United States. It services some areas itself and contracts with third parties to service other areas on its behalf. From time to time it acquires such third-party servicers, as it may determine.

At the end of 2020, WSM had assets of approximately $12.2 million. It had $17.4 million in sales and over $1.0 million of net income in 2020. As of September 21, 2021, it had assets of $12.8 million, year-to-date sales revenue of $15.9 million, and year-to-date net income of $1.85 million.

WSM has one credit facility in place, the proceeds of which are used for working capital purposes, which may include the acquisition of other water station servicing companies.

WSM has recently been awarded contracts to purchase and install approximately 14,200 water stations at retail and convenience stores around the country.

**INVESTORS WILL NOT HAVE ANY OWNERSHIP INTEREST IN EITHER CTL OR WSM AND WILL HAVE NO MANAGEMENT OR VOTING RIGHTS IN EITHER OF THOSE COMPANIES. NO EQUITY INTERESTS ARE BEING OFFERED UNDER THIS PPM.**

### Issuer Administration

The Issuer's administration and management of the Investment Contracts will be conducted by WSM on behalf of the Issuer. WSM may subcontract the accounting, auditing, legal and other functions, including servicing and maintenance, to third parties for the benefit of the Issuer, the costs of which shall be treated as company expenses.

### Issuer Income

The proceeds from the sale of the Investment Contracts will be used to purchase the water stations under the Purchase Order Agreement. CTL expects to recognize income from those sales, after payment of all expenses, including manufacturing, administration, management, accounting, debt service, licensing and other governmental fees and applicable taxes, and all other related expenses. Broker- and/or dealer fees will be paid with respect to Investment Contracts sold to Investors in those jurisdictions in which the Issuer determines that a broker or dealer is necessary to conduct the offering and sale thereof pursuant to applicable rules and regulations.

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts

WSM will receive income from its operation, management and administration of the water stations in two ways:  first, it will receive the residual share of sales from each water station, and second, it will receive the residual share of net advertising revenue attributable to each water station.

**Issuer Expenses**

With respect to the manufacture of the water stations purchased under any Investment Contract, all such expenses will be paid by CTL from the purchase price paid by the Investor. Those expenses will include, but are not necessarily limited to, labor and materials, utilities, management and administration expenses, including accounting and legal fees and costs, licensing and other governmental fees, and applicable taxes.  Those expenses are more specifically identified on Schedules I-A and I-B for full year 2020 and September YTD 2021, respectively.

With respect to the placement, installation, operation, servicing and maintenance, management, and administration of the water stations by WSM, all such expenses (the "Servicing Expenses") will be paid by WSM from the revenues derived from the sale of water from the water stations subject to the Investment Contracts.  Those expenses will include, but are not necessarily limited to, location placement expenses and leases, water, electricity and other utilities costs, servicing, maintenance and repair costs, which may include fees paid to third-party contractors to perform such services, credit card, banking and other payment and cash management fees, debt service, legal and accounting fees and costs, and administration and management expenses.  Those expenses are more specifically identified on Schedules II-A and II-B for full year 2020 and September YTD 2021, respectively.

**Payment and Financial Statements and CPA Audit**

Investors will receive monthly statements reporting gross sales of water and the Water Sales Fee for each water station subject to their Investment Contracts.  They will also receive a quarterly statement detailing the gross revenue, costs, and net advertising revenue received attributable to the advertising placed on their water stations.

The Issuer will prepare financial statements quarterly and annually in accordance with Generally Accepted Accounting Principles ("GAAP") or such other methodology as determined to be appropriate for the Issuer in consultation with the Issuer's accountants.  CTL's annual financial statements will be audited by a qualified certified accounting firm, beginning with 2021. WSM's annual financial statements will be audited by a qualified certified accounting firm beginning in the first year in which its revenues equal or exceed $25,000,000.  Until then, WSM's annual financial statements will be certified by its manager or chief financial officer.  The quarterly financial statements for each of CTL and WSM will be certified by its manager or chief financial officer.  These financial statements shall be made available to Investors upon request.

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts

# MANAGEMENT

## Ryan Wear – Manager of CTL and WSM

Ryan Wear is the manager of both CTL and WSM. He has been involved in the business of managing vending machines in general for approximately 27 years, beginning while he was still in high school, when he founded Summit Refreshments, a food and beverage vending machine company servicing northwest Washington state. He ultimately sold Summit Refreshments to Canteen Vending, the largest vending company in the world. At the time of the sale, Summit had over 5,000 vending machines in the field. He is also the owner, with his father, of companies engaged in the acquisition, placing, operating, servicing and maintaining, managing and administering of vending machines that sell food and beverages.

## Kevin Nooney – Investment Manager

Kevin Nooney has many years of experience in banking and finance and manages banking relationships and provides investment guidance where needed for CTL, WSM and their Affiliates (the "CT Companies"). His responsibilities include developing relationships with investment sources, raising capital to provide for the growth of the CT Companies, structuring investments in CTL, WSM and the other CT Companies, and vetting investors. His activities include obtaining bank and other financing to meet the needs of the CT Companies, in addition to securities offerings.

## Jeremy Briggs – Principal Financial Officer

Presently the Principal Financial Officer of CTL and WSM, Jeremy served as Company Controller for Global Fiberglass Solutions from 2018 to 2021, Business Consultant for Keeton CPA LLC in Nevada from 2016, to 2018, and served National Energy Services from 2011 to 2016 as Chief Financial Officer as Chief Accounting Officer from 2008 to 2011. Prior to 2008, Mr. Briggs worked as an Auditor in a regional auditing firm, as a Divisional Accountant at Toll Brothers, and has over 20 years of supervisory experience in business with emphasis on accounting and finance in various industries including recycling, hospitality, construction, manufacturing, not-for-profit and consulting services. Previously he was a Lead Faculty professor at University of Phoenix, teaching Accounting and Finance courses, Faculty Adviser to the Business Society DMD, and Campus Faculty Assessment Liaison for the School of Business. In 2007, Jeremy graduated from Keller Graduate school with a Master's degree in Accounting and Finance.

# SELECTED FINANCIAL INFORMATION

The financial information for CTL and WSM for the periods January 1 to December 31, 2020 and January 1 to September 30, 2021 are attached as <u>Schedules I through IV</u> hereto.

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts

| Creative Technologies | September YTD 2021 | 2020 |
|---|---|---|
| Revenues | 38,933,489.47 | 57,287,993.11 |
| COGs | 22,610,449.63 | 29,269,887.31 |
| Other Expenses | 8,220,203.13 | 15,103,574.54 |
| Miscellaneous Income | -0- | 144,705.47 |
| Net Income | 8,102,836.70 | 13,059,236.73 |
| | | |
| Current Assets | 22,635,959.72 | 36,708,550.87 |
| Fixed Assets | 15,640,851.76 | 2,080,397.43 |
| Other Assets | 44,932,029.61 | 41,393,651.73 |
| Total Assets | 83,208,841.09 | 80,182,600.03 |
| | | |
| Current Liabilities | 24,132,721.73 | 28,513,456.37 |
| Long Term Liabilities | 20,541,760.66 | 20,573,204.86 |
| Total Liabilities | 44,764,482.39 | 49,086,661.23 |
| Equity | 38,534,358.70 | 31,095,938.80 |
| Total Liabilities and Equity | 83,208,841.09 | 80,182,600.03 |

| Water Station Management | September YTD 2021 | 2020 |
|---|---|---|
| Revenues | 15,902,328.68 | 17,386,659.36 |
| COGs | 435,122.78 | 273,010.73 |
| Other Expenses | 12,612,621.17 | 16,104,991.67 |
| Net Income | 1,854,584.73 | 1,008,656.96 |
| | | |
| Current Assets | 1,893,283.07 | 3,566,402.69 |
| Fixed Assets | 10,911,976.25 | 8,674,098.18 |
| Total Assets | 12,805,259.32 | 12,240,500.87 |
| | | |
| Current Liabilities | 194,489.39 | 178,628.08 |
| Long Term Liabilities | 9,049,218.89 | 10,354,909.48 |
| Total Liabilities | 9,243,708.28 | 10,533,534.56 |
| Equity | 3,561,551.04 | 1,706,966.31 |
| Total Liabilities and Equity | 12,805,259.32 | 12,240,500.87 |

23

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts

# LEGAL AND JUDICIAL PROCEEDINGS

Issuer and its managers have no lawsuits pending or judgments entered against Issuer or its managers. To the best of the manager's knowledge, there are no legal actions contemplated against Issuer and/or its managers.

WSM and Ryan Wear are currently the subjects of an investigation by the Washington State Department of Financial Institutions ("DFI"). DFI is seeking information regarding past offerings and sales of franchises and business opportunities. The investigation is in the early stages. DFI has issued a cease and desist order that prohibits WSM from issuing securities unless they are registered or exempt from registration under the securities laws of Washington. The securities in this offering are being offered by CTL, d/b/a WaterStation Technology, as seller of the water stations, together with WSM, as servicer. WSM will maintain and administer the water stations pursuant to the Service Agreement that is signed at the beginning of the investment. Because the Securities are being issued only to accredited investors pursuant to Rule 506(b) of Regulation D, CTL and WSM believe this offering is exempt from registration and is therefore permitted under the cease and desist order.

# PLAN OF DISTRIBUTION

## General

Issuer is directly offering the Securities to Investors in those jurisdictions in which it is not required to register as a broker/dealer and its employees are not required to register as an agent or sales person. In those jurisdictions in which Issuer or an officer or employee could be required to register as a broker-dealer or any of its officers or employees as an agent or salesperson, Issuer intends to engage a placement agent to offer and sell the Securities. Any such placement agent will receive reasonable and customary fees for its services. The Issuer does not intend to engage placement agents or to otherwise incur broker-dealer fees except in those jurisdictions in which it believes it is necessary to do so in order to comply with the applicable broker-dealer registration laws, rules and regulations of individual states. Investors in any such jurisdiction will be provided additional disclosure concerning the fees paid to broker-dealers for offering and selling of the Securities in those jurisdictions as a supplement to this PPM. Issuer, however, reserves the right at any time during the Offering to determine to hire an agent or agents to assist Issuer in any jurisdiction with the offering, sale and placement of the Securities and to pay such agents reasonable and customary fees in connection therewith, to reimburse such agents for their reasonable out-of-pocket expenses and fees, and to indemnify such agents in the normal and customary manner. Investors will be provided supplemental disclosure concerning the fees paid to broker-dealers for offering and selling of the Securities in the event Issuer elects to pursue that course.

24

This Offering is a continuing offer and is not limited by the number of Investment Contracts sold, the dollar amounts invested, the number of Investors who purchase Investment Contracts, the number of water stations sold pursuant to Investment Contracts, or any related factors. Issuer may determine at any time to discontinue the Offering in its sole discretion.

## Suitability of Investment

The Securities will be sold only to Investors who are Accredited Investors, as defined by Rule 501(a) under the Securities Act. To be an Accredited Investor, you must satisfy one of the following tests:

- **Natural persons.** If you are a natural person, either:

  o your individual net worth, or joint net worth with your spouse or spousal equivalent must exceed $1,000,000 (in calculating net worth (a) your primary residence shall not be included as an asset; (b) indebtedness that is secured by your primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of the sale of securities exceeds the amount outstanding sixty (60) days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (2) indebtedness that is secured by your primary residence in excess of the estimated fair market value of the primary residence shall be included as a liability); or

  o you had an individual income in excess of $200,000 in each of the two most recent years or joint income with your spouse or spousal equivalent in excess of $300,000 in each of those years and have a reasonable expectation of reaching the same income level in the current year; or

  o you hold in good standing one or more of the Series 7, Series 65 and Series 82 securities licenses.

- **Legal entities.** If you are a legal entity, you are:

  o An entity in which all of the equity owners are Accredited Investors.

You must also complete the Investor Suitability Statement and provide to the Issuer any additional documents it may require.

Being an Accredited Investor does not, by itself, mean that you may participate in the Offering, however, and Issuer reserves the right to reject the subscription for an Investment Contract from any prospective Investor for any reason, at the sole discretion of Issuer. You should not rely on Issuer to determine the suitability of an investment in Issuer for you. If you are unsure about the

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts

meaning of any information provided or the advisability of investing in the Securities, please consult your financial or other professional adviser.

**Sale Procedures**

Each Investor wishing to purchase Securities must execute and deliver, in the form provided by Issuer, each of (i) a Subscription Agreement substantially in the form of <u>Exhibit A</u> hereto, (ii) a Purchase Order Agreement substantially in the form of <u>Exhibit B</u> hereto, and (ii) a Service Agreement substantially in the form of <u>Exhibit C</u> hereto. Each Investor, by executing the Subscription Agreement, will also represent and warrant to Issuer that the Investor: (A) has received, reviewed, and analyzed this PPM, and all exhibits attached hereto; (B) has had the opportunity to ask questions of Issuer or its representatives and all such questions were satisfactorily answered and such answers were not inconsistent with the PPM; (C) has the legal ability to enter into the Subscription Agreement in the capacity stated; (D) has provided correct information and will promptly advise Issuer of any changes; (E) is an Accredited Investor; and (F) agrees to hold Issuer harmless from any loss, damage or liability, including reasonable attorneys' fees, due to or arising from a breach of the representations and warranties of such investor as contained in the Subscription Agreement.

If, after careful review of this PPM, you wish to invest in the Securities, please:

• Notify Kevin Nooney or Jeremy Briggs at their email address on page vi of this PPM of your interest and indicate the number of water stations you wish to purchase. He will have prepared and delivered to you an executable Subscription Agreement, completed Purchase Order Agreement and Service Agreement.

• Execute the Subscription Agreement, Purchase Order Agreement, Service Agreement and Investor Suitability Statement and send them to:

Water Station Management LLC, 2732 Grand Avenue, Suite 122, Everett, WA 98201, Attention: Kevin Nooney or Jeremy Briggs

• Submit payment via wire transfer or certified check

Note that delivery of an executed Subscription Agreement, Investment Contract, Investor Suitability Statement and submission of payment does not mean that you have successfully subscribed to the Securities. Your subscription will only be complete when Issuer notifies you that it has accepted your subscription.

**Transfer Restrictions**

The Securities will be "restricted securities," as defined in Rule 144 under the Securities Act, and will not be transferrable unless subsequently registered under the Securities Act or an exemption

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts

from such registration is available. Subject to compliance with law, limited exceptions may be made for transfers (1) not involving a change in beneficial ownership or (2) by an entity without consideration to (x) a parent, subsidiary or other affiliate of the holder that is an entity or (y) any of its partners, members or other equity owners, or to the estate of any of its partners, members or other equity owners, or (3) transfers in compliance with Rule 144 under the Securities Act, as long as Issuer is furnished with reasonably satisfactory evidence of compliance with such rule. Issuer may refuse any transfer, including a permitted transfer, if Issuer reasonably determines that, as a result of such transfer, Issuer would become subject to the reporting requirements of the Securities Exchange Act of 1934, as amended.

**Additional Information**

This is an offering to Accredited Investors only, each of whom accepts the responsibility for conducting its own due diligence investigation and consulting with its own professional advisors in connection with their investment. Prospective investors and their advisors are invited to ask us questions concerning Issuer, the Securities, the terms of this offering and such other matters as the prospective Investors and their advisors deem pertinent in connection with this investment. We will use reasonable efforts to respond fully to such questions and to supply all information (other than confidential information) available to us that the prospective investors or their advisors request.

Issuer's limited liability agreements and other documents referred to in this PPM are available for review by prospective Investors on request. Any statements in this PPM with respect to those documents do not purport to be complete and are qualified in their entirety by reference to the documents themselves.

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts

**EXHIBIT A**
**TO**
**PRIVATE PLACEMENT AGREEMENT**

**<u>FORM OF SUBSCRIPTION AGREEMENT</u>**

[Subscription Agreement is attached hereto.]

Exh-A-1

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts

**THIS PRIVATE PLACEMENT SUBSCRIPTION AGREEMENT ("SUBSCRIPTION AGREEMENT") RELATES TO AN OFFERING OF INVESTMENT CONTRACTS (THE "SECURITIES") IN TRANSACTIONS INTENDED TO BE EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED ("SECURITIES ACT"). THE SECURITIES HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE SECURITIES ACT OR ANY U.S. STATE SECURITIES LAWS, AND MAY NOT BE OFFERED, SOLD, ASSIGNED, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, AND IN EACH CASE IN ACCORDANCE WITH THE APPLICABLE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION.**

**[Insert State-Specific Legends if Applicable]**

# SUBSCRIPTION AGREEMENT

Creative Technologies, LLC and
Water Station Management LLC
2732 Grand Avenue, Suite 122
Everett, WA  98201
Attention: Kevin L. Nooney

Ladies and Gentlemen:

Creative Technologies, LLC, a Washington limited liability company ("Creative Technologies"), and Water Station Management LLC, a Washington limited liability company,  ("Water Station" and, together with Creative Technologies, the "Company") are offering, on an exempt private placement basis, investment contracts consisting of (i) a purchase order agreement (the "Purchase Order") between Creative Technologies and the Subscriber, and (ii) a service and maintenance agreement (the "Service Agreement") between Water Station, and the Subscriber (the purchase order agreement and the Service Agreement, together, the "Security" or the "Investment Contract"). The Securities are being offered (the "Offering") to eligible investors (each a "Subscriber" and collectively, "Subscribers").  The Securities will be issued in denominations of $450,000.00 or integral multiples of $9,000.00 in excess thereof.  The Securities are being offered solely to Subscribers on a continuing basis pursuant to the Confidential Private Placement Memorandum dated January 1, 2022 (the "PPM") as it may be amended from time to time, and the form of Purchase Order and Service Agreement which, together, constitute the Investment Contract, which are included therein.

## 1. Subscription.

Pursuant to and in accordance with the terms and conditions of this Subscription Agreement, Subscriber hereby irrevocably subscribes for and agrees to purchase from the Company, and the Company,

Subscription Agreement
CTL-WSM Investment Contracts

subject to its right in its sole discretion to accept or reject this subscription, in whole or in part, agrees to sell to Subscriber, the principal amount of Securities set forth on <u>Appendix A</u> to this Subscription Agreement.

**2. Payment.**

Simultaneously with delivery by Subscriber of the documents described in Section 3., Subscriber will make payment in full for the Securities by wire transfer of funds in U.S. dollars or by bank check (in each case, the "Subscription Proceeds") in the amount set forth in <u>Appendix A</u> hereto, in accordance with the instructions provided on the cover sheet accompanying this Subscription Agreement, to Creative Technologies, LLC for deposit in a separate subscription account established by the Company with a bank or other financial institution of its determination (the "Subscription Account"). Subscriber agrees that when the Subscription Proceeds are deposited in the Subscription Account, the Company's only duty shall be to hold the Subscription Proceeds in that account until it has satisfied itself that the Subscriber has met the Company's Investor Suitability Standards, at which time it shall transfer the Subscription Proceeds to the Company's operating accounts.

**3. Documents Required from Subscriber.**

(a) Subscriber will, simultaneously with delivery of the Subscription Proceeds, as provided in Section 2. above, return to the Company two (2) completed and executed copies of (i) this Subscription Agreement, (ii) the Purchase Order, (iii) the Service Agreement, (iv) an Investor Suitability Questionnaire attached as <u>Schedule A</u> to this Agreement (the "Investor Questionnaire"), and any other documentation that the Company has requested from Subscriber.

(b) Subscriber shall complete, sign and return to the Company as soon as possible, any other documents, certificates, instruments, questionnaires, notices, and undertakings as the Company may reasonably request in connection with Subscriber's subscription for the Securities.

**4. Acceptance of Subscription; Return of Subscription Proceeds.**

Subscriber acknowledges and agrees that the Company may, in its sole discretion for any reason or no reason, accept or reject this subscription in whole or in part, and that this subscription will be deemed accepted by the Company only when this Subscription Agreement is countersigned by an authorized officer of the Company and delivered to Subscriber. If this subscription is not accepted by the Company, this Subscription Agreement and any other documents delivered in connection herewith will be returned to Subscriber by the Company at the address of Subscriber as set forth in this Subscription Agreement, and any Subscription Proceeds shall be returned to Subscriber by the Company, without interest or deduction, in accordance with the payment information provided by Subscriber.

**5. Closing.**

The consummation of the purchase and sale of the Securities (the "Closing") shall take place at on such date and time, and at such place as the Company executes this Agreement (the "Closing Date").

(a) At the Closing, the Company or its designee shall transfer the Subscription Proceeds of the Subscriber to the Creative Technologies's operating account.

2

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 94 of 332

(b) Upon the transfer of the Subscription Proceeds from the Subscription Account to Creative Technologies's operating account, the Company will deliver an executed copy of the Purchase Order and the Service Agreement to the Subscriber.

## 6. Representations, Warranties, and Covenants of Subscriber.

Subscriber hereby represents and warrants to, and covenants with, the Company (which representation, warranties and covenants shall survive the closing of the Offering), and acknowledges that the Company is relying thereon, that:

(a) Subscriber is resident, or if not a natural person, maintains its principal place of business, in the jurisdiction set out under the heading "Address of Subscriber" above Subscriber's signature on the execution page of this Subscription Agreement, which address is Subscriber's principal residence or place of business, and such address was not obtained or used for the purpose of acquiring the Securities.

(b) Subscriber has received and carefully read this Subscription Agreement, the PPM, the Purchase Order and the Service Agreement, including any exhibits appended thereto. Subscriber has relied only on the PPM, its review of the Investment Contract, and the responses of representatives of the Company to such questions as Subscriber has asked, in making its investment decision. Subscriber has received no written or oral representations or information from the Company or any other person that is inconsistent with the PPM.

(c) Subscriber (i) is an "accredited investor," as defined in Rule 501(a) of Regulation D under the Securities Act of 1933 (the "Securities Act"), and (ii) has such knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of investing in the Securities, as more completely set forth in the Investor Questionnaire, which is incorporated by reference as if more fully set forth herein. Subscriber shall provide the Company with such further assurances of its eligibility to participate in the Offering as may reasonably be requested by the Company.

(d) Subscriber has the legal capacity and competence to enter and execute this Subscription Agreement and to take all actions required pursuant hereto. If Subscriber is a corporation, partnership, limited liability company, or other entity, (1) it is duly incorporated or formed, is validly existing, and is in good standing under the laws of its jurisdiction of incorporation or formation, (2) it has duly authorized, executed, and delivered this Subscription Agreement, the Purchase Order, the Service Agreement, and (3) the execution and delivery of this Subscription Agreement, the Purchase Order, and the Service Agreement by Subscriber, and the performance of its obligations thereunder, will not (i) violate its organizational documents or any law, regulation, or court order applicable to it, or (ii) breach, or constitute a default under, any agreement to which it is a party.

(e) The information provided by Subscriber in the Investor Questionnaire is true, complete and accurate.

(f) This Subscription Agreement, the Purchase Order and the Service Agreement, when duly accepted by the Company, will constitute legal and binding obligations of Subscriber, enforceable in accordance with its terms, except as may be limited by bankruptcy, insolvency, and other laws affecting enforcement of creditors' rights generally, and equitable principles.

3

(g)  Subscriber can bear the risks of an investment in the Securities and can afford the loss of its entire investment in the Securities.

(h) Subscriber has such knowledge and experience in financial, investment and business matters to be capable of evaluating the merits and risks of the prospective investment. Subscriber has consulted with such attorney(s), accountant(s), or other adviser(s) as Subscriber has deemed appropriate to assist it in evaluating an investment in the Securities.

(i)    Subscriber is aware that the Company's business constitutes a speculative enterprise, that certain of the information disclosed to Subscriber concerning the Company contains forward looking statements which involve risks and uncertainties, and that the Company's actual results may differ significantly from the results discussed in these forward-looking statements.  Subscriber further acknowledges that the value of the Company's assets is inherently uncertain and is dependent upon market, technological, and regulatory developments concerning feasible and allowable uses.  Subscriber represents and warrants to the Company that it has assessed these factors independently and has agreed to enter into this Investment Contract without reliance upon or expectation of any disclosures of any kind from the Company, except that certain Private Placement Memorandum dated January 1, 2022 numbered _____ and with Subscriber's name identified on the first page thereof (the "PPM"), and the responses from the Companies' representatives to any questions Subscriber has asked pursuant to Paragraph (l) below.

(j)  Subscriber has received, reviewed and analyzed the PPM and all the exhibits attached thereto.

(k)  Subscriber has conducted its own independent assessment, analysis and investigation with respect to the Company and its business and Subscriber is agreeing to enter into this Agreement, the Purchase Order, the Service Agreement and any related documents, certificates and instruments based on this assessment, analysis and investigation.  Subscriber has been afforded a reasonable opportunity to ask questions of, and receive answers from, representatives of the Company concerning the terms and conditions of the Offering and to obtain any additional information, to the extent that the Company possesses such information or can acquire it without unreasonable effort or expense, necessary to verify the accuracy of the information furnished in the PPM; and Subscriber has received satisfactory answers to all such questions to the extent it deemed appropriate to evaluate the merits and risks of an investment in the Securities.

(l)  Subscriber acknowledges that the information contained in the PPM and this Subscription Agreement, the Purchase Order, the Service Agreement and in all related and ancillary documents provided to Subscriber for the Offering (except for any information that may be publicly available), may constitute material nonpublic information, and agrees to keep all such information confidential (except for any disclosure to Subscriber's counsel, accountants, and investment representatives, if any, for the purpose of evaluating an investment in the Securities, and Subscriber will ensure that such agents are subject to Subscriber's own obligation of confidentiality), and will not reproduce or disclose any such information to any other person, or use such information for any purpose other than an investment in the Securities, except as required by law or order of a court of competent jurisdiction or regulatory agency or authority.

(m) Subscriber acknowledges and understands that because it is purchasing the Securities in an offering intended to be exempt from registration under the Securities Act, certain protections, rights, and remedies applicable to investors participating in registered offerings may not be available to it.

(n) Subscriber acknowledges that the Securities will be "restricted securities," as defined in Rule 144 under the Securities Act ("Rule 144") and have not been, and will not be registered under the Securities Act, and the Company has no intention or obligation to register any Securities under the Securities Act or any applicable state securities laws, or to take any action so as to otherwise facilitate offers and sales of the Securities by Subscriber (including pursuant to Rule 144). Subscriber acknowledges and agrees that unless registered under the Securities Act, the Securities may not be sold or otherwise transferred except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act, and in each case in accordance with applicable laws of any state or other jurisdiction.

(o) Subscriber is acquiring the Securities for its own account for investment purposes and not as nominee or agent or otherwise for any other person, and not with a view to, or for resale in connection with, any "distribution" of the Securities within the meaning of the Securities Act. Subscriber understands that the Securities are being offered and sold in the Offering in reliance on exemptions from the registration requirements of the Securities Act and any applicable state securities laws, and that the Company is relying, in part, on the truth and accuracy of, and Subscriber's compliance with, the representations, warranties, and covenants set forth herein to determine the availability of such exemptions and the eligibility of Subscriber to acquire the Securities.

(p) Subscriber agrees that: (1) it will not sell, assign, pledge, give, or other otherwise transfer the Securities, or any interest therein, except pursuant to an effective registration statement under the Securities Act or in a transaction that is exempt from, or not subject to, the registration requirements of the Securities Act and, in any case, in accordance with all applicable state or other securities laws; (2) the Securities will bear the legend set forth in Section 6(x) of this Agreement; (3) the Company may require an opinion of counsel or other evidence acceptable to it to permit any sale or other transfer of the Securities by Subscriber other than pursuant to an effective registration statement; and (4) the Company will not be required to give effect to any transfer or attempted transfer of the Securities except in accordance with the foregoing restrictions.

(q) Subscriber further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Securities, and requirements relating to the Company which are outside of Subscriber's control, and which the Company is under no obligation, and may not be able, to satisfy.

(r) Subscriber acknowledges and understands that there is no intention or expectation that the Company will ever register the sale of the Securities with the Securities Exchange Commission or any state authorities.

(s) Subscriber acknowledges and understands that no agency, governmental authority, securities commission or similar regulatory body, stock exchange, or other entity has reviewed, passed on, or made any finding or determination as to the merits of an investment in the Securities, nor has any such agency or governmental authority made any recommendation or endorsement with respect to the Securities.

(t) Subscriber acknowledges and understands that there may be material tax consequences to it of an acquisition, holding or disposition of the Securities, and that the Company gives no opinion and makes no representation with respect to the consequences to Subscriber under any U.S, state, local, or foreign tax law of the acquisition, holding, or disposition of the Securities, and Subscriber acknowledges that it is solely responsible for determining the tax consequences of an investment in the Securities.

(u) Subscriber acknowledges and understands that there are risks associated with an investment in the Securities, including, by way of example and not in limitation, the risks identified in the PPM, and that Subscriber could incur the loss of its entire investment in the Securities.

(v) Subscriber acknowledges and understands that the PPM reflects the Company's current intentions and business, financial, and other information currently available to the Company, and that the precise nature of the Company's operations, use of proceeds of the Offering, capital needs, and other factors inherent in the Company's business can be expected to change from time to time.

(w) Subscriber will, if required by applicable securities legislation, regulations, rules, policies, or orders, or by any securities commission, stock exchange, or other regulatory authority, execute, deliver, file, and otherwise assist the Company in filing, such reports, undertakings, and other documents with respect to the issuance of the Securities.

(x) Subscriber acknowledges and understands that the Purchase Order and Service Agreement will bear the following legend in compliance with applicable securities laws:

"THIS [PURCHASE ORDER][SERVICE AND MAINTENANCE] AGREEMENT, TOGETHER WITH THE RELATED [SERVICE AND MAINTENANCE][PURCHASE ORDER] AGREEMENT, CONSTITUTE A SECURITY THAT IS SUBJECT TO FEDERAL AND/OR STATE SECURITIES LAWS. SUCH SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("SECURITIES ACT"), OR APPLICABLE STATE SECURITIES LAWS. THE SECURITY HAS BEEN ACQUIRED SOLELY FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TOWARD RESALE AND MAY NOT BE OFFERED FOR SALE, SOLD, ASSIGNED, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, AND IN COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAWS OR THE APPLICABLE LAWS OF ANY OTHER JURISDICTION."

(y) Subscriber has not purchased the Securities as a result of any form of general solicitation or general advertising, including advertisements, articles, notices or other communications published in any newspaper, magazine or similar media or broadcast over radio, television or other form of telecommunications, or any seminar or meeting whose attendees have been invited by general solicitation or general advertising.

(z) Subscriber certifies that each of the foregoing representations and warranties set forth in this Section 6 is true as of the date hereof and will be deemed to be reaffirmed and confirmed on the Closing Date and shall survive the Closing of the Offering.

6

## 7. Representations, Warranties, and Covenants of the Company.

The Company hereby represents and warrants and covenants to Subscriber that:

(a) Each of Creative Technologies and Water Station is a limited liability company duly formed and validly existing under the laws of the State of Washington. The Company has all necessary limited liability company power to own, lease, use, and operate its properties and to carry on its business as now being conducted and presently proposed to be conducted. The Company is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which its ownership or leasing of assets, or the conduct of its business, makes such qualification necessary.

(b) The Company has the limited liability company power to execute, deliver, and perform its obligations under this Subscription Agreement. The Company has duly authorized the execution and delivery of this Subscription Agreement and the issuance and delivery of the Securities hereunder and, upon acceptance of Subscriber's subscription by delivery of a duly executed copy hereof to Subscriber, this Subscription Agreement will constitute a valid and binding obligation of the Company, enforceable in accordance with its terms, except as enforcement may be limited by insolvency and similar laws affecting the enforcement of creditors' rights generally and the effect of rules of law governing equitable remedies. The Securities, when issued against payment in full therefor and in accordance with the provisions of this Subscription Agreement, will constitute valid and binding obligations of the Company, enforceable in accordance with their terms, except as enforcement may be limited by insolvency and similar laws affecting the enforcement of creditors' rights generally and the effect of rules of law governing equitable remedies.

## 8. Indemnification.

Subscriber acknowledges that the Securities are being offered to Subscriber in reliance upon Subscriber's representations, warranties, and covenants in this Subscription Agreement, and that the availability to the Company of exemptions under applicable securities laws for the sale of the Securities in the Offering depends, in part, on the truthfulness and accuracy of the representations made by Subscriber and the information provided by Subscriber to the Company.  Accordingly, Subscriber agrees, to the maximum extent permitted by applicable law, to indemnify and hold harmless the Company, its officers, directors, and affiliates against any damage, loss, expense, or cost, including reasonable attorneys' fees, that they may incur resulting from any breach of any representation, warranty, or covenant of Subscriber, or from any inaccurate or incomplete information provided by Subscriber, in this Subscription Agreement, or the Investor Questionnaire.

## 9. Conditions to Closing.

(a) The obligations of the Company to issue and sell the Securities to Subscriber under this Agreement are subject to the representations and warranties of Subscriber in Section 6 of this Agreement being true and correct as of the Closing in all respects with the same effect as if made on the Closing Date.

(b) The obligations of Subscriber to purchase and pay for the Securities under this Agreement are subject to the representations and warranties of the Company in Section 7 of this Agreement being true and correct as of the Closing in all respects with the same effect as if made on the Closing Date.

## 10. No Revocation; Binding Effect.

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 99 of 332

The obligations of Subscriber hereunder are irrevocable. This Subscription Agreement shall be binding upon and inure to the benefit of the parties hereto, and their heirs, executors, administrators, successors, and permitted assigns. If Subscriber comprises more than one person, the obligations of such persons shall be joint and several.

**11. Termination of Agreement.**

Subscriber acknowledges that the Company has the right in its sole and absolute discretion to abandon the Offering at any time before the Closing. If the Company abandons the Offering, it shall, as promptly as practicable, return to Subscriber, without interest or deduction, all Subscription Proceeds remitted by Subscriber, and this Subscription Agreement shall terminate and be of no further force and effect, and no party shall have any rights against any other party hereunder.

**12. Counterparts.**

This Subscription Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed to be an original, and all of which together will be deemed to be one and the same agreement.

**13. Assignment.**

This Subscription Agreement, and the rights, obligations, and interests hereunder, may not be assigned by any party hereto without the prior written consent of the other party. Any such assignment or attempted assignment shall be null and void *ab initio*.

**14. Severability.**

Each provision of this Subscription Agreement is intended to be severable. If any term or provision hereof is held by a court of law to violate any applicable local, state, or federal ordinance, statute, administrative or judicial decision, or public policy, and if such court should declare such provision of this Agreement to be illegal, invalid, unlawful, void, voidable, or unenforceable as written, then such provision shall be given full force and effect to the fullest extent that is legal, valid and enforceable, the remainder of this Agreement shall be construed as if such illegal, invalid, unlawful, void, voidable or unenforceable provision was not contained herein, and the rights, obligations and interests of the parties under the remainder of this Agreement shall continue in full force and effect. If any provision is held to be unenforceable, the court making such determination shall have the power to, and shall, modify such provision to the minimum extent necessary to make such provision, as so modified, enforceable, and such provision shall then be applicable in such modified form.

**15. Notices.**

All notices or other communications given or made hereunder shall be in writing and shall be mailed by registered or certified mail, return receipt requested, postage prepaid, to Subscriber at the address set forth below and to the Company at the address set forth on the first page of this Agreement.

**16. Amendment.**

This Subscription Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by all parties.

8

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 100 of 332

**17. Survival.**

The provisions of this Subscription Agreement shall survive the Closing and the termination of the Offering.

**18. Governing Law.**

This Subscription Agreement shall be governed by and construed in accordance with the domestic laws of the State of Washington without giving effect to any choice or conflict of law provision or rule (whether of the State of Washington or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Washington.

**19. Submission to Jurisdiction.**

Subscriber hereby irrevocably submits to the non-exclusive jurisdiction of the federal courts located in Seattle, Washington and the state courts located in Everett, Washington with respect to any suit, action, or other proceeding relating to the Offering of the Securities.

**20. Waiver of Jury Trial.**

SUBSCRIBER IRREVOCABLY WAIVES All RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDINGS ARISING OUT OF OR RESULTING FROM THIS SUBSCRIPTION AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS SUBSCRIPTION AGREEMENT. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY SUBSCRIBER, AND SUBSCRIBER HEREBY AGREES THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY PERSON OR ENTITY TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE COMPANY TO ENTER INTO THIS SUBSCRIPTION AGREEMENT.

[Signatures on following page.]

Subscription Agreement
CTL-WSM Investment Contracts

IN WITNESS WHEREOF, subject to acceptance by the Company, Subscriber has executed this Subscription Agreement on _____, 20_____.

Name (full legal name of Subscriber): _____

Address of Subscriber: _____

Telephone Number of Subscriber: _____

E-mail Address of Subscriber: _____

Subscription Amount: $_____

**Natural Persons**:                                      **Entities**:

_____         _____
(signature)                                               (entity name)

                                                          By: _____
                                                              Name:
                                                              Title:

Acceptance:

ACCEPTED as of the _____ day of _____, 20_____.

CREATIVE TECHNOLOGIES, LLC, a Washington limited liability company, and

By: _____
Name: Ryan Wear
Title:   Manager

WATER STATION MANAGEMENT LLC, a Washington limited liability company

By: _____
Name: Ryan Wear
Title:   Manager

Accepted Subscription Amount: $_____

Signature Page

Subscription Agreement
CT-WSM Investment Contracts

<div align="center">

**SCHEDULE A**
**TO**
**SUBSCRIPTION AGREEMENT**

**<u>CONFIDENTIAL INVESTOR SUITABILITY QUESTIONNAIRE</u>**

</div>

The information contained herein is being furnished by the undersigned subscriber ("Subscriber") to enable Creative Technologies, LLC, a Washington limited liability company ("Creative Technologies"), and Water Station Management LLC, a Washington limited liability company ("Water Station" and together with Creative Technologies, the "Company") to determine whether, under Section 4(a)(2) of the Securities Act of 1933 (the "Act"), and Rule 506 of Regulation D ("Regulation D") promulgated thereunder, Subscriber is eligible to purchase the investment contracts consisting of a purchase order agreement between Creative Technologies and Subscriber and a service and maintenance agreement between Water Station and Subscriber (the "Securities") in a private placement conducted by the Company pursuant to the terms of the Confidential Private Placement Memorandum dated January 1, 2022.

Subscriber understands that: (i) the Company will rely upon the information contained herein for purposes of such determination; (ii) the Securities will not be registered under the Act in reliance upon exemptions from registration provided by the Act and Regulation D; and (iii) its purchase of the Securities will be solely for Subscriber's account and not for the account of any other person or with a view toward resale, assignment, fractionalization, or distribution thereof.

Subscriber herewith furnishes the Company with the following additional representations and information. Subscriber acknowledges that although the information provided in this questionnaire will be kept confidential, the Company may disclose the information to any regulatory authority, governmental agency, or court to establish an exemption from registration under federal and applicable state securities laws for the offer and sale of the Securities to Subscriber.

1. **Type of Ownership** (Select only one.)

   **Non-Custodial Ownership**

   ☐    **Individual** — One signature required.

   ☐    **Joint Tenants with Rights of Survivorship** — All parties must sign.

   ☐    **Community Property** — All parties must sign.

   ☐    **Tenants in Common** — All parties must sign.

   ☐    **Corporation** — Include corporate resolution, articles of incorporation and bylaws. Authorized signature required.

   ☐    **Partnership** — Include partnership agreement.  Authorized signature(s) required.

   ☐    **Other (Specify)** — _____ Include title and signature pages.

2. **Investor Information** (You must include a permanent street address even if your mailing address is a P.O. Box.)

   (a) **Natural Persons:** (Please print name(s) to whom Securities are to be registered.)

   First, Middle, Last Name:

   _____

Social Security #:

_____

Date of Birth:

_____

Street Address:

_____

City:

_____

State:

_____

Zip Code:

_____

Daytime Phone #:

_____

If Not a US Citizen, Country of Citizenship:

_____

E-mail Address:

_____

Current occupation (if retired, please describe last occupation; if your current employment is less than five years, please provide the requested employment information for the past five years):

_____

Employer:

_____

Nature of Business:

_____

Position and/or Duties:

_____

Length of Employment:

_____

Please list all professional qualifications that you have held or currently hold, including bar admissions, accounting certificates, brokerage licenses and other professional licenses or certificates:

_____
_____

Please provide the name of your financial advisor(s), if any, who assists you with your investment decisions and the period you have used the advisor(s). (Note: If your advisor is acting as a purchaser representative (as defined in Rule 501(i) of Regulation D), we will request that your advisor complete and return to us a purchaser representative questionnaire.)

_____
_____

Please list your education, including any undergraduate, graduate, and post-graduate degrees earned:

_____
_____

Are you able to bear the economic risk of an investment in the Securities, including a complete loss of the investment?

_____
_____

Do you have any pre-existing relationship with the Company or any of their officers, directors, or controlling persons? If the answer is "yes," please describe the relationship.

_____
_____

Have you invested in other public or private offerings of securities? If the answer is "yes," please provide, for each investment, the date, the amount invested, and a brief description of the investment (e.g., public or private, debt or equity)

_____
_____

(b) **Joint-Owner:** (If applicable.)

First, Middle, Last Name:

_____

Social Security #:

_____

Date of Birth:

_____

Street Address:

_____

City:

_____

State:

_____

Zip Code:

_____

Daytime Phone #:

_____

If Not a US Citizen, Country of Citizenship:  _____

(c) **Corporation/Partnership/Other Entity:**

Entity Name:

_____

Type of Entity:  _____

Tax ID#:

_____

State of Incorporation/Formation:

_____

Date of Incorporation/Formation:

_____

Name of Officer(s), General Partner, or another Authorized Person(s):

_____

Street Address:

_____

City:

_____

State:

_____

Zip Code:

_____

What is the current value of the total assets of this entity?

_____

Describe the nature of the business conducted by this entity:

_____

\* If there is more than one beneficial owner, we will require the requested information for each additional beneficial owner.

3. **Investor Eligibility Certifications**

Subscriber hereby represents and warrants that Subscriber meets the qualifications to purchase Securities because (please mark one):

(a)  If a natural person, I hereby represent and warrant that (mark as appropriate):

☐ I have an individual net worth (excess of total assets at fair market, including residences other than the primary residence, automobiles, and personal property over liabilities (but excluding indebtedness secured by the primary residence up to the fair market value of the property and including the amount of any such indebtedness in excess of such fair market value)), or joint net worth with my spouse or spousal equivalent, of more than $1,000,000.

☐ I had individual income in excess of $200,000 or joint income with my spouse or spousal equivalent in excess of $300,000, in each of the two most recent years, and I have a reasonable expectation of reaching the same income level in the current year.

☐ I hold in good standing one or more of the Series 7, Series 65 and Series 82 securities licenses.

(b)   If other than a natural person, Subscriber represents and warrants that it is:

☐ An entity in which all the equity owners are accredited investors. If this section is checked then each equity owner of the entity must complete and deliver a Purchaser Questionnaire.

**By making the foregoing representations Subscriber hereby acknowledges that the representations set forth in this Questionnaire are accurate and complete in all respects, and undertakes to inform the Company, in writing, of any material changes in the information set forth herein. Subscriber understands that the Company will rely on the accuracy and completeness of the information provided herein for the purposes of determining Subscriber's eligibility to purchase Securities in the Offering.**

Name (full legal name of Subscriber): _____

Address of Subscriber: _____

Telephone Number of Subscriber: _____

E-mail Address of Subscriber: _____

**SIGNATURES:**

**<u>Natural Persons:</u>**                                    **<u>Entities:</u>**

_____

_____                    (name of entity)

(signature)

                                              By: _____

Date: _____                    Name: _____

                                              Title: _____

                                              Date: _____

# COVER SHEET WITH SUBSCRIPTION INSTRUCTIONS

Enclosed are the documents to subscribe for CTL-WSM Investment Contracts (the "Securities") of Creative Technologies, LLC, a Washington limited liability company ("Creative Technologies"), and Water Station Management LLC, a Washington limited liability company ("Water Station" and together with Creative Technologies, the "Company"). The Securities are being offered to eligible investors pursuant to the Confidential PPM, dated January 1, 2022. Set forth herein are instructions for the execution of the enclosed documents.

A. **Instructions.**

• **Wire Instructions**: The wire instructions for payment of the Securities are attached as <u>Exhibit A</u>. Alternatively, you may pay the subscription price by enclosing a bank check for the full subscription price payable to Creative Technologies with the executed copies of your Subscription Agreement, as described below

• **Tax Compliance**: Complete the IRS Form W-9 attached hereto as <u>Exhibit B</u>, or such other certification, as applicable.

• **Subscription Agreement**: Two copies of the Subscription Agreement, together with a completed Investor Suitability Questionnaire must be completed, executed, and delivered to the Company at the address set forth below. The Company will execute both copies of the Subscription Agreement and return one copy to you for your records. Before delivering the executed copies of the Subscription Agreement, please e-mail one copy of the completed Subscription Agreement and Investor Questionnaire to the Company. Once you have been notified that the review of your subscription documents has been completed, you should deliver the executed copies of all documents, as instructed above.

Creative Technologies, LLC/
Water Station Management LLC

2732 Grand Avenue, Suite 122
Everett, WA 98201

Attention: Kevin Nooney
Email: kevin.nooney@waterstationtechnology.com

or

Attention: Jeremy Briggs
Email: Jeremy.briggs@refreshingusa.com

The Company has the right to accept or reject your subscription, in whole or in part, in its sole discretion.

**EXHIBIT A**
**TO**
**SUBSCRIPTION AGREEMENT**

**<u>Wire Instructions</u>**

Account Name:

Account Number:

Routing Number:

Bank:

Bank Address:

**EXHIBIT B**
**TO SUBSCRIPTION AGREEMENT**

**<u>IRS Form W-9</u>**

[IRS Form W-9 is attached on following page.]

Form **W-9**

(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer
# Identification Number and Certification

▶ Go to *www.irs.gov/FormW9* for instructions and the latest information.

Give Form to the
requester. Do not
send to the IRS.

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only *one* of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC    ☐ C Corporation    ☐ S Corporation    ☐ Partnership    ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ _____

Note: Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is not disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

**6** City, state, and ZIP code

Requester's name and address (optional)

**7** List account number(s) here (optional)

*Print or type.*
*See Specific Instructions on page 3.*

## Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

Note: If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

Social security number

☐☐☐ – ☐☐ – ☐☐☐☐

or

Employer identification number

☐☐ – ☐☐☐☐☐☐☐

## Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

Sign
Here

Signature of
U.S. person ▶

Date ▶

# General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

Future developments. For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See* What is backup withholding, *later.*

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting,* later, for further information.

Note: If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

Definition of a U.S. person. For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien;

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States;

• An estate (other than a foreign estate); or

• A domestic trust (as defined in Regulations section 301.7701-7).

Special rules for partnerships. Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

In the cases below, the following person must give Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States.

• In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the entity;

• In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally, the U.S. grantor or other U.S. owner of the grantor trust and not the trust; and

• In the case of a U.S. trust (other than a grantor trust), the U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

Foreign person. If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person, do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Pub. 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

Nonresident alien who becomes a resident alien. Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items.

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

*Example.* Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or Form 8233.

## Backup Withholding

What is backup withholding? Persons making certain payments to you must under certain conditions withhold and pay to the IRS 24% of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

Payments you receive will be subject to backup withholding if:

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the instructions for Part II for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See *Exempt payee code,* later, and the separate Instructions for the Requester of Form W-9 for more information.

Also see *Special rules for partnerships,* earlier.

## What is FATCA Reporting?

The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all United States account holders that are specified United States persons. Certain payees are exempt from FATCA reporting. See *Exemption from FATCA reporting code,* later, and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you no longer are tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account; for example, if the grantor of a grantor trust dies.

## Penalties

Failure to furnish TIN. If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

Civil penalty for false information with respect to withholding. If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

Criminal penalty for falsifying information. Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

Misuse of TINs. If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

# Specific Instructions

## Line 1

You must enter one of the following on this line; do not leave this line blank. The name should match the name on your tax return.

If this Form W-9 is for a joint account (other than an account maintained by a foreign financial institution (FFI)), list first, and then circle, the name of the person or entity whose number you entered in Part I of Form W-9. If you are providing Form W-9 to an FFI to document a joint account, each holder of the account that is a U.S. person must provide a Form W-9.

a. Individual. Generally, enter the name shown on your tax return. If you have changed your last name without informing the Social Security Administration (SSA) of the name change, enter your first name, the last name as shown on your social security card, and your new last name.

Note: ITIN applicant: Enter your individual name as it was entered on your Form W-7 application, line 1a. This should also be the same as the name you entered on the Form 1040/1040A/1040EZ you filed with your application.

b. Sole proprietor or single-member LLC. Enter your individual name as shown on your 1040/1040A/1040EZ on line 1. You may enter your business, trade, or "doing business as" (DBA) name on line 2.

c. Partnership, LLC that is not a single-member LLC, C corporation, or S corporation. Enter the entity's name as shown on the entity's tax return on line 1 and any business, trade, or DBA name on line 2.

d. Other entities. Enter your name as shown on required U.S. federal tax documents on line 1. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on line 2.

e. Disregarded entity. For U.S. federal tax purposes, an entity that is disregarded as an entity separate from its owner is treated as a "disregarded entity." See Regulations section 301.7701-2(c)(2)(iii). Enter the owner's name on line 1. The name of the entity entered on line 1 should never be a disregarded entity. The name on line 1 should be the name shown on the income tax return on which the income should be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on line 1. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on line 2, "Business name/disregarded entity name." If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

## Line 2

If you have a business name, trade name, DBA name, or disregarded entity name, you may enter it on line 2.

## Line 3

Check the appropriate box on line 3 for the U.S. federal tax classification of the person whose name is entered on line 1. Check only one box on line 3.

| IF the entity/person on line 1 is a(n) . . . | THEN check the box for . . . |
|---|---|
| • Corporation | Corporation |
| • Individual<br>• Sole proprietorship, or<br>• Single-member limited liability company (LLC) owned by an individual and disregarded for U.S. federal tax purposes. | Individual/sole proprietor or single-member LLC |
| • LLC treated as a partnership for U.S. federal tax purposes,<br>• LLC that has filed Form 8832 or 2553 to be taxed as a corporation, or<br>• LLC that is disregarded as an entity separate from its owner but the owner is another LLC that is not disregarded for U.S. federal tax purposes. | Limited liability company and enter the appropriate tax classification. (P= Partnership; C= C corporation; or S= S corporation) |
| • Partnership | Partnership |
| • Trust/estate | Trust/estate |

## Line 4, Exemptions

If you are exempt from backup withholding and/or FATCA reporting, enter in the appropriate space on line 4 any code(s) that may apply to you.

Exempt payee code.

• Generally, individuals (including sole proprietors) are not exempt from backup withholding.

• Except as provided below, corporations are exempt from backup withholding for certain payments, including interest and dividends.

• Corporations are not exempt from backup withholding for payments made in settlement of payment card or third party network transactions.

• Corporations are not exempt from backup withholding with respect to attorneys' fees or gross proceeds paid to attorneys, and corporations that provide medical or health care services are not exempt from payments reportable on Form 1099-MISC.

The following codes identify payees that are exempt from backup withholding. Enter the appropriate code in the space in line 4.

1—An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2)

2—The United States or any of its agencies or instrumentalities

3—A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

4—A foreign government or any of its political subdivisions, agencies, or instrumentalities

5—A corporation

6—A dealer in securities or commodities required to register in the United States, the District of Columbia, or a U.S. commonwealth or possession

7—A futures commission merchant registered with the Commodity Futures Trading Commission

8—A real estate investment trust

9—An entity registered at all times during the tax year under the Investment Company Act of 1940

10—A common trust fund operated by a bank under section 584(a)

11—A financial institution

12—A middleman known in the investment community as a nominee or custodian

13—A trust exempt from tax under section 664 or described in section 4947

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 13.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt payees except for 7 |
| Broker transactions | Exempt payees 1 through 4 and 6 through 11 and all C corporations. S corporations must not enter an exempt payee code because they are exempt only for sales of noncovered securities acquired prior to 2012. |
| Barter exchange transactions and patronage dividends | Exempt payees 1 through 4 |
| Payments over $600 required to be reported and direct sales over $5,000[1] | Generally, exempt payees 1 through 5[2] |
| Payments made in settlement of payment card or third party network transactions | Exempt payees 1 through 4 |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney reportable under section 6045(f), and payments for services paid by a federal executive agency.

Exemption from FATCA reporting code. The following codes identify payees that are exempt from reporting under FATCA. These codes apply to persons submitting this form for an account you hold in the United States. If you are only submitting this form for an account you hold in the United States, you may leave this field blank. Consult with the person requesting this form if you are uncertain if the financial institution is subject to these requirements. A requester may indicate that a code is not required by providing you with a Form W-9 with "Not Applicable" (or any similar indication) written or printed on the line for a FATCA exemption code.

A—An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37)

B—The United States or any of its agencies or instrumentalities

C—A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

D—A corporation the stock of which is regularly traded on one or more established securities markets, as described in Regulations section 1.1472-1(c)(1)(i)

E—A corporation that is a member of the same expanded affiliated group as a corporation described in Regulations section 1.1472-1(c)(1)(i)

F—A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state

G—A real estate investment trust

H—A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940

I—A common trust fund as defined in section 584(a)

J—A bank as defined in section 581

K—A broker

L—A trust exempt from tax under section 664 or described in section 4947(a)(1)

M—A tax exempt trust under a section 403(b) plan or section 457(g) plan

Note: You may wish to consult with the financial institution requesting this form to determine whether the FATCA code and/or exempt payee code should be completed.

### Line 5

Enter your address (number, street, and apartment or suite number). This is where the requester of this Form W-9 will mail your information returns. If this address differs from the one the requester already has on file, write NEW at the top. If a new address is provided, there is still a chance the old address will be used until the payor changes your address in their records.

### Line 6

Enter your city, state, and ZIP code.

## Part I. Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN.

If you are a single-member LLC that is disregarded as an entity separate from its owner, enter the owner's SSN (or EIN, if the owner has one). Do not enter the disregarded entity's EIN. If the LLC is classified as a corporation or partnership, enter the entity's EIN.

Note: See *What Name and Number To Give the Requester,* later, for further clarification of name and TIN combinations.

How to get a TIN. If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local SSA office or get this form online at *www.SSA.gov*. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at *www.irs.gov/Businesses* and clicking on Employer Identification Number (EIN) under Starting a Business. Go to *www.irs.gov/Forms* to view, download, or print Form W-7 and/or SS-4.  Or, you can go to *www.irs.gov/OrderForms* to place an order and have Form W-7 and/or SS-4 mailed to you within 10 business days.

If you are asked to complete Form W-9 but do not have a TIN, apply for a TIN and write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

Note: Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

Caution: A disregarded U.S. entity that has a foreign owner must use the appropriate Form W-8.

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if item 1, 4, or 5 below indicates otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on line 1 must sign. Exempt payees, see  *Exempt payee code,* earlier.

Signature requirements. Complete the certification as indicated in items 1 through 5 below.

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 114 of 332

1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983. You must give your correct TIN, but you do not have to sign the certification.

2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983. You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

3. Real estate transactions. You must sign the certification. You may cross out item 2 of the certification.

4. Other payments. You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), ABLE accounts (under section 529A), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions. You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) other than an account maintained by an FFI | The actual owner of the account or, if combined funds, the first individual on the account[1] |
| 3. Two or more U.S. persons (joint account maintained by an FFI) | Each holder of the account |
| 4. Custodial account of a minor (Uniform Gift to Minors Act) | The minor[2] |
| 5. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee[1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner[1] |
| 6. Sole proprietorship or disregarded entity owned by an individual | The owner[3] |
| 7. Grantor trust filing under Optional Form 1099 Filing Method 1 (see Regulations section 1.671-4(b)(2)(i)(A)) | The grantor* |

| For this type of account: | Give name and EIN of: |
|---|---|
| 8. Disregarded entity not owned by an individual | The owner |
| 9. A valid trust, estate, or pension trust | Legal entity[4] |
| 10. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 11. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 12. Partnership or multi-member LLC | The partnership |
| 13. A broker or registered nominee | The broker or nominee |

| For this type of account: | Give name and EIN of: |
|---|---|
| 14. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |
| 15. Grantor trust filing under the Form 1041 Filing Method or the Optional Form 1099 Filing Method 2 (see Regulations section 1.671-4(b)(2)(i)(B)) | The trust |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or DBA name on the "Business name/disregarded entity" name line. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see *Special rules for partnerships,* earlier.

*Note: The grantor also must provide a Form W-9 to trustee of trust.

Note: If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records From Identity Theft

Identity theft occurs when someone uses your personal information such as your name, SSN, or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:

• Protect your SSN,

• Ensure your employer is protecting your SSN, and

• Be careful when choosing a tax preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity or credit report, contact the IRS Identity Theft Hotline at 1-800-908-4490 or submit Form 14039.

For more information, see Pub. 5027, Identity Theft Information for Taxpayers.

Victims of identity theft who are experiencing economic harm or a systemic problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the TAS toll-free case intake line at 1-877-777-4778 or TTY/TDD 1-800-829-4059.

Protect yourself from suspicious emails or phishing schemes. Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

The IRS does not initiate contacts with taxpayers via emails. Also, the IRS does not request personal detailed information through email or ask taxpayers for the PIN numbers, passwords, or similar secret access information for their credit card, bank, or other financial accounts.

If you receive an unsolicited email claiming to be from the IRS, forward this message to *phishing@irs.gov*. You may also report misuse of the IRS name, logo, or other IRS property to the Treasury Inspector General for Tax Administration (TIGTA) at 1-800-366-4484. You can forward suspicious emails to the Federal Trade Commission at *spam@uce.gov* or report them at *www.ftc.gov/complaint*. You can contact the FTC at *www.ftc.gov/idtheft* or 877-IDTHEFT (877-438-4338). If you have been the victim of identity theft, see *www.IdentityTheft.gov* and Pub. 5027.

Visit *www.irs.gov/IdentityTheft* to learn more about identity theft and how to reduce your risk.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons (including federal agencies) who are required to file information returns with the IRS to report interest, dividends, or certain other income paid to you; mortgage interest you paid; the acquisition or abandonment of secured property; the cancellation of debt; or contributions you made to an IRA, Archer MSA, or HSA. The person collecting this form uses the information on the form to file information returns with the IRS, reporting the above information. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation and to cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their laws. The information also may be disclosed to other countries under a treaty, to federal and state agencies to enforce civil and criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism. You must provide your TIN whether or not you are required to file a tax return. Under section 3406, payers must generally withhold a percentage of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to the payer. Certain penalties may also apply for providing false or fraudulent information.

**EXHIBIT B**
**TO**
**PRIVATE PLACEMENT AGREEMENT**

**FORM OF PURCHASE ORDER AGREEMENT**

[Purchase Order Agreement is attached hereto.]

Exh-B-1

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts



## Purchase Order Agreement

Date: _____202__

**WaterStation® Technology**
2732 Grand Avenue, Suite 122
Everett, WA 98201
Phone: 425-320-1281,email: rwear@waterstationtechnology.com

| Customer: | | | Customer Billing Address (if different) | |
|---|---|---|---|---|
| Address: | | | Address: | |
| City: | County: | | City: | County: |
| State/Province: | Postal Code: | | State/Province: | Postal Code: |
| Contact: | Phone: | | Fax: | WST Rep.: RW |

## Equipment And Price

| MODEL | QTY | UNIT DESCRIPTION | UNIT PRICE | SUB TOTAL |
|---|---|---|---|---|
| | | ***All Water Stations -, alkaline vending machines-M700BVA***<br><br>complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $9,000 | |
| | | | **Shipping** | na |
| | | | **Taxes** | To be paid by buyer if applicable |
| | | | **TOTAL** | |

**TERMS OF PAYMENT: 100% of balance prior to transfer of ownership.**

**DELIVERY: ALL GOODS F.O.B. WAREHOUSE**

**PLEASE READ BEFORE SIGNING:** THE CUSTOMER AGREES TO PURCHASE FROM WaterStation® Technology. THE EQUIPMENT LISTED ABOVE FOR THE AMOUNT LISTED ABOVE. THE CUSTOMER AGREES TO ALL TERMS AND CONDITIONS HEREIN, AND AS CONTINUED ON PAGE 2 OF THIS PURCHASE AGREEMENT.

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 118 of 332

# TERMS AND CONDITIONS

**1. OWNERSHIP OF EQUIPMENT: The Customer** upon full payment of the amount indicated above shall be the sole owner and titleholder to the Equipment.

**2. LIMITED WARRANTY:** WaterStation® Technology warrants that (a) its WaterStation (the "Equipment") will perform substantially in accordance with th e accompanying written materials and is free from defects in materials and workmanship under normal use and service for a period of one year.

**3. CUSTOMER REMEDIES:** WaterStation® Technology  and its suppliers' entire liability and Customer's exclusive remedy shall be, at WaterStation® Technology  option, either (a) return of the price paid for the  Equipment, or (b) repair or replacement of the Equipment that  does not meet this Limited Warranty and which is returned to WaterStation® Technology  with a copy of Customer's receipt. This Limited Warranty is void if failure of the Equipment has resulted from accident, abuse, or misapplication. Any replacement Equipment will be warranted for the remainder of the ori ginal warranty period or thirty [30] days, whichever is longer.

**4. NO OTHER WARRANTIES:** TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WaterStation® Technology. AND ITS SUPPLIERS DISCLAIM ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, WITH REGARD TO THE EQUIPMENT AND ANY RELATED WRITTEN MATERIALS. THIS LIMITED WARRANTY GIVES CUSTOMER SPECIFIC LEGAL RIGHTS. CUSTOMER MAY HAVE OTHER RIGHTS DEPENDING ON THE JURISDICTION.

**5. NO LIABILITY FOR DAMAGES:** TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT  SHALL WaterStation® Technology OR ITS SUPPLIERS BE LIABLE FOR ANY DAMAGES WHATSOEVER (INCLUDING WITHOUT LIMITATION, SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR INDIRECT DAMAGES FOR PERSONAL INJURY, LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION, OR ANY OTHER PECUNIARY LOSS) ARISING OUT OF THE USE OF OR INABILITY TO USE THIS PRODUCT, EVEN IF WaterStation® Technology HAS BEEN ADVISED OF THE POSSIBILITY OF  SUCH DAMAGES. IN ANY CASE, WaterStation® Technology AND ITS SUPPLIERS' ENTIRE LIABILITY UNDER ANY PROVISION OF THIS AGREEME NT SHALL BE LIMITED TO THE AMOUNT ACTUALLY PAID BY YOU FOR THE EQUIPMENT. BECAUSE SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, THE ABOVE LIMITATION MAY NOT APPLY TO YOU.

**6. LICENSING AND REGULATORY RESPONSIBILITIES OF PURCHASER:** The Purchaser agrees to comply with all licensing and regulatory requirements regarding the operation of the Equipment in Purcha ser's jurisdiction, whether Federal, State/Provincial or Munici pal and hereby undertakes sole responsibility for doing so.

**7. GOVERNING LAW:** The enforcement and interpretation of this agreement shall be  governed by the laws of Washington.

**9. ENTIRE AGREEMENT:** This Agreement constitutes the entire agreement between the pa rties and supersedes all prior agreements, memoranda, correspondence, communications, negotiations, and representatio ns, whether verbal or written, express or implied, statutory or otherwise between the Purchaser and the Company. This Agreement may not be changed or modified orally, but may only be changed or modified by an agr eement in writing signed by the party against whom enforcement of any waiver, change, modification, extension, or discharge is sought.

Customer full name (please print)  _____

Authorized signature  _____  Date _____

Authorized Signer's printed name  _____  Title _____

**Accepted by WaterStation® Technology.**  _____  Date _____

# EXHIBIT C
## TO
## PRIVATE PLACEMENT AGREEMENT

## <u>FORM OF SERVICE AND MAINTENANCE AGREEMENT</u>

[Servicing and Maintenance Agreement is attached hereto.]

Confidential
Private Placement Memorandum
CTL-WSM Investment Contracts

**THIS SERVICE AND MAINTENANCE AGREEMENT, TOGETHER WITH THE RELATED PURCHASE ORDER AGREEMENT, CONSTITUTE A SECURITY THAT IS SUBJECT TO FEDERAL AND/OR STATE SECURITIES LAWS. SUCH SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("SECURITIES ACT"), OR APPLICABLE STATE SECURITIES LAWS. THE SECURITY HAS BEEN ACQUIRED SOLELY FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TOWARD RESALE AND MAY NOT BE OFFERED FOR SALE, SOLD, ASSIGNED, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, AND IN COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAWS OR THE APPLICABLE LAWS OF ANY OTHER JURISDICTION.**

<span style="color:red">**[Insert Applicable State Legend]**</span>

## WATER STATION MANAGEMENT LLC

## SERVICE AND MANAGEMENT AGREEMENT

This Service and Management Agreement (the "Agreement") is effective as of _____, 2022 by and between **Water Station Management LLC**, a Washington limited liability company ("WSM" or "Contractor"), and _____, ("Owner").

## RECITALS

A.      WSM is a Washington limited liability company generally engaged in the business of: (1) servicing, maintaining and repairing water vending machines ("water stations"); (2) locating and relocating such machines for commercial vending purposes; and (3) managing and administering the operation of such machines and the collection of revenues and distribution of profits therefrom.

B.      Owner is purchasing from Creative Technologies, LLC ("CTL") certain water stations more particularly described in <u>Exhibit A</u> hereto (the "Water Stations") pursuant to a Purchase Order Agreement between Owner and CTL.

C.      The Parties desire to enter into an Agreement under which WSM provides certain management and other services with respect to the Water Stations, subject to the terms and conditions set forth herein.

## AGREEMENT

In consideration of the mutual promises contained herein, the Parties hereby agree as follows:

1.      <u>Scope of Services</u>.  Subject to the terms and conditions set forth herein, WSM agrees to provide the following services to Owner:

(a)  Definitions.  For purposes of this Agreement, "Location(s)" shall mean any location, address and/or place of business where WSM, whether currently, in the past and/or during the term of this Agreement, whether directly, indirectly and/or on behalf of any Water Station owner: (1) contracts or has contracted for the placement, use and/or operation of Water Stations, including, but not limited to, any lease agreement; (2) has established, solicited or procured any business relationship relating to the placement, use and/or operation of Water Stations, including, but not limited to, engaging in negotiations or targeted marketing or solicitation efforts towards the owner of said Location; and/or (3) is contained on the list of locations maintained by WSM in the ordinary course of its business.

For purposes of this Agreement, "Location Owners" shall mean: (1) any owner of a Location, as defined herein, and/or its heirs, devisees, spouses, assigns, parents, subsidiaries, shareholders, officers, directors, partners, and/or members; (2) any person or entity contained on the list of Location Owners maintained by WSM in the ordinary course of its business; and/or (3) any owner of a Location that was discovered, came to the attention of Owner and/or entered into a business or contractual relationship with Owner based on the direct or indirect efforts of WSM during the term of this Agreement, including, but not limited to, marketing, advertising, solicitation, negotiation, and/or execution of contract work performed by WSM.

(b)  Location/Relocation of Water Stations/Leases/Services.  WSM will use its best efforts to locate, negotiate and secure leases for the operation of the Water Stations at specific Locations within its existing and future network of Location Owners, along with the other services provided in this Paragraph 1(b).

More particularly, during the term of this Agreement, WSM will take commercially reasonable steps to:

(1)  Find suitable Locations for the Water Stations and Location Owners with which to contract for the placement, use and operation of those Machines;

(2)  Negotiate, execute and maintain lease agreements and related contracts under and through which the Owner receives payment and a stream of revenue for the use of those Machines, including, but not limited to, providing for the following:

(A)  Collection of cash from the Water Stations by third-party local service agents contracted with or hired by WSM based on payment of a percentage of such collectables back to those third-party agents (such agents may be owned by or affiliated with WSM);

(B)  Negotiation, execution and servicing of service agreements for credit card or electronic payment sales with third-party credit card companies under contract with WSM; and

(C)  Negotiation, execution and servicing of agreements to receive advertising revenue gained from advertisements contained on the LCD or other screens of the Water Stations, and collection of related revenues from advertisers by WSM.

(3)  Transport the Water Stations to and from the Locations;

2

Service Agreement
Water Station Management LLC

(4)    Service, maintain and repair the Water Stations as reasonably necessary in WSM's discretion;

(5)    Manage the operations of those Machines;

(6)    Relocate the Machines to new replacement Locations in the event a lease is cancelled or terminated during the term of this Agreement;

(7)    Maintain all licensing and registrations reasonable and necessary for the use and operation of Water Stations as described herein;

(8)    Hire any employees, independent contractor, third party contractors, materialmen, suppliers, and vendors reasonable and necessary, in WSM's discretion, to carry out the services described herein, including, but not limited to, technicians, repair and/or maintenance contractors and suppliers; and

(9)    Maintain all books and records, including, but not limited to, any software records and leases and all agreements including
vendor and sub-agreements relating to the Water Stations.

(Collectively, the above services shall be referred to herein as the "Services").

WSM will receive a commission/payment for the above services, all as more particularly set forth below.

(c)    <u>Management and Authority</u>.  Owner hereby grants to WSM full authority to make all day-to-day decisions and take all actions not specifically reserved by Owner under this Agreement with respect to the placement, use and management of the Water Stations, including, but not limited to, all actions described under Paragraph 1(b) above.

(d)    <u>Major Decisions</u>.  The following decisions require written mutual approval by Owner and WSM:

(1)    Any decision to renew a lease or other agreement for the placement and use of a Water Station that extends longer that the current Term of this Agreement.

(2)    Any decision to terminate an existing lease or other agreement for the placement and use of a Water Station before the term of that lease or other agreement expires.

(3)    Any decision to decommission any Water Station; and/or

(4)    Any decision to enter into a new lease or other agreement for the placement and use of a Water Station if that lease or other agreement pays a fixed monthly payment that is less than the fixed payment or average monthly payment over the preceding 12 month period under the existing such lease or other agreement.

(e)    <u>No Warranty</u>.  WSM makes no representation, guarantee or warranty to secure any specific lease, location or number of leases or locations, nor to generate any specific amount of revenue from such leases or locations.  WSM shall have no liability for any such failure

3

Service Agreement
Water Station Management LLC

to secure any specific lease, location or number of leases or locations, nor for any failure to generate any specific amount of revenue therefrom.

2. <u>Term</u>.  This Agreement shall be effective as of the date of mutual execution and shall remain in effect for a period of 10 years unless terminated earlier as set forth below (the "Term," as may be extended as provided herein).

The Owner shall have the option to renew this Agreement for an additional period of _____ (____) years each after the expiration of the above term.

3. <u>Compensation to the Owner</u>

(a)  The monthly compensation to the Owner for use of the Owner's Water Stations shall be _____ Dollars ($_____.00) per Water Station per month, commencing on the effective date of the Agreement and continuing monthly to the termination date and for any extension of the term of the Agreement.  Payment to the Owner shall be made on or before the 25 day of each month commencing in the month following the effective date of the Agreement and shall be made via ACH deposit as designated by the Owner.  The effective date of this Agreement shall be the day on which Creative Technologies, LLC receives 100% of the purchase proceeds for all Water Stations purchased.

(b)  In addition to the monthly compensation to Owner set forth above, the Owner shall be entitled to and shall be paid quarterly, thirty percent (30%) of the Net Advertising Revenue received from WSM's Advertising Agency and/or Agencies for any advertising placed upon Owner's Water Stations.  Net Advertising Revenue shall be defined as gross advertising revenue received by WSM less any and all costs incurred by WSM directly or indirectly related to the placement of advertising on the Water Stations.  Payment to the Owner of the Owner's share of the Net Advertising Revenue shall be made on the 15th day following the end of each calendar quarter during the term of the Agreement and shall be made via ACH deposit as designated by the Owner.  At the time of payment described above, WSM shall provide the Owner with a statement showing the gross revenue, costs described above and Net Advertising Revenue distributed by WSM.

4. <u>Relationship Between the Parties</u>.

(a)  <u>Limited Agency</u>.  WSM shall be the agent for Owner for purposes of taking the actions described in Paragraph 1(b) above and is fully authorized by Owner to negotiate and execute any and all documents, including any leases and related agreements with Location Owners that are necessary to fulfill the duties described herein.

(b)  <u>No Partnership/Joint Venture</u>.  Notwithstanding anything to the contrary contained herein, nothing in this Agreement shall be construed as creating any partnership or joint venture.  Owner shall have no ownership interest in WSM and hereby expressly waives and releases any right, title, claim, and/or ownership in or to WSM or the assets or profits thereof.

(c)  <u>No Employment Agreement</u>.  Nothing in this Agreement shall be construed as creating any employer/employee relationship between the Parties.

4

Service Agreement
Water Station Management LLC

(d)      No Fiduciary Relationship.  To the fullest extent allowable under the law, Owner fully and unconditionally waives, releases and discharges WSM from any fiduciary duty at law or by statute, that WSM might otherwise owe to Owner.

(e)      Indemnification, Defense and Hold Harmless.  Owner hereby agrees to fully and unconditionally indemnify, defend and hold WSM, its officers, directors, shareholders, employees, independent contractors, and/or members harmless from any and all claims, rights, causes of action, lawsuits, proceedings, and/or other liabilities brought or asserted by any third party that arise from or are in any way related to this Agreement and/or the performance by WSM under this Agreement, except in cases of gross negligence or intentional misconduct by WSM.

(f)      Waiver of Competition by WSM.  Owner agrees and acknowledges that WSM currently provides and will continue providing similar services to those described herein to various other Water Station owners, including, but not limited to, in relation to the same network of Locations and Location Owners with whom WSM will market and potentially negotiate agreements under this Agreement.  Owner fully and unconditionally releases any claim, right or cause of action against WSM for engaging in such competitive activities, including, but not limited to, any related claim of breach of fiduciary duties, conflict of interest, breach of contract, and/or interference.

5.    Bank Deposits.  Owner understands and agrees that WSM provides the management and other services relating to Water Stations that are the subject matter of this Agreement to other owners.  Owner further understands and agrees that WSM is not required to maintain separate bank accounts or to otherwise segregate the Gross Profits or Net Profits as described in Paragraph 3 above from similar payments received under contracts for the benefit of other Water Station owners.  WSM will track and keep records reflecting the payments received from Location Owners described in Paragraph 3 above and will not distribute such funds except in accordance with the requirements of said Paragraph 3 above.  Owner fully and unconditionally grants WSM full power and authority to establish and deposit funds into its bank account, make any payments and distributions, sign any documents, and take any further actions WSM deems reasonable or necessary in order to carry out the obligations described in this Agreement, including, but not limited to, pursuant to Paragraph 3 above.

6.    Insurance.  Owner shall obtain liability insurance coverage for the Water Stations and related operations naming WSM as an additional insured at a minimum value of One Million and No/100 Dollars ($1,000,000) and provide proof of such coverage to WSM within fourteen (14) days of mutual execution of this Agreement.

7.    Operating Reports.  WSM shall provide Owner with an annual operating report or equivalent statements/supporting documents reflecting annual gross and net profits, costs and distributions.

8.    Termination.  Either Party may terminate this Agreement, upon 30 days written notice and failure of the other Party to cure, upon the following occurrences:

(a)    Material breach by the other Party;

(b)    The other Party's filing and/or adjudication of bankruptcy, insolvency, liquidation, reorganization, compulsory composition, arrangement, readjustment, or dissolution;

5

(c)        Death of the Owner;

(d)        The Owner is adjudicated by a Court of competent jurisdiction to be legally incompetent to manage his person or estate or is incapacitated;

(e)        The other Party makes an assignment for the benefit of creditors;

(f)        Any third party obtains against the other Party or the other Party seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator of all or substantially all of its business, property or other assets

In addition to the above, either Party may terminate this Agreement by providing written notice to the other Party of its intent to terminate at least sixty (60) days prior to the expiration of the Term of this Agreement, as extended, and as stated in Section 12 below.

Upon termination, WSM is authorized to pay any and all third-party obligations and costs, reimburse itself for any out-of-pocket expenses, return any Water Stations to the Owner, wind down any obligations under any lease or other agreement with any Location Owners, and otherwise do all things that are reasonable and necessary to wind down operations as described under this Agreement. Thereafter, WSM is authorized to disburse any remaining net profits as set forth in Paragraph 3 above.

9.      <u>Noncompete/Nonsolicitation</u>.

(a)        <u>General Noncompete</u>. Owner agrees, during the term of this Agreement and for a period of three (3) years after termination of this Agreement, regardless of which Party terminated said Agreement and/or the nature or cause, if any, for such termination, Owner shall not, directly or indirectly, whether on Owner's own behalf and/or on behalf of any other person or entity (e.g., as an agent, officer, director, employee, and/or consultant of any such third party), engage in any service and/or support the development, manufacture, marketing, and/or sale of any product that competes with or is intended to compete with any service or product offered, sold or otherwise provided by WSM (or is intended to be offered, sold or otherwise provided by WSM in the future), including, but not limited to, the management and services described in Paragraph 1 above, within the following geographical area (the state in which the Water Stations are located if left blank): _____).

This Paragraph and Section shall survive termination of this Agreement.

(b)        <u>Noncompete Relating to Locations</u>. In addition to the foregoing, Owner agrees to, at any time after the Termination of this Agreement regardless of which Party terminated said Agreement and/or the nature or cause, if any, for such termination, Owner shall not, directly or indirectly, whether on Owner's own behalf and/or on behalf of any other person or entity (e.g., as an agent, officer, director, employee, and/or consultant of any such third party), place, manage, operate, maintain, use, and/or derive any profit from any Water Station (including the Water Stations identified herein) at any Location or with any Location Owner, as defined in Paragraph 1 above.

6

It is specifically agreed that, for purposes of this Paragraph, WSM owns all rights in and to any lease or related agreements entered into with the Location Owners and with respect to operation of the Water Stations at any Location and that Owner may not compete in any way with and/or interfere or impair the rights of WSM in such leases or related agreements.

This Paragraph and Section shall survive termination of this Agreement.

(c)     Nonsolicitation. During the term of this Agreement and after the termination of this Agreement, and regardless of which Party terminated said Agreement and/or the nature or cause, if any, for such termination, Owner shall not, directly or indirectly, whether on Owner's own behalf and/or on behalf of any other person or entity (e.g., as an agent, officer, director, employee, and/or consultant of any such third party), (a) use or access WSM's past or present Location Owner, client and/or customer lists and contact information in any way in Owner's business activities, unless expressly consented to in writing by WSM; (b) solicit, contact, communicate with, and/or advertise to any Location Owners and/or WSM's past or present clients and/or customers; (c) interfere in any way with WSM's past, present or future business relationships and/or expectancy, including, but not limited to, with respect to any Location Owners and/or WSM's past or present clients and/or customers, marketing and/or advertising activities, accounts payable, accounts receivable, pending sales, management agreements and/or services, and/or other aspects of WSM's business and/or operations; (d) engage in any conduct that violates the Uniform Trade Secrets Act (RCW 19.108.010, et seq.) with respect to WSM and/or the Location Owners; and/or (e) engage in any commercial defamation or disparagement of WSM or its principals, agents and/or employees, including to the Location Owners and/or WSM's clients and/or customers.

Owner agrees that, in the event it violates this Paragraph, in addition to any damages available to WSM at law or in equity, to account for and disgorge and pay to WSM any and all profits, payments, proceeds, and monies received from any such Location Owner.

This Paragraph and Section shall survive termination of this Agreement.

(d)     Injunction.     Owner acknowledges and agrees that a breach of this Agreement, including, but not limited to, any violation of the Noncompete and/or Nonsolicitation Agreements set forth above, will result in immediate and irreparable harm to WSM. Owner further acknowledges and agrees that money damages may be inadequate for such violations of this Agreement and consents to the entry of a temporary and permanent injunction or similar equitable relief restricting any violation of this Agreement upon default. Owner consents to entry of such an order without requiring WSM to post any bond or other security, or, if any applicable Statute, Rule or Court requires such bond, Owner agrees such bond shall be in the amount of not more than $100.00. Owner further acknowledges such an order is available in addition to any damages or other relief to which WSM is entitled by law or in equity.

This Paragraph and Section shall survive termination of this Agreement.

10.     Intellectual Property.     Owner agrees that any and all intellectual property rights, including, but not limited to, any and all right, title, claim, and/or interest in or to any and all patents, copyrights, trademarks, trade names, derivative works, moral rights, trade secrets, contract and licensing rights, claims and causes of action, proprietary rights thereto (the "Intellectual Property

Service Agreement
Water Station Management LLC

Rights"), with respect to WSM's business, operations, proprietary information, business model, methods and collection protocols relating to credit cards and other electronic payments, trade dress, trade secrets, designs, methods, formulas, client lists, technical specifications, including, but not limited to, its Water Stations and "WV Stations", shall remain the sole and exclusive property of WSM and Owner unconditionally releases and waives any right, title, claim, and/or interest in or to said Intellectual Property Rights. Owner agrees to promptly return to WSM any such documents, drawings, lists, designs, specifications, and/or other materials relating to such Intellectual Property Rights and to hold the same in strict confidence and not disclose them to any third party without the express written consent of WSM.

This Paragraph and Section shall survive termination of this Agreement.

11.     Ownership of Lease Rights, Locations and Contracts with Location Owners. Notwithstanding anything to the contrary in this Agreement, WSM holds any and all right, title, claim and/or interest in or relating to: (a) any lease or other agreement entered into between any Location Owners and WSM and/or Owner relating to the placement, use and operation of the Water Stations; and (b) the Locations. Owner expressly releases, waives and disavows any such right, title, claim and/or interest in or to said lease, other agreement or Locations, excepting the right to payment specifically prescribed under Paragraph 3 above.

This Paragraph and Section shall survive termination of this Agreement.

12.     Right to Purchase Water Stations ("WSM Purchase"). WSM shall have a right, but not an obligation, to purchase Owner's Water Stations upon the happening of the following events and subject to the following terms:

(a)     The following events shall cause and give rise to WSM's option to purchase the Water Stations:

(1)     In the event that during the term of this agreement, the Owner desires to close or sell its business, assets and/or all or a portion of its Water Stations, it must provide WSM sixty (60) day written notice and opportunity to purchase the Water Stations.

(2)     [Upon][At any time following] the expiration of three years after the execution of this Agreement, regardless of whether the events described in Paragraph 12(a)(1) have occurred, WSM shall have the option to purchase the Water Stations.

(3)     In the event that the Parties cannot agree on the resolution of a significant dispute affecting or limiting WSM's ability to perform the functions and services outlined in Section 1 (Scope of Services), and in particular Paragraphs 1(b), 1(c), and 1(d) thereof, regardless of whether the events described in Paragraph 12(a)(1) or 12(a)(2) have occurred, WSM shall have the option to purchase the Water Stations.

8

(b)     Upon the occurrence of any of the triggering events under Paragraph 12(a)(1), Paragraph 12(a)(2) or Paragraph 12(a)(3) above, WSM shall have SIXTY (60) DAYS to provide Owner with written notice of its intent to exercise its option to purchase the Water Stations.

(c)     WSM has the option, but not the obligation, to buy some or all of the Owner's Water Stations, as determined solely by WSM, if it exercises the above option.

(d)     WSM Purchase of Water Stations

(1)     In the event that Owner gives notice as stated in Paragraph 12(a)(1) of intent to sell, and WSM provides notice as stated in Paragraph 12(b) of intent to buy, then both WSM and Owner do hereby agree that the following description of value and purchasing price, or an otherwise determined purchase price which is mutually acceptable to Owner and to WSM, do fairly, adequately and completely determine the purchase price required for WSM to acquire the Water Stations and water vending business of Owner.

(i)     If such notification occurs before the end of the third year of this Agreement, WSM and Owner hereby agree that the fair purchase price is equal to 85% of the actual amount invested by Owner for Water Stations ("Owner Investment") under this Agreement as described in Exhibit A (or the Water Stations as referenced in this Agreement  if there is no Exhibit A).

(ii)     If such notification occurs after the end of the third year of this Agreement but before the end of the fifth year of this Agreement (years 4 and 5) then the fair purchase price is equal to 100% of Owner Investment as defined in Paragraph 12(d)(a)(i) above.

(iii)     If such notification occurs after the end of the fifth year of this Agreement but before the end of the sixth year of this Agreement (year 6) then the fair purchase price is equal to 90% of Owner Investment as defined in Paragraph 12(d)(a)(i) above.

(iv)     For each additional year under this schedule, the fair purchase price shall be reduced by the amount of 10% times Owner Investment.

(2)     In the event of an occurrence as described in Paragraph 12(a)(2) or 12(a)(3) and if WSM does subsequently give notice as stated in Paragraph 12(b) of intent to buy, then both WSM and Owner do hereby agree that the following description of value and purchasing price, or an otherwise determined purchase price which is mutually acceptable to Owner and to WSM, do fairly, adequately and completely determine the purchase price required for WSM to acquire the Water Stations and water vending business of Owner.

(i)     If such notification occurs before the end of the second year of this Agreement, WSM and Owner hereby agree that the fair purchase price is equal to 110% of the actual amount invested by Owner for Water Stations ("Owner Investment") under this Agreement as described in Exhibit A (or the Water Stations as referenced in this Agreement  if there is no Exhibit A).

(ii)     If such notification occurs after the end of the second year of this Agreement but before the end of the seventh year of this Agreement (years 3 through

9

7) then the fair purchase price is equal to 100% of Owner Investment as defined in Paragraph 12(d)(a)(i) above.

(iii) If such notification occurs after the end of the seventh year of this Agreement but before the end of the eighth year of this Agreement (year 8) then the fair purchase price is equal to 90% of Owner Investment as defined in Paragraph 12(d)(a)(i) above.

(iv) For each additional year under this schedule, the fair purchase price shall be reduced by the amount of 10% times Owner Investment.

(3) Closing of the sale upon WSM shall be within sixty (60) days of the agreement or determination of value and the purchase price shall be paid all cash at closing. At closing, other than the surviving rights and obligations under this Agreement, Buyer will have no subsequent ownership or other interest in the Water Stations or the water vending business as described in this Agreement.

This Section shall survive termination of this Agreement.

13. <u>Intentionally Omitted</u>.

14. <u>Voluntary Agreement</u>. The Parties agree and acknowledge that they have read this Agreement, fully understand it, and have voluntarily executed its terms.

15. <u>Integration</u>. This Agreement contains the entire understanding of the Parties and supersedes any prior understandings and agreements between them with respect to the subject matter hereof. There are no other representations, agreements, arrangements or understandings, oral or written, between or among the parties hereto, or any of them, relating to the subject matter of this Agreement. No amendment, modification, termination, waiver or supplement of any provision of this Agreement shall be a valid or effective unless made in writing and executed by the Parties hereto subsequent to the date of this Agreement.

16. <u>Equal Opportunity in Drafting</u>. It is understood and agreed that this Agreement has been executed knowingly and voluntarily and the Parties equally participated in, or had an opportunity to participate in, the drafting of this Agreement. No ambiguity shall be construed against any Party based upon a claim that that Party drafted the ambiguous language.

17. <u>Authority</u>. The Parties each represent and warrant that they have full power and actual authority to enter into this Agreement and to carry out all actions required of them by this Agreement. All persons executing this Agreement represent and warrant that they have full power and authority to bind the entity on whose behalf they are signing, including any marital communities.

18. <u>Binding Effect</u>. This Agreement shall bind and inure to the benefit of the Parties hereto and their respective heirs, legatees, representatives, employees, attorneys, receivers, trustees, transferees, subsidiaries, members, shareholders, parents, affiliates, agents, successors and/or authorized assigns, and the marital communities of the Parties.

<center>10</center>

Service Agreement
Water Station Management LLC

19.     Attorney's Fees.  If either Party institutes suit against the other concerning this Agreement, the prevailing Party shall be entitled to an award of its reasonable attorney's fees and other litigation expenses and costs.

20.     Governing Law.  The substantive laws of the State of Washington shall govern this Agreement for all purposes, including interpretation and enforcement.  The Parties agree the venue and jurisdiction for any lawsuit commenced to enforce the terms of this Agreement or otherwise arising out of this Agreement shall be vested in the Snohomish County (Washington) Superior Court or the U.S. District Court for the Western District of Washington in Seattle, Washington.

21.     Counterparts.  This Agreement may be executed in any number of identical counterparts, notwithstanding that all Parties have not signed the same counterpart, with the same effect as if all Parties had signed the same document.  The Parties may transmit their signatures via email, facsimile or other electronic transmittal and it will have the same force and effect as if they exchanged original signatures.

22.     Time is of the Essence.  Time is of the essence to this Agreement.

23.     Further Documents.      Both Parties agree to execute all documents and to take any further actions reasonable and necessary to fulfill their obligations provided hereunder.

24.     Severability.    In the event a Court holds one or more provisions of this Agreement unenforceable, illegal, invalid, or void, such determination shall not affect the other provisions of this Agreement or render this Agreement in any way invalid, unenforceable or void. If any provision contained herein shall for any reason be held by any Court to be excessively broad as to duration, geographic scope, activity, or subject, it shall be constructed by limiting or reducing it such that the Court deems it reasonable, and shall not have the effect of rendering that provision or the entire Agreement otherwise unenforceable.

25.     Notice.   All notices provided hereunder shall be sent to the Parties at the following addresses, subject to change by either Party upon written notice to the other:


WSM:
2732 Grand Ave, Suite 122
Everett, WA 98201

Owner:
_____
_____
_____


26.     Successors and Assigns.  The rights and benefits of this Agreement shall inure to the benefit of, and be enforceable by WSM's successors and assigns.  The rights and obligations of Owner under this Agreement may only be assigned with the prior written consent of the Company and pursuant to Section 13 hereof.

Service Agreement
Water Station Management LLC

27.     Third-Party Beneficiaries.  The parties hereto agree that, with respect to Section 13 hereof, CTL shall be a third-party beneficiary of this Agreement.  There shall be no other third-party beneficiaries of this Agreement.

[Signatures on following page.]

12

Executed on the dates set forth below and effective as of the date first above written.

WATER STATION MANAGEMENT LLC,
a Washington limited liability company

By: _____       Date: _____

Its: _____


Owner:

_____

By: _____       Date: _____

Its: _____


_____

By: _____       Date: _____

Its: _____

**EXHIBIT D**
**TO**
**PRIVATE PLACEMENT AGREEMENT**

**FORM OF INVESTOR SUITABILITY QUESTIONNAIRE**

[Investor Suitability Questionnaire is attached hereto.]

Exh D-1

# <u>CONFIDENTIAL INVESTOR SUITABILITY QUESTIONNAIRE</u>

The information contained herein is being furnished by the undersigned subscriber ("Subscriber") to enable Creative Technologies, LLC, a Washington limited liability company ("Creative Technologies"), and Water Station Management LLC, a Washington limited liability company ("Water Station" and together with Creative Technologies, the "Company") to determine whether, under Section 4(a)(2) of the Securities Act of 1933 (the "Act"), and Rule 506 of Regulation D ("Regulation D") promulgated thereunder, Subscriber is eligible to purchase the investment contracts consisting of a purchase order agreement between Creative Technologies and Subscriber and a service and maintenance agreement between Water Station and Subscriber (the "Securities") in a private placement conducted by the Company pursuant to the terms of the Confidential Private Placement Memorandum dated January 1, 2022.

Subscriber understands that: (i) the Company will rely upon the information contained herein for purposes of such determination; (ii) the Securities will not be registered under the Act in reliance upon exemptions from registration provided by the Act and Regulation D; and (iii) its purchase of the Securities will be solely for Subscriber's account and not for the account of any other person or with a view toward resale, assignment, fractionalization, or distribution thereof.

Subscriber herewith furnishes the Company with the following additional representations and information. Subscriber acknowledges that although the information provided in this questionnaire will be kept confidential, the Company may disclose the information to any regulatory authority, governmental agency, or court to establish an exemption from registration under federal and applicable state securities laws for the offer and sale of the Securities to Subscriber.

1. **Type of Ownership** (Select only one.)

   **Non-Custodial Ownership**

   ☐     **Individual** — One signature required.

   ☐     **Joint Tenants with Rights of Survivorship** — All parties must sign.

   ☐     **Community Property** — All parties must sign.

   ☐     **Tenants in Common** — All parties must sign.

   ☐     **Corporation** — Include corporate resolution, articles of incorporation and bylaws. Authorized signature required.

   ☐     **Partnership** — Include partnership agreement. Authorized signature(s) required.

   ☐     **Other (Specify)** — _____ Include title and signature pages.

2. **Investor Information** (You must include a permanent street address even if your mailing address is a P.O. Box.)

   (a) **Natural Persons:** (Please print name(s) to whom Securities are to be registered.)

First, Middle, Last Name:

_____

Social Security #:

_____

Date of Birth (MM/DD/YYYY):

_____

Street Address:

_____

City:

_____

State:

_____

Zip Code:

_____

Daytime Phone #:

_____

If Not a US Citizen, Country of Citizenship:

_____

E-mail Address:

_____

Current occupation (if retired, please describe last occupation; if your current employment is less than five years, please provide the requested employment information for the past five years):

_____

Employer:

_____

Nature of Business:

_____

Position and/or Duties:

_____

Length of Employment:

_____

Please list all professional qualifications that you have held or currently hold, including bar admissions, accounting certificates, brokerage licenses and other professional licenses or certificates:

_____
_____

Please provide the name of your financial advisor(s), if any, who assists you with your investment decisions and the period you have used the advisor(s). (Note: If your advisor is acting as a purchaser representative (as defined in Rule 501(i) of Regulation D), we will request that your advisor complete and return to us a purchaser representative                                                                 questionnaire.)

_____
_____

Please list your education, including any undergraduate, graduate, and post-graduate degrees earned:

_____
_____

Are you able to bear the economic risk of an investment in the Securities, including a complete loss of the investment?

_____
_____

Do you have any pre-existing relationship with the Company or any of their officers, directors, or controlling persons? If the answer is "yes," please describe the relationship.

_____
_____

Have you invested in other public or private offerings of securities? If the answer is "yes," please provide, for each investment, the date, the amount invested, and a brief description of the investment (e.g., public or private, debt or equity)

_____
_____

(b) **Joint-Owner:** (If applicable.)

First, Middle, Last Name:

_____

Social Security #:

_____

Date of Birth:

_____

Street Address:

_____

City:

_____

State:

_____

Zip Code:

_____

Daytime Phone #:

_____

If Not a US Citizen, Country of Citizenship: _____

**(c) Corporation/Partnership/Other Entity:**

Entity Name:

_____

Type of Entity: _____

Tax ID#:

_____

State of Incorporation/Formation:

_____

Date of Incorporation/Formation:

_____

Name of Officer(s), General Partner, or another Authorized Person(s):

_____

Street Address:

_____

City:

_____

State:

_____

Zip Code:

_____

What is the current value of the total assets of this entity?

_____

Describe the nature of the business conducted by this entity:

_____

—

\* If there is more than one beneficial owner, we will require the requested information for each additional beneficial owner.

### 3. Investor Eligibility Certifications

Subscriber hereby represents and warrants that Subscriber meets the qualifications to purchase Securities because (please mark one):

(a) If a natural person, I hereby represent and warrant that (mark as appropriate):

☐ I have an individual net worth (excess of total assets at fair market, including residences other than the primary residence, automobiles, and personal property over liabilities (but excluding indebtedness secured by the primary residence up to the fair market value of the property and including the amount of any such indebtedness in excess of such fair market value)), or joint net worth with my spouse or spousal equivalent, of more than $1,000,000.

☐ I had individual income in excess of $200,000 or joint income with my spouse or spousal equivalent in excess of $300,000, in each of the two most recent years, and I have a reasonable expectation of reaching the same income level in the current year.

☐ I hold in good standing one or more of the Series 7, Series 65 and Series 82 securities licenses.

(b) If other than a natural person, Subscriber represents and warrants that it is:

☐ An entity in which all the equity owners are accredited investors. If this section is checked then each equity owner of the entity must complete and deliver a Purchaser Questionnaire.

**By making the foregoing representations Subscriber hereby acknowledges that the representations set forth in this Questionnaire are accurate and complete in all respects, and undertakes to inform the Company, in writing, of any material changes in the information set forth herein. Subscriber understands that the Company will rely on the accuracy and completeness of the information provided herein for the purposes of determining Subscriber's eligibility to purchase Securities in the Offering.**

Name (full legal name of Subscriber): _____

Address of Subscriber: _____

Telephone Number of Subscriber: _____

E-mail Address of Subscriber: _____

**SIGNATURES:**

**<u>Natural Persons:</u>**

_____
(signature)


Date: _____

**<u>Entities:</u>**

_____
(name of entity)


By: _____

Name: _____

Title: _____

Date: _____

**SCHEDULE I-A**
**TO**
**PRIVATE PLACEMENT AGREEMENT**

**FINANCIALS OF CREATIVE TECHNOLOGIES, LLC**
**FOR THE PERIOD JANUARY 1 – DECEMBER 31, 2020**

[The Financials of Creative Technologies, LLC for the period January 1 – December 31, 2020 are attached hereto.]

Sch I-A-1

# Creative Technologies, LLC
# Profit & Loss
### January through December 2020

| | Jan - Dec 20 |
|---|---:|
| **Ordinary Income/Expense** | |
| **Income** | |
| Sales | 57,428,243.11 |
| **Total Income** | 57,428,243.11 |
| | |
| **Cost of Goods Sold** | |
| Direct Labor | 72,000.00 |
| Freight and Shipping Costs | 237,726.46 |
| installation Expense | 1,927,715.80 |
| Location Placement Fee | 6,706,000.00 |
| Overhead Expenses | 117,000.00 |
| Purchases - Resale Items | 20,177,019.35 |
| **Total COGS** | 29,237,461.61 |
| | |
| **Gross Profit** | 28,190,781.50 |
| | |
| **Expense** | |
| Advertising and Promotion | 64,311.03 |
| Amoritization Expense | 33,999.96 |
| Automobile Expense | 48,698.38 |
| Bad Debt | 500.00 |
| Bank Service Charges | -483.32 |
| Broker Fees | 8,481,452.71 |
| Business Licenses and Permits | 4,581.47 |
| Business Taxes | 134,038.76 |
| Computer and Internet Expenses | 51,875.77 |
| Depreciation Expense | 747,092.18 |
| Dues and Subscriptions | 3,130.83 |
| Employee Recruiting | 8,336.63 |
| Insurance Expense | 569,612.38 |
| Interest Expense | 332,916.53 |
| Licensing | 58,488.62 |
| Meals and Entertainment | 10,652.17 |
| Miscellaneous Expense | 1,461.81 |
| Office Supplies | 13,559.83 |
| Overhead Allocation | -189,000.00 |
| Payroll Expense | 2,281,471.75 |
| Postage and Delivery | 6,691.93 |
| Professional Fees | 623,074.18 |
| Reconciliation Discrepancies | 3,627.62 |
| Rent Expense | 1,703,169.27 |
| Repairs and Maintenance | 82,362.30 |
| Shop Supplies | 26,054.06 |
| Telephone Expense | 30,951.85 |
| Travel Expense | 391,822.33 |
| Utilities | 28,503.99 |
| **Total Expense** | 15,552,955.02 |
| | |
| **Net Ordinary Income** | 12,637,826.48 |
| | |
| **Other Income/Expense** | |
| **Other Income** | |
| Miscellaneous Income | 144,705.47 |
| **Total Other Income** | 144,705.47 |
| | |
| **Net Other Income** | 144,705.47 |
| | |
| **Net Income** | **12,782,531.95** |

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 142 of 332

Creative Technologies, LLC
Balance Sheet

|  | 12/31/2020 |
|---|---|
| **ASSETS** | |
| Current Assets | |
| Checking/Savings | |
| Bank of America | 6,254,483.49 |
| Chase Bank | 69,363.30 |
| Coastal Community Bank | 19,339.83 |
| First Federal | 17,441,791.52 |
| Installation Bank Account | 191.41 |
| Key Bank | 139,749.02 |
| Merchant Account | 25,933.25 |
| Total Checking/Savings | 23,950,851.82 |
| Accounts Receivable | |
| Accounts Receivable | 8,001,556.93 |
| Total Accounts Receivable | 8,001,556.93 |
| Other Current Assets | |
| Funds in Escrow | 3,682,720.00 |
| Inventory | 1,073,422.12 |
| Total Other Current Assets | 4,756,142.12 |
| Total Current Assets | 36,708,550.87 |
| Fixed Assets | |
| Furniture, Fixtures and Vending | |
| Furniture and Equipment | 819,440.86 |
| Vending Equipment | 1,192,852.17 |
| Accumulated Depreciation | (362,168.01) |
| Total Furniture, Fixtures and Vending | 1,650,125.02 |
| House owned machines | |
| House owned machines - Other | 462,250.00 |
| accumulated Depreciation-House | (133,977.16) |
| Total House owned machines | 328,272.84 |
| Intellectual Property | |
| Intellectual Property - Other | 340,000.00 |
| accumulated Amortization | (238,000.43) |
| Total Intellectual Property | 101,999.57 |
| Total Fixed Assets | 2,080,397.43 |
| Other Assets | |
| Notes Receivable | 6,345,500.00 |
| Related Party Notes Receivable | 35,048,151.73 |
| Total Other Assets | 41,393,651.73 |
| TOTAL ASSETS | 80,182,600.03 |

LIABILITIES & EQUITY

Liabilities
    Current Liabilities
    Credit Cards
        Bank of America CC

| | |
|---|---:|
| Bank of America CC #1469 | 43,717.13 |
| Bank of America CC #1843 | 28,356.06 |
| Bank of America CC #2119 | 67,108.24 |
| Bank of America CC #2609 | 122,612.19 |
| Bank of America CC #3056 | 18,245.57 |
| Bank of America CC #3442 | 84,225.11 |
| Bank of America CC #5097 | 60,999.18 |
| Bank of America CC #5576 | 106,495.84 |
| Bank of America CC #5923 | 127,249.83 |
| Bank of America CC #6931 | 10,795.32 |
| Bank of America CC #7819 | 226,058.42 |
| Bank of America CC #8823 | 10,836.87 |
| Bank of America CC #8845 | 4,397.95 |
| Bank of America CC - Other | (914,239.73) |
| Total Bank of America CC | (3,142.02) |
| Bank of America CC #2 | |
| Bank of America CC #0103 | 494,274.34 |
| Bank of America CC #2 - Other | (489,470.96) |
| Total Bank of America CC #2 | 4,803.38 |
| Total Credit Cards | 1,661.36 |
| Other Current Liabilities | |
| Accrued Expenses | 1,942,946.00 |
| Current Portion of Long Term De | 243,405.01 |
| Customer Deposits | 25,325,444.00 |
| Loan Note Payable | 1,000,000.00 |
| Total Other Current Liabilities | 28,511,795.01 |
| Total Current Liabilities | 28,513,456.37 |
| Long Term Liabilities | |
| Capital Lease - Falcon | |
| Lease Less Current Portion | (8,405.01) |
| Capital Lease - Falcon - Other | 8,405.01 |
| Total Capital Lease - Falcon | - |
| First Federal Loan | |
| Loan Fees First Federal | (427,095.14) |
| First Federal Loan - Other | 21,000,000.00 |
| Total First Federal Loan | 20,572,904.86 |
| Loan-Less Current Portion | (235,000.00) |
| PPP Loan | 235,300.00 |
| Total Long Term Liabilities | 20,573,204.86 |
| Total Liabilities | 49,086,661.23 |

Equity
    Member 1 Draws                 (1,324,127.80)

| | |
|---|---|
| Member 1 Equity | (266,749.40) |
| Retained Earnings | 19,627,579.27 |
| Net Income | 13,059,236.73 |
| Total Equity | 31,095,938.80 |
| TOTAL LIABILITIES & EQUITY | 80,182,600.03 |

**SCHEDULE I-B**
**TO**
**PRIVATE PLACEMENT AGREEMENT**

**FINANCIALS OF CREATIVE TECHNOLOGIES, LLC**
<u>**FOR THE PERIOD JANUARY 1 – SEPTEMBER 30, 2021**</u>

[The Financials of Creative Technologies, LLC for the period January 1 – September 30, 2021 are attached hereto.]

Sch I-B-1

# Creative Technologies, LLC
## Profit & Loss
### January through September 2021

|  | Jan-Sept 21 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| Sales | 38,933,489.47 |
| **Total Income** | 38,933,489.47 |
| **Cost of Goods Sold** | |
| Direct Labor | 424,001.06 |
| Freight and Shipping Costs | 82,845.91 |
| installation Expense | 193,456.61 |
| Location Placement Fee | 285,607.50 |
| Overhead Expenses | 305,421.80 |
| Purchases - Resale Items | 21,319,116.75 |
| **Total COGS** | 22,610,449.63 |
| **Gross Profit** | 16,323,039.84 |
| **Expense** | |
| Advertising and Promotion | 85,173.69 |
| Amoritization Expense | 8,499.99 |
| Automobile Expense | 208,319.14 |
| Bank Service Charges | 3,182.80 |
| Broker Fees | 2,985,759.50 |
| Business Licenses and Permits | 3,693.91 |
| Business Taxes | 118,015.75 |
| Computer and Internet Expenses | 108,766.05 |
| Depreciation Expense | 1,350,000.00 |
| Employee Recruiting | 12,425.99 |
| Insurance Expense | 349,318.44 |
| Interest Expense | 497,850.05 |
| Licensing | 2,388.47 |
| Meals and Entertainment | 8,003.91 |
| Miscellaneous Expense | 8,771.33 |
| Office Supplies | 8,421.54 |
| Overhead Allocation | -168,753.00 |
| Payroll Expense | 988,504.25 |
| Professional Fees | 467,410.97 |
| Reconciliation Discrepancies | 21.00 |
| Rent Expense | 643,194.39 |
| Repairs and Maintenance | 213,857.05 |
| Telephone Expense | 16,655.81 |
| Travel Expense | 287,603.80 |
| Utilities | 13,118.31 |
| **Total Expense** | 8,220,203.14 |
| **Net Ordinary Income** | 8,102,836.70 |
| **Net Income** | **8,102,836.70** |

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 147 of 332

# Creative Technologies, LLC
# Balance Sheet
### As of September 30, 2021

|  | Sept 30, 21 |
|---|---|
| **ASSETS** | |
|   **Current Assets** | |
|     **Checking/Savings** | |
|       Bank of America | 6,883,135.12 |
|       Chase Bank | 57,500.40 |
|       Coastal Community Bank | 11,780.50 |
|       First Federal | 4,434,923.04 |
|       Installation Bank Account | 1,288.14 |
|       Key Bank | 19,516.52 |
|       Merchant Account | 25,933.25 |
|     **Total Checking/Savings** | 11,434,076.97 |
|     **Accounts Receivable** | |
|       Accounts Receivable | 567,700.88 |
|     **Total Accounts Receivable** | 567,700.88 |
|     **Other Current Assets** | |
|       Note Receivable | 174,700.88 |
|       Inventory | 10,444,204.87 |
|       Inventory Assets | 11,045.62 |
|       Undeposited Funds | 4,230.50 |
|     **Total Other Current Assets** | 10,634,181.87 |
|   **Total Current Assets** | 22,635,959.72 |
|   **Fixed Assets** | |
|     Accumulated Depreciation | -2,624,362.88 |
|     Furniture and Equipment | 3,072,329.17 |
|     House owned machines | |
|       accumulated Depreciation-House | -133,977.16 |
|       House owned machines - Other | 462,250.00 |
|     **Total House owned machines** | 328,272.84 |
|     Intellectual Property | |
|       accumulated Amortization | -238,000.43 |
|       Intellectual Property - Other | 528,083.04 |
|     **Total Intellectual Property** | 290,082.61 |
|     Vending Equipment | 14,574,530.02 |
|   **Total Fixed Assets** | 15,640,851.76 |
|   **Other Assets** | |
|     Notes Receivable | 6,345,500.00 |
|     Related Party Notes Receivable | 38,586,529.61 |
|   **Total Other Assets** | 44,932,029.61 |
| **TOTAL ASSETS** | **83,208,841.09** |
| **LIABILITIES & EQUITY** | |
|   **Liabilities** | |
|     **Current Liabilities** | |
|       Accounts Payable | 261,430.47 |
|       Total Credit Cards | 10,843.71 |
|       Other Current Liabilities | |

24-01863-FPC11   Doc 1161-2   Filed 08/01/25   Entered 08/01/25 21:58:04   Pg 148 of 332

# Creative Technologies, LLC
# Balance Sheet
### As of September 30, 2021

|  | Sept 30, 21 |
|---|---|
| **Accrued Expenses** | 1,922,867.95 |
| **Current Portion of Long Term De** | 243,405.01 |
| **Customer Deposits** | 20,916,448.77 |
| **Loan Note Payable** | 1,000,000.00 |
| **Loan Shareholder** | 50,000.00 |
| **Total Other Current Liabilities** | 24,132,721.73 |
| **Total Current Liabilities** | 24,132,721.73 |
| **Long Term Liabilities** | |
| **Capital Lease - Falcon** | |
| **Lease Less Current Portion** | -8,405.01 |
| **Capital Lease - Falcon - Other** | -546.99 |
| **Total Capital Lease - Falcon** | -8,952.00 |
| **First Federal** | |
| **Loan Fees** | -427,095.14 |
| **First Federal Term Debt - Other** | 20,977,507.80 |
| **Total First Federal Term Debt** | 20,550,412.66 |
| **Loan-Less Current Portion** | -235,000.00 |
| **PPP Loan** | 235,300.00 |
| **Total Long Term Liabilities** | 20,541,760.66 |
| **Total Liabilities** | 44,674,482.39 |
| **Equity** | |
| **Member 1 Draws** | -1,324,127.80 |
| **Member 1 Equity** | -266,749.40 |
| **Opening Balance Equity** | 3,199.17 |
| **Retained Earnings** | 32,019,200.03 |
| **Net Income** | 8,102,836.70 |
| **Total Equity** | 38,534,358.70 |
| **TOTAL LIABILITIES & EQUITY** | **83,208,841.09** |

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 149 of 332

**SCHEDULE II-A**
**TO**
**PRIVATE PLACEMENT AGREEMENT**

**FINANCIALS OF WATER STATION MANAGEMENT LLC**
**<u>FOR THE PERIOD JANUARY 1 – DECEMBER 31, 2020</u>**

[The Financials of Water Station Management LLC for the period January 1 – December 31, 2020 are attached hereto.]

Sch II-A-1

# WaterStation Management LLC
## Profit & Loss
### January through December 2020

|  | Jan - Dec 20 |
|---|---|
| **Ordinary Income/Expense** | |
| Income | 17,386,659.36 |
| **Cost of Goods Sold** | 273,010.73 |
| **Gross Profit** | 17,113,648.63 |
| **Expense** | |
| Bank Charges | 17,944.50 |
| Commissions & fees | 3,797,953.08 |
| Insurance | 86,292.70 |
| Legal & Professional Fees | 2,975.00 |
| Meals and Entertainment | 588.07 |
| Office Expenses | 1,716.30 |
| Partners | 7,698,072.32 |
| Payroll Expense | 429,427.10 |
| Rent or Lease | 549,379.93 |
| Repair & Maintenance | 3,118,707.15 |
| Supplies | 2,346.06 |
| Taxes & Licenses | 347,858.43 |
| Travel | 7,579.28 |
| Travel Reimbursement | 200.00 |
| Utilities | 20,114.98 |
| 6090B98 · Broker Fees-WSM | 9,916.97 |
| 6600B98 · Taxes-WSM | 1,400.00 |
| 66900 · *Reconciliation Discrepancies | 69.80 |
| 6901B98 · Interest Expense-WSM | 12,450.00 |
| **Total Expense** | 16,104,991.67 |
| **Net Ordinary Income** | 1,008,656.96 |
| **Other Income/Expense** | |
| Other Expense | 0.00 |
| **Net Other Income** | 0.00 |
| **Net Income** | 1,008,656.96 |

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 151 of 332

# WaterStation Management LLC
## Balance Sheet
### As of December 31, 2020

|  | Dec 31, 20 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| First Federal Bank | 2,602,033.86 |
| WSM (5591) | 774,564.23 |
| **Total Checking/Savings** | 3,376,598.09 |
| **Accounts Receivable** | |
| Accounts Receivable | 129,297.98 |
| **Total Accounts Receivable** | 129,297.98 |
| **Other Current Assets** | |
| Inventory Asset | 28,550.00 |
| 12000 · Undeposited Funds | 31,956.62 |
| **Total Other Current Assets** | 60,506.62 |
| **Total Current Assets** | 3,566,402.69 |
| **Fixed Assets** | |
| Accumulated Depreciation | -2,129,229.00 |
| Equipment | 10,759,258.17 |
| Note Receivable | 44,069.01 |
| **Total Fixed Assets** | 8,674,098.18 |
| **TOTAL ASSETS** | **12,240,500.87** |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| Accounts Payable | 178,625.08 |
| **Total Accounts Payable** | 178,625.08 |
| **Total Current Liabilities** | 178,625.08 |
| **Long Term Liabilities** | |
| Debt | 5,459,309.58 |
| Shareholder Loan | 4,895,599.90 |
| **Total Long Term Liabilities** | 10,354,909.48 |
| **Total Liabilities** | 10,533,534.56 |
| **Equity** | |
| 32000 · Retained Earnings | 698,309.35 |
| Net Income | 1,008,656.96 |
| **Total Equity** | 1,706,966.31 |
| **TOTAL LIABILITIES & EQUITY** | **12,240,500.87** |

**SCHEDULE II-B**
**TO**
**PRIVATE PLACEMENT AGREEMENT**

**FINANCIALS OF WATER STATION MANAGEMENT LLC**
**FOR THE PERIOD JANUARY 1 – SEPTEMBER 30, 2021**

[The Financials of Water Station Management LLC for the period January 1 – September 30, 2021 are attached hereto.]

Sch II-B-1

WaterStation Management, LLC
Profit & Loss
January through September 2021

Ordinary Income/Expense

Income

| | |
|---|---:|
| Fees Billed | (2.80) |
| Services | 4,317.85 |
| 4000B98 · Income-WSM | 14,140,746.14 |
| 4200B98 · Machine Servicing Income-WSM | 1,757,267.49 |
| **Total Income** | 15,902,328.68 |
| **Cost of Goods Sold** | |
| 5000B98 · Cost of Goods Sold-WSM | 298,347.78 |
| 5210B98 · Freight In/ShippingCosts-WSM | 31,000.00 |
| 5220B98 · Freight Out/Ship Costs-WSM | 32,850.00 |
| 5310B98 · Overhead-WSM | 72,925.00 |
| **Total COGS** | 435,122.78 |
| **Gross Profit** | 15,467,205.90 |
| **Expense** | |
| Advertising | 245.38 |
| Bank Charges | 13,774.28 |
| Office Expenses | 268.18 |
| Partners | 7,062,053.87 |
| Payroll Expense | 124,458.25 |
| Rent or Lease | 174,358.66 |
| Repair & Maintenance | 2,601,275.00 |
| Taxes & Licenses | 116,644.33 |
| Utilities | 1,602.86 |
| 6040B98 · Rent/Lease Office-WSM | 449.73 |
| 6072B98 · Truck/Auto Lease-WSM | 1,043.60 |
| 6095B98 · Commissions-Retail Loc.-WSM | 3,239,864.19 |
| 6220B98 · Charitable Contributions-WSM | 2,431.68 |
| 6250B98 · Bank Service Charges-WSM | 5,727.52 |
| 6260B98 · Merchant Processing Fees-WSM | 26.09 |
| 6310B98 · Insurance-WSM | 81,500.41 |
| 6500B98 · Communications-WSM | 514.81 |
| 6510B98 · Utilities-WSM | 57.71 |
| 6605B98 · Other taxes-WSM | 2,220.43 |
| 6650B98 · Licences & Permits-WSM | 83,024.19 |
| 6901B98 · Interest Expense-WSM | 101,080.00 |
| **Total Expense** | 13,612,621.17 |
| **Net Ordinary Income** | 1,854,584.73 |
| **Net Income** | 1,854,584.73 |

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 154 of
332

**WaterStation Management LLC**
**Balance Sheet**
**As of September 30, 2021**

## ASSETS

| | |
|---|---:|
| **Current Assets** | |
|   **Checking/Savings** | |
|     1010.WS · Bank of America (5591) | 1,183,334.65 |
|     1020.WS · First Federal Bank (8502) | 204,102.61 |
|   **Total Checking/Savings** | 1,387,437.26 |
|   **Accounts Receivable** | |
|     1200.WS · Accounts Receivable | 280,031.58 |
|   **Total Accounts Receivable** | 280,031.58 |
|   **Other Current Assets** | |
|     Inventory Asset | 28,550.00 |
|     12000 · Undeposited Funds | 97,308.89 |
|     1310B98 · Inventory-WSM | 108,900.00 |
|     1410B98 · Other receivables-WSM | (8,944.66) |
|   **Total Other Current Assets** | 225,814.23 |
| **Total Current Assets** | 1,893,283.07 |
| **Fixed Assets** | |
|   Accumulated Depreciation | (2,129,229.00) |
|   Equipment | 12,990,418.80 |
|   Other Assets | 50,786.45 |
| **Total Fixed Assets** | 10,911,976.25 |
| **TOTAL ASSETS** | 12,805,259.32 |
| **LIABILITIES & EQUITY** | |
|   **Liabilities** | |
|     **Current Liabilities** | |
|       Accounts Payable | 194,287.26 |
|       Credit Cards | 202.13 |
|     **Total Current Liabilities** | 194,489.39 |
|     **Long Term Liabilities** | |
|       Debt | 5,465,316.58 |
|       Shareholder Loan | 3,583,902.31 |
|     **Total Long Term Liabilities** | 9,049,218.89 |
|   **Total Liabilities** | 9,243,708.28 |
|   **Equity** | |
|     32000 · Retained Earnings | 1,706,966.31 |
|     Net Income | 1,854,584.73 |
|   **Total Equity** | 3,561,551.04 |
| **TOTAL LIABILITIES & EQUITY** | 12,805,259.32 |

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 155 of 332

# EXHIBIT 30

# FRANCHISE DISCLOSURE DOCUMENT

WST Franchise Systems LLC
A Washington limited liability company
2732 Grand Avenue Suite 122
Everett, WA 98201
425-320-1281
Bryce.Froberg@waterstationtechnology.com
www.waterstationtechnology.com



The franchise is to operate a vending machine business dispensing purified, mineralized water under the trade name "WaterStation". You will either manage the business yourself (our "active owner model") or engage our affiliate WaterStation Management LLC to manage your business (our "passive owner model").

The total investment necessary to begin operation of a WaterStation franchise under our "active owner model" is $69,600 to $393,500. This includes $48,500 to $341,500 that must be paid to the franchisor or affiliate. The total investment necessary to begin operation of a WaterStation franchise under our "passive owner model" is $23,600 to $324,500. This includes $22,500 to $314,500 that must be paid to the franchisor or affiliate.

This disclosure document summarizes certain provisions of your franchise agreement and other information in plain English. Read this disclosure document and all accompanying agreements carefully. You must receive this disclosure document at least 14 calendar-days before you sign a binding agreement with, or make any payment to, the franchisor or an affiliate about the proposed franchise sale. **Note, however, that no governmental agency has verified the information contained in this document.**

You may wish to receive your disclosure document in another format that is more convenient for you. To discuss the availability of disclosures in different formats, please contact Bryce Froberg at 2732 Grand Avenue Suite 122, Everett, WA 98201 and 425-320-1281.

The terms of your contract will govern your franchise relationship. Don't rely on the disclosure document alone to understand your contract. Read all your contract carefully. Show your contract and this disclosure document to an advisor, like a lawyer or an accountant.

Buying a franchise is a complex investment. The information in this disclosure document can help you make up your mind. More information on franchising, such as "A Consumer's Guide to Buying a Franchise," which can help you understand how to use this disclosure document, is available from the Federal Trade Commission. You can contact the FTC at 1-877-FTC- HELP or by writing to the FTC at 600 Pennsylvania Avenue, NW. Washington, D.C. 20580. You can also visit the FTC's home page at www.ftc.gov for additional information. Call your state agency or visit your public library for other sources of information on franchising.

There may also be laws on franchising in your state. Ask your state agencies about them.

Issuance date: April 4, 2017

WaterStation FDD 2017

1799 Bender00000505

# STATE COVER PAGE

Your state may have a franchise law that requires us to register or file with a state franchise administrator before offering or selling in your state. REGISTRATION OF A FRANCHISE BY A STATE DOES NOT MEAN THAT THE STATE RECOMMENDS THE FRANCHISE OR HAS VERIFIED THE INFORMATION IN THIS DISCLOSURE DOCUMENT.

Call the state franchise administrator listed in Exhibit A for information about the franchisor or about franchising in your state.

MANY FRANCHISE AGREEMENTS DO NOT ALLOW YOU TO RENEW UNCONDITIONALLY AFTER THE INITIAL TERM EXPIRES. YOU MAY HAVE TO SIGN A NEW AGREEMENT WITH DIFFERENT TERMS AND CONDITIONS IN ORDER TO CONTINUE TO OPERATE YOUR BUSINESS. BEFORE YOU BUY, CONSIDER WHAT RIGHTS YOU HAVE TO RENEW YOUR FRANCHISE, IF ANY, AND WHAT TERMS YOU MIGHT HAVE TO ACCEPT TO RENEW.

Please consider the following RISK FACTORS before you buy this franchise:

1.    THE FRANCHISE AGREEMENT REQUIRES YOU TO RESOLVE DISPUTES WITH US BY ARBITRATION ONLY IN WASHINGTON. OUT-OF-STATE ARBITRATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES. IT MAY ALSO COST YOU MORE TO ARBITRATE WITH US IN WASHINGTON THAN IN YOUR OWN STATE.

2.    THE FRANCHISE AGREEMENT STATES THAT WASHINGTON LAW GOVERNS THE AGREEMENT, AND THIS LAW MAY NOT PROVIDE THE SAME PROTECTIONS AND BENEFITS AS LOCAL LAW. YOU MAY WANT TO COMPARE THESE LAWS.

3.    THERE MAY BE OTHER RISKS CONCERNING THIS FRANCHISE.

We may use the services of one or more FRANCHISE BROKERS or referral sources to assist us in selling our franchise. A franchise broker or referral source represents us, not you. We pay this person a fee for selling our franchise or referring you to us. You should be sure to do your own investigation of the franchise.

Effective Date: See the next page for state effective dates.

WaterStation FDD 2017

1799 Bender00000506

## STATE EFFECTIVE DATES

The following chart lists states which require that this disclosure document be registered or filed with the state or be exempt from registration. In these states, the effective date of this disclosure document is as follows:

| State | Effective Date |
|---|---|
| California | |
| Hawaii | |
| Illinois | |
| Indiana | |
| Maryland | |
| Michigan | |
| Minnesota | |
| New York | |
| North Dakota | |
| Rhode Island | |
| South Dakota | |
| Virginia | |
| Washington | |
| Wisconsin | |

In the following states, we have filed a notice of exemption from the registration or filing requirements of the state's business opportunity laws with respect to the offering described in this disclosure document:

| State | Effective Date |
|---|---|
| Connecticut* | |
| Florida | |
| Kentucky* | |
| Nebraska* | |
| Texas* | |
| Utah | |

\* One-time filing

iii

1799 Bender00000507

**(THE FOLLOWING APPLIES TO TRANSACTIONS GOVERNED BY
THE MICHIGAN FRANCHISE INVESTMENT LAW ONLY)**

THE STATE OF MICHIGAN PROHIBITS CERTAIN UNFAIR PROVISIONS THAT
ARE SOMETIMES IN FRANCHISE DOCUMENTS. IF ANY OF THE FOLLOWING
PROVISIONS ARE IN THESE FRANCHISE DOCUMENTS, THE PROVISIONS ARE VOID
AND CANNOT BE ENFORCED AGAINST YOU.

Each of the following provisions is void and unenforceable if contained in any documents
relating to a franchise:

(a)     A prohibition on the right of a franchisee to join an association of franchisees.

(b)     A requirement that a franchisee assent to a release, assignment, novation, waiver,
or estoppel which deprives a franchisee of rights and protection provided in this act. This shall
not preclude a franchisee, after entering into a franchise agreement, from settling any and all
claims.

(c)     A provision that permits a franchisor to terminate a franchise prior to the
expiration of its term except for good cause. Good cause shall include the failure of the
franchisee to comply with any lawful provision of the franchise agreement and to cure such
failure after being given written notice thereof and a reasonable opportunity, which in no event
need be more than 30 days, to cure such failure.

(d)     A provision that permits a franchisor to refuse to renew a franchise without fairly
compensating the franchisee by repurchase or other means for the fair market value at the time of
expiration of the franchisee's inventory, supplies, equipment, fixtures, and furnishings.
Personalized materials which have no value to the franchisor and inventory, supplies, equipment,
fixtures, and furnishings not reasonably required in the conduct of the franchise business are not
subject to compensation. This subsection applies only if: (i) the term of the franchise is less than
5 years and (ii) the franchisee is prohibited by the franchise or other agreement from continuing
to conduct substantially the same business under another trademark, service mark, trade name,
logotype, advertising, or other commercial symbol in the same area subsequent to the expiration
of the franchise or the franchisee does not receive at least 6 months advance notice of
franchisor's intent not to renew the franchise.

(e)     A provision that permits the franchisor to refuse to renew a franchise on terms
generally available to other franchisees of the same class or type under similar circumstances.
This section does not require a renewal provision.

(f)     A provision requiring that arbitration or litigation be conducted outside this state.
This shall not preclude the franchisee from entering into an agreement, at the time of arbitration,
to conduct arbitration at a location outside this state.

(g)     A provision which permits a franchisor to refuse to permit a transfer of ownership
of a franchise, except for good cause. This subdivision does not prevent a franchisor from
exercising a right of first refusal to purchase the franchise. Good cause shall include, but is not
limited to:

iv

1799 Bender00000508

(i)     The failure of the proposed transferee to meet the franchisor's then-current reasonable qualifications or standards.

(ii)    The fact that the proposed transferee is a competitor of the franchisor or sub-franchisor.

(iii)   The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

(iv)    The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

(h)     A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor. This subdivision does not prohibit a provision that grants to a franchisor a right of first refusal to purchase the assets of a franchise on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in the manner provided in subdivision (c).

(i)     A provision which permits the franchisor to directly or indirectly convey, assign, or otherwise transfer its obligations to fulfill contractual obligations to the franchisee unless provision has been made for providing the required contractual services.

If the franchisor's most recent financial statements are unaudited and show a net worth of less than $100,000, the franchisee may request the franchisor to arrange for the escrow of initial investment and other funds paid by the franchisee until the obligations, if any, of the franchisor to provide real estate, improvements, equipment, inventory, training or other items included in the franchise offering are fulfilled. At the option of the franchisor, a surety bond may be provided in place of escrow.

THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION, OR ENDORSEMENT BY THE ATTORNEY GENERAL.

Any questions regarding this notice should be directed to:

State of Michigan Department of Attorney General
G. Mennen Williams Building, 7th Floor
525 W. Ottawa Street
Lansing, Michigan 48909
Telephone Number: (517) 373 7117

v

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 161 of 332

1799 Bender00000509

# TABLE OF CONTENTS

| Item | Page |
|------|------|

Item 1 THE FRANCHISOR AND ANY PARENTS, PREDECESSORS, AND AFFILIATES... 1
Item 2 BUSINESS EXPERIENCE ................................................................................ 2
Item 3 LITIGATION ................................................................................................... 3
Item 4 BANKRUPTCY ............................................................................................... 3
Item 5 INITIAL FEES ............................................................................................... 3
Item 6 OTHER FEES................................................................................................. 4
Item 7 ESTIMATED INITIAL INVESTMENT ........................................................ 8
Item 8 RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES............................ 10
Item 9 FRANCHISEE'S OBLIGATIONS ................................................................. 13
Item 10 FINANCING ................................................................................................. 14
Item 11 FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS, AND TRAINING ................................................................................................ 14
Item 12 TERRITORY................................................................................................. 19
Item 13 TRADEMARKS............................................................................................. 20
Item 14 PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION.......................... 21
Item 15 OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE FRANCHISE BUSINESS ................................................................................ 23
Item 16 RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL................................. 23
Item 17 RENEWAL, TERMINATION, TRANSFER, AND DISPUTE RESOLUTION .......... 24
Item 18 PUBLIC FIGURES ....................................................................................... 27
Item 19 FINANCIAL PERFORMANCE REPRESENTATIONS ............................... 27
Item 20 OUTLETS AND FRANCHISEE INFORMATION ..................................... 29
Item 21 FINANCIAL STATEMENTS....................................................................... 32
Item 22 CONTRACTS ............................................................................................... 32
Item 23 RECEIPTS..................................................................................................... 32

## EXHIBITS

A. State Administrators and Agents for Service of Process
B. Franchise Agreement (with Guaranty and Non-Compete Agreement)
C. Management Agreement
D. Form of General Release
E. Financial Statements
F. Operating Manual Table of Contents
G. Current and Former Franchisees
H. State Addenda to Disclosure Document
I. State Addenda to Franchise Agreement
Receipt (2 copies)

WaterStation FDD 2017

1799 Bender00000510

# Item 1
# THE FRANCHISOR AND ANY PARENTS, PREDECESSORS, AND AFFILIATES

In this disclosure document, "we", "us," or "our" refers to WST Franchise Systems LLC. "You" means the person or entity to whom we grant a franchise. If you are a corporation, limited liability company, or other entity, each owner of the franchise entity must sign our Guaranty and Non-Compete Agreement, which means that all of the franchise agreement's provisions also will apply to your owners.

Our Company

Our name is WST Franchise Systems LLC. Our principal business address is 2732 Grand Avenue Suite 122, Everett, WA 98201. We do not have any parent entities. We do not have any affiliates that offer franchises in any line of business. You will purchase WaterStation vending machines from our affiliate, Creative Technologies, LLC, d/b/a WaterStation Technology. It has the same business address as us. If you choose to our "passive management" model, then our affiliate WaterStation Management, LLC ("WaterStation Management") will provide management services to your business. It has the same business address as us. We do not have any other affiliates which provide products or services to our franchisees.

We do not have any predecessors.

We use the names "WST Franchise Systems LLC" and "WaterStation Technology". We do not intend to use any other names to conduct business.

Our agent for service of process in Washington is Ryan Wear, and the agent's principal business address is 2732 Grand Avenue Suite 122, Everett, WA 98201. Our agents for service of process in other states are disclosed in Exhibit A.

We are a Washington limited liability company. We were formed on February 15, 2017.

We do not operate businesses of the type being franchised, but our affiliate does.

We do not have any other business activities. We have not offered franchises in other lines of business.

The Franchise

If you sign a franchise agreement with us, you purchase WaterStation vending machines from our affiliate, place them in appropriate retail locations, and manage and service the machines. Our line of self-serve WaterStation machines purify water to the highest standard and percolate it through a series of natural minerals to create a virtual spring water with electrolytes and an alkaline pH. Our mission is to provide individuals, towns, cities and whole nations with a healthier and less expensive drinking water delivered through more responsible purification systems that do not damage the environment.

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 163 of 332

1799 Bender00000511

You will either manage the business yourself (our "active owner model") or engage our affiliate WaterStation Management LLC to manage your business (our "passive owner model"). If you have our affiliate manage your business, you will sign a Management Agreement in the form attached as Exhibit C.

<u>The Market and Competition</u>

The market for mineral waters is well developed and competitive. Sales are not seasonal. You will compete against other companies offering products through vending machines in general, and also compete against other companies offering mineral water. There are some competitors that offer mineral water through vending machines. Our largest competitor has approximately 20% of the market.

<u>Laws and Regulations</u>

In some states, our water vending machines must be approved by the state before they can be offered. WaterStation machines are currently approved in California and Washington. In each state where approval is required, we will obtain the state approval for our machines prior to offering a franchise.

In some states, there are specific laws and regulations that apply to operators of beverage vending machines. Under these laws and regulations, you may be required to obtain a particular license, maintain certain records, submit certain reports and information to the state, and to comply with applicable health and safety standards. You are responsible for complying with the laws and regulations where you place your WaterStation machines.

<u>Prior Business Experience</u>

We have offered franchises since 2017.

None of our affiliates have offered franchises in other lines of business.

Our affiliate, Creative Technologies, LLC was formed in 2013 to develop and market WaterStation machines. It began selling WaterStation machines in 2013. You will purchase your WaterStation machines from this company. Creative Technologies, LLC has also operated a business similar to the type you will operate since 2013. It operates in Washington, Oregon, Nevada, California, and Arizona.

If you choose to our "passive owner model" franchise, then our affiliate WaterStation Management, LLC will provide management services to your business.

**Item 2**
**BUSINESS EXPERIENCE**

The following people are our directors, trustees, general partners, principal officers, and any other individuals who will have management responsibility relating to the sale or operation of franchises offered by this document:

2

1799 Bender00000512

**Ryan Wear – Managing Member.** Ryan Wear has been our Managing Member since our formation in February 2017, and Managing Member of Creative Technologies LLC, d/b/a WaterStation Technology, since June 2013, in Everett, WA. He has also been Managing Member of Summit Management, LLC in Everett, WA since May 2005.

**Nickolas Streeter – Director of Product Development.** Nickolas Streeter has been Director of Product Development for us since our formation in February 2017 for Creative Technologies LLC, d/b/a WaterStation Technology, since June 2013, in Everett, WA. He has also been Owner/Operator of VendPro, LLC in Everett, WA since May 2010.

**Bryce Froberg – Director of Business Development.** Bryce Froberg has been Director of Business Development for us and for Creative Technologies LLC, d/b/a WaterStation Technology, in Everett, WA, since February 2017. He was Owner of The Flying Locksmiths in Seattle, WA from January 2016 to February 2017. He was Merchandising Manager for Sound Beverage Distributors in Bellingham, WA from June 2011 to August 2013.

**Tawnya Bjorkquist – Administration and HR Support.** Tawnya Bjorkquist has been responsible for Administration and HR Support for Creative Technologies LLC, d/b/a WaterStation Technology since March 2014 in Everett, WA. From April 2012 until March 2014, she was Legal Assistant to James R Walsh Attorney at Law, in Lynwood, WA.

<div align="center">

**Item 3**
**LITIGATION**

</div>

No litigation is required to be disclosed in this Item.

<div align="center">

**Item 4**
**BANKRUPTCY**

</div>

No bankruptcy information is required to be disclosed in this Item.

<div align="center">

**Item 5**
**INITIAL FEES**

</div>

Franchise Fee

If you purchase the "active owner model" franchise, you must pay us $25,000 as the initial franchise fee when you sign your franchise agreement. If you purchase a "passive owner model" franchise, you do not pay us an initial franchise fee. Otherwise, this fee is uniform.

If (1) you fail to complete the initial training program to our satisfaction, or (2) we conclude, no more than 10 days after you complete the initial training program, that you do not have the ability to satisfactorily operate your franchise, then we have the right to terminate your franchise agreement. If we do so, we will refund your franchise fee less any out-of-pocket costs we have incurred, subject to your signing a general release of our liability. Otherwise, the franchise fee is not refundable.

<div align="center">3</div>

WaterStation FDD 2017

1799 Bender00000513

WaterStation Machines

When you start your business, you must order at least six WaterStation machines from WaterStation Technology. We currently offer two types of vending machines to franchisees:

WST-700: The WST-700 is a state-of-the-art water dispensing system that purifies drinking water to a very high standard and percolates it through layers of natural minerals to produce a soft, silky alkaline mineral water in one, three and five gallon increments.

WST-600: The WST-600 delivers alkaline mineral water in a single-serve portion allowing the consumer to fill their favorite reusable cup or sports bottle.

The WaterStation machines range in price from $7,500 to $15,700 each. You pay 50% upon signing and 50% prior to shipping. At your option, you may either take shipment of all of your machines directly, or we can hold your machines until you have locations secured with customers for installation. The price depends on which model you choose and which features and accessories you order. The price includes a supply of our proprietary filters.

Your initial cost of WaterStation machines will range from $22,500 (assuming 6 units at $7,500, with 50% paid after you open for business) to $314,500 (assuming 20 units at $15,700 each, paid in full before you open for business).

You will also order spare parts from us before you open, with an estimated cost of $1,000 to $2,000.

The cost of WaterStation machines is not refundable.

**Item 6
OTHER FEES**

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Royalty | 8% of your gross sales for "active owner" franchise; 5% of your gross sales for "passive owner" franchise | Monthly, on the 5th day of the following month | See Note 1 and Note 2. |
| Marketing Fund Contribution | Amount we determine up to 1% of your gross sales; currently none. | Monthly, on the 5th day of the following month | We have the right to start a Marketing Fund in the future. |

4

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 166 of 332

1799 Bender00000514

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Management Fee | 20% of your gross sales | Monthly, on the 5th day of the following month | Payable only if you engage WaterStation Management to manage your business, under our "passive ownership" model. See Note 2. |
| Replacement / Additional Training Fee | Currently, $500 | Prior to attending training | If you send a manager or other employee to our training program after you open, we will charge our then-current training fee. |
| Third Party Vendors | Pass-through of costs, plus reasonable administrative charge. Currently, none. | Varies | We have the right to require franchisees to use third-party vendors and suppliers that we designate. Examples can include computer support vendors, mystery shopper, and customer feedback systems. The vendors and suppliers may bill franchisees directly, or we have the right to collect payment for these vendors together with a reasonable markup or charge for administering the payment program. |
| Non-compliance fee | $250 | On demand | We may charge you $250 if your business is not in compliance with our system specifications or the franchise agreement and you fail to correct the non-compliance after 30 days' notice. Thereafter, we may charge you $250 per week until you correct such non-compliance. |
| Reimbursement | Amount that we spend on your behalf, plus 10% | Within 15 days of invoice | If we pay any amount that you owe or are required to pay to a third party, you must reimburse us. |
| Late fee | $100 plus interest on the unpaid amount at a rate equal to 18% per year (or, if such payment exceeds the maximum allowed by law, then interest at the highest rate allowed by law) | On demand | We may charge a late fee if you fail to make a required payment when due. |

5

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 167 of 332

1799 Bender00000515

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Insufficient funds fee | $50 (or, if such amount exceeds the maximum allowed by law, then the maximum allowed by law) | On demand | We may charge an insufficient funds fee if a payment made by you is returned because of insufficient funds in your account. |
| Costs of collection | Our actual costs | As incurred | Payable if we incur costs (including reasonable attorney fees) in attempting to collect amounts you owe to us. |
| Special support fee | Our then-current fee, plus our expenses. Currently, $600 per day. | On demand | If we provide in-person support to you in response to your request, we may charge this fee plus any out-of-pocket expenses (such as travel, lodging, and meals for employees providing onsite support). |
| Customer complaint resolution | Our expenses | | We may take any action we deem appropriate to resolve a customer complaint about your business. If we respond to a customer complaint, we may require you to reimburse us for our expenses. |
| Records audit | Our actual cost | On demand | Payable only if (1) we audit you because you have failed to submit required reports or other non-compliance, or (2) the audit concludes that you under-reported gross sales by more than 3% for any month. |
| Business evaluation fee | Currently $600, plus our out-of-pocket costs | On demand | Payable only if we conduct an in-person evaluation of your business because of a governmental report, customer complaint or other customer feedback, or your default or non-compliance with any system specification. |
| Non-compliance cure costs and fee | Our out-of-pocket costs and internal cost allocation, plus 10% | When billed | We may cure your non-compliance on your behalf (for example, if you do not have required insurance, we may purchase insurance for you), and you will owe our costs plus a 10% administrative fee. |

6

WaterStation FDD 2017

1799 Bender00000516

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| Transfer fee | $5,000 | When you notify us of your intent to transfer your business. | You pay us this fee when you notify us of your intent to sell your business. You must give us at least 30 days prior notice. We will refund half of this fee if you do not sell the business. |
| Indemnity | Our costs and losses from any legal action related to the operation of your franchise | On demand | You must indemnify and defend (with counsel reasonably acceptable to us) us and our affiliates against all losses in any action by or against us related to, or alleged to arise out of, the operation of your franchise (unless caused by our misconduct or negligence). |
| Prevailing party's legal costs | Our attorney fees, court costs, and other expenses of a legal proceeding, if we are the prevailing party | On demand | In any legal proceeding (including arbitration), the losing party must pay the prevailing party's attorney fees, court costs and other expenses. |

All fees are payable only to us. All fees are imposed by us and collected by us. All fees are non-refundable. All fees are uniform for all franchisees, although we reserve the right to change, waive, or eliminate fees for any one or more franchisees as we deem appropriate.

There are no marketing cooperatives, purchasing cooperatives, or other cooperatives.

Notes

1.      "Gross Sales" is defined in our franchise agreement as the total dollar amount of all sales generated through your business for a given period, including, but not limited to, payment for any services or products sold by you, whether for cash or credit. Gross Sales does not include (i) bona fide refunds to customers, (ii) sales taxes collected, (iii) sale of used equipment not in the ordinary course of business, or (iv) sales of prepaid cards or similar products (but the redemption of any such card or product will be included in Gross Sales).

2.      If our affiliate WaterStation Management manages your franchise pursuant to a Management Agreement in the form attached as Exhibit C, WaterStation Management will deduct the royalty fee and other fees owed from funds it collects from your machines.

WaterStation FDD 2017

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 169 of 332

1799 Bender00000517

**Item 7**
**ESTIMATED INITIAL INVESTMENT**

**YOUR ESTIMATED INITIAL INVESTMENT – ACTIVE MODEL**

| Type of expenditure | Amount | | Method of payment | When due | To whom payment is to be made |
|---|---|---|---|---|---|
| Initial franchise fee | $25,000 | – $25,000 | Check or wire transfer | Upon signing the franchise agreement | Us |
| Rent, Utilities and Leasehold Improvements (see Note 2) | $0 | – $2,000 | Check | Upon signing lease | Landlord, utility companies, contractors |
| Market Introduction Program | $2,000 | – $6,000 | Check, debit, and/or credit | As incurred or when billed | Vendors and suppliers |
| WaterStation Machines | $22,500 | – $314,500 | Check or wire transfer | 50% upon ordering; 50% before shipping | Creative Technologies, LLC |
| Spare Parts Inventory | $1,000 | – $2,000 | Check or wire transfer | Upon ordering | Creative Technologies, LLC |
| Computer Systems | $500 | – $1,500 | Check, debit, and/or credit | As incurred | Vendors and suppliers |
| Insurance | $1,000 | – $4,000 | Check | Upon ordering | Insurance company |
| Vehicle Wrap (see Note 3) | $0 | – $4,000 | Check | Upon purchase | Vendor |
| Office Expenses | $1,000 | – $2,000 | Check, debit, and/or credit | As incurred | Vendors |
| Licenses and Permits | $100 | – $500 | Check | Upon application | Government |
| Professional Fees (lawyer, accountant, etc.) | $500 | – $3,000 | Check, debit, and/or credit | As incurred or when billed | Professional service firms |
| Travel, lodging and meals for initial training (see Note 4) | $1,000 | – $4,000 | Cash, debit or credit | As incurred | Airlines, hotels, and restaurants |
| Additional funds (for first 3 months) (see Note 5) | $15,000 | – $25,000 | Varies | Varies | Employees, suppliers |

8

1799 Bender00000518

| Type of expenditure | Amount | Method of payment | When due | To whom payment is to be made |
|---|---|---|---|---|
| Total | $69,600 - $393,500 | | | |

Notes

1.　　The initial franchise fee is refundable only as described in Item 5. If you lease a location, then your lease security deposit and utility deposits will usually be refundable unless you owe money to the landlord or utility provider. None of the other expenditures in this table will be refundable. Neither we nor any affiliate finances any part of your initial investment.

2.　　We estimate the low end of real property, leasehold improvements, and utilities at zero because we expect you will open as a home-based business. However, you may desire to have a professional office space. If you are storing WaterStation Machines (rather than having us ship directly to the installation location), you may desire a warehouse space.

3.　　We recommend you have a vehicle wrapped with our brand décor, but we do not require you do so. You will need a vehicle in order to service your WaterStation machines. We assume you have already have a personal vehicle that you can use for this purpose.

4.　　This does not include salary or compensation paid to your employees to attend training, if any.

5.　　This includes any other required expenses you will incur before operations begin and during the initial period of operations, such as payroll, additional inventory, and other operating expenses in excess of income generated by the business. In formulating the amount required for additional funds, we relied on the following factors, basis, and experience: the development of a WaterStation business by our affiliate, and our general knowledge of the industry.

**YOUR ESTIMATED INITIAL INVESTMENT**

| Type of expenditure | Amount | Method of payment | When due | To whom payment is to be made |
|---|---|---|---|---|
| Initial franchise fee | $0 - $0 | Check or wire transfer | Upon signing the franchise agreement | Us |
| Rent, Utilities and Leasehold Improvements (see Note 2) | $0 - $0 | N/A | N/A | N/A |

WaterStation FDD 2017

1799 Bender00000519

| Type of expenditure | Amount | | Method of payment | When due | To whom payment is to be made |
|---|---|---|---|---|---|
| WaterStation Machines | $22,500 | $314,500 | Check or wire transfer | 50% upon ordering; 50% before shipping | Creative Technologies, LLC |
| Computer Systems | $0 | $2,500 | Check, debit, and/or credit | As incurred | Vendors and suppliers |
| Insurance | $1,000 | $4,000 | Check | Upon ordering | Insurance company |
| Licenses and Permits | $100 | $500 | Check | Upon application | Government |
| Professional Fees (lawyer, accountant, etc.) | $0 | $3,000 | Check, debit, and/or credit | As incurred or when billed | Professional service firms |
| Travel, lodging and meals for initial training | $0 | $0 | Cash, debit or credit | As incurred | Airlines, hotels, and restaurants |
| Additional funds (for first 3 months) (see Note 3) | $0 | $0 | Varies | Varies | |
| Total | $23,600 | $324,500 | | | |

Notes

      1.    None of the other expenditures in this table will be refundable. Neither we nor any affiliate finances any part of your initial investment.

      2.    We estimate the real property, leasehold improvements, and utilities at zero because we expect you will open as a home-based business.

      3.    If you purchase a "passive owner model" franchise, we do not expect you to incur any additional costs in excess of income generated by the business. In formulating the amount required for additional funds, we relied on the following factors, basis, and experience: the structure of our Management Agreement, and our general knowledge of the industry.

## Item 8
## RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES

Generally

      We have the right to require you to purchase or lease all goods, services, supplies, fixtures, equipment, inventory, computer hardware and software, real estate, or comparable items related to establishing or operating your business (1) either from us or our designee, or from suppliers approved by us, or (2) according to our specifications.

10

1799 Bender00000520

(1)      <u>Specific Obligations</u>

The following are our current specific obligations for purchases and leases:

A.     <u>WaterStation Machines</u>. You purchase WaterStation vending machines from our affiliate, Creative Technologies, LLC. It currently offer two types of vending machines to franchisees:

WST-700: The WST-700 is a state-of-the-art water dispensing system that purifies drinking water to a very high standard and percolates it through layers of natural minerals to produce a soft, silky alkaline mineral water in one, three and five gallon increments.

WST-600: The WST-600 delivers alkaline mineral water in a single-serve portion allowing the consumer to fill their favorite reusable cup or sports bottle.

B.     <u>WaterStation Filters and Spare Parts</u>. You purchase WaterStation filters and spare parts from our affiliate, Creative Technologies, LLC.

C.     <u>Insurance</u>. You must obtain insurance as described in the Franchise Agreement and in our Manual, which includes (i) Commercial General Liability insurance, including products liability coverage, and broad form commercial liability coverage, written on an "occurrence" policy form in an amount of not less than $1,000,000 single limit per occurrence and $2,000,000 aggregate limit, (ii) Business Automobile Liability insurance including owned, leased, non-owned and hired automobiles coverage in an amount of not less than $1,000,000, and (iii) Workers Compensation coverage as required by state law. Your insurance policies must add us and our affiliates as additional insured.

D.     <u>Computer software and hardware</u>. You must purchase and use the computer software and hardware that we specify. See Item 11 for more details.

(2)      <u>Us or our Affiliates as Supplier</u>

As described above, our affiliate Creative Technology LLC is the sole supplier of WaterStation machines and parts.

(3)      <u>Ownership of Suppliers</u>

Creative Technology LLC has the same ownership as us.

(4)      <u>Alternative Suppliers</u>

We do not permit you to use any supplier other than us and our affiliates for WaterStation machines, filters, and parts.

If there are any other suppliers that we require, and if you want to use a supplier that is not on our list of approved suppliers, you must request our approval in writing. We will grant or revoke approvals of suppliers based on criteria appropriate to the situation, which may include

11

1799 Bender00000521

evaluations of the supplier's capacity, quality, financial stability, reputation, and reliability; inspections, product testing, and performance reviews. Our criteria for approving suppliers are not available to you. We permit you to contract with alternative suppliers who meet our criteria only if you request our approval in writing, and we grant approval. There is no fee for us to review or approve an alternate supplier. We will provide you with written notification of the approval or disapproval of any supplier you propose within 30 days after receipt of your request. We may grant approvals of new suppliers or revoke past approvals of suppliers on written notice to you, or by updating our Manual.

(5)     Issuing Specifications and Standards

We issue specifications and standards to you for applicable aspects of the franchise in our Manual and/or in written directives. We may issue new specifications and standards for any aspect of our brand system, or modify existing specifications and standards, at any time by revising our Manual and/or issuing new written directives (which may be communicated to you by any method we choose). We will generally (but are not obligated to) issue new or revised specifications only after thorough testing in our headquarters and/or a limited market test using multiple WaterStation machines.

(6)     Revenue To Us and Our Affiliates

Our affiliate Creative Technologies, LLC will derive revenue from the required purchases of WaterStation machines, filters, and parts by franchisees. Our affiliate WaterStation Management will receive management fees from "passive owner model" franchises. Because we are a new franchisor, our total revenue in the prior fiscal year was $0. Our revenue from all required purchases and leases of products and services by franchisees in the prior fiscal year was $0. The percentage of our total revenues that were from required purchases or leases in the prior fiscal year was 0%.

(7)     Proportion of Required Purchases and Leases

We estimate that the required purchases and leases to establish your business will be 80 - 95% of your total purchases and leases to establish your business.

We estimate that the required purchases and leases of goods and services to operate your business will be 70 – 85% of your total purchases and leases of goods and services to operate your business.

(8)     Payments by Designated Suppliers to Us

We do not currently receive payments from any designated suppliers based on purchases by you or other franchisees. However, the franchise agreement does not prohibit us from doing so.

(9)     Purchasing or Distribution Cooperatives

No purchasing or distribution cooperative currently exists.

12

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 174 of 332

1799 Bender00000522

(10)     Negotiated Arrangements

We do not negotiate purchase arrangements with suppliers, including price terms, for the benefit of franchisees.

(11)     Benefits Provided To You For Purchases

We do not provide any material benefit to you based on your purchase of particular goods or services, or your use of particular suppliers.

## Item 9
## FRANCHISEE'S OBLIGATIONS

**This table lists your principal obligations under the franchise and other agreements. It will help you find more detailed information about your obligations in these agreements and in other items of this disclosure document.**

| Obligation | Section in agreement | Disclosure document item |
|---|---|---|
| a. Site selection and acquisition/lease | § 6.1 | Item 11 |
| b. Pre-opening purchase/leases | §§ 6.2, 6.3 | Items 5, 7, 8 and 11 |
| c. Site development and other pre-opening requirements | Article 6 | Items 5, 7, 8 and 11 |
| d. Initial and ongoing training | §§ 5.4, 6.4, 7.6 | Items 5, 6, 8 and 11 |
| e. Opening | §§ 6.5, 6.6 | Items 7, 8 and 11 |
| f. Fees | Article 4, §§ 5.5, 7.8, 10.5, 11.2, 11.3, 14.5, 15.2, 16.1, 17.6 | Items 5, 6 and 7 |
| g. Compliance with standards and policies/operating manual | §§ 6.3, 7.1, 7.3, 7.5, 7.9 – 7.13, 7.15, 10.1, 10.4, 11.1 | Items 8, 11 and 14 |
| h. Trademarks and proprietary information | Article 12, § 13.1 | Items 13 and 14 |
| i. Restrictions on products/services offered | § 7.3 | Items 8, 11 and 16 |
| j. Warranty and customer service requirements | §§ 7.7, 7.8, 7.9 | Item 8 |
| k. Territorial development and sales quotas | N/A | Item 12 |
| l. Ongoing product/service purchases | Article 8 | Items 6 and 8 |

13

| Obligation | Section in agreement | Disclosure document item |
|---|---|---|
| m. Maintenance, appearance, and remodeling requirements | §§ 7.12, 7.13 | Items 6, 7 and 8 |
| n. Insurance | § 7.15 | Items 6, 7 and 8 |
| o. Advertising | Article 9 | Items 6, 7, 8 and 11 |
| p. Indemnification | Article 16 | Items 6 and 8 |
| q. Owner's participation/management/staffing | § 2.4 | Items 15 |
| r. Records and reports | Article 10 | Item 11 |
| s. Inspections and audits | §§ 10.5, 11.2 | Items 6 and 11 |
| t. Transfer | Article 15 | Items 6 and 17 |
| u. Renewal | § 3.2 | Item 17 |
| v. Post-termination obligations | Article 13, § 14.3 | Item 17 |
| w. Non-competition covenants | § 13.2 | Item 17 |
| x. Dispute resolution | Article 17 | Items 6 and 17 |

## Item 10
## FINANCING

We do not offer direct or indirect financing. We do not guarantee your note, lease or obligations.

## Item 11
## FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS, AND TRAINING

**Except as listed below, we are not required to provide you with any assistance.**

(1)    Our Pre-Opening Obligations

Before you open your business:

A.    *Your Site.* We do not assist you in (i) locating your site and negotiating the purchase or lease of your headquarters, (ii) conforming the premises to local ordinances and building codes and obtaining any required permits for your headquarters, or (iii) constructing, remodeling, or decorating the premises.

14

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 176 of 332

1799 Bender00000524

B. *Hiring and training employees*. We will provide you with our suggested staffing levels (Section 5.2), suggested guidelines for hiring employees (Section 5.2), operational instructions in the Manual which you can use as part of training new employees (Section 5.3), and our initial training program described below. Our on-site opening support (as described below) includes assisting you in training employees. All hiring decisions and conditions of employment are your sole responsibility.

C. *Necessary equipment, signs, fixtures, opening inventory, and supplies*. We will provide you a list of our specifications and approved suppliers for equipment, signs, fixtures, opening inventory, and supplies necessary to open your business. (Section 5.4) Our affiliate Creative Technologies, LLC is the sole vendor of WaterStation machines and WaterStation spare parts inventory and supplies. Creative Technologies, LLC will deliver these items to you or the location reserved for the machine. It does not install the machines, inventory or supplies.

D. *Operating Manual*. We will give you access to our Operating Manual (Section 5.1).

E. *Initial Training Program.* We will conduct our initial training program. (Section 5.4). The current initial training program is described below. You do not need to attend our training program if you have a "passive owner model" franchise.

F. *Business plan review*. If you request, we will review your pre-opening business plan and financial projections. (Section 5.4).

G. *Market introduction plan*. We will advise you regarding the planning and execution of your market introduction plan. (Section 5.4). This does not apply if you have a "passive owner model" franchise.

H. *On-site opening support.* If you request, we will have a representative provide on-site support for at least one or two days in connection with your business opening. (Section 5.4). This does not apply if you have a "passive owner model" franchise.

(2)     Length of Time To Open

The typical length of time between signing the franchise agreement and the opening of your business is 30-45 days. Factors that may affect the time period include your ability to obtain financing, obtain business permits and licenses, schedule initial training, and hire employees, and the availability of WaterStation machines from our affiliate. If you have a "passive owner model" franchise, the only factor that affects the time period is the availability of WaterStation machines from our affiliate.

(3)     Our Post-Opening Obligations

After you open your business:

A. *Developing products or services you will offer to your customers*. Although it is our intent and practice to refine and develop WaterStation machines, the franchise agreement does not obligate us to do so.

WaterStation FDD 2017

1799 Bender00000525

B. *Hiring and training employees*. We will provide you with our suggested staffing levels (Section 5.2), suggested guidelines for hiring employees (Section 5.2), and operational instructions in the Manual which you can use as part of training new employees (Section 5.3). All hiring decisions and conditions of employment are your sole responsibility.

C. *Improving and developing your business; resolving operating problems you encounter.* If you request, we will provide advice to you (by telephone or electronic communication) regarding improving and developing your business, and resolving operating problems you encounter, to the extent we deem reasonable. If we provide in-person support in response to your request, we may charge a fee (currently $600 per day) plus any out-of-pocket expenses (such as travel, lodging, and meals for our employees providing onsite support). (Section 5.5).

D. *Establishing prices*. Upon your request, we will provide recommended prices for products and services. (Section 5.5)

E. *Establishing and using administrative, bookkeeping, accounting, and inventory control procedures.* We will provide you our recommended procedures for administration, bookkeeping, accounting, and inventory control. (Section 5.5). We may make any such procedures part of required (and not merely recommended) procedures for our system.

F. *Marketing Fund*. We will administer the Marketing Fund. (Section 5.5).

G. *Website*. We will maintain a website for the WaterStation brand, which will include your business information and telephone number. (Section 5.5)

H. *Management Services*. If you have a "passive owner model" franchise, you will sign a Management Agreement with our affiliate, WaterStation Management LLC, under which our affiliate will:

(i) identify and obtain locations for the machines;

(ii) deliver, setup, and install machines;

(iii) operate, inspect, service, repair, and maintain the machines;

(iv) collect funds from the machines;

(v) provide monthly reports to you, summarizing sales, revenues, and other business metrics;

(vi) manage the relationship with the lessor of space each machine, including remitting any payments to the lessor;

(vi) remit funds owed to us under the Franchise Agreement;

(vii) relocate a machine if WaterStation Management deems appropriate; and

16

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 178 of 332

1799 Bender00000526

(vii)    remove the machine from a location when WaterStation Management deems appropriate or when the location is no longer available (Section 1 of Management Agreement).

<u>(4)    Advertising</u>

(i)    *Our obligation*. We do not currently have a Marketing Fund. If we form one, we will use it only for marketing and related purposes and costs. Media coverage is primarily local. We use outside vendors and consultants to produce advertising. We are not required to spend any amount of advertising in the area or territory where any particular franchisee is located. We will maintain the brand website (which will be paid for by the Marketing Fund). We have no other obligation to conduct advertising.

(ii)    *Your own advertising material*. You may use your own advertising or marketing material only with our approval. To obtain our approval, you must submit any proposed advertising or marketing material at least 14 days prior to use. If we do not respond, the material is deemed rejected. If you develop any advertising or marketing materials, we may use those materials for any purpose, without any payment to you.

(iii)    *Advertising council*. We do not have an advertising council composed of franchisees. The franchise agreement does not give us the power to form an advertising council.

(iv)    *Local or Regional Advertising Cooperatives.* We do not currently have any local or regional advertising cooperatives. We do not have the right to require you to participate in a local or regional advertising cooperative.

(v)    *Advertising Fund*. If we form a Marketing Fund, then you and all other franchisees must contribute to our Marketing Fund. Your contribution is 1% of gross sales per month. All franchisees contribute the same percentage. Any outlets operated by us or our affiliates are not obligated to contribute to the Marketing Fund on the same basis. We administer the fund. The fund is not audited. We will make unaudited annual financial statements available to you upon request. We did not spend any money from the Marketing Fund in our most recently concluded fiscal year. If not all marketing funds are spent in the fiscal year in which they accrue, the money will remain in the Marketing Fund to be spent in the next year. No money from the Marketing Fund is spent principally to solicit new franchise sales.

(vi)    *Market introduction plan.* You must develop a market introduction plan and obtain our approval of the plan before you open for business. This does not apply if you have a "passive owner model" franchise.

<u>(5)    Computer Systems</u>

We require you to purchase either "Parlevel" vending management software from Parlevel Systems or "ePort Connect" vending management software from USA Technologies. These systems generate or store data such as location, route, sales, payment, location information, and operation alerts. You will also need an office computer (desktop or laptop) with typical office software such as email, word processing, spreadsheets, et cetera.

17

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 179 of 332

1799 Bender00000527

We estimate that your computer will cost approximately $1,000 to purchase. You may use your existing personal computer instead of buying a separate computer for the business. ePort Connect and Parlevel are approximately $15 per month per vending machine.

We are not obligated to provide any ongoing maintenance, repairs, upgrades, or updates. We do not require you to enter into any such contract with a third party (other than your ongoing subscriptions for Parlevel or ePort).

You must upgrade or update any system when we determine. There is no contractual limit on the frequency or cost of this obligation.

We estimate that the annual cost of any optional or required maintenance, updating, upgrading, or support contracts will be $100 to $2,000 per year.

You must give us independent access to the information that will be generated or stored in these systems. The information that we may access will include sales, location data, and reports. There is no contractual limitation on our right to access the information.

(6)     Operating Manual

See Exhibit F for the table of contents of our Operating Manual as of the date this disclosure document, with the number of pages devoted to each subject and the total number of pages in the Operating Manual.

(7)     Training Program

Our training program consists of the following:

### TRAINING PROGRAM

| Subject | Hours of Classroom Training | Hours of On-The-Job Training | Location |
|---|---|---|---|
| REPORTING | 2 | - | Everett, WA |
| FILTER CHANGING | 2 | - | Everett, WA |
| PLACEMENT | 2-3 | - | Everett, WA |
| SALES | 4-5 | - | Everett, WA |
| TROUBLESHOOTING | 1 | - | Everett, WA |
| TOTALS: | 11 – 13 | - | |

Training classes will be scheduled in accordance with the needs of new franchisees. We anticipate holding training class once per month. Training will be held at our offices and business location in Everett, Washington.

18

The instructional materials consist of the Operating Manual and other materials, lectures, discussions, and demonstration and practice with WaterStation machines.

Training classes will be led by the following people: Royce Davenport will provide most operational training. Nickolas Streeter will provide sales training. Bryce Froberg will provide reporting and additional operation training.

Nick Streeter has 3 years of experience with us and our affiliates, and 15 years of experience in our industry. Royce Davenport has 3 years of experience with us and our affiliates, and 4 years of experience in our industry. Bryce Froberg has less than 1 year of experience with us and our affiliates, and in our industry.

There is no fee for up to four people to attend training. You must pay the travel and living expenses of people attending training.

Unless you purchase a "passive owner model" franchise, you must attend training. You may send any additional persons to training that you want (up to the maximum described above). You must complete training to our satisfaction at least one week before opening your business.

We do not currently require additional training programs or refresher courses, but we have the right to do so.

## Item 12
## TERRITORY

(1)      Your Location

We anticipate that you will manage your business from your home or from a small office setting. You might also need a storage or warehouse space for WaterStation machines that you have not deployed.

(2)      Grant of Territory

We do not grant you a territory.

(3)      Relocation; Establishment of Additional Outlets

You may relocate your business headquarters, as long as you give us prior written notice. You do not have the right to establish additional franchised outlets

(4)      Options to Acquire Additional Franchises

You do not receive any options, rights of first refusal, or similar rights to acquire additional franchises.

19

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 181 of 332
1799 Bender00000529

<u>(5)    Exclusivity</u>

You will not receive an exclusive territory. You may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control.

<u>(6)    Other</u>

There are no restrictions on us from soliciting or accepting orders anywhere. If we do so, we do not pay any compensation to you. We may use any channel of distribution (such as the Internet, catalog sales, telemarketing, or other direct marketing sales), to make sales anywhere using our principal trademarks. We have not used other channels of distribution to make sales under other trademarks, but we reserve the right to do so.

You may solicit customers anywhere in the United States. However, we reserve the right to create exclusive territories in the future in which you cannot solicit or service customers.

Neither we nor any of our affiliates operates, franchises, or has plans to operate or franchise a business under a different trademark selling goods or services similar to those you will offer. However, the franchise agreement does not prohibit us from doing so.

## Item 13
## TRADEMARKS

<u>(1) – (4)    Principal Trademark</u>

The following is the principal trademark that we license to you. This trademark is owned by Creative Technologies, LLC, dba WaterStation Technology, LLC. It is registered on the Supplemental Register of the United States Patent and Trademark Office.

| Trademark | Registration Date | Registration Number |
|---|---|---|
| WaterStation Technology | September 1, 2015 | 4805763 |

Because no federal registration is at least five years old, no Section 8 or 15 affidavits have been filed and the trademark above is not incontestable. The trademark has not yet been renewed.

<u>(5)    Determinations</u>

There are no currently effective material determinations of the United States Patent and Trademark Office, the Trademark Trial and Appeal Board, or any state trademark administrator or court. There are no pending infringement, opposition, or cancellation proceedings.

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 182 of 332

1799 Bender00000530

(6)     Litigation

There is no pending material federal or state court litigation regarding our use or ownership rights in a trademark.

(7)     Agreements

Creative Technologies, LLC, our affiliate, owns the trademarks described in this Item. Under an Intercompany License Agreement between us and Creative Technologies, LLC, we have been granted the exclusive right to sublicense the trademarks to franchisees throughout the United States. The agreement is of perpetual duration. It may be modified only by mutual consent of the parties. It may be canceled by our affiliate only if (1) we materially misuse the trademarks and fail to correct the misuse, or (2) we discontinue commercial use of the trademarks for a continuous period of more than one year. The Intercompany License Agreement specifies that if it is ever terminated, your franchise rights will remain unaffected.

(8)     Protection of Rights

We protect your right to use the principal trademarks listed in this Item, and protect you against claims of infringement or unfair competition arising out of your use of the trademarks, to the extent described in this section.

The franchise agreement obligates you to notify us of the use of, or claims of rights to, a trademark identical to or confusingly similar to a trademark licensed to you. The franchise agreement does not require us to take affirmative action when notified of these uses or claims. We have the right to control any administrative proceedings or litigation involving a trademark licensed by us to you.

If you use our trademarks in accordance with the franchise agreement, then (i) we will defend you (at our expense) against any legal action by a third party alleging infringement by your use of the trademark, and (ii) we will indemnify you for expenses and damages if the legal action is resolved unfavorably to you.

Under the franchise agreement, we may require you to modify or discontinue using a trademark, at your expense.

(9)     Superior Prior Rights and Infringing Uses

We do not know of either superior prior rights or infringing uses that could materially affect your use of the principal trademarks.

## Item 14
## PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION

Patents and Copyrights

We do not own rights in, or licenses to, patents that are material to the franchise.

21

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 183 of 332

1799 Bender00000531

Our Director of Product Development, Nickolas Streeter, has a pending patent, application number 62,303,814, filed March 3, 2016, titled "Water Vending Machines".

There are no currently effective determinations of the United States Patent and Trademark Office or any court regarding the pending patent. There are no proceedings pending in the United States Patent and Trademark Office or any court regarding the pending patent.

All of our original works of authorship fixed in a tangible medium of expression are automatically protected under the U.S. Copyright Act, whether or not we have obtained registrations. This includes our Operating Manual as well as all other sales, training, management and other materials that we have created or will create. You may use these copyrighted materials during the term of the franchise, in a manner consistent with our ownership rights, solely for your franchised business.

We do not have any registered copyrights. There are no pending copyright applications for our copyrighted materials. There are no currently effective determinations of the U.S. Copyright Office (Library of Congress) or any court regarding any copyright.

There are no agreements currently in effect that limit our right to use or license the use of our copyrighted materials or the pending patent.

We have no obligation to protect any of our copyrights or patents or to defend you against claims arising from your use of copyrighted or patented items. The franchise agreement does not require us to take affirmative action when notified of copyright or patent infringement. We control any copyright or patent litigation. We are not required to participate in the defense of a franchisee or indemnify a franchisee for expenses or damages in a proceeding involving a copyright or patent licensed to the franchisee. We may require you to modify or discontinue using the subject matter covered by any of our copyrights or patents.

We do not know of any copyright or patent infringement that could materially affect you.

(7)     Proprietary Information

We have a proprietary, confidential Operating Manual and related materials that include guidelines, standards and policies for the development and operation of your business. We also claim proprietary rights in other confidential information or trade secrets that include all methods for developing and operating the business, and all non-public plans, data, financial information, processes, vendor pricing, supply systems, marketing systems, formulas, techniques, designs, layouts, operating procedures, customer data, information and know-how.

You (and your owners, if the franchise is owned by an entity) must protect the confidentiality of our Operating Manual and other proprietary information, and use our confidential information only for your franchised business. We may require your managers and key employees to sign confidentiality agreements.

22

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 184 of 332

1799 Bender00000532

# Item 15
## OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE FRANCHISE BUSINESS

(1)     Your Participation

You are required to participate personally in the direct operation of your business.

If you are the sole owner of the business, then you are deemed the "Principal Executive". If the business is owned through a corporation or limited liability company, you must designate one person as your "Principal Executive". The Principal Executive is the executive primarily responsible for your business and has decision-making authority on behalf of the business. The Principal Executive must own at least 10% of the business. The Principal Executive must complete our initial training program. The Principal Executive must complete any post-opening training programs that we develop in the future. The Principal Executive must make reasonable efforts to attend all in-person meetings and remote meetings (such as telephone conference calls), including regional or national brand conferences, that we require. The Principal Executive cannot fail to attend more than three consecutive required meetings.

If your business is owned by an entity, all owners of the business must sign our Guaranty and Non-Compete Agreement (see Attachment 2 to Exhibit B).

(2)     "On-Premises" Supervision

When your business performs services for a customer, you are not required to personally conduct "on-premises" supervision of your business. However, we recommend on-premises supervision by you.

There is no limit on who you can hire as an on-premises supervisor. The general manager of your business (whether that is you or a hired person) must successfully complete our training program.

If the franchise business is owned by an entity, we do not require that the general manager own any equity in the entity.

(3)     Restrictions On Your Manager

If we request, you must have your general manager sign a confidentiality and non-compete agreement. We do not require you place any other restrictions on your manager.

# Item 16
## RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

You must offer for sale only our WaterStation vending machines, and related services. You must offer for sale all goods and services that we require. We have the right to change the types of authorized goods or services, and there are no limits on our right to make changes.

WaterStation FDD 2017

1799 Bender00000533

We do not restrict your access to customers. However, we reserve the right to create exclusive territories in the future in which you cannot solicit or service customers.

**Item 17**
**RENEWAL, TERMINATION, TRANSFER, AND DISPUTE RESOLUTION**

**THE FRANCHISE RELATIONSHIP**

**This table lists certain important provisions of the franchise and related agreements. You should read these provisions in the agreements attached to this disclosure document.**

| Provision | Section in franchise or other agreement | Summary |
|---|---|---|
| a. Length of the franchise term | § 3.1 | Five years from date of franchise agreement. |
| b. Renewal or extension of the term | § 3.2 | You may obtain a successor franchise agreement for up to three additional 5 year terms. |
| c. Requirements for franchisee to renew or extend | § 3.2 | For our franchise system, "renewal" means that at the end of your term, you sign our successor franchise agreement for an additional 5 year term. You may be asked to sign a contract with materially different terms and conditions than your original contract.<br><br>To renew, you must give advance notice to us; be in compliance; confirm your business to then-current standards for new franchisees; sign then-current form of franchise agreement; sign general release (unless prohibited by applicable law). |
| d. Termination by franchisee | § 14.1 | If we violate a material provision of the franchise agreement and fail to cure or to make substantial progress toward curing the violation within 30 days after notice from you. |
| e. Termination by franchisor without cause | Not Applicable | |

24

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 186 of 332

1799 Bender00000534

| Provision | Section in franchise or other agreement | Summary |
|---|---|---|
| f. Termination by franchisor with cause | § 14.2 | |
| g. "Cause" defined--curable defaults | § 14.2 | Non-payment by you (10 days to cure); violate franchise agreement other than non-curable default (30 days to cure). |
| h. "Cause" defined--non-curable defaults | § 14.2 | Misrepresentation when applying to be a franchisee; intentionally submitting false information; bankruptcy; violation of law; violation of confidentiality; violation of non-compete; violation of transfer restrictions; libel or defamation of us; cease operations for more than 5 consecutive days; three defaults in 12 months; cross-termination; charge or conviction of a felony, or accusation of an act that is reasonably likely to materially and unfavorably affect our brand; any other breach of franchise agreement which by its nature cannot be cured. |
| i. Franchisee's obligations on termination/non-renewal | §§ 14.3 – 14.6 | Pay all amounts due; return Manual and proprietary items; notify phone, internet, and other providers and transfer service; cease doing business; remove identification; purchase option by us. |
| j. Assignment of agreement by franchisor | § 15.1 | Unlimited |
| k. "Transfer" by franchisee - defined | Article 1 | For you (or any owner of your business) to voluntarily or involuntarily transfer, sell, or dispose of, in any single or series of transactions, (i) substantially all of the assets of the business, (ii) the franchise agreement, (iii) direct or indirect ownership interest of more than 25% of the business, or (iv) control of the business. |

25

1799 Bender00000535

| Provision | Section in franchise or other agreement | Summary |
|---|---|---|
| l. Franchisor's approval of transfer by franchisee | § 15.2 | No transfers without our approval. |
| m. Conditions for franchisor's approval of transfer | § 15.2 | Pay transfer fee; buyer meets our standards; buyer is not a competitor of ours; buyer signs our then-current franchise agreement; you've made all payments to us and are in compliance with the franchise agreement; buyer completes training program; you sign a general release; business complies with then-current system specifications. |
| n. Franchisor's right of first refusal to acquire franchisee's business | § 15.5 | If you want to transfer your business, we have a right of first refusal. |
| o. Franchisor's option to purchase franchisee's business | Not Applicable | |
| p. Death or disability of franchisee | § 15.4 | If you die or become incapacitated, your executor must transfer the business to a third party within nine months. |
| q. Non-competition covenants during the term of the franchise | § 13.2 | Neither you, any owner of the business, or any spouse of an owner may have ownership interest in, or be engaged or employed by, any competitor. |
| r. Non-competition covenants after the franchise is terminated or expires | § 13.2 | For two years, no ownership of or employment by a competitor. |
| s. Modification of the agreement | § 18.4 | No modification or amendment of the franchise agreement will be effective unless it is in writing and signed by both parties. This provision does not limit our right to modify the Manual or system specifications. |

26

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 188 of 332

1799 Bender00000536

| Provision | Section in franchise or other agreement | Summary |
|---|---|---|
| t. Integration/merger clause | § 18.3 | Only the terms of the franchise agreement are binding (subject to state law). Any representations or promises outside of the disclosure document and franchise agreement may not be enforceable. However, this does not disclaim the representations made by us in this disclosure document. |
| u. Dispute resolution by arbitration or mediation | § 17.1 | All disputes are resolved by arbitration (except for injunctive relief) (subject to applicable state law). |
| v. Choice of forum | §§ 17.1; 17.5 | Arbitration will take place where our headquarters is located (currently, Everett, Washington) (subject to applicable state law). Any legal proceedings not subject to arbitration will take place in the District Court of the United States, in the district where our headquarters is then located, or if this court lacks jurisdiction, the state courts of the state and county where our headquarters is then located (subject to applicable state law). |
| w. Choice of law | § 18.8 | Washington (subject to applicable state law). |

**For additional disclosures required by certain states, refer to Exhibit H - State Addenda to Disclosure Document**

## Item 18
## PUBLIC FIGURES

We do not use any public figure to promote our franchise.

## Item 19
## FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a

27

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 189 of 332

1799 Bender00000537

reasonable basis for the information, and if the information is included in the disclosure document. Financial performance information that differs from that included in Item 19 may be given only if: (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about possible performance at a particular location or under particular circumstances.

### Table 1: Statement of Revenues Per WaterStation Machine

Set forth below is the average monthly sales of water per WaterStation machine for the six-month period of July 1, 2016 to December 31, 2016:

**Average Monthly Revenue Per Machine From Water Sold: $516.83**

| | |
|---|---|
| **Top Quartile:** | **$907.11** |
| **2nd Quartile:** | **$547.79** |
| **3rd Quartile:** | **$388.40** |
| **Bottom Quartile:** | **$210.84** |

Notes:

1.      Table 1 is historical financial data and not a projection of future performance. It includes only WaterStation machines deployed for at least six months. The number of machines meeting this criteria ranged between 88 and 95 per month. An average of 93.83 machines met this criteria each month, for a total of 583 "machine-months" used in Table 1. During this period, 222 (38%) of the monthly results met or exceeded the average of $516.83.

2.      The sales information is for sales of water only. It does not include revenue generated from advertising or sales of supplemental product (such as sale of 5-gallon jugs and single serve water bottles)

3.      The data in this Item 19 is not audited.

**4.      Between 88 and 95 machines deployed for more than six months sold this amount. Your individual results may differ. There is no assurance that you'll sell as much.**

5.      Written substantiation of the information contained in this Item 19 will be made available to prospective franchisees upon reasonable request.

Except as set forth in this Item 19, we do not make any representations about a franchisee's future financial performance or the past financial performance of company-owned or franchised outlets. We also do not authorize our employees or representatives to make any such representations either orally or in writing. If you are purchasing an existing outlet, however, we may provide you with the actual records of that outlet. If you receive any other financial performance information or projections of your future income, you should report it to the

28

1799 Bender00000538

franchisor's management by contacting Ryan Wear, 2732 Grand Avenue Suite 122, Everett, WA 98201, and 425-320-1281, the Federal Trade Commission, and the appropriate state regulatory agencies.

## Item 20
## OUTLETS AND FRANCHISEE INFORMATION

### Table 1
### Systemwide Outlet Summary
### For years 2014 to 2016

| Column 1 Outlet Type | Column 2 Year | Column 3 Outlets at the Start of the Year | Column 4 Outlets at the End of the Year | Column 5 Net Change |
|---|---|---|---|---|
| Franchised | 2014 | 0 | 0 | 0 |
| | 2015 | 0 | 0 | 0 |
| | 2016 | 0 | 0 | 0 |
| Company-Owned | 2014 | 2 | 2 | 0 |
| | 2015 | 2 | 2 | 0 |
| | 2016 | 2 | 2 | 0 |
| Total Outlets | 2014 | 2 | 2 | 0 |
| | 2015 | 2 | 2 | 0 |
| | 2016 | 2 | 2 | 0 |

### Table No. 2
### Transfers of Outlets from Franchisees to New Owners (other than the Franchisor)
### For years 2014 to 2016

| Column 1 State | Column 2 Year | Column 3 Number of Transfers |
|---|---|---|
| Total | 2014 | 0 |
| | 2015 | 0 |
| | 2016 | 0 |

29

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 191 of 332

1799 Bender00000539

**Table 3**
**Status of Franchised Outlets**
**For years 2014 to 2016**

| Column 1<br>State | Column 2<br>Year | Column 3<br>Outlets at the Start of the Year | Column 4<br>Outlets Opened | Column 5<br>Termi-Nations | Column 6<br>Non-Renewals | Column 7<br>Reacquired by Franchisor | Column 8<br>Ceased Operations – Other Reasons | Column 9<br>Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| N/A | 2014 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2015 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Totals | 2014 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2015 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

**Table 4**
**Status of Company-Owned Outlets**
**For years 2014 to 2016**

| Column 1<br>State | Column 2<br>Year | Column 3<br>Outlets at the Start of the Year | Column 4<br>Outlets Opened | Column 5<br>Outlets Reacquired From Franchisee | Column 6<br>Outlets Closed | Column 7<br>Outlets Sold to Franchisee | Column 8<br>Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| Oregon | 2014 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2015 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 1 |
| Washington | 2014 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2015 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 1 |
| Totals | 2014 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2015 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2016 | 1 | 0 | 0 | 0 | 0 | 1 |

30

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 192 of 332

1799 Bender00000540

**Table 5**
**Projected Openings As Of December 31, 2016**

| Column 1<br>State | Column 2<br>Franchise Agreements Signed But Outlet Not Opened | Column 3<br>Projected New Franchised Outlets In The Next Fiscal Year | Column 4<br>Projected New Company-Owned Outlets In the Next Fiscal Year |
|---|---|---|---|
| Arizona | 0 | 2 | 0 |
| California | 0 | 3 | 1 |
| Colorado | 0 | 1 | 0 |
| Florida | 0 | 3 | 0 |
| New Mexico | 0 | 1 | 0 |
| Nevada | 0 | 1 | 1 |
| New York | 0 | 1 | 0 |
| Texas | 0 | 2 | 0 |
| Utah | 0 | 1 | 0 |
| Totals | 0 | 15 | 2 |

(4)     Current Franchisees

Exhibit G contains the names of all current franchisees (as of the end of our last fiscal year) and the address and telephone number of each of their outlets.

(5)     Former Franchisees

Exhibit G contains the name, city and state, and current business telephone number, or if unknown, the last known home telephone number of every franchisee who had an outlet terminated, canceled, not renewed, or otherwise voluntarily or involuntarily ceased to do business under the franchise agreement during the most recently completed fiscal year or who have not communicated with us within 10 weeks of the disclosure document issuance date.

If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.

(6)     Sale of Previously Owned Outlet

We are not selling a previously-owned franchised outlet now under our control.

(7)     Confidentiality Clauses

In the last three fiscal years, no franchisees have signed any contract, order, or settlement provision that directly or indirectly restricts a current or former franchisee from discussing his or her personal experience as a franchisee in our system with any prospective franchisee.

WaterStation FDD 2017

1799 Bender00000541

<u>(8)</u>      <u>Franchisee Organizations</u>

There are no trademark-specific franchisee organizations associated with our franchise system.

## Item 21
## FINANCIAL STATEMENTS

**We have not been in business for three years or more, and therefore cannot include all financial statements required by the Franchise Rule of the Federal Trade Commission.** Exhibit E contains our audited opening financial statements dated March 1, 2017. Our fiscal year end is December 31.

## Item 22
## CONTRACTS

Copies of all proposed agreements regarding this franchise offering are attached as the following Exhibits:

B.      Franchise Agreement (with Guaranty and Non-Compete Agreement)
C.      Management Agreement
D.      Form of General Release
I.       State Addenda to Franchise Agreement

## Item 23
## RECEIPTS

Detachable documents acknowledging your receipt of this disclosure document are attached as the last two pages of this disclosure document.

32

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 194 of 332

1799 Bender00000542

# EXHIBIT A

## STATE ADMINISTRATORS AND AGENTS FOR SERVICE OF PROCESS

We may register this Disclosure Document in some or all of the following states in accordance with the applicable state law. If and when we pursue franchise registration, or otherwise comply with the franchise investment laws, in these states, the following are the state administrators responsible or the review, registration, and oversight of franchises in each state and the state offices or officials that we will designate as our agents for service of process in those states:

| State | State Administrator | Agent for Service of Process (if different from State Administrator) |
|---|---|---|
| California | Commissioner of Business Oversight<br>Department of Business Oversight<br>1515 K Street<br>Suite 200<br>Sacramento, CA 95814-4052<br>866-275-2677 | |
| Hawaii | Department of Commerce and Consumer Affairs<br>Business Registration Division<br>Commissioner of Securities<br>P.O. Box 40<br>Honolulu, HI 96810<br>(808) 586-2722 | Commissioner of Securities<br>Department of Commerce and Consumer Affairs<br>Business Registration Division<br>Securities Compliance Branch<br>335 Merchant Street, Room 203<br>Honolulu, HI 96813 |
| Illinois | Franchise Bureau<br>Office of Attorney General<br>500 South Second Street<br>Springfield, IL 62706<br>(217) 782-4465 | |
| Indiana | Franchise Section<br>Indiana Securities Division<br>Secretary of State<br>Room E-111<br>302 W. Washington Street<br>Indianapolis, IN 46204<br>(317) 232-6681 | |
| Maryland | Office of the Attorney General<br>Division of Securities<br>200 St. Paul Place<br>Baltimore, MD 21202-2020<br>(410) 576-7042 | Maryland Commissioner of Securities<br>200 St. Paul Place<br>Baltimore, MD 21202-2020 |
| Michigan | Michigan Attorney General's Office<br>Consumer Protection Division<br>Attn: Franchise Section<br>525 W. Ottawa Street<br>Williams Building, 1st Floor<br>Lansing, MI 48933<br>(517) 373-7117 | |

1

| State | State Administrator | Agent for Service of Process (if different from State Administrator) |
|---|---|---|
| Minnesota | Minnesota Department of Commerce<br>Market Assurance Division<br>85 7th Place East, Suite 500<br>St. Paul, MN 55101-2198<br>(651) 296-6328 | |
| New York | New York State Department of Law<br>Investor Protection Bureau<br>120 Broadway, 23rd Floor<br>New York, NY 10271<br>(212) 416-8211 | Secretary of State<br>99 Washington Avenue<br>Albany, NY 12231 |
| North Dakota | North Dakota Securities Department<br>600 East Boulevard Ave., State Capital Fifth<br>Floor, Dept. 414<br>Bismarck, ND 58505-0510<br>(701) 328-4712 | |
| Oregon | Department of Consumer & Business<br>Services<br>Division of Finance and Corporate Securities<br>Labor and Industries Building<br>Salem, Oregon 97310<br>(503) 378-4140 | |
| Rhode Island | Department of Business Regulation<br>Securities Division<br>1511 Pontiac Avenue<br>John O. Pastore Complex–69-1<br>Cranston, RI 02920-4407<br>(401) 462-9527 | |
| South Dakota | Department of Labor and Regulation<br>Division of Securities<br>124 South Euclid Suite 104<br>Pierre, SD 57501-3185<br>(605) 773-4823 | |
| Virginia | State Corporation Commission<br>1300 East Main Street<br>9th Floor<br>Richmond, VA 23219<br>(804) 371-9051 | Clerk<br>State Corporation Commission<br>1300 East Main Street, 1st Floor<br>Richmond, VA 23219 |
| Washington | Department of Financial Institutions<br>Securities Division<br>150 Israel Rd SW<br>Tumwater, WA 98501<br>(360) 902-8760 | |
| Wisconsin | Division of Securities<br>Department of Financial Institutions<br>Post Office Box 1768<br>Madison, WI 53701<br>(608) 266-2801 | Securities And Franchise Registration<br>Wisconsin Securities Commission<br>201 West Washington Avenue, Suite 300<br>Madison, WI 53703 |

WaterStation FDD 2017

1799 Bender00000544

**EXHIBIT B**

**FRANCHISE AGREEMENT**

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 197 of 332

1799 Bender00000545



# FRANCHISE AGREEMENT

| SUMMARY PAGE | |
|---|---|
| 1.  **Franchisee** | _____ |
| 2.  **Effective Date** | _____ |
| 3.  **Initial Franchise Fee** | $_____ |
| 4.  **Opening Deadline** | _____ |
| 5.  **Principal Executive** | _____ |
| 6.  **Franchisee's Address** | _____ |

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 198 of 332

1799 Bender00000546

# FRANCHISE AGREEMENT

This Agreement is made between WST Franchise Systems LLC, a Washington limited liability company ("WST"), and Franchisee on the Effective Date.

## Background Statement:

A.     WST and its affiliate Creative Technologies, LLC, have created and own a system (the "System") for developing and operating a vending machine business to dispense purified, mineralized water under the trade name "WaterStation".

B.     The System includes (1) methods, procedures and standards for developing and operating a WaterStation business, (2) particular products and services, (3) the Marks, (4) training programs, (5) business knowledge, (6) marketing plans and concepts, and (7) other mandatory or optional elements as determined by WST from time to time.

C.     The parties desire that WST license the Marks and the System to Franchisee for Franchisee to develop and operate a WaterStation business on the terms and conditions of this Agreement.

## ARTICLE 1.  DEFINITIONS

"**Action**" means any action, suit, proceeding, claim, demand, governmental investigation, governmental inquiry, judgment or appeal thereof, whether formal or informal.

"**Approved Vendor**" means a supplier, vendor, or distributor of Inputs which has been approved by WST.

"**Business**" means the WaterStation business owned by Franchisee and operated under this Agreement.

"**Competitor**" means any business which sells, installs, services, or manages vending machines that sell water.

"**Confidential Information**" means all non-public information of or about the System, WST, and any WaterStation business, including all methods for developing and operating the Business, and all non-public plans, data, financial information, processes, vendor pricing, supply systems, marketing systems, formulas, techniques, designs, layouts, operating procedures, customer data, information and know-how.

"**Gross Sales**" means the total dollar amount of all sales generated through the Business for a given period, including, but not limited to, payment for any services or products sold by Franchisee, whether for cash or credit. Gross Sales does not include (i) bona fide refunds to customers, (ii) sales taxes collected by Franchisee, (iii) sales of used equipment not in the ordinary course of business, or (iv) sales of prepaid cards or similar products (but the redemption of any such card or product will be included in Gross Sales).

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 199 of 332

1799 Bender00000547

"**Input**" means any goods, services, supplies, fixtures, equipment, inventory, computer hardware and software, real estate, or comparable items related to establishing or operating the Business.

"**Location**" means a location where a Machine is placed.

"**Losses**" includes (but is not limited to) all losses; damages; fines; charges; expenses; lost profits; reasonable attorneys' fees; travel expenses, expert witness fees; court costs; settlement amounts; judgments; loss of WST's reputation and goodwill; costs of or resulting from delays, financing, advertising material and media time/space and the costs of changing, substituting or replacing the same; and any and all expenses of recall, refunds, compensation, public notices and other such amounts incurred in connection with the matters described.

"**Machine**" means a WaterStation machine.

"**Manual**" means WST's confidential Operating Manual(s), including any supplements, additions, or revisions from time to time, which may be in any form or media.

"**Marketing Fund**" means the fund established (or which may be established) by WST into which Marketing Fund Contributions are deposited.

"**Marks**" means the trade name and logo contained on the Summary Page, and all other trade names, trademarks, service marks and logos specified by WST from to time for use in a WaterStation business.

"**Owner**" means each person or entity which directly or indirectly owns or controls any equity of Franchisee. If Franchisee is an individual person, then "Owner" means Franchisee.

"**Required Vendor**" means a supplier, vendor, or distributor of Inputs which WST requires franchisees to use.

"**System Standards**" means, as of any given time, the then-current mandatory procedures, requirements, and/or standards of the System as determined by WST, which may include without limitation, any procedures, requirements and/or standards for appearance, business metrics, cleanliness, customer service, design, equipment, inventory, marketing and public relations, operating hours, presentation of Marks, product and service offerings, quality of products and services (including any guaranty and warranty programs), reporting, safety, technology (such as computers, computer peripheral equipment, smartphones, point-of-sale systems, back-office systems, information management systems, security systems, video monitors, other software, backup and archiving systems, communications systems (including email, audio, and video systems), payment acceptance systems, and internet access, as well as upgrades, supplements, and modifications thereto), uniforms, and vehicles.

"**Transfer**" means for Franchisee (or any Owner) to voluntarily or involuntarily transfer, sell, or dispose of, in any single or series of transactions, (i) substantially all of the assets of the

1799 Bender00000548

Business, (ii) this Agreement, (iii) direct or indirect ownership interest of more than 25% of the Business, or (iv) control of the Business.

## ARTICLE 2.  GRANT OF LICENSE

**2.1    Grant.** WST grants to Franchisee the right to operate a WaterStation business headquartered at the address specified on the Summary Page. Franchisee shall develop, open and operate a WaterStation business for the entire term of this Agreement. The parties acknowledge that Franchisee must operate the Business to meet WST's minimum System Standards, but that the means of satisfying the System Standards are left to the control and discretion of Franchisee.

**2.2    No Protected Territory.** Franchisee acknowledges that it does not receive a protected or exclusive territory. Without limiting the generality of the foregoing, WST retains the right to (i) solicit and serve (and to authorize third parties to solicit and service) customers located anywhere, through any channel of commerce (ii) establish and license others to establish and operate WaterStation businesses located anywhere; and (iii) sell and service vending machines other brand names other than WaterStation, with machines the same as, similar to, or dissimilar to WaterStation machines.

**2.3    Sales and Service Area; Future Exclusive Areas.** As of the date of this Agreement, Franchisee may solicit, sell to, and provide service to customer located anywhere in the United States (but not outside of the United States). WST retains the right to designate territories in which it grants a party the exclusive right to solicit, sell to, and/or provide service to customers located in the territory. If WST grants such exclusive rights and gives Franchisee notice thereof, then Franchisee shall not thereafter solicit or sell WaterStation machines in such territory.

**2.4    Franchisee Control.** Franchisee represents that Attachment 1 (i) identifies each owner, officer and director of Franchisee, and (ii) describes the nature and extent of each owner's interest in Franchisee. If any information on Attachment 1 changes (which is not a Transfer), Franchisee shall notify WST within 10 days.

**2.5    Principal Executive.** Franchisee agrees that the person designated as the "Principal Executive" on the Summary Page is the executive primarily responsible for the Business and has decision-making authority on behalf of Franchisee. The Principal Executive must have at least 10% ownership interest in Franchisee. The Principal Executive must participate in the direct operation of the Business and must devote substantial time and attention to the Business. If the Principal Executive dies, becomes incapacitated, transfers his/her interest in Franchisee, or otherwise ceases to be the executive primarily responsible for the Business, Franchisee shall promptly designate a new Principal Executive, subject to Water Station Franchising's reasonable approval.

**2.5    Guaranty.** If Franchisee is an entity, then Franchisee shall have each Owner sign a personal guaranty of Franchisee's obligations to WST, in the form of Attachment 2.

**2.6    No Conflict.** Franchisee represents to WST that Franchisee and each of its Owners (i) are not violating any agreement (including any confidentiality or non-competition covenant) by entering into or performing under this Agreement, (ii) are not a direct or indirect owner of any

5

Competitor, and (iii) are not listed or "blocked" in connection with, and are not in violation under, any anti-terrorism law, regulation, or executive order.

## ARTICLE 3. TERM

**3.1** **Term.** This Agreement commences on the Effective Date and continues for 5 years.

**3.2** **Successor Agreement.** When the term of this Agreement expires, Franchisee may enter into a successor agreement for up to 3 additional periods of 5 years each, subject to the following conditions prior to each renewal:

(i)       Franchisee notifies WST of the election to renew between 90 and 180 days prior to the end of the term;

(ii)      Franchisee (and its affiliates) are in compliance with this Agreement and all other agreements with WST (or any of its affiliates) at the time of election and at the time of renewal;

(iii)     Franchisee has made or agrees to make (within a period of time acceptable to WST) changes to the Business as WST requires to conform to the then-current System Standards;

(iv)     Franchisee executes WST's then-current standard form of franchise agreement, which may be materially different than this form (including, without limitation, higher and/or different fees), except that Franchisee will not pay another initial franchise fee and will not receive more renewal or successor terms than described in this Section; and

(v)      Franchisee and each Owner executes a general release (on WST's then-standard form) of any and all claims against WST, its affiliates, and their respective owners, officers, directors, agents and employees.

## ARTICLE 4. FEES

**4.1** **Initial Franchise Fee.** Upon signing this Agreement, Franchisee shall pay an initial franchise fee in the amount stated on the Summary Page. This initial franchise fee is not refundable, except as provided in <u>Section 6.4</u>.

**4.2** **Royalty Fee.** In Franchisee's first year of operation, Franchisee shall pay WST a monthly royalty fee (the "<u>Royalty Fee</u>") equal to 8% of Gross Sales; provided, however, that if Franchisee is a party to a Management Agreement with WaterStation Management, LLC, then the Royal Fee shall be 5% of Gross Sales. The Royalty Fee for any given month is due on the 5th day of the following month.

**4.3** **Marketing Fund Contribution.** If WST has formed a Marketing Fund, Franchisee shall pay WST a contribution to the Marketing Fund (the "<u>Marketing Fund Contribution</u>") equal to 1% of Franchisee's Gross Sales (or such lesser amount as WST determines), at the same time as the Royalty Fee.

6

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 202 of 332

1799 Bender00000550

**4.4     Replacement / Additional Training Fee.** If Franchisee sends an employee to WST's training program after opening, WST may charge its then-current training fee. As of the date of this Agreement, the training fee is $500 per person.

**4.5     Third Party Vendors.** If WST requires Franchisee to use a designated third-party vendor, WST has the right (but not the obligation) to collect payment on behalf of the vendor and remit the payment to the vendor. If WST does so, it may impose a reasonable markup or charge for administering the payment program.

**4.6     Non-Compliance Fee.** WST may charge Franchisee $250 for any instance of non-compliance with the System Standards or this Agreement (other than Franchisee's non-payment of a fee owed to WST) which Franchisee fails to cure after 30 days' notice from WST. Thereafter, WST may charge Franchisee $250 per week until Franchisee ceases such non-compliance. This fee is a reasonable estimate of WST's internal cost of personnel time attributable to addressing the non-compliance, and is not a penalty or estimate of all damages arising from Franchisee's breach. The non-compliance fee is in addition to all of WST's other rights and remedies.

**4.7     Reimbursement.** WST may (but is never obligated to) pay on Franchisee's behalf any amount that Franchisee owes to a supplier or other third party. If WST does so or intends to do so, Franchisee shall pay such amount plus a 10% administrative charge to WST within 15 days after invoice by WST accompanied by reasonable documentation.

**4.8     Payment Terms.**

(a)     <u>Method of Payment</u>. Franchisee shall pay the Royalty Fee, Marketing Fund Contribution, and any other amounts owed to WST by pre-authorized bank draft or in such other manner as WST may require.

(b)     <u>Calculation of Fees</u>. Franchisee shall report monthly Gross Sales to WST by the 5th day of the following month. If Franchisee fails to report monthly Gross Sales, then WST may withdraw estimated Royalty Fees and Marketing Fund Contributions equal to 125% of the last Gross Sales reported to WST, and the parties will true-up the actual fees after Franchisee reports Gross Sales. Franchisee acknowledges that WST has the right to remotely access Franchisee's point-of-sale system and to calculate Gross Sales.

(c)     <u>Late Fees and Interest</u>. If Franchisee does not make a payment on time, Franchisee shall pay a $100 "late fee" plus interest on the unpaid amount at a rate equal to 18% per year (or, if such payment exceeds the maximum allowed by law, then interest at the highest rate allowed by law).

(d)     <u>Insufficient Funds</u>. WST may charge $50 for any payment returned for insufficient funds (or, if such amount exceeds the maximum allowed by law, then the fee allowed by law).

(e)     <u>Costs of Collection</u>. Franchisee shall repay any costs incurred by WST (including reasonable attorney fees) in attempting to collect payments owed by Franchisee.

1799 Bender00000551

(f)     <u>Application</u>. WST may apply any payment received from Franchisee to any obligation and in any order as WST may determine, regardless of any designation by Franchisee.

(g)     <u>Obligations Independent; No Set-Off.</u> The obligations of Franchisee to pay to WST any fees or amounts described in this Agreement are not dependent on WST's performance and are independent covenants by Franchisee. Franchisee shall make all such payments without offset or deduction.

## ARTICLE 5.  ASSISTANCE

**5.1     Manual.** WST shall make its Manual available to Franchisee.

**5.2     Assistance in Hiring Employees.** WST shall provide its suggested staffing levels to Franchisee. WST shall provide suggested guidelines for hiring employees. All hiring decisions and conditions of employment are Franchisee's sole responsibility.

**5.3     Assistance in Training Employees.** WST shall, to the extent it deems appropriate, provide programs for Franchisee to conduct training of new employees.

**5.4     Pre-Opening Assistance.**

(a)     <u>Pre-Opening Specifications and Vendors</u>. To the extent not included in the Manual, WST shall provide Franchisee with (i) applicable System Standards and other specifications as WST deems appropriate (which may include specifications regarding inventory, supplies, materials, and other matters), and (ii) WST's lists of Approved Vendors and/or Required Vendors.

(b)     <u>Business Plan Review</u>. If requested by Franchisee, WST shall review and advise on Franchisee's pre-opening business plan and financial projections. **Franchisee acknowledges that WST accepts no responsibility for the performance of the Business.**

(c)     <u>Pre-Opening Training</u>. WST shall make available its standard pre-opening training to the Principal Executive and up to three other employees, at WST's headquarters. WST shall not charge any fee for this training. Franchisee is responsible for its own travel, lodging, meal, and other out-of-pocket expenses.

(d)     <u>Market Introduction Plan</u>. WST shall advise Franchisee regarding the planning and execution of Franchisee's market introduction plan.

(e)     <u>On-Site Opening Assistance</u>. If requested by Franchisee, WST shall have a representative support Franchisee's business opening with at least one or two days of onsite opening training and assistance, at WST's expense.

**5.5     Post-Opening Assistance.**

(a)     <u>Advice, Consulting, and Support</u>. If Franchisee requests, WST will provide advice to Franchisee (by telephone or electronic communication) regarding improving and developing Franchisee's business, and resolving operating problems Franchisee encounters, to the extent

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 204 of 332

1799 Bender00000552

WST deems reasonable. If WST provides in-person support in response to Franchisee's request, WST may charge its then-current fee plus any out-of-pocket expenses (such as travel, lodging, and meals for employees providing onsite support).

(b)     <u>Pricing</u>. Upon request, WST will provide recommended prices for products and services offered by franchisees of the System.

(c)     <u>Procedures</u>. WST will provide Franchisee with WST's recommended administrative, bookkeeping, accounting, and inventory control procedures. WST may make any such procedures part of required (and not merely recommended) System Standards.

(d)     <u>Marketing</u>. WST shall manage the Marketing Fund.

(e)     <u>Internet</u>. WST shall maintain a website for WaterStation.

## ARTICLE 6.   DEVELOPMENT AND OPENING

**6.1     Headquarters.** If Franchisee desires to relocate its headquarters from the address on the Summary Page, it shall give prior notice to WST.

**6.2     New Franchisee Training.** Franchisee's Principal Executive must complete WST's training program for new franchisees. If the Principal Executive (i) fails to complete the initial training program to WST's satisfaction, or (ii) WST concludes, no more than 10 days after the Principal Executive completes the initial training program, that the Principal Executive does not have the ability to satisfactorily operate the Business, then WST may terminate this Agreement. In such event, WST shall refund the initial franchise fee to Franchisee (less any out-of-pocket costs incurred by WST), subject to Franchisee's prior execution of a general release of liability of WST and its affiliates, in a form prescribed by WST.

**6.3     Conditions To Opening.** Franchisee shall notify WST at least 30 days before Franchisee intends to open the Business. Before opening, Franchisee must satisfy all of the following conditions: (1) Franchisee is in compliance with this Agreement, (2) Franchisee has obtained all applicable governmental permits and authorizations, (3) the Business conforms to all applicable System Standards, (4) Franchisee has hired sufficient employees, (5) Franchisee's officers and employees have completed all of WST's required pre-opening training; and (6) WST has given its written approval to open, which will not be unreasonably withheld.

**6.4     Opening Date.** Franchisee shall open the Business on or before the date stated on the Summary Page.

## ARTICLE 7.   OPERATIONS

**7.1     Compliance With Manual and System Standards**. Franchisee shall at all times and at its own expense comply with all System Standards and with all other mandatory obligations contained in the Manual.

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 205 of 332
1799 Bender00000553

**7.2     Compliance With Law.** Franchisee and the Business shall comply with all laws and regulations. Franchisee and the Business shall obtain and keep in force all governmental permits and licenses necessary for the Business.

**7.3     Obtaining Locations.** Franchisee shall obtain suitable Locations for its Machines. Franchisee shall obtain WST's prior approval for any Location. Franchisee shall follow any procedures of WST for submitting information and obtaining approval of a potential Location. If a potential Location is not approved by WST, it is deemed rejected.

**7.4     Products and Services.** Franchisee shall offer all products and services, and only those products and services, from time to time prescribed by WST in the Manual or otherwise in writing. Notwithstanding any provision of this Agreement or the Manual to the contrary, Franchisee retains the sole discretion to determine the prices it charges for products and services.

**7.5     Personnel.**

          (a)     Service. Franchisee shall cause its personnel to render competent and courteous service to all customers and members of the public.

          (b)     Appearance. Franchisee shall cause its personnel to comply with any dress attire, uniform, personal appearance and hygiene standards set forth in the Manual.

          (c)     Qualifications. WST may set minimum qualifications for categories of employees employed by Franchisee.

          (d)     Sole Responsibility. Franchisee is solely responsible for the terms and conditions of employment of all of its personnel, including recruiting, hiring, training, scheduling, supervising, compensation, and termination. Franchisee is solely responsible for all actions of its personnel. Franchisee and WST are not joint employers, and no employee of Franchisee will be an agent or employee of WST.

**7.6     Post-Opening Training.** WST may at any time require that the Principal Executive and/or any other employees complete training programs, in any format and in any location determined by WST. WST may charge a reasonable fee for any training programs. WST may require Franchisee to provide training programs to its employees. If a training program is held at a location which requires travel by the Principal Executive or any other employee, then Franchisee shall pay all travel, living and other expenses.

**7.7     Guaranties and Warranties.** Franchisee shall implement any guaranties, warranties, or similar commitments regarding products and/or services that WST may require.

**7.8     Customer Complaints.** Franchisee shall use its best efforts to promptly resolve any customer complaints. WST may take any action it deems appropriate to resolve a complaint regarding the Business (from a customer, a location, or any other party), and WST may require Franchisee to reimburse WST for any expenses.

**7.9     Customer Evaluation and System Compliance Programs.** Franchisee shall participate at its own expense in programs required from time to time by WST for obtaining customer

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 206 of 332

1799 Bender00000554

evaluations and/or reviewing Franchisee's compliance with the System, which may include (but are not limited to) a customer feedback system, customer survey programs, and mystery shopping. WST shall share with Franchisee the results of these programs, as they pertain to the Business. Franchisee must meet or exceed any minimum score requirements set by WST for such programs.

**7.10    Payment Systems.** Franchisee shall accept payment from customers in any form or manner designated by WST (which may include, for example, cash, specific credit and/or debit cards, gift cards, electronic fund transfer systems, and mobile payment systems). Franchisee shall purchase or lease all equipment and enter into all business relationships necessary to accept payments as required by WST. Franchisee must at all times comply with payment card industry data security standards (PCI-DSS).

**7.11    Resale of WaterStation Machines.** Franchisee shall not sell WaterStation Machines to any person or entity other than another WaterStation franchisee without the prior approval of WST.

**7.12    Maintenance and Repair.** Franchisee shall operate, inspect, service, repair, and maintain its Machines in accordance with all applicable System Standards.

**7.13    Vehicles.** If Franchisee purchases or leases one or more vehicles for the Business, Franchisee shall ensure that all vehicles comply with all applicable System Standards, including without limitation required equipment and exterior décor. Franchisee shall keep all vehicles in good repair, clean, and free of dents and other damage, and shall ensure that the vehicles presents a first-class image appropriate to WST's System. Franchisee shall use the vehicle solely for the Business.

**7.14    Meetings.** The Principal Executive shall use reasonable efforts to attend all in-person meetings and remote meetings (such as telephone conference calls) that WST requires, including any national or regional brand conventions. Franchisee shall not permit the Principal Executive to fail to attend more than three consecutive required meetings.

**7.15    Insurance.**

(a)    Franchisee shall obtain and maintain insurance policies in the types and amounts as specified by WST in the Manual. If not specified in the Manual, Franchisee shall maintain at least the following insurance coverage:

(i)    Commercial General Liability insurance, including products liability coverage, and broad form commercial liability coverage, written on an "occurrence" policy form in an amount of not less than $1,000,000 single limit per occurrence and $2,000,000 aggregate limit;

(ii)    Business Automobile Liability insurance including owned, leased, non-owned and hired automobiles coverage in an amount of not less than $1,000,000; and

(iii)    Workers Compensation coverage as required by state law.

24-01863-FPC11      Doc 1161-2      Filed 08/01/25      Entered 08/01/25 21:58:04      Pg 207 of 332

1799 Bender00000555

(b)     Franchisee's policies must list WST and its affiliates as an additional insured and the policies must stipulate that WST shall receive a 30 day prior written notice of cancellation. Franchisee shall provide Certificates of Insurance evidencing the required coverage to WST prior to opening and upon annual renewal of the insurance coverage, as well as at any time upon request of WST.

**7.16    Suppliers and Landlord.** Franchisee shall pay all vendors and suppliers in a timely manner. If Franchisee leases its headquarters, Franchisee shall comply with its lease.

**7.17    Public Relations.** Franchisee shall not make any public statements (including giving interviews or issuing press releases) regarding WaterStation, the Business, or any particular incident or occurrence related to the Business, without WST's prior written approval.

**7.18    Association With Causes.** Franchisee shall not in the name of the Business (i) donate money, products, or services to any charitable, political, religious, or other organization, or (ii) act in support of any such organization, without WST's prior written approval.

**7.19    No Other Businesses.** If Franchisee is an entity, Franchisee shall not own or operate any other business except WaterStation businesses.

**7.20    No Third Party Management.** Franchisee shall not engage a third-party management company to manage or operate the Business (other than an affiliate of WST) without the prior written approval of WST, which will not be unreasonably withheld.

**7.21    No Co-Branding.** Franchisee shall not "co-brand" or associate any other business activity with the WaterStation Business in a manner which is likely to cause the public to perceive it to be related to the WaterStation Business.

**7.22    No Subcontracting.** Franchisee shall not subcontract or delegate to a third party any services to be performed by Franchisee for a customer (other than engaging individuals as independent contractors in the ordinary course of business).

**7.23    Identification.** Franchisee must identify itself as the independent owner of the Business in the manner prescribed by WST.

**7.24    Business Practices.** Franchisee, in all interactions with customers, employees, vendors, governmental authorities, and other third parties, shall be honest and fair. Franchisee shall comply with any code of ethics or statement of values from WST. Franchisee shall not take any action which may injure the goodwill associated with the Marks.

## ARTICLE 8.   WATERSTATION MACHINES AND SUPPLY CHAIN

**8.1    Generally.** Franchisee shall acquire all Inputs required by WST from time to time in accordance with System Standards. WST may require Franchisee to purchase or lease any Inputs from WST, WST's designee, Required Vendors, Approved Vendors, and/or under WST's specifications. WST may change any such requirement or change the status of any vendor. To make such requirement or change effective, WST shall issue the appropriate System Standards.

12

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 208 of 332

1799 Bender00000556

**8.2    WaterStation Machines.** Without limiting the generality of <u>Section 8.1</u>, Franchisee shall purchase all WaterStation machines, filters, parts, and other inventory solely from WST or its affiliate, or other party designated by WST.

**8.3    Warranty and Service.**

(a)    As of the date of this Agreement, WST or its affiliate warrants parts and materials for 12 months on WaterStation machines sold to Franchisee:

(b)    WST and its affiliates reserve the right to modify its warranty policy.

**8.4    Alternate Vendor Approval.** If WST requires Franchisee to purchase a particular Input (other than WaterStation machines, filters, parts, and inventory) only from an Approved Vendor or Required Vendor, and Franchisee desires to purchase the Input from another vendor, then Franchisee must submit a written request for approval and any information, specifications and/or samples requested by WST. WST may condition its approval on such criteria as WST deems appropriate, which may include evaluations of the vendor's capacity, quality, financial stability, reputation, and reliability; inspections; product testing, and performance reviews. WST will provide Franchisee with written notification of the approval or disapproval of any propose new vendor within 30 days after receipt of Franchisee's request.

**8.5    Alternate Input Approval.** If WST requires Franchisee to purchase a particular Input, and Franchisee desires to purchase an alternate to the Input, then Franchisee must submit a written request for approval and any information, specifications and/or samples requested by WST. WST will provide Franchisee with written notification of the approval or disapproval of any proposed alternate Input within 30 days after receipt of Franchisee's request.

**8.6    Shortages and Unavailability.** WST shall not have liability to Franchisee for unavailability of, or delay in shipment or receipt of, any products or supplies from any vendor (including WST or its affiliates) resulting from shortages, order backlogs, production difficulties, delays, unavailability of transportation, fire, strikes, work stoppages, or other causes beyond the control of WST.

**8.7    Product Recalls.** If WST or any vendor, supplier, or manufacturer of an item used or sold in Franchisee's Business issues a recall of such item or otherwise notifies Franchisee that such item is defective or dangerous, Franchisee shall immediately cease using or selling such item, and Franchisee shall at its own expense comply with all instructions from WST or the vendor, supplier, or manufacturer of such item with respect the recall, repair, or other remedy of such item.

## ARTICLE 9.  MARKETING

**9.1    Implementation.** Franchisee shall not use any marketing materials or campaigns (including point-of-sale materials, advertising, social media marketing, and sponsorships) that have not been approved by WST. Franchisee shall implement any marketing plans or campaigns determined by WST.

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 209 of 332

1799 Bender00000557

**9.2    Use By WST.** WST may use any marketing materials or campaigns developed by or on behalf of Franchisee, and Franchisee hereby grants an unlimited, royalty-free license to WST for such purpose.

**9.3    Marketing Fund.** WST may establish a Marketing Fund to promote the System on a local, regional, national, and/or international level. If WST has established a Marketing Fund:

(a)    <u>Separate Account</u>. WST shall hold the Marketing Fund Contributions from all franchisees in one or more bank accounts separate from WST's other accounts.

(b)    <u>Use</u>. WST shall use the Marketing Fund only for marketing, advertising, and public relations materials, programs and campaigns (including at local, regional, national, and/or international level), and related overhead. The foregoing includes such activities and expenses as WST reasonably determines, and may include, without limitation: development and placement of advertising and promotions; sponsorships; contests and sweepstakes; development of décor, trade dress, Marks, and/or branding; development and maintenance of brand websites; social media; internet activities; e-commerce programs; search engine optimization; market research; public relations, media or agency costs; trade shows and other events; printing and mailing; and administrative and overhead expenses related to the Marketing Fund (including the compensation of WST's employees working on marketing and for accounting, bookkeeping, reporting, legal and other expenses related to the Marketing Fund).

(c)    <u>Discretion</u>. Franchisee agrees that expenditures from the Marketing Fund need not be proportionate to contributions made by Franchisee or provide a direct or any benefit to Franchisee. The Marketing Fund will be spent at WST's sole discretion, and WST has no fiduciary duty with regard to the Marketing Fund.

(d)    <u>Surplus or Deficit</u>. WST may accumulate funds in the Marketing Fund and carry the balance over to subsequent years. If the Marketing Fund operates at a deficit or requires additional funds at any time, WST may loan such funds to the National Marketing Fund on reasonable terms.

(e)    <u>Financial Statement</u>. WST will prepare an unaudited annual financial statement of the Marketing Fund within 120 days of the close of WST's fiscal year and will provide the financial statement to Franchisee upon request.

**9.4    Market Introduction Plan.** Franchisee must develop a market introduction plan and obtain WST's approval of the marketing plan prior to opening the Business.

**9.5    Internet Marketing.** WST has the exclusive right to conduct and manage all marketing and commerce on the internet or other electronic medium, including all websites and "social media" marketing. Franchisee shall not conduct such marketing or commerce, nor establish any website or social media presence independently, except as WST may specify, and only with WST's consent. WST retains the right to approve any linking to or other use of WST's website. Franchisee must comply with any internet, online commerce and/or social media policy that WST may prescribe.

24-01863-FPC11      Doc 1161-2      Filed 08/01/25      Entered 08/01/25 21:58:04      Pg 210 of 332

1799 Bender00000558

## ARTICLE 10.        RECORDS AND REPORTS

**10.1    Systems.** Franchisee shall use such customer data management, sales data management, administrative, bookkeeping, accounting, and inventory control procedures and systems as WST may specify in the Manual or otherwise in writing.

**10.2    Reports.**

(a)    <u>Financial Reports</u>. Franchisee shall provide such periodic financial reports as WST may require in the Manual or otherwise in writing, including:

(i)    a quarterly profit and loss statement and balance sheet for the Business within 30 days after the end of each fiscal quarter of WST's fiscal year, and

(ii)    an annual financial statement (including profit and loss statement, cash flow statement, and balance sheet) for the Business within 90 days after the end of WST's fiscal year.

(b)    <u>Legal Actions and Investigations</u>. Franchisee shall promptly notify WST of any Action or threatened Action by any customer, governmental authority, or other third party against Franchisee or the Business, or otherwise involving the Franchisee or the Business. Franchisee shall provide such documents and information related to any such Action as WST may request.

(c)    <u>Government Inspections</u>. Franchisee shall give WST copies of all inspection reports, warnings, certificates, and ratings issued by any governmental entity with respect to the Business, within three days of Franchisee's receipt thereof.

(d)    <u>Other Information</u>. Franchisee shall submit to WST such other financial statements, reports, records, copies of contracts, documents related to litigation, tax returns, copies of governmental permits, and other documents and information related to the Business as specified in the Manual or that WST may reasonably request.

**10.3    Initial Investment Report.** Within 120 days after opening for business, Franchisee shall submit to WST a report detailing Franchisee's investment costs to develop and open the Business, with costs allocated to the categories described in Item 7 of WST's Franchise Disclosure Document and with such other information as WST may request.

**10.4    Business Records.** Franchisee shall keep accurate books and records reflecting all expenditures and receipts of the Business, with supporting documents (including, but not limited to, payroll records, payroll tax returns, register receipts, production reports, sales invoices, bank statements, deposit receipts, cancelled checks and paid invoices) for at least three years. Franchisee shall keep such other business records as WST may specify in the Manual or otherwise in writing.

**10.5    Records Audit.** WST may examine and audit all books and records related to the Business, and supporting documentation, at any reasonable time. WST may conduct the audit at franchisee headquarters and/or require Franchisee to deliver copies of books, records and

15

24-01863-FPC11      Doc 1161-2      Filed 08/01/25      Entered 08/01/25 21:58:04      Pg 211 of 332

1799 Bender00000559

supporting documentation to a location designated by WST. Franchisee shall also reimburse WST for all costs and expenses of the examination or audit if (i) WST conducted the audit because Franchisee failed to submit required reports or was otherwise not in compliance with the System, or (ii) the audit reveals that Franchisee understated Gross Sales by 3% or more for any month.

**10.6    Remote Access Systems.** Franchisee shall give WST unlimited access to Franchisee's software systems related to the operation of the Business, by any means designated by WST.

### ARTICLE 11.    FRANCHISOR RIGHTS

**11.1    Manual; Modification.** The Manual, and any part of the Manual, may be in any form or media determined by WST. WST may supplement, revise, or modify the Manual, and WST may change, add or delete System Standards at any time in its discretion. WST may inform Franchisee thereof by any method that WST deems appropriate (which need not qualify as "notice" under <u>Section 18.9</u>). In the event of any dispute as to the contents of the Manual, WST's master copy will control.

**11.2    Business Evaluation.** WST may accompany Franchisee or its personnel on any services performed for a customer to conduct an evaluation. If Franchisee's headquarters are open to the public or used for meeting customers or potential customers, WST may enter the premises of the Business from time to time during normal business hours and conduct an evaluation. Franchisee shall cooperate with WST's evaluators. The evaluation may include, but is not limited to, observing operations, conducting a physical inventory, evaluating physical conditions, monitoring sales activity, speaking with employees and customers, and removing samples of products, supplies and materials. WST may videotape and/or take photographs of the evaluation. Without limiting WST's other rights under this Agreement, Franchisee will, as soon as reasonably practical, correct any deficiencies noted during an evaluation. If WST conducts an evaluation because of a governmental report, customer complaint or other customer feedback, or a default or non-compliance with any System Standard by Franchisee (including following up a previous failed evaluation), then WST may charge all out-of-pocket expenses plus its then-current evaluation fee to Franchisee.

**11.3    WST's Right To Cure.** If Franchisee breaches or defaults under any provision of this Agreement, WST may (but has no obligation to) take any action to cure the default on behalf of Franchisee, without any liability to Franchisee. Franchisee shall reimburse WST for its costs and expenses (including the allocation of any internal costs) for such action, plus 10% as an administrative fee.

**11.4    Right to Discontinue Supplies Upon Default.** While Franchisee is in default or breach of this Agreement, WST may (i) require that Franchisee pay cash on delivery for products or services supplied by WST, (ii) stop selling or providing any products and services to Franchisee, and/or (iii) request any third party vendors to not sell or provide products or services to Franchisee. No such action by WST shall be a breach or constructive termination of this Agreement, change in competitive circumstances or similarly characterized, and Franchisee shall not be relieved of any obligations under this Agreement because of any such action. Such rights of WST are in addition to any other right or remedy available to WST.

16

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 212 of 332

1799 Bender00000560

**11.5    Business Data.** All customer data and other non-public data generated by the Business is Confidential Information and is exclusively owned by WST. WST hereby licenses such data back to Franchisee without charge solely for Franchisee's use in connection with the Business for the term of this Agreement.

**11.6    Innovations.** Franchisee shall disclose to WST all ideas, plans, improvements, concepts, methods and techniques relating to the Business (collectively, "Innovations") conceived or developed by Franchisee, its employees, agents or contractors. WST will automatically own all Innovations, and will have the right to use and incorporate any Innovations into the System, without any compensation to Franchisee.

**11.7    Communication Systems.** If WST provides email accounts and/or other communication systems to Franchisee, then Franchisee acknowledges that it has no expectation of privacy in the assigned email accounts and other communications systems, and authorizes WST to access such communications.

**11.8    Delegation.** WST may delegate any duty or obligation of WST under this Agreement to a third party.

**11.9    System Variations.** WST may vary or waive any System Standard for any one or more WaterStation franchises due to the peculiarities of the particular site or circumstances, density of population, business potential, population of trade area, existing business practices, or any other condition relevant to the performance of a franchise or group of franchises. Franchisee is not entitled to the same variation or waiver.

**11.10   Temporary Public Safety Closure.** If WST discovers or becomes aware of any aspect of the Business which, in WST's opinion, constitutes an imminent danger to the health or safety of any person, then immediately upon WST's order, Franchisee must temporarily cease operations of the Business and remedy the dangerous condition. WST shall have no liability to Franchisee or any other person for action or failure to act with respect to a dangerous condition.

## ARTICLE 12.          MARKS

**12.1    Authorized Marks.** Franchisee shall use no trademarks, service marks or logos in connection with the Business other than the Marks. Franchisee shall use all Marks specified by WST, and only in the manner as WST may require. Franchisee has no rights in the Marks other than the right to use them in the operation of the Business in compliance with this Agreement. All use of the Marks by Franchisee and any goodwill associated with the Marks, including any goodwill arising due to Franchisee's operation of the Business, will inure to the exclusive benefit of WST.

**12.2    Change of Marks.** WST may add, modify, or discontinue any Marks to be used under the System. Within a reasonable time after WST makes any such change, Franchisee must comply with the change, at Franchisee's expense.

1799 Bender00000561

**12.3    Infringement.**

(a)    <u>Defense of Franchisee</u>. If Franchisee has used the Marks in accordance with this Agreement, then (i) WST shall defend Franchisee (at WST's expense) against any Action by a third party alleging infringement by Franchisee's use of a Mark, and (ii) WST will indemnify Franchisee for expenses and damages if the Action is resolved unfavorably to Franchisee.

(b)    <u>Infringement By Third Party</u>. Franchisee shall promptly notify WST if Franchisee becomes aware of any possible infringement of a Mark by a third party. WST may, in its sole discretion, commence or join any claim against the infringing party.

(c)    <u>Control</u>. WST shall have the exclusive right to control any prosecution or defense of any Action related to possible infringement of or by the Marks.

## ARTICLE 13.    COVENANTS

**13.1    Confidential Information.** With respect to all Confidential Information, Franchisee shall (a) adhere to all procedures prescribed by WST for maintaining confidentiality, (b) disclose such information to its employees only to the extent necessary for the operation of the Business; (c) not use any such information in any other business or in any manner not specifically authorized in writing by WST, (d) exercise the highest degree of diligence and effort to maintain the confidentiality of all such information during and after the term of this Agreement, (e) not copy or otherwise reproduce any Confidential Information, and (f) promptly report any unauthorized disclosure or use of Confidential Information. Franchisee acknowledges that all Confidential Information is owned by WST (except for Confidential Information which WST licenses from another person or entity). This Section will survive the termination or expiration of this Agreement indefinitely.

**13.2    Covenants Not to Compete.**

(a)    <u>Restriction – In Term</u>. During the term of this Agreement, neither Franchisee, any Owner, nor any spouse of an Owner (the "<u>Restricted Parties</u>") shall directly or indirectly have any ownership interest in, or be engaged or employed by, any Competitor.

(b)    <u>Restriction – Post Term</u>. For two years after this Agreement expires or is terminated for any reason (or, if applicable, for two years after a Transfer), no Restricted Party shall directly or indirectly have any ownership interest in, or be engaged or employed by, any Competitor in the United States.

(c)    <u>Interpretation</u>. The parties agree that each of the foregoing covenants is independent of any other covenant or provision of this Agreement. If all or any portion of the covenants in this Section is held to be unenforceable or unreasonable by any court, then the parties intend that the court modify such restriction to the minimum extent reasonably necessary to protect the legitimate business interests of WST. Franchisee agrees that the existence of any claim it may have against WST shall not constitute a defense to the enforcement by WST of the covenants of this Section. If a Restricted Party fails to comply with the obligations under this Section during the restrictive period, then the restrictive period will be extended for each day of noncompliance.

<div align="center">18</div>

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 214 of 332

1799 Bender00000562

**13.3** **Employee Recruitment.** During the term of this Agreement and for one year after termination, transfer, or expiration of this Agreement, Franchisee shall not knowingly employ or seek to employ or engage as an independent contractor any person then employed by WST or by any other WaterStation franchisee.

**13.4** **General Manager and Key Employees.** If requested by WST, Franchisee will cause its general manager and other key employees to sign WST's then-current form of confidentiality and non-compete agreement.

## ARTICLE 14. DEFAULT AND TERMINATION

**14.1** **Termination by Franchisee.** Franchisee may terminate this Agreement only if WST violates a material provision of this Agreement and fails to cure or to make substantial progress toward curing the violation within 30 days after receiving written notice from Franchisee detailing the alleged default. Termination by Franchisee is effective 10 days after WST receives written notice of termination.

**14.2** **Termination by WST.**

(a)  <u>Subject to 10-Day Cure Period</u>. WST may terminate this Agreement if Franchisee does not make any payment to WST when due, or if Franchisee does not have sufficient funds in its account when WST attempts an electronic funds withdrawal, and Franchisee fails to cure such non-payment within 10 days after WST gives notice to Franchisee of such breach.

(b)  <u>Subject to 30-Day Cure Period</u>. If Franchisee breaches this Agreement in any manner not described in subsection (a) or (c), and fails to cure such breach to WST's satisfaction within 30 days after WST gives notice to Franchisee of such breach, then WST may terminate this Agreement.

(c)  <u>Without Cure Period</u>. WST may terminate this Agreement by giving notice to Franchisee, without opportunity to cure, if any of the following occur:

(i)  Franchisee misrepresented or omitted material facts when applying to be a franchisee, or breaches any representation in this Agreement;

(ii)  Franchisee intentionally submits any false report or intentionally provides any other false information to WST;

(iii)  a receiver or trustee for the Business or all or substantially all of Franchisee's property is appointed by any court, or Franchisee makes a general assignment for the benefit of Franchisee's creditors or Franchisee makes a written statement to the effect that Franchisee is unable to pay its debts as they become due, or a levy or execution is made against the Business, or an attachment or lien remains on the Business for 30 days unless the attachment or lien is being duly contested in good faith by Franchisee, or a petition in bankruptcy is filed by Franchisee, or such a petition is filed against or consented to by Franchisee and the petition is not dismissed within 45 days, or Franchisee is adjudicated as bankrupt;

WaterStation FDD 2017                                          Franchise Agreement

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 215 of 332

1799 Bender00000563

(iv)     Franchisee fails to open for business by the date specified on the Summary Page;

(v)      Franchisee or any Owner commits a material violation of <u>Section 7.2</u> (compliance with laws) or <u>Section 13.1</u> (confidentiality), violates <u>Section 13.2</u> (non-compete) or <u>Article 15</u> (transfer), or commits any other violation of this Agreement which by its nature cannot be cured;

(vi)     Franchisee abandons or ceases operation of the Business for more than five consecutive days;

(vii)    Franchisee or any Owner slanders or libels WST or any of its employees, directors, or officers;

(viii)   Franchise refuses to cooperate with or permit any audit or inspection by WST or its agents or contractors, or otherwise fails to comply with <u>Section 10.5</u> or <u>Section 11.2</u>.

(ix)     the Business is operated in a manner which, in WST's reasonable judgment, constitutes a significant danger to the health or safety of any person, and Franchisee fails to cure such danger within 48 hours after becoming aware of the danger (due to notice from WST or otherwise);

(x)      Franchisee has received two or more notices of default and Franchisee commits another breach of this Agreement, all in the same 12-month period;

(xi)     WST (or any affiliate) terminates any other agreement with Franchisee (or any affiliate) due to the breach of such other agreement by Franchisee (or its affiliate); or

(xii)    Franchisee or any Owner is charged with, pleads guilty to, or is convicted of a felony, or is accused by any governmental authority or third party of any act that in WST's opinion is reasonably likely to materially and unfavorably affect WST's brand.

**14.3    Effect of Termination.** Upon termination or expiration of this Agreement, all obligations that by their terms or by reasonable implication survive termination, including those pertaining to non-competition, confidentiality, indemnity, and dispute resolution, will remain in effect, and Franchisee must immediately:

(i)      pay all amounts owed to WST based on the operation of the Business through the effective date of termination or expiration;

(ii)     return to WST all copies of the Manual, Confidential Information and any and all other materials provided by WST to Franchisee or created by a third party for Franchisee relating to the operation of the Business, and all items containing any Marks, copyrights, and other proprietary items;

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 216 of 332
1799 Bender00000564

(iii) notify the telephone, internet, email, electronic network, directory, and listing entities of the termination or expiration of Franchisee's right to use any numbers, addresses, domain names, locators, directories and listings associated with any of the Marks, and authorize their transfer to WST or any new franchisee as may be directed by WST, and Franchisee hereby irrevocably appoints WST, with full power of substitution, as its true and lawful attorney-in-fact, which appointment is coupled with an interest; to execute such directions and authorizations as may be necessary or appropriate to accomplish the foregoing; and

(iv) cease doing business under any of the Marks.

**14.4   Remove Identification.** Within five days after termination or expiration, Franchisee shall at its own expense "de-identify" all of its operations so that it no longer contains the Marks, signage, or any trade dress of a WaterStation business, to the reasonable satisfaction of WST. Franchisee shall comply with any reasonable instructions and procedures of WST for de-identification.

**14.5   Other Claims.** Termination of this Agreement by WST will not affect or discharge any claims, rights, causes of action or remedies (including claims for WST's lost future income after termination), which WST may have against Franchisee, whether arising before or after termination.

**14.6   Purchase Option.** When this Agreement expires or is terminated, WST will have the right (but not the obligation) to purchase any or all of the assets related to the Business (including any or all WaterStation machines) at fair market value. To exercise this option, WST must notify Franchisee no later than 30 days after this Agreement expires or is terminated. If the parties cannot agree on fair market value within 30 days after the exercise notice, the fair market value will be determined by an independent appraiser reasonably acceptable to both parties. The parties will equally share the cost of the appraisal. WST's purchase will be of assets only (free and clear of all liens), and will not include any liabilities of Franchisee. If WST exercises the purchase option, WST may deduct from the purchase price: (a) all amounts due from Franchisee; (b) Franchisee's portion of the cost of any appraisal conducted hereunder; and (c) amounts paid or to be paid by WST to cure defaults under Franchisee's lease and/or amounts owed by Franchisee to third parties. If any of the assets are subject to a lien, WST may pay a portion of the purchase price directly to the lienholder to pay off such lien. WST may withhold 25% of the purchase price for 90 days to ensure that all of Franchisee's taxes and other liabilities are paid. WST may assign this purchase option to another party.

## ARTICLE 15.        TRANSFERS

**15.1   By WST.** WST may transfer or assign this Agreement, or any of its rights or obligations under this Agreement, to any person or entity, and WST may undergo a change in ownership and/or control, without the consent of Franchisee.

**15.2   By Franchisee.** Franchisee acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee and that WST entered into this Agreement in reliance on Franchisee's business skill, financial capacity, personal character, experience, and business

21

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 217 of 332

1799 Bender00000565

ability. Accordingly, Franchisee shall not conduct or undergo a Transfer without providing WST at least 30 days prior notice of the proposed Transfer, and without obtaining WST's consent. In granting any such consent, WST may impose conditions, including, without limitation, the following:

 (i) WST receives a transfer fee equal to $5,000, payable Franchisee notifies WST of Franchisee's intent to sell the Business (WST will refund 50% of this fee if Franchisee does not sell the Business);

 (ii) the proposed assignee and its owners have completed WST's franchise application processes, meet WST's then-applicable standards for new franchisees, and have been approved by WST as franchisees;

 (iii) the proposed assignee is not a Competitor;

 (iv) the proposed assignee executes WST's then-current form of franchise agreement, which form may contain materially different provisions;

 (v) Franchisee has paid all monetary obligations to WST in full, and Franchisee is not otherwise in default or breach of this Agreement;

 (vi) the proposed assignee and its owners and employees undergo such training as WST may require;

 (vii) Franchisee, its Owners, and the transferee and its owners execute a general release of WST in a form satisfactory to WST; and

 (viii) the Business fully complies with all of WST's most recent System Standards.

**15.3 Transfer for Convenience of Ownership.** If Franchisee is an individual, Franchisee may Transfer this Agreement to a corporation or limited liability company formed for the convenience of ownership after at least 15 days' notice to WST, if, prior to the Transfer: (1) the transferee provides the information required by Section 2.3; (2) Franchisee provides copies of the entity's charter documents, by-laws (or operating agreement) and similar documents, if requested by WST, (3) Franchisee owns all voting securities of the corporation or limited liability company, and (4) Franchisee provides a guaranty in accordance with Section 2.5.

**15.4 Transfer upon Death or Incapacity.** Upon the death or incapacity of Franchisee (or, if Franchisee is an entity, the person with the largest ownership interest in Franchisee), the executor, administrator, or personal representative of that person must Transfer the Business to a third party approved by WST within nine months after death or incapacity. Such transfer must comply with Section 15.2.

**15.5 WST's Right of First Refusal.** Before Franchisee (or any Owner) engages in a Transfer (except under Section 15.3 or Section 15.4), WST will have a right of first refusal, as set forth in this Section. Franchisee (or its owners) shall provide to WST a copy of the terms and conditions of any Transfer. For a period of 30 days from the date of WST's receipt of such copy, WST will have the right, exercisable by notice to Franchisee, to purchase the assets subject of the proposed

22

24-01863-FPC11  Doc 1161-2  Filed 08/01/25  Entered 08/01/25 21:58:04  Pg 218 of 332
1799 Bender00000566

Transfer for the same price and on the same terms and conditions (except that WST may substitute cash for any other form of payment). If WST does not exercise its right of first refusal, Franchisee may proceed with the Transfer, subject to the other terms and conditions of this Article.

**15.6    No Sublicense.** Franchisee has no right to sublicense the Marks or any of Franchisee's rights under this Agreement.

**15.7    No Lien on Agreement.** Franchisee shall not grant a security interest in this Agreement to any person or entity. If Franchisee grants an "all assets" security interest to any lender or other secured party, Franchisee shall cause the secured party to expressly exempt this Agreement from the security interest.

## ARTICLE 16.        INDEMNITY

**16.1    Indemnity.** Franchisee shall indemnify and defend (with counsel reasonably acceptable to WST) WST, its parent entities, subsidiaries and affiliates, and their respective owners, directors, officers, employees, agents, successors and assignees (collectively, "Indemnitees") against all Losses in any Action by or against WST and/or any Indemnitee directly or indirectly related to, or alleged to arise out of, the operation of the Business. Notwithstanding the foregoing, Franchisee shall not be obligated to indemnify an Indemnitee from claims arising as a result of any Indemnitee's misconduct or negligence. This indemnity will continue in effect after this Agreement ends.

**16.2    Assumption by WST.** WST may elect to assume the defense and/or settlement of any Action subject to this indemnification, at Franchisee's expense. Such an undertaking shall not diminish Franchisee's obligation to indemnify the Indemnitees.

## ARTICLE 17.        DISPUTE RESOLUTION

**17.1    Arbitration.**

(a)    Disputes Subject to Arbitration. Except as expressly provided in subsection (c), any controversy or claim arising out of or relating to this Agreement (including its formation), shall be resolved by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, including the Optional Rules for Emergency Measures of Protection. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction.

(b)    Location. The place of arbitration shall be the city and state where WST's headquarters are located.

(c)    Injunctive Relief. Either party may apply to the arbitrator seeking injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved. Either party also may, without waiving any remedy or right to arbitrate under this Agreement, seek from any court having jurisdiction any interim or provisional injunctive relief.

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 219 of 332

1799 Bender00000567

(d)     <u>Confidentiality</u>. All documents, information, and results pertaining to any arbitration or lawsuit will be confidential, except as required by law or as required for WST to comply with laws and regulations applicable to the sale of franchises.

(e)     <u>Performance During Arbitration or Litigation</u>. Unless this Agreement has been terminated, WST and Franchisee will comply with this Agreement and perform their respective obligations under this Agreement during the arbitration or litigation process.

**17.2     Damages.** In any controversy or claim arising out of or relating to this Agreement, each party waives any right to punitive or other monetary damages not measured by the prevailing party's actual damages, except damages authorized by federal statute. In the event of termination of this Agreement prior the expiration of the term, WST's actual damages will include its lost future income from Royalty Fees and other amounts that Franchisee would have owed to WST but for the termination.

**17.3     Waiver of Class Actions.** The parties agree that any claims will be arbitrated, litigated, or otherwise resolved on an individual basis, and waive any right to act on a class-wide basis.

**17.4     Time Limitation.** Any arbitration or other legal action arising from or related to this Agreement must be instituted within two years from the date such party discovers the conduct or event that forms the basis of the arbitration or other legal action. The foregoing time limit does not apply to claims (i) by one party related to non-payment under this Agreement by the other party, (ii) for indemnity under <u>Article 16</u>, or (iii) related to unauthorized use of Confidential Information or the Marks.

**17.5     Venue Other Than Arbitration.** For any legal proceeding not required to be submitted to arbitration, the parties agree that any such legal proceeding will be brought in the United States District Court where WST's headquarters is then located. If there is no federal jurisdiction over the dispute, the parties agree that any such legal proceeding will be brought in the court of record of the state and county where WST's headquarters is then located. Each party consents to the jurisdiction of such courts and waives any objection that it, he or she may have to the laying of venue of any proceeding in any of these courts.

**17.6     Legal Costs.** In any legal proceeding (including arbitration) related to this Agreement or any guaranty, the non-prevailing party shall pay the prevailing party's attorney fees, costs and other expenses of the legal proceeding. "Prevailing party" means the party, if any, which prevailed upon the central litigated issues and obtained substantial relief.

<div align="center">

**ARTICLE 18.          MISCELLANEOUS**

</div>

**18.1     Relationship of the Parties.** The parties are independent contractors, and neither is the agent, partner, joint venture, or employee of the other. WST is not a fiduciary of Franchisee and does not control Franchisee or its Business. WST has no liability for Franchisee's obligations to any third party whatsoever.

**18.2     No Third Party Beneficiaries.** This Agreement does not confer any rights or remedies upon any person or entity other than Franchisee, WST, and WST's affiliates.

<div align="center">24</div>

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 220 of 332

1799 Bender00000568

**18.3    Entire Agreement.** This Agreement constitutes the entire agreement of the parties and supersedes all prior negotiations and representations. Nothing in this Agreement or in any related agreement is intended to disclaim the representations made by WST in its franchise disclosure document.

**18.4    Modification.** No modification or amendment of this Agreement will be effective unless it is in writing and signed by both parties. This provision does not limit WST's rights to modify the Manual or System Standards.

**18.5    Consent; Waiver.** No consent under this Agreement, and no waiver of satisfaction of a condition or nonperformance of an obligation under this Agreement will be effective unless it is in writing and signed by the party granting the consent or waiver. No waiver by a party of any right will affect the party's rights as to any subsequent exercise of that right or any other right. No delay, forbearance or omission by a party to exercise any right will constitute a waiver of such right.

**18.6    Cumulative Remedies.** Rights and remedies under this Agreement are cumulative. No enforcement of a right or remedy precludes the enforcement of any other right or remedy.

**18.7    Severability.** The parties intend that (i) if any provision of this Agreement is held by an arbitrator or court to be unenforceable, then that provision will be modified to the minimum extent necessary to make it enforceable, unless that modification is not permitted by law, in which case that provision will be disregarded, and (ii) if an unenforceable provision is modified or disregarded, then the rest of this Agreement will remain in effect as written.

**18.8    Governing Law.** The laws of the state of Washington (without giving effect to its principles of conflicts of law) govern all adversarial proceedings between the parties. The parties do not intend that the Washington Franchise Investment Protection Act or any other law or regulation of the state of Washington for the protection of franchisees or business opportunity purchasers apply unless Franchisee is located in the state of Washington.

**18.9    Notices.** Any notice will be effective under this Agreement only if made in writing and delivered as set forth in this Section to: (A) if to Franchisee, addressed to Franchisee at the notice address set forth in the Summary Page; and (B) if to WST, addressed to 2732 Grand Avenue Suite 122, Everett, WA 98201. Any party may designate a new address for notices by giving notice of the new address pursuant to this Section. Notices will be effective upon receipt (or first rejection) and must be: (1) delivered personally; (2) sent by registered or certified U.S. mail with return receipt requested; or (3) sent via overnight courier. Notwithstanding the foregoing, WST may amend the Manual, give binding notice of changes to System Standards, and deliver notices of default by electronic mail or other electronic communication.

**18.10   Joint and Several Liability.** If two or more people sign this Agreement as "Franchisee", each will have joint and several liability.

**18.11   No Offer and Acceptance.** Delivery of a draft of this Agreement to Franchisee by WST does not constitute an offer. This Agreement shall not be effective unless and until it is executed by both Franchisee and WST.

25

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 221 of 332

1799 Bender00000569

# ARTICLE 19.  CERTIFICATION OF FRANCHISOR'S COMPLIANCE

By signing this Agreement, Franchisee acknowledges the following:

    (1)    Franchisee understands all the information in WST's Disclosure Document.

    (2)    Franchisee understands the success or failure of the Business will depend in large part upon Franchisee's skills, abilities and efforts and those of the persons Franchisee employs, as well as many factors beyond Franchisee's control such as weather, competition, interest rates, the economy, inflation, labor and supply costs, lease terms and the marketplace.

    (3)    That no person acting on WST's behalf made any statement or promise regarding the costs involved in operating a WaterStation franchise that is not in the Disclosure Document or that is contrary to, or different from, the information in the Disclosure Document.

    (4)    That no person acting on WST's behalf made any claim or representation to Franchisee, orally, visually, or in writing, that contradicted the information in this Disclosure Document.

    (5)    That no person acting on WST's behalf made any statement or promise regarding the actual, average or projected profits or earnings, the likelihood of success, the amount of money Franchisee may earn, or the total amount of revenue a WaterStation franchise will generate, that is not in the Disclosure Document or that is contrary to, or different from, the information in the Disclosure Document.

    (6)    That no person acting on WST's behalf made any statement or promise or agreement, other than those matters addressed in this Agreement, concerning advertising, marketing, media support, market penetration, training, support service, or assistance that is contrary to, or different from, the information contained in the Disclosure Document.

    (7)    Franchisee understands that this Agreement contains the entire agreement between WST and Franchisee concerning the WaterStation franchise, which means that any oral or written statements not set out in this Agreement will not be binding.

[*Signatures on next page*]

Franchise Agreement

1799 Bender00000570

Agreed to by:

FRANCHISOR:

WST FRANCHISE SYSTEMS LLC

By: _____
Name: _____
Title: _____
Date: _____

FRANCHISEE:

[*if an individual:*]

_____
Name: _____
Date: _____

[*if an entity:*]

_____

By: _____
Name: _____
Title: _____
Date: _____

(*Check if applicable*) At the same time as the parties execute this Agreement, they are also executing a Rider to Franchise Agreement pursuant to:

_____ Illinois
_____ Indiana
_____ Maryland
_____ Minnesota
_____ New York
_____ North Dakota
_____ Rhode Island
_____ Washington
_____ Other

27

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 223 of 332

1799 Bender00000571

**Attachment 1 to Franchise Agreement**

**OWNERSHIP INFORMATION**

1.    **Form of Ownership.** Franchisee is a (check one):

       **_____**     *Sole Proprietorship*
       **_____**     *Partnership*
       **_____**     *Limited Liability Company*
       **_____**     *Corporation*

    State of incorporation / organization / residence: **_____**

2.    **Owners.** If Franchisee is a partnership, limited liability company or corporation:

| Name | Shares or Percentage of Ownership |
|------|-----------------------------------|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

3.    **Officers.** If Franchisee is a limited liability company or corporation:

| Name | Title |
|------|-------|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

WaterStation FDD 2017

Franchise Agreement

1799 Bender00000572

**GUARANTY AND NON-COMPETE AGREEMENT**

This Guaranty and Non-Compete Agreement (this "Guaranty") is executed by the undersigned person(s) (each, a "Guarantor") in favor of WST Franchise Systems LLC, a Washington limited liability company ("WST").

**Background Statement:** _____ ("Franchisee") desires to enter into a Franchise Agreement with WST for the franchise of a WaterStation business (the "Franchise Agreement"; capitalized terms used but not defined in this Guaranty have the meanings given in the Franchise Agreement). Guarantor owns an equity interest in Franchisee. Guarantor is executing this Guaranty in order to induce WST to enter into the Franchise Agreement.

Guarantor agrees as follows:

1.     **Guaranty.** Guarantor hereby unconditionally guarantees to WST and its successors and assigns that Franchisee shall pay and perform every undertaking, agreement and covenant set forth in the Franchise Agreement and further guarantees every other liability and obligation of Franchisee to WST, whether or not contained in the Franchise Agreement. Guarantor shall render any payment or performance required under the Franchise Agreement or any other agreement between Franchisee and WST upon demand from WST. Guarantor waives (a) acceptance and notice of acceptance by WST of this Guaranty; (b) notice of demand for payment of any indebtedness or nonperformance of any obligations of Franchisee; (c) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed; (d) any right Guarantor may have to require that an action be brought against Franchisee or any other person or entity as a condition of liability hereunder; (e) all rights to payments and claims for reimbursement or subrogation which any of the undersigned may have against Franchisee arising as a result of the execution of and performance under this Guaranty by the undersigned; (f) any law which requires that WST make demand upon, assert claims against or collect from Franchisee or any other person or entity (including any other guarantor), foreclose any security interest, sell collateral, exhaust any remedies or take any other action against Franchisee or any other person or entity (including any other guarantor) prior to making any demand upon, collecting from or taking any action against the undersigned with respect to this Guaranty; and (g) any and all other notices and legal or equitable defenses to which Guarantor may be entitled.

2.     **Confidential Information.** With respect to all Confidential Information Guarantor shall (a) adhere to all security procedures prescribed by WST for maintaining confidentiality, (b) disclose such information to its employees only to the extent necessary for the operation of the Business; (c) not use any such information in any other business or in any manner not specifically authorized or approved in writing by WST, (d) exercise the highest degree of diligence and make every effort to maintain the confidentiality of all such information during and after the term of the Franchise Agreement, (e) not copy or otherwise reproduce any Confidential Information, and (f) promptly report any unauthorized disclosure or use of Confidential Information. Guarantor acknowledges that all Confidential Information is owned by

29

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 225 of 332

1799 Bender00000573

WST or its affiliates (except for Confidential Information which WST licenses from another person or entity). Guarantor acknowledges that all customer data generated or obtained by Guarantor is Confidential Information belonging to WST. This Section will survive the termination or expiration of the Franchise Agreement indefinitely.

3. **Covenants Not to Compete.**

(a) <u>Restriction - In Term</u>. During the term of the Franchise Agreement, Guarantor shall not directly or indirectly have any ownership interest in, or be engaged or employed by, any Competitor.

(b) <u>Restriction – Post Term</u>. For two years after the Franchise Agreement expires or is terminated for any reason (or, if applicable, for two years after a Transfer by Guarantor), Guarantor shall not directly or indirectly have any ownership interest in, or be engaged or employed by, any Competitor operating in the United States.

(c) <u>Interpretation</u>. Guarantor agrees that each of the foregoing covenants is independent of any other covenant or provision of this Guaranty or the Franchise Agreement. If all or any portion of the covenants in this Section is held to be unenforceable or unreasonable by any court, then the parties intend that the court modify such restriction to the minimum extent reasonably necessary to protect the legitimate business interests of WST. Guarantor agrees that the existence of any claim it or Franchisee may have against WST shall not constitute a defense to the enforcement by WST of the covenants of this Section. If Guarantor fails to comply with the obligations under this Section during the restrictive period, then the restrictive period will be extended for each day of noncompliance.

4. **Employee Recruitment.** During the term of the Franchise Agreement and for one year after termination, transfer, or expiration of the Franchise Agreement, Guarantor shall not knowingly employ or seek to employ or engage as an independent contractor any person then employed by WST or by any other franchisee of WST.

5. **Modification.** Guarantor agrees that Guarantor's liability hereunder shall not be diminished, relieved or otherwise affected by (a) any amendment of the Franchise Agreement, (b) any extension of time, credit or other indulgence which WST may from time to time grant to Franchisee or to any other person or entity, or (c) the acceptance of any partial payment or performance or the compromise or release of any claims.

6. **Governing Law; Dispute Resolution.** This Guaranty shall be governed by and construed in accordance with the laws of the state of Washington. The provisions of Article 17 (Dispute Resolution) of the Franchise Agreement apply to and are incorporated into this Guaranty as if fully set forth herein. If multiple Guarantors sign this Guaranty, each will have joint and several liability.

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 226 of 332

1799 Bender00000574

Agreed to by:

Name: _____
Address: _____
_____
_____
Date: _____


Name: _____
Address: _____
_____
_____
Date: _____


Name: _____
Address: _____
_____
_____
Date: _____

Franchise Agreement

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 227 of 332

1799 Bender00000575

**EXHIBIT C**

**MANAGEMENT AGREEMENT**

This Management Agreement (this "Agreement") is made as of _____ between WaterStation Management LLC, a Washington limited liability company ("Manager") and _____, a _____ _____ ("Franchisee").

**Background Statement:** Franchisee and WST Franchise Systems LLC, a Washington limited liability company("WST") are parties to a Franchise Agreement dated _____ pursuant which Franchisee agreed to purchase WaterStation vending machines (the "Machines") and operate a WaterStation franchise. Franchisee and Manager desire that Manager manage Franchisee's WaterStation franchise on the terms and conditions set forth herein.

**1.      Engagement.** Franchisee hereby engages Manager to provide the following services to Franchisee (the "Services"):

      (i)      identify and obtain locations for the Machines, on such terms as Manager deems appropriate;

      (ii)      deliver, setup, and install Machines;

      (iii)      operate, inspect, service, repair, and maintain the Machines;

      (iv)      collect funds from the Machines;

      (v)      provide monthly reports to Franchisee, summarizing sales, revenues, and other business metrics;

      (vi)      manage the relationship with the lessor of space each Machine, including remitting any payments to the lessor;

      (vii)      remit funds owed to WST under the Franchise Agreement;

      (viii)      relocate a Machine if Manager deems appropriate; and

      (ix)      remove the Machine from a location when Manager deems appropriate or when the location is no longer available.

**2.      Term.** This Agreement shall run concurrently with the term of the Franchise Agreement.

**3.      Financial Management.** Manager shall document all water vending sales and collect all cash payments contained in the Machines. Manager shall forward the accrued sum to Franchisee on or before the tenth day of each month for the previous month's sales, less any fees owed to Manager or WST.

1

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 228 of 332

1799 Bender00000576

4. **Maintenance and Service Fee.** Manager shall be due a maintenance and service fee (the "M&S Fee") equal to 20% of all gross sales from or related to the Machines (including products and advertising). Manager shall deduct the M&S Fee from funds collected from the Machines.

5. **Risk of Loss and Insurance.** Franchisee is responsible for maintaining insurance on the Machines and bears all risk of loss.

6. **Good Faith and Commercially Reasonable Efforts.** In providing the Services, Manager shall act in good faith and use commercially reasonable efforts. Franchisee acknowledges that Manager makes no guaranties or representations regarding the profitability of any location or Machine.

7. **Expenses.** Manager is solely responsible for all expenses of providing the Services.

8. **Termination By Franchisee.** Franchisee may terminate this Agreement at any time after 30 days' notice. If Franchisee relocates the Machines after termination, Franchisee will bear all costs thereof. Such termination shall not cause the termination of the Franchise Agreement or release Franchisee from any obligations thereunder.

9. **Termination By Manager.** Manager may terminate this Agreement (i) upon 90 days' prior notice to Franchisee, or (ii) if the Franchise Agreement is terminated or any circumstance arises that would permit WST to terminate the Franchise Agreement.

10. **Delegation.** Franchisee acknowledges the Manager may delegate the performance of one or more of the Services to third parties.

11. **Miscellaneous.** This Agreement shall be governed by and construed in accordance with the laws of the state of Washington. The provisions of Article 17 (Dispute Resolution) and Article 18 (Miscellaneous) of the Franchise Agreement apply to and are incorporated into this Agreement as if fully set forth herein, and as if "Manager" was substituted for "WST".

*[Signatures on next page]*

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 229 of 332

1799 Bender00000577

Agreed to by:

MANAGER:

WATERSTATION MANAGEMENT LLC

By: _____
Name: _____
Title: _____
Date: _____


FRANCHISEE:

[*if an individual:*]

_____
Name: _____
Date: _____

[*if an entity:*]

_____

By: _____
Name: _____
Title: _____
Date: _____

3

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 230 of 332

1799 Bender00000578

# EXHIBIT D

# FORM OF GENERAL RELEASE

[*This is our current standard form of General Release. This document is not signed when you purchase a franchise. In circumstances, such as a renewal of your franchise or as a condition of our approval of a sale of your franchise, we may require you to sign a general release.*]

This General Release ("Release") is executed by the undersigned ("Releasor") in favor of WST Franchise Systems LLC, a Washington limited liability company ("WST").

**Background Statement**: [*describe circumstances of Release*]

Releasor agrees as follows:

1.      **Release.** Releasor (on behalf of itself and its parents, subsidiaries and affiliates and their respective past and present officers, directors, shareholders, managers, members, partners, agents, and employees (collectively, the "Releasing Parties")) hereby releases WST, its affiliates, and their respective directors, officers, shareholders, employees, and agents (collectively, the "Released Parties") from any and all claims, causes of action, suits, debts, agreements, promises, demands, liabilities, contractual rights and/or obligations, of whatever nature, known or unknown, which any Releasing Party now has or ever had against any Released Party based upon and/or arising out of events that occurred through the date hereof, including without limitation, anything arising out of the Franchise Agreement (collectively, "Claims").

2.      **Covenant Not to Sue.** Releasor (on behalf of all Releasing Parties) covenants not to initiate, prosecute, encourage, assist, or (except as required by law) participate in any civil, criminal, or administrative proceeding or investigation in any court, agency, or other forum, either affirmatively or by way of cross-claim, defense, or counterclaim, against any Released Party with respect to any Claim.

3.      **Representations and Acknowledgments.** Releasor represents and warrants that: (i) Releasor is the sole owner of all Claims, and that no Releasing Party has assigned or transferred, or purported to assign or transfer, to any person or entity, any Claim; (ii) Releasor has full power and authority to sign this Release; and (iii) this Release has been voluntarily and knowingly signed after Releasor has had the opportunity to consult with counsel of Releasor's choice. Releasor acknowledges that the release in Section 1 is a complete defense to any Claim.

4.      **Miscellaneous.** If any of the provisions of this Release are held invalid for any reason, the remainder of this Release will not be affected and will remain in full force and effect. In the event of any dispute concerning this Release, the dispute resolution, governing law, and venue provisions of the Franchise Agreement shall apply. Releasor agrees to take any actions and sign any documents that WST reasonably requests to effectuate the purposes of this Release. This Release contains the entire agreement of the parties concerning the subject matter hereof.

Agreed to by:

1799 Bender00000579

Name: _____

Date: _____

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 232 of 332

1799 Bender00000580

# EXHIBIT E

# FINANCIAL STATEMENTS

WaterStation FDD 2017

1799 Bender00000581



A. ANDREW GIANIODIS
CERTIFIED PUBLIC ACCOUNTANT

## WST FRANCHISE SYSTEMS, LLC

MARCH 1, 2017

FINANCIAL STATEMENTS

279 Niagara Falls Blvd.     Amherst, New York 14226     716 – 510-6068

# WST Franchise Systems, LLC

## Table of Contents

|  | Page |
|---|---|
| Independent Auditor's Report | 1 |
| Balance Sheet | 2 |
| Statement of Operations | 3 |
| Statement of Changes in Owner's Equity | 4 |
| Statement of Cash Flows | 5 |
| Notes to Financial Statements | 6 - 7 |

WaterStation FDD 2017



**A. ANDREW GIANIODIS**
CERTIFIED PUBLIC ACCOUNTANT

March 15, 2017

## INDEPENDENT AUDITORS' REPORT

Board of Directors and Members of
WST Franchise Systems, LLC:

REPORT ON FINANCIAL STATEMENTS

I have audited the accompanying balance sheet of WST Franchise Systems, LLC (a limited liability company) as of March 1, 2017 and the related statements of operations, changes in owner's equity and cash flows for the period then ended. These financial statements are the responsibility of the Company's management.

MANAGEMENT'S RESPONSIBILITY FOR THE FINANCIAL STATEMENTS

Management is responsible for the preparation and fair presentation of these financial statements in accordance with principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation of financial statements that are free from material misstatement, whether due to fraud or error.

AUDITOR'S RESPONSIBILITY

My responsibility is to express an opinion on these financial statements based on my audits. I conducted my audits in accordance with generally accepted auditing standards as accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.

An audit includes performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of risks of material misstatements of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the Company's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, I express no such opinion.

-1-

279 Niagara Falls Blvd.       Amherst, New York 14226       716 – 510-6068

WaterStation FDD 2017

An audit also includes evaluating appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements. examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.

I believe that the audit evidence I have obtained is sufficient and appropriate to provide a basis for my audit opinion.

OPINION

In my opinion, the financial statements referred to above present fairly, in all material respects, the financial position of WST Franchise Systems, LLC (a limited liability company) as of March 1, 2017 and the results of operations and its cash flows for the period then ended in conformity with accounting principles generally accepted in the United States of America.

A. Andrew Gianiodis
Certified Public Accountant

279 Niagara Falls Blvd.          Amherst, New York 14226          716 – 510-6068

1799 Bender00000585

# WST Franchise Systems LLC

## Balance Sheet
## March 1, 2017

### Assets

| | | |
|---|---|---|
| Current assets | | |
| Cash | $ | 100 |
| Miscellaneous Receiveables | | - |
| **Total Current Assets** | | 100 |
| **Total fixed assets** | | - |
| Other assets | | |
| Intangible assets (net) | | - |
| | | - |
| **Total Assets** | $ | 100 |

### Liabilities & Equity

| | | |
|---|---|---|
| Current liabilities | | |
| Due to affiliates | $ | 100 |
| Total Current Liabilities | | 100 |
| **Total liabilities** | | 100 |
| Member's Equity | | |
| Member's Equity | | - |
| **Total equity** | | - |
| **Total liabilities and equity** | $ | 100 |

*See accompanying notes*
*- 2 -*

## WST Franchise Systems LLC

### Statement of Operations
### Period ending March 1, 2017

| | | |
|---|---|---|
| Revenues | | |
| Franchise revenue | $ | - |
| | | - |
| Total revenue | | - |
| Cost of Sales | | - |
| Gross Margin | | - |
| Operating Expenses | | - |
| Net Income | $ | - |

*See accompanying notes*
- 3 -

WaterStation FDD 2017

# WST Franchise Systems LLC

## Statement of Changes in Owner's Equity
### Period ending March 1, 2017

|                                      | Total Equity |
| ------------------------------------ | ------------ |
| Owners' equity at February 15, 2017  | $ -          |
| Equity Infusion                      | -            |
| Net Loss                             | -            |
| Owners' equity at March 1, 2017      | $ -          |

*See accompanying notes*
- 4 -

# WST Franchise Systems LLC

## Statement of Cash Flows
### Period ending March 1, 2017

Cash flows from operating activities:

| | | |
|---|---|---|
| Net Loss | $ | - |
| Adjustments to reconcile net loss to net cash provided by operating<br>Depreciation & amortization | | - |
| Changes in assets and liabilities<br>Current assets<br>Current liabilities | | -<br>100 |
| Net cash provided by operating activities | | 100 |
| Cash flows from investing activities: | | |
| Proceeds from Note Payable<br>Purchase of Fixed Assets<br>Purchase of Intangible Assets | | -<br>-<br>- |
| Net cash provided by investing activities | | - |
| Cash flows from financing activities: | | |
| Proceeds from Equity Infusion | | - |
| Net cash provided by investing activities | | - |
| Net increase in cash | | 100 |
| Cash - beginning of period | | - |
| Cash - end of period | $ | 100 |
| Supplemental Disclosures<br>Interest Paid<br>Income Taxes Paid | | -<br>- |

*See accompanying notes*
- 5 -

WaterStation FDD 2017

## NOTE 1  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### ORGANIZATION AND NATURE OF BUSINESS

The Company (a Limited Liability Company) was organized on February 15, 2017 under the laws of the State of Washington for the purpose of offering franchise opportunities to entrepreneurs who want to own and operate their own Water Stations Technologies operation, as a franchise.

### BASIS OF PRESENTATION

The financial statements are presented on the accrual basis of accounting.

### REVENUE RECOGNITION

Initial franchise fees will be recorded as income when the company provides substantially all the initial services agreed upon in the franchise agreement or when the franchise has commenced operations, whichever comes first. If the fee is received over a period of time and the Company has no reasonable basis for estimating the collectability of the fee, the Company will use the installment method of recognition of the initial fee as revenue.

Monthly royalty fees will be recognized when reported by the franchisee.

### COMPANY INCOME TAXES

The Company is an LLC; as such, the Company will not be responsible for income taxes on the company level. Instead, its taxable income will be included on the owner's personal tax returns.

## NOTE 2  DISCLOSURE ABOUT FAIR VALUE OF FINANCIAL INSTRUMENTS

The Company estimates that the fair value of all financial instruments at March 1, 2017, as defined in FASB 107, does not differ materially from the aggregate carrying values of its financial instruments recorded in the accompanying balance sheet. The estimated fair value amounts have been determined by the Company using available market information and appropriate valuation methodologies. Considerable judgment is required in interpreting market data to develop the estimates of fair value, and accordingly, the estimates are not necessarily indicative of the amounts that the Company could realize in a current market exchange.

6

**NOTE 3  COMMITMENTS AND CONTINGENCIES**

The Company does not carry general liability or worker's compensation coverage, nor is it self-insured.

**NOTE 4  FRANCHISE AGREEMENT**

The terms of the Company's franchise agreement will be as follows:

A. The Company will grant the right to use the Company name, trademark and system in the franchisee's franchise development business.
B. The franchisee is obligated to pay a non-refundable initial franchise fee.
C. The franchisee is obligated to pay a monthly royalty fee. Certain other fees are also outlined in the agreement.

**NOTE 5  SUBSEQUENT EVENTS**

Subsequent events have been evaluated through March 15, 2017, the date that the financial statements were available to be issued.

7

WaterStation FDD 2017

**EXHIBIT F**

**OPERATING MANUAL TABLE OF CONTENTS**

| Manual Section | Number of Pages |
|---|---|
| Preface & Introduction | 25 |
| Establishing a WaterStation Technology Business | 37 |
| Personnel | 47 |
| Administrate Procedures | 19 |
| WaterStation Services | 19 |
| Selling and Marketing WaterStation Services | 12 |
| | |
| **Total Number of Pages** | **159** |

WaterStation FDD 2017

1799 Bender00000592

# EXHIBIT G

## CURRENT AND FORMER FRANCHISEES

Current Franchisees

Names of all current franchisees (as of the end of our last fiscal year) and the address and telephone number of each of their outlets:

      None

Former Franchisees

Name, city and state, and current business telephone number, or if unknown, the last known home telephone number of every franchisee who had an outlet terminated, canceled, not renewed, or otherwise voluntarily or involuntarily ceased to do business under the franchise agreement during the most recently completed fiscal year or who have not communicated with us within 10 weeks of the disclosure document issuance date:

      None

WaterStation FDD 2017

1799 Bender00000593

**EXHIBIT H**

**STATE ADDENDA TO DISCLOSURE DOCUMENT**

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 246 of
332

1799 Bender00000594

# CALIFORNIA ADDENDUM TO DISCLOSURE DOCUMENT

California Corporations Code, Section 31125 requires the franchisor to give the franchisee a disclosure document, approved by the Department Of Business Oversight, prior to a solicitation of a proposed material modification of an existing franchise.

THE CALIFORNIA FRANCHISE INVESTMENT LAW REQUIRES THAT A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE BE DELIVERED TOGETHER WITH THE OFFERING CIRCULAR.

OUR WEBSITE HAS NOT BEEN REVIEWED OR APPROVED BY THE CALIFORNIA DEPARTMENT OF BUSINESS OVERSIGHT. ANY COMPLAINTS CONCERNING THE CONTENT OF THIS WEBSITE MAY BE DIRECTED TO THE CALIFORNIA DEPARTMENT OF BUSINESS OVERSIGHT AT www.dbo.ca.gov.

THESE FRANCHISES HAVE BEEN REGISTERED UNDER THE FRANCHISE INVESTMENT LAW OF THE STATE OF CALIFORNIA. SUCH REGISTRATION DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION OR ENDORSEMENT BY THE COMMISSIONER OF BUSINESS OVERSIGHT NOR A FINDING BY THE COMMISSIONER THAT THE INFORMATION PROVIDED HEREIN IS TRUE, COMPLETE AND NOT MISLEADING.

ALL THE OWNERS OF THE FRANCHISE WILL BE REQUIRED TO EXECUTE PERSONAL GUARANTEES. THIS REQUIREMENT PLACES THE MARITAL ASSETS OF THE SPOUSES DOMICILED IN COMMUNITY PROPERTY STATES – ARIZONA, CALIFORNIA, IDAHO, LOUISIANA, NEVADA, NEW MEXICO, TEXAS, WASHINGTON AND WISCONSIN AT RISK IF YOUR FRANCHISE FAILS.

1.      The following paragraph is added to the end of Item 3 of the Disclosure Document:

Neither franchisor nor any person or franchise broker in Item 2 of this disclosure document is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities Exchange Act of 1934, 15 U.S.C.A. 78a et seq., suspending or expelling such persons from membership in that association or exchange.

2.      The following paragraph is added to the end of Item 6 of the Disclosure Document:

With respect to the Late Fee described in Item 6, this Item is amended to disclose that the maximum rate of interest permitted under California law is 10%.

3.      The following paragraphs are added at the end of Item 17 of the Disclosure Document:

The Franchise Agreement requires franchisee to sign a general release of claims upon renewal or transfer of the Franchise Agreement. California Corporations Code Section 31512 provides that any condition, stipulation or provision purporting to bind any person acquiring a franchise to waive compliance with any provision of that law or any rule or order thereunder is void.

2

1799 Bender00000595

California Business and Professions Code Sections 20000 through 20043 provide rights to the franchisee concerning termination, transfer, or non-renewal of a franchise. If the Franchise Agreement contains a provision that is inconsistent with the law, the law will control.

The Franchise Agreement provides for termination upon bankruptcy. This provision may not be enforceable under federal bankruptcy law (11 U.S.C.A. Sec. 101 et seq.).

The Franchise Agreement contains a covenant not to compete which extends beyond the termination of the franchise. This provision may not be enforceable under California law.

The Franchise Agreement requires binding arbitration. The arbitration will occur in Everett, Washington, with the costs being borne equally by Franchisor and Franchisee. Prospective franchisees are encouraged to consult private legal counsel to determine the applicability of California and federal laws (such as Business and Professions Code Section 20040.5, Code of Civil Procedure Section 1281, and the Federal Arbitration Act) to any provisions of a franchise agreement restricting venue to a forum outside the State of California.

The Franchise Agreement requires application of the laws of Washington. This provision may not be enforceable under California law.

4.    The following paragraph is added at the end of Item 19 of the Disclosure Document:

**The earnings claims figures do not reflect the costs of sales, operating expenses, or other costs or expenses that must be deducted from the gross revenue or gross sales figures to obtain your net income or profit. You should conduct an independent investigation of the costs and expenses you will incur in operating your WaterStation business. Franchisees or former franchisees, listed in the offering circular, may be one source of this information.**

WaterStation FDD 2017

1799 Bender00000596

**HAWAII ADDENDUM TO DISCLOSURE DOCUMENT**

In the State of Hawaii only, this Disclosure Document is amended as follows:

THESE FRANCHISES WILL BE/HAVE BEEN FILED UNDER THE FRANCHISE INVESTMENT LAW OF THE STATE OF HAWAII. FILING DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION OR ENDORSEMENT BY THE DIRECTOR OF COMMERCE AND CONSUMER AFFAIRS OR A FINDING BY THE DIRECTOR OF COMMERCE AND CONSUMER AFFAIRS THAT THE INFORMATION PROVIDED HEREIN IS TRUE, COMPLETE AND NOT MISLEADING.

THE FRANCHISE INVESTMENT LAW MAKES IT UNLAWFUL TO OFFER OR SELL ANY FRANCHISE IN THIS STATE WITHOUT FIRST PROVIDING TO THE PROSPECTIVE FRANCHISEE, OR SUBFRANCHISOR, AT LEAST SEVEN DAYS PRIOR TO THE EXECUTION BY THE PROSPECTIVE FRANCHISEE, OF ANY BINDING FRANCHISE OR OTHER AGREEMENT, OR AT LEAST SEVEN DAYS PRIOR TO THE PAYMENT OF ANY CONSIDERATION BY THE FRANCHISEE, OR SUBFRANCHISOR, WHICHEVER OCCURS FIRST, A COPY OF THE DISCLOSURE DOCUMENT, TOGETHER WITH A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE.

THIS DISCLOSURE DOCUMENT CONTAINS A SUMMARY ONLY OF CERTAIN MATERIAL PROVISIONS OF THE FRANCHISE AGREEMENT. THE CONTRACT OR AGREEMENT SHOULD BE REFERRED TO FOR A STATEMENT OF ALL RIGHTS, CONDITIONS, RESTRICTIONS AND OBLIGATIONS OF BOTH THE FRANCHISOR AND THE FRANCHISEE.

Registered agent in the state authorized to receive service of process:

Commissioner of Securities
335 Merchant Street
Honolulu, Hawaii 96813

<u>Registration of franchises or filings of offering circulars in other states</u>. As of the date of filing of this Addendum in the State of Hawaii:

1.	A franchise registration is effective or an offering circular is on file in the following states: _____

2.	A proposed registration or filing is or will be shortly on file in the following states: _____

3.	No states have refused, by order or otherwise to register these franchises.

4.	No states have revoked or suspended the right to offer these franchises.

5.	The proposed registration of these franchises has not been withdrawn in any state.

<div align="center">4</div>

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 249 of
332

1799 Bender00000597

## ILLINOIS ADDENDUM TO DISCLOSURE DOCUMENT

In the State of Illinois only, this Disclosure Document is amended as follows:

Illinois law governs the agreements between the parties to this franchise.

Section 4 of the Illinois Franchise Disclosure Act provides that any provision in a franchise agreement that designates jurisdiction of venue outside the State of Illinois is void. However, a franchise agreement may provide for arbitration outside of Illinois.

Section 41 of the Illinois Franchise Disclosure Act provides that any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with the Illinois Franchise Disclosure Act or any other law of Illinois is void.

Your rights upon termination and non-renewal of a franchise agreement are set forth in sections 19 and 20 of the Illinois Franchise Disclosure Act.

5

1799 Bender00000598

**MARYLAND ADDENDUM TO DISCLOSURE DOCUMENT**

In the State of Maryland only, this Disclosure Document is amended as follows:

The following is added to Item 11:

Fees related to advertising are to be raised and spent as follows: _____. You may obtain an accounting of advertising expenditures by the Marketing Fund by making a written request to us.

The following is added to Item 17:

Pursuant to COMAR 02-02-08-16L, the general release required as a condition of renewal, sale, and/or assignment/transfer shall not apply to any liability under the Maryland Franchise Registration and Disclosure Law.

You are not required to assent to a period of limitations for causes of action under the Maryland Franchise Law, Business Regulation Article, §14-227, Annotated Code of Maryland, other than the period of limitations set forth in that statute. You must bring an action under such law within three years after the grant of the franchise.

You have the right to file a lawsuit alleging a cause of action arising under the Maryland Franchise Law in any court of competent jurisdiction in the State of Maryland.

The Franchise Agreement provides for termination upon bankruptcy of the franchisee. This provision may not be enforceable under federal bankruptcy law.

6

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 251 of 332

1799 Bender00000599

# MINNESOTA ADDENDUM TO DISCLOSURE DOCUMENT

In the State of Minnesota only, this Disclosure Document is amended as follows:

☐ Minnesota Statutes, Section 80C.21 and Minnesota Rules 2860.4400(J) prohibit the franchisor from requiring litigation to be conducted outside Minnesota, requiring waiver of a jury trial, or requiring the franchisee to consent to liquidated damages, termination penalties or judgment notes. In addition, nothing in the Franchise Disclosure Document or agreement(s) can abrogate or reduce (1) any of the franchisee's rights as provided for in Minnesota Statutes, Chapter 80C or (2) franchisee's rights to any procedure, forum, or remedies provided for by the laws of the jurisdiction.

☐ With respect to franchises governed by Minnesota law, the franchisor will comply with Minnesota Statutes, Section 80C.14, Subd. 3-5, which require (except in certain specified cases) (1) that a franchisee be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice for non- renewal of the franchise agreement and (2) that consent to the transfer of the franchise will not be unreasonably withheld.

☐ The franchisor will protect the franchisee's rights to use the trademarks, service marks, trade names, logotypes or other commercial symbols or indemnify the franchisee from any loss, costs or expenses arising out of any claim, suit or demand regarding the use of the name.

☐ Minnesota considers it unfair to not protect the franchisee's right to use the trademarks. Refer to Minnesota Statues, Section 80C.12, Subd. 1(g).

☐ Minnesota Rules 2860.4400(D) prohibits a franchisor from requiring a franchisee to assent to a general release.

☐ The franchisee cannot consent to the franchisor obtaining injunctive relief. The franchisor may seek injunctive relief. See Minn. Rules 2860.4400J. Also, a court will determine if a bond is required.

☐ The Limitations of Claims section must comply with Minnesota Statutes, Section 80C.17, Subd. 5, which states "No action may be commenced pursuant to this Section more than three years after the cause of action accrues."

**THESE FRANCHISES HAVE BEEN REGISTERED UNDER THE MINNESOTA FRANCHISE ACT. REGISTRATION DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION OR ENDORSEMENT BY THE COMMISSIONER OF COMMERCE OF MINNESOTA OR A FINDING BY THE COMMISSIONER THAT THE INFORMATION PROVIDED HEREIN IS TRUE, COMPLETE AND NOT MISLEADING.**

**THE MINNESOTA FRANCHISE ACT MAKES IT UNLAWFUL TO OFFER OR SELL ANY FRANCHISE IN THIS STATE WHICH IS SUBJECT TO REGISTRATION WITHOUT FIRST PROVIDING TO THE PROSPECTIVE FRANCHISEE, AT LEAST 7**

**DAYS PRIOR TO THE EXECUTION BY THE PROSPECTIVE FRANCHISEE OF ANY BINDING FRANCHISE OR OTHER AGREEMENT, OR AT LEAST 7 DAYS PRIOR TO THE PAYMENT OF ANY CONSIDERATION, BY THE FRANCHISEE, WHICHEVER OCCURS FIRST, A COPY OF THIS PUBLIC OFFERING STATEMENT, TOGETHER WITH A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE FRANCHISE. THIS PUBLIC OFFERING STATEMENT CONTAINS A SUMMARY ONLY OF CERTAIN MATERIAL PROVISIONS OF THE FRANCHISE AGREEMENT. THE CONTRACT OR AGREEMENT SHOULD BE REFERRED TO FOR AN UNDERSTANDING OF ALL RIGHTS AND OBLIGATIONS OF BOTH THE FRANCHISOR AND THE FRANCHISEE.**

WaterStation FDD 2017

1799 Bender00000601

## NEW YORK ADDENDUM TO DISCLOSURE DOCUMENT

In the State of New York only, this Disclosure Document is amended as follows:

In the State of New York only, this Disclosure Document is amended as follows:

1.      The following information is added to the cover page of the Franchise Disclosure Document:

> **INFORMATION COMPARING FRANCHISORS IS AVAILABLE. CALL THE STATE ADMINISTRATORS LISTED IN EXHIBIT A OR YOUR PUBLIC LIBRARY FOR SOURCES OF INFORMATION. REGISTRATION OF THIS FRANCHISE BY NEW YORK STATE DOES NOT MEAN THAT NEW YORK STATE RECOMMENDS IT OR HAS VERIFIED THE INFORMATION IN THIS FRANCHISE DISCLOSURE DOCUMENT. IF YOU LEARN THAT ANYTHING IN THE FRANCHISE DISCLOSURE DOCUMENT IS UNTRUE, CONTACT THE FEDERAL TRADE COMMISSION AND NEW YORK STATE DEPARTMENT OF LAW, BUREAU OF INVESTOR PROTECTION AND SECURITIES, 120 BROADWAY, 23RD FLOOR, NEW YORK, NEW YORK 10271. THE FRANCHISOR MAY, IF IT CHOOSES, NEGOTIATE WITH YOU ABOUT ITEMS COVERED IN THE FRANCHISE DISCLOSURE DOCUMENT. HOWEVER, THE FRANCHISOR CANNOT USE THE NEGOTIATING PROCESS TO PREVAIL UPON A PROSPECTIVE FRANCHISEE TO ACCEPT TERMS WHICH ARE LESS FAVORABLE THAN THOSE SET FORTH IN THIS FRANCHISE DISCLOSURE DOCUMENT.**

2.      The following is added at the end of Item 3:

Except as provided above, with regard to the franchisor, its predecessor, a person identified in Item 2, or an affiliate offering franchises under the franchisor's principal trademark:

A. No such party has an administrative, criminal or civil action pending against that person alleging: a felony, a violation of a franchise, antitrust, or securities law, fraud, embezzlement, fraudulent conversion, misappropriation of property, unfair or deceptive practices, or comparable civil or misdemeanor allegations.

B. No such party has pending actions, other than routine litigation incidental to the business, which are significant in the context of the number of franchisees and the size, nature or financial condition of the franchise system or its business operations.

C. No such party has been convicted of a felony or pleaded nolo contendere to a felony charge or, within the 10 year period immediately preceding the application for registration, has been convicted of or pleaded nolo contendere to a misdemeanor charge or has been the subject of a civil action alleging: violation of a franchise, antifraud, or securities law; fraud; embezzlement; fraudulent conversion or misappropriation of property; or unfair or deceptive practices or comparable allegations.

WaterStation FDD 2017

1799 Bender00000602

D. No such party is subject to a currently effective injunctive or restrictive order or decree relating to the franchise, or under a Federal, State, or Canadian franchise, securities, antitrust, trade regulation or trade practice law, resulting from a concluded or pending action or proceeding brought by a public agency; or is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities and Exchange Act of 1934, suspending or expelling such person from membership in such association or exchange; or is subject to a currently effective injunctive or restrictive order relating to any other business activity as a result of an action brought by a public agency or department, including, without limitation, actions affecting a license as a real estate broker or sales agent.

3. The following is added to the end of Item 4:

Neither the franchisor, its affiliate, its predecessor, officers, or general partner during the 10-year period immediately before the date of the offering circular: (a) filed as debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code; (b) obtained a discharge of its debts under the bankruptcy code; or (c) was a principal officer of a company or a general partner in a partnership that either filed as a debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code or that obtained a discharge of its debts under the U.S. Bankruptcy Code during or within 1 year after that officer or general partner of the franchisor held this position in the company or partnership.

4. The following is added to the end of Item 5:

The initial franchise fee constitutes part of our general operating funds and will be used as such in our discretion.

5. The following is added to the end of the "Summary" sections of Item 17(c), titled "**Requirements for franchisee to renew or extend**," and Item 17(m), entitled "**Conditions for franchisor approval of transfer**":

However, to the extent required by applicable law, all rights you enjoy and any causes of action arising in your favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force; it being the intent of this proviso that the non-waiver provisions of General Business Law Sections 687.4 and 687.5 be satisfied.

6. The following language replaces the "Summary" section of Item 17(d), titled "**Termination by franchisee**":

You may terminate the agreement on any grounds available by law.

7. The following is added to the end of the "Summary" section of Item 17(j), titled "**Assignment of contract by franchisor**":

10

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 255 of 332

1799 Bender00000603

However, no assignment will be made except to an assignee who in good faith and judgment of the franchisor, is willing and financially able to assume the franchisor's obligations under the Franchise Agreement.

8.     The following is added to the end of the "Summary" sections of Item 17(v), titled "**Choice of forum**", and Item 17(w), titled "**Choice of law**": The foregoing choice of law should not be considered a waiver of any right conferred upon the franchisor or upon the franchisee by Article 33 of the General Business Law of the State of New York.

11

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 256 of 332

1799 Bender00000604

# NORTH DAKOTA ADDENDUM TO DISCLOSURE DOCUMENT

In the State of North Dakota only, this Disclosure Document is amended as follows:

THE SECURITIES COMMISSIONER HAS HELD THE FOLLOWING TO BE UNFAIR, UNJUST OR INEQUITABLE TO NORTH DAKOTA FRANCHISEES (NDCC SECTION 51-19-09):

1. <u>Restrictive Covenants</u>: Franchise disclosure documents that disclose the existence of covenants restricting competition contrary to NDCC Section 9-08-06, without further disclosing that such covenants will be subject to the statute.

2. <u>Situs of Arbitration Proceedings</u>: Franchise agreements providing that the parties must agree to the arbitration of disputes at a location that is remote from the site of the franchisee's business.

3. <u>Restrictions on Forum</u>: Requiring North Dakota franchisees to consent to the jurisdiction of courts outside of North Dakota.

4. <u>Liquidated Damages and Termination Penalties</u>: Requiring North Dakota franchisees to consent to liquidated damages or termination penalties.

5. <u>Applicable Laws</u>: Franchise agreements that specify that they are to be governed by the laws of a state other than North Dakota.

6. <u>Waiver of Trial by Jury</u>: Requiring North Dakota Franchises to consent to the waiver of a trial by jury.

7. <u>Waiver of Exemplary & Punitive Damages</u>: Requiring North Dakota Franchisees to consent to a waiver of exemplary and punitive damage.

8. <u>General Release</u>: Franchise Agreements that require the franchisee to sign a general release upon renewal of the franchise agreement.

9. <u>Limitation of Claims</u>: Franchise Agreements that require the franchisee to consent to a limitation of claims. The statute of limitations under North Dakota law applies.

10. <u>Enforcement of Agreement</u>: Franchise Agreements that require the franchisee to pay all costs and expenses incurred by the franchisor in enforcing the agreement. The prevailing party in any enforcement action is entitled to recover all costs and expenses including attorney's fees.

1799 Bender00000605

**RHODE ISLAND ADDENDUM TO DISCLOSURE DOCUMENT**

In the State of Rhode Island only, this Disclosure Document is amended as follows:

Item 17, summary columns for (v) and (w) are amended to add the following:

> Any provision in the franchise agreement restricting jurisdiction or venue to a forum outside Rhode Island or requiring the application of the laws of a state other than Rhode Island is void as to a claim otherwise enforceable under the Rhode Island Franchise Investment Act.

# VIRGINIA ADDENDUM TO DISCLOSURE DOCUMENT

In the Commonwealth of Virginia only, this Disclosure Document is amended as follows:

The following statements are added to Item 17(h):

> Under Section 13.1-564 of the Virginia Retail Franchising Act, it is unlawful for a franchisor to cancel a franchise without reasonable cause. If any grounds for default or termination stated in the Franchise Agreement do not constitute "reasonable cause," as that term may be defined in the Virginia Retail Franchising Act or the laws of Virginia, that provision may not be enforceable.

> Under Section 13.1-564 of the Virginia Retail Franchising Act, it is unlawful for a franchisor to use undue influence to induce a franchisee to surrender any right given to him under the franchise. If any provision of the Franchise Agreement involves the use of undue influence by the franchisor to induce a franchisee to surrender any rights given to the franchisee under the franchise, that provision may not be enforceable.

Item 17(t) is amended to read as follows:

> Only the terms of the Franchise Agreement and other related written agreements are binding (subject to applicable state law). Any representations or promises outside of the Disclosure Document and Franchise Agreement may not be enforceable.

14

1799 Bender00000607

# WASHINGTON ADDENDUM TO DISCLOSURE DOCUMENT

(See Exhibit I for Washington Addendum to Disclosure Document and Rider to Franchise Agreement)

WaterStation FDD 2017

1799 Bender00000608

# EXHIBIT I

## STATE ADDENDA TO FRANCHISE AGREEMENT

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 261 of 332

1799 Bender00000609

# ILLINOIS RIDER TO FRANCHISE AGREEMENT

This Rider amends the Franchise Agreement dated _____ (the "Agreement"), between WST Franchise Systems LLC, a Washington limited liability company ("WST") and _____, a _____ _____ ("Franchisee").

1. **Definitions.** Capitalized terms used but not defined in this Rider have the meanings given in the Agreement. The "Illinois Act" means the Illinois Franchise Disclosure Act of 1987.

2. **Governing Law and Jurisdiction.** Notwithstanding any provision of the Agreement to the contrary, the Agreement is governed by Illinois law. The parties irrevocably submit to the jurisdiction and venue of the federal and state courts in Illinois, except for matters which the Agreement provides will be resolved by arbitration.

3. **Limitation of Claims.** No action can be maintained to enforce any liability created by the Illinois Act unless brought before the expiration of 3 years from the act or transaction constituting the violation upon which it is based, the expiration of 1 year after Franchisee become aware of facts or circumstances reasonably indicating that Franchisee may have a claim for relief in respect to conduct governed by the Illinois Act, or 90 days after delivery to the Franchisee of a written notice disclosing the violation, whichever shall first expire.

4. **Waivers Void.** Notwithstanding any provision of the Agreement to the contrary, any condition, stipulation, or provision purporting to bind Franchisee to waive compliance with any provision of the Illinois Act or any other law of the State of Illinois is void. This Section shall not prevent Franchisee from entering into a settlement agreement or executing a general release regarding a potential or actual lawsuit filed under any of the provisions of this Act, nor shall it prevent the arbitration of any claim pursuant to the provisions of Title 9 of the United States Code.

5. **Effective Date.** This Rider is effective as of the Effective Date.

Agreed to by:

FRANCHISEE:

_____

By: _____
Name: _____
Title: _____
Date: _____

FRANCHISOR:

WST FRANCHISE SYSTEMS LLC

By: _____
Name: _____
Title: _____
Date: _____

# INDIANA RIDER TO FRANCHISE AGREEMENT

This Rider amends the Franchise Agreement dated _____ (the "Agreement"), between WST Franchise Systems LLC, a Washington limited liability company ("WST") and _____, a _____ _____ ("Franchisee").

1.    **Definitions**. Capitalized terms used but not defined in this Rider have the meanings given in the Agreement. The "Indiana Acts" means the Indiana Franchise Act and the Indiana Deceptive Franchise Practices Act.

2.    **Certain Provisions Deleted**. To the extent required for the Agreement to be in compliance with the Indiana Acts, any provision of the Agreement which would have any of the following effects is hereby deleted:

(1)    Requiring goods, supplies, inventories, or services to be purchased exclusively from the franchisor or sources designated by the franchisor where such goods, supplies, inventories, or services of comparable quality are available from sources other than those designated by the franchisor. However, the publication by the franchisor of a list of approved suppliers of goods, supplies, inventories, or service or the requirement that such goods, supplies, inventories, or services comply with specifications and standards prescribed by the franchisor does not constitute designation of a source nor does a reasonable right of the franchisor to disapprove a supplier constitute a designation. This subdivision does not apply to the principal goods, supplies, inventories, or services manufactured or trademarked by the franchisor.

(2)    Allowing the franchisor to establish a franchisor-owned outlet engaged in a substantially identical business to that of the franchisee within the exclusive territory granted the franchisee by the franchise agreement; or, if no exclusive territory is designated, permitting the franchisor to compete unfairly with the franchisee within a reasonable area.

(3)    Allowing substantial modification of the franchise agreement by the franchisor without the consent in writing of the franchisee.

(4)    Allowing the franchisor to obtain money, goods, services, or any other benefit from any other person with whom the franchisee does business, on account of, or in relation to, the transaction between the franchisee and the other person, other than for compensation for services rendered by the franchisor, unless the benefit is promptly accounted for, and transmitted to the franchisee.

(5)    Requiring the franchisee to prospectively assent to a release, assignment, novation, waiver, or estoppel which purports to relieve any person from liability to be imposed by the Indiana Deceptive Franchise Practices Act or requiring any controversy between the franchisee and the franchisor to be referred to any person, if referral would be binding on the franchisee. This subsection (5) does not apply to arbitration before an independent arbitrator.

(6)    Allowing for an increase in prices of goods provided by the franchisor which the franchisee had ordered for private retail consumers prior to the franchisee's receipt of an official

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 263 of 332    1799 Bender00000611

price increase notification. A sales contract signed by a private retail consumer shall constitute evidence of each order. Price changes applicable to new models of a product at the time of introduction of such new models shall not be considered a price increase. Price increases caused by conformity to a state or federal law, or the revaluation of the United States dollar in the case of foreign-made goods, are not subject to this subsection (6).

(7)     Permitting unilateral termination of the franchise if such termination is without good cause or in bad faith. Good cause within the meaning of this subsection (7) includes any material violation of the franchise agreement.

(8)     Permitting the franchisor to fail to renew a franchise without good cause or in bad faith. This chapter shall not prohibit a franchise agreement from providing that the agreement is not renewable upon expiration or that the agreement is renewable if the franchisee meets certain conditions specified in the agreement.

(9)     Requiring a franchisee to covenant not to compete with the franchisor for a period longer than three years or in an area greater than the exclusive area granted by the franchise agreement or, in absence of such a provision in the agreement, an area of reasonable size, upon termination of or failure to renew the franchise.

(10)     Limiting litigation brought for breach of the agreement in any manner whatsoever.

(11)     Requiring the franchisee to participate in any (A) advertising campaign or contest; (B) promotional campaign; (C) promotional materials; or (D) display decorations or materials; at an expense to the franchisee that is indeterminate, determined by a third party, or determined by a formula, unless the franchise agreement specifies the maximum percentage of gross monthly sales or the maximum absolute sum that the franchisee may be required to pay.

   **3.**     **Effective Date.** This Rider is effective as of the Effective Date.

   Agreed to by:

FRANCHISEE:                              FRANCHISOR:

                                         WST FRANCHISE SYSTEMS LLC

_____

By: _____              By: _____
Name: _____              Name: _____
Title: _____            Title: _____
Date: _____              Date: _____

1799 Bender00000612

# MARYLAND RIDER TO FRANCHISE AGREEMENT

This Rider amends the Franchise Agreement dated _____ (the "<u>Agreement</u>"), between WST Franchise Systems LLC, a Washington limited liability company ("<u>WST</u>") and _____, a _____ _____ ("<u>Franchisee</u>").

**1.**     **<u>Definitions</u>.** Capitalized terms used but not defined in this Rider have the meanings given in the Agreement. The "<u>Maryland Franchise Law</u>" means the Maryland Franchise Registration and Disclosure Law, Business Regulation Article, §14-206, Annotated Code of Maryland.

**2.**     **<u>No Waiver of State Law In Sale</u>.** Notwithstanding any provision of the Agreement to the contrary, as a condition of the sale of a franchise, WST shall not require a prospective franchisee to agree to a release, assignment, novation, waiver, or estoppel that would relieve WST or any other person from liability under the Maryland Franchise Law.

**3.**     **<u>No Release of Liability</u>.** Pursuant to COMAR 02-02-08-16L, the general release required as a condition of renewal, sale, and/or assignment/transfer shall not apply to any liability under the Maryland Franchise Registration and Disclosure Law.

**4.**     **<u>Statute of Limitations</u>.** Any provision of the Agreement which provides for a period of limitations for causes of action shall not apply to causes of action under the Maryland Franchise Law, Business Regulation Article, §14-227, Annotated Code of Maryland. Franchisee must bring an action under such law within three years after the grant of the franchise.

**5.**     **<u>Jurisdiction</u>.** Notwithstanding any provision of the Agreement to the contrary, Franchisee does not waive its right to file a lawsuit alleging a cause of action arising under the Maryland Franchise Law in any court of competent jurisdiction in the State of Maryland.

**6.**     **<u>Effective Date</u>.** This Rider is effective as of the Effective Date.

Agreed to by:

FRANCHISEE:                      FRANCHISOR:

                                             WST FRANCHISE SYSTEMS LLC

_____

By: _____          By: _____

Name: _____       Name: _____

Title: _____        Title: _____

Date: _____        Date: _____

# MINNESOTA RIDER TO FRANCHISE AGREEMENT

This Rider amends the Franchise Agreement dated _____ (the "<u>Agreement</u>"), between WST Franchise Systems LLC, a Washington limited liability company ("<u>WST</u>") and _____, a _____ _____ ("<u>Franchisee</u>").

1.     **<u>Definitions</u>**. Capitalized terms used but not defined in this Rider have the meanings given in the Agreement. The "<u>Minnesota Act</u>" means Minnesota Statutes, Sections 80C.01 to 80C.22.

2.     **<u>Amendments</u>**. The Agreement is amended to comply with the following:

☐   Minnesota Statutes, Section 80C.21 and Minnesota Rules 2860.4400(J) prohibit the franchisor from requiring litigation to be conducted outside Minnesota, requiring waiver of a jury trial, or requiring the franchisee to consent to liquidated damages, termination penalties or judgment notes. In addition, nothing in the Franchise Disclosure Document or agreement(s) can abrogate or reduce (1) any of the franchisee's rights as provided for in Minnesota Statutes, Chapter 80C or (2) franchisee's rights to any procedure, forum, or remedies provided for by the laws of the jurisdiction.

☐   With respect to franchises governed by Minnesota law, the franchisor will comply with Minnesota Statutes, Section 80C.14, Subd. 3-5, which require (except in certain specified cases) (1) that a franchisee be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice for non- renewal of the franchise agreement and (2) that consent to the transfer of the franchise will not be unreasonably withheld.

☐   The franchisor will protect the franchisee's rights to use the trademarks, service marks, trade names, logotypes or other commercial symbols or indemnify the franchisee from any loss, costs or expenses arising out of any claim, suit or demand regarding the use of the name. Minnesota considers it unfair to not protect the franchisee's right to use the trademarks. Refer to Minnesota Statues, Section 80C.12, Subd. 1(g).

☐   Minnesota Rules 2860.4400(D) prohibits a franchisor from requiring a franchisee to assent to a general release.

☐   The franchisee cannot consent to the franchisor obtaining injunctive relief. The franchisor may seek injunctive relief. See Minn. Rules 2860.4400J. Also, a court will determine if a bond is required.

☐   The Limitations of Claims section must comply with Minnesota Statutes, Section 80C.17, Subd. 5, and therefore the applicable provision of the Agreement is amended to state "No action may be commenced pursuant to Minnesota Statutes, Section 80C.17 more than three years after the cause of action accrues."

3.     **<u>Effective Date</u>**. This Rider is effective as of the Effective Date.

Agreed to by:

FRANCHISEE:                                    FRANCHISOR:

                                               WST FRANCHISE SYSTEMS LLC
_____

By: _____                      By: _____
Name: _____                       Name: _____
Title: _____                     Title: _____
Date: _____                      Date: _____

WaterStation FDD 2017

1799 Bender00000615

# NEW YORK RIDER TO FRANCHISE AGREEMENT

This Rider amends the Franchise Agreement dated _____ (the "Agreement"), between WST Franchise Systems LLC, a Washington limited liability company ("WST") and _____, a _____ _____ ("Franchisee").

1.     **Definitions.** Capitalized terms used but not defined in this Rider have the meanings given in the Agreement.

2.     **Waivers Not Required.** Notwithstanding any provision of the Agreement to the contrary, Franchisee is not required to assent to a release, assignment, novation, waiver or estoppel which would relieve WST or any other person from any duty or liability imposed by New York General Business Law, Article 33.

3     **Waivers of New York Law Deleted.** Any condition, stipulation, or provision in the Agreement purporting to bind Franchisee to waive compliance by WST with any provision of New York General Business Law, or any rule promulgated thereunder, is hereby deleted.

4.     **Governing Law.** Notwithstanding any provision of the Agreement to the contrary, the New York Franchises Law shall govern any claim arising under that law.

5.     **Effective Date.** This Rider is effective as of the Effective Date.

Agreed to by:

FRANCHISEE:

_____

By: _____
Name: _____
Title: _____
Date: _____

FRANCHISOR:

WST FRANCHISE SYSTEMS LLC

By: _____
Name: _____
Title: _____
Date: _____

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 268 of 332

1799 Bender00000616

## NORTH DAKOTA RIDER TO FRANCHISE AGREEMENT

This Rider amends the Franchise Agreement dated _____ (the "Agreement"), between WST Franchise Systems LLC, a Washington limited liability company ("WST") and _____, a _____ _____ ("Franchisee").

**1.** **Definitions.** Capitalized terms used but not defined in this Rider have the meanings given in the Agreement.

**2.** **Amendments.** The Agreement (and any Guaranty Agreement) is amended to comply with the following:

(1) Restrictive Covenants: Every contract by which Franchisee, any Guarantor, or any other person is restrained from exercising a lawful profession, trade, or business of any kind subject to NDCC Section 9-08-06.

(2) Situs of Arbitration Proceedings: Franchisee and any Guarantor are not required to agree to the arbitration of disputes at a location that is remote from the site of Franchisee's business.

(3) Restrictions on Forum: Franchisee and any Guarantor are not required to consent to the jurisdiction of courts outside of North Dakota.

(4) Liquidated Damages and Termination Penalties: Franchisee is not required to consent to liquidated damages or termination penalties.

(5) Applicable Laws: The Agreement (and any Guaranty Agreement) is governed by the laws of the State of North Dakota.

(6) Waiver of Trial by Jury: Franchisee and any Guarantor do not waive a trial by jury.

(7) Waiver of Exemplary & Punitive Damages: Franchisee does not waive of exemplary and punitive damages.

(8) General Release: Franchisee and any Guarantor are not required to sign a general release upon renewal of the Agreement.

(9) Limitation of Claims: Franchisee is not required to consent to a limitation of claims. The statute of limitations under North Dakota law applies.

(10) Enforcement of Agreement: The prevailing party in any enforcement action is entitled to recover all costs and expenses including attorney's fees.

**3.** **Effective Date.** This Rider is effective as of the Effective Date.

WaterStation FDD 2017

1799 Bender00000617

Agreed to by:

FRANCHISEE:                                    FRANCHISOR:

_____        WST FRANCHISE SYSTEMS LLC

By: _____        By: _____
Name: _____        Name: _____
Title: _____        Title: _____
Date: _____        Date: _____

WaterStation FDD 2017

1799 Bender00000618

# RHODE ISLAND RIDER TO FRANCHISE AGREEMENT

      This Rider amends the Franchise Agreement dated _____ (the "<u>Agreement</u>"), between WST Franchise Systems LLC, a Washington limited liability company ("<u>WST</u>") and _____, a _____ _____ ("<u>Franchisee</u>").

      **1.**     **<u>Definitions</u>.** Capitalized terms used but not defined in this Rider have the meanings given in the Agreement.

      **2.**     **<u>Jurisdiction and Venue</u>.** Any provision of the Agreement restricting jurisdiction or venue to a forum outside the State of Rhode Island or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under Rhode Island Franchise Investment Act.

      **3.**     **<u>Effective Date</u>.** This Rider is effective as of the Effective Date.

      Agreed to by:

FRANCHISEE:

_____

FRANCHISOR:

WST FRANCHISE SYSTEMS LLC

By: _____
Name: _____
Title: _____
Date: _____

By: _____
Name: _____
Title: _____
Date: _____

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 271 of 332

1799 Bender00000619

**WASHINGTON ADDENDUM TO DISCLOSURE DOCUMENT**
**AND**
**RIDER TO FRANCHISE AGREEMENT**

The state of Washington has a statute, RCW 19.100.180 which may supersede the franchise agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise. There may also be court decisions which may supersede the franchise agreement in your relationship with the franchisor including the areas of termination and renewal of your franchise.

In any arbitration involving a franchise purchased in Washington, the arbitration site shall be either in the state of Washington, or in a place mutually agreed upon at the time of the arbitration, or as determined by the arbitrator.

In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW shall prevail.

A release or waiver of rights executed by a franchisee shall not include rights under the Washington Franchise Investment Protection Act except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel. Provisions such as those which unreasonably restrict or limit the statute of limitation period for claims under the Act, rights or remedies under the Act such as a right to a jury trial may not be enforceable.

Transfer fees are collectable to the extent that they reflect the franchisor's reasonable estimated or actual costs in effecting a transfer.

Agreed to by:

FRANCHISEE:

FRANCHISOR:

_____        WST FRANCHISE SYSTEMS LLC

By: _____        By: _____
Name: _____        Name: _____
Title: _____        Title: _____
Date: _____        Date: _____

1799 Bender00000620

# RECEIPT

This disclosure document summarizes certain provisions of the franchise agreement and other information in plain language. Read this disclosure document and all agreements carefully.

If WST Franchise Systems LLC offers you a franchise, it must provide this disclosure document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale. New York requires that you be given this disclosure document at the earlier of the first personal meeting or 10 business days before the execution of any franchise or other agreement, or payment of any consideration that relates to the franchise relationship.

If WST Franchise Systems LLC does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and any applicable state agency (which are listed in Exhibit A).

The name, principal business address, and telephone number of each franchise seller offering the franchise is:

| Name | Principal Business Address | Telephone Number |
|------|----------------------------|------------------|
| Ryan Wear | 2732 Grand Avenue Suite 122, Everett, WA 98201 | (877) 475-7717 |
| Bryce Froberg | 2732 Grand Avenue Suite 122, Everett, WA 98201 | (877) 475-7717 |
| | | |

Issuance Date: April 4, 2017

I received a disclosure document dated April 4, 2017, that included the following Exhibits:

    A.    State Administrators and Agents for Service of Process
    B.    Franchise Agreement (with Guaranty and Non-Compete Agreement)
    C.    Management Agreement
    D.    Form of General Release
    E.    Financial Statements
    F.    Operating Manual Table of Contents
    G.    Current and Former Franchisees
    H.    State Addenda to Disclosure Document
    I.    State Addenda to Franchise Agreement

Signature: _____
Print Name: _____
Date Received: _____

**Keep This Copy For Your Records**

1799 Bender00000621

WaterStation FDD 2017

1799 Bender00000622

# RECEIPT

This disclosure document summarizes certain provisions of the franchise agreement and other information in plain language. Read this disclosure document and all agreements carefully.

If WST Franchise Systems LLC offers you a franchise, it must provide this disclosure document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale. New York requires that you be given this disclosure document at the earlier of the first personal meeting or 10 business days before the execution of any franchise or other agreement, or payment of any consideration that relates to the franchise relationship.

If WST Franchise Systems LLC does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and any applicable state agency (which are listed in Exhibit A).

The name, principal business address, and telephone number of each franchise seller offering the franchise is:

| Name | Principal Business Address | Telephone Number |
|------|---------------------------|------------------|
| Ryan Wear | 2732 Grand Avenue Suite 122, Everett, WA 98201 | (877) 475-7717 |
| Bryce Froberg | 2732 Grand Avenue Suite 122, Everett, WA 98201 | (877) 475-7717 |
| | | |

Issuance Date: April 4, 2017

I received a disclosure document dated April 4, 2017, that included the following Exhibits:

- A.  State Administrators and Agents for Service of Process
- B.  Franchise Agreement (with Guaranty and Non-Compete Agreement)
- C.  Management Agreement
- D.  Form of General Release
- E.  Financial Statements
- F.  Operating Manual Table of Contents
- G.  Current and Former Franchisees
- H.  State Addenda to Disclosure Document
- I.  State Addenda to Franchise Agreement

Signature: _____

Print Name: _____

Date Received: _____

**Return this copy to us.**

**WST Franchise Systems LLC**
**2732 Grand Avenue Suite 122, Everett, WA 98201**

WaterStation FDD 2017

1799 Bender00000623

# EXHIBIT 31



**Purchase Order Agreement**

December 29th, 2020

**WaterStation® Technology**
2732 Grand Avenue, Suite 122
Everett, WA 98201
Phone: 425-320-1281;  email:  rwear@waterstationtechnology.com

| Customer:  Penny Rentals, LLC | | Customer Billing Address (if different) | |
|---|---|---|---|
| Address: 329 Oak Hollow Way | | Address: | |
| City: Little Elm | County: | City: | County: |
| State/Province: TX | Postal Code:  75068 | State/Province: | Postal Code: |
| Contact: Joel | Phone: 623-399-7626 | Fax: | WST Rep.: RW |

## Equipment And Price

| MODEL | QTY | UNIT DESCRIPTION | UNIT PRICE | SUB TOTAL |
|---|---|---|---|---|
| M700BVA | 24 | ***All Water Stations -, alkaline vending machines-M700BVA*** <br> complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. <br><br> **Down Payment received on 12/30/2020** | $8,500 | $187,000 <br><br><br> $46,750 |
| | | | Shipping | na |
| | | | Taxes | To be paid by buyer if applicable |
| | | | TOTAL | $140,250 |

**TERMS OF PAYMENT: 100% of balance prior to transfer of ownership.**

**DELIVERY: ALL GOODS F.O.B. WAREHOUSE**

**PLEASE READ BEFORE SIGNING:** THE CUSTOMER AGREES TO PURCHASE FROM WaterStation® Technology. THE EQUIPMENT LISTED ABOVE FOR THE AMOUNT LISTED ABOVE. THE CUSTOMER AGREES TO ALL TERMS AND CONDITIONS HEREIN, AND AS CONTINUED ON PAGE 2 OF THIS PURCHASE AGREEMENT.

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 277 of 332

1799 Bender00000126

# TERMS AND CONDITIONS

**1. OWNERSHIP OF EQUIPMENT: The Customer** upon full payment of the amount indicated above shall be the sole owner and titleholder to the Equipment.

**2. LIMITED WARRANTY:** WaterStation® Technology warrants that (a) its WaterStation (the "Equipment") will perform substantially in accordance with the accompanying written materials and is free from defects in materials and workmanship under normal use and service for a period of one year.

**3. CUSTOMER REMEDIES:** WaterStation® Technology  and its suppliers' entire liability and Customer's exclusive remedy shall be, at WaterStation® Technology  option, either (a) return of the price paid for the Equipment, or (b) repair or replacement of the Equipment that does not meet this Limited Warranty and which is returned to WaterStation® Technology  with a copy of Customer's receipt. This Limited Warranty is void if failure of the Equipment has resulted from accident, abuse, or misapplication. Any replacement Equipment will be warranted for the remainder of the original warranty period or thirty [30] days, whichever is longer.

**4. NO OTHER WARRANTIES:** TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WaterStation® Technology. AND ITS SUPPLIERS DISCLAIM ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, WITH REGARD TO THE EQUIPMENT AND ANY RELATED WRITTEN MATERIALS. THIS LIMITED WARRANTY GIVES CUSTOMER SPECIFIC LEGAL RIGHTS. CUSTOMER MAY HAVE OTHER RIGHTS DEPENDING ON THE JURISDICTION.

**5. NO LIABILITY FOR DAMAGES:** TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL WaterStation® Technology OR ITS SUPPLIERS BE LIABLE FOR ANY DAMAGES WHATSOEVER (INCLUDING WITHOUT LIMITATION, SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR INDIRECT DAMAGES FOR PERSONAL INJURY, LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION, OR ANY OTHER PECUNIARY LOSS) ARISING OUT OF THE USE OF OR INABILITY TO USE THIS PRODUCT, EVEN IF WaterStation® Technology HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN ANY CASE, WaterStation® Technology AND ITS SUPPLIERS' ENTIRE LIABILITY UNDER ANY PROVISION OF THIS AGREEMENT SHALL BE LIMITED TO THE AMOUNT ACTUALLY PAID BY YOU FOR THE EQUIPMENT. BECAUSE SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, THE ABOVE LIMITATION MAY NOT APPLY TO YOU.

**6. TECHNICAL EXPERTISE REQUIRED OF PURCHASER:** The Purchaser understands that a significant level of technical expertise is required to operate the Equipment and hereby acknowledges confirms that the _**LASI Program**_ will assist in install and training to provide such sufficient expertise to install, operate and maintain the Equipment.

**7. LICENSING AND REGULATORY RESPONSIBILITIES OF PURCHASER:** The Purchaser agrees to comply with all licensing and regulatory requirements regarding the operation of the Equipment in Purchaser's jurisdiction, whether Federal, State/Provincial or Municipal and hereby undertakes sole responsibility for doing so.

**8. GOVERNING LAW:** The enforcement and interpretation of this agreement shall be governed by the laws of Washington.

**9. ENTIRE AGREEMENT:** This Agreement constitutes the entire agreement between the parties and supersedes all prior agreements, memoranda, correspondence, communications, negotiations, and representations, whether verbal or written, express or implied, statutory or otherwise between the Purchaser and the Company. This Agreement may not be changed or modified orally, but may only be changed or modified by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification, extension, or discharge is sought.

Customer full name (please print)  _____

Authorized signature  _____  Date _____

Authorized Signer's printed name  _____  Title _____

**Accepted by WaterStation® Technology.**  _____  Date _____

24-01863-FPC11     Doc 1161-2     Filed 08/01/25     Entered 08/01/25 21:58:04     Pg 278 of 332

1799 Bender00000127

# EXHIBIT 32







**BUSINESS PLAN for**

**Big Boy Tools LLC**

# Executive Summary

**Market Research and Analysis:**

Water is the most crucial element needed for human activity on the planet. Since water demand increases with population, the re-use of water and proper treatment methods have become a critical necessity.

There is a growing concern for the continuity of a reliable supply of clean and healthy water. Over 250 million Americans are impacted by drinking water contamination in all 50 states (sources in Business Plan).

Awareness is raised more and more each day in regards to the immense amount of petroleum products that are required in the production, delivery, and distribution of bottled drinking water; furthermore, in the creation and destruction of plastic bottles that are now filling landfills and polluting oceans there are fewer choices for this recycling service (China no longer accepts plastic recycling from the United States effective 2018).

In an effort to stem the tide of plastic bottle waste, major cities all across North America are banning the distribution of water in plastic bottles in public buildings and other common areas.

These trends and shifts in government regulations and societal awareness present tremendous challenges and opportunities.

See Business Plan for more details.

**Description of the business:**

WaterStation Technology's portfolio of Water Vending Machines creates an enormous opportunity to provide a valuable service to people and the community while building a business with inventory free, recurring revenues and great growth potential. This is all brought about with a one-of-a-kind *Business Alliance Affiliation* (BAA) profit-sharing business model with a joint LLC between the company and the investor. Our line of self-serve WaterStation® machines purify water to the highest standard and percolate it through a series of natural minerals to create virtual spring water with electrolytes and an alkaline pH.

Investors will either manage the business themselves (our "active owner model") or engage our affiliate WaterStation Management LLC to manage their business (our "passive owner model"). If an investor were to have our affiliate manage their business, the investor would sign a Management Agreement.

Investors were to sign an agreement with our debt-free Water Station Management Division. This division purchases WaterStation® vending machines from our affiliate, WaterStation Technology and carries out the following responsibilities:

- Identify and sign up Agreement with vending locations
- Carry out site readiness to prepare a shipment of WaterStations®
- Manage the overall day-to-day operating responsibilities including overseeing maintenance and place them in appropriate retail locations, and manage and service the machines.

**Our Mission:**

Our mission is to be the premier advanced water purification provider of unexcelled specialized water services through an integrated network of a superior portfolio of unmatched systems. To do so by managing the Business Alliance Affiliation's financial, human and physical resources in a manner that will ensure maximum benefit to customers, serviced communities and whole nations with healthier and less expensive drinking water

through more responsible purification systems that do not damage the environment as well as providing profitable growth and share value to its owners.

**Product Description:**
Our mission is to provide individuals, towns, cities and whole nations with healthier and less expensive drinking water delivered through more responsible purification systems that do not damage the environment. See Business Plan for more information on product descriptions.

**Services Provided:**
**Phase 1:**
Initially, with the BAA investor shall offer the WST-700BVAA (**B**ulk **V**ending **A**lkaline **A**mbient) WaterStation® for targeted placements in four locations (there are over 25 business locations available).
**Phase 2:**
Following the successful startup of Phase 1, all products and services, and only those products and services, from time to time prescribed by WST in the Agreement or otherwise in writing.

**Market Research:**
Water is the most crucial element needed for human activity on the planet. Since water demand increases with population, the re-use of water and proper treatment methods have become a critical necessity.

There is a growing concern for the continuity of a reliable supply of clean and healthy water. Over 250 million Americans are impacted by drinking water contamination in all 50 states (sources in Business Plan).

Awareness is raised more and more each day in regards to the immense amount of petroleum products that are required in the production, delivery, and distribution of bottled drinking water; furthermore, in the creation and destruction of plastic bottles that are now filling landfills and polluting oceans there are fewer choices for this recycling service (China no longer accepts plastic recycling from the United States effective 2018).

In an effort to stem the tide of plastic bottle waste, major cities all across North America are banning the distribution of water in plastic bottles in public buildings and other common areas.

These trends and shifts in government regulations and societal awareness present tremendous challenges and opportunities.

See Business Plan for more details.

**Business Strategies:**
Established business strategies in the location of WaterStation® placements with support functions by Water Station Management, are identified in the Business Plan.

**The Market and Competition**
The market for mineral waters is well developed and competitive. Sales are not seasonal. Investors will compete against other companies offering products through vending machines in general, and also compete against other companies offering mineral water. There are some competitors that offer mineral water through vending machines. Our largest competitor has approximately 20% of the market. WaterStation Technology has patent-pending differentiators vs conventional water vending machine to achieve market share growth for investors.

**Financial Needs:**

The minimum investment for the BAA investment model is 33 WST-700 WaterStations® at the cost of $280,500. Water Station Management has H2O funding solutions for investors, including SBA sources, to leverage the investor's liquidity. Currently, BAA investors operational on or before 12 months are experiencing an _overall portfolio average of units_ at or exceeding 20% ROA of liquid investment – (Alkaline Revenue Only). Additional revenues, consisting of local business, national accounts and billboard advertising on each side of the WaterStations® will become available through the planned Advertising offering to occur on or before the end of 2020.

See Financial Projections in Section 3 of the Business Plan.

**This section of the page is intentionally left blank**

## TABLE OF CONTENTS

1      INTRODUCTION
    1.1   Ecology Status    3
    1.2   Environmental Impact with Plastic Bottles    4
    1.3   Opportunity    7
    1.4   Established Market Demand    9
          Product Description    9
          Green Energy Services    10
    1.5   Professional Support through Location & Installation    10
          Targeted Business Locations    10
          Marketing to Prospective Locations    11
          Placements of WaterStations®    12
          Servicing to Prospective Locations    12
          Enhance the Business Location's Customer Visits/Profits    12

2      MARKET ANALYSIS
    2.1   Marketplace for WST Business Models    14
          Joint Venture Partnership Agreement Highlights    14
          Dealership Program Highlights – Water Purifiers    20
3      FINANCIAL INFORMATION – Bulk Vending
    3.1   Financial Model    15
          Revenue Projections    15
          Overview of Revenue Splits    17
          Innovative Engineering Designs    18
          Ice and Water Vending Machine    18

4      COMPETITION
    4.1   Competition – Bulk Vending    19
    4.2   Competitive Analysis    19

5      INVESTOR INFORMATION
    5.1   Investor Background    25
    5.2   Develop New Business Locations    25
    5.3   Maintain Current Customer Base    26
    5.4   Drive Higher Revenue Dollars for each Water Stations®    26
    5.6   Public Relations to Enhance Brand Recognition    27

6      TRAINING
    6.1   Training Program    27
    6.2   Discovery    27
    6.3   Training    27

7      ATTACHMENTS
    7.1   Purchasing Agreement    28
    7.2   Proforma    28
    7.3   WST Brochures    28

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 284 of 332

# 1    INTRODUCTION

Water is the most crucial element needed for human activity on the planet. Since water demand increases with population, the re-use of water and proper treatment methods have become a critical necessity.

There is a growing concern for the continuity of a reliable supply of clean and healthy water.

Awareness is raised more and more each day in regards to the immense amount of petroleum products that are required in the production, delivery, and distribution of bottled water.  Furthermore, in the creation and destruction of plastic bottles that are now filling landfills and polluting oceans.

In an effort to stem the tide of plastic bottle waste, major cities all across North America are banning the distribution of water in plastic bottles in public buildings and other common areas.

These trends and shifts in government regulations and societal awareness present tremendous challenges and opportunities.

The _Smart Snacks in School_ rules set limits on calories, fats, sugar and sodium and encourage the consumption of dairy, whole grains, protein, fruits and vegetables. Schools must comply with these rules by July 1, 2014.  (Your Business name) brings a whole new meaning to healthy drinking water.

## 1.1  Ecology  Status



Bottled water is not a solution as demonstrated by the billions of plastic bottles going into landfill annually. Plastic never really degrades, it just breaks down into smaller pieces and can take up to 1,000 years to fully disintegrate.  Plastic water bottles are the fastest growing form of municipal solid waste in the United States.



**1.2**

# Environmental Impact with Plastic Bottles



**Cumulative plastic waste generation and disposal**

— Primary waste generated
— All waste discarded
— All waste incinerated
— All waste recycled

*Million metric tons*

Product lifetime distributions for the eight industrial use sectors plotted as
log-normal probability distribution functions.
GEYER, JAMBECK, LAW, 'SCIENCE ADVANCES', JULY 2017

> *"More than 90 percent of the environmental impacts from a plastic bottle happen before the consumer opens it." Oil for plastic, oil for shipping, oil for refrigeration — and in the end, most of the effort goes to landfills.*

- Many small towns and rural counties struggle to offer recycling services
  - Especially with tight government budgets
  - Limited access to recycling processors
  - Wide fluctuation in the market for recyclable materials.

- Shawn Lindsey, a recycling expert who advises the not-for-profit Center for Rural Strategies, said
  - "Some towns cannot get vendors to bring in recycling containers because
    - it takes weeks to fill a bin
    - tying up a company asset
    - Providing an insufficient return"

**Source: WSJ 6/18/17 Recycling Vexes Rural Areas**

## Health Hazards Upon the usage of Plastic Water Bottles



<div style="color:blue">

**Skip the Plastic Bottle,
eliminate Polution and
Save A Life**

</div>

- WST's "bottle-less" design _eliminates plastic bottle pollution environmental concerns and costs for recycling of plastic bottles_

- Plastic tends to disintegrate day by day and higher temperature speeds up its reaction, _causing toxic chemicals to release into our food & water_

- Studies reveal that chemicals like: BPA & Phthalates are lined with many health issues like hormonal imbalance, obesity, cancers, etc.

**Water Stations® designs are Eco & Health Hazard Friendly**

## Tap Water Contaminants



Figure 1. 316 contaminants found in nation's tap water, more than half have no safety standards.

202 Contaminants with no safety standards (unregulated)

114 Contaminants with safety standards (regulated)

_Source_: EWG analysis of water utility test. Data includes 20 million water quality tests for 47,677 communities in 45 states and the District of Columbia

<span style="color:red">**This section of the page is intentionally left blank**</span>

## Map of Cities in US with Water Contamination:



Say the name Erin Brockovich and you think, strong, tough and stubborn. Erin is all that and definitely more. She is a modern-day "David" who loves a good brawl with today's "Goliaths." She thrives on being the voice for those who don't know how to yell. She is a rebel. She is a fighter. She is a mother. She is a woman. She is you and me.

Here are the links to show a US Map of cities having water pollution:

http://www.brockovich.com/the-peoples-reporting-registry-map/

Click on "THE MAP" upper right of page; click "VISIT THE MAP"; under "Show all categories", click the down arrow and click on "Water Contamination". A map will populate showing hundreds of cities with water contamination issues.



- The tests found chromium-6 in almost 90 percent of the water systems sampled.
- Oklahoma, Arizona and California had the highest average statewide levels and the greatest shares of detections above California's public health goal
- Among major cities, Phoenix had, by far, the highest average level, at almost 400 times the California health goal and St. Louis and Houston also had comparatively high levels

Please see link for details and to see map of US that allows search of status of each zip code community's contamination:
http://www.ewg.org/research/chromium-six-found-in-us-tap-water

Drinking Water Violations in the US:
https://www.fluksaqua.com/en/drinking-water-quality-violations-in-the-us

### 1.3 Opportunity

When investing in a business, there are three critical factors to consider:

1. Risk
2. Reward
3. Lifestyle

WaterStation Technology's *Business Alliance Partner* (BAP) profit-sharing business model brings unmatched differentiators to address these three critical factors:

**<u>Risk</u>**:



- No Brick & Mortar – DEMOGRAPHIC CHANGES can impact operational performance
- System mobility design – MAXIMIZE REVENUES for the BWST investor

**<u>Reward:</u>**



- Low Operating Costs eliminating the need for
  - o Inventory
  - o Full Time Personnel
  - o Trucks to deliver inventory
- Cash/Debt or Credit card business – NO ACT'S RCV'S
- That means the gross sales are actually gross profit!

**<u>Lifestyle:</u>**



- Eliminates Inventory Re-Stocking Services and overhead activities
- At-home remote monitoring Water Stations® Performance

**This section of the page is intentionally left blank**



Due to the recent water quality concerns, the bottled water industry is one of the fastest growing industries throughout the world. Through our market research, we see enormous potential for water vending machines that produce and dispense reverse osmosis purified water into the 5 gallon/ 18.9 litre container and eliminate costly delivery charges by getting the truck off the road. Consumers are becoming very concerned with the <u>*high cost*</u> of bottled water.

The majority of bottled water companies will usually sell 5 gallons of water from $5.00 - $9.00. The approximate cost to produce 5 gallons of reverse osmosis water is less than 10 cents.

Presently, there are some retail centers that sell bottled water. Bottled water companies will usually supply them with the bottle racks, deliver the water for a wholesale cost of anywhere from $2.00 - $4.00 per 5 gallon bottle.
This is costly, takes up <u>valuable floor space</u> and results in full and empty bottles lying around.

We believe that replacing retail racks of 5-gallon jugs of water with water vending machines (WaterStations®) that will allow the consumer to refill their own sports bottles or jugs <u>*for a fraction of the cost is one of the biggest traffic generators any retail store can experience today.*</u>

Target markets include, but are not limited to:
- Apartment buildings
- Car washes
- Convenient Stores
- Fitness and Health Centers
- Gas Stations
- Golf and Tennis Clubs
- Grocery Stores
- Hospitals
- Hotels and Resorts
- Military and Government Facilities
- Naturopathic Locations
- Office Buildings
- Pharmacies and Health Food Stores
- Physician Offices
- Public Parks, Beaches and Other Common Areas
- Schools – all grades/Colleges/Universities
- Vending Machine operations

**This section of the page is intentionally left blank**

## 1.4 **Established Market Demand**

Thirty years ago, bottled water barely existed as a business in the United States. Last year, Americans spent more on Poland Spring, Fiji Water, Evian, Aquafina, and Dasani than was spent on iPods or movie tickets – i.e., US$15 billion.

Americans move 1 billion bottles of water around a week. That's a weekly convoy equivalent to 37,800 18-wheelers delivering water. Supplying Americans with plastic water bottles for one year consumes more than 47 million gallons of oil, according to the Container Recycling Institute. That's enough to take 100,000 cars off the road and to remove 1 billion pounds of carbon dioxide out of the atmosphere per annum.

## **Product Description**

The WaterStations® combine the five most advanced and significant water treatment Technology in existence:

- **Reverse Osmosis** - membrane allows pure water to pass through tiny pores while blocking contaminants.

- **Ultraviolet Purification (UV)** - light rays sterilize harmful microbes and biological contaminants.

- **Granular Activated Carbon (GAC)** - attracts negatively charged contaminant ions to positively charged activated carbon. Excellent at removing chlorine.

- **Carbon Block Filters** - absorbs thousands of known chemicals.

- **Kinetic Degradation Fluxion Water Filters** - breaks down contaminants on a molecular level and removes heavy metals such as copper, mercury, etc.

The unique WaterStation® patent-pending filtration system treats potable water from the local supply in a series of purification and filtration steps to remove silt and suspended solids, chemicals and metals.  It then removes dissolved solids from the water utilizing reverse osmosis. Next, it is chilled. Finally, it is sterilized with ultra-violet light to kill bacteria, organisms and other pathogens to ensure sterilized, fresh tasting and safe water every time.

The WaterStation® models dispenses chilled, on-demand, real-time treated healthy water.

The WaterStation®, thus far, surpasses the competition – in price point, small foot-print, commercial grade quantity and duration specifications, and in its operational patent-pending feature-sets.

And also, of great significance, especially for United States penetration, the WST Water Stations® are fully compliant with all Federal and State standards.

In addition, WaterStation Technology has developed a proprietary remote diagnostic and monitoring system. Each of our Water Stations® has an integrated Wi-Fi internet service; this results in a real time report on its operations, particularly money earned and water dispensed, its mean-time to routine filter exchanges, any service problems or failures and its general operational characteristics. This online functionality significantly reduces operating costs because service personnel only need to visit the Water Stations® on site when an actual need arises.

And by providing third-party installation with service, maintenance or monitoring, as preferred by customers, the Company has long-term recurring revenue performance on its balance sheet.

## Green Energy Services

By vending water directly into consumer containers, there are no trucks burning expensive fuel and polluting the air, and there are no petroleum products and processes consumed in making plastic water bottles. Nor is there any cost or environmental pollution damage from the current huge proliferation of plastic bottles going into our landfills plus the added overhead costs for recycling the plastic bottles.

## 1.5 Professional Support through Location, Acquisition, Site-preparation and Installation (LASI)

### Targeted Business Locations for Bell's Water Stations®

Targeted market segment opportunities for placement of Water Stations® and Self-contained Container for converting a water source, whether dirty water or sea water (which can be desalinated). See below for 27 Vertical Market placement location opportunities.

| Vertical Markets | WST-100/200 Alkaline | WST600SS Alkaline | M600SS WaterStation® Pure Water | WST700 Bulk Vend WaterStation® Alkaline | WST600 WaterStation® Desalinization | WST800 Desalinization Container |
|---|---|---|---|---|---|---|
| Airports | X | X | | | | |
| Apartments/Condos | X | X | | | | |
| City Buildings | X | X | X | X | X | X |
| City Outside locations | | | X | X | X | X |
| Federal Buildings | X | X | X | X | X | X |

| | | | | | | |
|---|---|---|---|---|---|---|
| Fitness/Health Clubs | | X | X | | | |
| Gas Stations | | | X | X | X | |
| Golf Club Resorts | X | X | X | X | X | |
| Government Buildings | X | X | X | X | X | X |
| Grocery Stores | | X | X | X | | |
| Handyman | X | X | | | | |
| Health Stores | X | X | X | X | | |
| Holistic Medicine Offices | X | X | X | X | | |
| Home | X | X | | | | |
| Hotels/Resorts | X | X | X | X | X | |
| Marinas | X | | X | X | X | |
| Military | X | X | X | X | X | X |
| Offices | X | X | X | X | | |
| Personal Trainer | X | | | | | |
| Schools/Colleges | | X | X | X | | |
| Shopping Malls | | X | X | X | | |
| Spas | | X | X | | | |
| Sports' Arenas | | X | X | X | | |
| State Governments | X | X | X | X | X | X |
| Vehicle Dealerships | X | X | | | | |

Two of the biggest challenges for investors:
- How they are able to find locations for the WaterStations®
- How to go about installing the Water Stations®

The LASI service, which is included in the Joint Venture Partnership Profit-sharing investment model, brings quantifiable, value-added benefits to the investor. WaterStation Technology has a national network of over 150 professional affiliations to carry out this important service. This is a total turnkey operation.

### **Marketing to prospective locations:**

### **WST600SS, WST400SS and WST700BV WaterStations®**



- Promote the service advantages by having the WaterStations® installed in their facility
- Two different income revenue streams would be shared to the business location
  1. Water
  2. Advertising the WaterStation® provides Bottle-less services to keep overhead costs down plus provides a *Green* eco-service for his customers
- New customers would be visiting their facility to bring them additional revenues not available before



A three - five year non-compete _Profit Sharing Ag_reement would be signed by the location owner to protect the WST WaterStation® business owner

## Placement of WaterStation® Units

Here are the key highlights of this total turnkey program:

- Corporate will interface with the interested investor to assist them in identifying important data points in establishing potential locations for Water Stations™
- Once the locations are mutually agreed to by the investor and corporate, WST will provide portal access for the investor to begin immediate operation of their business and establishing revenues for their business

## Servicing to Prospective Locations:



Professional installation specialists will carry out site preparation for the WaterStations® in an agreed-upon location that requires the following criteria:

1. Water source to connect to machine
2. 110-volt power source to plug in machine
3. Drain, <u>NOTE:</u> The hook-up is a simple method of connecting to a cold water line for the water source and into the drainage line for the drain; sometimes a drain will need to be installed (city ordnances will be followed)

- Upon shipment of WaterStations® to the location, the service team receives, installs, calibrates (according to WST Business and location owners' specifications) and turn the Water Stations™ over for beginning of operation

## Enhance the Business Location's Customer Visits/Profits



- Grand Opening announcing new Bulk Vending WaterStations® for each location
  - Store greeter at the WaterStation® to offer samples – use paper cups
  - Professional sign introducing Alkaline Water for your health benefits
  - Provide information trifold on benefits of alkaline water & WST patent-pending filtration system
  - First Week $0.25 per gallon – "Taste the Difference…Improve Your Health"
  - Direct mail program to community neighborhoods – first three months
  - Establish social media program; newsletters weekly to targeted prospects
  - Implement "_Frequent Water Rewards_" program
  - Create a Referral program
  - New Water usage customers
  - Advertisers

## 2   MARKET ANALYSIS

# 1.1  Marketplace WST Business Models
## *Market Opportunity in the Vending Industry*

Welcome to the largest "all-cash" business in the world – the booming $42 Billion Dollar Vending Machine Industry!  New convenient innovations continue to propel this remarkable industry to new heights.  In fact, every minute, over $79,000 is put in vending machines in the United States alone!  That's a whopping $115 Million Dollars per day!  This market niche has dynamic, long-term market growth, not mature and declining – a critically important factor for investors.

To address this growth market, WaterStation Technology has designed two business models:

1. *Vending Machines* – *Total Turnkey Investor Program (4 Options)*
   *Joint Venture Partnership Profit-sharing Program*
   - **Option 1:** 10 WST-700BVAA (**B**ulk Vending **A**lkaline **A**mbient) Water Stations for $120,000 (**for Veterans/Spouses only**)
   - **Option 2:** 33 WST-700BVAA (**B**ulk Vending **A**lkaline **A**mbient) Water Stations for $280,500
   - **Option 3:** 66 WST-700BVAA (**B**ulk Vending **A**lkaline **A**mbient) Water Stations for $581,000
   - **Option 4:** 100 WST-700BVAA (**B**ulk Vending **A**lkaline **A**mbient) Water Stations for $850,000
   - 
2. *Water Purifiers – Full Time Investor Program (3 Options)*
   *Water Purifier Program*
   - 13 – WST-100 and/or WST-200 Water Purifier Systems for $40,000 (Veterans receive three extra Water Purifier Systems vs. Non-veterans)

## Joint Venture Partnership Agreement Highlights



- Business model designed for ***total-passive investor***
- **Not a Franchise:** Business, not a franchise, saving Royalty and Ad costs savings to your bottom line profits
- **Investment options**: Four Options from $120,000 to $850,000
  - WST-700BVAA WaterStations®
  - ➤ **Option 1:** 10 WST-700BVAA (**B**ulk **V**ending **A**lkaline **A**mbient) WaterStations® for $120,000
    **(For Veterans/Spouses Only)**
- ➤ **Option 2:** 33 WST-700BVAA (**B**ulk **V**ending **A**lkaline **A**mbient) WaterStations® for $280,500

➢ **Option 3:** 66 WST-700BVAA (**B**ulk **V**ending **A**lkaline **A**mbient) WaterStations® for $581,000
➢ **Option 4:** 100 WST-700BVAA (**B**ulk **V**ending **A**lkaline **A**mbient) WaterStations® for $850,000

- **Territory Description:** investor can pick geographical areas
  - o Defined boundaries available in multiple states/cities in the US
- **Water Station Financial Solution Program options:** WaterStation H20 Funding Solutions for leveraging liquidity vs. cash options
- **Qualifies for the Section 179 Org Act:** deduct the full cost of equipment from 2019 to 2022 taxes, up to $1,000,000 per year allows for lowering purchasing costs and enhances ROI at a faster timeline
- **Phase 1 – WST700BVAA WaterStations®**: placement opportunities in 27 focused business locations
  - o Patent-pending designs enhancing performance through engineering bringing competitive differentiation in the market place
  - o Over 8 key differentiators vs. conventional water bulk vending machines
  - o Four revenue streams to business owner – water (1); advertising (3)
  - o *WST's Profit Sharing Agreement* with business locations brings 30% higher revenues due to *four* revenue streams vs. only *one* with conventional water vending machines
- **Phase 2** – focus on all 27 business locations with proprietary WaterStations® portfolio of models to expand market share and revenue growth
- **Eco-efficiency Business model:** Exclusive BOTTLE-LESS water purification system that will convert water sources (even brackish or sea water) into Pure or Alkaline water in a standalone WaterStation®
- **Inventory free**: – no need for overhead costs of brick and mortar facility, full-time personnel, vehicles or recycling costs resulting operational cost savings of tens of thousands of dollars annually

## 3    FINANCIAL INFORMATION – Bulk Vending

## 3.1 Financial Model

## 3.2 See Proforma

### 3.3 $100 of Advertising sales:
- 20% to business location
- 20% to dedicated sales representative
- 60% remaining is split between investor and WST

### 30% of Sales in Net to Investor

**Innovative Engineering Design**

WaterStation Technology®'s one-of-a-kind design turns local tap water into healthful drinking water:

- Filters local water into pure drinking water
- Contaminated or good drinking water into alkaline water at a fraction of the cost of bottled alkaline water
- Filters sea water into, through our unique filtration system, pure drinking water
- New benefits to vending machine owners:
  - This is not a franchise, it is a business; therefore, no
    - Royalty fees
    - Ad fees
    - Territorial restrictions
  - No shelf life of inventory goods, brick and mortar facility, personnel, delivery trucks resulting in an enormous cost savings to the owner
  - Utilizes premises' water, electricity and small footprint for the machine
  - Business Owner placement of WaterStation® receives a percentage override of the proceeds
  - Credit cards and/or iPad Pay/Apple wristwatches can be used to convert foreign currency exchange and minimize vandalism challenges
  - No bad checks written
  - No Accounts Receivables to collect
  - All of our Water Stations™ never need to be restocked
  - Easy to manage: no full-time employees, trucks, brick and mortar building to house inventory and other overhead support functions
  - Monitor each vending machine remotely via the web to reduce operating costs

## 4    COMPETITION

# 4.1 Competition – Bulk Vending:

October 10, 2016 -- Primo Water Corporation (Nasdaq: PRMW), a leading provider of multi-gallon purified bottled water, self-service refill water and water dispensers, and Glacier Water Services, Inc., a leading provider of high-quality drinking water dispensed to consumers through self-service refill water machines, announced that they have executed a merger agreement pursuant to which Primo will acquire all outstanding shares of Glacier.

The transaction unites two highly complementary brands and is intended to generate refill and exchange network services:

1. Self-serve refill water machines
   a. Only represents 20% of the overall Bulk Vending Market for USA
   b. Over 20-year old technology
2. Water exchange of water bottles
   Note: in both service offerings, they provide Reverse Osmosis which removes minerals from the water
   a. When stripped of these minerals, _water can be unhealthy_ and it will begin uniting with $CO_2$ in the air and _turning acid_

    b. When stripped of these minerals, water can be unhealthy and it will begin uniting with CO2 in the air and turning acid

    c. Dangerous chemicals like pesticides, herbicides and Chlorine are molecularly smaller than water and can pass freely through the filter

    d. Reverse Osmosis lowers the pH value to an acidic condition

## 4.2 Competitive Analysis

| Description | WaterStations® | Others |
|---|---|---|
| Franchise/Royalty/Ad fees/Territory Restrictions | Not Applicable | Varies |
| Only **_Total Bottle-Free_** WaterStations® globally (Pure, Alkaline, Desalinization) | Yes | No |
| **_UNIQUE_** Alkaline 7-filtration system | Yes | No |
| **_ONE-OF-A-KIND_** Special Veteran Funding Program Option | Yes | No |
| **_PRIVATE LABEL_** WaterStation® – Option | Yes | Varies |
| **_HDTV for 2nd REVENUE SOURCE_** (advertising) plus **_Educational Services_** – Option | Yes | No |
| **L**ocation/**A**ction-Marketing/**S**ite preparation/**I**nstallation and calibration (**_LASI_**) Turnkey Program | Yes | No |
| Web site design/maintain and Social Media Turnkey - Option | Yes | No |
| **_REMOTE MONITORING_** each WaterStation® - **_Safety & Lower Costs_** (When to collect funds, maintenance) | Yes | No |
| **_Multiple funding options_** (Cash, Tax deferred IRA, Lease or Debt Financing Programs) | Yes | Varies |
| **_Advanced Vending Technology_** with multiple payment options using cash, credit/debit cards Plus mobile devices (iPhone, Apple Watch or Goggle Wallet) | Yes | No |
| **_Wrap_** to identify each WaterStation® as "Veteran Owned Business" or "Disabled Veteran Owned Business | Yes | No |

**This section of the page is intentionally left blank**

## _Dealership Program Highlights - Water Purifiers_



Our Dealership Opportunity will allow entrepreneurs the ability to secure their own territory and supply the purest alkaline water through an environmentally friendly business model.

This Business Model is designed for two types of owners: sales/business development minded and operational/logistically focused. Model can be owner operator or expand with the addition of sales staff. If done correctly, this model is highly duplicable, providing the opportunity for substantial returns to our dealer partners.

- **Investment option**:
    - 10 WST-100 and/or WST-200 Water Purifiers for $40,000
- **Funding Source for balance of Payment:**
    - Third party funding options
- **Target Market:**
    - Office/professional locations and residential consumers
        - Our training manual will focus on targeting office locations, as this market provides the best ROI to complement our proven selling techniques.
- **Protective Territory:**
    - Assigned a geographical territory based upon population
- **Business Model**
    - Sell WST-100 or WST-200 to office locations on a monthly subscription rental plan
    - Buy Machines from WST (either before your close a sale, or once you've closed)
    - Generate leads (50-60 a week)
        - Cold calls
        - Referrals
        - Trade Shows
    - Set appointments (15-20 a week)
        - Show prospects the video
        - Test their water against ours (TDS test)
        - Give prospects a free two-day trail with a commitment
        - Follow up on two-day trial and close the deal

**Day-to-Day: Dealership Owner**
**Clients:** B2B
**Objective:** Rent office water machines (units) to business clients on a month-by-month basis (typically 36-60-month contracts)
The day-to-day of a Veteran Dealership investor can be broken down into one of two structures.

**1) Owner Operator Business**: Dealership owner sells units on his/her own, forgoing any commission obligation to sales representatives. With the proper skill set and prior training, an owner operator could also do the installs (check the proforma for estimate cost savings from doing installation).

All units are outfitted with filters, so after the appropriate time period, owner operators will be required to change out the appropriate filters throughout the relationship (this cost is estimated in the proforma).

**2) Owner Managed Business**: Dealership owner hires sales reps (commission only, we have the contract and commission break down ready to go). Utilizes install team to install units and either utilizes sales reps or install team to change out filters for the duration of contract.

**Acquiring Business:**
Sales reps will be encouraged to apply our sales training document to their sales efforts. This document outlines recommended cold calls and appointments each week. Additionally, sales reps will be provided a short, 90 second, video to provide prospective clients, as well as other marketing materials.

Dealership owners are encouraged to support their sales staff by attending networking meeting in efforts to grow brand awareness and build strategic relationships. Some Dealers have staffed call centers to help generate warm leads. Dealer owner should invest in a web site educational purposes of the value-added differentiators of your Dealership, benefits of alkaline water, patent-pending filtration system to assure purist water referencing the World Health Organizations' Total Dissolved Solids (TDS) measurement chart.

Dealership owners should encourage sales reps to get reviews and Dealership owners should follow up on closed sales in efforts to acquire a word-of-mouth lead and/or referral from happy customers, which can also be part of the web site.

**After the Contract Expires**
Contracts are for 60 months. After the contract expires the Dealership Partner has a few choices:
- Let the client buy the machine at a reduced price (we can advise)
- Renegotiate a reduced monthly rent and collect the payments yourself (the "Financing" section below outlines how option 2 is different than the traditional financial structure)
- Sell them the newest model--doing the entire transaction all over again

*Our suggestion is option three.

**Financing**
There are two options to finance your office water machines (units):
1. Collect the monthly rents yourself and payout the sales reps and install team from working capital
2. Sell the contracts to a financial institution and receive the money for the units upfront (this is what WST does)

Financial institutions will fund one of two ways for the Dealer owner:

1. Factor the total and give you 75%-80% of the total rents upfront
2. Give you 100% of the rents and then charge additional interest, on top of the negotiated monthly rents, to the customer.

**Example:**
**Scenario 1:** (example of factoring) 60-month contract for $70 a month (60 x 70 = $4,200). $4,200 x 75% = $3,150 to Dealership owner upfront.
**Scenario 2:** 60-month contract for $70 a month (60 x 70 = $4,200). Dealership Partner gets $4,200 upfront. Client, after interest, will be charged closer to $78 a month.

- Typical turnaround time for financing is 24-72 hours.

**Analysis**: Review
   o Did sales reps hit their lead numbers?
   o What feedback did the market provide regarding price, product and service?
   o Track performance against budget objectives; make changes where applicable

Duplicate. This model is all about following a process and duplicating that process with sales reps. We will help provide the framework.

Currently, water cooler users either have water delivered or purchase it at retail outlets such as grocery stores, etc. This is costly due to increasing delivery costs whether to the user or the retail outlet. Water Stations™ conveniently located can service thousands of business and residential consumers and compete very favorably with delivered and retail water on the basis of price, convenience and environmental impact.

No more lifting and changing difficult, plastic water jugs, each time risking injury from the heavy lifting. Ditch the distraction of water delivery and make your life easier with the plumbed-in purification systems from Water Station Technology:

| | |
|---|---|
| • High Costs | • Safety – handling bacterial issues |
| • Spillage | • Excessive accounting issues |
| • Storage issues | • Delivery inconvenience |
| • Lifting 42-pound bottles | • Security issues |

Drinking enough pure, mineralized and balanced water has been shown to aid the body in healing itself from many health issues, including:

| | |
|---|---|
| • Gastrointestinal issues | • Pain and inflammation in muscles and joints |
| • Dysfunction of liver and kidney | • Tension headaches and migraines |
| • Hormonal problems | • Weight loss |

- Diabetes

- Gall and kidney stones

- Water retention

- Skin problems, acne, eczema psoriasis

**Introducing the two WaterStations® for this market:**



The WST-100 is the first compact reverse osmosis water purifier with built in alkaline mineralization. It percolates water through five beds of minerals to produce alkaline water in a very natural way.

Clean, simple and appliance-like appearance that houses all filters and hoses. Its compact design keeps your cabinet organized and efficient. It is fully automatic and can be enjoyed without complicated operating procedures.

The WaterStation® is the worlds only commercial scale, certified, high-capacity _BOTTLE-FREE_ water purifier and distribution machine _that dispenses chilled,_ great tasting water.

The value-added characteristics of the WaterStations® are unique, but simple:

- The Water Stations™ starts generating income after being installed 24/7.

- Depending on WaterStation® model, it can produce up to $60,000 revenue per year in a remarkably small footprint, as little as 12 square feet.

- The business has very low manpower needs. Typically, one person can service up to 100 water vending machines.

- It's a year-round income producer that skyrockets in the summer months.

- A WaterStation® will fill bottles, and over 80% of bottles filled are competitors' bottles.

- WST's WaterStations® are "_inventory free_" and can operate at gross profit margins of 95% compared to 45% for bottled water vending machines.

- Because the distribution occurs without bottling costs or re-cycling issues, our operations are essentially Eco-Friendly and waste/pollution-free.

- Mobility design allows placements in locations that generate the most rewarding revenue performance.

- Inventory free design of the WaterStations® are ideal for jails (plastic bottles can act as a weapon) and military bases – eliminates the constant multiple

delivery requirements of refilling inventory resulting in an extra safety factor for these locations plus elimination of recycling/pollution control costs

Our **GREEN ENERGY** WaterStation® system design reduces reliance on petroleum products, as fuel for distribution and recycling, and as raw material for plastic bottles



The marginal difference between WaterStation® and the competition begins at 20% and increases to over 80% as more water is consumed.

In the commercial section the predominant business model around the world for the past 30 or more years has been the "5-gallon jug" on top of the water cooler. As displayed in the chart above, this business model is well approaching its end of life. As fuel and other operating costs continue to go up - the effective delivery radius of a 5 gallon jug gets shorter and shorter.

The water industry, heavily invested in bottling and delivery infrastructure, has been slow to respond to growing consumer concerns about quality, safety, cost and environment.

There is no doubt that there is a prevailing social mandate to *Go Green* regarding water vending machines for employees. To some business owners and office managers, water purification and water filtration systems may not seem like a priority given the financial pressures in today's markets. As difficult as it may currently seem, taking proactive measures now to embrace green and clean water purification equipment will prevent much greater difficulties in the future, such as stiff fines from regulatory agencies and a

tarnished public image. Taking a proactive approach to abiding by these inevitable regulations will not only save businesses money on the long term, but they will definitely decrease short term operating costs as well as facilitate the business's corporate responsibility and environmental conscience.

Not addressing ways to further promote and utilize environmentally friendly water vending machines could also result in negative public perception; that a company is not making every effort to help the environment and is not a good neighbor, which could lead to public relations problems.

In the search for providing real, tangible Eco-Friendly water purification systems and solutions, water vending provides a new, unique, and important way to make a substantial impact. The press and articles today are rife with detailing the environmentally hazardous effects of millions of plastic water bottles polluting our environment world-wide. These same articles also note the public desire to have safe, great-tasting water in convenient single-serve sizes, and therefore see no real or imminent slowing for consumer demand.

**There are no 100% accurate forecasts, but the fact is – as the earth's population grows, so will its need and dependency on a renewable, sustainable supply of clean water.**

## 5    INVESTOR INFORMATION

## 5.1 Investor Business Background

Big Boy Tools LLC is Ohio Limited Liability Company formed in 2012 by Sterling A. Davis to own/manage previous franchise, known as Snap-on Tools. Currently, entity is in process of purchasing WaterStation vending machine franchise business, initially with 200 machines to be installed/located throughout the United States, mainly in Nevada, Texas, and Arizona.

Sterling A. Davis began his career as a franchise owner, known as Snap-on Tools, in 2013 and successfully managed and operated the company. He sold his Franchise to Snap-on Tools and plans to manage the Waterstation machines.

## 5.2 Develop New Business Locations

Through the _Business Alliance Partner_ Profit-sharing Licensing program, I plan to take full advantage of the on-going support beging provided by the Water Station Management Dealer Vender support team. This support team will carry out the following responsibilities:

- Finding proper locations
- Obtain a 3 – 5-year, non-compete _Profit Sharing Agreement_ with an automatic renewal
- Preparing the sites prior to delivery of WaterStations®
- Install and calibrate the WaterStations® in each of my business locations

- Carrying out daily operations and maintenance of my partner business alliance locations.

I will have the option to also recommend potentially new business locations to expand my footprint of additional locations for investment purposes or to receive a finder's fee from Water Station Mangement if those referred locations agree to having WaterStations® installed.

# 5.3 Maintain Current Customer Base

Important to develop strong business relations with the owners of each Business Location along with their employees. It is important the WSM Vender Dealer educate all persons involved with each Business Location on the critical need for water filtration due to the documented contaminated water coming out of the water faucets within each location in the zip code where the WaterStation® is located along with the value-added benefits of the WST-700BVAA WaterStation® provides vs. conventional water vending machine offerings. Here are some of the topics to present to the owner and their employees:

- Documented sources identifying the water contamination issues from drinking water
  - **Link:** (enter your zip code):https://www.ewg.org/tapwater/#.We960LpFxpw
  - **Link:** video: https://youtu.be/Hs__Layx9w0
- How the patent-pending WaterStation® differentiates from conventional water vending machines and their water purification TDS measurement performance
- Benefits of drinking Alkaline water vs. Reverse Osmosis
- Provide marketing flyer handouts for consumers to highlight above bullet points
- Have Marketing sign by cashier about asking them to try their Alkaline water and benefits

To assure strong customer service support, protocol is to stop by each location at least once a week to verify cleanliness of the WaterStations® and develop stronger relationships with employees and answer any questions.

Ways to increase the education of consumers and enhance higher revenue dollars, may be carried out through an Open House at periodic, agreed-upon times with each business location to provide the following services with support tools:

- Use source references on the water contamination in the zip code area of the WaterStation® business location
- World Health Organization Chart on importance of low Total Dissolved Solids' (TDS) measurements for safest drinking water
- Graphic that shows how the WST-700BVAA's patent-pending alkaline mineralization filter differentiates vs. conventional water vending machines
- Provide alkaline water for a taste test with the theme:" Taste the Difference…Improve Your Health"

- Offer a one-gallon container, with store's logo, for consumer to fill up at a special price of $0.25/gallon during Open House
  - Taste test their home faucet drinking water with the Alkaline water in container
- Offer special discount pricing during open house for customers
- Have handout that explains above bullets

# 5.4 Drive Higher Revenue Dollars for each WaterStation®

Water Stations® will be placed in common locations that can easily be accessed by their customers, preferably in front of store. When the advertising becomes available (expected on or before end of 2020) the Water Stations® built-in 15" HDTV will educate the customers on the healthy advantages of Alkaline water and to add four new, additional revenues through advertising. Once educated, the opportunity of returning to the location would be enhanced for future purchases.

- See 5.3 to maintain and expand customer base

Create and the following services after each installation:

- Grand Opening announcement of WaterStation® for each location
- Store greeter at the WaterStation®
  - Offer samples
  - Discuss differentiators offered with the WaterStation® through benefits not available with other water vending machines
  - Benefits of alkaline water
  - Documenting contaminated drinking water in the zip code of each WaterStation® placement
  - Provide flyers highlight above for consumers
- Grand opening announcement of WaterStation® for each business location
- Establish a referral program
- Implement a Public Relation program to enhance brand recognition

Carry out marketing programs to enhance the brand recognition of the WaterStations® and the healthy, beneficial advantages of Alkaline water housed in a unique, one-of-a-kind a _bottle-less_ vending machine that is eco-friendly eliminating recycling costs and environmental landfill contamination. Being active in the community and taking active role in educating the public at local events such as fairs, rodeos, and other popular events. Joint the local Chamber of Commerce, Rotary Club and Lions Club to expand networking business opportunities and to know business leaders in the community. Also, participate in local and Regional

exhibits that would enhance increasing new business locations placements of WST-700 WaterStations®

## 6   TRAINING

## 6.1   Training Program

With the _Business Alliance Partner_ (BAP) profit-sharing business model, the WSM Vending Dealer will have gone through proper training to assure efficiency of servicing of the WaterStations® to minimize down time to enhance daily revenues for the investor and each business location.

## 6.2   Discovery

Option to travel to Everett, WA to meet with the organization to receive a better business alliance arrangement and to learn more about the organization, information on the WaterStations® and other benefits as an investor.

- Introduction to Senior Management
- Meet Marketing and Team members
- History of WST
- Overview of the WST portfolio
- Tour of manufacturing
  - o Review each WaterStation® with its unique designs and how they are different from conventional water vending machines
- Demonstrate how to change filters in the Water Stations®

## 6.3   Training for Vending Dealers signing MOU

Learn the following support programs

- LASI turnkey program overview
  - o Emphasize key targeted markets to match Water Stations®
  - o City protocols to meet their installation guidelines
  - o Rollout Strategies to enhance your start-up operations to grow your revenue performance
- Ad Program protocols
  **Local Area**
  - o Find potential advertisers in my local area for two revenue streams
    1. Local advertisers for the LCD display
    2. Local advertise on both sides of the WST-700 WaterStation®
  **National**
  - o Corporate will find National advertisers that will be installed in all BAP locations, when available
- Software programs
  1. Corporate manages, remotely via Wi-Fi, the revenue performance of each Water Station® using the real-time software package to monitor revenue per Water Station® (included in system package)
  2. Trip scheduling to manage Water Stations® to keep operating costs low

      3. Credit card reader protocols
      4. X/Y Plotting software to track Water Station® revenues vs. targeted goal
- Maintenance protocols for both during and after the 3-year warranty
      1. How carry out routine maintenance requirements
      2. Customer Service 800 number for Customer Service assistance
- Review Grand Opening rollout strategies
      1. Go over Marketing Support programs and support materials
- Question and Answer session

By becoming a certified Water Station Management support source, my company can provide Sales and Services to other Business Alliance Partner investors and receive additional fees in carrying out their on-going operations and maintenance requirements.

# 7 ATTACHMENTS

7.1    <u>Attachments</u>
    A. Purchase Agreement
    B. Proforma - 10-Year Cash Flow Projection with Start-up Budget for the new Water Stations™
    C. WaterStation Technology Brochures

**This section of the page is intentionally left blank**









**WST700BVAA**    **MWST600BVD**    **WST600SSPC**    **WST600SSAC**











**WST-100**    **WST-200**    **Desalinization Container**

# EXHIBIT 33

| Customer | Model | Unit Description | Unit Price | Total | Document Name |
|---|---|---|---|---|---|
| 210 SA Holdings, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00004350.pdf |
| 2540 Properties LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $140,250 | WA_DFI_00002977.pdf |
| 3LW, LLC | M700BVA | All Water Stations, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $187,000 | WA_DFI_00002771.pdf |
| 5161 LLC | M700BVA | All Water Stations -, alkaline vending machines-WST700 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. Machines will be equipped with reporting capabilities standard on all units. | $8,500 | $4,998,000 | WA_DFI_00005401_0002.pdf |
| AA WST, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $12,000 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $12,000 | $144,000 | WA_DFI_00002911.pdf |
| Aarana Water Vending, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00005543.pdf |
| Abby Wyatt Group, Inc. | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $420,000 | WA_DFI_00004001.pdf |
| Abby Wyatt Group, Inc. | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $561,000 | WA_DFI_00004025.pdf |
| Acquastation LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $239,000 | WA_DFI_00003466.pdf |
| Adventure Done Right LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00004414.pdf |
| Aiden Waterworks LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $595,000 | WA_DFI_00004417.pdf |
| Apex Water Innovations, LLC | M700BVA | All Water Stations -, alkaline vending machines-WST700 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. Machines will be equipped with reporting capabilities standard on all units. | $8,500 | $144,500 | WA_DFI_00002925.pdf |
| Apex Water Innovations, LLC | M700BVA | All Water Stations -, alkaline vending machines-WST700 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. Machines will be equipped with reporting capabilities standard on all units. | $8,500 | $280,500 | WA_DFI_00002924.pdf |
| Aquastation LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $239,000 | WA_DFI_00003431.pdf |
| Aquastation LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $215,000 | WA_DFI_00003409.pdf |
| Aquastation LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00003471.pdf |
| Aquatic Technica LLA | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $994,500 | WA_DFI_00004338.pdf |
| Aquatic Technica LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $994,500 | WA_DFI_00000043.pdf |
| Aquatic Technica LLC | M700BVA | All Water Stations -, alkaline vending machines-WST700 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. Machines will be equipped with reporting capabilities standard on all units. | $8,500 | $994,500 | WA_DFI_00001742_0002.pdf |

| Customer | Model | Unit Description | Unit Price | Total | Document Name |
|---|---|---|---|---|---|
| Aquatic Technica LLC | M700BVA | All Water Stations -, alkaline vending machines-WST700 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. Machines will be equipped with reporting capabilities standard on all units. | $8,500 | $994,500 | WA_DFI_00005540.pdf |
| Aquatic Technica LLC | M700BVA | Alkaline vending machines-WST700 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. Machines will be equipped with reporting capabilities standard on all units. | $8,500 | $994,500 | WA_DFI_00006517_0002.pdf |
| Arravend LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,000 | $2,700,000 | WA_DFI_00005507.pdf |
| Arravend LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,000 | $3,000,000 | WA_DFI_00005546.pdf |
| Ash Vending, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $850,000 | WA_DFI_00004028.pdf |
| Ash Vending, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $850,000 | WA_DFI_00004143.pdf |
| ATMII, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $603,500 | WA_DFI_00005544.pdf |
| Axial Tilt LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $680,000 | WA_DFI_00005571.pdf |
| BAM INV, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $297,500 | WA_DFI_00004424.pdf |
| Be of Service, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00004431.pdf |
| BFC Vend LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $7,650 | $382,500 | WA_DFI_00005547.pdf |
| Bhakti Infrastructure Investments, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00004434.pdf |
| Biyaya, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $637,500 | WA_DFI_00004029.pdf |
| Biyaya, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $144,500 | WA_DFI_00004030.pdf |
| Biyaya, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $289,000 | WA_DFI_00004316.pdf |
| Bradley Allan Burau, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 | $8,500 | $1,270,000 | WA_DFI_00003393.pdf |
| Bradley Allan Burau, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $1,189,030 | WA_DFI_00003486.pdf |
| Brown Family Enterprises LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00004436.pdf |
| Buckeye Water Direct, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $255,000 | WA_DFI_00003487.pdf |

| Customer | Model | Unit Description | Unit Price | Total | Document Name |
|---|---|---|---|---|---|
| C&C Investment Holdings, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $850,000 | WA_DFI_00003777.pdf |
| C&C Investment Holdings, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $637,500 | WA_DFI_00004002.pdf |
| C&C Investment Holdings, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00004031.pdf |
| Carol Bryant, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $871,405 | WA_DFI_00003394.pdf |
| Cedric Pantanella | M700BVA | All Water Stations -, alkaline vending machines-WST700 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. Machines will be equipped with reporting capabilities standard on all units. | $12,000 | $120,000 | WA_DFI_00004038.pdf |
| CFO LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $297,500 | WA_DFI_00004034.pdf |
| CFO LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $1,003,000 | WA_DFI_00004035.pdf |
| CFO LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $408,000 | WA_DFI_00004033.pdf |
| CFO LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $504,500 | WA_DFI_00004036.pdf |
| Chancellor, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $497,250 | WA_DFI_00004040.pdf |
| CHAURISHI RETAIL ENTERPRISES LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00004439.pdf |
| Cherry Water, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00004041.pdf |
| Chris and Stephanie Teichmiller | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $289,000 | WA_DFI_00004042.pdf |
| Chris and Stephanie Teichmiller | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00004043.pdf |
| CJGE Water LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00004007.pdf |
| CleanWater, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00004024.pdf |
| CLI WST, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $850,000 | WA_DFI_00000187.pdf |
| CLI WST, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $595,000 | WA_DFI_00005508.pdf |
| CLI WST, LLC | M700BVA | All Water Stations, alkaline vending machines-M700BVA complete with filters, etc. | $8,500 | $850,000 | WA_DFI_00007590.pdf |

| Customer | Model | Unit Description | Unit Price | Total | Document Name |
|---|---|---|---|---|---|
| Coco Aqua LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00000136.pdf |
| Coco Aqua LLC | M700BVA | All Water Stations, alkaline vending machines-M700BVA complete with filters, etc. | $8,500 | $425,000 | WA_DFI_00007772.pdf |
| Covalent Holdings LLC | DrinkUp | All Water Stations -, alkaline vending machines-M700BV) complete with 3 stage sediment filters, 500 gpd reverse osmosis, poit carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $10,000 | $280,000 | WA_DFI_00002393.pdf |
| Culminate Water Technology LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00004458.pdf |
| D & J Water, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $212,500 | WA_DFI_00004048.pdf |
| D Alkapure Water, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00004050.pdf |
| David Akhamie | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $12,000 | $120,000 | WA_DFI_00005428_0001.pdf |
| Detroit New Water Wave LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $595,000 | WA_DFI_00004054.pdf |
| DMJ Water Holdings, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $994,500 | WA_DFI_00002943.pdf |
| DN2LA, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $289,000 | WA_DFI_00004022.pdf |
| DN2LA, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. Price listed includes $25,000 initial Franchise Fee for Active Model Participation | $8,500 | $215,000 | WA_DFI_00004051.pdf |
| DOS Legacy Holdings, LLC dba Aqua Rental Machines | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $76,500 | WA_DFI_00004117.pdf |
| DosCocos, Inc | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $255,000 | WA_DFI_00003437.pdf |
| DSN Solutions, Inc. | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00004053.pdf |
| Duane Okamoto, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $611,000 | WA_DFI_00003395.pdf |
| Duane Okamoto, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $595,000 | WA_DFI_00003438.pdf |
| Dub AV, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00002958.pdf |
| Dub Industries, LLC dba Dub AV | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00002959.pdf |
| Echo Vending LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $1,498,125 | WA_DFI_00004485.pdf |

| Customer | Model | Unit Description | Unit Price | Total | Document Name |
|---|---|---|---|---|---|
| ECO RESPONSIBLE, LLC | M700BVA | All Water Stations -, alkaline vending machines-WST700 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. Machines will be equipped with reporting capabilities standard on all units. | $12,000 | $120,000 | WA_DFI_00004056.pdf |
| EIS SOLUTION LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $297,500 | WA_DFI_00005365_0001.pdf |
| EK Alliance Inc. | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $255,000 | WA_DFI_00004006.pdf |
| EK Alliance Inc. | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $190,000 | WA_DFI_00004015.pdf |
| EMMATOINE LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BV) complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $153,000 | WA_DFI_00004466.pdf |
| EMMATOINE LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BV complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $272,000 | WA_DFI_00004465.pdf |
| e-RM Partners, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00005897.pdf |
| Ethyan, LLC c/o Isreal Sands Law P.A. | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00002967.pdf |
| Eunoia, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $850,000 | WA_DFI_00004298.pdf |
| Ever Upward Inc | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00003853.pdf |
| Ever Upward Inc | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $196,000 | WA_DFI_00004000.pdf |
| Ever Upward Inc | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00004099.pdf |
| EZ Vending, LLC | M700BVA | All Water Stations -, alkaline vending machines- M700BVA | $8,500 | $280,500 | WA_DFI_00003137.pdf |
| EZ Vending, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA 8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $238,425 | WA_DFI_00003139.pdf |
| FacTS Property Services | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00005220.pdf |
| Flatlands Equipment, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA$8,333.33 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,333.33 | $1,000,000 | WA_DFI_00004060.pdf |
| Francois Beauchemin | M700BVA | All Water Stations, alkaline vending machines-M700BVA complete with filters, etc. | $8,500 | $127,500 | WA_DFI_00007726.pdf |
| Francois Beauchemin, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $127,500 | WA_DFI_00000053.pdf |
| Frank Badolato | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00002971.pdf |
| Frank O'Donnell | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $85,000 | WA_DFI_00004062.pdf |

| Customer | Model | Unit Description | Unit Price | Total | Document Name |
|---|---|---|---|---|---|
| Freedom Water Technologies, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $399,500 | WA_DFI_00005238.pdf |
| Fresca41 LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00000067.pdf |
| Fresca41 LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $8,500 | WA_DFI_00003669.pdf |
| Fresca41 LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $2,397,000 | WA_DFI_00003671.pdf |
| Fresca41 LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $210,000 | WA_DFI_00003991.pdf |
| G1 Ventures, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $9000 | $144,000 | WA_DFI_00003986.pdf |
| G1 Ventures, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $9,000 | $126,000 | WA_DFI_00004240.pdf |
| Gary Young, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $702,069 | WA_DFI_00003396.pdf |
| Gary Young, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $702,100 | WA_DFI_00003443.pdf |
| GrayFin Ventures LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $850,000 | WA_DFI_00005435.pdf |
| Great Oak Water | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00007294_0005_0001.pdf |
| Gregory Ingram, a sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00005587.pdf |
| H2oneO Limited Liability Company | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00003599.pdf |
| H2oneO Limited Liability Company | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $297,171 | WA_DFI_00003410.pdf |
| Half Full Vending, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $267,750 | WA_DFI_00003397.pdf |
| Hamann Inc | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $238,000 | WA_DFI_00003446.pdf |
| HFC Express, Inc. | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00005438.pdf |
| Horeb Water Solutions, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $268,000 | WA_DFI_00003994.pdf |
| Horeb Water Solutions, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $267,750 | WA_DFI_00004108.pdf |

| Customer | Model | Unit Description | Unit Price | Total | Document Name |
|---|---|---|---|---|---|
| Hydration Station NC, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $340,000 | WA_DFI_00004068.pdf |
| Hye Kyoung Shin, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA | $8,500 | $595,000 | WA_DFI_00003340.pdf |
| Hye Kyoung Shin, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $595,000 | WA_DFI_00003447.pdf |
| Ian Scott | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00003045.pdf |
| Ian ScottMichael Cheng | M700BVA | All Brand New Water Stations -, alkaline vending machines complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,170 | $280,500 | WA_DFI_00003044.pdf |
| Indiana Water Technology, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $2,006,000 | WA_DFI_00004069.pdf |
| Jam Capital II LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $144,500 | WA_DFI_00005553.pdf |
| James Sartain | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $850,000 | WA_DFI_00005437.pdf |
| JBF Consulting Services, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $297,500 | WA_DFI_00003405.pdf |
| JDM2 Water Stations, LLC | M700BVA | All Water Stations -, alkaline vending machines-WST700 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. Machines will be equipped with reporting capabilities standard on all units. | $8,500 | $850,000 | WA_DFI_00005339_0002.pdf |
| Jim Vilt | M700BVA | All Water Stations -, alkaline vending machines-WST700 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $340,000 | WA_DFI_00005346_0001.pdf |
| JK Seven LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $196,000 | WA_DFI_00005516.pdf |
| JK Seven LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00005577.pdf |
| JK Seven LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $196,000 | WA_DFI_00007279_0003_0001.pdf |
| JLE Enterprises LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00005451.pdf |
| Jonathan B. Echols DMD, PC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $297,500 | WA_DFI_00005578.pdf |
| JRC REAL ESTATE III, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $1,190,000 | WA_DFI_00003992.pdf |
| JRC REAL ESTATE III, LLC | M700BVA | All Water Stations -alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $1,700,000 | WA_DFI_00004039.pdf |
| Jung J. Lee, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. Franchise Fee | $8,500 | $949,000 | WA_DFI_00003406.pdf |

| Customer | Model | Unit Description | Unit Price | Total | Document Name |
|---|---|---|---|---|---|
| Jung J. Lee, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $922,290 | WA_DFI_00003449.pdf |
| Kancace B. Farmer, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $344,250 | WA_DFI_00003450.pdf |
| Kinetic Properties, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $297,500 | WA_DFI_00005556.pdf |
| KLN Consulting, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $299,000 | WA_DFI_00005519.pdf |
| KLN Consulting, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $510,000 | WA_DFI_00005555.pdf |
| Klokkenga Helicopter Leasing, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $85,000 | WA_DFI_00000120.pdf |
| Klokkenga Helicopter Leasing, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $340,000 | WA_DFI_00000121.pdf |
| Kwansoo Lee, a Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BV/A complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $1,499,400 | WA_DFI_00007440.pdf |
| Kwansoo Lee, a Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $1,427,000 | WA_DFI_00003411.pdf |
| Kyle Smith, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $702,100 | WA_DFI_00003600.pdf |
| LGM Water LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00005466.pdf |
| Liquid Gold Associates, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $210,000 | WA_DFI_00004003.pdf |
| Liquid Gold Associates, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00004070.pdf |
| LivingWater Station LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00005471.pdf |
| Lovin' Water LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $170,000 | WA_DFI_00003056.pdf |
| Lucrum Sky, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $1,003,000 | WA_DFI_00004071.pdf |
| Lucrum Sky, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,075 | $1,130,500 | WA_DFI_00004072.pdf |
| Lucrum Sky, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00004073.pdf |
| Map Investments, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA | $8,500 | $210,000 | WA_DFI_00003376.pdf |

| Customer | Model | Unit Description | Unit Price | Total | Document Name |
|---|---|---|---|---|---|
| Map Investments, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, Inline alkaline ionizer module selection button. | $8,500 | $210,000 | WA_DFI_00003496.pdf |
| May Auerbach, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $202,300 | WA_DFI_00004075.pdf |
| May Auerbach, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $297,500 | WA_DFI_00004095.pdf |
| MBK IT Servicess, Inc. | M700BVA | All Water Stations -, alkaline vending machines-M700BVA$8500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $128,500 | WA_DFI_00003140.pdf |
| Meridian Advisors, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $297,500 | WA_DFI_00004101.pdf |
| Michael Scott Runnels, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $675,750 | WA_DFI_00003468.pdf |
| Michael Scott Runnels, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $901,000 | WA_DFI_00004310.pdf |
| Mike and Jason Crandall | M700BVA | All Water Stations -, alkaline vending machines-M700BVA¡2,143 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. With Graphics | $121,430 | $157,780 | WA_DFI_00005426_0001.pdf |
| Millenia Consulting, Inc. | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00005598.pdf |
| MK Bella, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $395,250 | WA_DFI_00005477.pdf |
| Mod Holdings LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00005573.pdf |
| Moland Springs | M700BVA | All Water Stations, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,000 | $1,080,000 | WA_DFI_00002781.pdf |
| Mountain States Pure Water LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $196,000 | WA_DFI_00005509.pdf |
| Mountain States Pure Water LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00005557.pdf |
| MSK Developments, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA$8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $85,000 | WA_DFI_00002892.pdf |
| NovaSprings LLC | WST 700 | All Water Stations -, alkaline vending machines-M700BVA $9,000 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $9,000 | $585,000 | WA_DFI_00002385.pdf |
| NS Square Eco Waters, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $296,000 | WA_DFI_00003995.pdf |
| NS Square Eco Waters, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00004078.pdf |
| Oed Properties LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00005492.pdf |

| Customer | Model | Unit Description | Unit Price | Total | Document Name |
|---|---|---|---|---|---|
| Optionary, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $285,600 | WA_DFI_00005777.pdf |
| OVIVE LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00004280.pdf |
| Pacific Water Technology, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $1,003,000 | WA_DFI_00005521.pdf |
| Pathways Consulting, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $144,500 | WA_DFI_00003069.pdf |
| Paul Martinchuk, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $357,000 | WA_DFI_00003167.pdf |
| Paul Martinchuk, a Sole Proprietorship | M700BVA | All Water Stations - alkaline vending machines - M700BVA | $8,500 | $128,000 | WA_DFI_00003155.pdf |
| Paul Talosig a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $337,500 | WA_DFI_00004079.pdf |
| Penny Rentals, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BV complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $140,250 | WA_DFI_00000061.pdf |
| PIGI Vending Solutions LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00005505.pdf |
| Placid, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00004080.pdf |
| Prasiti Water Investments, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $1,649,000 | WA_DFI_00005511.pdf |
| Prasiti Water Investments, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $714,000 | WA_DFI_00005559.pdf |
| Prasiti Water Investments, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $935,000 | WA_DFI_00005594.pdf |
| Premium Water services, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $340,000 | WA_DFI_00002948.pdf |
| Progressive Partners LLC | WST-700 | All Water Stations -, alkaline vending machines-M700BVA $9,000 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $9,000 | $423,000 | WA_DFI_00002394.pdf |
| Pura Water Vending LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00002970.pdf |
| Pure Lyfe Water, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $102,000 | WA_DFI_00004081.pdf |
| Pure Water Vending, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $1,164,200 | WA_DFI_00004004.pdf |
| Pure Water Vending, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $1,598,000 | WA_DFI_00004083.pdf |

| Customer | Model | Unit Description | Unit Price | Total | Document Name |
|---|---|---|---|---|---|
| Raymond T. Jone, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $574,000 | WA_DFI_00003400.pdf |
| Raymond T. Jone, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $559,300 | WA_DFI_00003478.pdf |
| Redmate Associates LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BV) complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $9,000 | $450,000 | WA_DFI_00005790.pdf |
| Redwaters LLC | WST 700 | All Water Stations -, alkaline vending machines-M700BV complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $9,000 | $936,000 | WA_DFI_00002378.pdf |
| Redwaters LLC | WST 700 | All Water Stations -, alkaline vending machines-M700BV) complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $9,000 | $450,000 | WA_DFI_00002380.pdf |
| Redwaters LLC | WST 700 | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $9,000 | $450,000 | WA_DFI_00001128.pdf |
| Rex Ventures, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $297,500 | WA_DFI_00005694.pdf |
| Rex Ventures, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $297,500 | WA_DFI_00005693.pdf |
| REZ Investments LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $420,000 | WA_DFI_00003399.pdf |
| REZ Investments LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $392,700 | WA_DFI_00003459.pdf |
| Richard Andreotta, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $196,000 | WA_DFI_00003999.pdf |
| Richard Andreotta, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00004085.pdf |
| Richard R. Peterson | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $850,000 | WA_DFI_00005563.pdf |
| Richard R. Peterson | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $297,500 | WA_DFI_00005564.pdf |
| Richard R. Peterson, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $595,000 | WA_DFI_00005512.pdf |
| Richland Real Estate, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA | $8,500 | $144,500 | WA_DFI_00003115.pdf |
| Richland Real Estate, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $144,500 | WA_DFI_00003113.pdf |
| River Capital Water Group, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA,8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $569,500 | WA_DFI_00002823.pdf |
| River Capital Water Group, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA,8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $850,000 | WA_DFI_00002824.pdf |

| Customer | Model | Unit Description | Unit Price | Total | Document Name |
|---|---|---|---|---|---|
| Rob and Kristian | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00007290_0002_0001.pdf |
| Robert Dost, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $1,118,136 | WA_DFI_00003461.pdf |
| Roman Jarosiewicz | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00005698.pdf |
| Ronald Cole, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $1,665,143 | WA_DFI_00003497.pdf |
| Ronald Cole, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. Franchise Fee | $8,500 | $1,712,000 | WA_DFI_00003408.pdf |
| Rosewater Ventures LLC | M700BVA | All Water Stations -, alkaline vending machines-WST700 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. Machines will be equipped with reporting capabilities standard on all units. | $7,407.41 | $3,000,000 | WA_DFI_00004165.pdf |
| Royal Reservoirs LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $433,500 | WA_DFI_00005701.pdf |
| Runyan's Management Company, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $501,500 | WA_DFI_00004086.pdf |
| Ryan Richard, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $297,000 | WA_DFI_00003996.pdf |
| Ryan Richard, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $697,000 | WA_DFI_00004088.pdf |
| Ryan Richard, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $1,496,000 | WA_DFI_00004089.pdf |
| Ryan Richard, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00004087.pdf |
| S & A Water Resources, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00003081.pdf |
| SAS10 LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00000149.pdf |
| SB Investments LLC | M700BVA | All Water Stations -, alkaline vending machines-WST700 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. Machines will be equipped with reporting capabilities standard on all units. | $8,500 | $280,500 | WA_DFI_00002816.pdf |
| Scott D. Burau, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 | $8,500 | $1,275,000 | WA_DFI_00003401.pdf |
| Scott D. Burau, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $1,189,030 | WA_DFI_00003498.pdf |
| Seascape water Stations, LLC | M700BVA | All Water Stations -, alkaline vending machines-WST700 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. Machines will be equipped with reporting capabilities standard on all units. | $8,100 | $105,300 | WA_DFI_00000208.pdf |
| Sell Water, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $210,000 | WA_DFI_00003412.pdf |

| Customer | Model | Unit Description | Unit Price | Total | Document Name |
|----------|-------|------------------|------------|-------|---------------|
| Sheldon Cohen Trust | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $192,500 | WA_DFI_00003100.pdf |
| Shimizu pure water, LLC | M700BVA | All Water Stations, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $1,980,500 | WA_DFI_00002768.pdf |
| Shimizu pure water, LLC | M700BVA | All Water Stations, alkaline vending machines-M700BVA with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $2,975,000 | WA_DFI_00002769.pdf |
| Silver Oak H2O, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $297,500 | WA_DFI_00005752.pdf |
| Siripi WST LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $3,408,500 | WA_DFI_00005575.pdf |
| SLM Lakeside, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00002435.pdf |
| SLM Lakeside, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $210,000 | WA_DFI_00003993.pdf |
| Snackify Vending LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $382,500 | WA_DFI_00005759.pdf |
| So Marketing Center Inc. | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $331,500 | WA_DFI_00004444.pdf |
| SS Water LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $7,800 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $7,800 | $195,000 | WA_DFI_00000154.pdf |
| SS Water LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,100 | $105,300 | WA_DFI_00002999.pdf |
| SS Water LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,100 | $202,500 | WA_DFI_00002998.pdf |
| SS Water LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $7,800 | $101,400 | WA_DFI_00002989.pdf |
| Starter Holdings, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00005765.pdf |
| STERLI, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $192,500 | WA_DFI_00003099.pdf |
| Steve and Stana Ciric | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00004046.pdf |
| Stillwater Ventures, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA7,425 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $7,425 | $1,499,850 | WA_DFI_00003989.pdf |
| Stillwater Ventures, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $1,800,000 | WA_DFI_00004020.pdf |
| Sullivan Painting, Inc. | M700BVA | All Water Stations - alkaline vending machines-WST700 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. Machines will be equipped with reporting capabilities standard on all units. | $8,500 | $102,000 | WA_DFI_00001502_0002.pdf |

| Customer | Model | Unit Description | Unit Price | Total | Document Name |
|---|---|---|---|---|---|
| Sun A WY, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $700,000 | WA_DFI_00005510.pdf |
| Sun A WY, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $1,003,000 | WA_DFI_00005558.pdf |
| Tanushka Water Vending, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00005279_0001.pdf |
| Tanushka Water Vending, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $297,000 | WA_DFI_00005513.pdf |
| Tanya Bhattarai | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $7,900 | $189,600 | WA_DFI_00007505.pdf |
| TDMAZ, Inc | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00005565.pdf |
| Think It LLC | WST700 | All Water Stations -, alkaline vending machines-WST700 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $51,000 | WA_DFI_00002840.pdf |
| Think It, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $68,000 | WA_DFI_00002834.pdf |
| Think It, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $76,500 | WA_DFI_00002835.pdf |
| Think It, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $252,000 | WA_DFI_00002836.pdf |
| Thirsty Dog, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $210,000 | WA_DFI_00004091.pdf |
| Thirsty Dog, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00004092.pdf |
| Thomas Brent Bowen, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $196,000 | WA_DFI_00003997.pdf |
| Thomas Brent Bowen, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00004111.pdf |
| Timely LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $273,900 | WA_DFI_00003046.pdf |
| Timely LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $280,500 | WA_DFI_00003047.pdf |
| Timothy Seth Peabody, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $208,000 | WA_DFI_00005514.pdf |
| Timothy Seth Peabody, a Sole Proprietorship | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $297,500 | WA_DFI_00005596.pdf |
| TremJ Enterprises, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $85,000 | WA_DFI_00007535.pdf |

| Customer | Model | Unit Description | Unit Price | Total | Document Name |
|---|---|---|---|---|---|
| UpTowne Ventures, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $212,000 | WA_DFI_00005515.pdf |
| UpTowne Ventures, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00005567.pdf |
| V2S2 LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $59,500 | WA_DFI_00004148.pdf |
| Venture Southeast LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $197,625 | WA_DFI_00005778.pdf |
| Veteran's Logistics LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00005780.pdf |
| Wakanda Ventures LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00005883.pdf |
| Water Dragon HMH LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00005884.pdf |
| Water LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $170,000 | WA_DFI_00002856.pdf |
| Water Station Holdings LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $2,875,000 | WA_DFI_00003467.pdf |
| Water Stations, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. With Graphics | $8,500 | $501,500 | WA_DFI_00005889.pdf |
| Water, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $170,000 | WA_DFI_00001470_0001.pdf |
| Water4Health, Inc. | UTOOBVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, SO usg product tank, Infine alkaline ionizer module selection button. | $8,500 | $161,500 | WA_DFI_00000082.pdf |
| Water-o-Rama, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $12,000 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $12,000 | $120,000 | WA_DFI_00001610.pdf |
| Water-o-Rama, LLC | M700BVA | All Water Stations, alkaline vending machines-M700BVA complete with filters, etc. | $12,000 | $120,000 | WA_DFI_00007648.pdf |
| Water-o-Rama, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $12,000 | $120,000 | WA_DFI_00000826.pdf |
| Waterstation Investments, LLC | M700BVA | All Water Stations, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $85,000 | WA_DFI_00002786.pdf |
| Waterstation Investments, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA 8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $109,400 | WA_DFI_00002808.pdf |
| Waterstation Investments, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA 8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00002809.pdf |
| WET LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $799,500 | WA_DFI_00004112.pdf |

| Customer | Model | Unit Description | Unit Price | Total | Document Name |
|---|---|---|---|---|---|
| Wilmington DE WS, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00004094.pdf |
| WST Utah, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $425,000 | WA_DFI_00005869.pdf |
| WST, LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA $8,500 complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $140,250 | WA_DFI_00003114.pdf |
| WV Water Tech LLC | M700BVA | All Water Stations -, alkaline vending machines-M700BVA complete with 3 stage sediment filters, 500 gpd reverse osmosis, post carbon filter, UV sterilizer, 50 usg product tank, inline alkaline ionizer module selection button. | $8,500 | $1,003,000 | WA_DFI_00005879.pdf |

# EXHIBIT 34

# SCHEDULE 2.b
## Water Station Owners

1. 210 SA Holdings, LLC (Marc Hildebrand)
2. 2540 Properties LLC (James and Rayne Osborne)
3. 352 Capital ABS Master Fund
4. 5161 LLC (Simon Fry)
5. A&R Water Supply
6. Aarana Water Vending LLC
7. Abby Wyatt Group (Mark Fleming)
8. Adventure Done Right LLC (Sean Done)
9. Afe X, Inc. (David Akhamie)
10. Aiden Waterworks LLC (Bo Yang)
11. Alkaline Water Holdings, LLC
12. Andrew Lunn, DDS
13. Aqualux TX LLC (Gary & Heidi Young)
14. AquaSpero LLC (Jerod Chirico)
15. Aquastation LLC (Tanguy Le Talaer)
16. Aquatica Technica, LLC (Jacob Barros)
17. Arravend LLC (Ash Sheanh)
18. ASH Vending, LLC (Robert Scott Hoery)
19. Axial Tilt LLC (James Matthew Ansley)
20. Be of Service LLC
21. BFC Vend LLC (Laura Blackmore)
22. Big Boy Tools LLC (Sterling A. Davis)
23. Biyaya LLC (Paul & Anna Lee Talosig)
24. Brown Family Enterprises LLC
25. C&C Investment Holdings, LLC (Charles Coggins)
26. ChugIt LLC (Helmut Giewat, James Vilt II)
27. CLI West LLC (Alan Leichtle)
28. Coldwater Vending LLC
29. Covalent Holdings LLC & Rise Franchise Solutions LLC (Patrick McKee)
30. Culminate Water Technology LLC (Padma Kandikonda)
31. Cum Laude Enterprises LLC (David Hull)
32. Cyborg Holdings LLC (Timothy Dailey)
33. D & J Water, LLC (John Forrey)
34. D Alkapure Water, LLC (Brenda Hildreth)
35. Daniel Panzarella (HFC Express Inc. / Veteran's Logistics LLC)
36. DDWS Tech (Dennis Demirjian)

37. DN2LA LLC (Dat Nguyen)
38. Dos Cocos, Inc. (Chet Beeton)
39. DOS Legacy Holdings LLC dba Aqua Rental Machines (Dalton Souders)
40. Dr. Scott Runnels Orthodontics & Dentofacial Orthopedics (Scott Runnels)
41. Driftless Water Ventures (Zac Scherrman)
42. Eco Responsible LLC (Cedric Pantanella)
43. Emmatoine LLC (Galia Biegle)
44. Etania LLC (Karthiga Jayaram)
45. Ethyan LLC
46. Ever Upward Inc. (David Beranek)
47. Facts Property Services
48. Facts Property Services, LLC (Aashish Parekh)
49. Flatlands Equipment LLC (Matt Fellows)
50. Flexible Industries
51. Francois Beauchemin, a Sole Proprietorship
52. Fresca41 LLC (Stéphane Deneux)
53. Fresh Water LLC
54. Freshwater Inc. / Natural Water LLC (Gabriel Vittori)
55. Granite Street Ventures, LLC (Cody and Jabez List)
56. Gray Family Enterprises, LLC (Don Gray)
57. Grayfin Ventures LLC (James Sartain, Jr.)
58. Great Oak Water LLC
59. Grier Aqua LLC (Terry Grier)
60. H2O Station Holdings, LLC
61. Half Full Vending LLC
62. Haller Investments, Inc. (Dean Haller)
63. Hawes Property and Investments, LLC (Gregory Hawes)
64. Helmut Giewat
65. Horeb Water Solutions, LLC (Steven Wells)
66. HRS2 LLC (Romil Doctor)
67. Hydration for Health, LLC (Chance and Carrie McLemore) (Chancellor, a Sole Propietorship)
68. IML Sunshine, LLC (Karla Letourneau)
69. James Group International, LLC
70. JBF Consulting Services LLC (John Flack)
71. JDM2 Waterstations (Michael Jarrell)
72. Jeffrey Brooke
73. JK Seven LLC (William Kyle White)
74. JLE Enterprises LLC (James Estes)
75. Johnson Lux Group LLC (Jason Lux)

76. JRC Real Estate III, LLC
77. Jung J. Lee WaterStation LLC (Jung Lee)
78. Kaizen Partners, LLC
79. Keystone Water Holdings, LLC
80. Kinetic Properties LLC (David Soltesz)
81. Kirk & Sherlyn Dunn
82. Klokkenga Helicopter Leasing, LLC (Mark Klokkenga)
83. Kmandy Investments LLC (Karthika Mandyam)
84. LGM Water LLC (Michael Gross)
85. LivingWater Station LLC (Karl Schoenleben)
86. Lucky Water LLC (Jonathan and Leslie Echols)
87. Lucrum Sky, LLC (Craig Simmons)
88. MAJI 8377 LLC (Jim Walker)
89. MBK IT Services, LLC (Trey Foster)
90. Meridian Advisors, LLC
91. Michael Assad/TMDAZ
92. Mod Holdings LLC (Patrick Modlin)
93. Natural Water LLC
94. Nira Enterprises LLC (Archan Tikoti)
95. NS Square Eco Waters LLC (Navaneeth Kumar Vankadari Ramprasad)
96. NTMK Corporation (Nate Wehunt)
97. Oaks Waterstation LLC (Duane and Linda Okamoto)
98. Oed Properties LLC (Joshua Oed)
99. Optionary LLC (Kristi Humphrey)
100. Penny Rentals LLC (Joel Campbell)
101. Pitus Holdings LLC (German Perry)
102. Prasiti Water Investments (Nirupa Keskar)
103. Premium Water Services, LLC (Dick Humphrey)
104. Progressive Partners LLC
105. Pure H2O LLC (William Spencer Bryant)
106. Pure Lyfe Water, LLC (May Auerbach)
107. Pure Water Vending LLC (Stephen Stefanini)
108. Q & V LLC (Tan Quan Nguyen)
109. R4AZ, LLC (Brett Richardson)
110. RCWSTECH1157 LLC
111. RDWSTECH3594, LLC (Robert C. Dost, DDS)
112. Rex Ventures, LLC (Jill Di Rito)
113. REZ Investments LLC
114. Richard Buys (Mike and Jason Crandall)
115. Richland Real Estate, LLC (Traci and Brendan McCormick)

116. RL Futures LLC (Ryan Richard)
117. Roman Jarosiewicz
118. Rose Trail Ventures LLC & Rose Trail Ventures 2 LLC (Pravin J. Thakkar Jr.)
119. Rosewater Ventures LLC
120. Rumson Wellness LLC (Taylor Ross)
121. S&A Water Resources, LLC (Shahid Mansoor)
122. SDB H2O LLC (Scott D. Burau)
123. Sell, Joseph (Sell Water LLC)
124. Silver Oak H20, LLC (Dustin Braeger)
125. Siripi WST LLC (Radhika Siripireddy)
126. SL21 Drink Up Holdings LLC
127. SLM Lakeside, LLC (Stewart McCoy)
128. Spruce Waters Investments LLC (Thomas Andersen)
129. SS Water, LLC (Ken Schueller)
130. Starter Holdings LLC (Joshua A. Leykam)
131. Steve and Stana Ciric
132. Stillwater Ventures LLC & Rosewater Ventures LLC & Coldwater Vending LLC (David Grillo)
133. Sun A. Wy LLC (Susan Pinkerton)
134. Tanushka Water Vending LLC
135. TDMAZ, Inc. (Mike Assad)
136. Tre Fontane, LLC (Jacob Barton)
137. UpTowne Ventures, LLC
138. Upwell (Upwell Water LLC, Water Vending Assets LLC / UW WS SPV 1 LLC, Water Vending LLC)
139. V2S2 LLC (Venkita Sharma)
140. Vital Fluids and Land LLC
141. Wakanda Ventures LLC (Adrian West)
142. Water Dragon HMH LLC (Riley Heller)
143. Water Filtration Stations, LLC
144. Water for Commerce Fund Management
145. Water Station LLC
146. Waterstation Investments LLC (Debra A. Stewart)
147. Waterstation Machines REZ Investments LLC (Judd Standage)
148. WST, LLC (Bradley Burau)
149. WV Water Tech LLC (Jason Blough)

24-01863-FPC11    Doc 1161-2    Filed 08/01/25    Entered 08/01/25 21:58:04    Pg 331 of 332

## Third-Party Borrowers[1]

150. BLC Water Company LLC*
151. Chaurishi Retail Enterprises LLC*
152. Coco Aqua LLC*
153. Cole WSTech LLC*
154. Freedom Water Technologies LLC*
155. G1 Ventures, LLC*
156. Henry Ernst & IIWST LLC*
157. Indiana Water Technology LLC*
158. JAM Capital II LLC / Carol and Forrest Bryant*
159. Kdawg Crypto LLC*
160. LES Enterprises (Scott Runnels)*
161. MJT Water Technology LLC*
162. Nova Springs LLC*
163. Pacific Water Technology*
164. PIGI Vending Solutions, LLC / Peter Wright*
165. Redwaters LLC*
166. Royal Reservoirs LLC*
167. Teichmiller Freedom Holdings LLC*
168. Water Stations, LLC / Raymond and Jane Jone*
169. WST Utah LLC*

044904\00001\18582013v5

---

[1] Third-Party Borrower (as defined in the Settlement Agreement) and not included in the calculation of the applicable "Water Station Owner" Supplemental Payment thresholds.