HON. FREDERICK P. CORBIT

LAW OFFICES OF CHRISTOPHER L. YOUNG PLLC
92 LENORA ST., NO. 146
SEATTLE, WA 98121
(206) 407-5829

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

In re:

REFRESHING USA, LLC,

        Debtors.[1]

No. 24-01863
(Jointly Administered)

LENDERS FUNDING'S OBJECTION TO PONZI SCHEME FINDINGS

    Lenders Funding, by and through undersigned counsel, objects to the Committee's request that the Court make Ponzi related findings as part of the plan confirmation process, ECF Nos. 1095 & 1158, as doing so would strip the rights of third-party lenders. The Committee has not established any actual intent to defraud with regard to third-party commercial loans. And while it may be true that a two-judge majority recently endorsed an actual intent jury instruction which omitted a *mens rea* finding, that opinion is factually distinguishable and its legal holdings do not apply to this case. *Cf. In re EPD Inv. Co. LLC*, 114 F.4th 1148 (9th Cir. 2024). Nor has the Committee established that the guarantors of indebtedness owing Lenders Funding excessively commingled their financial affairs with Refreshing

---

[1] Debtors and debtors-in-possession in the following chapter 11 cases: Refreshing USA, LLC (85-3358945), Case No. 24-01863-11; Water Station Management LLC (81-1202716), Case No. 24-01864-11; and Creative Technologies, LLC (46-2581888) Case No. 24-01866-11.

PONZI FINDINGS
OBJECTION - 1

LAW OFFICES OF CHRISTOPHER L. YOUNG PLLC
92 LENORA ST. NO. 146
SEATTLE, WA 98121
(206) 407-5829

24-01863-FPC11    Doc 1208    Filed 08/22/25    Entered 08/22/25 08:04:42    Pg 1 of 20

USA. Accordingly, Lenders Funding asks the Court to deny the Committee's request to make Ponzi related findings at confirmation.

## I. FACTUAL BACKGROUND

**A. Lenders Funding Loans Money to Refreshing, Receives Collateral from Guarantors to Secure Repayment.**

1. Lenders Funding is in the business of loaning funds to third parties in exchange for collateral to support non-payment. ECF No. 1002-1 ¶ 13.

2. Refreshing USA, LLC, made two promissory notes dated December 15, 2023 in favor of Lenders Funding. *Id*. ¶ 2.

3. Prior to November 2023, no one at Lenders Funding knew of Refreshing USA, LLC, Ryan Wear, Richard Wear, or any of their business entities. *Id*. ¶ 11.

4. Lenders Funding was introduced to Refreshing USA by Brain Hannan, an investment banker, who was retained by Refreshing to obtain a bridge loan allegedly to provide "bridge financing" until Refreshing could consummate a capital raise. *Id*. ¶ 12.

5. Following that introduction, due diligence, including credible underwriting, and the receipt of collateral, Lenders Funding lent monies to Refreshing memorialized by the notes dated December 15, 2023. *Id*. ¶ 13.

6. All of Refreshing's obligations under those notes are guaranteed by WST AZ Properties, LLC and 204 NWW LLC ("**Guarantors**") and their real property. ECF No. 1002 ¶¶ 3-5.

**B. Ryan Wear Indicted for Use of Investor Funds**.

7. A grand jury empaneled for the United States District Court for the Southern District of New York has entered criminal charges of securities fraud and wire fraud against Ryan Wear. A true and correct copy of that indictment is attached hereto as **Exhibit A**.

PONZI FINDINGS OBJECTION - 2

LAW OFFICES OF CHRISTOPHER L. YOUNG PLLC
92 LENORA ST. NO. 146
SEATTLE, WA 98121
(206) 407-5829

24-01863-FPC11    Doc 1208    Filed 08/22/25    Entered 08/22/25 08:04:42    Pg 2 of 20

8. As stated in the indictment, Mr. Wear "operated Water Station Management LLC . . . as a fraudulent *investment* scheme, systematically deceiving *investors* about the nature and profitability of Water Station's purported water vending machine business." Ex. A ¶ 1 (emphasis supplied).

