# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WASHINGTON**

IN RE:

REFRESHING USA LLC,                    Chapter 11

          DEBTOR.                    Bankr. Case No. 24-01863-11

**SUPPLEMENTAL EXPERT REPORT OF BECKY YANG O'MALLEY**
**PURSUANT TO FED. R. CIV. PRO. 26(A)(2)(B) and BANKR. R. 7026**
~~August 1, 2025~~ September 4, 2025

1601824860.1

**TABLE OF CONTENTS**

I.  INTRODUCTION AND QUALIFICATIONS ................................................................. 1

    A.  Assignment ................................................................................................... 1

    B.  Qualifications ............................................................................................... 2

II.  SUMMARY OF OPINIONS .......................................................................................... 3

III.  DOCUMENTS AND INFORMATION CONSIDERED ................................................ 6

IV.  OVERVIEW OF DEBTORS .......................................................................................... 8

V.  ACCOUNTING AND FINANCE FUNCTIONS ......................................................... 11~~13~~

VI.  GENERAL BACKGROUND REGARDING THE WATER STATION INVESTMENT
OPPORTUNITY ........................................................................................................... 13~~14~~

    A.  Water Machine Investment Opportunity Promoted by Ryan Wear ........................... 13~~14~~

    B.  Individuals and Entities that Became Investors ........................................ 16~~18~~

    C.  Sale of Water Machines ............................................................................. 17~~19~~

    D.  Delays in Investor Monthly Payments ...................................................... 20~~23~~

    E.  Buyback of Water Machines ...................................................................... 23~~26~~

    F.  Events Leading Up to WS Entities Bankruptcy Filing ............................. 25~~27~~

VII.  DEFINITION OF A PONZI SCHEME .......................................................................... 26~~28~~

VIII.  SOURCES AND USES ANALYSIS .............................................................................. 27~~30~~

    A.  Objectives of a Sources and Uses Analysis ............................................... 27~~30~~

    B.  Development of the Bank Statement Database ........................................... 28~~31~~

    C.  Forensic Analysis of QuickBooks .............................................................. 29~~32~~

IX.  ANALYSIS AND OPINIONS ........................................................................................ 32~~35~~

    A.  Analysis of Debtors' Sources and Uses of Funds ...................................... 32~~35~~

        1.  Deposits and Receipts ...................................................................... 32~~35~~

        2.  Disbursements and Withdrawals ...................................................... 38~~41~~

        3.  Consolidated Sources and Uses ....................................................... 45~~47~~

    B.  Analysis of Available Cash Flow ............................................................... 47~~50~~

    C.  Examples of New Investor Funds Paying Out Investors ........................... 49~~53~~

    D.  Analysis of Intercompany Transfers and Evidence of Commingling ......... 54~~57~~

        1.  Accounting Records Evidence of Commingling ............................... 56~~59~~

        2.  Commingling of Assets and Liabilities ............................................ 57~~60~~

    E.  Reliance on Loans ...................................................................................... 59~~63~~

1601824860.1

| | | |
|---|---|---|
| 1. | Bond Funds | 59~~63~~ |
| 2. | Loans from Merchant Cash Advance Companies | 63~~67~~ |
| F. | Analysis of the Unrealistic Returns Required for Debtors to Make Their Promised Payments | 64~~68~~ |
| G. | Debtors' Failure to Use Funds as Promised | 66~~70~~ |
| 1. | Analysis of Real Estate Transactions | 67~~71~~ |
| 2. | Analysis of Vending Company Acquisitions for Summit | 67~~72~~ |
| 3. | Analysis of Vending Company Acquisitions for Refreshing Texas | 68~~72~~ |
| 4. | Analysis of KGBH Enterprises | 68~~72~~ |
| 5. | Payments to Insiders | 68~~73~~ |
| X. | CONCLUSIONS | 68~~73~~ |
| XI. | SUPPLEMENTATION | 70~~74~~ |

1601824860.1

I.      **INTRODUCTION AND QUALIFICATIONS**

    **A. Assignment**

    1.    I have been engaged by counsel for the Official Committee of Unsecured Creditors to provide expert testimony in the consolidated matter of *In Re Refreshing USA LLC*, Case No. 24-01863-11, *In Re Creative Technologies LLC*, Case No. 24-0166-11, *In Re Water Station Management*, Case No. 24-0166-11.

    2.    Specifically, I have been asked to provide an opinion as to whether the financial transactions of Water Station Management LLC ("WSM"), Creative Technologies, LLC ("Creative"), Refreshing USA, LLC ("Refreshing"), Ideal Property Investments LLC ("Ideal"), and affiliated entities described on the attached **Appendix C** (collectively, the "WS Entities") have the economic and financial indicia of a Ponzi scheme.  The WS Entities were majority owned, controlled, and managed by Ryan Wear ("Wear").

    3.    As an expert consultant, I am providing this written report to K&L Gates, in their role as counsel for the Committee, in compliance with Federal Rules of Civil Procedure 26(a)(2)(B) and Bankruptcy Rule 7026.

    4.    I am supplementing this report for documents and information that was not made available to me prior to August 1, 2025, the date that my original report was filed.  Specifically, I received reports showing details about Automated Clearing House ("ACH") transactions initiated from the Main Operating Bank Accounts and an audio recording of a telephone call between Jordan Chirico, Tyler Sadek, and Wear.  Based on my review and analysis of the additional documents and information, I have made updates this report, schedules, and Appendix D.

    4.5.    The opinions contained in this report are based on materials reviewed or considered as of the date of this report. Discovery in this matter is ongoing. I reserve the right to supplement my analyses, opinions, or express additional opinions should additional and/or presently unknown

1601824860.1

information about this matter become available to me at or before trial. I anticipate that I will also consider the opinions of other experts and may issue a report in response thereto.

**B. Qualifications**

~~5.~~6.    I am a Certified Fraud Examiner, with over 20 years of consulting experience in providing forensic accounting, finance and economic analyses in civil and criminal litigation matters, complex fraud investigations, and internal investigations on behalf of law firms, corporations, individuals, government agencies, and non-profit organizations.

~~6.~~7.    I am a Managing Director in the Los Angeles office of GlassRatner Advisory Services ("GlassRatner"). Prior to working at GlassRatner, I held leadership positions in several national public accounting firms. I have also developed and presented various learning events on forensic accounting and fraud issues. I am currently on the Board of Directors and serve as President of the Los Angeles Chapter of the Association of Certified Fraud Examiners.

~~7.~~8.    I have testified in federal court, depositions, and arbitrations, and have also participated in proffer sessions to present forensic accounting findings and conclusions to federal prosecutors and law enforcement. A copy of my CV, together with a list of the trial and deposition testimony I have given in the last four years is attached as **Appendix A**.

~~8.~~9.    In order to perform this engagement, I relied on other GlassRatner professionals with experience in financial analysis, economic damages, business valuation, and forensic accounting, all of whom worked under my direct supervision and control. I have relied on the work of the team to support my review of information related to this matter, and references to "I," "our," and "we" recognize this reliance.

~~9.~~10.  Any minor differences in amounts calculated or referenced in supporting documentation, the schedules, appendices, tables, or charts in this report are due to rounding.

1601824860.1

~~10.~~11.  The hourly rates charged by GlassRatner for professional services provided in this matter range from $285 to $795, and my time has been billed at $525 per hour. GlassRatner's compensation is not contingent upon the outcome of this matter.  Neither my compensation nor that of GlassRatner is contingent upon my findings, the testimony I may give, or the outcome of this litigation.

II.     **SUMMARY OF OPINIONS**

~~11.~~12.  Based on my review of the documents and information produced in this matter, and analysis of the financial and accounting records, my opinions are as follows:

    a.  Starting no later than March 1, 2018 and continuing through September 2024, the WS Entities, operated by Wear, started using new Investor funds to pay existing Investors and creditors.

    b.  As the majority owner, Wear controlled the business operations and activities of the WS Entities.  Wear ignored corporate formalities and operated the WS Entities as a single, consolidated enterprise, evidenced by the following:

- The WS Entities shared common facilities, personnel, and infrastructure.  For example, the WS Entities operated out of the same place of business located at 2732 Grand Avenue, Everett, WA.

- There was extensive commingling of funds and other assets among the WS Entities, including using each entity's funds to pay the expenses of WSM, Ideal, Refreshing, and other affiliated entities.

- There was a lack of internal controls and procedures with respect to Wear's intercompany transfers and access to bank accounts. During the period January 2018 through 2024, there were over $79 million in intercompany company

1601824860.1

transfers from the WS Entities to 33 different related entities and affiliates. The recordation of intercompany transactions in the accounting system were incomplete and provided little or no context regarding the purpose or nature of the transactions.

- Wear used WS Entity funds on businesses unrelated to water machines and vending machines.

c. Since 2018, the WS Entities did not generate sufficient operating cash flow to meet their obligations to their Investors and creditors. Cash deposits from vending operations totaled $82.5 million during the period January 2018 through September 2024 and represented only 11.0% of total bank deposits. During the period January 2018 through September 2024, the WS Entities received over $~~223.8~~225.3 million in cash deposits from new Investors and over $~~161.8~~156.4 million in loans from third parties. Because the WS Entities did not generate sufficient cash from its business operations, they were dependent on the receipt of new Investor funds and third-party loans.

d. Investors were led to believe that they were buying into a guaranteed, low-effort, and risk-free investment opportunity. In actuality, the majority of the water machines sold to Investors never existed. Wear relied on new Investor funds and loan funds in order to meet the investment returns promised to Investors and to perpetuate the illusion of a legitimate business.

e. The bank records show numerous intercompany transfers among the WS Entities, indicating the commingling of funds among the related business entities was extensive and routine. The majority of these transactions were recorded in the accounting books and records in a pooled general ledger account called "Intercompany Receivable

1601824860.1

Payable." The vast majority of the accounting entries associated with these transactions lacked any description or information about the purpose or nature of the transactions.

f.   The bank records show that the WS Entities diverted Investor funds to acquire real estate and vending companies for other entities controlled by Wear, instead of manufacturing or acquiring water stations.

g.   The bank records show that WSM used bond funds in a manner that was contrary to the terms of the U.S. Bank Trust Company Indenture Agreement dated April 29, 2022 ("Indenture Agreement")[1]. WSM used bond funds to pay Investors, purchase real estate and vending machine companies, and repay loan obligations of affiliated parties. A large portion of the bond funds was also transferred to other related entities and used to service outstanding and overdue loans, payments to Investors, and payments to vendors.

h.   The accounting books and records maintained in QuickBooks contain discrepancies and are incomplete due to missing transactions and missing transaction data such payee and payor names. This is a common technique used to hide fraudulent activities and to obscure information regarding the company's revenues, expenses, assets, and liabilities. The incomplete accounting entries are indicators of lack of internal controls and procedures, which allow the Ponzi scheme perpetrators to access and move company funds without scrutiny.

---

[1] *See* Indenture Agreement between Water Station Management, as Issuer and U.S. Bank Trust Company, National, as Trustee dated April 29, 2022 (USB00969 – USB01149).

1601824860.1

III.     **DOCUMENTS AND INFORMATION CONSIDERED**

~~12.~~13.  In forming my opinions, I reviewed documents and other materials provided to me by counsel, the Debtors and their professionals, the unsecured creditors, or obtained from publicly available sources.  The documents and materials include bank records (e.g., monthly statements, check images, deposit advices, and wire transfer information), financial statements, tax records, and electronic copies of QuickBooks accounting data for Debtor.

~~13.~~14.  Based on my review of QuickBooks, bank records, and documents produced in this matter, I identified 75 separate bank accounts for 39 different WS Entities and their affiliates.  A list of these bank accounts is included in **Appendix B**.

~~14.~~15.  In forming my opinions, I primarily relied on the main operating bank accounts in the name of Debtors held with Bank of America and First Fed for the period beginning in January 2018 through September 2024, as reflected in Table 1 below. Based on my assessment of the available bank records for the WS Entities, the largest concentration of bank transaction activity occurred in these bank accounts, which included deposits of Investor funds and monthly payments to Investors during the January 2018 through September 2024 time period.  The bank accounts listed in Table 1 are collectively referred to in this report as the "Main Operating Bank Accounts."

1601824860.1

**Table 1. - Main Operating Bank Accounts Analyzed[2]**

| Entity Name | Bank Name | Account Type | Account Last 4 Digits |
|---|---|---|---|
| Creative Technologies LLC | Bank of America | Business Platinum Checking | BOA A/C 6352 |
| Creative Technologies LLC dba Water Station Technology LLC | First Fed | Analyzed Business | FF A/C 3905 |
| Ideal Property Investments LLC | Bank of America | Business Fundamentals Checking | BOA A/C 9435 |
| Refreshing USA LLC | Bank of America | Business Advantage Checking | BOA A/C 7830 |
| Refreshing USA LLC | First Fed | Everyday Business | FF A/C 2909 |
| Water Station Management LLC | Bank of America | Business Fundamentals Checking | BOA A/C 5591 |
| Water Station Management LLC | First Fed | Disbursement Account | FF A/C 5304 |
| Water Station Management LLC | First Fed | Collections Account | FF A/C 5401 |
| Water Station Management LLC | First Fed | Business Checking Plus | FF A/C 8502 |
| Water Station Management LLC | First Fed | Loan Fees Account | FF A/C 9802 |

15.16.  I considered the financial and accounting records maintained in QuickBooks by the WS Entities.  The electronic QuickBooks files contained transaction data pertaining to the business activities of the WS Entities, including transactions relating to Investors.

16.17.  I considered documents and information produced in other legal proceedings related to this matter, listed below.  These documents include corporate records, agreements relating to the purchase of water machines by Investors, and Debtor email correspondences.

    a.  Pacific Water Technology LLC, Spruce Water Investments LLC, Indiana Water Technology, LLC AR Water Supply LLC, BLC Water Company LLC, Granite Street Ventures LLC, Rumson Wellness LLC, v. Ryan R. Wear, et al. (Cause No. 24-2-02887-31) filed on April 17, 2024;

    b.  352 Capital GP, LLC, on behalf of 352 Capital ABS Master Fund LP v. Ryan Wear, et al. (Case:. 1:24-cv-05102) filed on July 3, 2024;

---

[2] Bank statements for Ideal BOA A/C 9435 prior to December 2020 are not available.  Refreshing BOA A/C 7830 and the First Fed bank accounts were opened in December 2020.