9. Mr. Wear raised over $200 million from *investors* "through multiple fraudulent solicitations . . . by claiming that each *investment* of $8,500 would fund the manufacture of a water vending machine that an *investor* would own and from which they would receive a share of the revenue generated by the machine." *Id*. ¶ 2 (emphasis supplied); *see also* ¶ 8 (Mr. Wear, as an example, "assigned one particular water machine to at least 25 separate joint venture investors.").

10. Subsequently, Mr. Wear "raised capital through bonds that he falsely claimed would fund the expansion of Water Station's business and would be collateralized by Water Station's numerous water vending machines." *Id*.

11. "Later still, [Mr.] Wear pursued direct investment contracts with large *investors* through increasingly bold misrepresentations about the company's financial position and growth prospects." *Id*. (emphasis supplied).

12. "To silence and satisfy questioning *investors*, [Mr.] Wear . . . operated a Ponzi-like scheme, using new *investor* funds to pay earlier *investors* while siphoning off millions to expand his personal vending machine empire and cover personal expenses." *Id*. ¶ 3 (emphasis supplied).

13. In April 2022, Mr. Wear raised additional capital through bond offerings of $56.25 million and $15 million. *Id*. ¶ 10. He then "covered up the fact that most of the bond collateral [vending machines] did not in fact exist by assigning machines to the bond that had already been assigned to other *investors*." *Id*. ¶ 13 (emphasis supplied).

14. "The bond offering allowed Ryan Wear, the defendant, to operate a Ponzi-like scheme to conceal and sustain his *investor* fraud." *Id*. ¶ 14 (emphasis supplied).

PONZI FINDINGS OBJECTION - 3

LAW OFFICES OF CHRISTOPHER L. YOUNG PLLC
92 LENORA ST. NO. 146
SEATTLE, WA 98121
(206) 407-5829

24-01863-FPC11    Doc 1208    Filed 08/22/25    Entered 08/22/25 08:04:42    Pg 3 of 20

15. Further, "through the use of interstate wire communications, including *investor* solicitations," Mr. Wear "made material misrepresentations about the nature, value, and condition of Water Station's business and misappropriated *investor* funds for his own use." *Id*. ¶ 22 (emphasis supplied).

16. The indictment also includes a criminal forfeiture provision, alleging forfeiture of all real and personal property derived from "proceeds traceable" to his alleged fraud upon investors. *Id*. ¶ 23.

17. Significantly, for purposes of this Objection, the indictment restricts its discussion of Mr. Wear's fraudulent activities to those involving "investors." *Id. passim*.

## C. Lenders Funding's Loans Do Not Conform to the Committee's Ponzi Assertions.

18. The Official Committee of Unsecured Creditors asks the Court to enter Ponzi findings as part of plan confirmation. ECF No. 1058.

19. The Committee cites to Ninth Circuit case law to define a Ponzi scheme. *Id*. at 5. However, the cited quotation refers only to "investors," not lenders, and characterizes a Ponzi scheme as the use of new investor funds to pay earlier investors. *Id*. Because later investors' funds were improperly used to benefit earlier investors, those later investors were the ones left "holding the bag." That is the very opposite of Lenders Funding's position, as Debtors and the Committee seek to take Lenders Funding's rightful value (repayment and/or collateral) to benefit earlier investors.[2]

---

[2] *See also id*. at 14-15 (citing Ninth Circuit case law that "characterize[s] these schemes as 'borrow[ing] from Peter to pay Paul' because the fraud consists of funneling money from new investors to pay old investors while cultivating the illusion of a legitimate profit-making business") which characterization bears no