1601824860.1

c. First Fed Bank, a Washington State Bank Corporation v. Creative Technologies LLC (Case No:. 24-2-10753-3 SEA) filed on May 14, 2024;

d. First Fed Bank, a Washington State Bank Corporation v. Ideal Property Investments LLC (Case No:. 24-2-08418-5 SEA) filed on April 17, 2024;

e. State of Washington Department of Financial Institutions Securities Division, In the Matter of Determining Whether there has been a violation of the Securities Act of Washington by: Ryan Wear; Water Station Management LLC; Creative Technologies LLC (Case No:. S-21-3226-25-SC01) commenced on October 12, 2021; and

f. Ideal Property Investments LLC/First Fed Bank Mediation (Case No. 2:24ap80033, E.D. Wash. Bankruptcy Court) dated April 30, 2025 and May 1, 2025.

17.18. I also considered a subset of the Proof of Claim forms and supporting documents filed by Creditors. The supporting documents included Purchase Order Agreements, Service and Management Agreements, Franchise Agreements, Listings of Water Machine Numbers, Loan Agreements, Refund Payment Agreements, and other supporting documents and information to support Creditors' claims.

18.19. A list of the documents and sources that I relied upon are identified in this report and listed on **Appendix D**.

## IV. <u>OVERVIEW OF DEBTORS</u>

19.20. Creative, Refreshing, and WSM collectively sold, manufactured, and managed water dispensing and vending machines located throughout the United States. Ideal served as a holding company for certain real estate that was acquired and serviced by funds from Creative, Refreshing and WSM. Other acquired real estate was purchased and placed in entities owned and

controlled by Wear with funds and loans from the Debtors and third-parties. The following section provides a brief overview of each entity.

20.21. Creative is a limited liability company formed in the State of Washington on May 2, 2013.[3] As set forth in its Amendment to the Limited Liability Company Agreement effective March 23, 2021, Wear holds a 90% membership interest in Creative and his father, Richard Wear, holds the remaining ten percent.[4]

21.22. Creative was held out as a manufacturer of water dispensing machines that were sold to retail customers, third-party investors, and WSM. Creative's inventory purportedly consisted of water dispensing machines that were: 1) constructed in-house, 2) constructed by third-parties, or 3) whole machines purchased from third-parties.[5]

22.23. WSM is a limited liability company formed in the State of Washington on January 25, 2016.[6] Wear holds a ninety-nine percent membership interest in WSM, with the remaining one percent held by Summit Management Services, LLC ("Summit").[7] Wear holds a ninety percent membership interest in Summit.[8]

23.24. WSM was held out as responsible for installing, operating, and servicing the water machines manufactured by Creative that were installed at commercial and institutional locations (e.g., supermarkets, gas stations, school districts) throughout the United States. WSM purportedly earned revenues from the sale of water to consumers from the water machines pursuant to contracts

---

[3] Creative Technologies LLC Certificate of Formation.
[4] Amendment to the Limited Liability Agreement of Creative Technologies LLC effective March 23, 2021 [WA_DFI_00001324_0001].
[5] Deposition of Ryan Wear In the Matter of Ryan Wear, et al., dated November 14, 2023, page 98, lines 12-25 attached as Exhibit C to the Declaration of Becky Yang O'Malley ("O'Malley Decl."), submitted herewith.
[6] State of Washington Secretary of State record of Certificate of Formation [USB00075 – 00076].
[7] See Organization Chart.
[8] Summit Management Services LLC Schedule K-1 for tax year 2020 issued to Ryan Wear [A09389-0011-112409, page 4].

1601824860.1

entered with the host locations. WSM entered into a service agreement in which the installation and servicing of water machines were outsourced to Refreshing.[9]

~~24.~~25.  Refreshing is a limited liability company formed in the State of Washington on November 5, 2020.[10] Summit holds an 88.9% membership interest in Refreshing, with the remaining 11.1% held by WSM.[11]

~~25.~~26.  Refreshing purportedly earned revenues from vending machine product sales at host locations. In addition, Refreshing also purportedly received monthly fees pursuant to the servicing agreement with WSM. Refreshing had several subsidiaries throughout the United States.[12]

~~26.~~27.  Ideal is a limited liability company formed in the State of Washington on September 9, 2019.[13] Wear holds a 90% membership interest in Ideal, with the remaining ten percent held by his father, Richard Wear. Ideal was formed by Wear to acquire and hold real estate, purportedly to support various vending operations nationwide.[14]  As of the date of its bankruptcy filing on September 5, 2024, Ideal owned approximately forty-one properties, either directly, or through a subsidiary entity in over twelve states.[15,16]

~~27.~~28.  A summary of the ownership structure and purported business purposes of the WS Entities is summarized in Chart 1 below.

---

[9] *See* Project Refreshing Due Diligence Report Prepared by Marcum LLP dated March 28, 2024, page 14.
[10] Refreshing USA LLC Certificate of Formation.
[11] Assignment and Assumption Agreement between Refreshing USA, LLC, Ryan Wear, and WaterStation Management, LLC [REL_IDPROP_ECA_00086358_0002].
[12] Project Refreshing Due Diligence Report Prepared by Marcum LLP dated March 28, 2024, Exhibit 13 – Organization Overview: Refreshing USA Affiliates, page 92.
[13] Ideal Property Investment LLC Certificate of Formation.
[14] Project Refreshing Due Diligence Report Prepared by Marcum LLP dated March 28, 2024, Points of Interest: Significant Related Party Transactions and Facilities, page 14.
[15] The twelve states are: Arizona, California, Florida, Georgia, Illinois, Montana, Nevada, Oregon, Texas, Tennessee, Utah, and Washington.
[16] Declaration of Eric Camm in Support of First Day Motions In re: Ideal Property Investments, LLC dated September 9, 2024 attached as Exhibit D to the O'Malley Decl.

1601824860.1

**Chart 1 – Structure of the WS Entities[17]**



28.29.  In addition to the four entities described above, there are an additional 64 affiliated

entities identified in **Appendix C**.

**V.      ACCOUNTING AND FINANCE FUNCTIONS**

29.30.  Wear was an authorized signer for the bank accounts held with Bank of America.[18]

The other authorized signers are identified below.  Wear was the only authorized signer for Ideal

---

[17] This chart excludes subsidiary operating companies.
[18] See Bank of America Business Signature Card forms attached as Exhibit E to the O'Malley Decl.

1601824860.1

BOA A/C . The bank statements show that the WS Entities initiated cash disbursements via check payments, wire transfer, and electronic fund transfers.

- Creative BOA A/C 6352: Richard Wear (added in June 2013) and Nickolas Howe (added in June 2024)

- WSM BOA A/C 5591 – Colin Keyes and Thomas Thadley (both added in November 2023)

- Refreshing BOA A/C 7830 – Richard Wear and Michael Cloutier (added in March 2021)

~~30.~~31. Wear was an authorized signer for the bank accounts held with First Fed Bank ("First Fed"). The email between First Fed and Wear indicates that Wear personally initiated payment transactions out of the Bank of America and First Fed bank accounts.[19]



```
Message

From:     Ryan Wear [rwear@waterstationtechnology.com]
Sent:     8/16/2021 8:31:41 AM
To:       Jason Naylor [Jason.Naylor@ourfirstfed.com]
Subject:  portal issues

[EXTERNAL: Please do not click on links or attachments unless you recognize the sender]
Hi Jason,

I made a series of mistakes over the weekend that I'm hoping you can help to resolve:

1.    I made a transfer from summit to WSM or at least intended to do so for $100,000 and this apparently paid down
our WSM loan by $100k instead of transferring to our checking account.
2.    I made a transfer from CT to WSM and it doesn't appear to have posted
3.    I made a batch of ACH payments from WSM and as a result of neither transfer posting it rejected as it went over
the limit.  Can you please process these after the two transfers are made?

On a separate note, I am wiring a large amount from our bank of America account into First Federal Creative and would
like to confirm the wire instruction details.

Thank you,
Ryan
```

---

[19] See A09389-0010-055799 attached as Exhibit E to the O'Malley Decl.

Page 12 of 70

1601824860.1

~~31.~~32.  The WS Entities maintained their accounting books and records in QuickBooks. Each entity maintained its own QuickBooks file.  WS Entities' accounting and finance functions were overseen by the Jeremy Briggs ("Briggs"), WS Entities' Corporate Controller.[20]  Briggs was terminated from his position at the end of August 2024 shortly after the appointment of the general receiver.[21]

**VI.  GENERAL BACKGROUND REGARDING THE WATER STATION INVESTMENT OPPORTUNITY**

**A.  Water Machine Investment Opportunity Promoted by Ryan Wear**

~~32.~~33.  Around 2016, the WS Entities began offering individuals the opportunity to purchase self-service water vending machines ("water machines") placed at various retail locations around the United States.[22]  Creative and WSM represented itself as an industry leader, and promoted itself as having expertise in manufacturing, servicing, and management of water machines.[23]  Debtors marketed and sold the water machines for $8,500 per machine as a passive, high return on investment ("ROI") opportunity.

~~33.~~34.  During the period 2018 through early 2023, the WS Entities raised over $223 million from individuals, or their affiliated Limited Liability Company business entities (herein, an "Investor" or "Investors"), who were told that they were investing in a growing and profitable water-vending manufacturing and distribution business.

~~34.~~35.  The self-service water vending machines would generally be installed in high-traffic retail locations, such as shopping centers, grocery stores, big-box stores, and convenience stores.  The water machines allowed consumers to refill 1, 3, or 5-gallon water bottles with high

---

[20] Project Refreshing Due Diligence Report Prepared by Marcum LLP dated March 28, 2024, page 9.
[21] Declaration and Affirmation of Jeremy Briggs, dated May 29, 2025, ¶64.
[22] Deposition of Ryan Wear In the Matter of Ryan Wear, et al., dated November 15, 2023, page 383, lines 7-23.
[23] Confidential Private Placement Memorandum of Creative Technologies, LLC and Water Station Management LLC, dated January 1, 2022, pages 19 - 20 [WA_DFI_00001324_0004] attached as Exhibit G to the O'Malley Decl.

1601824860.1

quality, filtered water. In addition, the water machines accepted multiple forms of payment (e.g., cash and credit cards) and Investors had the ability to remotely monitor sales activity for their machines through an online portal.[24]

35.36. Investors were led to believe that they were buying into a guaranteed, low-effort, and risk-free investment opportunity. The marketing materials described the investment as a "totally passive," "recession resistant," and "turnkey" franchise opportunity, and Investors could expect to achieve "**18% to 20% ROI** on overall average revenues on or before 12-months of startup operations."[25,26] Depending upon the specific deal, Investors were promised either a percentage of gross profits attributable to the revenue generated by water machine or a fixed monthly payment equivalent to an annual return on investment ranging between 12% and 20%. For example, Bryce Froberg, Director of Business Development, told one investor that the "vast majority make 20%+, but some make even more than that."[27]

36.37. For context, the promoted 18% to 20% ROI was very attractive to Investors in light of prevailing interest rates in 2016. The following table indicates national bank interest rates on December 30, 2016.[28]

---

[24] Water Station Technology Investor Deck [WA_DFI_00004520_0001] attached as Exhibit G to the O'Malley Decl.
[25] *See* marketing materials attached as Exhibit G to the O'Malley Decl.
[26] *See* marketing materials attached as Exhibit G to the O'Malley Decl.
[27] Email dated November 18, 2020 from Bryce Froberg to Karyl Oules attached as Exhibit G to the O'Malley Decl.
[28] https://ncua.gov/analysis/cuso-economic-data/credit-union-bank-rates/credit-union-and-bank-rates-2016-q4.

1601824860.1

**Table 2. - Interest Rates on December 30, 2016**

| Product | All Banks (National Average Rate) |
|---|---|
| 5 Year CD - $10,000 | 1.23% |
| 4 Year CD - $10,000 | 1.00% |
| 3 Year CD - $10,000 | 0.82% |
| 2 Year CD - $10,000 | 0.62% |
| 1 Year CD- $10,000 | 0.41% |
| 6 Month CD - $10,000 | 0.25% |
| 3 Month CD - $10,000 | 0.16% |
| Money Market Account – $2,500 | 0.12% |
| Interest Checking Account- $2,500 | 0.09% |
| Regular Savings Account – $1,000 | 0.12% |

~~37.~~38. The WS Entities promoted other investor benefits, stating that the investment opportunity qualified for tax deduction under IRS Section 179,[29] and investors could finance their investments with favorable loans that were approved by the U.S Small Business Administration. Lastly, the WS Entities offered Investors a guaranteed buyback of water machines if they were ever dissatisfied with their investment. [30]

~~38.~~39. The machine purchaser transactions were effected through the execution of several interrelated agreements signed by Investors:

a. Purchase Order Agreement – Document issued by WSM that outlined the details of the transaction, including the number of water machines to be purchased by the Investor, the price per unit, delivery terms, and payment terms. The Purchase Order itself also stated

---

[29] The Section 179 tax deduction allows investors to deduct the full cost of machinery and qualifying equipment during the tax year, rather than depreciating the costs over several years. The Section 179 Deduction limits are subject to annual changes set form by the Internal Revenue Service. https://www.irs.gov/pub/irs-prior/i4562--2021.pdf
[30] Water Station Technology Investor Deck – Return on Investment Considerations [WA_DFI_00004520_0001] and email dated November 18, 2020 from Bryce Froberg to Karyl Oules, in which Mr. Froberg states, "…we will buy you out and repay your full investment if you are unhappy as an investment partner." See Exhibit G to the O'Malley Decl.