PONZI FINDINGS OBJECTION - 4

LAW OFFICES OF CHRISTOPHER L. YOUNG PLLC
92 LENORA ST. NO. 146
SEATTLE, WA 98121
(206) 407-5829

24-01863-FPC11    Doc 1208    Filed 08/22/25    Entered 08/22/25 08:04:42    Pg 4 of 20

20. The Committee also accuses the Debtors of "commingling assets between all Debtor-entities and related companies." *Id*. at 21. However, that statement does not describe the transaction between Lenders Funding, Refreshing, and WST AZ and 204 NWW—as neither Guarantor was involved in the diverting of "tens of millions of dollars." *Id*.

21. In its memorandum, the Committee inserts "[creditors]" twice to augment a quote from a Ninth Circuit opinion, which insertions are meant intentionally to mislead this Court. *Id*. at 23.

22. The Committee also states in conclusory fashion, "*we now know that the vast majority of capital raised from third parties was diverted to uses other than the acquisition or operation of vending and water machines*." *Id*. at 25 (italics in original). In actuality, the alleged facts show Mr. Wear raised capital from *investors*. That necessary clarification is set forth in detail in the criminal indictment.

23. The alleged diversion of investor capital has nothing to do with Lenders Funding.

24. The acquisition of vending or water machines has nothing to do with Lenders Funding.

25. With regard to Refreshing's use of loan proceeds, should those uses be improper, the appropriate remedy would be to pursue the recipients of those proceeds rather than to deprive the lender of its right to repayment/collateral.

26. Finally, even assuming *arguendo* that a portion of Refreshing's pre-petition operations comprised a Ponzi-like fraud upon investors, those activities do

---

resemblance to Lenders Funding's loans here, *and* at 16 (pinning the definition of Ponzi to investor funds).

PONZI FINDINGS OBJECTION - 5

LAW OFFICES OF CHRISTOPHER L. YOUNG PLLC
92 LENORA ST. NO. 146
SEATTLE, WA 98121
(206) 407-5829

24-01863-FPC11    Doc 1208    Filed 08/22/25    Entered 08/22/25 08:04:42    Pg 5 of 20

not relate to innocent and everyday activities like refinancing commercial real estate.

## II. AUTHORITY AND ARGUMENT

**A. Ninth Circuit Case Law.**

In this circuit, a Ponzi-scheme presumption permits a bankruptcy court to infer a debtor's actual intent to hinder, delay, or defraud creditors by the mere existence of a Ponzi scheme. *EPD*, 114 F.4th at 1152. As the Ninth Circuit explained, "Trustees of a Ponzi scheme estate often rely on the fraudulent transfer provisions of the Bankruptcy Code or state fraudulent transfer laws to recover funds lost by Ponzi scheme investors." *Id*. at 1157. Where a trustee proves the existence of a Ponzi scheme, an irrebuttable presumption arises that the debtor transferred money with actual intent to hinder, delay, or defraud. *Id*. "Once a trustee proves that the debtor operated a Ponzi scheme and therefore establishes an actual intent to defraud, the burden shifts to the winning *investor* to show they received the subject transfers in 'good faith' and for 'reasonably equivalent value.'" *Id*. (italics supplied). Should the *investor* establish such a defense, they may retain their own investment but must return value in excess to the estate. *Id*. at 1158.

**B. Commercial Reasonableness Remains an Issue of Fact.**

The key term used above—both in the criminal indictment and Ninth Circuit case law—is "investor." A Ponzi finding should not create an irrebuttable presumption of actual intent with respect to commercially reasonable third-party transactions. Nevertheless, that is exactly what the Committee asks the Court to do. Given the consequential prejudice of making such a broad finding at confirmation, this Court must decline the Committee's invitation.

The Committee places too much reliance on distinguishable facts and law. Although the majority in *EPD* acknowledged, "lenders *can* be victims of a Ponzi scheme as a matter of a law," it also conceded a lender's invocation of commercial reasonableness creates a factual dispute. 114 F.4th at 1162 (emphasis supplied).