1601824860.1

that the Investor was purchasing the water machines from "Creative Technologies, LLC dba Waterstation® Technology."

b. Franchise Agreement – Document issued by WSM that outlined the terms and conditions for the Investor to operate the water machines, including franchise fees and royalty fees due to WSM from the investor.

c. Service and Management Agreement – Document issued by WSM stating that the water machines would be installed and managed by WSM for a fee, and what the payment amount Investors would expect to receive.

d. Loan Agreements – Some Investors obtained loans from banks to finance their investments. The banks that provided most of the financing to these Investors included First Fed, Unibank, and Celtic Bank, but there were others.

39.40. The WS Entities told Investors that their capital would be used to either purchase existing water dispensary machines from existing investors or to manufacture new machines for installation at retail locations throughout the United States. Investors and their banks, as applicable, were provided with a list of the machines they purportedly owned, including the location address and machine serial number.

**B. Individuals and Entities that Became Investors**

41. During the period January 2018 through December 2023, a total of 271 individuals and/or entities became Investors in the WS Entities as either owners of water machines or franchisees. [31] As shown in Chart 2 below, the number of new Investors increased in 2020 and 2021, as compared to the prior years, but decreased significantly in 2022 and 2023.

---

[31] The number of new investors represents the count of the first cash deposit received by Creative or WSM from an Investor based on review of the bank statements. Some individuals made multiple deposits or invested more than once, and in these instances, only the first deposit transaction is counted.

1601824860.1

**Chart 2 – Number of New Investors by Year**



### C. Sale of Water Machines

40.42.  During the period January 2018 through December 2023, the WS Entities received $225.3 million in cash deposits from new Investors and paid out $120.4127.4 million in Investor returns, as summarized in Table 3 below.

41.43.  The investment amount for each Investor was outlined in their signed Purchase Order Agreement.  To participate in the investment, Investors wired funds to Creative's bank account.[32]  The WS Entities did not segregate the funds received from Investors in a separate bank account. Investor funds obtained from bank loans were also deposited into the same Creative bank account.

---

[32] Most Investors sent wire transfers, but some Investors paid with a check.  The majority of Investor payments were wired to Creative's bank account; however a small portion ($4.5 million) was wired to WSM's bank account.

1601824860.1

**Table 3. - Total Investor Funds Received and Total Investor Returns by Year**

Formatted Table

| | Number of New Investors[33] | Investor Funds Received | Investor Returns |
|---|---|---|---|
| 2018 | 42 | $ 17,074,156 | $ 2,973,356 |
| 2019 | 57 | 30,807,997 | 7,649,816 |
| 2020 | 80 | 79,263,693 | 15,816,727 |
| 2021 | 72 | 75,062,055 | ~~31,505,878~~ 32,091,843 |
| 2022 | 16 | 19,600,627 | ~~44,431,555~~ 44,580,445 |
| 2023 | 4 | 3,535,157 | ~~17,587,192~~ 23,908,275 |
| Sept 2024 | 0 | - | 454,076 |
| **TOTAL** | **271** | **$ 225,343,685** | $ ~~120,418,600~~ 127,474,538 |

~~42.~~44.  Initially Investor returns were based on a profit-sharing model where Investors received a percentage of gross profits generated from the sale of water to consumers from the water machines. Prior to September 2020, the Service and Management Agreements included terms stating what Investors would expect to earn during the ramp-up period once the water machine was placed at the retail location.  Examples of the payment terms during the ramp-up period were as follows:

    a.   WSM agreed to find suitable locations for the water machines and "if after a nine to twelve-month startup period, the overall portfolio average is earning less than $450 per machine per month net earnings to the owner; replace machines earning less than $150 with one earning greater than $200 per month."[34]

---

[33] The number represents the count of the first cash deposit received from an Investor based on a review of the bank records.  Some Investors paid for their water machines in installments, and in these instances, only the first payment is counted.

[34] *See* Water Station Management LLC Service and Management Agreement for Placid LLC dated May 9, 2019, Section 1(b)(1) – Location/Relocation of Vending Machines/Lease/Services [KLG_Ponzi-00002499] attached in Exhibit H to the O'Malley Decl.

1601824860.1

b.  Guaranteed a monthly minimum payment based on a six month "Ramp Up" schedule at $80 per machine at the end of the 2nd full month in service, $90 average per machine at the end of the 3rd full month in services, $100 average per machine at the end of the 4th full month in services, and $110 average per machine at the end of the 5th full month in service.[35]

43.45.  Starting around September 2020, the WS Entities transitioned to a fixed-return model whereby Investors received a monthly predetermined dollar amount paid on a monthly basis.  The fixed monthly payment amount was tied to the size of their investment, and the monthly payment amount was typically equal to 1% of total investment, or 12% on an annual basis.[36,37] Payments commenced starting thirty days after receipt of full payment (i.e., amount listed in the Purchase Order Agreement) from the Investor.  Investors that signed Service and Management Agreements prior to September 2020 entered into Service Contract Addendums that amended the monthly payments to the fixed-return model.

44.46.  As shown in Table 3 above, payments to existing Investors increased starting in 2019. The source of these payments were the cash inflows generated from closing 42 new Investors that signed Service and Management Agreements (referenced in ¶38 above) in 2018.

a.  In 2020, payments to existing Investors of $15.8 million represented the equivalent of 20% of $79.3 million of new Investor funds.

---

[35] *See* Water Station Management LLC Service and Management Agreement for Pure Water Vending LLC dated June 24, 2020, Section 3a(5) – Commission/Compensation/Distribution [KLG_Ponzi-00005023] attached in Exhibit H to the O'Malley Decl.
[36] See Addendum A dated September 27, 2020 to the Water Station Management LLC Service and Management Agreement for Steve and Stana Ciric dated September 16, 2020 [KLG_Ponzi-00003164 and KLG_Ponzi-00003165] attached in Exhibit H to the O'Malley Decl.
[37] For example, an Investor that contributed $280,500 would receive 1%, or $2,805 on a monthly basis.  On an annual basis, the investor would receive $33,660 [$2,805 * 12], which is equal to an annual rate of return of 12% [$33,660 / $280,500].

1601824860.1

b. In 2021, payments to existing Investors of $~~31.5~~32.1 million represented the equivalent of ~~42~~43% of $75 million new Investor funds received from 72 new investors.

c. In 2022, Creative closed 16 new Investors compared to 72 investors in the prior year, receiving only $19.6 million of new Investor funds, or *$55.5 million less* than it received in new Investor funds 2021.

d. Despite the decrease in new Investor funds in 2022, payments to Investors *increased* by $~~12.9~~12.5 million to $~~44.4~~44.6 million, equivalent to an increase of approximately ~~41~~39% compared to 2021.

e. In 2023, the WS Entities made $~~17.6~~23.9 million of payments to existing Investors while it only received $3.5 million from four new Investors.

f. There were no new investors in 2024, and payments to existing Investors were a fraction of the amounts paid in prior years. Around this time, WSM also defaulted on its obligations under the Indenture Agreement and a group of Investors sued WSM, alleging fraud.

**D. Delays in Investor Monthly Payments**

~~45.~~47. Based on reporting by Investors, monthly payments to Investors became inconsistent starting in June 2022.[38] Emails between Wear and Investors corroborate this, and indicate that the delays in Investor payments occurred as early as October 2021. The emails also indicate that the WS Entities were in arrears for multiple months, and Investors were becoming increasingly irate due to broken promises that payments were forthcoming and the overall lack of

---

[38] See Declaration of Sterling Davis dated April 23, 2024, Declaration of David Schroeder dated April 22, 2024 filed in the matter Pacific Water Technology LLC, Spruce Water Investments LLC, Indiana Water Technology, LLC AR Water Supply LLC, BLC Water Company LLC, Granite Street Ventures LLC, Rumson Wellness LLC, v. Ryan R. Wear, et al. (Cause No. 24-2-02887-31).

1601824860.1

responsiveness.  Table 4 below provides excerpts from email correspondences sent by Investors to Wear inquiring about their missing monthly payments.[39]

**Table 4. - Select Investor Emails Regarding Delays in Monthly Payments**

| Email Date | Investor | Email Excerpt |
|---|---|---|
| 10/29/2021 | D&J Water LLC / John Forrey | Still waiting for the September Revenue sharing deposit into my D & J Water account.<br><br>The current back figure owed to us for the period July 2020 through August 2021 is $9,184.93; this figure is after acknowledging and accounting for the $3,197.64 back balance received earlier this month. |
| 3/29/2022 | Abby Wyatt Group Inc / Mark Fleming | I have not received my March payment yet. Past payments have arrived between 25th of each month. If the timing has changed, please let me know. Please advise as to when I can expect the next payment to arrive. |
| 4/7/2022 | Richard Peterson | I am being very patient with the late payment this month. Can I please get an answer to why my payment is delayed. ACH glitch sounds a bit fishy. I need to know what's going on. Is Water Station have [sic] cash flow issues? |
| 4/9/2022 | JLE Enterprises LLC / James Estes | I did not get the March distribution last week as promised. I'm getting concerned that Waterstation may be having financial difficulties that are not being disclosed to investors. |
| 4/21/2022 | NTMK Corp.  / Nate Wehunt | I've attempted on multiple occasions to reach you via phone, text, email, and even postal letter and have not received a response. Unfortunately, continued ignoring of these communications is only exacerbating the issue.<br><br>As of yesterday, April 20th, 2022, WST is now late on two payments to NTMK Corp. for the revenues collected by WST on the NTMK Corp machines in February and March of 2022. |
| 7/10/2022 | Jim Vilt | I desperately need my payments the next few months as it will more than likely be my only income. I find it sad that I have been a huge proponent of helping WST grow and am one of the last to get paid. Contractually, I have a written<br>signed agreement by Ryan to get paid by the 20th of each month. |
| 7/14/2022 | CJGE Water LLC / Craig Richard | My payments, per my agreement, were due on the 20th. I now have had 8 straight months of payments that are late (as few as one day to as many as 12 days). There has been no good explanation as to why (is it just not a priority to pay people on-time, is it a cash flow issue, etc.)? |
| 8/18/2022 | Biyaya LLC / Paul Talosig | I have not seen any payments from WST. According to your letter, we should have received them by now with 1.5% interest. |

---

[39] The email sent by Investors to Wear are attached as Exhibit J to the O'Malley Decl.

1601824860.1

| Email Date | Investor | Email Excerpt |
|---|---|---|
| 10/26/2022 | Nira Enterprises LLC / Archan Tikoti | Now it's Oct 26th and this is my 8th email following up on this. The September payment is also due. So now I am 3 months behind and have been funding the loan payments using my personal funds. Can you please look into this asap? I fail to understand why you wouldn't fix the problem since you promised to do that in your earlier emails. |
| 11/16/2022 | JH Water Ventures LLC / Jeremy Herbertson | The dates you have given for funding this have now passed 4 times! This needs to be funded today or I will be forced to go the legal route once again. |
| 11/28/2022 | James Group International LLC | Your prior messages suggested a transfer on 11/23/2022. Since then, no follow up and no wire/ACH transfer. |
| 5/26/2023 | Steve Pruett | Unfortunately, I have to continue to reach out as I'm still waiting to receive April's and May's disbursement, or some understanding of what's holding things up. |
| 6/26/2023 | NTMK Corp. / Nate Wehunt | Are you able to confirm that the required minimum payments have been initiated? There are now three payments outstanding (April 20, May 20, and June 20). |
| 10/25/2023 | BAM Inv LLC / Barry McGee | It's déjà vu all over again! You again are now two months behind. You said you should've received the funds yesterday and make payment immediately which means it would be in my account this morning. Not surprisingly that didn't happen. |

46.48.  The same Investors also reported that their monthly payments completely stopped by mid-year 2023.  This is evident from the bank records which show a significant decrease in monthly payments in June 2023, as shown in Chart 3 below.

47.49.  Chart 3 also shows over $12 million in Investor payments in May 2022, which is most likely due to catch up payments from prior months and buyback of water machines (discussed in further detail below) when WSM received the first payment of over $8.4 million in bond proceeds from the Indenture Agreement on April 29, 2022.

1601824860.1

**Chart 3. – Monthly Investor Payments**



### E. Buyback of Water Machines

48.50. On October 12, 2021, The State of Washington Department of Financial Institutions, Security Division ("DFI") commenced its investigation in Wear, WSM, Creative, and along with certain employees and affiliated third-party entities and individuals (collectively, the "Respondents"), into potential violations of the Securities Act of Washington, the Franchise Investment Protection Act of Washington, and the Business Opportunity Fraud Action of

Washington.[40]  Complaints from Investors were the impetus of the investigation.[41]

49.51.  Documents produced in connection with the DFI investigation included Refund Payment Agreements for the buyback of water machines by WSM and/or Creative from Investors ("Buyback Agreements").

50.52.  Because the WS Entities stopped making monthly payments, many of the Investors could no longer cover the monthly debt service associated with the loans they obtained in order to purchase the water machines and opted to request a refund.  As summarized in Table 5 below and detailed on **Schedule I**.

51.53.  The buyback of water machines from the Investors would have required significant cash reserves, as the value of the water machines far exceeded the cash balances in the WS Entities' bank accounts.  The WS Entities used money from Investors and intercompany transfers to fund the Buyback Agreements in 2018 through 2021 and money from the Indenture Agreement to fund the $1.9 million in Buyback Agreements in 2022.

**Table 5. - Summary of Refund Payment Agreements[42]**

| Year | Number of Signed Refund Payment Agreements | Number of Water Machines | Value of Water Machines |
|------|------|------|------|
| 2018 | 1 | 40 | $   270,000 |
| 2019 | 5 | 83 | 596,800 |
| 2020 | 2 | 46 | 348,700 |
| 2021 | 15 | 770 | 5,809,475 |
| 2022 | 28 | 1,439 | 12,106,272 |
| 2023 | 30 | 2,498 | 21,514,158 |
| **Total** | **81** | **4,876** | **$   40,645,405** |

[40] *See* July 17, 2024 letter from DFI, attached as Exhibit B to the O'Malley Decl.
[41] In its charging statement filed on May 16, 2025, DFI concluded that the Respondents violated the "anti-fraud section of the Securities Act of Washington, by employing a device, scheme, or artifice to defraud; by making untrue statements of material fact or omitting to state material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading; or by engaging in an act, practice, or course of business that operates or would operate as a fraud or deceit upon any person." See Exhibit C to the O'Malley Decl.
[42] An exemplar Refund Payment Agreements  is attached as Exhibit O to the O'Malley Decl.