PONZI FINDINGS
OBJECTION - 6

LAW OFFICES OF CHRISTOPHER L. YOUNG PLLC
92 LENORA ST. NO. 146
SEATTLE, WA 98121
(206) 407-5829

24-01863-FPC11    Doc 1208    Filed 08/22/25    Entered 08/22/25 08:04:42    Pg 6 of 20

Because the issue on appeal in *EPD* was the form of jury instruction, the existence of a factual dispute there was insufficient to carry the day on appeal. *Id.*

That ruling should neither bind nor persuade the Court at plan confirmation. After all, *EPD* applied a Ponzi finding at trial, based on the debtor's own characterizations of lenders as investors and jury instructions which were cobbled together from dicta. *See* 114 F.4th at 1165 n.1.

Should Debtors or the Committee dispute Lenders Funding's invocation of commercial reasonableness, such a factual dispute must be resolved by the factfinder at trial, rather than indirectly through broad prejudicial findings at plan confirmation. Accordingly, this Court must not make any one-size-fits-all Ponzi finding at confirmation with regard to lenders.

C. **No Evidence of Actual Intent**.

The Committee has not proven (and cannot prove) Refreshing made a promissory note in favor of Lenders Funding with actual intent to defraud creditors; after all, the evidence on record tends to prove Refreshing paid creditors with the loan proceeds obtained from Lenders Funding. *See, e.g.*, ECF No. 1073 at 3. Payment of existing indebtedness can hardly be called a fraud on those creditors. Nor does the Committee present any concrete examples of "badges of fraud" with regard to the Guarantors. And because Refreshing was not an entity which pledged collateral to Lenders Funding, Refreshing got value from Lenders Funding without harm to past, present or future creditors.

No doubt the Committee will reply it has presented "evidence" in support of its request for Ponzi findings. To be sure, the criminal indictment details Mr. Wear's alleged misuse of investor funds and deceptive activities toward investors, including fraudulent pledges of personal property as collateral, but there is no mention anywhere of Debtor malfeasance with respect to third-party lenders. Nor do Mr. Wear's alleged bad acts with respect to investors mean there was actual

PONZI FINDINGS
OBJECTION - 7

LAW OFFICES OF CHRISTOPHER L. YOUNG PLLC
92 LENORA ST. NO. 146
SEATTLE, WA 98121
(206) 407-5829

24-01863-FPC11    Doc 1208    Filed 08/22/25    Entered 08/22/25 08:04:42    Pg 7 of 20

intent to defraud past, present or future creditors in connection with third-party commercial loans. "Such an inference is not inevitable here." 114 F.4th at 1167.

The fact the criminal indictment and Committee memorandum both fail to present specific evidence of actual intent with regard to third-party loans militates against broad Ponzi related findings at confirmation with respect to lenders.

**D.   No Evidence of Excessive Commingling Between Refreshing and Guarantors.**

Nor has the Committee shown Refreshing's affairs were entangled at all with those of Guarantors but rather repeats conclusory allegations of "excessive commingling." ECF No. 1158 at 15 and *passim*. Yes, the Committee presents hearsay and summaries of transfers between some related entities, but what remains markedly absent is any showing that Refreshing's operations were excessively entangled with WST AZ Properties or 204 NWW. Instead, the record available to the Court concerning Lenders Funding shows a commercially reasonable arm's-length transaction through which real property collateral was pledged to support non-payment of a third-party loan.

All of which demonstrates the Committee's novel request for blanket Ponzi findings at confirmation should be denied. Should the Court disagree, then Lenders Funding maintains it must be excepted from any such finding. After all, there is no legal basis for this Court to deprive Lenders Funding's of its rights as a secured, third-party creditor. There is no mystery as to why the Debtors and Committee seek Ponzi findings to be used as a sword against lenders. Debtors' counsel has already demanded a king's ransom in exchange for selling Lenders Funding's collateral. And the amount of professional fees billed in this case removes all doubt that victims are not the focus of the requested relief. Accordingly, Lenders Funding objects to the Ponzi finding request and looks to this court of equity to uphold the rights of third-party lenders.