1601824860.1

**F. Events Leading Up to WS Entities Bankruptcy Filing**

~~52.~~54. Involuntary Petitions for Chapter 11 bankruptcy were filed against Refreshing, Creative, and WSM in U.S. Bankruptcy Court in Texas on August 27, 2024. Ideal filed for Chapter 11 bankruptcy in the Eastern District of Washington September 5, 2024.  However, there were a number of significant events leading up to the filing.

~~53.~~55. Between December 2024 and March 2025, nearly a dozen lawsuits were filed against Debtors in Washington state.

~~54.~~56. On April 16, 2024, the group of investors known in the bankruptcy case as the "Pacific Parties" filed a lawsuit against Debtors and their affiliates alleging, among other things, that Debtors were operating a fraudulent enterprise. On April 24, 2024, the Pacific Parties filed a Motion for Temporary Restraining Order against Wear and the WS Entities.  In support of this Motion, the Pacific Parties submitted the results from an independent investigation by the company ProxyPics Inc., which obtained photographic evidence of the existence of water station vending machines at over 400 locations through the United States.  Out of the 400 locations, only 47 locations were verified to have water stations.[43]  Plaintiffs' Motion for Temporary Restraining Order was granted on April 26, 2024.

~~55.~~57. On April 17, 2024, First Fed Bank filed a Petition for Appointment of General Receiver against Ideal, alleging that it defaulted on three commercial loans obtained through First Fed.  First Fed Bank filed a similar petition against Creative on May 14, 2024.

~~56.~~58. On June 20, 2024, U.S. Bank issued a notice of event of default when WSM failed to make a required interest payment under the terms of the Indenture Agreement.

---

[43] Declaration of Brett Karol, dated April 25, 2024.

1601824860.1

~~57.~~59.  On July 3, 2024, 352 Capital GP LLC filed a lawsuit against Wear, the Debtors, and others alleging that he misappropriated over $100 million in bond funds between 2022 and 2024.

**VII.**     **DEFINITION OF A PONZI SCHEME**

~~58.~~60.  Ponzi schemes are investment frauds characterized by the organizer's use of new funds to pay the returns of old investors and other creditors.

~~59.~~61.  Ponzi scheme organizers often promise investments that generate high returns with little or no risk, when in fact no legitimate profit-making business opportunity exists.  In many cases, the organizers do not use the funds as promised; instead, the funds are used to pay those who invested earlier or for other, unrelated purposes.  With little or no legitimate earnings, Ponzi schemes require a constant flow of new money in order to survive.  The Ponzi scheme eventually collapses when the organizer is no longer able to access new sources of capital (e.g., recruiting new investors or, as is the case here, bond investors or commercial lenders) that are necessary to continue making the promised payments that are essential for keeping old investors at bay.[44]

~~60.~~62.  In general, Ponzi schemes exhibit the following characteristics: [45]

---

[44] https://www.investor.gov/protect-your-investments/fraud/types-fraud/ponzi-scheme
[45] *See*, e.g., *Scholes v. Lehman*, 56 F.3d 750, 757 (7th Cir. 1995); *Wylev. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 590 n.1 (9th Cir. 1991 (describing the Ponzi scheme's purported "profit-making business opportunity" as "an illusion"); *Wing v. Williams*, 2011 U.S. Dist. LEXIS 25607, at *10 (D. Utah Mar. 11, 2011); *In re Taubman*, 160 B.R. 964, 973 (Bankr. S.D. Ohio 1993); *O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197, 1199 (11th Cir. 2003) (noting fact that 100% return was promised to those investors who were able to find two additional investors); *United States v. Benson*, 79 Fed. App'x 813, 817 (6th Cir. 2003) (noting that perpetrator promised 138% and 181% return with no risk); *Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 624-25 (Bankr. E.D. Ohio 2006); *In re Taubman*, 160 B.R. at 978 (Bankr. S.D. Ohio 1993); *Kapila v. Phillips Buick-Pontiac GMC Truck, Inc. (In re ATM Fin. Servs., LLC)*, 2011 Bankr. LEXIS 2394, at *15 (Bankr. M.D. Fla. June 24, 2011) ("The debtor and the Netschi Companies conned people into making a purchase they believed would generate a future income steam based on the perpetrators' misrepresentations about the amount of withdrawal fees each ATM could earn. The ATM purchases were therefore no different from investors hoping to make above market returns based on phony investments, and the monies they transferred to the debtor and the Netschi Companies were functionally equivalent to investments."); *Santa Barbara Capital Mgmt. v. Neilson (In re Slatkin)*, 525 F.3d 805, 813–14 (9th Cir. 2008); *Emerson v. Maples (In re Mark Benskin & Co.)*, 161 B.R. 644, 650 (Bankr. W.D. Tenn. 1993).

1601824860.1

a.  Unrealistic returns promised to investors with little or no risk;

b.  The entity operating the Ponzi scheme conducted little or no legitimate business operations as represented to investors;

c.  Purported business operations of the Ponzi scheme entity produced little or no profits or earnings;

d.  The source of payments to investors was not obtained by any business venture of the Ponzi scheme entity, but was taken from cash infused by new investors;

e.  Investors' funds cannot be traced to a specific investment;

f.  The Ponzi scheme entity failed to invest all the investors' funds in promised investments;

g.  The Ponzi scheme entity used investor funds for non-investor purposes;

h.  Later investors in the Ponzi scheme entity received lower returns than earlier investors; and

i.  Money was transferred between related entities within the Ponzi scheme entity for no business purposes.

## VIII.  SOURCES AND USES ANALYSIS

### A. Objectives of a Sources and Uses Analysis

~~61.~~63.  A sources and uses analysis often serves as a critical tool in investigating and determining a Ponzi scheme.

~~62.~~64.  A sources and uses analysis attempts to identify and categorize all money coming into an entity (i.e., sources), and all money being withdrawn from an entity (i.e., uses).  The overall objective of a sources and uses analysis is to analyze the flow of funds to identify patterns consistent with the Ponzi scheme characteristics listed above.  These patterns include:

1601824860.1

a. Upon receipt of funds from new investors, the funds were immediately used to make payments to exiting investors.

b. Insufficient revenue from legitimate business operations to cover the business' payment obligations.

c. Cash transactions that do not support the day-to-day operations of the businesses, and instead were used for other purposes.

d. Excessive and unsupported payments to insiders.

e. Commingled funds belonging to one entity are deposited into the bank account of a related entity.  The commingling can occur through intercompany and affiliated entity fund transfers, wire transfers, or electronic fund transfers.

f. Reliance on third-party financing, loans or other liquidity sources as a means of artificially maintaining payments to Investors to extend the Ponzi scheme. Third-party financing provides the Ponzi operation with access to money when new Investor funds have diminished but the organizer wants to continue the perception of a successful business.

g. Discrepancies between the bank records and the recording of transactions in the accounting system, which are indicators of the lack of internal controls, unreliable financial reporting, and potentially fraud.

**B.  Development of the Bank Statement Database**

63.65.  In order to perform the sources and uses analysis, I first compiled a bank statement database containing all transaction activity for the Main Operating Bank Accounts (see Table 1). The purpose of the bank account database is to enable the classification of bank transaction data in a structured manner.  To create the bank statement database, I first extracted the relevant data

1601824860.1

fields from the bank statement (e.g., transaction posting date, transaction description, transaction type, and transaction amount). For the Bank of America accounts, I utilized the cancelled check images, wire transfer reports, ACH transaction reports, and deposit advices produced by the bank in order to identify the payee and payor names that were not included in the transaction description on the bank statements. I also utilized the ACH transaction reports for the First Fed bank accounts. I then sorted the database by transaction description to allow me to create a new data field called "Standardized Description." The purpose of the Standardized Description data field is to present the transaction description (e.g., payee, payor, vendor name) in a uniform format.[46] Finally, using the "Standardized Description" column, I categorized all transactions into broad categories. For this exercise, I relied on multiple sources including the Claims Register, information pertaining to the Investors contained in the various legal filings, internet research, discussions with counsel, and the general ledgers for the WS Entities maintained in QuickBooks, although to a lesser extent, as discussed in further detail below.

64.66. I was able to identify deposits from Investors primarily from the wire transfer transaction descriptions or the check memo field. I also located lists of Investor names and investment amounts within the discovery produced in connection with the Ideal Property Investments LLC/First Fed Bank Mediation and the DFI Investigation. Lastly, I was also able to cross-check Investor names to entries in Creative's and WSM's QuickBooks files.

**C. Forensic Analysis of QuickBooks**

65.67. As part of my work, I analyzed the transaction data contained in QuickBooks and compared it to the bank records to ascertain the completeness and reliability of the accounting

---

[46] In some instances, transaction descriptions were standardized to correct for anomalies, e.g., spelling variations, payee name inconsistencies, and truncation.

entries. Based on my forensic accounting review, I noted discrepancies that call into question the completeness and reliability of the WS Entities' internal accounting books and records.

66.68.  The ending balances shown on the monthly bank reconciliation reports did not agree with the ending balances presented on the bank statements for the period January 2018 through April 2019 for Creative and for the period April 2019 through December 2020 for WSM. The common causes of discrepancies in bank reconciliations include missing transactions, duplicate entries, or data entry errors.

67.69.  The general ledgers for the WS Entities show a significant number of cash receipts and cash disbursement transactions where the "Name" field is blank. In some instances, the "Memo" field contains some information pertaining to the transaction, however, in most cases, it is not possible to determine the payor or payee based on the general ledger alone. These incomplete accounting entries relating to the movement of cash raise red flags regarding the purpose and propriety of the transaction. An excerpt of the general ledger cash account for WSM and Creative showing missing information are attached as **Schedule J**.

68.70.  There are inconsistencies in how funds received by Creative from Investors were categorized on the general ledger. Investor funds were categorized as "Undeposited Funds" in 2020, "Customer Deposits" in 2021, and "Interco Receivable/Payable" in 2022 through April 2023. I also noted that money from the bond funds were recorded in Creative's general ledger as "Customer Deposits." These entries are unusual as bond funds are neither related to sales nor would they be considered customer deposits. An excerpt of the general ledger account for Customer Deposits is attached as **Schedule K**.

69.71.  The general ledgers for the WS Entities show numerous cash receipts and cash disbursements categorized as "Ask My Accountant," which is a temporary or suspense general

1601824860.1

ledger account for transactions that require additional information or investigation to determine their proper classification. On Creative's general ledgers alone, the cash receipts totaled over $40 million and cash disbursements totaled approximately $900,000 categorized as "Ask My Accountant" for the period 2018 through 2022. These transactions were eventually reclassified using bulk general journal entries that did not provide any detail regarding which specific transactions were being reclassified.[47] An excerpt of the general ledger showing transactions categorized as "Ask My Accountant" is attached in **Schedule L**.

70.72. The general ledgers for Creative and WSM contain large bulk journal entries usually recorded every quarter that lack any descriptions or audit trail to identify the composition of the entries that are being reclassified (see **Schedule M**).

   a. For example, the revenues for Creative reported in QuickBooks 2023 consist entirely of large bulk round dollar amount journal entries.

   b. Another example is a journal entry for WSM on January 1, 2021 in the amount of $15,037,219 adjusting Creative's Intercompany Receivable/Payable general ledger account with "Moving all transactions to Interco as these were xfered to WSM for payments to partners."[48] There is insufficient information in QuickBooks to be able to identify the corresponding transactions that make up the $15,037,219 adjustment. Furthermore, I do not see any corresponding journal entries in WSM's QuickBooks file.

---

[47] Jeremy Briggs declaration references the "Suspense Account" and states that transactions would remain in this account because he could not determine their proper place on WSM's general ledger. See Declaration and Affirmation of Jeremy Briggs, dated May 29, 2025, ¶41 attached as Exhibit F to the O'Malley Decl.
[48] See General Journal 472 dated 1/1/2021 printed from Creative's QuickBooks files attached as Exhibit K to the O'Malley Decl.

1601824860.1

71. 73.  The discrepancies and incomplete accounting entries are indicators of a lack of internal controls and a lack of transparency regarding the purpose or nature of the underlying transactions. This is common in Ponzi schemes as incomplete accounting records make it difficult to determine how Investor funds are being used. The absence of internal controls is also highly indicative that a single individual, in this case Wear, had control and oversight over all aspects of the operation. Based on the aforementioned observations, I can only conclude that the QuickBooks files are incomplete and most likely contain inaccuracies with respect to revenues, expenses, assets, and liabilities of the WS Entities.

IX.    **ANALYSIS AND OPINIONS**

    A. **Analysis of Debtors' Sources and Uses of Funds**

       1. **Deposits and Receipts**

72. 74.  As previously stated, several patterns and indicators can be observed in a sources and uses analysis. A summary of my sources and uses analysis for the Main Operating Bank Accounts can be found in **Schedule A**.

73. 75.  My investigation determined that during the period January 2016 through September 2024, approximately $750 million in 15,151 separate transactions were deposited into the Main Operating Bank Accounts. I have categorized sources (e.g., cash deposits) into the following five categories: intercompany transfers, investor funds, bank loans and bond deposits, cash deposits from operations, and deposits from insiders.

74. 76. **Intercompany Transfers:** The largest category of deposits into the Main Operating Bank Accounts is intercompany transfers of money. Approximately $276.7 million, or 36.9% of total deposits, was transferred into the Main Operating Bank Accounts from 59 bank accounts owned by other WS Entities, subsidiaries, related entities, and affiliates. Intercompany transfers are not "new" funds being deposited. The large volume and amount of intercompany

transactions allowed Wear to move money around to the entity that needed cash on any given day to make Investor payments, to pay expenses, or to withdraw funds for acquisitions, perpetuating an illusion of a legitimate business.