PONZI FINDINGS
OBJECTION - 8

LAW OFFICES OF CHRISTOPHER L. YOUNG PLLC
92 LENORA ST. NO. 146
SEATTLE, WA 98121
(206) 407-5829

24-01863-FPC11    Doc 1208    Filed 08/22/25    Entered 08/22/25 08:04:42    Pg 8 of 20

DATED August 22, 2025.

                                                  */s/ Christopher L. Young*
                                                  Christopher L. Young, WSBA No. 47977
                                                  Counsel for Lenders Funding

PONZI FINDINGS OBJECTION - 9

LAW OFFICES OF CHRISTOPHER L. YOUNG PLLC
92 LENORA ST. NO. 146
SEATTLE, WA 98121
(206) 407-5829

24-01863-FPC11    Doc 1208    Filed 08/22/25    Entered 08/22/25 08:04:42    Pg 9 of 20

# **EXHIBIT A**

PONZI FINDINGS
OBJECTION - 10

LAW OFFICES OF CHRISTOPHER L. YOUNG PLLC
92 LENORA ST. NO. 146
SEATTLE, WA 98121
(206) 407-5829

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| UNITED STATES OF AMERICA | **INDICTMENT** |
|---|---|
| v. | 25 Cr. ___ |
| RYAN WEAR, | |
| Defendant. | 25 CRIM 365 |

## COUNT ONE
### (Securities Fraud)

The Grand Jury charges:

1. RYAN WEAR, the defendant, operated Water Station Management LLC ("Water Station") as a fraudulent investment scheme, systematically deceiving investors about the nature and profitability of Water Station's purported water vending machine business. While promoting Water Station as a lucrative passive income opportunity generated through a fleet of proprietary water vending machines, WEAR knew the company was not the profitable enterprise he represented and misappropriated investor funds for personal use and to perpetuate the fraud.

2. RYAN WEAR, the defendant, raised over $200 million from investors, many of whom were retail investors and military veterans, through multiple fraudulent solicitations. WEAR initially raised funds by claiming that each investment of $8,500 would fund the manufacture of a water vending machine that an investor would own and from which they would receive a share of the revenue generated by the machine. He later raised capital through bonds that he falsely claimed would fund the expansion of Water Station's business and would be collateralized by Water Station's numerous water vending machines. Later still, WEAR pursued direct investment contracts with large investors through increasingly bold misrepresentations about the company's financial position and growth prospects.

3.  RYAN WEAR, the defendant, perpetuated the fraud by selling far more water vending machines than Water Station had ever manufactured, selling the same machines to multiple investors, and claiming machines existed that were never built. The small fraction of vending machines that actually did exist failed to generate anywhere near the amount of revenue that WEAR promised the machines would generate. To silence and satisfy questioning investors, WEAR therefore operated a Ponzi-like scheme, using new investor funds to pay earlier investors while siphoning off millions to expand his personal vending machine empire and cover personal expenses.

4.  RYAN WEAR, the defendant, eventually failed to raise enough additional funds to conceal past losses and misappropriation, and to make promised payments to satisfy investor obligations and bondholders. In August 2024, Water Station was forced into bankruptcy. As of the date of this Indictment, investors have lost over $200 million.