~~75.~~77.  The bank statements show a significant increase in the volume of intercompany transfers in 2022 and 2023, as presented in Table 6 below. The increase in intercompany transfers in these years was due to Wear transferring bond funds from WSM to other bank accounts owned by the WS Entities and bank accounts owned by related entities.  A summary of the intercompany transfers by bank account and by year can be found in **Schedule B**.

**Table 6. - Deposits – Intercompany Transactions**

| Year | Total Intercompany Transactions In | % of Total | Number of Transactions | % of Total |
|---|---|---|---|---|
| 2018 | $    5,134,160 | 1.9% | 74 | 2.9% |
| 2019 | 8,605,896 | 3.1% | 82 | 3.2% |
| 2020 | 18,316,259 | 6.6% | 132 | 5.2% |
| 2021 | 26,507,518 | 9.6% | 124 | 4.8% |
| 2022 | 110,860,735 | 40.1% | 784 | 30.6% |
| 2023 | 98,086,282 | 35.5% | 925 | 36.1% |
| 2024 (9 mos.) | 9,166,633 | 3.3% | 440 | 17.2% |
| **Total** | $    **276,677,484** | **100.0%** | **2,561** | **100.0%** |

~~76.~~78.  **Investor Funds:**  Deposits of money from Investors for the purchase of water stations or payment of franchise fees are the second largest category.  In total, over $225.3 million was received from Investors, or 30% of total deposits.  The majority of the Investor funds ($220.8 million, or 98%) were deposited into Creative's bank accounts.  The remaining $4.5 million was deposited in WSM's bank accounts.  As summarized in Table 7, Investor funds decreased significantly in 2022 and 2023.  A summary of Investor funds received by month can be found on **Schedule C**.

1601824860.1

**Table 7. - Cash Deposits from Investors by Year**

| Total | Investor Funds[49] | % of Total |
|---|---|---|
| 2018 | $    17,074,156 | 7.6% |
| 2019 | 30,807,997 | 13.7% |
| 2020 | 79,263,693 | 35.2% |
| 2021 | 75,062,055 | 33.3% |
| 2022 | 19,600,627 | 8.7% |
| 2023 | 3,535,157 | 1.6% |
| 2024 (9 mos.) | - | 0.0% |
| **TOTAL** | **$   225,343,685** | **100.0%** |

~~77.~~79.  **Bank Loans and Bond Deposits:**  The third largest category of deposits into WSM bank accounts came from loan proceeds totaling $156.5 million, representing 20.9% of the WS Entities' total historical deposits.

~~78.~~80.  During the period April 2022 through April 2024, over $97.7 million[50] in bond proceeds, representing 62.5% of total loan proceeds, were deposited into the Main Operating Bank Accounts.   The remaining $58.7 million of loan proceeds, equivalent to 37.5% of total loan proceeds include the First Fed bank loans, loans secured by real estate (i.e., mortgages), SBA and PPP loans, and funding from revolving lines of credit, and merchant financing companies.   Table 8 below summarizes the deposits from loans by year.   The loan deposits are summarized on **Schedule D.**

---

[49] Many Investors financed their investments with loans.  The total amount in loans obtained by Investors and deposited into WS Entities' bank accounts was $67.7 million.
[50] Over $101,523,736 in bond funds were deposited into the WSM's bank accounts.  The Main Operating Bank Account accounts for $97,759,786 in bond funds, and excludes the $3,763,950 deposited into WSM's Bank of America A/C 1258, that is not part of our analysis.

**Table 8. – Cash Deposits from Loans by Year**

| Year | Bond Proceeds | Other Loan Proceeds | Total | % of Total |
|---|---|---|---|---|
| 2018 | $ - | $ - | $ - | 0.0% |
| 2019 | - | 300,300 | 300,300 | 0.2% |
| 2020 | - | 24,025,598 | 24,025,598 | 15.4% |
| 2021 | - | 1,197,307 | 1,197,307 | 0.8% |
| 2022 | 51,388,903 | 11,383,693 | 62,772,596 | 40.1% |
| 2023 | 30,592,105 | 19,569,939 | 50,162,044 | 32.1% |
| 2024 (9 mos.) | 15,778,778 | 2,253,000 | 18,031,778 | 11.5% |
| **TOTAL** | **$ 97,759,786** | **$ 58,729,837** | **$ 156,489,623** | **100.0%** |

~~79.~~81. **Cash Deposits from Operations:** The fourth largest category are cash deposits into the Main Operating Bank Accounts relating to business operations totaling $82.2 million, or 11% of total cash deposits. This category includes items such as cash receipts from the sale of water and vending machine products, vendor rebates, payouts from insurance companies, and refunds from taxing agencies. The bank statements show that 64.1% of the cash deposits ($52.7 million) were deposited into Refreshing's bank account. Table 9 below summarizes the cash deposits from operations by year.

**Table 9. – Cash Deposits from Operations by Entity**

| Year | Creative | WSM | Refreshing | Ideal | Total |
|---|---|---|---|---|---|
| 2018 | $ 112,134 | $ 152,606 | $ - | $ - | $ 264,740 |
| 2019 | 411,717 | 390,793 | - | - | 802,511 |
| 2020 | 218,266 | 1,927,174 | - | - | 2,145,440 |
| 2021 | 399,999 | 2,380,064 | 11,736,081 | 256,475 | 14,772,619 |
| 2022 | 494,545 | 3,479,672 | 23,749,604 | 1,415,274 | 29,139,095 |
| 2023 | 504,655 | 9,652,616 | 17,134,341 | 2,022,187 | 29,313,799 |
| 2024 (9 mos.) | 79,045 | 4,949,978 | 123,790 | 655,086 | 5,807,899 |
| **Total** | **$ 2,220,362** | **$ 22,932,904** | **$ 52,743,816** | **$ 4,349,022** | **$ 82,246,103** |
| *% of Total* | *2.7%* | *27.9%* | *64.1%* | *5.3%* | *100.0%* |

1601824860.1

80.82.  **Deposits from Insiders:** The last category is deposits of cash from Insiders totaling $9.2 million, as summarized in Table 10, and detailed on **Schedule E**.  The sources of the funds include Wear's personal Bank of America and Wells Fargo bank accounts totaling $6,672,897, Pistol Inc. totaling $10,000, and Richard Wear totaling $61,200.  The sources of funds also include cash received from Jordan Chirico and Tyler Sadek totaling $500,000 and $1,981,000, respectively.  As further discussed below, Wear received $6,297,202 in cash from the Debtors and the deposits from him were simply a recycling of this cash he received from the Debtors.

**Table 10. – Cash Deposits from Insiders**

| Year | Amount | % of Total |
|---|---|---|
| 2018 | $        746,652 | 8.1% |
| 2019 | 1,032,695 | 11.2% |
| 2020 | 899,000 | 9.7% |
| 2021 | 1,831,200 | 19.9% |
| 2022 | 890,500 | 9.7% |
| 2023 | 3,556,750 | 38.6% |
| 2024 (9 mos.) | 268,300 | 2.9% |
| **TOTAL** | **$     9,225,097** | **100.0%** |

81.83.  As summarized in Table 11 below, the deposits into the Main Operating Bank Accounts were largely comprised of money from intercompany transactions (36.9%) and Investor funds (30%).  When comparing money from Investors to "new" funds deposited into the account (i.e., excluding the intercompany transfers), the Investor funds account for 47.6% of money deposited into the Main Operating Bank Accounts.[51]  The WS Entities also received substantial proceeds from loans, totaling over $156.5 million, or 20.9% of total deposits into the Main Operating Bank Accounts.

---

[51] 47.6% is calculated as follows:  $226.3 million divided by $473.3 million  [$750 million in total deposits, minus $276.7 million in intercompany transfers].

1601824860.1

82.84. Critically, WS Entities' business operations represented only 11% of total deposits into the Main Operating Bank Accounts.

**Table 11. - Total Cash Deposits into the Main Operating Bank Accounts by Category**

| Category | Amount | % of Total |
|---|---|---|
| Intercompany Transfers | $ 276,677,484 | 36.9% |
| Investor Funds | 225,343,685 | 30.0% |
| Bank Loans & Bond Deposits | 156,489,623 | 20.9% |
| Cash Deposits from Operations | 82,246,103 | 11.0% |
| Deposits from Insiders | 9,225,097 | 1.2% |
| **TOTAL** | **$ 749,981,992** | **100.0%** |

83.85. As illustrated in Chart 4 below, the WS Entities earned minimal revenue from operations (yellow bars) during the period 2018 through 2021. The majority of the cash deposited into WS Entities' bank accounts during this time period were Investor funds (blue bars). Starting in the second quarter of 2022, the WS Entities began relying on loans from banks and third-party lenders (purple bar), and bond funds (orange bars) as it was no longer able to secure funding from new Investors. The chart demonstrates that the WS Entities operated as a Ponzi scheme utilizing new Investor funds to pay existing Investors (pink line) and to fund the operations of the WS Entities. When the WS Entities stopped received cash infusions for new Investors, they relied on loans from banks and third parties to perpetuate the illusion of a legitimate business.

1601824860.1

**Chart 4 – Composition of Cash Deposits**



### 2. Disbursements and Withdrawals

~~84.~~86. The bank records show that during the period January 2016 through September 2024, there were ~~47,880~~ 49,709 transactions totaling over $751 million withdrawn from the Main Operating Bank Accounts. My investigation of disbursements from the Main Operating Bank Accounts shows that the WS Entities used Investor funds for other purposes, including paying expenses and obligations unrelated to Creative's operations, paying Investors, purchasing real estate assets and vending machine companies, and making loan payments. A summary of my sources and uses analysis for the Main Operating Bank Accounts can be found in **Schedule A**. I

1601824860.1

have categorized these uses into the following categories: intercompany transactions, operating expenses, Investor payments, purchases of assets, and payments to insiders.

85.87.  **Intercompany Transactions:** The largest category of uses were intercompany transfers of funds out of the Main Operating Bank Accounts into other WS Entities bank accounts and accounts owned by subsidiaries, related entities, and affiliates.  Over $305.9 million, or 40.7% of total cash withdrawals were transferred out of the Main Operating Bank Accounts during the period January 2018 through September 2024, as summarized in Table 12 below.

86.88.  The volume of intercompany transfers of money out of the Main Operating Bank Accounts was 81% greater than intercompany transfers of money in, which is highly indicative of commingling of funds. In addition, the intercompany transactions allowed Wear to transfer funds to the entity that needed cash on any given day to make Investor payments, to pay expenses, or to withdraw funds for acquisitions, perpetuating an illusion of a legitimate business.  The increase in intercompany transactions in 2022 and 2023 was due to WSM transferring bond funds to other WS Entities bank accounts and bank accounts owned by related entities. A summary of the intercompany transfers by bank account and by year can be found in **Schedule B**.

**Table 12. - Total Intercompany Transactions**

| Year | Total Intercompany Transactions Out | % of Total | Number of Transactions | % of Total |
|---|---|---|---|---|
| 2018 | $        7,818,068 | 2.6% | 207 | 4.5% |
| 2019 | 9,740,164 | 3.2% | 171 | 3.7% |
| 2020 | 21,385,702 | 7.0% | 285 | 6.1% |
| 2021 | 35,304,838 | 11.5% | 359 | 7.7% |
| 2022 | 119,772,227 | 39.1% | 1,627 | 35.1% |
| 2023 | 99,958,862 | 32.7% | 1,523 | 32.9% |
| 2024 (9 mos.) | 12,009,986 | 3.9% | 464 | 10.0% |
| **Total** | **$    305,989,845** | **100.0%** | **4,636** | **100.0%** |

1601824860.1

~~87.~~89.  **Operating Expenses:**  The second largest category of cash disbursements were payments of operating expenses paid from the Main Operating Bank Accounts, including, but not limited to manufacturing and equipment costs, direct labor, professional fees, broker fees, inventory and supplies, and commissions, in addition to overhead costs such as rent, salaries and wages, commissions, and insurance.  As summarized in Table 13, total cash disbursements from operations totaled $~~173.5~~ 169.7 million, or ~~23.1~~22.6% of total cash withdrawals.  Total cash disbursements for operating expenses for each entity can be found in **Schedule A**.

### Table 13. - Operating Expenses

| Year | Amount | % of Total |
|------|--------|------------|
| 2018 | $ 9,654,623 | ~~5.6~~5.7% |
| 2019 | 15,772,902 | ~~9.1~~9.3% |
| 2020 | 26,694,721 | ~~15.4~~15.7% |
| 2021 | ~~46,279,035~~ 45,693,071 | ~~26.7~~26.9% |
| 2022 | ~~31,082,374~~ 30,678,754 | ~~17.9~~18.1% |
| 2023 | ~~28,995,597~~ 26,194,735 | ~~16.7~~15.4% |
| 2024 (9 mos.) | 15,028,740 | ~~8.7~~8.9% |
| **TOTAL** | $ ~~173,507,992~~ 169,717,545 | **100.0%** |

→ Formatted Table

~~88.~~90.  **Investor Payments:**  The third largest category of cash disbursements were payments to Investors, which totaled $~~120.4~~127.5 million, or ~~16~~17% of total cash disbursements, as summarized in Table 14.  Investor payments were paid primarily from WSM and Creative bank accounts.  The payments include monthly Investor payments, as well as the buyback of water machines.  A summary of Investor payments can be found in **Schedule C**.

89.91. The use of Creative's money for Investor payments indicates that the WS Entities never generated sufficient revenues from operations, and Wear relied on new Investor funds in order to pay old Investors until he could no longer attract new investors.