### The Defendant's Scheme to Defraud Water Station Investors

5.  RYAN WEAR, the defendant, is a businessman who owns and operates multiple vending machine businesses. In or around 2016, WEAR launched Water Station, which marketed, managed, maintained, and serviced a machine known as the WST-700 (a "Water Machine")—a vending system that he had developed for dispensing purified drinking water by the gallon using an alkaline mineralization process to create the taste of fresh spring water. Water Station's business model was to sell the Water Machines to investors and then operate and manage them as part of what WEAR called a "joint venture" or "JV" program. As part of the program, investors typically entered into investment contracts to purchase Water Machines for $8,500; WEAR received a fee for managing the machines; the retail location at which the machines were installed received a commission fee; and the remaining revenues were to be split 50/50 between the investor and

24-01863-FPC11    Doc 1208    Filed 08/22/25    Entered 08/22/25 08:04:42    Pg 12 of 20

WEAR. In later years, beginning around 2019, WEAR modified the joint venture contracts to provide for a flat fee, often 15% per annum, in lieu of a revenue percentage.

6. RYAN WEAR, the defendant, claimed to investors that the Water Machines would be attractive to customers in areas where purified water was not easily accessible, and that retailers in these areas would be incentivized to give the machines prominent placement in stores in return for revenue-based commission. The investors in the joint venture program were often retail investors—in particular military veterans—in search of passive investment opportunities that produced steady income streams.

7. By the end of 2019, Water Station had entered into joint venture agreements for over 4,000 Water Machines, but had manufactured fewer than 2,000 Water Machines, leaving Water Station with only half as many machines as RYAN WEAR, the defendant, had sold. By the end of 2020, the discrepancy had grown even greater: Water Station had entered into JV agreements for over 11,000 Water Machines, but had manufactured fewer than 4,000 Water Machines. And by the end of 2021, Water Station had entered into JV agreements for over 14,000 Water Machines, but had manufactured fewer than 5,000 Water Machines. At that point, WEAR had collected more than $100 million of investor income from JV investors based on the representation that the money would be used to purchase Water Machines, but he had failed to purchase almost two-thirds of those machines.

8. RYAN WEAR, the defendant, covered up the missing machines by assigning the same Water Machines to multiple investors and creditors. For example, WEAR assigned one particular Water Machine to at least 25 separate joint venture investors, and at the same time WEAR continued to use that same Water Machines as collateral in a bank loan application on behalf of one of WEAR's own companies. WEAR also covered up the missing Water Machines by assigning traditional vending machines, including snack machines, to investors who believed

that they were purchasing much more valuable Water Machines. And other times WEAR simply fabricated fake serial numbers.

9. Because RYAN WEAR, the defendant, had not produced enough Water Machines to generate the revenue he had promised to investors, WEAR was regularly underpaying investors, paying late, or missing payments altogether. When WEAR did make a payment to an investor, he often did so with another investor's money. Some investors who had access to a portal that allowed them to monitor their Water Machines' performance often complained about disappointing revenue numbers. WEAR responded by assigning the same few, high-performing Water Machines to multiple investors to further mislead the investors. To avoid investor scrutiny of the revenue data, starting in 2019, WEAR switched many investors from a percentage-of-revenue structure to a flat-fee structure. By early 2022, WEAR's efforts to obscure and manipulate the company's revenue numbers did not appease investors.

10. In or about April 2022, as pressure from investors was building, RYAN WEAR, the defendant, raised additional capital for Water Station through a bond offering. In the bond offering, Water Station issued Class A notes in the aggregate principal amount of $56.25 million, and Class B rate notes in the aggregate principal amount of $15 million. Through subsequent issuances, WEAR ultimately raised over $100 million in the bond offering. The sole purchaser of the Class B notes in the bond offering was a New York, New York-based investment fund managed by Jordan Chirico and an affiliate of that fund. Chirico, who had an ongoing series of financial dealings with WEAR, was himself a joint venture investor in Water Station. Chirico later directed his investment fund and its affiliates to purchase the entirety of the bond issuance.