90.92. The use of Creative, Ideal, and Refreshing money to pay Investors shows Wear's disregard of the corporate structure of the WS Entities and commingling of obligations among the affiliated entities. Payments from Creative to the Investors are further evidence of a Ponzi scheme. Creative sold water machines to Investors; therefore, there would be no business reason for Creative to pay Investors, unless it was buying back the water machines. WSM was responsible for making monthly payments to Investors, as set forth in the Service and Management Agreements.

**Table 14. - Total Payments to Investors**

| Year | WSM | Creative | Ideal | Refreshing | Total |
|---|---|---|---|---|---|
| 2018 | $ 2,233,467 | $ 739,889 | $ - | $ - | $ 2,973,356 |
| 2019 | 5,217,742 | 2,432,074 | | | 7,649,816 |
| 2020 | 6,515,223 | 9,301,504 | - | - | 15,816,727 |
| 2021 | ~~12,705,933~~ 13,291,897 | 18,308,038 | 11,407 | 480,500 | ~~31,505,878~~ 32,091,843 |
| 2022 | ~~32,422,404~~ 32,826,024 | ~~12,009,151~~ 11,754,421 | - | - | ~~44,431,555~~ 44,580,445 |
| 2023 | ~~14,867,871~~ 21,188,955 | 2,658,172 | 61,148 | - | ~~17,587,192~~ 23,908,275 |
| 2024 (9 mos.) | 143,709 | 296,905 | - | 13,462 | 454,076 |
| **Total** | $ ~~74,106,350~~ **81,417,018** | $ ~~45,745,733~~ **45,491,003** | $ **72,556** | $ **493,962** | $ ~~120,418,600~~ **127,474,538** |
| *% of Total* | *~~61.5~~63.9%* | *~~38.0~~35.7%* | *0.1%* | *0.4%* | *100.0%* |

91.93. **Loan Obligations:** This category of disbursements represents loan payments to the banks, mortgage providers, merchant financing companies, and the U.S Bank Collection Account pursuant to the Indenture Agreement. In total, $~~65.5~~61.8 million, or ~~8.7~~8.2% of total cash

disbursements related to loans, as summarized in Table 15.  **Schedule F** summarizes the loan obligation payments by year for each entity.

**Table 15. - Cash Disbursements – Loan Obligations**

| Year | Amount | % of Total |
|---|---|---|
| 2018 | $ - | 0.0% |
| 2019 | 92,412 | 0.1% |
| 2020 | 807,092 | ~~1.~~1.3% |
| 2021 | 3,918,826 | ~~6.0~~6.3% |
| 2022 | 17,249,308 | ~~26.3~~27.9% |
| 2023 | ~~37,723,164~~ 34,042,743 | ~~57.6~~55.0% |
| 2024 (9 mos.) | 5,735,675 | ~~8.8~~9.3% |
| **TOTAL** | $ ~~65,526,477~~ 61,846,056 | **100.0%** |

~~92.~~94.  **Purchases of Assets:**  This category of disbursements represents the use of cash to acquire real estate properties and vending companies.  WS Entities used Investor funds, bond funds, and loan funds to acquire these assets.  In total, $~~62.6~~62.3 million, or ~~148.3~~48.3% of total cash disbursements related to the acquisition of real properties and other vending companies, as summarized in Table 16.  **Schedule G** summarizes the bank transactions associated with the purchase of real estate and **Schedule H** summarizes the bank transactions associated with the purchase vending companies on behalf of Summit, Refreshing Texas, and other acquisitions.

1601824860.1

**Table 16. - Purchases of Assets**

| Year | Amount | % of Total |
|---|---|---|
| 2018 | $ 132,068 | 0.2% |
| 2019 | 7,288,394 | 11.7% |
| 2020 | 21,619,648 | 34.7% |
| 2021 | 27,272,603 | 43.8% |
| 2022 | 4,733,042 | 7.6% |
| 2023 | 1,272,551 | 2.0% |
| 2024 (9 mos.) | 14,329 | 0.0% |
| **Total** | **$ 62,332,635** | **100.0%** |

~~93.~~95.  **Payments to Insiders:**  This category consists of over $~~23.2~~23.6 million in disbursements to Insiders, including Wear, entities controlled by him, including Pistol Inc., and transactions posted to the "Ryan Wear" general ledger account in the WS Entities' accounting books and records.  The most significant transaction is a $5 million payment to Pistol Inc. on December 20, 2020 using Investor funds.  Pistol, Inc. is an entity controlled by Wear that owns a recycling business, real estate, and a gas station, all of which are unrelated to the water or vending machine business.[52]

~~94.~~96.  Wear also received cash totaling $6,297,202 from Debtors.  As noted above, any cash deposits received from Wear were simply a recycling of the cash he received from the Debtors.

~~95.~~97.  This category also includes large unsubstantiated and undocumented payments that benefitted Tyler Sadek ("Sadek") totaling $~~3,449,610~~3,864,540 and Jordan Chirico ("Chirico"), formerly employed by 352 Capital, totaling $6,718,539.  The amounts paid to Chirico include three payments totaling over $~~4.7~~4.6 million to Newtech Small Business for the payoff of a loan in the

---

[52] Deposition of Ryan Wear In the Matter of Ryan Wear, et al., dated November 14, 2023, page 177, lines 3-23; page 178, line 1.

1601824860.1

name of C3 Capital, the company owned by Chirico.[53]   These loan payoffs were made on September 30, 2022, at the direction of Wear using bond proceeds.[54]   There does not appear to be any documentation to support the business reason why Wear would use WSM funds to paydown loans unrelated to the management and servicing of water machines, or to pay Sadek and Chirico.

~~96.~~98.   A summary of the cash disbursements made to insiders is summarized in Table 17 below and detailed in **Schedule E**.

**Table 17. - Cash Disbursements – Insiders**

| Year | Amount | % of Total |
|------|--------|------------|
| 2018 | $  1,395,890 | ~~6.0~~5.9% |
| 2019 | 1,265,501 | 5.4% |
| 2020 | 8,749,300 | ~~37.7~~37.0% |
| 2021 | 3,544,080 | ~~15.3~~15.0% |
| 2022 | ~~6,589,950~~ 6,844,680 | ~~28.4~~28.9% |
| 2023 | ~~1,687,880~~ 1,848,080 | ~~7.3~~7.8% |
| 2024 (9 mos.) | 3,000 | 0.0% |
| **TOTAL** | $  ~~23,235,600~~ 23,650,530 | **100.0%** |

~~97.~~99.   As summarized in Table 18 below, 40.7% of cash disbursements from the Main Operating Bank Accounts were comprised of money from intercompany transactions; 23.1% comprised of operating expenses; 16.0 % comprised of payments to Investors; and 8.7% comprised of loan payments.   When excluding the intercompany transfers from the outflows of money, operating expenses comprised of 39% of cash disbursements while Investor Payments comprised of 16%.

---

[53] Declaration and Affirmation of Jeremy Briggs, dated May 29, 2025, ¶39.
[54] *Ibid.*, Exhibits 57 and 58, attached as Exhibits F & I to the O'Malley Decl.

1601824860.1

**Table 18. - Cash Disbursements by Category**

| Category | Amount | % of Total |
|---|---|---|
| Intercompany Transfers | $ 305,989,845 | 40.7% |
| Operating Expenses | ~~173,507,992~~ 169,717,545 | ~~23.1~~22.6% |
| Investor Payments | ~~120,418,600~~ 127,474,538 | ~~16.0~~17.0% |
| Loan Payments | ~~65,526,477~~ 61,846,056 | ~~8.7~~8.2% |
| Acquisitions | 62,332,635 | 8.3% |
| Payments to Insiders | ~~23,235,600~~ 23,650,530 | 3.1% |
| **TOTAL** | **$  751,011,149** | **100.0%** |

**3. Consolidated Sources and Uses**

~~98.~~100.        From the beginning, the WS Entities did not generate sufficient revenues from operations to meet their obligations to the Investors or to pay operating expenses, as summarized in Table 19 below.  The WS Entities were wholly dependent on Investor funds and intercompany transfers to remain sustainable during the initial years (2018 through 2022), and third-party loans and bonds in the subsequent years prior to the receivership and bankruptcy.

**Table 19. - Comparison of Revenues from Operations to**
**Investor Payments and Operating Expenses**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Jan - Sept 2024 | Total |
|---|---|---|---|---|---|---|---|---|
| **Revenues from Operations** | $    264,740 | $    802,511 | $    2,145,440 | $    14,772,619 | $    29,139,095 | $    29,313,799 | $    5,807,899 | $    82,246,103 |
| Less: Payments to Investors | $    (2,973,356) | $    (7,649,816) | $    (15,816,727) | $    (32,091,843) | $    (44,580,445) | $    (23,908,275) | $    (454,076) | $    (127,474,538) |
| **Subtotal** | **$    (2,708,616)** | **$    (6,847,306)** | **$    (13,671,287)** | **$    (17,319,223)** | **$    (15,441,350)** | **$    5,405,524** | **$    5,353,823** | **$    (45,228,435)** |
| Less: Operating Expenses | $    (9,654,623) | $    (15,772,902) | $    (26,694,721) | $    (45,693,071) | $    (30,678,754) | $    (26,194,735) | $    (15,028,740) | $    (169,717,545) |
| **Total Shortfall** | **$    (12,363,239)** | **$    (22,620,208)** | **$    (40,366,008)** | **$    (63,012,294)** | **$    (46,120,104)** | **$    (20,789,211)** | **$    (9,674,916)** | **$    (214,945,980)** |

1601824860.1

99. 101.    The Timeline of Sources and Cash Infusion (Chart 5 below) demonstrates that during the first three years, WS Entities relied on Investor Funds (blue bars) to maintain monthly payments to Investors (black line) and cover operating expenses (red line).   WSM received loan proceeds from First Fed (purple bars) deposited into Creative's bank account in December 2020.  Although a large portion of First Fed loans was used to purchase real estate, the bank records show that the loan proceeds were also used for Investor payments and operating expenses.  In 2022, the amount of funds from new Investors decreased significantly, and WSM's scheme would have likely unraveled had it not secured bond funding (orange bars) starting in April 2022.

**Chart 5 – Timeline of Sources of Cash Infusion**



1601824860.1

~~100.~~102.    This chart illustrates that the WS Entities experienced cash liquidity issues starting in March 2018, when they began using Investor funds to make monthly payments to Investors.  The WS entities were never sufficiently capitalized or profitable from the start, contrary to the marketing materials provided to Investors.  Wear has testified that Investor funds received by Creative did not get used for any other purpose other than covering costs associated with building or buying water machines and day-to-day operating expenses,[55] the bank records unequivocally show that this was not the case, as new Investor funds were used to make Investor payments, purchase real estate, cover operating expenses, and pay insiders.

**B.  Analysis of Available Cash Flow**

~~101.~~103.    The bank account activity demonstrates a consistent pattern of deposits or transfers being made from various sources, including Investor funds, intercompany transfers, and to a much lesser extent, business operations.   These funds were then immediately disbursed, leaving a cash available balance near zero (and in some instances, a negative account balance) at the end of each month.  Chart 6 below shows the monthly ending balances for the WS Entities for the period January 2018 through September 2024. The chart demonstrates that on a consistent basis, cash disbursements (i.e., Funds Out) exceeded cash receipts (i.e., Funds In).  There is no build-up of funds or cash reserves, which reflects the absence of operating revenues generated from business activities, and WS Entities' reliance on the infusion of cash from new Investors, loans, and intercompany transfers.

---

[55] Deposition of Ryan Wear In the Matter of Ryan Wear, et al., dated November 15, 2023, page 203, lines 1-23.

1601824860.1

**Chart 6 – Bank Account Monthly Ending Balances**



102.104. Internal emails between Wear and employees also support that the WS Entities did not have adequate capital, experienced cash flow issues, and could not pay their debts.[56] Table 20 below provides excerpts from internal email correspondences discussing cash flow issues.

**Table 20. - Select Internal Emails Regarding Cash Flow Issues**

| Email Date | Name | Email Excerpt |
|---|---|---|
| 5/5/2021 | Email from Michael Cloutier (Refreshing) to Wear | Colorado needs $57,126 to cover Vistar, taxes and other expenses. We will be close on Pepsi based on what the A/P shows now. A contributor to the cash needed situation is the start-up of the Denver warehouse. In addition, Vistar has cut off deliveries due to cash flow issues in Colorado. |

---

[56] Internal emails discussing cash flow issues are attached as Exhibit L to the O'Malley Decl.

1601824860.1

| Email Date | Name | Email Excerpt |
|---|---|---|
| 8/25/2021 | Email from Michael Cloutier (Refreshing) to Wear | Texas needs a cash deposit of $105,305 this week. Their payroll will hit Thursday morning in the amount of $100,786 so most of the cash needed this week is for payroll. |
| 12/15/2021 | Email from Ryan Wear | …This still leaves a cash shortfall of $1.2 million this week until the refinance of the real estate is completed. |
| 4/12/2022 | Email from Jeff Greco to Ryan Wear | Here are my thoughts on the Top 3 things that would make a difference to help manage your cash flow and insure [sic] your obligations are met…. <br> 1. Measure cash bank account balances <br> 2. Set reserves for each bank account/business unit <br> 3. Monthly cash inflow/outflow report |
| 6/18/2022 | Email from Ryan Wear | At the rate we are deploying we are spending far more in interest and revenue losses than what we could be paying in extra costs to deploy the units. |
| 7/6/2022 | Email from Mike Melton (Refreshing) | We really need a call to discuss the current situation as it relates to our cash flow. We are losing sales, opportunities, accounts, and people due to the current mess we are experiencing. Without any indication from Jeremy as to a timely resolution; I think we may need to consider other options and discuss potential ramifications. |
| 7/7/2023 | Email from Audry Case (Refreshing) | Jeremy – Just wanted you to be aware. I didn't send VendPro a check this week for Vistar invoices due to cash flow issues. My check register balance today is -$33,680.48 if all outstanding checks were to clear. |
| 6/26/2023 | Email from First Fed Bank to Ryan Wear | …friendly reminder that your 6/24 payment is due for 8825 LLC. Currently there are not sufficient funds in the Creative Tech account ending in #905 to pull the payment. |
| 8/1/2023 | Email from First Fed Bank to Ryan Wear | Creative's checking account does not have enough funds to cover the payment. Current balance is 36.51. |
| 8/26/2023 | Email from Ryan Wear | We are still experiencing some big cash flow issues. We will resolve these with funds coming from Cadence combined with other financing expected to close in September. |

## C. Examples of New Investor Funds Paying Out Investors

~~103.~~ 105.　　Analysis of the bank statements for this time period reveals a consistent pattern of funds flowing into Creative from Investors, and on the same day or a few days after, funds would be transferred either to pay existing Investors or to another entity to cover some other expense. The following charts are examples showing the use of new Investor funds to pay earlier Investors, as well as obligations of the WS Entities

1601824860.1

**Chart 7. – March 23, 2018**



104.106. In Chart 8 below, $132,067.76 in Investor funds was paid to Alliance Title

Corporation to acquire the property located at 10436 S. Harrison Avenue, Posen, IL.