11. The bond issuance afforded Water Station capital to purchase and deploy Water Machines, which were supposed to be either (i) new machines manufactured by an affiliated entity of Water Station, or (ii) machines that had previously been sold to joint venture partners, which

4

would be repurchased and owned by Water Station. Under the terms of the bond, the most RYAN WEAR, the defendant, could spend to purchase or re-purchase Water Machines was $8,500. The Water Machines and the revenue they generated were supposed to secure Water Station's payment obligations under the bonds, such that the obligations would be fully secured by collateral. Water Station was responsible for collecting the revenue generated by the Water Machines and depositing those funds into a designated bank account, from which payments to bondholders would be made. WEAR also personally guaranteed payments to bondholders of up to approximately $11 million.

12. On at least 25 occasions, between approximately May 2022 and April 2023, RYAN WEAR, the defendant, drew funds from the bond offering. At the time of each of those withdrawals, he submitted a signed withdrawal certificate stating that Water Station was using the bond proceeds solely to purchase a specific number of Water Machines, which were identified by serial number and retail location. In the process, WEAR told the bondholders that the total bond collateral had increased from approximately 2,794 Water Machines to over 10,000 machines. Those representations were false. By 2022, the production of new Water Machines had fallen substantially, and in 2023 no new Water Machines were produced at all. By the end of 2022, WEAR had sold over 18,000 Water Machines, but had manufactured fewer than 6,000 Water Machines. By the end of 2023, WEAR had sold more than 22,000 Water Machines, but Water Station had manufactured fewer than 6,000 Water Machines. In other words, the company was missing almost three-fourths of the machines that WEAR claimed to exist.

13. As he had done with the joint venture investors, RYAN WEAR, the defendant, covered up the fact that most of the bond collateral did not in fact exist by assigning machines to the bond that had already been assigned to other investors. At least one-third of the machines that WEAR assigned as collateral to the bond were also assigned as collateral to joint venture investors. In addition, thousands of the machines that WEAR assigned to the bond were traditional vending

5

machines, not WST-700 machines. And some of the assigned machines were simply made up. WEAR also fabricated the monthly revenue reports that he submitted to the bond collateral manager, representing revenue numbers to be over 50 times greater than the Water Station's actual earnings.

15. The bond offering allowed RYAN WEAR, the defendant, to operate a Ponzi-like scheme to conceal and sustain his investor fraud. First, he used bond money to repurchase Water Machines from some of the joint venture investors, reducing the pressure from those investors who had been complaining about payments. Second, WEAR used bond money to pay other investors, telling those investors that they were being paid from Water Machine revenue when in fact they were being paid from bond proceeds. These Ponzi-like payments were even made to the bondholders themselves, with WEAR using money that he had drawn from the bond to pay the bondholders their monthly interest payment. WEAR also used the bond funds to enrich himself by purchasing real estate and expanding his personal vending machine empire, which was not a permissible use of bond funds under the terms of the bond offering.

15. Between November 2022 and January 2023, RYAN WEAR, the defendant, sought additional financing to continue his fraud scheme. He entered into two investment contracts with a San Francisco-based investment firm, which provided that the firm would invest $32.2 million with Water Station in exchange for 3,427 Water Machines. As with the joint venture agreements and the bond offering, the contracts with this investor provided the investment funds would be used to purchase specific Water Machines, identified by retail location and serial number. But many of the machines that WEAR purported to sell the investor had already been sold as part of the bond issuance, while other machines purportedly sold to this investor were actually standard vending machines. And many of the machines did not exist at all—WEAR had invented them to obtain this investor's funds. As with the funds from the bond and the joint venture investors,

6

24-01863-FPC11    Doc 1208    Filed 08/22/25    Entered 08/22/25 08:04:42    Pg 16 of 20

WEAR used much of the money raised from the investment firm to pay earlier investors, to make the required interest payments to the bondholders, and for his own personal purposes.