**Chart 8. – October 24, 2018**



1601824860.1

**Chart 9. – February 20, 2019**



**Chart 10. – January 20, 2020**



1601824860.1

105.107.    In Chart 11 below, Investor funds were used to pay $225,000 to Chicago Title and $300,000 to Roberts Coffee Vending.  These two transactions totaling $525,000 were recorded as "Summit Management Acquisitions" in Creative's accounting records.

**Chart 11. – July 13, 2020**



## Chart 12. – September 22, 2020



## Chart 13. – February 16, 2021



1601824860.1

**Chart 14. – March 25, 2022**



### D. Analysis of Intercompany Transfers and Evidence of Commingling

~~106.~~ 108.    Two common characteristics of a Ponzi scheme are the lack of profits from business operations and using "new" investor funds to pay "old" investors.    This implies that in the absence of cash flow from earnings, investors are paid through an infusion of additional cash from new investors or other capital sources. Because of these transfers of funds from one source to another, investors' funds cannot be traced to specific business operations. When a company

1601824860.1

commingles funds and operates at a loss while continuing to pay the old investors, the money to pay the old investors necessarily comes from new investments.[57]

~~107.~~109.     The WS Entities' bank records show 4,627 intercompany transfer transactions to and from bank accounts for 30 different related entities. The number of intercompany transactions is summarized in Table 21 below.  Wear disregarded corporate formalities and transferred money from one entity to the entity that needed cash on any given day to make Investor payments, pay expenses, or to acquire real estate property and vending companies, perpetuating an illusion of a legitimate business.  A summary of the intercompany transfers by bank account and by year can be found in **Schedule B**.  The commingling of Investor funds, intercompany transfers, and deposits of cash receipts from operations are so entangled that it would be insurmountable to unwind.

**Table 21. - Intercompany Transfers Transaction Count**

| Year | Transfers In | Number of Transactions - Transfers In | Transfers Out | Number of Transactions -Transfers Out |
|---|---|---|---|---|
| 2018 | $    5,134,160 | 74 | $    7,818,068 | 20~~74~~ |
| 2019 | 8,605,896 | 82 | 9,740,164 | 171~~0~~ |
| 2020 | 18,316,259 | 134 | 21,385,702 | 285~~2~~ |
| 2021 | 26,507,518 | 125 | 35,304,838 | 359~~8~~ |
| 2022 | 110,860,735 | 784 | 119,772,227 | 1,627~~6~~ |
| 2023 | 98,086,282 | 925 | 99,958,862 | 1,523 |
| 2024 (9 mos.) | 9,166,633 | 440 | 12,009,986 | 464 |
| **Total** | **$ 276,677,484** | **2,564** | **$    305,989,845** | **4,636~~27~~** |

Formatted Table

---

[57] *Miller v. Wulf*, 84 F. Supp. 3d 1266, 1273–74 (D. Utah), aff'd, 632 F. App'x 937 (10th Cir. 2015); *see also In re Hedged–Invs. Assocs., Inc.*, 48 F.3d 470, 474 (10th Cir. 1995).

1601824860.1

**1. Accounting Records Evidence of Commingling**

~~108.~~110.　　The intercompany transfers are recorded in a manner that does not provide any transparency regarding the source (i.e., originating) or use (i.e., recipient) bank account of the funds or how the funds were used.  Instead, the intercompany transactions are lumped into one general ledger account called *Intercompany Receivable/Payable*.  The pooled general ledger account also includes entries for other types of transactions, including cash receipts, cash disbursements, ACH transactions, and large bulk journal entries. However, many of these transactions contain missing information (e.g., the name field is blank or cannot determine the originating or recipient bank account), and therefore, it becomes difficult to distinguish whether the transactions are related to Investors, loans, or goods and services, etc.

~~109.~~111.　　Intercompany transfers between entities were not recorded in a consistent manner in the WS Entities' QuickBooks.  For example, there are instances in which intercompany transactions between Creative and WSM were categorized as an *Intercompany Receivable/Payable* in Creative's accounting, but were categorized to a different general ledger account in WSM's accounting.  There are also large bulk journal entries, typically on a quarterly basis, that appear to reclassify the intercompany transactions to specific revenue, expense, assets, or liabilities accounts.  However, the journal entries provide no detail about which specific transactions are being reclassified.  The *Intercompany Receivable/Payable* report from Creative and WSM are attached as **Schedule N**.

~~110.~~112.　　The Intercompany Receivable/Payable accounts were also not reconciled on a periodic basis, as evidenced by the unusually large balances.  Intercompany accounts should be reconciled and netted to zero on a monthly basis, however WSM's accounting records show that they were never reconciled and at December 31, 2023, reflect a negative balance (i.e.,

1601824860.1

amount owed) of $60,184,591. Furthermore, because many of the transactions contain missing information, it is impossible to determine the exact make-up of the negative balance.

111.113.    In summary, the large volume of intercompany transfers and inadequate tracking of these transactions in the accounting books and records is highly indicative of and consistent with a Ponzi scheme. The extensive commingling of the financial activities of the WS Entities are indicators of a lack of distinction among the entities and Wear is managing and operating the WS Entities as a single, consolidated enterprise.

**2. Commingling of Assets and Liabilities**

112.114.    Other examples of commingling include the payment and recordation of transactions that belong to another entity.  These types of transactions were prevalent among the WS Entities and are highly indicative of a Ponzi scheme.  Representative examples included the following:

a.  Approximately $25.3 million in cash disbursements from Creative's and WSM's bank accounts were used to acquire real estate properties on behalf of Ideal during the period October 2018 through October 2023.  These transactions are discussed in further detail in *Section G* below.

b.  Approximately $32.1 million in cash disbursements from Creative's and WSM's bank accounts were used to acquire vending companies on behalf of Summit during the period May 2019 through October 2022.  Approximately $15 million was expended from Creative's bank account during the period May 2019 through the beginning of December 2000, when the only sources of new funds were deposits from Investors. The acquisitions of these vending companies were recorded on Creative's financial statements, even though the assets were acquired by Summit.  This issue was raised by Creative's CPA firm in 2020 who proposed accounting journal entries to "remov[e]

1601824860.1

assets capitalized in 2020 that belong to related parties, not Creative Technologies."[58] Incorrectly recording assets owned by another entity is a common way to misrepresent a company's financial condition by potentially overstating assets or portraying a healthier financial position.

c. Approximately $4 million in cash disbursements from Creative's bank accounts were used to acquire vending companies on behalf of Refreshing Texas during the period November 2019 through March 2021.

d. Over $1.1 million in cash disbursements in April 2023 from WSM's bank accounts were used to acquire shares of stock in KGBH Enterprises.[59] This transaction occurred around the time when payments to Investors were delayed and inconsistent (see Chart 3).

e. Cash disbursements were made in 2022 and 2023 totaling $123,100 from Creative's bank account to Cadence Bank for the benefit of Ideal, as shown in the bank statement excerpt from Creative BOA A/C 6352. These transactions were recorded as "Rent Expense" in Creative's accounting books and records.

| 01/20/23 | WIRE TYPE:WIRE OUT DATE:230120 TIME:1213 ET TRN:2023012000326642 SERVICE REF:009552 BNF:IDEAL PROPERTY INVESTMENTS ID:78547247 BNF BK: CADENCE BANK ID:084201278 PMT DET:231KB41021K41729 Ideal Property Investments | 903701200326642 | 25,000.00 |

f. Cash disbursements were made in 2019 through 2023 totaling $210,294 from Creative's bank account to Western Alliance to service the loan for 3422 W. Clarendon Ave LLC, as shown in the bank statement excerpt from Creative BOA A/C 6352.

---

[58] See Transaction Journal PAJE #6 dated 12/31/2020 printed from Creative's QuickBooks files attached as Exhibit M to the O'Malley Decl.
[59] See Stock Purchase Agreement between KGBH Enterprises Inc. and WSM entered into April 5, 2023 [REL_IDPROP_ECA_00058102_0005] attached as Exhibit A to the O'Malley Decl.

Page 58 of 70

1601824860.1

24-01863-FPC11    Doc 1244-2    Filed 09/04/25    Entered 09/04/25 20:00:24    Pg 62 of 74

These transactions were also recorded as "Rent Expense" in Creative's accounting books and records.



g. Wear also set up automatic payments from WSM's and Creative's bank accounts to service loans obligations for Ideal, Summit, and 8825 LLC.[60]



From: Kasi O'Leary <Kasi.OLeary@ourfirstfed.com>
Sent: Monday, May 1, 2023 12:52 PM
To: Ryan Wear <rwear@waterstationtechnology.com>
Cc: Bailey Page <Bailey.Page@ourfirstfed.com>
Subject: RE: April Payment status?

Thanks Ryan, will get on this asap.

Here is a breakdown on the other loans' payments and where they are set up from for Automatic payments.

Ideal Properties-Everett #...858 – comes from WSM account #...502
Ideal Properties-Tualatin #...678 – comes from WSM account #...502
8825 LLC-Kent – comes from Creative Tech account #...905
Summit Management - #...616 – comes from Creative Tech account #...905

With that said, with your authorization we can pull the funds from any account with us, since the automatic payments have already passed, we will have to manually post these anyway.

Thanks!

## E. Reliance on Loans

## 1. Bond Funds

~~113.~~115.        While one source of funds in a typical Ponzi scheme relies upon a continual source of new Investor funds, third-party financing frequently provides Ponzi operators with access to funds essential to continued maintenance of the scheme when investor cash flow diminishes. Loans allow the organizer to continue to make promised Investor payments in furtherance of the Ponzi scheme and to cover operating losses due to low or nonexistent legitimate income-producing activity.

---

[60] A09389-0012-009857 attached as Exhibit N to the O'Malley Decl.

1601824860.1

114.116.    Through WSM, the WS Entities received over $97.7 million of bond funds during the period April 2020 through April 2024.[61]  The WS Entities experienced critical cash flow issues at the beginning of 2022.  Debtors' scheme would have likely unraveled had it not secured the bond funding pursuant to the Indenture Agreement.

115.117.    Debtors also relied on third-party loans to provide the liquidity to make monthly Investor payments and water machine buyback payments.

116.118.    As shown in Table 22, the ending bank account balances for Creative and WSM during the first quarter of 2022 became alarmingly low, as compared to the prior 12-month period.

**Table 22. - Comparison of Bank Account Ending Balances:
2021 vs. First Three Months of 2022**

|  | WSM Bank Accounts | Creative Bank Accounts |
|---|---|---|
| Average Ending Bank Account Balance – Dec 2021 | $    1,699,272 | $    10,771,220 |
|  |  |  |
| Ending Account Balance - Jan 2022 | $       220,916 | $         621,517 |
| Ending Account Balance - Feb 2022 | $       138,657 | $         826,018 |
| Ending Account Balance - March 2022 | $         85,034 | $           30,950 |

117.119.    A deeper analysis into the WS Entities' uses of the bond proceeds also reveals the common patterns of a Ponzi scheme.  The Indenture Agreement, for example, prohibited the use of the bond proceeds for any purposes other than to prepay rents, acquire additional water machines, and to repay the debts and liabilities owed by Ideal to United Business

---

[61] Between April 2022 and February 2024, WSM issued $115,425,000 in notes pursuant to the Indenture Agreement: $91,125,000 in Class A notes held by 352 Capital and TWI.  During the same period, WSM issued $24,300,000 in Class B Notes held by the same parties.  The $97.7 million described here represents the bond funds deposited into the Main Operating Bank Accounts, and excludes the bond funds deposited into WSM BOA A/C 1258.

1601824860.1

Bank.[62]  As summarized in Table 23, over half of the bond funds were transferred out to other WS Entities bank accounts and approximately $12.7 million was used to pay Investor monthly payments.

**Table 23. - Uses of Bond Funds**

| Description | Amount | % of Total |
|---|---|---|
| Intercompany Transfers Out | $ 58,432,374 | 59.8% |
| Investor Payments | 12,292,733 | 12.6% |
| Operating Expenses | 12,096,132 | 12.4% |
| Bond Obligation | 7,624,519 | 7.8% |
| Loan Payments | 7,064,028 | 7.2% |
| Acquisition | 200,000 | 0.2% |
| Payments to Insider | 50,000 | 0.1% |
| **Total** | **$ 97,759,786** | **100%** |

~~118.~~120.     In addition to payments to investors, the WS Entities used bond funds to purchase real estate and vending companies, and repay loan obligations of an affiliated party.  A large portion of the bond funds was transferred to other entities through multiple bank accounts.  This evidence is highly indicative of a Ponzi scheme because it creates the appearance of legitimate activity while obscuring the flow of funds in order to conceal the unauthorized activity.  This was corroborated by Briggs who stated that bond proceeds were generally used for purposes other than buying water machines, and used to "pay virtually every other kind of business expense imaginable, including costs to service Water Machines, payments to service outstanding and overdue loans, commercial lease payments, payroll payments, commission payments to retailers, vendor payments, and payments to franchisees."[63]

---

[62] Section 7.6(e) of the Indenture Agreement.
[63] See Declaration and Affirmation of Jeremy Briggs, dated May 29, 2025, ¶33 – ¶35.