### The Scheme Unravels

16. In or about the summer of 2023, the company responsible for managing the bond collateral notified RYAN WEAR, the defendant, that it was unable to locate a significant number of Water Machines that were supposed to be collateral for the Water Station bonds—specifically, more than 3,300 bond collateral Water Machines did not appear to be generating any revenue. By this time, WEAR had purportedly sold approximately 10,593 Water Machines that were collateral for the Water Station bonds. The bond collateral manager then arranged for a survey of the physical locations where certain Water Machines were supposed to be located, only to learn that 163 of 164 visited locations had no Water Machines on site. WEAR struggled to explain the more than 3,000 missing Water Machines that were supposed to have been purchased with certain draws of Water Station bond proceeds. Through the remainder of 2023, WEAR provided a series of excuses and misleading answers.

17. In or about November 2023, Water Station failed to make timely payments of Water Machine revenue collections, and as a result, by December 2023, Water Station was unable to meet its bond payment and payroll obligations. Water Station was also failing to make many required payments to the San Francisco-based investment firm and many of the joint venture investors, resulting in increasing investor complaints.

18. In or around January 2024, Jordan Chirico—who then, through his investment fund, controlled the entirety of the bond issuance—and another joint venture investor in Water Station confronted RYAN WEAR, the defendant, about the fact that there were only 2,342 Water Machines in the field. Chirico questioned WEAR about what happened to the money from investors, and WEAR admitted that he improperly used bond proceeds to instead buy traditional

7

vending machines and real estate. WEAR further admitted that it "would be a challenge" to deliver the Water Machines he claimed he had purchased and agreed that he had bought vending machines instead of Water Machines. The other investor on the call then told WEAR that he sold "$110 million of stuff that . . . does not exist," that this was "the largest franchise fraud in the history of the United States," and that he was "going to jail." Nonethless, after that call, WEAR "upsized" the bond and issued an additional $19 million worth of notes, all of which were purchased by Chirico's investment fund. While the new bond issuance was expressly for operating Water Station and paying its debt service, WEAR continued to use bond proceeds for other purposes, including making a payment to Chirico.

19. In June 2024, Water Station failed to make its required interest payment to bondholders, and in August 2024 the company entered involuntary bankruptcy. RYAN WEAR, the defendant, never made another payment to the bondholders or other investors. To this day, more than $115 million of outstanding principal on the bonds remained unpaid, and JV investors have filed tens of millions of dollars' worth of claims in the bankruptcy proceeding.

Statutory Allegations

20. Between in or about 2016 and in or about August 2024, in the Southern District of New York and elsewhere, RYAN WEAR, the defendant, willfully and knowingly, directly and indirectly, by the use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which

8

operated and would operate as a fraud and deceit upon a person, to wit, WEAR made material misrepresentations to Water Station's existing and potential investors, joint venture partners, and bondholders regarding the nature, value, and condition of Water Station's business and misappropriated investor funds for his own use.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT TWO
### (Wire Fraud)

The Grand Jury further charges:

21. The allegations contained in paragraphs 1 through 19 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

22. Between in or about 2016 and in or about August, 2024, in the Southern District of New York and elsewhere, RYAN WEAR, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, WEAR, through the use of interstate wire communications, including investor solicitations communicated to prospective investors located in the Southern District of New York and elsewhere, made material misrepresentations about the nature, value, and condition of Water Station's business and misappropriated investor funds for his own use.

(Title 18, United States Code, Sections 1343 and 2)

## FORFEITURE ALLEGATION

23. As a result of committing the offense alleged in Counts One and Two of this Indictment, RYAN WEAR, the defendant, shall forfeit to the United States pursuant to Title 18,

9

United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

## SUBSTITUTE ASSETS PROVISION

24. If any of the property described above as being subject to forfeiture, as a result of any act or omission of RYAN WEAR, the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be

subdivided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461, to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Sections 981; Title 21, United States Code, Section 853; and Title 28, United States Code, Section 2461.)

_____
Grand Jury Foreperson

_____
JAY CLAYTON
United States Attorney