1601824860.1

119.121. The following flow charts are two examples of the use of bond funds on a single day following the deposit of bond funds into WSM's bank account. The volume of transactions that occurred on a single day and the types of transactions, again, are highly indicative of a Ponzi scheme.

120.122. Chart 15 below illustrates that bond funds were transferred to other entities and through multiple bank accounts, and that the bond funds benefited Ideal and Refreshing.

**Chart 15 – Example of Use of Bond Funds for Intercompany Transfers**



121.123. Chart 16 below illustrates that WSM engaged in the unauthorized use of bond funds contrary to the bond Indenture Agreement. On August 23, 2022, upon receipt of $3,883,125 in bond funds, WSM initiated 153 banking transactions that included payments to Investors and intercompany transfers to Refreshing and Creative. The bank records also show that Refreshing and Creative utilized the funds received from the intercompany transfers to pay Investors and loans, and none of the funds were used to acquire water machines.

1601824860.1

**Chart 16. - Uses of Bond Funds – August 23, 2022 (153 transactions)**



### 2. Loans from Merchant Cash Advance Companies

~~122.~~ 124.     Starting in July 2022, Wear, through the WS Entities, also relied on cash advances from Merchant Cash Advance ("MCA") companies.[64]   MCA loans enable businesses struggling with cash flow problems to access upfront working capital advances in exchange for a percentage of future receivables (i.e., sales).  MCA loans are considered a last-resort option for businesses due to their onerous interest rates and daily or weekly loan payments that are

---

[64] The MCA Agreements are attached in Exhibit P to the O'Malley Decl.

1601824860.1

automatically swept (debited by ACH) from the borrower's bank account. Reliance on severe forms of financing to maintain cash flow is consistent with the existence of a Ponzi scheme. Table 24 below indicates that nine of the thirteen WS Entities had daily ACH sweeps.

123.125.    During the period July 2022 through May 2024, bank records show that the WS Entities obtained MCA loans in the aggregate amount of over $11.5 million from thirteen different MCA lenders. During this period, approximately $10.6 million was repaid to these lending companies, of which many required daily repayments.

**Table 24. - Payments to MCA Companies**

| | Merchant Cash Advance Company | 2022 | 2023 | 2024 | Total | Payment Frequency | Payment Amount |
|---|---|---|---|---|---|---|---|
| 1 | Advantage Platform | $ 405,000 | $ - | $ - | $ 405,000 | *Weekly* | *$16,875* |
| 2 | Capybara Capital LLC | 421,875 | - | - | 421,875 | *Weekly* | *$16,875* |
| 3 | City Capital | 1,030,568 | 35,550 | - | 1,066,118 | *Daily* | *$11,711* |
| 4 | Fidi Capital | - | 1,080,312 | - | 1,080,312 | *Daily* | *$13,594* |
| 5 | Gold Capital LLC | - | - | 1,110,000 | 1,110,000 | *Daily* | *$30,000* |
| 6 | I Fund Experts LLC | 347,713 | - | - | 347,713 | *Daily* | *$3,748* |
| 7 | Infusion Capital | 450,272 | - | - | 450,272 | *Daily* | *$5,497* |
| 8 | Kalamata Capital Group | 151,250 | 87,500 | - | 238,750 | *Weekly* | *$6,250* |
| 9 | Last Chance Fund | 558,300 | - | - | 558,300 | *Daily* | *$5,520* |
| 10 | NFG Advance | - | 761,250 | - | 761,250 | *Daily* | *$9,063* |
| 11 | Quick Funding Group | 517,489 | - | - | 517,489 | *Daily* | *$8,771* |
| 12 | Riverside Capital | - | 3,490,521 | - | 3,490,521 | *Daily* | *$100,000* |
| 13 | Timeless Funding | - | - | 109,909 | 109,909 | *Daily* | *$18,318* |
| | **Total** | **$ 3,882,466** | **$ 5,455,133** | **$ 1,219,909** | **$ 10,557,509** | | |

**F.   Analysis of the Unrealistic Returns Required for Debtors to Make Their**

**Promised Payments**

124.126.    Investors were led to believe that they were purchasing revenue-generating water machines placed at locations throughout the U.S. Investors were often provided an inventory of water vending machines with serial numbers to identify their machines and their purported locations. Many Investors were told that Water Station would help them operate and manage the machines for a share of profits and that they would receive monthly distributions based on the performance of each machine.

1601824860.1

125.127.     Investment returns determined at the outset and based on the purchase price, rather than actual performance is indicative of a Ponzi scheme. The Investor payments are not based on real business activity or growth and give the Investors the false impression that the investment is performing well, thereby encouraging further investment. In actuality, the Investors are receiving a redistribution of funds received from new Investors.

126.128.     Based on my review of a select sample of Service and Management Agreements and Service Contract Addendums between Investors and WSM, Investors were offered fixed monthly payments equivalent to an annual return on investment ranging between 15% and 24%, as summarized in Table 25 below. WSM made monthly distributions to Investors for the purported monthly revenues generated by the water machines that promoted the façade of legitimate business operations.

127.129.     In reality, only a small fraction of water machines sold to Investors actually existed and very little revenue was generated from the water machines.

1601824860.1

**Table 25. - Investor Returns**

| Investor Name | Date of Service and Management Agreement | # of Water Stations | Price / Unit | Total Cost of Water Stations | Fixed Annual Return |
|---|---|---|---|---|---|
| H2OneO LLC | 3/16/2020 | 50 | $8,500 | $ 425,000 | 15% |
| Big Boy Tools LLC | 5/18/2020 | 350 | $8,500 | $ 2,975,000 | 16% |
| Indiana Water Technology LLC | 9/10/2020 | 236 | $8,500 | $ 2,006,000 | 15% |
| Ron Cole | 9/18/2020 | 280 | $8,500 | $ 2,380,000 | 12% |
| DosCocos Inc. | 9/22/2020 | 40 | $8,500 | $ 340,000 | 15% |
| Gary Young | 9/29/2020 | 118 | $8,500 | $ 1,003,000 | 12% |
| Teichmiller Freedom Holdings | 11/30/2020 | 34 | $8,500 | $ 289,000 | 12% |
| Richard Andreotta Jr. | 12/19/2020 | 33 | $8,500 | $ 280,500 | 12% |
| Francois Beauchemin | 12/26/2020 | 15 | $8,500 | $ 127,500 | 12% |
| CLI WST LLC | 5/12/2021 | 100 | $8,500 | $ 850,000 | 12% |
| TDMAZ Inc. | 5/21/2021 | 50 | $8,500 | $ 425,000 | 12% |
| BAM INV LLC | 7/14/2021 | 35 | $8,500 | $ 297,500 | 12% |
| FacTS Property Services | 12/14/2021 | 50 | $8,500 | $ 425,000 | 12% |
| Klokkenga Leasing LLC | 12/14/2021 | 40 | $8,500 | $ 340,000 | 12% |
| RCWSTECH1157 LLC | 12/24/2021 | 236 | $8,500 | $ 2,006,000 | 12% |
| Paul Talosig | 12/28/2021 | 75 | $8,500 | $ 637,500 | 12% |
| Rosewater Ventures | 12/28/2021 | 405 | $7,407 | $ 3,000,000 | 24% |
| Stillwater Ventures LLC | 12/28/2021 | 225 | $8,000 | $ 1,800,000 | 23% |
| Optionary LLC | 12/29/2021 | 35 | $8,500 | $ 297,500 | 14% |
| Klokkenga Leasing LLC | 1/6/2022 | 10 | $8,500 | $ 85,000 | 12% |
| Redwaters LLC | 3/21/2022 | 50 | $9,000 | $ 450,000 | 15% |
| Redwaters LLC | 5/20/2022 | 104 | $9,000 | $ 936,000 | 15% |
| 5161 LLC | 6/30/2022 | 588 | $8,500 | $ 4,998,000 | 16% |
| Chris & Stephanie Teichmiller | 11/24/2020 | 34 | $8,500 | $ 289,000 | 12% |

~~128.~~130.    In summary, the returns promised by Wear were patently unachievable because WSM never generated sufficient operating revenues to pay Investors, the majority of the water machines sold to Investors did not exist, and WS Entities relied on Investor funds and loan proceeds to pay its obligations. This is highly indicative of and consistent with a Ponzi scheme.

**G. Debtors' Failure to Use Funds as Promised**

~~129.~~131.    Based on my analysis of the bank records, QuickBooks, and other supporting documentation, the WS Entities used funds in a manner that was inconsistent with its contractual obligations to investors and the bond.

~~130.~~132.    I have identified real estate transactions, vending company acquisitions, and other transactions that are unrelated to the vending operations of Debtors. Debtors never disclosed

1601824860.1

to Investors, for example, that their funds would be used to pay themselves, acquire real estate or other vending companies.

~~131.~~133.     With respect to the funds raised from Investors, however, what is most alarming is that Debtors did not use Investor funds to build or acquire water machines to support the profitable enterprise Debtors claimed to operate.  For example, of the limited operating revenue generated by the WS Entities as a whole ($82.2 million), WSM generated only $22.9 million (see **Schedule A**), or 27.9% of total operating revenue during the period January 2018 through September 2024. As described above, Investors were paid $~~120.4~~127.4 million which is $~~97.5~~ 104.5 million greater than the actual cash generated by WSM. [65]

1. **Analysis of Real Estate Transactions**

~~132.~~134.     Based on the bank records, there were $25.3 million in cash disbursements from Creative's and WSM's bank accounts related to real estate transactions.  Approximately $9.9 million in cash disbursements were for properties purchased in the name of Ideal using funds from Creative and Refreshing.[66]  This analysis is presented on **Schedule G**.  These acquisitions do not appear to have any connection to the manufacturing or purchase of water machines.  For example, the real estate purchased includes vacant land, RV and boat storage, and residential real estate.[67]

2. **Analysis of Vending Company Acquisitions for Summit**

~~133.~~135.     Based on the bank records, there were $31.8 million in cash disbursements from Creative's and WSM's bank accounts related to acquisitions for Summit during the time period March 2018 through October 2022.  The transactions were primarily payments to law firms, title companies, individuals, and businesses.  These transactions were classified in Creative's and

---

[65] $120.4 million in Investor payments - $22.9 million in cash receipts in operating revenue for WSM = $97.5 million.
[66] See Final Settlement Statements are Exhibit D to the O'Malley Decl.
[67] See the Supplemental Declaration of Eric Camm In Support of First Day Motions, attached in Exhibit D to the O'Malley Decl.

1601824860.1

WSM's general ledger as "Summit Management Acquisition." This analysis is presented on **Schedule H**.

### 3. Analysis of Vending Company Acquisitions for Refreshing Texas

~~134.~~136.    Based on the bank records, there were approximately $4 million in cash disbursements from Creative's bank account related to acquisitions for Refreshing Texas during the period November 2018 through March 2021 . The transactions were primarily payments to the entities Golden Brew, NV Distribution Texas LLC, and Roberts Coffee and Vending. Other transactions include payments to vendors for vending machine products. These transactions were classified in the general ledger as "Refreshing Texas" in Creative's general ledger. These transactions are listed on **Schedule H**.

### 4. Analysis of KGBH Enterprises

~~135.~~137.    In April 2023, Wear acquired 75% of the shares of KGBH Enterprises dba Guardian Refresh for $1.1 million using cash in WSM's bank accounts. Guardian Refresh was a vending machine supplier that specialized in servicing office breakrooms. This transaction occurred around the time that the WS Entities stopped making monthly Investor payments. This analysis is presented on **Schedule H**.

### 5. Payments to Insiders

~~136.~~138.    As discussed above, there were net payments totaling over $14 million that benefited Wear, Wear's father, Sadek, and Chirico. These transactions are detailed on **Schedule E**.

## X.    <u>CONCLUSIONS</u>

~~137.~~139.    Based on my review of the documents and information produced in the matter, and analysis of the financial and accounting records, my conclusions are as follows:

1601824860.1

138.140.    Starting no later than March 1, 2018 through September 2024, the WS Entities, operated by Wear, started using new Investor funds to pay existing Investors and creditors.

139.141.    The WS Entities never generated sufficient operating cash flow to meet their obligations to their Investors and creditors.

140.142.    Investors were led to believe that they were buying into a guaranteed, low-effort, and risk-free investment opportunity.  In actuality, the majority of the water machines sold to Investors never existed.  Wear relied on new Investor funds and loan funds in order to meet the investment returns promised to Investors and to perpetuate the illusion of a legitimate business.

141.143.    The bank records show that the WS Entities used Investor funds to acquire real estate and vending companies for other entities controlled by Wear, instead of manufacturing or acquiring water stations.

142.144.    As the majority owner, Wear controlled and operated the WS Entities as a single, consolidated enterprise, evidenced by the extensive and undocumented commingling of funds and other assets among the WS Entities, intercompany transactions, and use of funds for purposes unrelated to authorized vending operations. The commingling of Investor funds, intercompany transfers, and deposits of cash receipts from operations are so entangled that it would be insurmountable to unwind.

143.145.    The WS Entities' accounting books and records maintained in QuickBooks contain discrepancies and are incomplete due to missing transaction data such as payee and payor names. This is a common technique used to hide fraudulent activities and to obscure information regarding the company's revenues, expenses, assets, and liabilities.

1601824860.1

144.146.    The bank records show that the Insiders received substantial unsupported payments.  Wear and entities controlled by him received over $6.6 6.4 million in net cash disbursements.  Chirico received over $6.2 million in net cash disbursements, including payoff of loans.  Sadek received over $1.4 $1.9 million in net cash disbursements.

## XI.    SUPPLEMENTATION

145.147.    I reserve the right to amend or supplement this report. I may use exhibits to summarize or exemplify my opinions (including exhibits I have not yet created) if called to testify at trial.


Dated: September 4, 2025September 4, 2025September 3, 2025


_____

Becky Yang O'Malley